## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| GLORIA NIEVES and EMILIO NIEVES, | : | CIVIL ACTION |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | Number: 06-123 (GMS) |
| ACME MARKETS, INC., a Delaware corporation | : | |
| d/b/a Acme Markets No. 7816, ACME MARKETS, | : | JURY TRIAL DEMANDED |
| INC., a Delaware Corporation d/b/a Acme Markets | : | |
| No. 7836, ACME MARKETS, INC., a Pennsylvania | : | |
| Corporation, d/b/a Acme Markets No. 7816, | : | |
| ACME MARKETS, INC., a Pennsylvania | : | |
| Corporation d/b/a Acme Markets No. 7836, | : | |
| | : | |
| Defendants. | : | |

## DEFENDANT ACME MARKETS, INC.'S OPENING BRIEF IN SUPPORT OF ITS
## MOTION FOR SUMMARY JUDGMENT

JENNIFER M. BECNEL-GUZZO (No. 4492)
BUCHANAN INGERSOLL & ROONEY PC
The Brandywine Building
1000 West Street, Suite 1410
Wilmington, DE 19801
(302) 552-4200
(302) 552-4295 (facsimile)
jennifer.becnelguzzo@bipc.com

and

ELIZABETH A. MALLOY *(admitted pro hac vice)*
BUCHANAN INGERSOLL & ROONEY PC
1835 Market Street
14th Floor
Philadelphia, PA 19103
(215) 665-8700

Attorneys for Defendant,
Acme Markets, Inc.

Dated: February 1, 2007

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................. iii

I.  STATEMENT OF UNDISPUTED FACTS ......................................................... 3

    A.  Introduction ................................................................................................. 3

    B.  Acme's Store Work Rules, Harassment Policy, and EEO Policy ............................ 3

    C.  Plaintiff's Employment with Acme ................................................................ 4

    D.  Ms. Nieves Violates Store Work Rules ......................................................... 5

    E.  Acme Suspends and Transfers Ms. Nieves For Violation of Store Work Rules ......................................................................................................... 5

    F.  Ms. Nieves' Husband Encourages Her to File Discrimination Charge ................... 6

        1.  Alleged Incidents of Harassment Potentially on Basis of National Origin ............................................................................................. 7

        2.  Alleged Incidents of Harassment Unrelated to Her National Origin ........... 8

    G.  Ms. Nieves' Enjoys Her Experience at the Smyrna Store ................................... 9

    H.  Ms. Nieves Resigns from Acme Ten Full Months After Transfer and Moves to Miami to Be with Family ............................................................... 10

    I.  Ms. Nieves Forgets About Her Charge While in Miami ..................................... 11

    J.  Ms. Nieves Returns to Delaware and Files this Lawsuit ..................................... 11

II.  ARGUMENT ................................................................................................. 11

    A.  Summary Judgment Standard ..................................................................... 11

    B.  Ms. Nieves Cannot Prove a Hostile Environment ......................................... 12

        1.  Any alleged harassment was not severe or pervasive. ........................... 12

        2.  The discrimination laws are not meant to protect employees from every work place frustration. ............................................................. 17

    C.  Ms. Nieves Cannot Meet Her Burden Of Proving Constructive Discharge .......... 18

        1.  A reasonable person in Ms. Nieves' situation would not have felt compelled to resign. ......................................................................... 18

        2.  Ms. Nieves did not complain about discrimination at the Smyrna Store. ............................................................................................. 20

        3.  Ms. Nieves did not exhaust her administrative remedies. ......................... 21

    D.  Ms. Nieves Cannot Meet Her Burden of Proving Retaliation Because the Action was Taken in Response to a Co-worker's Complaint and Acme Had a Legitimate, Non-discriminatory Reason for Suspending and Transferring Her to the Smyrna Store. .............................................................. 22

    E.  Ms. Nieves' Claim for Breach of Covenant of Good Faith and Fair Dealing Fails Because It Is Barred by Amended Statute. ............................................... 25

F.    Ms. Nieves' Cannot Meet Her Burden of Proving Intentional Infliction of Emotional Distress ("IIED")...................................................................................26

    1.    The IIED claim is barred by the Exclusivity Provision of the Workers' Compensation Act. ....................................................26

    2.    Acme's conduct does not rise to the level of extreme and outrageous conduct. ..................................................................28

G.    Even if Properly Pled, Ms. Nieves Cannot Prove Disparate Treatment Because She Cannot Prove That Any Similarly Situated Employee Was Treated Differently and That Acme's Reasons Were a Pretext for Discrimination.............................................................................................29

H.    Mr. Nieves' Loss of Consortium Claim Should be Dismissed Because It Cannot Survive as an Independent Cause of Action...............................................30

III.  CONCLUSION......................................................................................................... 31

## TABLE OF AUTHORITIES

**Cases**

Abraham v. Raso, 183 F.3d 279 (3d Cir. 1999).............................................................. 12

Abramson v. William Patterson College of New Jersey, 260 F.3d 265 (3d Cir. 2001)............... 24

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)..................................................... 12

Andrews v. City of Philadelphia, 895 F.2d 1469 (3d Cir. 1990)............................... 14, 16

Angeloni v. Diocese of Scranton, 135 Fed. Appx. 510 (3d Cir. 2005)................................ 19, 20

Anjelino v. The New York Times Co., 200 F.3d 73 (3d Cir. 2000)....................................... 21

Antol v. Perry, 82 F.3d 1291 (3d Cir. 1996)................................................................... 21

Arasteh v. MBNA Bank, 146 F. Supp. 2d 476 (D. Del. 2001)............................................ 12

Battista v. Chrysler Corp., 454 A.2d 286 (Del. Super. 1982)........................................... 27

Brodsky v. Hercules Incorporated, 966 F. Supp 1337 (D. Del. 1997)................................. 27

Burlington Northern & Santa Fe R.R. Co., 126 S. Ct. 2405 (2006)............................... 22, 23

Cloverland-Green Spring Dairies, Inc. v. Pennsylvania Milk Mktg. Bd., 298 F.3d 201 (3d Cir.
      2002) ............................................................................................................ 12

Clowes v. Allegheny Valley Hospital, 991 F.2d 1159, (3d Cir. 1993)................................. 20

Cole v. Delaware Technical and Community College, 459 F. Supp. 2d 296 (D. Del.
      2006) ......................................................................................... 13, 17, 25, 26

Conneen v. MBNA Am. Bank, N.A., 334 F.3d 318 (3d Cir. 2003)...................................... 25

Cuffee v. Dover Wipes Co., 334 F. Supp. 2d 565 (D. Del. 2004)...................................... 20

Duffy v. Paper Magic Group, Inc., 265 F.3d 163 (3d Cir. 2001)................................... 18, 20

E.E.O.C. v. Avecia, Inc., 151 Fed. Appx. 162 (3d Cir. 2005)........................................ 26, 27

Everett v. Hospital Billing and Collection Service, Ltd., 2005 WL 751940 (D. Del.)............... 27

Faragher v. City of Boca Raton, 524 U.S. 775 (1986)............................................... 13, 14

Ferguson v. E.I. duPont de Nemours and Co., 520 F. Supp. 1172 (D. Del. 1983)................... 23

Fuentes v. Perksie, 32 F.3d 759 (3d Cir. 1994).............................................................. 24

Gharzouzi v. Northwestern Human Servs. of Pennsylvania, 225 F. Supp. 2d 514 (M.D. Pa.
      2002) ............................................................................................................ 15

Gray v. York Newspapers, Inc., 957 F.2d 1070 (3d Cir. 1992)......................................... 18

Harris v. Forklift Sys., Inc., 510 U.S. 17 (1993)...................................................... 13, 14

Howze v. Jones & Laughlin Steel Corp., 750 F.2d 1208 (3d Cir. 1984)............................... 22

Hunt v. Cromartie, 526 U.S. 541 (1999)....................................................................... 11

Jensen v. Potter, 435 F.3d 444 (3d Cir. 2006) ....................................................... 12, 17

Jones v. Elliott, 551 A.2d 62 (Del. 1988)..................................................................... 30

Jones v. School District of Philadelphia, 198 F.3d 403 (3d Cir. 1999) .............................. 24

Kautz v. Met-Pro Corporation, 412 F.3d 463 (3d Cir. 2005) ........................................... 24

Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101 (3d Cir. 1997)................................... 24

Keown v. Richford Holdings, 2002 WL 1340311 (E.D. Pa.)....................................... 15, 16

Kofron v. Amoco Chemicals Corp., 441 A.2d 226 (Del. 1982)......................................... 27

Konstantopoulos v. Westvaco, 690 A.2d 936 (Del. 1996) ............................................... 27

Krouse v. Am. Sterilizer Co., 126 F.3d 494 (3d Cir. 1997)............................................... 24

Lee v. Minner, 458 F.3d 194 (3d Cir. 2006).................................................................. 11

Limehouse v. Steak & Ale Restaurant Corp., 2004 WL 304339 (Del. Super.).......................... 27

Lord v. Souder, 748 A.2d 393 (Del. 2000)................................................................... 25

Matczak v. Frankford Candy and Chocolate Co., 136 F.3d 933 (3d Cir. 1997)....................... 28

McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) ............................................... 24

Morgan v. Secretary of Health and Human Services, 2002 WL 732091 (D. Del.) ................ 11, 12
Ocasio v. Lehigh Valley Family Health Center, 92 Fed. Appx. 876 (3d Cir. 2004) .............. 13, 14
Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75 (1998) ............................................. 13, 16
Paris v. Christiana Care Visiting Nurse, 197 F. Supp. 2d 111 (D. Del. 2002) ................. 13, 15, 17
Patel v. Cigna Corp., 2005 WL 1656930 (D.N.J.) ................................................................... 15
Petrocelli v. DaimlerChrysler Corp., 2006 WL 733567 (D. Del.) ............................................. 13
Petrocelli v. Daniel Woodhead Co., 993 F.2d 27 (3d Cir. 1993) .............................................. 30
Phillips v. DaimlerChrysler., 2003 WL 22939481 (D. Del) ...................................................... 23
Rafferty v. Hartman Walsh Painting, Co., 760 A.2d 157 (Del. 2000) ....................................... 27
Richards v. The City of Wilmington, 2004 WL 609324 (D. Del.) ............................................ 27
Saldana v. Kmart Corp., 260 F.3d 228 (3d Cir. 2001) ............................................................. 12
Sherrod v. Philadelphia Gas Works, 57 Fed. Appx. 68 (3d Cir. 2003) .................................... 14
Shramban v. Aetna, 262 F. Supp. 2d 531 (E.D. Pa. 2003) ................................................. 14, 15
Spencer v. Wal-Mart Stores, Inc., 469 F.3d 311 (3d Cir. 2006) ............................................... 19
Tunis v. City of Newark, 184 Fed. Appx. 140 (3d Cir. 2006) .................................................. 18
Valdes v. Union Bd. of Education, 186 Fed. Appx. 319 (3d Cir. 2006) .................................... 23
Veneziano v. Long Island Pipe Fabrication & Supply, 79 Fed. Appx. 506 (3d Cir. 2003) .......... 28
Wagner v. Berwick Industries, 122 Fed. Appx. 570 (3d Cir. 2004) .......................................... 23
Waiters v. J.L.G. Parsons II, 729 F.2d 233 (3d Cir. 1984) ..................................................... 21
Washington, Jr., v. Autozoners, Inc., 452 F. Supp. 2d 546 (D. Del. 2006) ........................... 12, 18
Woodson v. Scott Paper Co., 109 F.3d 913 (3d Cir. 1997) ...................................................... 22
Yatzus v. Appoquinimink School District, 458 F. Supp. 2d 235 (D. Del. 2006) ........................ 26

**Statutes**

42 U.S.C. §1981 ................................................................................................................ passim
19 *Del. C.* § 712 ..................................................................................................................... 26
19 *Del. C.* §2304 .................................................................................................................... 27

## PROCEDURAL HISTORY

On or about February 28, 2006, Plaintiffs Gloria Nieves and Emilio Nieves filed a seven-count Complaint against Defendant Acme Markets, Inc. Ms. Nieves alleges a hostile environment on the basis of her national origin and resulting constructive discharge in violation of Title VII and 42 U.S.C. § 1981 (Count I) and Delaware's Discrimination in Employment Act (Count III), and retaliation in violation of Title VII and 42 U.S.C. § 1981 (Count II) and Delaware's Discrimination in Employment Act (Count IV). Ms. Nieves also claims that Acme wrongfully terminated her employment in violation of the Covenant of Good Faith and Fair Dealing (Count V), and that that Acme's actions amounted to an unlawful and intentional infliction of emotional distress (Count VI). Plaintiff Emilio Nieves, Ms. Nieves' husband, alleges loss of consortium (Count VII). Pursuant to FED. R. CIV. P. 56, Defendant Acme Markets, Inc. now moves for summary judgment on all of Plaintiffs' claims as a matter of law.

## SUMMARY OF ARGUMENT

Ms. Nieves was employed by Acme as a Deli clerk. She claims she was subjected to sporadic insensitive comments by co-workers. She was suspended for one week and transferred laterally in March 2004 to a different store after a co-worker complained that Ms. Nieves threw water and ham at her, and tried to swipe her off her feet with a mop handle. Ms. Nieves left Acme voluntarily ten months after the transfer. She moved to Miami to live with relatives, and worked there for seven months until she decided to return to her husband in Delaware.

This Court should grant Defendant's Motion for Summary Judgment on Ms. Nieves' claims for the following reasons:

        1.      There are no disputed issues of fact.

2.    Ms. Nieves cannot meet her burden of proving the elements of her claim for hostile work environment in violation of Title VII, 42 U.S.C. §1981 and Delaware's Discrimination In Employment Act.  The conduct by her co-workers about which she complains was neither pervasive nor severe enough to rise to the level of an actionable hostile environment.

3.    Ms. Nieves cannot meet her burden of proving constructive discharge in violation of Title VII, 42 U.S.C. §1981 and Delaware's Discrimination In Employment Act.

4.    Plaintiff Gloria Nieves' claim of retaliation under Title VII, §1981, and the Delaware Discrimination Act fails as a matter of law because Ms. Nieves cannot prove a causal link between the alleged protected activity and adverse action, as required for her prima facie case.  Additionally, she cannot prove that Acme's legitimate, non-discriminatory reason for suspending and transferring her was a pretext for retaliation.

5.    Ms. Nieves' claim for "retaliatory constructive discharge" under Title VII and Delaware statute is barred because she did not exhaust her administrative remedies and fails in all respects because she cannot meet her burden of proving constructive discharge.

6.    Ms. Nieves claim for breach of the covenant of good faith and fair dealing is barred because the Delaware Discrimination Act provides the sole remedy for employment discrimination claims to the exclusion of all other remedies;

7.    Ms. Nieves' claim of disparate treatment, if any, is barred because she cannot establish that similarly situated individuals were treated more favorably.

8.    Ms. Nieves intentional infliction of emotional distress claim is barred by the Delaware Workers Compensation Act and fails because she cannot prove that any of Acme's conduct rose to the level of extreme and outrageous to go beyond all possible bounds of decency;

2

9.    Plaintiff Emilio Nieves' claim of loss of consortium fails as a matter of law because such a claim cannot stand independent of Ms. Nieves' claim of intentional infliction of emotional distress and breach of the covenant of good faith and fair dealing.

The record is woefully short of any illegal conduct by Acme, and the company's summary judgment motion should be granted.

# I.    STATEMENT OF UNDISPUTED FACTS[1]

## A.    Introduction

Defendant Acme Markets, Inc. ("Defendant", "Acme" or the "Company") operates retail grocery stores in Delaware, Maryland, New Jersey and Pennsylvania.  Plaintiff Gloria Nieves ("Ms. Nieves") was represented by a Union, UFCW Local 27 ("Union").  G. Nieves Dep., Ex. A at 17.  Section 9.2 of the Collective Bargaining Agreement between UFCW Local 27 and Acme provides Acme with the right to discipline any employee for good and sufficient cause.  CBA, §9.2, Ex. B.

## B.    Acme's Store Work Rules, Harassment Policy, and EEO Policy

Acme also has numerous store policies and rules by which all employees are expected to abide.  Acme's Store Work Rules ("Store Rules") specifically state that "violations of accepted, well-known, common sense rules of good conduct, as well as violations of written rules, will not be tolerated."  Store Rules, Ex. C.  In addition, the section entitled <u>Personal Conduct</u> specifically states:

> [c]onduct such as … causing or contributing to a disruption in the work place, … interfering with another associate in regards to any of his/her work or employment, any derogatory act or statement to or about another associate, … or any other inappropriate conduct will not be tolerated, and will subject you to disciplinary action up to and including discharge.

---

[1] Plaintiffs' version of the facts are presented as true only for the purposes of this Summary Judgment Motion.

Id. at p.3.

Likewise, Acme's Sexual and Workplace Harassment Policy ("Harassment Policy")
provides a procedure through which employees are to address claims of harassment or other
discriminatory treatment, requiring employees to promptly report any such incident to their store
director or direct supervisor, Human Resources or the EEO/Diversity Department.  Harassment
Policy, Ex. D.  In adhering to its policy that unlawful harassment will not be tolerated, Acme
assures that "[e]very complaint of harassment will be investigated thoroughly and promptly," and
"if an associate is found to have engaged in prohibited harassment or retaliation, he or she will be
disciplined up to and including discharge." Id.  Ms. Nieves received, read, and understood both
the Store Rules and the Harassment Policy.  Acknowledgement forms, Ex. E; G. Nieves Dep.,
Ex. A at 18-20.  Additionally, Ms. Nieves attended training on the Harassment Policy, viewed a
video and completed a Discrimination Quiz during Orientation.  Acme Discrimination Quiz,
Ex. F; G. Nieves Dep., Ex. A at 22-23.

Further, Acme's EEO policy specifically prohibits discrimination on the basis of race or
national origin in any aspect of employment, and also provides a reporting mechanism for
employees to follow if they believe they are subject to discrimination.  EEO Policy, Ex. G.
Ms. Nieves was familiar with the policy.  G. Nieves Dep., Ex. A at 24-25.

### C.    Plaintiff's Employment with Acme

Ms. Nieves began her employment with the Company in November 2001 as a part-time
courtesy clerk at Acme's Middletown, Delaware store ("Middletown store").[2]  G. Nieves Dep.,
Ex. A at 16-17.  She transitioned into full-time employment at the Middletown store two years
later, in November 2003, when she became the deli clerk in charge of the deli at night.  Id. at 17,

---

[2] There were two relevant stores in Middletown, Delaware. Ms. Nieves began her employment at a store in
Middletown in November 2001, which closed down when a new store in Middletown opened. Ms. Nieves
transferred to the new store shortly after it opened. G. Nieves Dep., Ex. A at 27-28.

30-31; G. Nieves Service History, Ex. H. Stephen Briley was the Store Director,[3] B.J.

Appenzeller and Jeannie Black were the Assistant Store Directors. G. Nieves Dep., Ex. A at

28-30. Denise Dean held the position of Deli Manager, although Ms. Dean was a member of the

Union like Ms. Nieves, and thus she was not a member of management. Id. at 32. Ms. Nieves

worked the night shift, generally working from 2:45 P.M. until 11:45 P.M. Id. at 48.

### D.    Ms. Nieves Violates Store Work Rules

Ms. Nieves was friendly with co-workers at the Middletown store, including Joyce

Alphin ("Ms. Alphin"). In fact, Ms. Nieves describes her personal relationship with Ms. Alphin

as "close." Id. However, early in March 2004, Ms. Alphin complained to Ms. Dean that while

she and Ms. Nieves were closing the deli the prior night, Ms. Nieves picked a bucket of water up

and threw it at her, and then threw a piece of ham. Alphin Dep., Ex. J at 8-9, 18-19. That same

week, on Saturday morning, Ms. Alphin complained again to Ms. Dean that Ms. Nieves tried to

knock her off her feet by swiping a mop under her feet during their shift the night before. Id. at

21-22. Ms. Nieves denies that she engaged in this conduct, but it is undisputed that Ms. Alphin

lodged the two complaints. Ms. Nieves does not contend that anything Ms. Alphin did was

discriminatory. G. Nieves Dep., Ex. A at 48.

### E.    Acme Suspends and Transfers Ms. Nieves For Violation of Store Work Rules

Ms. Dean reported these incidents to Mr. Briley. Dean Dep., Ex. K at 19. Because such

conduct by Ms. Nieves was in clear violation of Store Rules, Mr. Briley suspended her on

March 6, 2004 pending investigation. G. Nieves Dep., Ex. A at 47. Mr. Briley then spoke with

Ms. Alphin, who confirmed both incidents involving Ms. Nieves. Alphin Dep., Ex. J at 23;

Briley Dep., Ex. I at 16-17. Mr. Briley also met with Mr. Henry Fajkowski, the Union

Representative. Briley Dep., Ex. I at 18. Mr. Briley and the Union agreed that Ms. Nieves

---

[3] Mr. Briley has since made a lateral move to the Ridley, Pennsylvania store. Briley Dep., Ex. I at 3.

would be suspended for one week, which would be limited to the week she already spent away from work, and that she would be transferred to the Smyrna, Delaware Acme ("Smyrna store") beginning the following Monday. Id. at 18, 27. Tom Holden, the Acting District Director, approved the transfer. Emails Discussing Incident, Ex. L. Stephen Moyer, Manager of Associate Relations of Acme's Eastern Division, also agreed with the transfer decision. Id.; Moyer Dep., Ex. M at 16-17. Mr. Briley met with Ms. Nieves to discuss the decision. G. Nieves Dep., Ex. A at 52-53. Acme issued a final warning letter to Ms. Nieves regarding her behavior:[4]

> You were suspended on March 6, 2004 for an incident with a co-worker on March 2, 2004 and a repeat incident on March 6, 2004 for inappropriate personal conduct that contributed to a disruption in the workplace .... [Y]our time missed, March 6, 2004 through March 13, 2004 shall serve as a disciplinary suspension, without pay. In addition, you were transferred to Store 7836.

Final Warning Letter, Ex. N; G. Nieves Dep., Ex. A at 55; Briley Dep., Ex. I at 18. Ms. Nieves started working at the Smyrna store on March 14.

### F.    Ms. Nieves' Husband Encourages Her to File Discrimination Charge

Plaintiff Emilio Nieves ("Mr. Nieves") encouraged his wife to file a discrimination charge with the Delaware Department of Labor ("DDOL"), which she did on April 2, 2004. G. Nieves Dep., Ex. A at 101-102. Her DDOL Charge alleges that she was subjected to a hostile work environment based on her national origin by co-workers, and that her transfer to the Smyrna Store was retaliatory because she complained to management. Charge, Ex. O. Although all Acme witnesses testified that Ms. Nieves never complained about discrimination and harassment, Acme must accept for purposes of this Motion Ms. Nieves' testimony that she did

---

[4]Acme's progressive disciplinary system does not apply to personal conduct offenses, so there was no requirement that Ms. Nieves first be issued a warning about such disruptive conduct. Moyer Dep., Ex. M at 17. Indeed, she could have been fired for this one occurrence.

6

so. Accordingly, set forth below is Ms. Nieves' position on the conduct which she asserts in this lawsuit:

### 1. Alleged Incidents of Harassment Potentially on Basis of National Origin

In the Charge, Ms. Nieves alleged that while she was working at the Middletown store, her co-workers made derogatory comments to her about her ability to speak English. Id. At her deposition, Ms. Nieves was asked to identify all incidents on this point she believed were harassing in nature. In response, she testified that on <u>one occasion</u>, her co-worker, Nancy Colbourn allegedly asked her to "speak English." G. Nieves Dep., Ex. A at 33-34.

> Q:    Did that ever happen again?
> A:    No.
> Q:    So Nancy one day when you were interacting with a customer told you to speak English?
> A:    Yes.
> Q:    And it only happened on that one day?
> A:    One day.

Id. at 34.

She also testified that her co-worker, Michele Warren, allegedly questioned why she received a full-time job when she could not speak English well, asked Ms. Nieves whether she had a Green Card, and asked her to speak English. Id. at 35-36, 44, 58. Additionally, while conversing with her co-workers about how her husband's winter hat resembled an Eskimo hat, her co-worker, Christina Shaw, allegedly asked her if she knew where Alaska was located, stating that she thought South American people do not have an education. Id. at 39-40. Ms. Nieves also testified in her deposition that a couple of her co-workers mocked her husband when he walked by them by saying "the plane, the plane," referencing a line from the movie entitled Fantasy Island. Id. at 37-38. According to Ms. Nieves, the character's role in the movie was a short Mexican man. Id. Finally, during a casual conversation amongst co-workers about

drugs, her co-workers suggested that Ms. Nieves would know better about drugs since she was from Colombia. Id. at 64-65. Ms. Nieves alleges that she complained to management about her co-workers' behavior and that management took no action. Id. at 35.

### 2.    Alleged Incidents of Harassment Unrelated to Her National Origin

Ms. Nieves also identifies other incidents she believed to be discriminatory. Even accepting as true Plaintiff's version of these events, these incidents had nothing to do with Ms. Nieves' national origin. She testified that she and several other co-workers were chastised for eating on the night shift, Id. at 88, that her co-worker Michele Warren yelled at her, "I don't have time, you are not my boss" when she requested that she bring over a new ham, Id. at 83, and that she had a difficult time getting a Sunday off because someone else asked for it first, even though Ms. Nieves did get off the requested day, Id. at 41-42. Ms. Nieves additionally testified that her co-worker, Nancy Colbourn, told her that she asked stupid questions all the time when she asked whether she or Ms. Colbourn should take a break, Id. at 43, and that when she returned from leave due to a minor heart attack, it was rumored that she was faking her illness, Id. at 48-49. Finally, Ms. Nieves testified that she requested two to three weeks off in December to visit her sick mother, but Ms. Dean denied it because it was a very busy time of year. Id. at 98-99. However, Ms. Nieves agreed that December was a very busy time at a food store, and she could not identify anyone who received a two to three week vacation in December. Id. at 100.[5]

---

[5] Ms. Nieves also alleged in her charge that after her transfer to the Smyrna store, the assistant store manager of the Middletown store threatened to have someone harm her husband if he entered the store. Id. at 107-08. Ms. Nieves heard about this from a former co-worker. Id. Ms. Appenzeller, the Assistant Manager at issue, explained she was simply responding to concerns of the associates, and only told them that if necessary, Acme would call the police. Appenzeller Dep., Ex. P at 28-29. She testified that the associates told her that they were afraid of Mr. Nieves coming into the store because of the stories Ms. Nieves told them. Id. Ms. Alphin testified that she and her co-workers saw Mr. Nieves unnecessarily linger around the deli area or saw him parked outside the Acme frequently after Ms. Nieves' suspension and transfer, and that Ms. Appenzeller responded that she would call the police if necessary. Alphin Dep., Ex. J at 29-32. In any event, this alleged incident was not directed at Ms. Nieves, did not effect the terms and conditions of her employment, and was not on account of her national origin.

8

### G.    Ms. Nieves' Enjoys Her Experience at the Smyrna Store

As noted above, on March 14, 2004, Ms. Nieves began working at the Smyrna store in the same position and with the same working hours she had at Middletown. Id. at 61. She enjoyed working at the Smyrna store, and testified that she got along well with everyone there. Id. at 60. Penny Armstrong was the Deli Manager at Smyrna, and Ms. Nieves testified "I love her to death." Id. She received a regularly scheduled pay raise. Id. at 63. The only problem she had at the Smyrna store, according to Ms. Nieves, was that the seafood manager "smacked" her on the mouth when Ms. Nieves said "F _ _ k." Id. at 61. This allegedly occurred on Labor Day weekend, on or around September 6, 2004. Id. Ms. Nieves does not believe this incident was related to any act of discrimination:

Q:    Was there any conduct at Smyrna that you felt was discrimination against you?
A:    No.
Q:    Was there any conduct at Smyrna that you felt was harassment against you?
A:    No.

Id. at 73.

Ms. Nieves testified that she told Frank Murphy, the store director of the Smyrna store, about the incident, and that he tried to address the issue. Id. at 62. She later talked to Ms. Armstrong about the incident, and at the time, Ms. Armstrong was her ex-boss. Id. at 79. In neither conversation did she claim that that she believed that her seafood manager was discriminating against her. Ms. Nieves also admits that she did not have a conversation with Ms. Armstrong until December, three months after the alleged incident occurred, and according to Ms. Nieves, when she determined that she had enough money to leave for Miami. Id. at 80. Ms. Nieves testified that she was saving money for at least four months to drive to Miami. Id. at 78.

**H.    Ms. Nieves Resigns from Acme Ten Full Months After Transfer and Moves to Miami to Be with Family**

On January 15, 2005, ten months after her transfer to the Smyrna store, Ms. Nieves resigned from her employment at Acme. Id. at 76. The day following her resignation, she moved to Miami, Florida, an entirely different state in a different corridor of the United States, and stayed with her aunt and uncle. Id. at 8. Ms. Nieves did not have any idea how long she intended to stay. Id. at 9. She looked for work at food and shopping stores within two weeks of arriving in Miami. Id. She chose to work at a nail salon close to her aunt and uncle's house. Id. at 10-11.

Ms. Nieves admits that she was having marital problems at the time, although she described them as "like every marriage." Id. at 78-79. In response to the question "Did problems with your husband or your marriage have any part at all in your decision to move to Miami, she answered: "I think sometimes yes, sometimes no. But everything was together. Everything was together." Id. at 79. Importantly, when asked during her deposition why she waited so long to leave her employment at Acme, she explained that she was saving enough money to drive to Miami with her car. Id. at 78. Mr. Nieves did not visit Ms. Nieves the entire seven months she was gone and only spoke with her once or twice a month. E. Nieves Dep., Ex. Q at 30. In fact, he testified that he sought advice from a divorce lawyer while his wife was gone, but did not follow through because the lawyer was too expensive. Id. at 49-50. Ms. Nieves and her husband filed separate tax returns for the year 2004. G. Nieves Dep., Ex. A at 145-147; E. Nieves Dep., Ex. Q, at 42-43.

Ms. Nieves admitted that in deciding to return to Delaware, her aunt advised her not to leave her husband. G. Nieves Dep., Ex A at 135. "But she told me to go back, your husband,

10

don't leave your husband. We don't talk about Acme; just my relation with my husband. That's all." Id.

### I.    Ms. Nieves Forgets About Her Charge While in Miami

Ms. Nieves admits that during her time in Miami, she forgot about the Charge she filed with the DDOL, and did not communicate with the Department of Labor. Id. at 114-117. As a matter of fact, the DDOL did not even know she moved. Id. at 114-115. As a result, Ms Nieves did not ask about or see any letters from the Department of Labor to her for the entire seven month period she was in Miami. Id. at 115-117.

### J.    Ms. Nieves Returns to Delaware and Files this Lawsuit

Ms. Nieves returned to Delaware in August 2005. Id. at 116, 123. When she returned, Ms. Nieves had no difficulty finding employment in her neighborhood. She promptly secured a job at the local Wawa, in Middletown, Delaware, which offered her a job within a day after she submitted her application. Id. at 123-124. She and her husband filed this lawsuit on February 28, 2006.

## II.    ARGUMENT

### A.    Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure authorizes the entry of summary judgment where the pleadings and supporting materials demonstrate that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(C); Hunt v. Cromartie, 526 U.S. 541, 549 (1999); Lee v. Minner, 458 F.3d 194, 197 (3d Cir. 2006). The mere existence of *some* factual dispute is not enough to defeat a Motion for Summary Judgment; the factual dispute must be both genuine and material. Morgan v. Secretary of Health and Human Services, No. CIV.A. 01-244-MPT, 2002 WL 732091, at *4 (D. Del.

2002) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)).[6] The Third Circuit holds that "[a] factual dispute is material if it bear[s] on an essential element of the Plaintiff's claim" and "is genuine if a reasonable jury could find in favor of the non-moving party." Cloverland-Green Spring Dairies, Inc. v. Pennsylvania Milk Mktg. Bd., 298 F.3d 201 (3d Cir. 2002)(quoting Abraham v. Raso, 183 F.3d 279, 287 (3d Cir. 1999)). Thus, to survive a motion for summary judgment, the party contesting the motion must demonstrate that there exists "a dispute over facts that might affect the outcome of the suit." Morgan, 2002 WL 732091, at *4, n.7. The non-moving party may not merely rely on "bare assertions, conclusory allegations or suspicions," but must set forth specific evidence showing there is a genuine issue for trial. Saldana v. Kmart Corp., 260 F.3d 228, 231 (3d Cir. 2001).

Because there are no genuinely disputed material facts that would preclude entry of summary judgment in favor of Acme, each of the counts of the Complaint should be dismissed and judgment entered for Acme as a matter of law.

### B.    Ms. Nieves Cannot Prove a Hostile Environment

#### 1.    Any alleged harassment was not severe or pervasive.

To prove a hostile environment claim under Title VII, Ms. Nieves must prove: (1) that she suffered intentional discrimination because of her race; (2) that the discrimination was severe or pervasive; (3) that the discrimination detrimentally affected her; (4) that the discrimination would have detrimentally affected a reasonable person of the same race as the plaintiff, in like position; and (5) a basis for respondent superior liability. Jensen v. Potter, 435 F.3d 444, 449 (3d Cir. 2006)(overturned on other grounds); Arasteh v. MBNA Bank, 146 F. Supp. 2d 476, 494 n.36 (D. Del. 2001); Washington, Jr., v. Autozoners, Inc., 452 F. Supp. 2d 546, 553 (D. Del. 2006). This same analysis is applied to the claims under Delaware's Discrimination in

---

[6] All decisions which are not reported in official reporters are attached in alphabetical order as Ex. R.

Employment Act and 42 U.S.C. §1981.  Petrocelli v. DaimlerChrysler Corp., No. Civ.A. 04-943-

KAJ, 2006 WL 733567, at *4 (D. Del. March 22, 2006)(citations omitted); Ocasio v. Lehigh

Valley Family Health Center, 92 Fed. Appx. 876, 879 n.3 (3d Cir. 2004)(citations omitted).

     Ms. Nieves' claim fails because she cannot meet her burden of proving that the alleged

harassment is "severe or pervasive."[7]  The United States Supreme Court explained that this

element requires a plaintiff to establish conduct so extreme and objectively offensive that it

amounts to a change in the conditions of employment.  See, e.g., Faragher v. City of Boca Raton,

524 U.S. 775, 786 (1986); Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998).

A plaintiff must prove that any actions by a defendant that allegedly affected the plaintiff's

psychological stability were severe or pervasive enough that a reasonable person would be

affected.  Harris v. Forklift Sys., Inc., 510 U.S. 17, 20 (1993).  "Conduct that is not severe or

pervasive enough to create an objectively hostile work environment--an environment that a

reasonable person would find hostile or abusive--is beyond Title VII's purview."  Id.

     In determining whether an environment is sufficiently hostile, a court must consider a

totality of the circumstances, including (1) the frequency of the discriminatory conduct, (2) its

severity, (3) whether it is physically threatening or humiliating, rather than a mere offensive

utterance, (4) whether it unreasonably interferes with an employee's work performance, and

(5) the effect on the employee's psychological well-being.  Paris v. Christiana Care Visiting

Nurse, 197 F. Supp. 2d 111, 118 (D. Del. 2002); Cole v. Delaware Technical and Community

College, 459 F. Supp. 2d 296, 307 (D. Del. 2006) (citing Harris, 510 U.S. at 23).

     Ms. Nieves' hostile environment claim rests on a handful of insensitive comments made

by her co-workers.  A review of all the circumstances reveals that these comments were neither

pervasive nor severe enough to create a hostile environment as a matter of law.  Ms. Nieves has

---

[7] For the purposes of this Motion only, Acme does not dispute the other prongs of the prima facie test.

presented no evidence that these comments alone altered the conditions of her employment or unreasonably interfered with her work performance, as required by the standard established under Faragher and Harris. Harris, 510 U.S. at 23; Faragher, 524 U.S. at 786, 788. Further, courts have found allegations that were not only similar to, but far more severe than those presented here, do not constitute a hostile environment.

For example, in Ocasio, the plaintiff alleged a hostile environment because over the course of her 3-year employment, she was told by her employer once not to speak Spanish with a co-worker, the Hispanic employees were referred to as "Spanish people," a Colombian co-worker made a joke about the work ethic of Puerto Ricans, she received an email ridiculing a Spanish patient for the way the patient pronounced the word "gateway," and several co-workers told her and her Hispanic co-worker that they were in America and should speak English. 92 Fed. Appx. at 880. The Third Circuit Court of Appeals affirmed the lower court's grant of summary judgment for the employer on the hostile environment claim, finding that such incidents were not pervasive and regular because isolated incidents like the ones the plaintiff experienced over the course of three years do not constitute a hostile environment. Id. The court added that such an environment was not "severe enough to affect the psychological stability of a minority employee." Id. (citing Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 (3d Cir. 1990)); see also, Sherrod v. Philadelphia Gas Works, 57 Fed. Appx. 68, 75-77 (3d Cir. 2003)(finding allegations that managers made derogatory comments about African-American employees, such as "the way [African-American employees] were eating at their desks, it must be their culture," and if employees were not working, "I'm going to sit at their desks with a whip" were not severe or pervasive, even when considered with other facially neutral alleged mistreatment); Shramban v. Aetna, 262 F. Supp. 2d 531, 535-36 (E.D. Pa. 2003)(finding that

while supervisor's alleged improper personal comments about plaintiff's ethnicity and religion,

mimicking her accent and belittling behavior were offensive, disparaging, unprofessional and in

poor taste, such conduct and comments were neither severe or continuous enough to alter

conditions of employment or create hostile environment).

Also, in Patel v. Cigna Corp., the plaintiff, who is Indian and was employed as an

independent contractor for the employer for about three years (November 1998 - September

2001), alleged that co-workers began harassing him after the September 11, 2001 terrorist

attacks. No. Civ. 02-6141, 2005 WL 1656930, at *1 (D.N.J. July 12, 2005). He alleged that his

co-workers suggested that he "americanize" his name, repeatedly asked if he had attended pilot

training school and knew how to fly crop dusters, told him he looked like a "pipe bomber" and

made corresponding gestures, and told him that his food was "nasty" and smelled bad. Id. at

*10. On September 12, 2001, he shaved his goatee, and co-workers asked him whether he was

trying to hide anything. Id. The court held that these allegations, while offensive, were

insufficient to establish a hostile environment because they were not sufficiently severe and were

not physically threatening. Id. Additionally, the court found that five alleged comments during

the course of his contract was not pervasive. Id. Even six incidents over a four month period

was held by this Court not to be sufficiently frequent to be pervasive. Paris, 197 F. Supp. 2d at

118 (granting employer's motion for summary judgment on hostile environment where six

incidents over a four month period was not pervasive and the comments were not objectively

severe because they were not directed at plaintiff); see also, Gharzouzi v. Northwestern Human

Servs. of Pennsylvania, 225 F. Supp. 2d 514, 536 (M.D. Pa. 2002)(six incidents in a three month

period not sufficiently pervasive); Keown v. Richford Holdings, No. CIV.A. 01-2156, 2002

15

WL 1340311, at *4-5 (E.D. Pa. June 19, 2002)(eleven sexually explicit pamphlets sent to plaintiff over a four month period not sufficiently pervasive).

Much like the plaintiff in Ocasio and Patel, Ms. Nieves similarly identifies isolated incidents (in her case, all with her co-workers) over a period of approximately 2 ½ years before she was transferred to the Smyrna store. She alleged that her co-workers told her to speak English while at work[8], and allegedly made derogatory comments about her ability to speak English by questioning why she received a full-time job when she could not speak English well, asking her whether she had a Green Card, and commenting about her educational background. Ms. Nieves also alleged that her co-workers suggested that Ms. Nieves knew better about drugs because she was from Colombia. Finally, Ms. Nieves alleged that a couple of her co-workers mocked her husband when he walked by them by saying "the plane, the plane," referencing a line from the movie played by a Mexican character. Ms. Nieves' employer was not even involved in these alleged incidents.

Title VII and similar discrimination laws are not meant to be a "general civility code for the workplace." Oncale, 523 U.S. at 81. A plaintiff also cannot rely upon casual, isolated, or sporadic incidents to support a hostile environment claim. Andrews, 895 F.2d at 1482. Rather, a plaintiff must show that she was subjected to "repeated, if not persistent acts of harassment to establish that a hostile work environment existed under Title VII. Id. Similar to the plaintiffs in Ocasio and Patel, Ms. Nieves was subjected to a handful of isolated, verbal comments by her co-workers over the course of 2 ½ years, some of which referred to her husband. These comments are clearly not repeated and persistent acts of harassment. They were not physically threatening,

---

[8] It is undisputed that Acme management never told Ms. Nieves that she could not speak Spanish while at work. G. Nieves Dep., Ex. A at 45. Indeed, management would encourage a Spanish-speaking employee to converse with customers in Spanish if necessary. Appenzeller Dep., Ex. P at 11; Briley Dep., Ex. I at 21.

and they were not severe or pervasive. Ms. Nieves' facts clearly fall appreciably short of severe and pervasive conduct and do not meet the threshold required to create a hostile environment.

### 2. The discrimination laws are not meant to protect employees from every work place frustration.

The other incidents Ms. Nieves alleged were not even based on her national origin, and therefore, do not violate the discrimination laws. "Many may suffer severe or pervasive harassment at work, but if the reason for that harassment is one that is not proscribed by Title VII, it follows that Title VII provides no relief." Jensen, 435 F.3d at 449. For instance, the deli manager allegedly posted a note chastising employees for eating on the night shift; Ms. Nieves was not singled out, but three other non-Hispanic employees were also chastised. Ms. Nieves also alleged that her deli manager gave her a hard time about requesting a day off, but admits that she received her requested day off. Further, incidents such as a co-worker yelling at her when Ms. Nieves asked her to bring a new ham by saying "I don't have time, you are not my boss" or Ms. Nieves' coworker once stating that she asked stupid questions, are not the type of comments the discrimination laws are meant to protect. In fact, the Title VII standard is meant to protect employers from the "hypersensitive" employee. Paris, 197 F. Supp. 2d at 119 (citing Andrews, 895 F.2d at 1483). Commonplace and daily mundane incidents such as these, while not necessarily pleasant, are also not discriminatory in nature and could hardly be viewed as hostile. The discrimination cannot shield employees from every workplace frustration or disappointment. As discussed above, it is well established that Title VII and the other discrimination laws are not meant to provide cover for those employees who are merely "dissatisf[ied] with work assignments, [have] a feeling of being unfairly criticized, or [endure] difficult or unpleasant working conditions." Cole, 459 F. Supp. 2d at 309. Ms. Nieves simply cannot look to discrimination laws for protection where there is no occurrence of discrimination.

Additionally, according to her own testimony and admissions, the personal conflicts Ms. Nieves allegedly experienced at the Middletown store were unrelated to her national origin, but instead were related to her co-workers disliking her better-than-average work ethic.  G. Nieves Dep., Ex. A at 69-70.  Such conflicts are not proscribed and not protected by Title VII and the other discrimination laws.

Because the undisputed facts establish that Plaintiff's allegations fail to meet the main element necessary to prove a cognizable claim of harassment, summary judgment for Acme is warranted as a matter of law.

### C.    Ms. Nieves Cannot Meet Her Burden Of Proving Constructive Discharge

#### 1.    A reasonable person in Ms. Nieves' situation would not have felt compelled to resign.

Ms. Nieves cannot prove that she was constructively discharged due to harassment based on her national origin.  To prove constructive discharge, Ms. Nieves must prove the considerably high burden that Acme knowingly permitted conditions of discrimination in employment so unpleasant or difficult that a reasonable person subject to them would have believed he had no other option but to resign.  Gray v. York Newspapers, Inc., 957 F.2d 1070, 1079 (3d Cir. 1992); Duffy v. Paper Magic Group, Inc., 265 F.3d 163, 167 (3d Cir. 2001); Tunis v. City of Newark, 184 Fed. Appx. 140, 142 (3d Cir. 2006).  In other words, "mere stressful and frustrating conduct would not compel a reasonable person to resign."  Washington, Jr., 452 F. Supp. 2d at 553 (citing Duffy, 265 F.3d at 169).  Additionally, the burden of proving constructive discharge is more onerous than that of establishing a hostile environment.  "To prove constructive discharge, the plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile environment."  Spencer v. Wal-Mart Stores, Inc., 469 F.3d 311,

18

317 n.4 (3d Cir. 2006). As described above, the conduct about which she complains does not rise to a hostile environment let alone this high standard.

Furthermore, courts have held that a constructive discharge claim cannot be sustained where there has been a passage of time after the intolerable conduct has ceased to occur. In Angeloni v. Diocese of Scranton, a plaintiff who worked as a dining room server at a home for priests brought a sexual harassment and retaliation claim against her employer, claiming that one of the priests kept touching her inappropriately. 135 Fed. Appx. 510, 511 (3d Cir. 2005). In May or June 1997, she complained to her supervisor and she was instructed to stop serving his table, and the alleged touching stopped. On January 19, 1998, approximately seven months later, the plaintiff resigned, and brought suit against her former employer. The court held that because the conduct the plaintiff complained about ended months earlier, "there is little or nothing on the record that supports [the plaintiff's] argument that a reasonable person would consider her work conditions so intolerable that she would feel compelled to resign." Id. at 513.

Likewise, any alleged hostile environment Ms. Nieves alleged stopped when she was transferred to the Smyrna store, ten months before she voluntarily resigned from her employment to move to Miami, Florida. By her own admissions, Ms. Nieves did not encounter any discrimination or harassment during her ten month tenure at the Smyrna store. Nothing that occurred during the ten months Ms. Nieves worked in the Smyrna store was illegal, nothing that happened even remotely rose to the level of intolerable, and nothing that happened would compel an employee to resign. The only incident that occurred while she worked at the Smyrna store was that she alleged that her seafood manager smacked her on the mouth when Ms. Nieves said "F _ _ k." This incident allegedly occurred on Labor Day weekend, on or around September 6, 2004. Even Ms. Nieves does not believe this incident was related to any act of discrimination.

19

G. Nieves Dep., Ex. A at 73. As a matter of law, the claim fails because there was no discriminatory conduct and a reasonable person in Ms. Nieves' position would not conclude that a single event by a co-worker four months earlier would compel resignation.

Importantly, Ms. Nieves' own testimony regarding her timing for resigning reflects that she was not constructively discharged. As discussed supra, she explains that she was saving money for at least four months to drive to Miami with her car, undermining her claim that she was constructively discharged. If she truly had to leave because of intolerable conditions, she could have quit and secured other local employment. Similarly, the plaintiff in Duffy explained that she chose to resign when she did because her son recently graduated from college and she was financially able to leave. 265 F.3d at 171. The Third Circuit Court of Appeals held that this explanation undermined her constructive discharge claim. Id.

> ### 2.   Ms. Nieves did not complain about discrimination at the Smyrna Store.

Ms. Nieves also bears the burden of proving that the employer *knowingly* permitted intolerable conditions. Duffy, 265 F.3d at 167. In the absence of shockingly intolerable behavior, courts have held that a reasonable employee would explore alternative avenues thoroughly before concluding that resignation was the only solution. Clowes v. Allegheny Valley Hospital, 991 F.2d 1159, 1161-62 (3d Cir. 1993); Cuffee v. Dover Wipes Co., 334 F. Supp. 2d 565, 578 (D. Del. 2004). It is undisputed that Ms. Nieves did not complain about discrimination after she was transferred to the Smyrna store and did not explore alternatives before concluding that resignation was her only option. Ms. Nieves was aware of the procedure to lodge a complaint about any harassment and/or discrimination. While she addressed the incident with her seafood manager at the Smyrna store, she did not claim any discrimination. Also, Ms. Nieves did not request a transfer to another department or to another Acme location.

Both of these options are simple alternatives that would have been explored by the reasonable employee in her position before resigning.

### 3.    Ms. Nieves did not exhaust her administrative remedies.

Ms. Nieves' constructive discharge claim is also barred for failure to exhaust her administrative remedies under Title VII and Delaware's Discrimination in Employment Act. To claim constructive discharge based on a discriminatorily hostile environment under these two statutes, Ms. Nieves must first exhaust her administrative remedies by asserting the claim administratively. The purpose of requiring exhaustion is to allow the administrative agency the opportunity to settle disputes without court involvement. Antol v. Perry, 82 F.3d 1291, 1296 (3d Cir. 1996).

Ms. Nieves filed her Charge with the DDOL on April 2, 2004, just two weeks after her transfer to the Smyrna store. The charge obviously makes no mention of her resignation which occurred ten months later. After Ms. Nieves' transfer to the Smyrna store, she worked with new co-workers and new management. Ms. Nieves admits that she never spoke with the investigator from the DDOL after she filed her initial Charge, and thus never amended her charge to claim constructive discharge, barring her claim in court.

There is a narrow exception to the general exhaustion requirement. Courts have held that where a claim concerning an incident falls within the scope of a prior administrative agency complaint or the investigation that arose out of it, the plaintiff may bring suit in court without any further exhaustion. Waiters v. J.L.G. Parsons II, 729 F.2d 233, 234-35 (3d Cir. 1984) (holding no exhaustion required where claim of discharge in retaliation for filing EEO charges fell within scope of retaliation in original complaint); Anjelino v. The New York Times Co., 200 F.3d 73, 94 (3d Cir. 2000)(finding charge of "abusive atmosphere" sufficient to provide

notice of hostile environment sexual harassment claim, not requiring exhaustion when charge may fairly be considered explanation of original charge or grow out of it); Howze v. Jones & Laughlin Steel Corp., 750 F.2d 1208, 1212 (3d Cir. 1984) (plaintiff's retaliation claim fairly considered explanation of original charge).

The present situation does not fall within such an exception. With Ms. Nieves' transfer arose a new situation, with new management and new co-workers who were not aware of any alleged environment at the Middletown store. More importantly, because Ms. Nieves never communicated with the DDOL after filing her initial charge, an explanation of any "constructive discharge" could not be within the scope of the original investigation. Any claim of retaliation at the Smyrna store would necessitate a new charge with the DDOL. Therefore, Ms. Nieves' claim is barred for failure to exhaust her administrative remedies.

**D.    Ms. Nieves Cannot Meet Her Burden of Proving Retaliation Because the Action was Taken in Response to a Co-worker's Complaint and Acme Had a Legitimate, Non-discriminatory Reason for Suspending and Transferring Her to the Smyrna Store.**

In her Complaint, Ms. Nieves appears to challenge the suspension, transfer and constructive discharge as retaliatory. To establish a prima facie case of retaliation under Title VII, Delaware's Discrimination in Employment Act, and § 1981, Ms. Nieves must prove that: (1) she engaged in a protected activity; (2) she suffered an adverse employment action after or contemporaneously with her protected activity; and (3) there was a causal connection between the two. Richards v. The City of Wilmington, No. Civ. 03-106-SLR, 2004 WL 609324, at *4 (D. Del. March 24, 2004) (citing Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir. 1997)).

The Supreme Court recently addressed the second prong of the prima facie case for retaliation, redefining and expanding what constitutes an adverse action by the employer. Burlington Northern & Santa Fe R.R. Co., 126 S. Ct. 2405, 2414-25 (2006). The Supreme Court

stated that to be retaliatory, a reasonable employee must find the action only to be "materially adverse, … dissuading a reasonable worker from making or supporting a charge of discrimination." Id. at 2415. The Supreme Court noted that while a lateral transfer may be viewed as "materially adverse" in some contexts, transfers and reassignments of job duties are "not automatically actionable." Id. at 2417. At this summary judgment stage, Acme does not argue that the transfer to Smyrna does not constitute an adverse employment action, so Burlington Northern is not implicated.

Even assuming that Ms. Nieves engaged in protected activity and suffered an adverse action, Ms. Nieves cannot fulfill the third prong of the prima facie case, that there is a causal link. To show a causal link, Ms. Nieves must show sufficient evidence "to raise the inference that her protected activity was the likely reason for the adverse action." Ferguson v. E.I. DuPont de Nemours and Co., 520 F. Supp. 1172, 1200 (D. Del. 1983). Acme's actions came at the heels of a complaint by Ms. Alphin that Ms. Nieves engaged in inappropriate personal conduct. Thus, no causal link exists between any protected activity engaged in by Ms. Nieves and her suspension and transfer, where the suspension and transfer occurred as a direct result of Ms. Alphin's complaints. Valdes v. Union Bd. of Education, 186 Fed. Appx. 319, 324 (3d Cir. 2006) (finding no causal link between protected activity and discharge where plaintiff engaged in continuing misconduct before and after protected activity); Wagner v. Berwick Industries, 122 Fed. Appx. 570, 572 (3d Cir. 2004) (finding no causal link between protected activity and discharge where discharge occurred after plaintiff was given several warnings for her unsatisfactory job performance); Phillips v. DaimlerChrysler Corp., 2003 WL 22939481, at *7-8 (D. Del. March 27, 2003)(sole reliance on temporal proximity between protected activity and

layoff insufficient to establish causal link where layoff was directly due to plaintiff's inability to work based on eye treatment).

If Ms. Nieves establishes a prima facie case, then the burden of production shifts to Acme to show that it had a legitimate, non-retaliatory reason for its conduct. <u>Krouse v. Am. Sterilizer Co.</u>, 126 F.3d 494, 500-01 (3d Cir. 1997); <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973). If Acme succeeds, then Ms. Nieves must show not only that Acme's proffered reason was false, but that retaliation was more likely than not the real reason. <u>Id.</u>; <u>Jones v. School District of Philadelphia</u>, 198 F.3d 403, 410 (3d Cir. 1999). To show pretext at this summary judgment stage, Ms. Nieves must introduce evidence for a fact finder to "(1) disbelieve the employer's articulated legitimate reason, or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." <u>Abramson v. William Patterson College of New Jersey</u>, 260 F.3d 265, 283 (3d Cir. 2001) (quoting <u>Fuentes v. Perksie</u>, 32 F.3d 759, 764 (3d Cir. 1994)).

In evaluating Acme's proffered reason for believability, the question is not whether the reason was prudent or correct, but whether it was so "weak, incoherent, implausible, or so inconsistent that a reasonable fact finder could rationally find [it] unworthy of credence." <u>Keller v. Orix Credit Alliance, Inc.</u>, 130 F.3d 1101, 1108-09 (3d Cir. 1997). While Ms. Nieves may disagree that Acme made the right decision, disagreement without more is not enough to rebut Acme's legitimate non-discriminatory reason for its actions. An employer can be wrong or mistaken in its decision so long as it was not acting with retaliatory animus. <u>Kautz v. Met-Pro Corporation</u>, 412 F.3d 463, 467 (3d Cir. 2005) (In making a decision, an employer can be "wrong or mistaken, since the factual dispute at issue is whether [retaliatory] animus motivated the employer, not whether the employer is wise, shrewd, prudent or competent."). As noted

above, Acme acted on the complaints of Ms. Alphin about inappropriate conduct by Ms. Nieves. The fact that Ms. Alphin made those complaints is completely undisputed. Ms. Nieves cannot meet her burden of proving that Acme's decision to suspend and transfer her was so "weak, incoherent, implausible, or so inconsistent" to be pretextual. Likewise, there is no evidence that retaliation motivated Acme. Thus, she cannot sustain her claim of retaliation.[9]

### E.    Ms. Nieves' Claim for Breach of Covenant of Good Faith and Fair Dealing Fails Because It is Barred by Amended Statute

In her Complaint, Ms. Nieves claims Acme breached the covenant of good faith and fair dealing by constructively terminating her in violation of public policy. Delaware law recognizes four situations where the covenant of good faith and fair dealing may be breached with respect to an employee: 1) the termination violated public policy; 2) the employer misrepresented an important fact and the employee relied on it to either accept a new position or remain in the present one; 3) the employer used its superior bargaining power to deprive an employee of clearly identifiable compensation related to the employee's past service; and 4) the employer falsified or manipulated employment records to create fictitious grounds for termination. Cole, 459 F. Supp. 2d at 309 (citing Conneen v. MBNA Am. Bank, N.A., 334 F.3d 318 (3d Cir. 2003); Lord v. Souder, 748 A.2d 393, 400 (Del. 2000)).

In her Complaint, Ms. Nieves claims constructive termination by Acme in violation of public policy under category one. A claim under category one requires that a termination occurred and a satisfaction of a two-part test: "1) the employee must assert a public interest recognized by some legislative, administrative or judicial authority, and 2) the employee must occupy a position with responsibility for advancing or sustaining that particular interest."

---

[9] Additionally, similar to Ms. Nieves claim of constructive discharge, her claim for constructive termination in retaliation under Title VII and Delaware's Discrimination in Employment Act is also barred for her failure to exhaust her administrative remedies.

E.E.O.C. v. Avecia, Inc., 151 Fed. Appx. 162, 165 (3d Cir. 2005); Cole, 459 F. Supp. 2d at 309-10.

Ms. Nieves' claim is not viable because in 2004, the Delaware legislature amended its employment discrimination law to state that 19 DEL. C. §712 was to be the "sole remedy for claims alleging a violation of this chapter to the exclusion of all other remedies." 19 DEL. C. §712(B) (2005); Yatzus v. Appoquinimink School District, 458 F. Supp. 2d 235, 248 (D. Del. 2006). Since the statute's amendment, courts in the Third Circuit have followed suit. Yatzus, 458 F. Supp. 2d at 248 (dismissing plaintiff's breach of covenant claim for wrongful termination based on sexual harassment because Delaware Discrimination statute provides exclusive remedy for relief); Avecia, 151 Fed. Appx. at 165 (barring breach of covenant claim for wrongful termination because amended statute provided exclusive remedy). Thus, Ms. Nieves cannot assert that her alleged constructive discharge fell within a recognized public interest under the first prong of the test because it is barred by statute.[10] Notably, Plaintiffs' counsel in this case was also counsel (once for the plaintiff and once for the defendant) in Yatzus and Avecia in which this Court and the Third Circuit struck down the breach of implied covenant claim based on the statute's amendment.

**F.    Ms. Nieves' Cannot Meet Her Burden of Proving Intentional Infliction of Emotional Distress ("IIED")**

**1.    The IIED claim is barred by the Exclusivity Provision of the Workers' Compensation Act.**

The "exclusivity provision" of Delaware's Workers Compensation Act states that:

---

[10] In any event, Ms. Nieves cannot prove there was a termination, as required by this state law claim. Her voluntary resignation from her employment with the Smyrna store, an environment she admits was not discriminatory or harassing towards her, to move to Miami does not amount to a constructive termination. Ms. Nieves chose to resign on her own, devoid of any such fraud or deceit on the part of the Company. See Cole, 459 F. Supp. 2d at 309 (granting motion for summary judgment for breach of covenant of good faith and fair dealing to employer where employee who resigned three years after alleged intolerable condition occurred could not prove constructive discharge).

> Every employer and employee…shall be bound by this chapter
> respectively to pay and to accept compensation for personal injury
> or death by accident arising out of and in the course of
> employment, regardless of the question of negligence and to the
> exclusion of all other rights and remedies.

Limehouse v. Steak & Ale Restaurant Corp., No. Civ.A. 03C-03-299, 2004 WL 304339, at *1

(Del. Super. 2004)(unpublished opinion).  It is well established that the Workers Compensation

Act's "exclusivity provision" also encompasses intentional infliction of emotional distress claims.

Id.; see also Battista v. Chrysler Corp., 454 A.2d 286, 289 (Del. Super. 1982)(holding that

personal injury under 19 Del. C. § 2304 included mental distress); Kofron v. Amoco Chemicals

Corp., 441 A.2d 226 (Del. 1982).[11]

Thus, Ms. Nieves' IIED claim is barred by the Delaware Workers Compensation Act

because any alleged emotional distress Ms. Nieves might have suffered would have been within

the course of employment.  19 DEL. C. § 2304; Everett v. Hospital Billing and Collection

Service, Ltd., No. Civ.A. 04-049 JJF, 2005 WL 751940 (D. Del. 2005) (dismissing IIED claim

against employer because the Delaware Workers Compensation Act is the exclusive remedy).

For example, in Konstantopoulos v. Westvaco Corp., the Delaware Supreme Court held that the

employee's claim against employer for IIED caused by sexual harassment during the course of

employment was barred by Workers Compensation Act.  690 A.2d 936, 938 (Del. 1996); see

also, Brodsky v. Hercules Incorporated, 966 F. Supp 1337 (D. Del. 1997)(following

Konstantopoulos holding in finding employee's IIED claim against employer during the course

of employment barred by Workers Compensation Act).  Thus, this claim should be dismissed

and summary judgment should be granted to Acme as a matter of law.

---

[11] The Delaware Supreme Court recognizes an exception only where there was a "true intent by the employer to injure the employee." Rafferty v. Hartman Walsh Painting, Co., 760 A.2d 157, 159 (Del. 2000).  The Workers Compensation Act still bars IIED claims where the employer intends "to do an action and that the worker was injured as a result." Avecia, 151 Fed. Appx. at 166.  The exception is not implicated here because Ms. Nieves cannot prove that Acme had a true intent to harm Ms. Nieves because it suspended and transferred her in response to a complaint about her inappropriate personal conduct in the workplace.

2.    **Acme's conduct does not rise to the level of extreme and outrageous conduct.**

Even if a common law IIED claim applied to Acme, establishing such a claim requires proving *intentional or reckless extreme and outrageous conduct which causes severe emotional distress.* Collins v. African Methodist Episcopal Zion Church, C.A. No. 04C-02-121, 2006 WL 1579828, at *9 (Del. Super., March 29, 2006); RESTATEMENT (SECOND) OF TORTS § 46 (emphasis added).  Liability for common law IIED has been found only where the conduct has been "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Collins, 2006 WL 1579828, at *10.  As a threshold matter, it is very rare that extreme and outrageous conduct can be established in the employment context.  Matczak v. Frankford Candy and Chocolate Co., 136 F.3d 933, 940 (3d Cir. 1997).  For example, in Matczak, the Third Circuit Court of Appeals affirmed summary judgment for the employer because the plaintiff's alleged facts, that the employer terminated him because he was disabled, were not enough to rise to the level of "extreme and outrageous." Id. at 940.  See also Veneziano v. Long Island Pipe Fabrication & Supply, 79 Fed. Appx. 506, 510 (3d Cir. 2003)(affirming summary judgment for employer where plaintiff's termination and lapse of insurance coverage after he was diagnosed with symptomatic HIV and PCP was not "severe and outrageous").

The undisputed facts establish that Acme's ordinary suspension and subsequent transfer of Ms. Nieves to the Smyrna store does not meet the high threshold of "extreme and outrageous." Such a conventional measure of discipline in the face of a personal conduct violation cannot conceivably go beyond all possible bounds of decency.  Additionally, Ms. Nieves cannot prove that any emotional distress allegedly suffered by her was severe in nature.  She testified in her deposition that she never visited any health care practitioner or counselor as a result of her

alleged emotional distress.  For these reasons, summary judgment should be granted to Acme as a matter of law.

**G.    Even if Properly Pled, Ms. Nieves Cannot Prove Disparate Treatment Because She Cannot Prove That Any Similarly Situated Employee Was Treated Differently and That Acme's Reasons Were a Pretext for Discrimination.**

While none of the counts in the Complaint claim disparate treatment, paragraphs 23 and 34 of the Complaint reference "disparate treatment."  While Ms. Nieves may not have intended a separate claim of disparate treatment apart from her hostile environment claim, and has certainly not properly pled one, Acme will address such a claim in an abundance of caution.  Presumably, giving her all of the benefit of the doubt, she challenges her suspension as discriminatory.

A disparate treatment claim must be analyzed under the McDonnell Douglas burden-shifting framework as discussed above.  To establish a prima facie case of disparate treatment discrimination based on national origin, Nieves must prove that:  1) she is a member of a protected class; 2) she suffered an adverse employment action; and 3) the action occurred under circumstances that give rise to an inference of unlawful discrimination, such as might occur when a similarly situated person not of the protected class is treated differently.  Petrocelli, 2006 WL at *6 (granting summary judgment on disparate treatment claim where only evidence plaintiff presented were his assertions that he perceived his co-workers to receive less severe discipline for conduct violations, but was unsure the exact discipline they received).

Ms. Nieves cannot prove that any similarly situated person was treated differently, and thus cannot establish a prima facie case.  Ms. Nieves was suspended for one week and transferred to the Smyrna store because of her inappropriate conduct in early March 2004, which was in clear violation of the store rules on personal conduct.  Indeed, to the contrary, the only employee she identified as violating the personal conduct standard was, in fact, fired:

29

| A: | Because one incident happened over there that Christina and Alex was playing around, you know, playing around or something. And she complain with Steve Briely [sic], and he was - Mr. Briely [sic] talk with him and he was fired. He touch her in a bad way, touch her in back. |
|----|----|
| Q: | Touched her back in a bad way? |
| A: | Yes, in a bad way. I don't know how it was, because I wasn't work that day. And he was fired. |
| Q: | Alex was fired? |
| A: | Yes. |

G. Nieves Dep., Ex. A at 68. The employee Ms. Nieves identified is white. Appenzeller

Declaration, Ex. S.

Moreover, even if a prima facie case is established, it is undisputed that Joyce Alphin

complained to management about Ms. Nieves' conduct, and that the suspension and transfer

resulted from that complaint, as explained above. Ms. Nieves cannot meet her burden of proving

that Acme's discipline was a pretext for discrimination. Her disparate treatment claim then, even

if pled, fails as a matter of law and summary judgment should be granted to Acme.

### H.    Mr. Nieves' Loss of Consortium Claim Should be Dismissed Because It Cannot Survive as an Independent Cause of Action.

Under Delaware law, a cause of action for loss of consortium is predicated on three

elements: (1) that the party asserting the cause of action was married to the person who suffered

a physical injury at the time the physical injury occurred; (2) as a result of the physical injury,

the other spouse was deprived of some sort of benefit which formerly existed in the marriage;

and (3) the injured spouse has a valid cause of action against the tortfeasor. Jones v. Elliott,

551 A.2d 62, 63-64 (Del. 1988). A loss of consortium claim is a derivative claim which simply

cannot survive as a separate cause of action without an underlying claim. Petrocelli v. Daniel

Woodhead Co., 993 F.2d 27, 30 (3d Cir. 1993). Because Ms. Nieves' intentional inflection of

emotional distress claim and breach of the covenant of good faith and fair dealing claim must be

dismissed, Mr. Nieves' claim for loss of consortium also cannot survive summary judgment.

## III.    CONCLUSION

For any and all of the reasons stated above, Defendant Acme Markets, Inc. respectfully

requests that the Court grant its Motion for Summary Judgment and enter judgment in its favor.

Respectfully submitted,

JENNIFER M. BECNEL-GUZZO (No. 4492)
BUCHANAN INGERSOLL & ROONEY PC
The Brandywine Building
1000 West Street, Suite 1410
Wilmington, DE 19801
(302) 552-4200
(302) 552-4295 (facsimile)
jennifer.becnelguzzo@bipc.com

and

ELIZABETH A. MALLOY
BUCHANAN INGERSOLL & ROONEY PC
1835 Market Street
14th Floor
Philadelphia, PA 19103
(215) 665-8700

Attorneys for Defendant,
Acme Markets, Inc.

Dated: February 1, 2007

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| GLORIA NIEVES and EMILIO NIEVES, | : | CIVIL ACTION |
| | : | |
|     Plaintiffs, | : | |
| | : | |
|     v. | : | |
| | : | Number:  06-123 (GMS) |
| ACME MARKETS, INC., a Delaware corporation | : | |
| d/b/a Acme Markets No. 7816, ACME MARKETS, | : | JURY TRIAL DEMANDED |
| INC., a Delaware Corporation d/b/a Acme Markets | : | |
| No. 7836, ACME MARKETS, INC., a Pennsylvania | : | |
| Corporation, d/b/a Acme Markets No. 7816, | : | |
| ACME MARKETS, INC., a Pennsylvania | : | |
| Corporation d/b/a Acme Markets No. 7836, | : | |
| | : | |
|     Defendants. | : | |

**APPENDIX TO DEFENDANT ACME MARKETS, INC.'S OPENING BRIEF IN
SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

JENNIFER M. BECNEL-GUZZO (No. 4492)
BUCHANAN INGERSOLL & ROONEY PC
The Brandywine Building
1000 West Street, Suite 1410
Wilmington, DE 19801
(302) 552-4200

and

ELIZABETH A. MALLOY *(admitted pro hac vice)*
BUCHANAN INGERSOLL & ROONEY PC
1835 Market Street
14th Floor
Philadelphia, PA  19103
(215) 665-8700

Attorneys for Defendant,
Acme Markets, Inc.

Dated:  February 1, 2007

APPENDIX TABLE OF CONTENTS

TAB

EXHIBIT A          Gloria Nieves Deposition................................................................A1-A74

EXHIBIT B          Collective Bargaining Agreement, Section 9.2............................A75-A78

EXHIBIT C          Store Rules ...................................................................................A79-A83

EXHIBIT D          Harassment Policy .......................................................................A84-A85

EXHIBIT E          Acknowledgement Forms .............................................................A86-A89

EXHIBIT F          Acme Discrimination Quiz ..........................................................A90-A92

EXHIBIT G          EEO Policy....................................................................................A93-A94

EXHIBIT H          Gloria Nieves Service History .....................................................A95-A100

EXHIBIT I          Briley Deposition .........................................................................A101-A08

EXHIBIT J          Alphin Deposition.........................................................................A109-A121

EXHIBIT K          Dean Deposition............................................................................A122-A124

EXHIBIT L          E-mails Discussing Incident ........................................................A125-A127

EXHIBIT M          Moyer Deposition .........................................................................A128-A131

EXHIBIT N          Final Warning Letter.....................................................................A132-A133

EXHIBIT O          Charge ...........................................................................................A134-A135

EXHIBIT P          Appenzeller Deposition ................................................................A136-A140

EXHIBIT Q          Emilio Nieves Deposition .............................................................A141-A147

EXHIBIT R          Cases Not Cited in Official Reporters .........................................A148-A245

EXHIBIT S          Appenzeller Declaration ...............................................................A246-A247

# EXHIBIT A

1        IN THE UNITED STATES DISTRICT COURT
2           FOR THE DISTRICT OF DELAWARE
3   GLORIA NIEVES and EMILIO NIEVES,:
4              Plaintiffs,    :
5              vs.            :    Civil Action No.
                                   06-123 GMS
6   ACME MARKETS, INC., a Delaware  :
    corporation, et al.,
7                             :
               Defendants.
8              - - -
9           Deposition of GLORIA NIEVES, taken
    pursuant to notice in the law offices of Buchanan,
    Ingersoll & Rooney, 1410 Brandywine Building, 1000
10  West Street, Wilmington, Delaware, on Wednesday,
    December 6, 2006, at 9:40 a.m., before Lorraine B.
11  Marino, Registered Diplomate Reporter and Notary
    Public.
12             - - -
13  APPEARANCES:
14             PHILIP B. BARTOSHESKY, ESQ.
               Biggs & Battaglia
15             921 North Orange Street
               Wilmington, DE  19801
16               for Plaintiffs
17             ELIZABETH A. MALLOY, ESQ.
               Buchanan, Ingersoll & Rooney
18             1835 Market Street - 14th Floor
               Philadelphia, PA  19103-2985
19               for Defendants
20  ALSO PRESENT:
21             EMILIO NIEVES
               STEPHEN MOYER
22
               WILCOX & FETZER
23     1330 King Street - Wilmington, Delaware 19801
                 (302) 655-0477
24             www.wilfet.com



WILCOX & FETZER LTD.
Registered Professional Reporters



Gloria Nieves

8

1    Q.      If you left on January 16 of 2005, when did

2    you make the decision to leave?

3    A.      I don't remember.  I don't remember.

4    Q.      Was it before Christmas?

5    A.      Yes.

6    Q.      Was it before Thanksgiving?

7    A.      No.

8    Q.      Are there any other reasons why you left

9    Delaware to go to Miami?

10   A.      No, no.

11   Q.      Who did you stay with in Miami?

12   A.      With my family.  At that time my uncle was

13   alive.

14   Q.      And what did you do in Miami?

15   A.      I was helping them.  He had a

16   transportation -- he had work with a Christian company

17   or something like that, and I work in nail, doing

18   manicure, pedicure.

19   Q.      When you arrived in Miami in January of

20   2005, did you look for work there?

21   A.      Yes.

22   Q.      And what did you do to look for work?

23   A.      I made application in different

24   supermarkets.

9

1    Q.       Do you remember any of the names where

2    you --

3    A.       Winn-Dixie.

4    Q.       Okay.  She can only get down one of us at a

5    time.  So if you can try to wait until I finish my

6    question, and then I will try to wait until you finish

7    your answer.  Sometimes in conversation that's

8    different.

9             Winn-Dixie?

10   A.       Winn-Dixie.

11   Q.       Anywhere else?

12   A.       Publix.

13   Q.       Anywhere else?

14   A.       I don't remember.  Winn-Dixie and Publix.

15   Q.       And if you arrived in Miami in the middle of

16   January of '05, when did you begin to look for work

17   there?

18   A.       Ten days later.

19   Q.       When you moved to Miami, how long did you

20   intend to stay there?

21   A.       I don't have any idea.  I didn't have any

22   idea.

23   Q.       Did you think you were going to stay

24   forever?

10

1   A.      No.

2   Q.      Other than the supermarkets, did you look

3   for work anywhere else in Miami?

4   A.      Yes.  In like shopping stores, like -- yes,

5   clothes and something like that.

6   Q.      Anywhere else?

7   A.      No.

8   Q.      Do you know the names of the shopping stores

9   you looked for work?

10  A.      No.  I walk around and I went inside because

11  they wanted -- they want help.

12  Q.      What was the address you stayed at in Miami?

13  A.      81864 Northwest 62 Court, Miami, Florida.

14  Q.      Did you find work in Miami?

15  A.      Yes, making nail.

16  Q.      And what was the name of the salon you

17  worked in?

18  A.      Unique Nails.

19  Q.      Do you know the address?

20  A.      I don't remember.

21  Q.      Was it in Miami?

22  A.      Miami.

23  Q.      Was it close to the house you were staying

24  in?



Gloria Nieves

11

1    A.      Yes.

2    Q.      And how long did you work at Unique Nails?

3    A.      Six months.

4    Q.      Were you paid by check?

5    A.      Yes.

6    Q.      Did you receive any forms at the end of the

7    year --

8    A.      No.

9    Q.      -- regarding earnings?

10   A.      No.

11   Q.      Do you have any of the checks or the check

12   stubs you received from Unique Nails?

13   A.      No.  At this moment, no.

14   Q.      Can you estimate how much money you earned

15   per week at Unique Nails?

16   A.      One hundred.

17   Q.      Did you also receive tips?

18   A.      Yes.

19   Q.      Does the $100 include the tips?

20   A.      No.

21   Q.      Can you estimate on a weekly basis how much

22   income you earned from tips at Unique Nails?

23   A.      It is hard sometimes.  Fifty or $60 a week.

24   Q.      Other than Unique Nails, is there anywhere

Gloria Nieves

16

1    work?

2    A.        No.

3    Q.        Did you work in the United States prior to

4    joining Acme in November of '01?

5    A.        I begin to work in Acme at 11/12/2001.

6    Q.        And prior to working at Acme, did you work

7    anywhere else?

8    A.        No.

9    Q.        Could you explain to me how you got the job

10   at Acme?

11   A.        Okay.  I was looking for job, and I apply in

12   all the supermarkets that we have over there.  Food

13   Lion, Acme was the only ones that we have over there,

14   and Threeway.  I think it is that Threeway.  It is

15   T-H-R-Y Way.  I don't know.

16           And I apply, and then that time the manager

17   of the store was Mr. Ford.  And I apply, and he hired

18   me, the only place that they hired me.

19   Q.        And which store was this?

20   A.        In the old one.

21   Q.        In Middletown?

22   A.        Yes, Middletown.

23   Q.        And what job did you get?

24   A.        I begin like a bagger.

Gloria Nieves

17

| | | |
|---|---|---|
| 1 | Q. | And was this a part-time position? |
| 2 | A. | Part-time. |
| 3 | Q. | At any time did you become full-time? |
| 4 | A. | Yes. |
| 5 | Q. | When was that? |
| 6 | A. | Two years later. |
| 7 | Q. | The end of 2003? |
| 8 | A. | Something like that. |
| 9 | Q. | Did you become a member of the union? |
| 10 | A. | Yes. |
| 11 | Q. | And when did you become a member of the |
| 12 | union? | |
| 13 | A. | Ninety days after my probation time. |
| 14 | Q. | And what union was that? |
| 15 | A. | Union 27. |
| 16 | Q. | Food and Commercial Workers Union? |
| 17 | A. | Yes. |
| 18 | Q. | Local 27? |
| 19 | A. | Local 27. |
| 20 | Q. | I am going to be showing you some documents |
| 21 | today. Take as much time as you need to read them. | |
| 22 | If for any reason I start talking and you haven't had | |
| 23 | a chance to read them, just tell me to stop. | |
| 24 | Sometimes it is hard for me to judge -- | |

Gloria Nieves

18

1    A.        Okay.

2    Q.        -- when people are done.

3                   MS. MALLOY:  Just, I guess, Gloria 1.

4    It doesn't really matter.

5                   (Gloria Nieves Deposition Exhibit No.

6    1 was marked for identification.)

7    BY MS. MALLOY:

8    Q.        Exhibit 1 is the first page of an employment

9    application.  Is this completed in your handwriting?

10   A.        Yes.

11   Q.        And did you complete this when you were

12   looking for work at Acme?

13   A.        Yes.

14   Q.        When you became employed by Acme, did you go

15   to any types of training?

16   A.        Yes.

17   Q.        What do you remember about that?

18   A.        How to bag, how the safety, the safety

19   rules, how to punch in, punch out, to -- what else?

20   To bag, be polite to customers, be safe, and get the

21   shopping carts outside.  That's all.

22   Q.        Did you receive copies of Acme policies when

23   you first became employed?

24   A.        Yes.

19

1              (Gloria Nieves Deposition Exhibit Nos.

2    2 and 3 were marked for identification.)

3    BY MS. MALLOY:

4    Q.        If you could look at No. 2, Exhibit 2, is

5    that your signature?

6    A.        Yes.

7    Q.        And when you signed Exhibit 2, had you

8    received a copy of the store work rules, which is

9    Exhibit 3?

10   A.        I don't remember.

11   Q.        Have you ever seen Exhibit 3 before?

12   A.        Yes.

13   Q.        Did you receive a copy of the store work

14   rules sometime shortly after you became employed?

15   A.        Yes.

16                  MS. MALLOY:  This will be 4.

17                  (Gloria Nieves Deposition Exhibit No.

18   4 was marked for identification.)

19   BY MS. MALLOY:

20   Q.        Exhibit 4 is a copy of the Acme Markets

21   sexual and workplace harassment policy.  Is that your

22   signature on the bottom?

23   A.        Yes.

24   Q.        And did you receive this policy on

Gloria Nieves

20

1    November 12 of '01?

2    A.        Yes.

3    Q.        Did you read this policy when you received

4    it?

5    A.        Yes.

6    Q.        Did you go to any type of training on Acme's

7    policy against workplace harassment?

8    A.        No.

9    Q.        Did you watch a video?

10   A.        A lot of videos.

11   Q.        Pardon me?

12   A.        A lot of videos.

13   Q.        Do you remember watching a video on the

14   harassment policy?

15   A.        No.

16   Q.        What other types of videos do you remember?

17   A.        The videos were how to bag, customer

18   service, and the uniforms, and how to lift stuff from

19   the floor or -- safety things.

20   Q.        Other than when you first received this

21   harassment policy, Exhibit 4, at any other point

22   during your employment did you go back to look at

23   it --

24   A.        No.

Gloria Nieves

22

1    5 was marked for identification.)

2                        (There was a pause.)

3    BY MS. MALLOY:

4    Q.        Exhibit 5 is a document which your lawyer

5    gave to me.  Have you seen this before?

6    A.        That one?

7    Q.        Yes.

8    A.        Yes.

9    Q.        Is that a document which you gave to your

10   lawyer?

11   A.        I give him a lot of papers, but I don't

12   know.  I don't remember.

13   Q.        This looks like it is a little quiz --

14   A.        Yes.

15   Q.        -- or learning tool for a seminar.  Do you

16   remember anything about doing this quiz?

17   A.        Yes.

18   Q.        I will call it a quiz.

19   A.        Yes.

20   Q.        What do you remember about that?

21   A.        Yes.

22   Q.        What do you remember?

23   A.        They -- now I see this, I remember that they

24   put a video, one guy, one girl.  The boy was making a

Gloria Nieves

23

1    jokes about sex, and the girl doesn't like it.

2    Something like that.

3    Q.      Okay.  And then was there anybody -- did you

4    review this video in the store?

5    A.      No.

6    Q.      Where did you go to do that?

7    A.      I just saw this video when they trained me,

8    and that's all.

9    Q.      Okay.  Is this when you first started

10   working?

11   A.      Yes.

12   Q.      And the quiz that we are looking at as

13   Exhibit 5, did you complete that yourself?

14   A.      Yes.

15   Q.      And was there anybody from the store there

16   at that time with you?

17   A.      The trainer, Lee.  Lee is her name.

18   Q.      Lee?

19   A.      Lee.

20   Q.      Is that a man or a woman?

21   A.      Woman.

22   Q.      Do you know her last name?

23   A.      No.  I don't remember.

24   Q.      Do you know where she worked?

Gloria Nieves

24

1   A.        No.  She doesn't work in Acme anymore.

2   Q.        Was she assigned to your store?

3   A.        She work in that store.

4   Q.        Okay.  So she was there when they were

5   playing this video?

6   A.        Yes.

7   Q.        Did she talk to you at all about the video?

8   A.        I don't remember.

9   Q.        Okay.  If you look at No. 4, Exhibit 4, it

10  looks like it is signed Lee -- could you tell what her

11  last name is from that?

12  A.        Lee Steel, Stool.  Lee Abreu.  Here it says

13  in the first one, in the second one that you give me,

14  it sounds like Abreu.  I don't know.

15  Q.        But you don't remember her name?

16  A.        No, I don't remember.

17  Q.        Okay.

18                (Gloria Nieves Deposition Exhibit No.

19  6 was marked for identification.)

20  BY MS. MALLOY:

21  Q.        Exhibit 6 reads "Notice.  Equal Employment

22  Opportunity Policy."  Have you ever seen this before?

23  A.        Yes.

24  Q.        And where did you see it?

Gloria Nieves

25

1    A.        When they train me.

2    Q.        Was it also posted on a bulletin board at

3    the store?

4    A.        I never saw that posted.

5    Q.        Was there a bulletin board at the store?

6    A.        No.

7    Q.        Was there a bulletin board in the break

8    room?

9    A.        They post it people that are supposed to

10   work, how many hours supposed to work.  The

11   harrassment that we saw before, that policy I saw

12   posted in the break room.

13   Q.        Okay.  The harassment policy was posted in

14   the break room?

15   A.        Yes.

16   Q.        Were there bulletin boards near the time

17   clocks?

18   A.        Yes.

19                  (Gloria Nieves Deposition Exhibit No.

20   7 was marked for identification.)

21   BY MS. MALLOY:

22   Q.        Exhibit 7 is a document your lawyer gave to

23   me.  What is this, if you know?

24   A.        It is the numbers of the persons that work

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

A15

Gloria Nieves

27

1   A.        Yes.   Thank you.

2   Q.        The page I gave you is called grievances.

3   Did anyone at the company or the union talk to you

4   about how to file a grievance?

5   A.        Never, never.

6   Q.        At any point did you file a union grievance?

7   A.        Never.

8   Q.        Did the union ever file a grievance for you?

9   A.        Never that I know.

10  Q.        Not that you know.   Okay.   Exhibit 7, the

11  one that says "Important" at the top, lists a lot of

12  union names.   Have you ever talked to any of these

13  people?

14  A.        Ay, the number that is not here.   No.   No.

15  No.

16  Q.        Okay.   Was there a union contact which you

17  had?   If you wanted to contact the union working at

18  the Middletown store, do you know the name of someone

19  you would have called?

20  A.        No.

21  Q.        Now, when you started working for Acme, you

22  were at the Middletown, Delaware store; is that right?

23  A.        Yes.

24  Q.        And that was the old store?

Gloria Nieves

28

1    A.        The old one, yes.

2    Q.        And then a new one opened?

3    A.        They opened the new one and they transfer

4    us, the people that want to work in the new one, and

5    we transfer -- we had been transferred from there to

6    the new one.

7    Q.        And how far away was the new one in

8    Middletown?

9    A.        From my house, five minutes.  Across the

10   street.

11   Q.        And how far away was the new one from the

12   old one?

13   A.        Ten minutes, 15 minutes.  Ten minutes.

14   Q.        And when, if you remember, did the new store

15   open in Middletown?

16   A.        I don't remember.

17   Q.        When you started work at Middletown, who was

18   the store director?

19   A.        Mr. Ford, William Ford.

20   Q.        And at some point did he move to another

21   location?

22   A.        Yes.

23   Q.        And who was the next store director?

24   A.        Steve Briely.

29

1    Q.    How did you get along with Mr. Briely?

2    A.    He was the boss, and we was the employees.

3    Q.    How did you get along with Mr. Ford?

4    A.    Good.  He talk with everybody.

5    Q.    Did Briely interact less with employees than

6    Mr. Ford?

7    A.    Yes, yes.

8    Q.    And can you place in time when Mr. Briely

9    came?  Was it a year after you started, a month after

10   you started?

11   A.    When the new store was opened, he was there.

12   Q.    Okay.  Did you have any problems working for

13   Acme before Mr. Briely came?

14   A.    Never.

15   Q.    And so then when we move to the new store,

16   who was Mr. Briely's assistant?

17   A.    Black, Jeanie Black.

18   Q.    How did you get along with Ms. Black?

19   A.    She was nice.  She is nice.

20   Q.    Any other assistant store directors after

21   Mr. Briely came?

22   A.    I don't remember the name.  He has mustache.

23   I don't remember the name.

24   Q.    A male?



Gloria Nieves

30

1    A.    Male, yes.

2    Q.    How about Barbara Appenzeller?

3    A.    I don't know her.  Barbara?

4    Q.    Somebody people sometimes called BJ.

5    A.    Ah, yes.

6    Q.    Is that a woman?

7    A.    Yes.

8    Q.    Was she an assistant store director?

9    A.    Yes, after Jeanie Black was transferred.

10   Q.    Okay.  And how did you get along with -- did

11   you call her BJ?  People called her --

12   A.    At the beginning she was fine.  And I called

13   her B -- in Spanish, BG.

14   Q.    BG?

15   A.    BG.  And she was fine.  She understand.  But

16   then she sometimes goes, sometimes no.

17   Q.    And I will give you an opportunity to

18   explain that in a minute.  When you moved to the new

19   store, what position were you in?

20   A.    Service clerk on deli.

21   Q.    At this point were you full-time?

22   A.    No.

23   Q.    What was your next position?

24   A.    Full-time person in charge of nighttime of

Gloria Nieves

31

1    deli.

2    Q.        You were the person in charge once you

3    became full-time?

4    A.        Yes, at nighttime.

5    Q.        And what does person in charge mean?  What

6    were your duties?

7    A.        Maintain everything clean, close the deli,

8    pull the produce out of cold, fill up the shelves on

9    the front of the deli, the new meats and everything,

10   and, yes, close the deli.

11   Q.        And what was the next position you held

12   after that?

13   A.        That's all.

14   Q.        At the Middletown store, let's talk about

15   when you moved to the new store.  Okay?

16   A.        Yes.

17   Q.        Do you understand my timeframe?  Who else

18   did you work with?  Who were your co-workers?

19   A.        A lot.  Nancy, Nancy, I don't know her last

20   name.  Denise Dean is the manager.  Penny Armstrong,

21   she moved to down in Smyrna, the Acme.  She is now the

22   deli manager in Smyrna.  I worked with Amanda

23   Cumberbatch, Connie -- I don't know her last name.  I

24   don't remember the last name.

Gloria Nieves

32

Q.      What was the first name?

A.      Connie.

Q.      Connie.  Okay.

A.      Connie.  Christina Shaw, Joyce Alphin.

Q.      Joyce?

A.      Joyce Alphin.  Warren, the last name is Warren, Michele Warren.  Alex, Phyllis, Jeanie, Jeanie, I don't remember the last name.  She is an old one.

        What else?  A lot of people that they went back and forth, back and forth.

Q.      Okay.  Of the people that you mentioned, which ones of them were supervisors or managers?

A.      None.  Denise Dean was the deli manager.

Q.      And was Denise the deli manager the whole period of time you were at Middletown?

A.      No.

Q.      Who came after Denise as deli manager?

A.      The first manager was Brenda.  I don't know the last name, Brenda.  And she was transferred to another store, and Denise Dean came like a deli manager.

Q.      And then was Denise there until you left Middletown?

A.      Middletown?

Gloria Nieves

33

1    A.       Yes.

2    Q.       Can you place in time when Brenda left and

3   Denise came?

4    A.       A couple of months after they opened the

5   store.

6    Q.       At some point in time did you believe that

7   you were being discriminated against or harassed at

8   Middletown?

9    A.       Yes.

10    Q.       When did that start?

11    A.       When I get my full-time position.

12    Q.       Can you explain to me what happened that you

13   believe was discrimination or harassment?  And I will

14   let you start in the beginning -- okay? -- and then we

15   will move forward.  Do you understand my question?

16    A.       Yes.

17    Q.       Good.

18    A.       They begin like -- we have a lot of Spanish

19   people, and I speak Spanish.  Many customers, all

20   people, like Puerto Rican, Mexican, they don't

21   understand.  They cannot speak English.  They look for

22   me.  And one of the co-workers began to say, "Speak

23   English.  Speak English.  We are in America."

24    Q.       And who is the person who said that to you?

Gloria Nieves

34

1    A.        Nancy.

2    Q.        And what was Nancy's position?

3    A.        Service, deli service clerk.

4    Q.        Like you?

5    A.        Yes.

6    Q.        Did that bother you when she said <'Speak

7    English"?

8    A.        Yes, because I was speak Spanish with my

9    customers.

10   Q.        And did you do anything when Nancy said,

11   "Speak English"?

12   A.        When the customer left, I told her.  I

13   explained her that they don't speak English.  They

14   don't understand.  I have to talk with them in

15   Spanish.

16   Q.        And what did Nancy say?

17   A.        She walk away.

18   Q.        Did that ever happen again?

19   A.        No.

20   Q.        So Nancy one day when you were interacting

21   with a customer told you to speak English?

22   A.        Yes.

23   Q.        And it only happened on that one day?

24   A.        One day.

35

1   Q.      Did you report to any supervisor that you

2   didn't like that?

3   A.      I report many stuff that they told me to my

4   supervisor, and they told me, "Let it go, Gloria.

5   Don't worry.  We are gonna fix it."

6   Q.      Did you ever report to a supervisor that

7   Nancy told you to speak English?

8   A.      Yes.

9   Q.      And who did you report that to?

10  A.      To Jeanie Black.

11  Q.      What did you say to Ms. Black?

12  A.      That she was -- the truth.  That she told

13  me, "Speak English.  Speak English.  We are in

14  America."  And I told Jeanie Black that is not fair

15  because many -- we are supposed to customer first.

16  And when they don't understand English, they can speak

17  Spanish with me.  And she told me, "Don't worry,

18  Gloria.  Everything is gonna be fine."

19  Q.      What was the next thing that happened that

20  you felt was discrimination or harassment?

21  A.      Okay.  When I -- they posted the position

22  for full-time, I put my name, my abilities, and I bid

23  that position.  Many people apply, and I bid it.  And

24  Michele Warren say that why I get full-time position

36

1    if my English is not good.

2    Q.      Who said that?

3    A.      Michele Warren?

4    Q.      And this was after you were selected?

5    A.      Yes.

6    Q.      And what did you say?

7    A.      I say I don't need my English to show people

8    that I am working, I am a good worker.  If I work, it

9    doesn't matter what language I speak.  Work is work.

10   Q.      And what was Michele Warren's position?

11   A.      Deli service clerk.

12   Q.      Did you report Michele's comment to anyone?

13   A.      Yes, yes.

14   Q.      To whom?

15   A.      To Jeanie Black and then BJ.

16   Q.      What did you tell Jeanie Black about this?

17   A.      About this, the same thing.

18   Q.      And what did she say?

19   A.      "Don't worry, Gloria.  Everything is gonna

20   be fine."

21   Q.      And what did you tell BJ?

22   A.      I said okay, because I don't need to show

23   you if I speak English to work.  I work good, no

24   matter what language.



37

1    Q.        And what did BJ say?

2    A.        "Don't worry, Gloria.  Everything is gonna

3    be fine."

4    Q.        The comment that Nancy made to you about

5    speaking English, was that before you moved into

6    full-time?

7    A.        After.

8    Q.        After.  Okay.  So all the problems happened

9    after you moved to full-time?

10   A.        Yes.

11   Q.        And you don't specifically remember what

12   date that was?

13   A.        I don't remember what date I get full-time

14   position.      .

15   Q.        Okay.  I know we can get that for you.

16   A.        Okay.

17   Q.        What is the next thing that happened that

18   you felt was discrimination or harassment?

19   A.        Okay.  When they -- one day my husband,

20   Emilio Nieves, and me, we walk through the store like

21   customers, and Michele Warren and Christina Shaw began

22   to say, "The plane, the plane."  Remember the movie

23   the "Fantasy Island"?  The little guy and the old man,

24   they have an accent because one was from Mexico and

Gloria Nieves

38

1    the other was from France.  The little one said, "The

2    plane, the plane."  And Christina began to say, "The

3    plane, the plane."

4    Q.      Can you place this in time?

5    A.      I don't -- it was wintertime, like

6    Thanksgiving or something like that, because I know I

7    was using one coat, a heavy coat.

8    Q.      Did you say anything to them at the time?

9    A.      Just look at and I smile.  That's all.  I

10   can't say nothing.  My English is not good to fight

11   with somebody else.

12   Q.      Did you report this to anyone?

13   A.      Yes.

14   Q.      To whom?

15   A.      BJ.

16   Q.      Is Jeanie Black gone at this time?

17   A.      Yes, she is gone.

18   Q.      And what specifically did you say to BJ?

19   A.      The same thing that I am telling you, "The

20   plane, the plane."

21   Q.      And what did she say?

22   A.      "Don't worry, Gloria.  I gonna fix that."

23   Q.      What was Michele's position?

24   A.      Deli clerk service.

1    Q.        And what was Christina's position?

2    A.        The same.

3    Q.        What is the next thing that happened that

4    you thought was discrimination or harassment?

5    A.        The other one.  One day we was Connie, the

6    last name I don't remember, Amanda Cumberbatch, and

7    Christina Shaw, and me, at nighttime, like 10:30 or

8    quarter of 11:00, we was -- everything was done, and

9    we was talking.  And Christina told me -- we was

10   talking about, because we saw my husband using a hat

11   like Russian people they use in winter.

12   Q.        A hat, like a furry hat?

13   A.        Yes, yes.  And she told me, "He looks like

14   an Eskimo."  I said, "No, like a Russian, because he

15   looks like a Russian."

16             "No.  An Eskimo."

17             I say, "Whatever.  I thought it was

18   Russian."  And she told me, "Gloria, anyway, do you

19   know where is Alaska?"

20   Q.        Who made that comment?

21   A.        Christina.  "Do you know where is Alaska

22   is?"

23   Q.        And what did you say?

24   A.        I said, "Of course.  I have the university."

Gloria Nieves

40

1          "Oh, I thought South American people doesn't

2    have education like us."

3    Q.          And that is Christina telling you that?

4    A.          Yes.

5    Q.          Did you report that to anyone?

6    A.          Everybody.  I told Jeanie, BJ, Steve Briely.

7    Sometimes I was crying.

8    Q.          What did you tell BJ about this?

9    A.          The same thing.

10   Q.          You just reported the story?

11   A.          Yes.  Oral, no writing.  Just oral.

12   Q.          And do you remember speaking to Steve Briely

13   about this --

14   A.          Yes.

15   Q.          -- Eskimo incident?

16   A.          About everything I say.  They made me feel

17   like a cuccarachia.

18   Q.          You told Briely that?

19   A.          Yes, like a cuccarachia, because never --

20   nothing that I say or do was good for them.

21   Q.          Were BJ and Briely together --

22   A.          No.

23   Q.          -- when you told them this?

24   A.          Separate, separate, because sometimes BJ

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

41

1   work at nighttime and Steve Briely during the day.

2   Q.      And what did BJ say when you told her about

3   this?

4   A.      "Don't worry, Gloria.  Don't pay attention.

5   They have bad jokes or hard jokes or not funny jokes."

6   Q.      And what did Briely say?

7   A.      "Well, I gonna fix that problem, Gloria.

8   Don't worry.  You are a good worker."

9   Q.      What was the next thing that happened?

10  A.      The next thing, okay, the next thing, I

11  request off -- I work every single week, no matter

12  whether I was full-time or not full-time.  In my days

13  off they call me, "Gloria, we need you."  I don't

14  care.  I work.  And one Sunday I request off because

15  my husband best friend had a child, and they want to

16  make a Baptist.

17  Q.      Baptism?

18  A.      Yes, and I request off.  And you know that

19  many times they change the time that we supposed to

20  request off:  One week, one month, one day, whatever.

21  And I request one week before.  And Denise Dean told

22  me, "I can't give you -- I will not give you that day

23  off because Michele Warren requested off."  And I say,

24  "I have more seniority than her.  And she doesn't work

42

1    every weekend.  I work every single Sunday.  And I

2    need that Sunday off, because I have priorities:  My

3    family, my husband."  And she wasn't so happy to give

4    me that day off.

5    Q.      This is Denise you were talking to?

6    A.      Yes.

7    Q.      And this is when she was the deli manager?

8    A.      Yes.  She is the deli manager now.

9    Q.      Did you get the day off?

10   A.      Yes.  But they was mad.  They were mad.

11   Q.      Who was mad?

12   A.      Denise.  And they give me less hours than

13   they supposed to give me, 48 hours, because I was

14   full-time.

15   Q.      When did you get less hours?

16   A.      The day after I request off.

17   Q.      How many hours less did you get than you

18   usually would?

19   A.      I get hours, 48 hours every week.  And after

20   that, two weeks in a row I get 45, 40 hours.

21   Q.      And how long did that happen?

22   A.      Two weeks, just two weeks.

23   Q.      Anything other than what you have already

24   told us that made you think that Denise was mad at you

Gloria Nieves

43

1    because you asked for time off?

2    A.      That I remember.  I was off because I had a

3    problems, health problems.  I have a mild heart

4    attack, and I went to the hospital, and I told my

5    husband, "Tell Denise that I can't work because I am

6    in the hospital."  After that they suspend me for any

7    reason that I know.

8    Q.      This is in March of '04?

9    A.      Yes.

10   Q.      Okay.  Is there anything other than what you

11   have already testified up until March of '04 that you

12   believe was discrimination or harassment?

13   A.      The other stuff that I told you.  And Nancy,

14   Nancy, that girl told me one day that my question was

15   all the time stupid.

16   Q.      What do you remember about that?

17   A.      Because I ask her, "You gonna take your

18   break or I gonna take my break?"  And she turned

19   around and say, "You always ask a stupid question."

20   And I say, "I am sorry.  I just ask."

21   Q.      Do you believe that Nancy's response was

22   discrimination against you?

23   A.      Yes.

24   Q.      Why?



Gloria Nieves

44

1   A.       Because -- I don't know.  I feel, I feel

2   like Michele Warren, they don't like.  When I speak

3   Spanish with customer, all the time, "Gloria, don't

4   speak Spanish."  And I was taking care of our

5   customers.  And the customer, they look for me

6   everywhere.

7   Q.       Was there anybody other than Nancy who told

8   you to speak English?

9   A.       Yes, Michele Warren.

10  Q.       What did Warren say?

11  A.       That I have to speak English because nobody

12  understands Spanish in that store.

13  Q.       When did she tell you that?

14  A.       I don't know.  Many times, because they

15  don't like -- because they feel bad when I speak

16  Spanish with customers, because they don't understand

17  what I say.

18  Q.       Did you ever report to any supervisor

19  Michele's comments?

20  A.       Yes, I report many times, many times.

21  Q.       Other than what you have already told me,

22  did you ever report Michele's comment?

23  A.       Yes.

24  Q.       To whom?

45

1    A.        To BJ, to Briely.

2    Q.        What did you tell BJ about Michele?

3    A.        That she made me feel like a little animal

4    because I can't speak Spanish with my customers.

5    Q.        What was her response?

6    A.        "Don't pay attention to her."

7    Q.        And what did you tell Mr. Briely?

8    A.        The same thing, and "Don't pay attention to

9    her, Gloria.  Everything gonna be fine."

10   Q.        Did any supervisor at Acme ever tell you

11   that you needed to speak English with customers?

12   A.        No.  Never, never.

13   Q.        The incident with Nancy that she told you

14   your question was stupid, was that when you were in

15   the full-time position?

16   A.        Yes.

17   Q.        The incidents with Michele when she told you

18   to speak English, were they also when you were

19   full-time?

20   A.        Yes.

21   Q.        Yes.  Okay.  You were telling me about a

22   problem in March of 2004.  What happened in March?

23   A.        I have a problem with my heart, a mild heart

24   attack, and I went to the doctor Thursday.

47

1    me, "Gloria, come to my office."  And I say, "Any

2    problem?"  Because I didn't know.  "No, no, no.  Go to

3    my office.  Don't punch in."  And I went over there.

4    I sit down.  BJ called the shop steward, Anna Trump,

5    Anna Trump.  She was there.  And BJ told me, "Gloria,

6    you are suspended indefinitely."  And I say, "Why?"

7    And she told me, "You gonna know, because you have to

8    talk with your union representative."  They give me

9    the phone number.  And that's all.  That's all.  I was

10   suspended one week.

11                My union representative called me.  He

12   talk all the time with my husband because I don't

13   understand what he said.  The only thing that I

14   understand was that Joyce Alphin told BJ and BJ and

15   Steve Briely I throw away to her a bucket of water,

16   that big bucket that we use for mop, and a piece of

17   ham, the big chunk in her face.  And I say she is

18   supposed to be hurt and wet.  And I said it is

19   impossible.  I never do.  I never did that.  And she

20   said that was the truth.

21                And my union representative told me,

22   "Gloria, I gonna fix."  I never meet him in person.

23   BY MS. MALLOY:

24    Q.      And what is his name?

48

1    A.      Woloski, Uloski.  Something the last name

2    Woski, Woski.  Henry Woloski or something like that.

3    He talk with my husband because I don't have any

4    experience with unions.  In my country we don't have

5    unions.  And my husband talked with him.

6            And then they talk with Mr. Steve Briely and

7    the union, and they take out a determination that they

8    transfer me from Middletown to Town of Smyrna.

9    Q.      What is your understanding of what

10   Mr. Woloski said the problem was?

11   A.      The problem was like I throw away a bucket

12   of water on Joyce's face and a piece, a chunk of ham.

13   Q.      Did you get along well with Joyce?

14   A.      Yes.  We were so close.  Joyce, Amanda and

15   me, we were so close, because we work all the time at

16   nighttime, 2:45 until 11:15.

17   Q.      Is there anything that Joyce ever did that

18   you thought was discrimination or harassment against

19   you?

20   A.      No, no.  She changed that day that I was in

21   the hospital.  And when I was in the hospital, they

22   thought that I was faking my illness.  Faking, say

23   something that is not true, faking?

24   Q.      Who thought you were faking?

Gloria Nieves

49

1   A.      Denise, the other, Michele, that I was

2  faking my illness.

3   Q.      Why do you believe Denise and Michele

4  thought --

5   A.      They say.  They say that.  They thought I

6  was faking my illness.

7   Q.      They said that to you?

8   A.      No.  To Amanda Cumberbatch.

9   Q.      Is there anything Amanda ever did that you

10  believe was discrimination --

11   A.      No.

12   Q.      -- or harassment against you?

13   A.      No.

14   Q.      Do you remember anything that happened in

15  early March --

16   A.      Nothing.

17   Q.      -- where you may have been yelling at your

18  co-workers?

19   A.      No.

20   Q.      Was there any incident -- strike that.

21           Was there any occasion that you remember in

22  early March of '04 when water came out of the bucket?

23   A.      Never, never.  That night I was mopping the

24  floor.  I squash the mop and I begin to mop.  That's

Gloria Nieves

52

1    A.        My heart attack?

2    Q.        No.  The problem at work.

3    A.        No.  No.  Because I didn't know.  When I

4    worked that week, like a Friday, I tried to punch in,

5    and BJ told me, "Don't punch in.  We need to talk with

6    you."  I didn't know nothing.  I discovered everything

7    when I called my union representative.  BJ never told

8    me what happened, nothing.  Just "You are suspended."

9            "Why?

10           "You are going to know."  That's all.  I

11   never signed nothing.  The shop steward, she give me

12   the phone number of the union.  "Bye, Gloria, bye."

13   Q.        So just so I am correct, and you never

14   talked to any of your co-workers --

15   A.        No.

16   Q.        -- about the incident --

17   A.        No.

18   Q.        -- at all?  Okay.

19           Do you have a meeting with Briely or BJ

20   about this?

21   A.        When they make a decision, Briely told me

22   that he need to talk with me.  And I went with my

23   husband, because he understand better than me.  And he

24   told me that I have to be transferred to Middletown to

Gloria Nieves

53

1   Smyrna.

2   Q.    Was anybody at this meeting other than you

3   and your husband and Mr. Briely?

4   A.    No.  Just Briely, Emilio Nieves and me.

5   Q.    And tell me what happened at this meeting.

6   A.    We went over there.  We talk.  My husband

7   was trying to talking with him about what happened.

8   And he say that I was a good worker but remember that

9   nobody work like everybody else, and that's all.

10        And I say, "If I want to do more about my

11  case, defend more, what happen?"  And he told me, "If

12  you continue with this problem, the end of this is

13  gonna be different."  He told me that.

14  Q.    Could you say that again, please?

15  A.    If you continue to check all that stuff,

16  like you continue to -- maybe he pronounce this,

17  grievance.

18  Q.    Grievance, grievance?

19  A.    Okay.  I don't know.  I didn't know what is

20  grievance.  I asked my husband when I left, "What is

21  grievance?"  I don't know many words in English.  I am

22  sorry.  He told me, "The end of this history is gonna

23  be different."  I don't know what was the meaning.

24        And I say, "Okay, Mr. Briely.  Thank you so

55

1              (Gloria Nieves Deposition Exhibit No.

2    9 was marked for identification.)

3    BY MS. MALLOY:

4    Q.       Exhibit 9 is a letter dated March 16, 2004.

5    Is that your handwriting on the top?

6    A.       Yes.

7    Q.       And that indicates that you received this

8    letter on March 19?

9    A.       Yes.

10   Q.       Did you get it in the mail?

11   A.       Yes.

12   Q.       When you met with Mr. Briely and he told you

13   about the transfer to Smyrna, was that before or after

14   you received this letter?

15   A.       After.

16   Q.       So when you met with Mr. Briely, you already

17   knew that you were gonna be transferred to Smyrna?

18   A.       Yes.

19   Q.       Other than what you have already testified

20   about, did you say anything else to Mr. Briely at this

21   meeting?

22   A.       No.

23   Q.       Had you ever worked in the Smyrna store

24   before?

58

```
 1    BY MS. MALLOY:
 2    Q.      Is there anything you want to add to your
 3    testimony?
 4    A.      Yes, please.
 5    Q.      Go ahead.
 6    A.      Michele Warren at that time when I get
 7    full-time position, she was asking if I am legal or
 8    no, if I have green card.  Of course, I am legal.
 9    Nobody is gonna hire -- no big company can hire
10    illegal people.  I showed the papers.  And I told to
11    Steve Briely.  "Don't worry, Gloria.  She is a
12    troublemaker, making trouble."
13    Q.      Did you report this comment by Michele
14    Warren to anybody?
15    A.      Yes.
16    Q.      To whom?
17    A.      BJ and Steve Briely.
18    Q.      Were BJ and Briely together when you told
19    them?
20    A.      No; different.
21    Q.      What did you tell BJ?
22    A.      BJ told me she think that -- what she think,
23    she is saying that.  "Of course, you are legal."  And
24    Mr. Briely told me, "Gloria, don't worry.  We gonna
```

60

1    Diana, Deana, Donna.    Donna.

2    Q.      Do you remember her last name?

3    A.      No, I don't remember.

4    Q.      How did you get along with her?

5    A.      Good.

6    Q.      Any other store directors or assistant store

7    directors at Smyrna?

8    A.      Kevin.  No.  I get along with everybody over

9    there.

10   Q.      Who were your co-workers?

11   A.      In deli?

12   Q.      In the deli.

13   A.      Okay.  Penny Armstrong was my deli manager.

14   Suzanna, I don't know the name, the last name.

15   Suzanna.  And Mrs. Pink, nickname Pink.  I don't know

16   the name.  Everybody call her Pink, Mrs. Pink.

17   Suzanna, Jane, Freddie.  Ay, the big guy.  I don't

18   remember.  I don't know the names.

19   Q.      How did you get along with Penny Armstrong?

20   A.      Good.  I love her to death.

21   Q.      Did you have problems with any co-workers or

22   supervisors in Smyrna?

23   A.      On deli, no.

24   Q.      Did you like working at Smyrna?

61

1    A.        At Smyrna, yes, until I went to seafood

2    department, because I was trying to learn -- I like to

3    learn everything.  I told Mr. Frank Murphy, "Can I go

4    to the seafood, because I want to learn more.

5              "Sure, Gloria.

6              "But I gonna get my full-time.

7              "No, don't worry."

8              I went over there.  I was working full-time,

9    the same thing I was working on deli.

10   Q.        Is that the person in charge at night?

11   A.        Yes, me.

12   Q.        So when you moved to seafood, you were the

13   person in charge at night?

14   A.        Yes, at nighttime.  2:45 until 11:15.  One

15   day I remember, it was September, September 6,

16   Memorial Day or holiday, something like that.

17   Q.        Labor Day?

18   A.        Labor Day.  I was working, and I make a

19   mistake.  We supposed to write down the dates, how

20   many days you have to put on the shelves, the seafood,

21   and I forgot that.  And I said bad words with F.  And

22   my boss smack my mouth.

23   Q.        Who was that?

24   A.        Linda Whitman.



62

1    Q.        Did she hit you or put her hand over your

2    mouth?

3    A.        No; hit me, hit me.  And I was crying

4    because nobody hit me.  Nobody supposed to touch

5    nobody, no matter what.  If somebody say bad word, say

6    "Gloria, shut up" or "be quiet" or "change your word."

7    But don't hit me.

8              And I went to Mr. Frank Murphy.  He try to

9    fix the problem.  And the security ask Linda Whitman,

10   and she said yes, she did it.  Nobody say nothing.

11   Nobody did nothing.

12   Q.        What did you want to happen?

13   A.        Because she told me that she doesn't like

14   that word, and I say, "You say other bad words and

15   nobody hit you."  That's all.

16   Q.        When you say that nothing happened to Linda,

17   what was it that you thought should happen to her?

18   A.        A warning or something or say you have to

19   respect or something like that.  I don't want trouble.

20   Just please, be more polite, or if you don't like that

21   word, say, "I don't like that word," but don't hit

22   nobody.  Nobody say nothing.

23   Q.        Where in the store were you and Linda when

24   this happened?



63

1    A.        Inside the seafood, behind the counter.

2    Q.        Were there customers around?

3    A.        I don't remember.  Co-workers, yes.

4    Q.        Who was there?

5    A.        A lot of people.  Two guys, and they saw

6    that.

7    Q.        Who were they?

8    A.        I don't remember their names, but she say

9    that she did it.  She recognized that.

10    Q.        Did she ever apologize to you?

11    A.        No.

12    Q.        Do you agree that you should not have used

13    the F word?

14    A.        Yes.  I say I am sorry.  I know it is a bad

15    word.  But nobody can beat you.

16    Q.        Any other problems that you had at Smyrna?

17    A.        That's all.

18    Q.        Okay.  Did you get pay increases while you

19    were employed by Acme?

20    A.        Like every six months, like ten cents or 20

21    cents, like a regular payment.  Not like -- because

22    you was transferred to down there, you are going to

23    have more money, no.  Like a regular pay.

24    Q.        You got regular pay increases?



64

1    A.        Yes, just one time when I work down in

2    Smyrna.

3    Q.        When you were at Middletown, did you ever

4    help your co-workers learn some Spanish words?

5    A.        Yes, yes.

6    Q.        Tell me about that.

7    A.        Amanda and Joyce, "How do you say good

8    morning?  How do you say bye?  How do you say boy?"

9    That's all.  The rest of the people, no.

10   Q.        Amanda and Joyce you did that with?

11   A.        Yes.

12             Sorry.  Can I say something that I forgot, I

13   remember at this moment?

14   Q.        Sure.

15   A.        When they was using -- everybody talk about

16   drugs, abuse drugs or whatever, everybody over there,

17   Michele, Nancy, "You have to ask Gloria because she is

18   from Colombia."

19   Q.        Tell me a little bit more about that.

20   People spoke about drugs?

21   A.        About drugs, about drugs, whatever topic,

22   and they say, each of them, between them, "You have to

23   talk with Gloria, because she knows better about drugs

24   because she is from Colombia."

Gloria Nieves

65

1    Q.        And who said that?

2    A.        Nancy, Michele, Christina.  And I say, "Why

3    you have to ask me about drugs?  I am from Colombia,

4    but I don't know nothing about that."

5    Q.        How many times did something like that

6    happen?

7    A.        Many times.

8    Q.        And was this after you became full-time in

9    Middletown?

10   A.        When I was part-time and when I was

11   full-time.

12   Q.        Can you estimate for me how many times a

13   comment like that was made?

14   A.        Four or five times.

15   Q.        And did you report any of those --

16   A.        Yes.

17   Q.        -- to anyone?

18   A.        Yes.

19   Q.        Who did you report it to?

20   A.        Steve Briely, when Jean Black was there, and

21   with BJ, Steve Briely, and with Phyllis.  She was a

22   CSL in front of Acme.

23   Q.        Phyllis?

24   A.        Phyllis.

68

1   differently because you brought problems to people's

2   attention?

3   A.      Because one incident happened over there

4   that Christina and Alex was playing around, you know,

5   playing around or something.  And she complain with

6   Steve Briely, and he was -- Mr. Briely talk with him

7   and he was fired.  He touch her in a bad way, touch

8   her in back.

9   Q.      Touched her back in a bad way?

10  A.      Yes, in a bad way.  I don't know how it was,

11  because I wasn't work that day.  And he was fired.

12  Q.      Alex was fired?

13  A.      Yes.

14  Q.      Do you believe that you were transferred to

15  the Smyrna store because you brought problems to

16  people's attention?

17  A.      Yes.

18  Q.      Okay.  Why do you believe that was the

19  reason?

20  A.      Because they know that I was new in the

21  area.  They knew that I have my brother-in-law in my

22  house.  They don't want me there.  They don't want me

23  there.  I feel that way.  They don't want me there

24  anyway.

69

1    Q.        Why did you think they didn't want you there

2    in Middletown?

3    A.        How can I say, explain?

4    Q.        Explain the best you can, and then I can ask

5    you more questions.

6    A.        Okay.  When you try to work good and to the

7    best the things that supposed to -- like they told

8    you, they train you to do this, and you do more than

9    they train you, they don't like it.  The co-worker

10   doesn't like it.  You understand what I mean?

11   Q.        Yes.  They didn't like you because you tried

12   to do a really good job?

13   A.        Yes.  Because like if they teach me just

14   clean one time a week the shelf or the meat when we

15   supposed, the meat, I clean it every night because it

16   doesn't smell good, they don't like it.  I clean the

17   sharp, the slicer ever single night before we left.

18   They don't like it.  No, Gloria.  First time they do

19   it.  No.  Why the first time?  We have plenty of time.

20   We can do it.  It is the way that I feel.

21        When somebody work more than you supposed to

22   do it, because many people work by the book, and I try

23   to work more than the book, I definitely -- that's the

24   way I feel.

70

1    Q.        And who was it that you think didn't like

2    you because you tried to do more than the book?

3    A.        Nancy, Christina, Michele.  Ay, what else?

4    Many people, many people.

5    Q.        Co-workers?

6    A.        Co-workers.

7    Q.        Was there anybody in management who didn't

8    like you because you tried to do more work?

9    A.        I don't know, because many people in front

10   of you, they are nice.  In back of you, they are not

11   honest.

12   Q.        Do you believe that anybody in management at

13   Acme did not like you because you brought these

14   problems with your co-workers to their attention?

15   A.        I gonna be honest with you.

16   Q.        Please be honest.

17   A.        Denise Dean was -- has a friend over there,

18   Joanne.  I don't know the last name.  She was like the

19   second on board on her team.  The position was posted.

20   Anyone can bid it.

21   Q.        This is the full-time position you applied

22   for?

23   A.        Yes.  And I got it.  Joanne didn't got it.

24   When I got it, the problems begin, because I feel

73

1   A.        No.  In Smyrna, no.

2   Q.        At Smyrna.

3   A.        No.

4   Q.        Was there any conduct at Smyrna that you

5   felt was discrimination against you?

6   A.        No.

7   Q.        Was there any conduct at Smyrna that you

8   felt was harassment against you?

9   A.        No.

10  Q.        Did you ever feel at Smyrna that you were

11  treated differently because of your national origin?

12  A.        No.  Everybody was nice with me over there.

13  Just with Linda.

14  Q.        Okay.  Is there anything that happened at

15  Smyrna that you thought happened to you because you

16  had complained to people before about problems?

17  A.        At the beginning I thought when she beat me

18  and I say maybe it was that.  But I didn't pay

19  attention.

20  Q.        That's the problem with Linda?

21  A.        Yes.

22  Q.        Did Linda know anything; do you know?  Do

23  you know if Linda --

24  A.        I don't know.

Gloria Nieves

76

1    Q.       And Murphy is the store director?

2    A.       Murphy is, Frank, yes.

3    Q.       Okay.  Your employment with Acme ended in

4    January?

5    A.       January 15.

6    Q.       January 15 of '05.  Tell me what you told

7    Acme about that.

8    A.       About what?

9    Q.       Did you tell anybody that you were leaving?

10   A.       Yes.  I told Mr. Frank Murphy that I am

11   gonna -- I am gonna quit.  And he say okay.  And

12   January 15 I received my last check, and January 16 I

13   went to Miami.  That's all.

14   Q.       And did you tell Mr. Murphy why you were

15   going to quit?

16   A.       No, no.  Just I want to quit.  I am so

17   stressful, problems here with Linda Whitman, and I am

18   done.  I say that.  I am done.  Thank you for

19   everything.  They give me my -- the last -- the check

20   before the last one, and that's all.

21   Q.       Now, if you started at Smyrna in the middle

22   of March of '04, when was the incident with Linda?

23   A.       In November.  I mean -- yes.

24   Q.       Labor Day, I think you said; right?

78

1    A.        Yes.  And I say --

2    Q.        So any other problems with Linda.

3    A.        No, no.  That's all.

4    Q.        Why did you wait until four months later

5    then?

6    A.        Because I was saving money.  I was saving

7    money, saving money, because I tried to go not by the

8    plane; just with my car.  And it is expensive to go

9    from here to there.  It is 28 hours or something like

10   that.  And I have to go, and I say I am done.

11   Q.        Why did you feel that you needed to go to a

12   different state?

13   A.        Because I need to stay with somebody that

14   really love me outside my husband.  I feel like I am a

15   human, like I deserve something good.  No matter what.

16   If my husband say, "Gloria, don't worry.  You are good

17   person," but I feel like I am not good enough for

18   nobody.

19   Q.        Were you having any marital problems at all

20   with your husband?

21   A.        Like every marriage.  Fight, little fights,

22   because we are different countries.  He is older than

23   me, and I am so -- how do you say when somebody is

24   spoiled?  How do you say?

79

1  Q.      Spoiled?  What did you say; spoiled?

2  A.      Yes.  And we have problems like every

3  marriage, like every marriage.

4  Q.      Did problems with your husband or your

5  marriage have any part at all in your decision to move

6  to Miami?

7  A.      I think sometimes yes, sometimes no.  But

8  everything was together.  Everything was together.

9  Q.      Did you give Acme anything in writing when

10  you left?

11  A.      No.

12  Q.      When you were at the Smyrna store, did you

13  talk to anybody about the fact that you felt that you

14  were under a lot of stress from the incident with

15  Linda?

16  A.      Yes.  I was crying.

17  Q.      Who did you talk to?

18  A.      Who was that guy?  I talk with Penny, Penny

19  Armstrong.  She was the deli manager, my ex-boss, my

20  ex-boss.

21  Q.      And what did you tell Penny?

22  A.      I feel like I don't deserve nothing.  I

23  don't want nobody be fired.  I don't want nobody be

24  fired because I don't want be fired me.  But something

80

1    like she is human, I am human, I deserve some kind of

2    a little respect, no?  No matter what position I have,

3    if she the boss or no.  Everybody has to respect

4    everybody, no?

5    Q.      And was this conversation with Penny around

6    Labor Day, when the incident happened?

7    A.      No; after that.  Between October,

8    December -- I mean, December, when I was -- I had

9    enough money to leave.

10                (Gloria Nieves Deposition Exhibit No.

11   10 was marked for identification.)

12   BY MS. MALLOY:

13   Q.      Exhibit 10 are some notes that your lawyer

14   gave to me.  I put them all together as one exhibit so

15   you can explain that to me.

16   A.      Okay.

17   Q.      The first page is a letter from your lawyer.

18   A.      Yes.

19   Q.      The second page that says P256 in the

20   corner -- do you see that at the bottom?  Is that the

21   one you are looking at?

22   A.      Yes.

23   Q.      Okay.  Tell me about these notes, and then I

24   will ask you some more questions.

1  A.      November 16, 2003, the same person, Michele

2  Warren, they ask why Acme they give me the full-time

3  position if my English is not good enough.

4  Q.      Okay.  We talked about that?

5  A.      Yes.

6  Q.      Okay.  No. 3?

7  A.      Okay.  New Year's Eve Michele Warren, she

8  yell at me in front of a customer.  I didn't say that.

9  In front of a customer, and I make the complaint, and

10 nobody say nothing.

11 Q.      Tell me what happened on New Year's Eve?  Is

12 this something we already talked about?

13 A.      No.

14 Q.      All right.  Tell me about that.

15 A.      You see I forgot many stuff.

16 Q.      Okay.  That's why I wanted to show you this.

17 A.      I was taking care -- New Year's Eve, you

18 know, we want to go home, and I was doing -- take a

19 customer, and I told Michele, "Will you please bring

20 one new ham."  And she yell at me, "I don't have time.

21 You are not my boss.

22         "Sorry."

23         And the customer would say, "Gloria, I am

24 sorry.  She doesn't -- nobody supposed to yell at you

Gloria Nieves

88

1    Q.        Okay.  What is No. 5?

2    A.        One Sunday we was working, Amanda, Connie,

3    and Ruth Williams, when the next day they make a

4    little note.  They put in front of the wall with they

5    say -- they put our names, Connie, Amanda, Ruth, and

6    Gloria, that we was eating bread pudding.

7             I asked Denise, "I want to see the video."

8    The video, they supposed to have videos.  And Denise

9    told me that I don't have any right to ask for the

10   video.  Because when we walk inside the deli, the

11   first thing that we see is the papers on the wall, and

12   it was a small paper, and the name was big:  Ruth

13   Williams, Connie, Amanda Cumberbatch and Gloria Nieves

14   eat bread pudding.

15            First of all, I don't like pudding.  Second,

16   we know that we not supposed to eat nothing from deli.

17   If you want to eat something, it is samples we put

18   outside for customers.  That's all.  But inside the

19   deli, we know that.  I know that.  I don't like

20   pudding.

21   Q.        Who made this sign?

22   A.        Denise.  And I ask her, "I want to see the

23   video, because if you say so, it is because somebody

24   saw on the video.  I want to see the video."  And she

Gloria Nieves

98

1    right order.

2                    THE WITNESS:  It is my fault, because

3    I didn't put it --

4                    MS. MALLOY:  No problem.  No problem.

5    Okay.

6    BY MS. MALLOY:

7    Q.      Let me take a second to read this.  I just

8    want to make sure I have asked you about everything.

9    (Pause)

10                   Could you look at No. 8 on page 260.  You

11   are talking about requesting time off?

12   A.      Yes.

13   Q.      I don't think we talked about that one, did

14   we?

15   A.      No.

16   Q.      Okay.  Tell me -- take your time and read it

17   and then tell me what that issue was.

18   A.      Okay.  Okay.  Yes.

19   Q.      Tell me what this issue was.

20   A.      Okay.  Every December my husband and me, we

21   go -- sometimes we go to Colombia to see my mother.

22   She is over there.  And she was sick.  And I told

23   Denise, "Denise, I want to go to Colombia in

24   December." And Denise told me no because in December

99

1    it is so hard to give time off to people because --

2    Q.      It is very busy at the store?

3    A.      Yes, December is so busy. From Thanksgiving

4    until the end of the year it is so busy in every

5    store. And I was so sad because it was my mother, no?

6    And I say okay, I will not go. I never said -- I

7    never complained. I never say nothing, but they

8    denied my request without pay.

9            I don't need pay, because I want to see my

10   mother. And I told my husband, "I don't care, Emilio,

11   that I don't want to see pay. I deserve pay because

12   it was my time off vacation." I work at Acme almost

13   five years, and they deny me that request. And I

14   thought it was unfair.

15   Q.      How much time were you asking to take off?

16   A.      Two or three weeks.

17   Q.      And your note says that Michele had

18   requested time off?

19   A.      No. Remember that I told you that I request

20   one Sunday off for the --

21   Q.      That's the baptism?

22   A.      Yes.

23   Q.      Okay.

24   A.      And everything was together because I

Gloria Nieves

100

1  remember everything.

2  Q.     Okay.  No problem.  Take your time.

3         Is there anybody who you know that took two

4  or three weeks' vacation in December?

5  A.     Excuse me?

6  Q.     You are saying that you asked for two or

7  three weeks off to go see your mother in Colombia in

8  December of 2003.

9  A.     Yes.

10  Q.     Right?  And you were denied that request.

11  A.     Yes.

12  Q.     Is there anybody who you know got two or

13  three weeks vacation in December any year?

14  A.     I don't know.  I don't know.

15  Q.     And then the next part of that goes to the

16  baptism, and we already talked about that?

17  A.     Yes.

18  Q.     Okay.  No. 9, you say that Jean Miller said

19  that you were faking your illness?

20  A.     Yes.

21  Q.     Did you hear her say that or did you learn

22  that from somebody else?

23  A.     I learned from somebody else.

24  Q.     Okay.  And who did you learn that from?

101

1   A.        Amanda Cumberbatch.

2   Q.        Okay.

3               MR. BARTOSHESKY:   Off the record.

4               (Discussion off the record.)

5               (Gloria Nieves Deposition Exhibit No.

6   11 was marked for identification.)

7   BY MS. MALLOY:

8   Q.        Was there something that you wanted to add?

9   A.        No, no.

10  Q.        Exhibit 11 is a charge of discrimination.

11  Is that your signature on the bottom?

12  A.        Yes, ma'am.

13  Q.        And you signed it on April 2 of '04?

14  A.        Yes.

15  Q.        Tell me about when did you first decide that

16  you were going to file a discrimination charge against

17  Acme?

18  A.        Okay, ma'am.   I don't remember specific what

19  day.   I don't remember.

20  Q.        Okay.

21  A.        But I see that why they have to transfer to

22  Smyrna.   I didn't do -- I truthfully, I never did

23  nothing against Acme or against coworkers.   And I told

24  my husband what is the best thing to do, because I

Gloria Nieves

102

1    don't know about -- in Colombia we don't have unions.

2    We don't have labor department.  We have labor

3    department, but I don't know nothing.

4              And he told me let's go to the labor

5    department.  Let's see what they say.  And we went.  I

6    told them everything that I say you, I tell you.

7    Q.       Okay.  Prior to filing this charge, let's

8    say it is April 2, '04, did you ever try to talk to

9    anybody in human resources at Acme?

10   A.       No.

11   Q.       Were you aware that there was a hotline

12   phone number?  Have you ever heard of that before?

13   A.       I know that hot number was for customers.

14   Q.       Okay.

15   A.       I don't know for employees.  I didn't know.

16   Q.       You didn't know?

17   A.       No.

18   Q.       Did you ever try to call the hotline number?

19   A.       And that number that we saw in the paper

20   that they send me.

21   Q.       Right.

22   A.       The letter that they notified me, it is the

23   number that I have to call.  I remember now.

24   Q.       Let me just --



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1  told me that they don't have that.

2  Q.      Do you know where Joyce reported that this

3  incident happened?

4  A.      No.  We punch out.  I went to one door.  She

5  went to -- I don't know where she went.  I left.  And

6  the next day I was suspended.

7  Q.      No. 8 says, "BJ said that if my husband came

8  into the store, she would have somebody physically

9  harm him."

10  A.     Yes.

11  Q.     Tell me about that.

12  A.     Okay.  Everything was like that.  When they

13  suspend me, I call my husband.  I was so crying,

14  upset, and the only person I have in here is my

15  husband.  I have to call him.  "Poppy, Poppy, they

16  suspend me.

17          "What happened?  Why?  What you did?"  He

18  thought I did something wrong.

19          I said, "Nothing.  They say nothing.

20          "Did you sign any paper?

21          "Nothing.

22          "They give you any warning?

23          "Nothing.

24          "Okay.  Where are you?

108

1          "In Acme, in the parking lot."

2          Okay.  I went -- "go home and stay over

3    there."

4          He finish his job.  He went home.  I wasn't

5    there.  I was -- I don't know where I was.  He was

6    worried about me.  And he was looking around the

7    parking lot if I was there.  And BJ told everybody on

8    deli the produce guy has to escort them to the parking

9    lot because they are afraid of my husband.

10   Q.      And how did you learn this?

11   A.      Because Amanda Cumberbatch told me because

12   they told -- BJ told her if you go outside, you have

13   to be escorted by somebody, because if he came here,

14   they can harm him and call 911.

15         He never talked with Denise.  He talked two

16   or three times with Denise, and that's all.  He

17   doesn't have bad temper over there.  He was looking

18   for me because he was upset for me because I am his

19   wife.  And when he doesn't find me in my house, he was

20   worried.  He say where is she.  And he called me, and

21   the battery of my phone was dead or something.  He was

22   worried.  He was driving around looking for me, and

23   when he went over there, he found me.  But they say

24   they come -- they have to escort everybody from deli

Gloria Nieves

114

1   Q.      No?   Okay.   Were you in Miami when you

2   received it?

3   A.      March 2005.   Yes.

4   Q.      Did you ever tell the Department of Labor

5   that you had moved to Miami?

6   A.      Yes.   When I called them, they know that I

7   was in Miami, and I say you have -- they don't tell me

8   nothing.   I received letters before, letters like this

9   that I received your complaint and everything, but

10  they know -- when they know that I was in Miami, I

11  told them that I going back.   They knew that I am

12  going back.

13  Q.      Did you tell them -- strike that.

14          Who at the Department of Labor do you

15  remember that you told that you were moving to Miami?

16  A.      I don't know.   They didn't know that I was

17  gonna move to Miami.   They didn't know.

18  Q.      Did you ever tell them?

19  A.      No, they didn't know, because my decision

20  took like this (indicating); no premeditation,

21  nothing.   I forgot about this case.   I went to the

22  labor department.   Everything was quiet; nothing.   I

23  didn't pay attention.   I thought that's all it was.   I

24  went to the labor department and that's all.   I didn't

Gloria Nieves

115

1    know.  And I went to the Miami.  The labor department

2    didn't know that I was in Miami.

3    Q.        Okay.  So just so I am clear -- I

4    misunderstood you a minute ago -- you never told the

5    labor department you went to Miami?

6    A.        Never, never.  They never know that I was in

7    Miami.

8    Q.        So you did receive Exhibit 15?

9    A.        Yes, ma'am.

10   Q.        And did you read it when you got it?

11   A.        No.  Later on, later on, because my husband

12   told me that I received a lot of letters from the

13   labor department.

14   Q.        Okay.  But you never saw these letters until

15   you moved back to --

16   A.        Yes.

17   Q.        -- Delaware?

18   A.        Yes.

19   Q.        And that was --

20   A.        Around this time, March, March, at the end

21   of March.

22   Q.        Now, I thought you told me you were in Miami

23   for about six months.

24   A.        Seven months.

Gloria Nieves

116

1    Q.        Seven months.

2    A.        Yes.

3    Q.        Okay.  And you left to go --

4    A.        January, January.

5    Q.        January 15?

6    A.        January, February, March, April, May, June,

7    July, August.

8    Q.        August.  You came back in August?

9    A.        Yes, August.

10   Q.        Okay.  So this letter that is dated in

11   March --

12   A.        Yes.

13   Q.        -- you didn't see this?

14   A.        No.

15   Q.        -- until you came back in August?

16   A.        I came back.  He told me that I received a

17   lot of letters, and I came back and I saw these

18   letters.

19   Q.        Okay.  So the first time you saw this

20   March 14 letter was in August?

21   A.        August, yes, when I back from Miami.

22   Q.        While you were in Miami, did you have any

23   telephone conversations with anybody at the Department

24   of Labor?

117

1    A.        No.

2    Q.        So this letter that is dated March 14 says

3    at the end, "If you have any information, documents,

4    or witness statements, please submit them to

5    me. . . ." So you didn't submit anything in addition?

6    A.        No.

7    Q.        Do you know whether your husband did?

8    A.        No.

9    Q.        You don't know or he did not?

10   A.        I don't know.

11   Q.        Okay.  Do you know who the Department of

12   Labor talked to about your case?

13   A.        No.

14   Q.        Have you talked to any of your co-workers

15   about whether they were interviewed by the Department

16   of Labor?

17   A.        No.

18            (Gloria Nieves Deposition Exhibit No.

19   16 was marked for identification.)

20   BY MS. MALLOY:

21   Q.        Exhibit 16 is a letter dated March 18, 2005,

22   from the Department of Labor.  This is a letter that

23   Acme received.  Have you ever seen it before?

24   A.        I don't remember, ma'am.

Gloria Nieves

123

1    Q.        Did you continue to work with Linda?

2    A.        Yes, but like serious.  Don't talk a lot

3    with her, because I was afraid that if I say something

4    wrong -- and I told her, "I am afraid to work with

5    you, because if I say something wrong, you are gonna

6    hit me.  I am afraid."  I am sorry.

7    Q.        What did she say?

8    A.        She was laughing.  Say yes, laugh.  When you

9    say something wrong, nobody say nothing to you.

10   Q.        And what was her position?

11   A.        Manager of the seafood.

12   Q.        Was she in the union, like you?

13   A.        Yes.

14   Q.        When you came back to Delaware in I think

15   you said it was around August or so --

16   A.        Yes.

17   Q.        -- what did you do to look for work?

18   A.        Oh, I wait just one month, because I am not

19   that kind of person that I have to stay in one place,

20   do nothing or watch TV or clean the house.  No.  And I

21   told Emilio, my husband, you know what?  I gonna find

22   a job.  I applied Super G, Food Lion and Wawa, and

23   when I apply at Wawa, they called me the next day, or

24   the same day I put application, they call me.  It

Gloria Nieves

124

1    gonna be one year.

2    Q.       When did you begin working at Wawa?

3    A.       12/11.

4    Q.       '05?

5    A.       '05, yes.

6    Q.       And what was your position?

7    A.       Employee associate, associate employee.

8    Like a regular.

9    Q.       Right.  And what store did you work in?

10   A.       In Middletown, 843, Middletown.

11   Q.       Has that been the only store you have been

12   at?

13   A.       Yes.

14   Q.       And are you full-time?

15   A.       No.  Part-time.  I work 40, 48 hours, but

16   they call me and I go to work.

17   Q.       When you started at Wawa, what was your pay

18   rate?

19   A.       7.50.

20   Q.       And did you get increases?

21   A.       Yes.

22   Q.       When and to what?

23   A.       They increase the salary, the pay of the --

24   how do you say in English when you are working good?

Gloria Nieves

135

1    and go to Miami, though, rather than just quit your

2    job?

3    A.        Because I was -- I want to escape.  You see,

4    stay alone, think clear, feel like you deserve, you

5    are human, because everybody tried to (indicating) you

6    don't deserve it.  Your English, speak English,

7    airplane.  And I say why?  I am human.  I don't care

8    if you are American, I am Latina.  I want to go.  Stay

9    alone and stay away from every problem.

10            I didn't care.  When I put that thing on the

11   labor department, I didn't care.  I said I am going.

12   I have to be with people like I feel good, because I

13   didn't see my family in a long time.  And I went over

14   there and I feel good.  I talk with my husband.  I

15   feel -- how do you feel?  Good, great.  And I was

16   relaxed, relaxed.

17            My aunt is so religious.  She is Catholic.

18   She began to talk, give me advice, and I say I have to

19   pack.

20   Q.        What did you talk to your aunt about?

21   A.        No about the stress, I talk about Acme.  But

22   she told me go back, your husband, don't leave your

23   husband.  We don't talk about Acme; just my relation

24   with my husband.  That's all.

145

1    returns?

2    A.       Yes.

3    Q.       Have you given your lawyer everything you

4    received from the Department of Labor?

5    A.       Yes.

6    Q.       Have you given your lawyer everything you

7    may have received from the EEOC?

8    A.       Yes.

9    Q.       Have you -- forgive me if I asked you this

10   before.  But since January of '05, when you left, have

11   you talked to anybody at Acme?

12   A.       No.

13   Q.       Have you talked to Amanda about anything?

14   A.       No, no.

15   Q.       Have you talked to Joyce about anything?

16   A.       No.

17                   (Gloria Nieves Deposition Exhibit No.

18   22 was marked for identification.)

19   BY MS. MALLOY:

20   Q.       Exhibit 22 is a document that your lawyer

21   gave us.  The first page says 2004 U.S. individual

22   income tax return summary.  Is this a document that

23   you completed?

24   A.       Yes.

Gloria Nieves

146

1    Q.        And how did you go about completing it?

2    A.        Excuse me?

3    Q.        How did you do this?

4    A.        I was in Miami, and my cousin helped me to

5    do that.

6    Q.        Did your cousin do it on a computer?

7    A.        Yes.

8    Q.        Do you have any other documents that relate

9    to this?

10   A.        No.

11   Q.        Do you have a copy of the signed one?

12   A.        No.

13   Q.        And this document reports that you made

14   $22,670 --

15   A.        Yes.

16   Q.        -- in 2004.

17   A.        Yes.

18   Q.        And this document is -- where it says filing

19   status, you checked married, filing separately.

20   A.        Yes.

21   Q.        Do you know why you did that?

22   A.        Because I was here, and I was in Miami, but

23   I decided it was the time to do taxes, and I have all

24   my papers down there, and my cousin told me that I can

147

```
1   do separate.

2   Q.       When you moved to Miami in January of '05,

3   how often did you talk to your husband?

4   A.       Kind of one time a week sometimes; sometimes

5   no talk.

6   Q.       Sometimes no talk?

7   A.       Yes.

8                (Gloria Nieves Deposition Exhibit

9   No.23 was marked for identification.)

10  BY MS. MALLOY:

11  Q.       Exhibit 23 is a copy of the complaint which

12  started the lawsuit in this case.  Have you read this

13  before?

14  A.       I think.

15  Q.       Take your time.

16  A.       I don't think so.

17  Q.       Okay.  Take your time.  I just have a couple

18  questions on it.

19                MR. BARTOSHESKY:  Just for the record,

20  the very first page of this is not part of the

21  complaint.

22                MS. MALLOY:  Right.  Cover sheet or

23  something like that.

24                MR. BARTOSHESKY:  And it is not
```

# EXHIBIT B



# COLLECTIVE BARGAINING AGREEMENT

between

## ACME MARKETS, INC.
## EASTERN SHORE

and

# UNITED FOOD AND COMMERCIAL WORKERS UNION
# LOCAL 27

## SEPTEMBER 28, 2003
## TO
## SEPTEMBER 27, 2008

# ARTICLE 9 - WORKING CONDITIONS

**9.1**    The Employer will furnish and launder such store linens as it desires worn by its employees. In the event the employer provides Dacron or similar type uniforms for employees, these garments may be laundered by the employee. Since this item of expense is intended to make the Employer's service more attractive to customers, members agree to cooperate by presenting a neat, clean business-like appearance while on duty in the store.

**9.2**    The Employer has the right to discharge or discipline any employee for good and sufficient cause, including but not limited to, proven or acknowledged dishonesty, intoxication during working hours, provided however, that no employee shall be discharged or discriminated against because of membership in the Union or for Union activities.

**9.3**    In the event that an employee's work is unsatisfactory, he/she shall be given at least one (1) written notice before disciplinary action is taken, and a copy of the notice shall be sent to the Union at the same time. Notices and warnings shall become null and void after nine (9) months from date of issue.

**9.4**    No employee shall suffer a reduction of hourly wage rates, increase of hours, or reduced vacation time solely by the signing of this Agreement.

**9.5**    If a physical examination or health permit is required by the Employer or local government, all expenses attached to same shall be borne by the Employer.

**9.6**    The Employer agrees, in the event of a temporary transfer at the Employer's request, to reimburse the employee for increased transportation costs on the basis of the IRS mileage rate per mile, except, however, when an employee chooses public transportation, excluding taxicabs, he/she shall be reimbursed only for the actual cost of such increases in transportation. Temporary assignments will not exceed thirty (30) days except in cases of relief of an employee absent on extended sick leave, or in the event that an associate is temporarily assigned to a newly opened or newly remodeled store. If any employee is required to work in more than one (1) store in the same day, the expenses for necessary transportation shall be borne by the Employer. The time required for travel between the stores shall be included as a portion of the employee's work day and considered as time worked for all purposes.

**9.7**    Employees shall be at their stores ready for work at their scheduled starting time, otherwise they are reporting late. They shall remain at their work until their scheduled quitting time. Employees shall be paid for all time worked. There shall be a time recording device in each of the employer's stores for the purpose of recording time worked. The Employer and the Union agree that a proven violation of established time recording device rules, including working before punching in or after punching out, may subject such an employee to disciplinary action up to and including discharge. Furthermore, all time during which an employee is suffered or permitted to work or is

required to be on duty on the Employer's premises at a given work place shall be considered hours worked and recorded.

**9.8**   Except by mutual agreement between the employee and the Employer, employees shall have a minimum of eight (8) hours off between the end of their schedule and the starting of their next schedule. Any employee who works during this eight (8) hour period shall be paid for such time at the rate of time and one-half (11/2) their straight time rate of pay.

**9.9**   The Employer will furnish all tools and personal protective equipment necessary to perform the job and shall maintain a first aid kit, fully equipped, in each store to be available for all shifts worked.

**9.10**   An employee who receives a pay rate which is higher than the pay rate provided in Schedule A for his/her classification, who is promoted to a department head and subsequently demoted to his/her former classification, shall receive the same pay rate differential which he/she previously received.

**9.11**   No employee shall be given a polygraph (lie detector test) unless the Union agrees in writing.

**9.12**   Time spent at legal proceedings at the request of the Employer or Employer's counsel shall be compensated. Such compensation shall also be paid for time spent at the request of any law enforcement agency, involving investigation or legal proceedings for the benefit of the Employer, provided that employee has given the Store Director prompt notice of the request.

**9.13**   Employees shall not be required to use their personal cars for the hauling of merchandise.

**9.14**   No employee shall be required to take a random drug or alcohol test, unless previously warned in writing except that the Union agrees the Employer may randomly drug test Pharmacy Technicians.

**9.15**   The Employer agrees to work jointly with the Union in resolving unsafe conditions or equipment within the employee's work area.

**9.16**   Employees who sustain an occupational injury requiring treatment by a doctor or hospital shall suffer no loss in pay for the day the injury occurs provided the employee returns to work unless otherwise instructed in writing by the attending doctor.

# EXHIBIT C



Night crew associates who have very minimal contact with customers may wear jeans, shorts, T-shirts, sweat shirts or other reasonable personal clothing with appropriate footwear while at work.
13.  All personal clothing worn at work should be kept neat and clean.  Fads, or new styles of an extreme nature, are to be avoided. The following items are examples of fads which are currently not acceptable business attire; stretch pants, skin tights, miniskirts, shorts, or athletic clothing such as sweat clothes, hooded shirts, warm-ups, etc.  Pants should not be tucked into footwear  This list is not exclusive  Acme associates must present the proper image to the public.

## PERSONAL HYGIENE AND GROOMING

14.  Associates are expected to use good judgment in hair styles. Hair should be neat, clean and well-groomed, and it should not be excessively full.  For safety and health reasons, hair should be confined so that it does not fall over the face.  A wig that conforms to these guidelines is acceptable.  Men should be cleanly shaved or beard/mustache neatly trimmed.
15.    Moderate makeup and minimal jewelry are acceptable Sunglasses are unacceptable inside the store.
16.  Personal hygiene must be practiced to avoid being offensive. Hands and fingernails must be clean.

**Revised 11/95**



# STORE WORK RULES
# TO OUR CUSTOMERS YOU ARE ACME



Acme Markets is recognized and respected as a leader in the food industry.  This recognition is due, in great part, to the appearance and behavior of our associates.  This booklet provides you with a copy of our Acme Markets, Inc. Store Work Rules and our Dress and Appearance Guidelines for store associates.

Rules protect both the Associate  and the Company, and prevent misunderstandings.

A rule is a prescribed guide for conduct or action which is to be followed without exception by all associates.  It is not intended or possible to state a rule for every situation or course of conduct which may arise.  Therefore, it must not be implied that the list below contains all of the Company rules which are or may be in effect; neither should it be assumed that any omission from the list implies permission.

Accordingly, violations of accepted, well-known, common sense rules of good conduct, as well as violations of written rules, will not be tolerated.

Violations of company rules will be considered cause for termination.

The Company reserves the right to change these work rules at any time.   These work rules are not an employment contract.

NOTE:  In the following Rules, the words "Company property" includes all Company vehicles, parking lots and loading docks, and the surrounding premises of the Acme facilities.

②

## FRIENDLINESS - CUSTOMER SERVICE
Serving our customers is our top priority! Our customers pay the wages of everyone in Acme.

Sincere, courteous, fair and just treatment and a concern for the feelings of others must be practiced in all of our business relationships. Acts of discourtesy to customers will not be tolerated.

Friendliness and courtesy among our associates are important in our stores to create a pleasant atmosphere; however, associates are to limit their conversations during working hours to subjects relating to business. Personal conversations among associates while serving customers, or personal remarks to or about customers are prohibited. Discussions concerning religious, racial, political, sexual, gender or ethnic subjects must be avoided at all times. Profanity is unacceptable under any circumstances.

## ATTENDANCE - CUSTOMER SERVICE
To provide the service our customers deserve, all associates must be on the job at the scheduled time.

If you find you cannot report to work at the scheduled time because of illness or emergency, you must personally notify your Store Manager or person-in-charge prior to your scheduled start time. Do not give the message to another associate to deliver for you.

Associates who have records of excessive absenteeism or lateness will be subject to disciplinary measures, up to and including discharge.

## TIME RECORDS
To comply with the law and for the protection and benefit of all associates, you must record your time worked using the time-recording device in each store. Each time you report for work, leave for or return from meal periods, and each time you go off duty, you must record your own time. You must be dressed and ready for work before you record your time, and your time must be recorded immediately following the completion of each work period. You must record only your own time and may not do so for another associate.

All time worked in any part of the Company is to be paid for. "Free time" or unauthorized overtime will not be tolerated.

## HONESTY AND ACCURACY
Each associate must follow Acme policies and procedures concerning the handling of cash, food stamps, coupons and any other valuables. Associates involved in any acts of dishonesty, including those described below, will subject themselves to termination, no matter what is later claimed to have been the intent. They may also subject themselves to possible arrest and prosecution.

1. Removing or attempting to remove from the store any Company property or merchandise without full payment and receipt.

2. Consuming or using merchandise on Company property without first paying the correct price for it and retaining the receipt.
3. Failing to record sales properly on the cash register at the time of sale.

4. Theft of cash or any substitute for cash, for example, food stamps, WIC checks, credit cards, debit cards, etc., or any Company property.
5. Engaging in coupon fraud or refund misappropriation.
6. Damaging merchandise or equipment or allowing someone else to do so, discarding damaged merchandise without authorization, and/or failure to report damage to the Store Manager.
7. Checking out your own purchases or the purchase of a relative, or a member of a common household.
8. False or improper receiving of merchandise, such as falsification of receiving records, receiving less merchandise than the amount listed, etc.
9. Failing to charge all customers and associate shoppers the correct prices and give accurate weights on all goods. No discounting or price reduction will be permitted except as authorized by the Store Manager or someone designated by the Store Manager.
10. Conspiring with another associate, salesperson, delivery driver or customer to do any of the above.
11. Falsification of information on any application, claim, record or report, written or verbal.

## PURCHASES BY ASSOCIATES
We encourage our associates to shop in our markets, but shopping in the store in which you work is subject to the following conditions:

1. Purchases are to be made at the same price charged other customers and are to be paid for in full at the time of the purchase.
2. You may shop for and purchase merchandise when you are off duty. All merchandise to be purchased must be placed on the checkstand so the cashier can record the price on the register in the same manner as all other customer purchases are recorded. Purchases are to be removed from the store as soon as they are paid for by the associate. The register tape must be with the merchandise until it is removed from the store.
3. Any merchandise purchased for consumption or use by you on Company property during your regularly scheduled break or meal period must be purchased prior to consumption or use at the register designated by the Store Manager. The register tape must be retained as proof of purchase. This applies to all associates on all shifts whether the store is open or closed.
4. Other purchases, such as meat, bakery, produce, are to be made from the case as any other customer would do. Special cuts of meat not available in the case may be prepared by the meat cutter, and will be wrapped in clear film with a label giving correct description, correct price per pound and per package.
5. You may not check out your own purchases or those of a relative or any member of a common household.

6. Store management, or their designee, in their discretion, may personally inspect any packages or containers you wish to remove from the store.

## PERFORMANCE

Full performance by all employees is a necessity in our business. Lack of performance such as inaccuracy, careleness, negligence, slowing of work or interference with your job or that of another associate, unsatisfactory work performance or failure to perform any assigned task for any reason will not be tolerated and will subject you to disciplinary measures, up to and including discharge.

## INSUBORDINATION

Refusal to comply with any directive given to you by your Store Manager or designated individual, inflammatory or abusive language, threats or acts causing bodily harm to other associates will not be tolerated and will subject you to disciplinary action up to and including discharge.

## PERSONAL CONDUCT

Conduct such as poor habits of personal cleanliness, causing or contributing to a disruption in the work place, fighting, horseplay, threatening, interfering with another associate  in regards to any of his/her work or employment, any derogatory act or statement to or about another associate, sleeping while on duty or any other inappropriate conduct will not be tolerated, and will subject you to disciplinary action up to and including discharge

## ALCOHOLIC BEVERAGES AND DRUGS/SUBSTANCES

It is the responsibility of both the company and the Associate  to maintain a safe, healthful and efficient working environment. The use of drugs and alcohol poses a serious threat to the welfare of the Company, its associates, customers and members of the public. Accordingly, Acme Markets is committed to the principles of establishing and maintaining a drug and alcohol free workplace.

The use, distribution or possession of alcoholic beverages, illegal drugs or medically unauthorized use of controlled substances while at work or on Company property is prohibited.

The use of alcoholic beverages and/or use of illegal drugs or medically unauthorized use of controlled substances prior to reporting to work or while on meal periods/breaks when scheduled to return to work is prohibited.

## FIREARMS

In the interest of protecting the safety of customers, Associates and other individuals, the possession of firearms or any other deadly weapon by an employee while at work or on Company property is prohibited.

## GAMBLING

You may not participate in illegal gambling in any way on Company property or during working hours

## SOLICITATION

Unauthorized solicitation of associates by outside individuals or solicitation of customers on Company property is not permitted. Associates shall not engage in the unauthorized solicitation of funds, unauthorized distribution of literature or the posting of unauthorized notices during working hours or on Company property.

## SMOKING AND EATING

Eating is permitted only during breaks and meal periods and then only in designated areas. Smoking, if permitted, will only be in designated smoking areas.

## GIFTS OR TIPS

You may not solicit or accept any business gifts, tips or gratuities.

## PROPRIETARY COMPANY INFORMATION

You may not discuss Company information with or provide Company documents to unauthorized persons. You may not remove Company documents from the work area or off the premises without the approval of a supervisor.

## ASSOCIATE 'S PERSONAL PROPERTY

Your personal belongings must be kept in lockers or other facilities provided. Lockers or other facilities may be inspected at any time without prior notice. You must provide your own lock if one is not provided. Acme assumes no responsibility for your personal property.

## FAIR TREATMENT

The Company believes in fair and equal treatment of associates and will not tolerate any form of sexual harassment or other illegal mistreatment by or to supervision, fellow associates or third parties.

## SAFETY AND SECURITY

Any accident or injury  experienced and/or witnessed by you, no matter how small, must be reported to your supervisor immediately.

All associates must comply with Company, federal, state and local health and safety regulations

It is necessary for associates to fully cooperate with any safety or security checks on Company property  including inspection of persons and personal property.

Any associate  who files a false accident or injury report will be subject to termination.

## ASSOCIATE PARKING

Acme's parking lots are primarily reserved for the use of our customers. Specified associate  parking areas have been designated. Your Store Manager will inform you of the proper

④

parking area. Acme is not responsible for theft, damage or vandalism to associate vehicles while on Company property.

## BULLETIN BOARDS

Associates may not post, remove or alter any document on a Company bulletin board without prior authorization from supervision.

## RELATIVES

Relatives are not permitted to work under the direct supervision of a relative or a member of a common household. No associate may serve or check out a relative or a member of a common household.

## COMPETITORS

Associates cannot work for a competitor of Acme. Before accepting any other employment, you should discuss that employment with your supervisor.

## DRESS AND APPEARANCE GUIDELINES FOR STORE EMPLOYEES

When we are in business, we dress for business. Store associates are provided with a uniform, and it must be kept clean and neat. Personal clothing worn to work must be clean and neat, and conform to the requirements stated below. Because we deal with the public and with food, all associates must abide by good personal hygiene and grooming standards. The Company reserves the right to change its dress and appearance requirements at any time.

## UNIFORMS

1. All associates in occupations serving or viewed by the public, or in areas receiving, preparing or manufacturing product, are expected to present a neat, clean and business-like appearance to the public they serve.
2. Uniforms provided by the Company will be worn by all associates while at work in order to provide recognition by the public within our stores. It is the employee's responsibility to launder uniforms as needed except where laundry service is provided by the Company. All buttons must be buttoned. Such uniforms are the property of Acme Markets, Inc., and must be returned upon termination or leaving the employ of Acme Markets. Company provided uniforms may not be altered by the employee, and employees must not affix any pins, buttons, or other adornments to them.
3. Male associates will be issued one or more of the following: blue apron, blue vest or blue jacket.

4. Female associates will be issued one or more of the following: blue apron, blue vest or blue topper.

5. Special situations:
- Customer Service Representatives will be issued red vests for men and women or red toppers for women.
- Associates who work in the meat room will be issued white coats and white aprons, supplied by a laundry service.

- Associates who bake in the in-store bakery will be issued baker's shirts, white pants and white aprons, supplied by a laundry service. White shirts and ties or white blouses and white turtle-neck tops are not required under a white baker's shirt, but are optional.
- Seafood department associates may wear a vinyl apron in addition to the standard uniform while preparing product for sale.
- Night crew associates who have very minimal contact with customers are not required to wear a uniform. A navy blue Acme T-shirt with a white Acme logo is optional.
- Associates who work outside may wear rain gear, jackets or other appropriate clothing over a uniform.

6. Aprons, when provided, are to be worn in the prescribed manner, with full bib around the neck and covering the maximum amount of clothing.
7. All food service associates will be issued blue uniform visors or caps to ensure sanitary conditions. Associates with long hair must wear restraints pulling hair away from the face.
8. Name badges supplied by the Company, must be worn at all times. The lettering used for displaying employees' names will be designated by the Company.

## PERSONAL CLOTHING

9. Men are required to wear a clean, pressed, white dress shirt and a tie. Men must wear navy blue, black, gray, brown or tan/khaki slacks, which are neat and clean in appearance. Shirts must be tucked into pants. Denim jeans of any style or color are not permitted.
10. Women are required to wear a clean, pressed white dress blouse with a collar or a white turtle-neck top. A tie is optional with a blouse. Women must wear a skirt or slacks of navy blue, black, gray, brown or tan/khaki color, which are neat and clean in appearance. Blouses and turtle neck tops must be tucked into skirts or pants. Denim jeans or denim skirts of any style or color are not permitted.
11. All associates are required to wear footwear that is suitable for the work environment. Leather footwear must totally protect the foot (leather shoes or leather sneakers are acceptable). Sneakers must be white or black. Fabric sneakers or sandals are unsafe and not permitted. For safety reasons, all footwear with laces must be fully laced and tied. Socks or hosiery must be worn.

12. Special Situations:
- During cool weather or while working in a cool area of the store, associates may wear sweaters over a white blouse or turtle neck, or over a white shirt and tie, and under a uniform apron, vest, jacket or topper. A sweater must be of a solid white, navy blue, or tan/khaki color.
- Associates who work in the meat room may wear sweaters or thermals over a white blouse or turtle neck, or over a white shirt and tie, and under a meat coat.

# EXHIBIT D



### Sexual & Workplace Harassment Policy

Acme Markets is committed to providing a workplace free of sexual as well as unlawful harassment based upon race, color, religion, sex, national origin, ancestry, age, medical condition, citizenship, disability, martial status, or sexual orientation. Unlawful harassment of associates by management, supervisors, or coworkers will not be tolerated. Also, reasonable attempts will be made to protect associates from harassment by non-associates in the workplace.

Harassment is verbal, non-verbal or physical conduct that creates an intimidating, offensive, or hostile working environment or that interferes with work performance. Such verbal, non-verbal or physical conduct constitutes harassment when:

- Submission to the conduct is made either an explicit or implicit term or condition of employment;
- Submission to or rejection of the conduct is used as the basis for an employment decision; or
- The harassment interferes with an associate's work performance or creates an intimidating, hostile, or offensive work environment.

Harassing conduct can take many forms and includes, but not limited to slurs, jokes, statements, gestures, pictures or cartoons regarding an associate's race, color, religion, national origin, ancestry, sex, age, medical condition, disability, martial status, citizenship or sexual orientation.

Sexually harassing conduct includes all of these prohibited actions, as well as requests for sexual favors, conversations containing sexual comments, and unwelcome sexual advances.

Associates should promptly report any incident of harassment, whether by an associate or a non-associate, to their store director or direct supervisor, Human Resources or EEO/Diversity Department. Associates are not required to complain first to their supervisor. Members of management of Human resources who learn of or who observe harassing conduct should promptly inform the EEO/Diversity Department.

Every complaint of harassment will be investigated thoroughly and promptly, and an attempt will be made to keep the investigation as confidential as possible. Acme Markets will not tolerate retaliation against any associate who reports harassing conduct or who participates in an investigation. If an associate is found to have engaged in prohibited harassment or retaliation, he or she will be disciplined up to and including discharge. It is the responsibility of every associate to act in accordance with this policy. If questions about this policy should arise, please contact Human Resources

### ACKNOWLEDGEMENT

I have read the foregoing Acme policy regarding sexual and workplace harassment. I also attended an education session and received a brochure regarding the issues of sexual and workplace harassment and discrimination. I understand my responsibility to conduct myself in accordance with this policy and education I received. I am aware that this signed acknowledgement form will be maintained permanently in my personnel file.

PRINT NAME: _Gloria Nieves_   SIGNATURE: _Gloria Nieves._

DATE: _11-12-01_   STORE/DEPT. _7814_

PRESENTED BY: _Lee Flower_   SSN: _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_

Acknow.doc
1/11/01

Boise – White          APR – Pink          Associate – Yellow

A85

# EXHIBIT E



**ACME**®
**An Albertson's Company**

### Sexual & Workplace Harassment Policy

Acme Markets is committed to providing a workplace free of sexual as well as unlawful harassment based upon race, color, religion, sex, national origin, ancestry, age, medical condition, citizenship, disability, martial status, or sexual orientation. Unlawful harassment of associates by management, supervisors, or coworkers will not be tolerated. Also, reasonable attempts will be made to protect associates from harassment by non-associates in the workplace.

Harassment is verbal, non-verbal or physical conduct that creates an intimidating, offensive, or hostile working environment or that interferes with work performance. Such verbal, non-verbal or physical conduct constitutes harassment when:

- Submission to the conduct is made either an explicit or implicit term or condition of employment;
- Submission to or rejection of the conduct is used as the basis for an employment decision; or
- The harassment interferes with an associate's work performance or creates an intimidating, hostile, or offensive work environment.

Harassing conduct can take many forms and includes, but not limited to slurs, jokes, statements, gestures, pictures or cartoons regarding an associate's race, color, religion, national origin, ancestry, sex, age, medical condition, disability, martial status, citizenship or sexual orientation.

Sexually harassing conduct includes all of these prohibited actions, as well as requests for sexual favors, conversations containing sexual comments, and unwelcome sexual advances.

Associates should promptly report any incident of harassment, whether by an associate or a non-associate, to their store director or direct supervisor, Human Resources or EEO/Diversity Department. Associates are not required to complain first to their supervisor. Members of management of Human resources who learn of or who observe harassing conduct should promptly inform the EEO/Diversity Department.

Every complaint of harassment will be investigated thoroughly and promptly, and an attempt will be made to keep the investigation as confidential as possible. Acme Markets will not tolerate retaliation against any associate who reports harassing conduct or who participates in an investigation. If an associate is found to have engaged in prohibited harassment or retaliation, he or she will be disciplined up to and including discharge. It is the responsibility of every associate to act in accordance with this policy. If questions about this policy should arise, please contact Human Resources

### ACKNOWLEDGEMENT

I have read the foregoing Acme policy regarding sexual and workplace harassment. I also attended an education session and received a brochure regarding the issues of sexual and workplace harassment and discrimination. I understand my responsibility to conduct myself in accordance with this policy and education I received. I am aware that this signed acknowledgement form will be maintained permanently in my personnel file.

PRINT NAME: _Gloria Nieves_    SIGNATURE: _Gloria Nieves._

DATE: _11-12-01_    STORE/DEPT. _7814_

PRESENTED BY: _Les Flair_    SSN: _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_

Acknow.doc
1/11/01

Boise – White          APR – Pink          Associate - Yellow          A87



**An Albertson's Company**

# ACKNOWLEDGEMENT FORM

This will notify Acme Markets that I have received my personal copy of the Welcome Booklet/Stores Rules and Dress and Appearance Guidelines. I acknowledge that it is my responsibility to read, understand, and follow Acme policies, work rules, posted rules and all guidelines and regulations.

I understand this booklet is for my information. Its provisions are not a contract of employment and may be modified or revoked by Acme Markets at any time without notice. The provisions of this booklet can be changed only with the express approval of the Vice President of Labor Relations.

I will retain my copy and will refer to it any time I may have a question. If the booklet does not answer any questions I may have, I will request an answer from my Store Director.

PRINT NAME: *Gloria Nieves*    SIGNATURE: *Gloria Nieves.*

DATE: *11-12-01*    STORE/DEPT. *78/4*

PRESENTED BY: *Lee A. Haw*    SSN: *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*

welcome.doc
1/11/01

Boise – White        APR – Pink        Associate - Yellow

A88

# NEW ASSOCIATE POLICIES AND PROCEDURES CHECKLIST

7814    *Gloria Nieves*     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
Store number    Associate Name         Social Security #

wilford    *Lee Hart*       11/12/01
Store Director    Office Coordinator       Associate Hire Date

| Policy | GN | |
|---|---|---|
| **Time Clock Policy** | GN | |
| | Associate's initials | Office Coordinator's initials |
| **ADA** | GN | |
| | Associate's initials | Office Coordinator's initials |
| **Sexual & Workplace Harassment** | GN | |
| | Associate's initials | Office Coordinator's initials |
| **Tobacco/Alcohol sale to Minors** | GN | |
| | Associate's initials | Office Coordinator's initials |
| **Minor Acknowledgement** | | |
| | Associate's initials | Office Coordinator's initials |
| **Child Labor Laws** | | |
| | Associate's initials | Office Coordinator's initials |
| **Work Rules** | GN | |
| | Associate's initials | Office Coordinator's initials |
| **'Right to Know'** | GN | |
| | Associate's initials | Office Coordinator's initials |

By initialing all of Acme Market's Policies and Procedures, I agree the Office Coordinator of Store # 7814 has reviewed all of the policies and procedures listed above. Also, I acknowledge that I received my Store Work Rules and Dress and Appearance Guidelines from the Office Coordinator. It is my responsibility to read, understand and flow Acme Markets policies, work rules, posted rules and all guidelines and regulations.

I understand this booklet is for my information. Its provisions are not an employment contract and may be modified or revoked by Acme Markets at any time without notice. The provisions of this booklet can be changed only with the express approval of the Vice-President of Labor Relations.

I will retain my copy and will refer to it any time I may have a question. If the booklet does not answer any question I may have, it is my responsibility to ask the Store Director or member of the store management team.

11-12-01
Date

595.20.7405
Social Security Number

7814
Store Location #

x *Gloria Nieves*
Signature

Gloria Nieves
Print Name

*Lee Hart*
Office Coordinator Signature

White - Associate Performance Record, Canary - Boise

A89

# EXHIBIT F

## BE AWARE - DON'T DISCRIMINATE

Imagine you are a clerk working at Acme. While working, you are confronted with the following situations. Please circle the response which best describes what you should do:

1. You walk into the Produce room and see a Playboy calendar hanging on the wall.
   a. Tell your Store Director about the calendar
   b. Find out whose calendar it is.
   c. Both a and b

2. A customer brings a Seeing Eye dog into the store.
   a. Explain to the customer that animals are not allowed in the store
   b. Offer to watch the dog outside the store
   c. Do nothing; the dog is there to help the customer

3. One of your co-workers has given you a hand-drawn cartoon that is both sexually and racially offensive. She asks you to show it around.
   a. Tell the co-worker that you won't show the cartoon around and inform the Store Director
   b. As the cartoon would only offend a few people, you decide to show the cartoon to your friends
   c. None of the above

4. A person in a wheel chair asks you for a job application.
   a. Turn the person away
   b. Refer the person to the Store Director or to the person who distributes job applications
   c. Ask the person, "What kind of work can you really do?"

5. Participating in the sexual harassment of a fellow employee is okay as long as:
   a. Everyone else is doing it
   b. Sexual harassment is never okay
   c. The person being harassed doesn't seem to mind

6. An employee in the store tells racial jokes in front of minority employees and customers.
   a. Inform your Store Director
   b. Ignore the employee; his/her beliefs are his/her own business
   c. None of the above

7. A co-worker makes sexual comments about your physical appearance. This upsets you.
   a. Tell the co-worker to stop
   b. Talk to the Store Director
   c. Both a and b

8. You notice that a customer is having difficulty reaching an item on a top shelf.
   a. Get the item for the customer
   b. Ask the customer if he/she needs any additional help shopping for other items
   c. Both a and b

P-254

9. Who do you contact if you have any questions or concerns about any of the above?
   a. The Manager of Personnel
   b. The Store Director
   c. Either a or b

discriminate.doc (1/11/01)

A91

## CORRECT RESPONSES

1.    a.    Tell your Store Director about the calendar

The Store Director should be informed about what goes on in his/her store, as he/she is responsible for everything that happens. The Store Director is best equipped to deal with the offender in this case.

2.    c.    Do nothing. The dog is there to help the customer

We are required by the Americans with Disabilities Act to make available the services of our store to all customers. Service animals (e.g. Seeing Eye dogs), therefore, are allowed in our stores. Also, it is Acme's policy to provide service to all our customers.

3.    a.    Tell the co-worker that you won't show the cartoon around and inform the Store Director.

Whether or not the cartoon is offensive to you is not the issue. If you show the cartoon around, you are participating in harassment and discrimination, which is not only against the law but also against company policy.

4.    b.    Refer the person to the Store Director or to the person who distributes job applications.

It is against the law to turn the person away. Do not ask the person a derogatory question that may be perceived as discriminatory.

5.    b.    Sexual harassment is never okay.

Sexual harassment is against the law regardless of who is involved. It is also against company policy.

6.    a.    Inform your Store Director

For any discriminatory behavior, the correct response is to let the Store Director know. Again, the Store Director is responsible for everything that occurs in the store.

7.    c.    Both a and b

Always let the person know how you feel about the situation, then let the Store Director know. This way, the person making the comments can never say, "I didn't know it bothered you."

8.    c.    Both a and b

It is our job as store employees to always offer a hand when needed and take that extra step to show the customers that we care enough to satisfy their needs. It shows that we are willing as a company to provide reasonable accommodation to our customers with special needs.

P-255

9.    c.    Either a or b

Either the Manager of Personnel or the Store Director can answer your questions or concerns about any topic above.

A92

# EXHIBIT G



**An Albertson's Company**
*75 VALLEY STREAM PARKWAY*
*MALVERN, PA 19355  610-889-4000*



# <u>NOTICE</u>

# EQUAL EMPLOYMENT OPPORTUNITY POLICY

It is the policy of Acme Markets to select, develop and promote employees based on the individual's ability and job performance. It has been, and shall continue to be, the policy of Acme to provide Equal Employment Opportunity to all people in all aspects of the employment relationship without discrimination because of race, color, sex, religion, national origin, age, non-job-related disability, citizenship, sexual orientation or marital status. This policy affects decisions including, but not limited to, an associate's compensation, benefits, terms and conditions of employment, opportunities for promotion, training and other privileges of employment. It has been, and shall continue to be, Acme's policy to maintain a working environment free of harassment and intimidation. It is further the policy of Acme to comply with the letter and spirit of applicable local, state and federal statutes concerning Equal Employment Opportunity. Employees who violate this policy will be subject to discipline up to and including discharge.

Anyone who feels that he or she has been discriminated against should report such incidents to his or her supervisor and/or the Director of Human Resources. All charges of violation of this policy will be investigated promptly. The confidentiality of persons reporting violations will be respected insofar as practicable in conducting an investigation of such claims. There shall be no retaliations taken against persons filing such complaints.

A94

# EXHIBIT H

# Gloria Nieves
# 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
# Location: 7836
# Position: R0000465

## Personal Information

| Associate # | 1762888 | Birth Date | 05-OCT-1963 | Ethnic Background | Hispanic |
|---|---|---|---|---|---|
| Marital Status | Married | Gender | Female | Rehireable | Y |
| Home Address | 625 Village Dr | Home Phone | (302) 378-8207 | | |
| | Middletown , DE 19709 | | | | |

## Employment Information
### Inactive Associate

| Hire Date | 12-NOV-2001 | Associate Type | Regular | Current Status | B |
|---|---|---|---|---|---|
| Rehire Date | | Associate Type Date | 16-NOV-2003 | United way Code | 938 |
| Termination Date | 15-JAN-2005 | Tax Entity | ACME | | |

## Primary Position Information

| Title | Butcher Block Service Cle | Location | 00007836 | Position | R0000465 |
|---|---|---|---|---|---|
| Pay Grade | 07851002 | Pay Rate | 9.3000 | Increase Date | 29-OCT-2004 |
| Last Check Date | | Position Tenure | | Location Tenure | |
| Avg Weekly Hours | 0 00 | Avg Monthly Wage | $0.00 | Union Local | 27 |
| Payroll Class | H | Contract/Sub | 07851/002 | Normal Hours | 40 |

## Additional Position Information

| Title | Location | Position | Rate | Normal Hours | Last Check Date |
|---|---|---|---|---|---|
| | | | No additional positions found | | |

## Service History

| Months of Service | 38 | Seniority Date | 12-NOV-2001 |
|---|---|---|---|

| Date | Status | Break Code | Description |
|---|---|---|---|
| 15-JAN-2005 | B | 303 | To Leave The Area |
| 13-MAR-2004 | A | RFS | Return From Suspension |
| 06-MAR-2004 | C | 212 | Administrative Suspension |
| 12-NOV-2001 | A | NEWHIRE | New Hire |

## Employment History

| System Date | Effective Date | Employment Type | Employ Type Date | Hire Date | Termination Date | Rehire Date | Pers Status | Pers Status Date | Pers Status Reason |
|---|---|---|---|---|---|---|---|---|---|
| 09-FEB-2005 | 09-FEB-2005 | R | 16-NOV-2003 | 12-NOV-2001 | 15-JAN-2005 | | B | 15-JAN-2005 | R |
| 16-MAR-2004 | 13-MAR-2004 | R | 16-NOV-2003 | 12-NOV-2001 | | | A | 13-MAR-2004 | R |
| 16-MAR-2004 | 06-MAR-2004 | R | 16-NOV-2003 | 12-NOV-2001 | | | C | 06-MAR-2004 | L |
| 26-NOV-2003 | 26-NOV-2003 | R | 16-NOV-2003 | 12-NOV-2001 | | | A | 12-NOV-2001 | N |
| 26-NOV-2001 | 26-NOV-2001 | P | 12-NOV-2001 | 12-NOV-2001 | | | A | 12-NOV-2001 | N |

## Federal Taxes

| | Marital | Status | Exemptions | Exempt Amount | Extra Tax | QTD Wages | QTD Tax | YTD Wages | YTD Tax |
|---|---|---|---|---|---|---|---|---|---|
| Federal | M | Active | 1 | | 0.00 | 0.00 | 0 00 | 0 00 | 0.00 |
| OASDI | | | | | | 0.00 | 0 00 | 0 00 | 0.00 |
| Medicare | | | | | | 0.00 | 0 00 | 0.00 | 0.00 |

## State Taxes

| State | Marital | status | Exemptions | Extra | QTD Wages | QTD Tax | YTD Wages | YTD Tax |
|---|---|---|---|---|---|---|---|---|
| DE | M | Active | 1 | 0.00 | 0 00 | 0.00 | 0.00 | 0.00 |

## Historical Position Information

| Title | Location | Position | Pos Type | Start Date | End Date |
|---|---|---|---|---|---|
| Butcher Block Service Cle | 00007836 | R0000465 | Primary | 08-AUG-2004 | 15-JAN-2005 |
| Butcher Block Service Cle | 00007836 | R0000465 | Primary | 08-AUG-2004 | |
| Butcher Block Service Cle | 00007836 | R0000465 | Primary | 08-AUG-2004 | 15-JAN-2005 |
| W/c Alt Wrk Prog - Servic | 00007836 | R0000599 | Secondary | 27-JUL-2004 | |
| W/C Alt Wrk Prog - Servic | 00007836 | R0000599 | Secondary | 27-JUL-2004 | 27-JUL-2004 |

A96

| Job Title | Emp No | JobCode | Type | Start Date | End Date |
|---|---|---|---|---|---|
| Service Deli Clerk | 00007836 | R0000557 | Primary | 14-MAR-2004 | |
| Service Deli Clerk | 00007836 | R0000557 | Secondary | 14-MAR-2004 | 15-JAN-2005 |
| Service Deli Clerk | 00007836 | R0000557 | Secondary | 14-MAR-2004 | 15-JAN-2005 |
| Service Deli Clerk | 00007836 | R0000557 | Secondary | 14-MAR-2004 | |
| Service Deli Clerk | 00007816 | R0000557 | Secondary | 06-MAY-2003 | |
| Service Deli Clerk | 00007816 | R0000557 | Primary | 06-MAY-2003 | |
| Service Deli Clerk | 00007816 | R0000557 | Secondary | 06-MAY-2003 | 19-MAR-2004 |
| Service Deli Clerk | 00007816 | R0000557 | Secondary | 06-MAY-2003 | 23-MAR-2004 |
| Front End Clerk | 00007816 | R0000807 | Primary | 05-MAY-2003 | |
| Front End Clerk | 00007816 | R0000807 | Secondary | 05-MAY-2003 | |
| Front End Clerk | 00007816 | R0000807 | Secondary | 05-MAY-2003 | |
| Front End Clerk | 00007816 | R0000807 | Secondary | 05-MAY-2003 | 23-MAR-2004 |
| Front End Clerk | 00007816 | R0000807 | Secondary | 05-MAY-2003 | 19-MAR-2004 |
| Service Deli Clerk | 00007814 | R0000557 | Secondary | 10-SEP-2002 | |
| Service Deli Clerk | 00007814 | R0000557 | Secondary | 01-SEP-2002 | 07-MAY-2003 |
| Service Deli Clerk | 00007814 | R0000557 | Secondary | 01-SEP-2002 | |
| Service Deli Clerk | 00007814 | R0000557 | Secondary | 01-SEP-2002 | 07-MAY-2003 |
| Scan Clerk-Grocery | 00007814 | R0000067 | Secondary | 23-JUL-2002 | 13-AUG-2002 |
| Scan Clerk-Grocery | 00007814 | R0000067 | Secondary | 23-JUL-2002 | |
| Produce Clerk | 00007814 | R0000307 | Secondary | 14-MAY-2002 | |
| Produce Clerk | 00007814 | R0000307 | Secondary | 14-MAY-2002 | 23-JUL-2002 |
| Front End Clerk | 00007814 | R0000807 | Primary | 29-MAR-2002 | |
| Front End Clerk | 00007814 | R0000807 | Secondary | 29-MAR-2002 | 13-MAY-2003 |
| Front End Clerk | 00007814 | R0000807 | Secondary | 29-MAR-2002 | 11-APR-2002 |
| Front End Clerk | 00007814 | R0000807 | Secondary | 29-MAR-2002 | 07-MAY-2003 |
| Courtesy Clerk | 00007814 | R0000812 | Primary | 12-NOV-2001 | |
| Courtesy Clerk | 00007814 | R0000812 | Secondary | 12-NOV-2001 | 10-MAY-2002 |
| Courtesy Clerk | 00007814 | R0000812 | Secondary | 12-NOV-2001 | 10-MAY-2002 |

## Payroll History
### From 01-NOV-2001 To 11-MAY-2006

| Store | JobCode | W/E Date | Rate | Tot-HRs | OT-HR | Reg-Pay | OT-Pay | Prem-Pay | Gross |
|---|---|---|---|---|---|---|---|---|---|
| 7814 | R0000812 | 24-NOV-2001 | 6 1500 | 44.00 | 0 00 | 270.60 | 0.00 | 1.50 | 272 10 |
| | | *Back Pay - Total* | | | *14.00* | | | *86.10* | |
| | | *Computer Guided Training* | | | *8.00* | | | *49.20* | |
| | | 01-DEC-2001 | | 16.50 | 0 00 | 101 48 | 0 00 | 1.00 | 102.48 |
| | | 08-DEC-2001 | | 18 00 | 0.00 | 110.70 | 0 00 | 0.00 | 110.70 |
| | | 15-DEC-2001 | | 8 00 | 0.00 | 49 20 | 0 00 | 1.00 | 50 20 |
| | | 22-DEC-2001 | | 20 50 | 0.00 | 126.08 | 0 00 | 1.13 | 127.21 |
| | | 29-DEC-2001 | | 13 25 | 0.25 | 81.49 | 0.77 | 2 00 | 84 26 |
| | | 12-JAN-2002 | | 9 00 | 0.00 | 55.35 | 0 00 | 0.00 | 55.35 |
| | | 19-JAN-2002 | | 18.75 | 0.00 | 115.31 | 0.00 | 1.38 | 116.69 |
| | | 26-JAN-2002 | | 17.75 | 0.00 | 109.16 | 0 00 | 1.00 | 110.16 |
| | | 02-FEB-2002 | | 17.00 | 0.00 | 104.55 | 0 00 | 0.00 | 104.55 |
| | | 09-FEB-2002 | | 21.00 | 0.00 | 129 15 | 0 00 | 1.50 | 130.65 |
| | | 16-FEB-2002 | | 22.00 | 0.00 | 135 30 | 0 00 | 1.25 | 136.55 |
| | | 23-FEB-2002 | | 19.00 | 0.00 | 116.85 | 0 00 | 1.00 | 117.85 |
| | | 02-MAR-2002 | | 27.00 | 0.00 | 166.05 | 0 00 | 1.00 | 167 05 |
| | | 09-MAR-2002 | | 16.00 | 0.00 | 98.40 | 0 00 | 0.00 | 98.40 |
| | | 16-MAR-2002 | | 13.25 | 0.00 | 81.49 | 0 00 | 1.00 | 82.49 |
| | | 23-MAR-2002 | | 11.50 | 0.00 | 70.73 | 0 00 | 1.50 | 72.23 |
| | | 30-MAR-2002 | | 12.00 | 0.00 | 73 80 | 0 00 | 0.00 | 73.80 |
| | | 06-APR-2002 | | 45.00 | 5.00 | 276.75 | 15 38 | 0.00 | 292.13 |
| | | *Computer Guided Training* | | | *14 00* | | | *86.10* | |
| | | 13-APR-2002 | | 42.00 | 2 00 | 258.30 | 6.15 | 1.28 | 265 73 |
| | | 20-APR-2002 | | 30.75 | 0.00 | 189.11 | 0 00 | 1.94 | 191.05 |
| | | 27-APR-2002 | | 39.25 | 0.00 | 241.39 | 0.00 | 7.07 | 248.46 |
| | | 04-MAY-2002 | | 44.00 | 4 00 | 270.60 | 12 30 | 4.70 | 287.60 |
| | R0000307 | 11-MAY-2002 | | 11.00 | 0.00 | 67 65 | 0 00 | 6.00 | 73.65 |
| | R0000807 | | | 25.50 | 0.25 | 156 83 | 0.77 | 0.00 | 157.60 |
| | | 18-MAY-2002 | 6 2500 | 44.00 | 4 00 | 275.00 | 12 50 | 1.83 | 289 33 |
| | | 25-MAY-2002 | | 44.25 | 0.25 | 276.56 | 0 78 | 8 38 | 285.72 |
| | | 01-JUN-2002 | | 45.50 | 0.50 | 284 38 | 1.56 | 11 57 | 289.39 |
| | | *Holiday* | | | *5.00* | | | *31 25* | |
| | | *Back Pay Reversal* | | | *0.00* | | | *-8.12* | |
| | | 08-JUN-2002 | | 43.25 | 0.00 | 270 31 | 0 00 | 6 23 | 276 54 |

A97

| Ref | Date | Rate | Hours | OT Hrs | Earnings | OT Earn | Other | Total |
|---|---|---|---|---|---|---|---|---|
| | 00-JUN-2002 | | 43.25 | 0.00 | 270.31 | 0.00 | 8.25 | 278.54 |
| | 15-JUN-2002 | | 36.00 | 0.00 | 225.00 | 0.00 | 8.00 | 239.67 |
| | *Retro Dollars* | | *0.00* | | | | *6.67* | |
| | 22-JUN-2002 | | 31.25 | 0.00 | 195.31 | 0.00 | 0.00 | 195.31 |
| | 29-JUN-2002 | | 40.50 | 0.00 | 253.13 | 0.00 | 8.05 | 261.18 |
| | 06-JUL-2002 | | 47.00 | 0.00 | 293.75 | 0.00 | 14.33 | 308.08 |
| | *Holiday* | | *5.00* | | | | *31.25* | |
| | 13-JUL-2002 | | 33.75 | 0.00 | 210.94 | 0.00 | 6.00 | 221.36 |
| | *Retro Dollars* | | *0.00* | | | | *4.42* | |
| R0000067 | 20-JUL-2002 | | 6.00 | 0.00 | 37.50 | 0.00 | 0.00 | 37.50 |
| R0000307 | | | 8.00 | 0.00 | 50.00 | 0.00 | 0.00 | 50.00 |
| R0000807 | | | 18.00 | 0.00 | 112.50 | 0.00 | 6.00 | 118.50 |
| | 27-JUL-2002 | | 26.75 | 0.00 | 167.19 | 0.00 | 0.00 | 167.19 |
| | 03-AUG-2002 | | 34.25 | 0.00 | 214.06 | 0.00 | 5.00 | 219.06 |
| R0000067 | 10-AUG-2002 | | 6.00 | 0.00 | 37.50 | 0.00 | 0.00 | 37.50 |
| R0000807 | | | 24.50 | 0.00 | 153.13 | 0.00 | 5.50 | 158.63 |
| | 17-AUG-2002 | | 30.25 | 0.00 | 189.06 | 0.00 | 6.00 | 195.06 |
| | 24-AUG-2002 | | 49.00 | 9.00 | 306.25 | 28.13 | 1.27 | 335.65 |
| | *New Associate Training* | | *8.00* | | | | *50.00* | |
| | 31-AUG-2002 | | 38.25 | 0.00 | 239.06 | 0.00 | 7.00 | 246.06 |
| R0000557 | 07-SEP-2002 | 6.5000 | 11.00 | 0.00 | 71.50 | 0.00 | 11.00 | 82.50 |
| R0000807 | | 6.2500 | 25.00 | 0.00 | 156.25 | 0.00 | 3.50 | 159.75 |
| | *Holiday* | | *5.00* | | | | *31.25* | |
| | 14-SEP-2002 | | 41.50 | 0.00 | 259.38 | 0.00 | 7.13 | 266.51 |
| | 21-SEP-2002 | | 37.00 | 0.00 | 231.25 | 0.00 | 4.00 | 245.31 |
| | *Retro Dollars* | | *0.00* | | | | *10.06* | |
| | 28-SEP-2002 | | 39.00 | 0.00 | 243.75 | 0.00 | 7.00 | 250.75 |
| | 05-OCT-2002 | | 41.25 | 0.00 | 257.81 | 0.00 | 5.08 | 262.89 |
| | 12-OCT-2002 | | 35.25 | 0.00 | 220.31 | 0.00 | 8.00 | 230.88 |
| | *Retro Dollars* | | *0.00* | | | | *2.57* | |
| | 19-OCT-2002 | | 33.75 | 0.00 | 210.94 | 0.00 | 0.00 | 210.94 |
| | 26-OCT-2002 | | 43.00 | 0.00 | 268.75 | 0.00 | 6.21 | 274.96 |
| | 02-NOV-2002 | | 43.00 | 3.00 | 268.75 | 9.38 | 4.14 | 288.44 |
| | *Retro Dollars* | | *0.00* | | | | *6.17* | |
| | 09-NOV-2002 | | 33.00 | 0.00 | 206.25 | 0.00 | 7.00 | 213.25 |
| | *Career Advancement Program (CAP) Training* | | *1.50* | | | | *9.38* | |
| R0000557 | 16-NOV-2002 | 6.7000 | 28.75 | 0.00 | 192.63 | 0.00 | 0.00 | 192.63 |
| | *Back Pay - Total* | | *3.75* | | | | *25.13* | |
| R0000807 | | 6.4500 | 15.00 | 0.00 | 96.75 | 0.00 | 0.00 | 96.75 |
| | 23-NOV-2002 | | 40.00 | 0.00 | 258.00 | 0.00 | 6.00 | 264.00 |
| | 30-NOV-2002 | | 49.00 | 0.00 | 316.05 | 0.00 | 12.55 | 328.60 |
| | *Holiday* | | *5.00* | | | | *32.25* | |
| | 07-DEC-2002 | | 36.75 | 0.00 | 237.04 | 0.00 | 7.00 | 244.04 |
| | 14-DEC-2002 | | 36.00 | 0.00 | 232.20 | 0.00 | 7.00 | 239.20 |
| | 21-DEC-2002 | | 39.00 | 0.00 | 251.55 | 0.00 | 6.00 | 257.55 |
| | *Floating/Personal Holiday* | | *5.00* | | | | *32.25* | |
| | 28-DEC-2002 | | 25.00 | 0.00 | 161.25 | 0.00 | 7.00 | 168.25 |
| | *Holiday* | | *5.00* | | | | *32.25* | |
| | 04-JAN-2003 | | 5.00 | 0.00 | 32.25 | 0.00 | 0.00 | 32.25 |
| | *Holiday* | | *5.00* | | | | *32.25* | |
| | 18-JAN-2003 | | 41.25 | 6.00 | 266.06 | 19.35 | 6.09 | 291.50 |
| | 25-JAN-2003 | | 36.50 | 0.00 | 235.43 | 0.00 | 5.00 | 240.43 |
| | 01-FEB-2003 | | 41.00 | 0.00 | 264.45 | 0.00 | 7.09 | 271.54 |
| | 08-FEB-2003 | | 31.50 | 0.00 | 203.18 | 0.00 | 7.00 | 210.18 |
| | 15-FEB-2003 | | 48.00 | 8.00 | 309.60 | 25.80 | 8.67 | 344.07 |
| | 22-FEB-2003 | | 30.00 | 0.00 | 193.50 | 0.00 | 6.00 | 199.50 |
| | 01-MAR-2003 | | 41.00 | 0.00 | 264.45 | 0.00 | 7.09 | 271.54 |
| | 08-MAR-2003 | | 34.00 | 0.00 | 219.30 | 0.00 | 7.00 | 228.44 |
| | *Retro Dollars* | | *0.00* | | | | *2.14* | |
| R0000557 | 15-MAR-2003 | 6.7000 | 23.00 | 0.00 | 154.10 | 0.00 | 7.00 | 161.10 |
| R0000807 | | 6.4500 | 14.00 | 0.00 | 90.30 | 0.00 | 0.00 | 90.30 |
| | 22-MAR-2003 | | 26.00 | 0.00 | 167.70 | 0.00 | 7.00 | 174.70 |
| | 29-MAR-2003 | | 34.00 | 0.00 | 219.30 | 0.00 | 0.00 | 219.30 |
| | *Jury Duty* | | *6.00* | | | | *38.70* | |
| | 05-APR-2003 | | 41.75 | 0.00 | 269.29 | 0.00 | 7.15 | 276.44 |
| | 12-APR-2003 | | 40.75 | 0.75 | 262.84 | 2.42 | 7.00 | 272.26 |

A98

| EmpNo | Code | Date / Description | Rate | Hours | OT | Amount | | | Total |
|---|---|---|---|---|---|---|---|---|---|
| | | Jury Duty | | | 6.00 | | | 38.70 | |
| | | 19-APR-2003 | | 49.75 | 1.75 | 320.89 | 5.64 | 8.78 | 335.31 |
| | | 26-APR-2003 | | 49.75 | 4.75 | 320.89 | 15.32 | 5.49 | 341.70 |
| | | 03-MAY-2003 | | 41.25 | 0.25 | 266.06 | 0.81 | 6.00 | 272.87 |
| 7816 | R0000557 | | 6.7000 | 3.00 | 4.00 | 20.10 | 13.40 | 0.29 | 33.79 |
| 7814 | R0000807 | 10-MAY-2003 | 6.4500 | 2.00 | 2.00 | 12.90 | 0.00 | 2.00 | 14.90 |
| 7816 | R0000557 | | 7.0000 | 41.25 | 1.25 | 288.75 | 4.38 | 0.08 | 293.21 |
| | | 17-MAY-2003 | | 46.25 | 0.25 | 323.75 | 0.88 | 8.54 | 337.54 |
| | | Retro Dollars | | | 0.00 | | | 4.37 | |
| | R0000807 | | 6.6500 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.01 |
| | R0000557 | | 7.0000 | 48.25 | 1.50 | 337.75 | 5.25 | 7.87 | 350.87 |
| | | 24-MAY-2003 | | | | | | | |
| | | 31-MAY-2003 | | 31.50 | 0.00 | 220.50 | 0.00 | 15.50 | 236.00 |
| | | 07-JUN-2003 | | 42.00 | 0.00 | 294.00 | 0.00 | 7.17 | 301.17 |
| | | 14-JUN-2003 | | 44.00 | 0.00 | 308.00 | 0.00 | 8.10 | 316.10 |
| | | 21-JUN-2003 | | 36.00 | 0.25 | 252.00 | 0.88 | 0.00 | 252.88 |
| | | 28-JUN-2003 | 8.0000 | 39.75 | 0.00 | 318.00 | 0.00 | 8.00 | 615.25 |
| | | Retro Dollars | | | 0.00 | | | 289.25 | |
| | R0000807 | | 7.0000 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 1.10 |
| | | Retro Dollars | | | 0.00 | | | 1.10 | |
| | R0000557 | 05-JUL-2003 | 8.0000 | 56.50 | 0.00 | 452.00 | 0.00 | 17.79 | 469.79 |
| | | Birthday | | | 5.00 | | | 40.00 | |
| | | 12-JUL-2003 | | 24.00 | 0.00 | 192.00 | 0.00 | 0.00 | 220.21 |
| | | Retro Dollars | | | 0.00 | | | 28.21 | |
| | | 26-JUL-2003 | | 38.75 | 0.00 | 310.00 | 0.00 | 7.00 | 351.12 |
| | | Retro Dollars | | | 0.00 | | | 34.12 | |
| | | 02-AUG-2003 | | 31.00 | 0.00 | 248.00 | 0.00 | 7.00 | 255.00 |
| | | 09-AUG-2003 | | 69.50 | 0.00 | 556.00 | 0.00 | 8.00 | 564.00 |
| | | Vacation Hours | | | 30.50 | | | 244.00 | |
| | | 16-AUG-2003 | | 35.00 | 0.00 | 280.00 | 0.00 | 8.00 | 288.00 |
| | | 23-AUG-2003 | | 34.50 | 0.00 | 276.00 | 0.00 | 8.00 | 284.00 |
| | | 30-AUG-2003 | | 35.00 | 0.00 | 280.00 | 0.00 | 7.00 | 287.00 |
| | | 06-SEP-2003 | | 44.00 | 0.00 | 352.00 | 0.00 | 8.00 | 360.00 |
| | | Holiday | | | 5.00 | | | 40.00 | |
| | | 13-SEP-2003 | | 47.75 | 0.00 | 382.00 | 0.00 | 8.65 | 390.65 |
| | | 20-SEP-2003 | | 45.00 | 0.00 | 360.00 | 0.00 | 8.44 | 368.44 |
| | | 27-SEP-2003 | | 40.00 | 0.00 | 320.00 | 0.00 | 8.00 | 339.56 |
| | | Retro Dollars | | | 0.00 | | | 11.56 | |
| | | 04-OCT-2003 | | 40.00 | 0.00 | 320.00 | 0.00 | 8.00 | 328.00 |
| | | 11-OCT-2003 | | 40.00 | 0.00 | 320.00 | 0.00 | 8.00 | 328.00 |
| | | 18-OCT-2003 | | 40.00 | 0.00 | 320.00 | 0.00 | 8.00 | 328.00 |
| | | 25-OCT-2003 | | 40.00 | 0.00 | 320.00 | 0.00 | 8.00 | 328.00 |
| | | 01-NOV-2003 | | 38.25 | 0.00 | 306.00 | 0.00 | 16.00 | 322.00 |
| | | 08-NOV-2003 | 8.3500 | 40.00 | 0.00 | 334.00 | 0.00 | 16.00 | 419.39 |
| | | Retro Dollars | | | 0.00 | | | 69.39 | |
| | | 15-NOV-2003 | 8.0000 | 40.00 | 0.00 | 320.00 | 0.00 | 16.00 | 252.61 |
| | | Back Pay Reversal | | | 0.00 | | | -83.39 | |
| | R0000807 | | 7.2000 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.01 |
| | R0000557 | 22-NOV-2003 | 8.2000 | 48.50 | 0.50 | 397.70 | 2.05 | 17.40 | 417.15 |
| | R0000807 | | 7.4000 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.01 |
| | R0000557 | 29-NOV-2003 | 8.5000 | 53.00 | 0.00 | 450.50 | 0.00 | 43.36 | 493.86 |
| | | Holiday | | | 8.00 | | | 68.00 | |
| | | 06-DEC-2003 | | 48.00 | 0.25 | 408.00 | 1.06 | 34.00 | 443.06 |
| | | 13-DEC-2003 | | 48.00 | 0.00 | 408.00 | 0.00 | 34.00 | 442.94 |
| | | Retro Dollars | | | 0.00 | | | 0.94 | |
| | | 20-DEC-2003 | | 48.50 | 0.50 | 412.25 | 2.13 | 34.00 | 448.38 |
| | | 27-DEC-2003 | | 48.25 | 0.25 | 410.13 | 1.06 | 34.00 | 445.19 |
| | | Holiday | | | 8.00 | | | 68.00 | |
| | | Computer Guided Training | | | 0.25 | | | 2.13 | |
| | | 03-JAN-2004 | | 52.75 | 0.25 | 448.38 | 1.06 | 44.53 | 493.97 |
| | | Holiday | | | 8.00 | | | 68.00 | |
| | | 10-JAN-2004 | | 48.50 | 8.50 | 412.25 | 36.13 | 0.00 | 448.38 |
| | | 17-JAN-2004 | | 48.00 | 8.00 | 408.00 | 34.00 | 0.00 | 442.00 |
| | | 24-JAN-2004 | | 48.25 | 8.25 | 410.13 | 35.06 | 0.00 | 445.19 |
| | | 31-JAN-2004 | | 48.25 | 8.25 | 410.13 | 35.06 | 0.00 | 445.19 |
| | | 07-FEB-2004 | | 48.50 | 8.50 | 412.25 | 36.13 | 0.00 | 448.38 |

A99

| Emp ID | Date / Description | Tot-HRs | OT-HR | Reg-Pay | OT-Pay | Prem-Pay | Gross |
|---|---|---|---|---|---|---|---|
| | 14-FEB-2004 | 48.00 | 8 00 | 408.00 | 34.00 | 0.00 | 442 00 |
| | 21-FEB-2004 | 40.00 | 0 00 | 340 00 | 0.00 | 0.00 | 340.00 |
| | 28-FEB-2004 | 16 25 | 8 25 | 138.13 | 35.06 | 0.00 | 173 19 |
| | 06-MAR-2004 | 39.00 | 7 00 | 331 50 | 29.75 | 0.00 | 361 25 |
| 7836 | 20-MAR-2004 | 40.00 | 0 00 | 340 00 | 0.00 | 0.00 | 340.00 |
| | 27-MAR-2004 | 48.00 | 8 00 | 408 00 | 34.00 | 0 00 | 442 00 |
| | 03-APR-2004 | 48 50 | 8 50 | 412 25 | 36.13 | 0 00 | 448.38 |
| | 10-APR-2004 | 48 25 | 8 25 | 410.13 | 35.06 | 0 00 | 445 19 |
| | 17-APR-2004 | 47 75 | 7 75 | 405.88 | 32.94 | 0 00 | 438.82 |
| | 24-APR-2004 | 48 50 | 8 50 | 412 25 | 36.13 | 0 00 | 448.38 |
| | 01-MAY-2004 | 48.00 | 8 00 | 408 00 | 34.00 | 0 00 | 442 00 |
| | 08-MAY-2004 | 48.00 | 8 00 | 408 00 | 34.00 | 0 00 | 442 00 |
| | 15-MAY-2004 | 9 0000 | 48 00 | 8 00 | 432 00 | 36.00 | 0 00 | 468.00 |
| | 22-MAY-2004 | 39 75 | 8 00 | 357 75 | 36.00 | 0 00 | 393 75 |
| | 29-MAY-2004 | 56.25 | 8 25 | 506 25 | 37.13 | 0 00 | 543 38 |
| | *Floating/Personal Holiday* | 8.00 | | | | 72 00 | |
| | 05-JUN-2004 | 40.00 | 7 75 | 360 00 | 34.88 | 16.00 | 410 88 |
| | *Holiday* | 8.00 | | | | 72 00 | |
| | 12-JUN-2004 | 40 25 | 0 25 | 362 25 | 1.13 | 0.00 | 363 38 |
| | 19-JUN-2004 | 48 50 | 8 50 | 436 50 | 38.25 | 0.00 | 474 75 |
| | 26-JUN-2004 | 49 00 | 9 00 | 441 00 | 40 50 | 0.00 | 481.50 |
| | 03-JUL-2004 | 48.00 | 8 25 | 432.00 | 37.13 | 0.00 | 469 13 |
| | 10-JUL-2004 | 48 00 | 8 00 | 432 00 | 36.00 | 16.00 | 484 00 |
| | *Holiday* | 8.00 | | | | 72 00 | |
| | 17-JUL-2004 | 40 00 | 0 00 | 360 00 | 0 00 | 0.00 | 360 00 |
| | *Vacation Hours* | 40 00 | | | | 360 00 | |
| R0000599 | 24-JUL-2004 | 37.25 | 5 50 | 335.25 | 24 75 | 0.00 | 360 00 |
| R0000557 | 31-JUL-2004 | 42 25 | 3 00 | 380 25 | 13.50 | 0.00 | 393 75 |
| | 07-AUG-2004 | 48.00 | 8 00 | 432 00 | 36.00 | 0.00 | 468.00 |
| R0000465 | 14-AUG-2004 | 48 00 | 8 00 | 432 00 | 36.00 | 0.00 | 468.00 |
| | 21-AUG-2004 | 41 50 | 6 00 | 373 50 | 27.00 | 0.00 | 400.50 |
| | 28-AUG-2004 | 48 25 | 8 25 | 434.25 | 37.13 | 0.00 | 471.38 |
| | 04-SEP-2004 | 46 50 | 6 50 | 418.50 | 29.25 | 0.00 | 447 75 |
| | 11-SEP-2004 | 55 00 | 8 00 | 495.00 | 36.00 | 15.04 | 546 04 |
| | *Holiday* | 8.00 | | | | 72 00 | |
| | 18-SEP-2004 | 44.75 | 8 00 | 402.75 | 36.00 | 0.00 | 438.75 |
| | 25-SEP-2004 | 48.00 | 8 00 | 432.00 | 36.00 | 0.00 | 468.00 |
| | 02-OCT-2004 | 48.00 | 8 00 | 432.00 | 36.00 | 0.00 | 468.00 |
| | 09-OCT-2004 | 48.00 | 8 00 | 432.00 | 36.00 | 0.00 | 468.00 |
| | 16-OCT-2004 | 48.00 | 8 00 | 432.00 | 36.00 | 0.00 | 468.00 |
| | 23-OCT-2004 | 46 00 | 8 00 | 414.00 | 36.00 | 0.00 | 450.00 |
| | 30-OCT-2004 | 9.3000 | 46 50 | 8 25 | 432.45 | 38.36 | 0.00 | 470 81 |
| | 06-NOV-2004 | 48.00 | 8 00 | 446.40 | 37.20 | 0.00 | 483 60 |
| | 13-NOV-2004 | 48.00 | 8 00 | 446.40 | 37.20 | 0.00 | 483 60 |
| | 20-NOV-2004 | 51.00 | 11 00 | 474.30 | 51.15 | 0.00 | 525 45 |
| | 27-NOV-2004 | 54 00 | 8 00 | 502.20 | 37.20 | 12.78 | 552.18 |
| | *Holiday* | 8.00 | | | | 74.40 | |
| | 04-DEC-2004 | 49 50 | 9 50 | 460.35 | 44.18 | 0.00 | 504 53 |
| | 11-DEC-2004 | 47 50 | 7.50 | 441.75 | 34.88 | 0.00 | 476 63 |
| | *Floating/Personal Holiday* | 8.00 | | | | 74.40 | |
| | 25-DEC-2004 | 39.75 | 0 00 | 369.68 | 0.00 | 0.00 | 369.68 |
| | *Holiday* | 8.00 | | | | 74.40 | |
| | 01-JAN-2005 | 55 50 | 7.75 | 516.15 | 36 04 | 16 72 | 568.91 |
| | *Holiday* | 8.00 | | | | 74.40 | |
| | 08-JAN-2005 | 47 50 | 7 50 | 441.75 | 34.88 | 0.00 | 476.63 |
| | 15-JAN-2005 | 41.75 | 7 50 | 388.28 | 34.88 | 0.00 | 423.16 |
| | 05-MAR-2005 | 39 00 | 0.00 | 362.70 | 0.00 | 0.00 | 362.70 |
| | *Floating/Personal Holiday* | 8.00 | | | | 74.40 | |
| | *Termination Vacation (Accrued)* | 31 00 | | | | 288.30 | |

| | | Tot-HRs | OT-HR | Reg-Pay | OT-Pay | Prem-Pay | Gross |
|---|---|---|---|---|---|---|---|
| Totals: | | 6,346.50 | 430.75 | 48,728.22 | 1,845 28 | 894.67 | 51,847 63 |

A100

# EXHIBIT I

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

GLORIA NIEVES and EMILIO NIEVES,)
                                )
         Plaintiffs,            )
                                )  Civil Action
v.                              )  No. 06-123 GMS
                                )
ACME MARKETS, INC.,a Delaware   )
corporation, d/b/a Acme Markets )
No. 7816, ACME MARKETS, INC., a )
Pennsylvania Corporation, d/b/a )
Acme Markets No. 7816, ACME     )
MARKETS, INC., a Pennslvania    )
Corporation d/b/a Acme Markets  )
No. 7836,                       )
                                )
         Defendants.            )

    Deposition of STEPHEN BRILEY taken pursuant to
notice at the law offices of Biggs and Battaglia,
921 North Orange Street, Wilmington, Delaware,
beginning at 10:22 a.m. on Monday, December 18, 2006,
before Lucinda M. Reeder, Registered Diplomate
Reporter and Notary Public.

APPEARANCES:

        PHILIP B. BARTOSHESKY, ESQ.
        Biggs and Battaglia
          921 Orange Street
          Wilmington Delaware 19801
          for the Plaintiffs,

        ELIZABETH A. MALLOY, ESQ.
        BUCHANAN, INGERSOLL & ROONEY, P.C.
          1835 Market Street, 14th Floor
          Philadelphia, Pennsylvania 19103-2085
          for the Defendants.

ALSO PRESENT:
GLORIA NIEVES and EMILIO NIEVES
STEPHEN MOYER
              WILCOX & FETZER, LTD.
    1330 King Street - Wilmington, Delaware  19801
                (302) 655-0477
                www.wilfet.com

A102



**WILCOX & FETZER LTD.**
Registered Professional Reporters



Stephen Briley

3

1    Okay?

2    A.    Okay.

3    Q.    If I ask a question which doesn't seem to make

4    sense, which lawyers have done on occasion, let me

5    know, and I'll try to clear it up.  Okay?

6    A.    Okay.

7    Q.    If you need a break for any reason, just let us

8    know.  What is your current employment?

9    A.    I am the store director for Acme Markets, in

10   Folsom, Pennsylvania, store No. 7893.

11   Q.    How long have you had that position?

12   A.    Store director, for 16 years.

13   Q.    How long have you been in the store in

14   Pennsylvania where you are now?

15   A.    Since August of 2005.

16   Q.    Where were you before that?

17   A.    I was in Middletown, Delaware.

18   Q.    How long were you at the Acme store in

19   Middletown?

20   A.    Got there in April 2003.

21   Q.    Was that when they opened the new store in

22   Middletown?

23   A.    Yes.

24   Q.    You had nothing to do with the prior store in

16

1    A.    I am not sure.

2    Q.    So you heard from someplace that you are not

3    sure where today that Gloria had been yelling at

4    somebody named Joyce.  Is that what you can recall

5    now?

6    A.    Yes.

7    Q.    Anything other than that?

8    A.    Yeah, I was made aware that it happened again

9    that week.

10    Q.    It being?

11    A.    The yelling at the same associate.

12    Q.    Do you know, were you made aware, can you

13    recall whether you were made aware of what kind of

14    yelling it was?  I mean, the words spoken, profanity,

15    anything along those lines?

16    A.    I can't recall any specifics.

17    Q.    You can't recall precisely who told you this

18    other than it was one of your assistant --

19    A.    One of my assistant directors.  Because I -- at

20    a store that size I had two, an ASD-I it's called and

21    an ASD-II.

22    Q.    Did you look into this situation?

23    A.    I reviewed it with Joyce.  I believe because

24    she brought it to her immediate supervisor's



17

1    attention, which was Denise, who was the deli manager.

2    Q.    She, the assistant director brought it to the

3    deli manager's attention?  Is that what you are

4    saying?

5    A.    The associate did, Joyce.

6    Q.    Joyce brought it to whose attention, Denise?

7    A.    Denise.

8    Q.    So you went and talked to Denise about the

9    situation?

10   A.    Denise and Joyce and myself, yes, we talked

11   about it.

12   Q.    Do you remember what you were told during those

13   conversations?

14   A.    I can't recall.

15   Q.    Other than talking to Denise and Joyce, do you

16   remember talking to anybody else about this situation?

17   A.    Afterwards, yes.

18   Q.    After what?

19   A.    After she was suspended.

20   Q.    Did you talk to Gloria about the situation

21   before you suspended her?

22   A.    I believe I would have, yes.

23   Q.    Do you remember anything that she said?

24   A.    No.

18

1    Q.    Did she deny it, deny that any of these things

2    occurred?

3    A.    I don't recall.

4    Q.    You said you talked to somebody after she was

5    suspended?

6    A.    Yes.

7    Q.    Who did you talk to after?

8    A.    That was the union representative.

9    Q.    Who was that?

10   A.    His name is Henry.

11   Q.    Do you remember his last name?

12   A.    No.

13   Q.    And -- tell us about the conversation you had

14   with Henry.

15   A.    From what I can remember, the -- we came to an

16   agreement that she was suspended and there would be a

17   final letter put in her file, and she would be

18   suspended -- I mean, excuse me, transferred to another

19   store.

20   Q.    When you say a final letter, what does that

21   mean?

22   A.    A final warning for the infraction.

23   Q.    And did you ever talk to -- other than -- well,

24   this union person, Henry, did he convey to you that he



Stephen Briley

21

1    Q.    At some point, did anybody from the Delaware

2  Department of Labor or Equal Employment Opportunity

3  Commission ever come talk to you about Gloria's

4  suspension or anything about her employment?

5    A.    Not that I can remember.

6    Q.    Did anybody from Acme's loss prevention or

7  anything along those lines ever after the fact come

8  and talk to you about the situation?

9    A.    Not that I can remember, no.

10    Q.    I think I already asked you about this, but I'm

11  not sure, so I am going to ask again.  You mentioned

12  Gloria talked to you about a couple of personal

13  issues.  Did she ever complain to you about any

14  problems she had with co-workers?

15    A.    No that I can recall, sir, no.

16    Q.    Did you ever hear anything in the store about

17  anybody having a problem with Gloria Nieves speaking

18  Spanish to customers or co-workers or anything along

19  those lines?

20    A.    No, no.

21    Q.    That wouldn't have been a problem if she spoke

22  to Hispanic customers in Spanish, would it?

23    A.    No, sir.

24    Q.    Was any part of the Middletown store under --

Stephen Briley

27

1    A.    Yes, Smyrna.

2    Q.    The Smyrna store?

3    A.    Yes.

4    Q.    Did you ever -- while you were -- while Gloria

5    was at the Middletown store, did you ever become aware

6    that she had any health problems?

7    A.    Not that I can recall.

8    Q.    Was the transfer to Smyrna -- why was she

9    transferred to a different store as part of this

10   discipline you imposed?

11   A.    To my recollection, that was the decision that

12   Henry, the union representative, and myself came to.

13   Q.    But do you know why that decision, why you came

14   to that decision?

15   A.    I don't recall the specific reason why.

16   Q.    Did anyone in the deli department or anybody

17   else at Acme in the Middletown store in that time

18   frame ever convey to you that some co-workers were

19   afraid of Gloria Nieves?

20   A.    Of Gloria?

21   Q.    Yeah.

22   A.    No.

23   Q.    Did any of them ever convey to you that they

24   might have been afraid of Mr. Nieves?

# EXHIBIT J

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


GLORIA NIEVES and EMILIO NIEVES,    )
                                    )
            Plaintiffs,             )
                                    )  Civil Action
v.                                  )  No. 06-123 GMS
                                    )
ACME MARKETS, INC., a Delaware      )
corporation d/b/a Acme Markets      )
No. 7816, ACME MARKETS, INC., a     )
Delaware Corporation d/b/a Acme     )
Markets No. 7836, ACME MARKETS,     )
INC., a Pennsylvania Corporation,   )
d/b/a Acme Markets No. 7816, ACME   )
MARKETS, INC., a Pennsylvania       )
Corporation, d/b/a Acme             )
Markets No. 7836,                   )
                                    )
            Defendants.             )


            Deposition of JOYCE A. ALPHIN taken
pursuant to notice at the law offices of Biggs &
Battaglia, 921 North Orange Street, Wilmington,
Delaware, beginning at 10:55 a.m., on Thursday,
January 18, 2007, before Kurt A. Fetzer, Registered
Diplomate Reporter and Notary Public.

APPEARANCES:

        PHILIP B. BARTOSHESKY, ESQ.
        BIGGS AND BATTAGLIA
          921 North Orange Street
          Wilmington, Delaware  19801
          For the Plaintiffs


            WILCOX & FETZER
    1330 King Street - Wilmington, Delaware 19801
            (302) 655-0477
            www.wilfet.com



**WILCOX & FETZER LTD.**
Registered Professional Reporters



Joyce A. Alphin                                    8

1    Q.    Other than that, she told you don't talk to

2    those two girls or she would get mad at you because

3    you did --

4    A.    Right.

5    Q.    -- did you have any other problems with Gloria?

6    A.    We stopped talking.  And her and I closed at

7    night, so it was just her and I toward the end of the

8    night.  And one night she picked a bucket of water up

9    and threw it down the counter at me and it splashed

10   all over my arm.  I just looked at her and then she

11   picked up a slab of ham and threw it at me.

12              And then about two nights later I was

13   wiping the bottom of the counter and I was squatted

14   down and she took the mop and almost knocked me off my

15   feet.

16   Q.    Okay.  So there was one night she threw a

17   bucket of water and a slab of ham?

18   A.    Right.

19   Q.    Then two nights later there was something with

20   a mop?

21   A.    Right.

22   Q.    Now, the situation with the water and the ham,

23   did you complain to anybody about that?

24   A.    I told Denise, the manager.

Joyce A. Alphin                    9

1    Q.    When did you tell her that?

2    A.    The next morning when I came in.

3    Q.    And the thing with the mop two nights later --

4    A.    That was on a Friday and I worked Saturday

5    morning and I told Denise that I was not going to work

6    with her no more.

7    Q.    Now, other than those incidents -- and that was

8    near the end of the time Gloria was at the Middletown

9    store, right?

10   A.    Right.

11   Q.    Did you ever complain to anybody at Acme

12   management about Gloria?

13   A.    No.

14   Q.    Did you ever tell Denise Dean or Mr. Briley

15   that Gloria's attitude was bad or anything along those

16   lines?

17   A.    I may have said it.  I don't recall.  Because

18   the tension was real thick back there.  It was really

19   tough.

20   Q.    Why was that?

21   A.    Because she wasn't speaking and, you know, if I

22   asked her something she would ignore me.  And she was

23   management, she was second in command.  And if I asked

24   her a question, she would just turn around, turn her

1    A.    Yes.

2    Q.    Do you know how she got to be in charge, how

3    she got that job?

4    A.    By seniority.

5    Q.    How do you know that?

6    A.    Because I pretty much knew who was next in line

7    for, you know, positions.

8    Q.    Did anybody ever complain about the fact that

9    Gloria got that job?

10   A.    No.

11   Q.    No?

12   A.    No.

13   Q.    Okay.  So Denise Dean was in charge of the

14   deli.  When did you tell Denise Dean about this

15   incident?

16   A.    The first one was the next morning.

17   Q.    What day of the week was this?  Do you

18   remember?

19   A.    No.  I would figure it was probably a Tuesday

20   night.

21   Q.    And then Denise Dean comes in at what time?

22   A.    She's there by 5:00 o'clock in the morning.

23   Q.    And when did you talk to her about the

24   situation?

1    A.    When I got done the school bus run.

2    Q.    So you went over to Acme before your workday at

3    Acme began?

4    A.    I gave her a call.

5    Q.    You called her on the telephone?

6    A.    Mm-hmm.

7    Q.    Did you go and talk to her in person?

8    A.    Not until I showed up next on Saturday for

9    work.

10   Q.    So you think it was a Tuesday night?

11   A.    Yeah.

12   Q.    You didn't work again until Saturday?

13   A.    No.  We get two nights off, so it would have

14   been Wednesday, Thursday and then I worked Friday

15   night.

16   Q.    So you called Denise Dean and you told her --

17   do you remember what you told her?

18   A.    That just, you know, her attitude, Gloria's

19   attitude was bad and she had picked a bucket of water

20   up and threw it at me.  And then I said she threw a

21   piece of ham at me and I told her I didn't want to

22   work with Gloria anymore.

23   Q.    What did Denise say to you?

24   A.    She said she would check into it, but the

Joyce A. Alphin                          21

1      Q.    So sometimes you worked during the day shift?

2      A.    During the week I worked nights; during the

3    weekends, day shift.

4      Q.    So you saw Denise Saturday morning?

5      A.    Right.

6      Q.    Had you worked with Gloria in the interim?

7      A.    Friday night.

8      Q.    So you worked Friday night and then you were

9    going to work Saturday morning too?

10     A.    Right.

11     Q.    So you worked a double shift?

12     A.    No.  As long as you have so many hours in

13   between the shifts and I didn't have to come in until

14   7:00 o'clock in the morning.

15     Q.    So you worked until like what time Friday

16   night?

17     A.    Till 11:00, 11:30.

18     Q.    Then you came back in at what time on Saturday?

19     A.    7:00.

20     Q.    7:00 Saturday morning.  When you saw Denise

21   Dean at about 7:00 on Saturday morning, what did you

22   say to her?

23     A.    That Friday night was the last straw; that

24   Gloria took the mop and tried to knock me off my feet.

Joyce A. Alphin

22

1    And I said that there were too many knives and things

2    back there and I wasn't playing her games anymore.

3       Q.    Tell me what happened Friday night with Gloria.

4       A.    It was toward the end of the night.  We were

5    finishing up mopping up the floors, sweeping up and I

6    was wiping the front of the deli counter and I was

7    squatted down and she took the mop right behind my

8    feet and almost knocked me over.

9       Q.    And did you say anything to her?

10       A.    Nope.

11       Q.    Did she say anything to you before she did

12    that?

13       A.    Nope.

14       Q.    It was just out of nowhere as far as you were

15    concerned?

16       A.    Yep.

17       Q.    And did you report this incident to anybody

18    before you talked to Denise Dean the next morning?

19       A.    No.

20       Q.    Again, was there any manager or assistant

21    manager on duty that night?

22       A.    It could have been Kyle or Joe.  I don't

23    recall.

24       Q.    Who is Joe?

Joyce A. Alphin                    23

1    A.    He's another, he was another front end manager.

2   He's not there anymore.

3    Q.    But you didn't report anything to them?

4    A.    No.

5    Q.    Okay.  When you talked to Denise Dean the next

6   morning, Saturday morning, what did you tell her?

7    A.    That that was the last straw; I wasn't working

8   with her no more and if they didn't do something, then

9   I was done, I was quitting.

10    Q.    And what did she say to you?

11    A.    She called Steve Briley back, which was the

12   store manager.

13    Q.    Called him back?  What do you mean by that?

14    A.    Back into the deli.

15    Q.    Did you talk to Mr. Briley?

16    A.    Yes, I did.

17    Q.    What did you tell him?

18    A.    I told him exactly what had happened with the

19   water and the ham and the mop.  And I told him, you

20   know, I wasn't going to play the games no more.  I

21   said there was knives in the deli and all and I said

22   the way she's been acting I'm not playing her.

23    Q.    And what did he say to you?

24    A.    He told me to just settle down and that he

Joyce A. Alphin                           29

1    A.    Yes.

2    Q.    Did you ever talk to Gloria again?

3    A.    No.

4    Q.    Do you know if anybody from the store ever went

5    to Smyrna to see what was going on with Gloria?

6    A.    No.

7    Q.    Did you ever talk to Christina Shaw about

8    Gloria?

9    A.    No.

10    Q.    Was there any concern that you heard from any

11    coworkers or Acme management about Mr. Nieves coming

12    into the store after Gloria had been suspended?

13    A.    It was a while after and he'd come in and he

14    would linger around the deli area.  And I had talked

15    to B. J. and said, you know, I didn't think that he

16    should be hanging around there.

17          And she said, "Let me know if he's in the

18    store and we'll call the cops" because I got to where

19    I didn't want to go out to my car because his car

20    would be out in the parking lot.

21    Q.    When you say, "a while after," is that --

22    A.    Probably like a week or so after she was

23    transferred.

24    Q.    Did he ever talk to you?

Joyce A. Alphin                    30

1    A.    No.

2    Q.    And B. J. is who?

3    A.    Assistant manager.

4    Q.    Do you know her last name?

5    A.    No.  I can think of it but right now I can't.

6    Q.    So about a week or so after Gloria had been

7    transferred or a week or so after she was no longer

8    working at the Middletown store, you noticed

9    Mr. Nieves in the store near the deli department?

10   A.    Yes.

11   Q.    How many times?

12   A.    It was pretty much whenever I was in there.

13   You know, if I worked five days or six days, he would

14   show up.

15   Q.    So it was every night for five or six days?

16   A.    Yes.

17   Q.    And then at that point you went to B. J.?

18   A.    Yes.

19   Q.    And after you went to B. J. did he stop showing

20   up at some point?

21   A.    Eventually.

22   Q.    Did you ever call the police --

23   A.    No.

24   Q.    -- or do anything like that?

1    A.    No.  They started walking me out to my car at

2    night.

3    Q.    Who is "they"?

4    A.    The front end guys, you know, or we would walk

5    out in a group.  You know, whoever was walking out

6    that time of night, we would walk out together.

7    Q.    Did you see him outside too?

8    A.    No.  I didn't -- I would just go right to my

9    car because they made me start parking up front.

10    Q.    Who is "they"?

11    A.    The management.

12    Q.    So management suggested that you park close to

13    the store because of the concern about Mr. Nieves?

14    A.    Yes.

15    Q.    When you say, "management," is that Denise Dean

16    or is it B. J.?

17    A.    B. J. and Steve.

18    Q.    Steve talked to you about that?

19    A.    Yeah.

20    Q.    How long did you do that, park close and get

21    escorted out or anything along those lines?

22    A.    For about two months.

23    Q.    And were you still seeing him two months later

24    in the store, Mr. Nieves?

Joyce A. Alphin                    32

1       A.    No.  But they would see his car out in the

2   parking lot and they would tell me he was out there.

3       Q.    Who is "they"?

4       A.    Like the associates that would be outside or

5   like if management walked out to check on carts, which

6   would be the front end manager, and, you know, they

7   would call me in the deli and tell me he was outside.

8       Q.    What kind of car was it?  Do you remember?

9       A.    He used to drive a little, red car.

10      Q.    And that's the one that people said that was

11  outside?

12      A.    Yes.

13      Q.    Did he ever talk to you about anything or

14  confront you, say anything to you?

15      A.    No.

16      Q.    Do you know if he said anything to anybody at

17  Acme?

18      A.    No.

19      Q.    You don't know?

20      A.    (Witness shakes head).

21              MR. BARTOSHESKY:  I think I'm just about

22  finished.  Let me just take a minute.

23              MS. MALLOY:  Okay.

24              (A brief recess was taken.)

# EXHIBIT K

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


GLORIA NIEVES and EMILIO NIEVES,  )
                               )
         Plaintiffs,      )
                               )  Civil Action
v.                           )  No. 06-123 GMS
                               )
ACME MARKETS, INC., a Delaware   )
corporation d/b/a Acme Markets  )
No. 7816, ACME MARKETS, INC., a  )
Delaware Corporation d/b/a Acme  )
Markets No. 7836, ACME MARKETS,  )
INC., a Pennsylvania Corporation, )
d/b/a Acme Markets No. 7816, ACME )
MARKETS, INC., a Pennsylvania    )
Corporation, d/b/a Acme          )
Markets No. 7836,               )
                               )
         Defendants.     )


         Deposition of DENISE K. DEAN taken
pursuant to notice at the law offices of Biggs &
Battaglia, 921 North Orange Street, Wilmington,
Delaware, beginning at 10:05 a.m., on Thursday,
January 18, 2007, before Kurt A. Fetzer, Registered
Diplomate Reporter and Notary Public.

APPEARANCES:

      PHILIP B. BARTOSHESKY, ESQ.
      BIGGS AND BATTAGLIA
        921 North Orange Street
        Wilmington, Delaware  19801
        For the Plaintiff


            WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
          (302) 655-0477
          www.wilfet.com

                              A123



WILCOX & FETZER LTD.
Registered Professional Reporters



Denise K. Dean                    19

1    A.   Yes.   What I remember of the incident was she

2   came in in tears and she said, "We have got to do

3   something.  Gloria now has thrown a bucket of water at

4   me."  And she requested to be moved out of the

5   department at that time.

6    Q.   And what did you do next?  What happened next?

7    A.   I went to Steve Briley.

8    Q.   And what did you tell him?

9    A.   Exactly what Joyce had told me.

10    Q.   Now, did Joyce also talk to Mr. Briley at this

11   point or did you just relay the concern?

12    A.   I relayed the concern.  I don't remember if she

13   went with me.

14    Q.   And what did Mr. Briley do then?  Did he tell

15   you --

16    A.   I believe he called personnel at that

17   particular time.

18    Q.   And did you hear him talking to personnel?

19    A.   No.

20    Q.   What happened next?  Did you talk to Gloria

21   about it?  Did you talk to anybody else about it?

22    A.   No.  Because I was the department head and I

23   took it to the store director who was to handle it

24   from there.

# EXHIBIT L

**Stephen Moyer** .

*Gloria Neives*

*7816*

| | |
|---|---|
| **From:** | Stephen Moyer |
| **Sent:** | Thursday, March 11, 2004 1:13 PM |
| **To:** | s07816.dir |
| **Cc:** | Stephen Moyer; Tom Holden |
| **Subject:** | RE: To Steve re G. Nieves 7816 |

*Trans to Smyrna!*
*Snd Letter —*

Steve B,

The union rep, (Henry) "mentioned" to me on Tuesday morning that there was a situation in Middletown concerning a deli clerk and he was going to see if he could get the clerk transferred. He didn't tell me who, or what the incident involved - naturally.

I have no problem with your suggestion, it Tom can arrange the transfer. Let me know outcome and I will do a letter to her. I'll need to know when she is back on the schedule and in what store.

Thanks
Steve Moyer


-----Original Message-----
From: s07816.dir [mailto:s07816dir@xprimary.7000.albertsons.com]
Sent: Thursday, March 11, 2004 10:48 AM
To: Stephen.Moyer@xprimary.7000.albertsons.com; Tom Holden
Cc: s07816.dir@albertsons.com; Tom Holden
Subject: Re: To Steve re G. Nieves 7816

Steve,
  She was suspended on saturday 03-06-04 for violation of company work rules for personnal conduct. She is a total disruption to our deli operation. Most of the associates in our deli are afraid to work with her. There was a incident on tuesday nite 03-02-04 that another associate came to my ASD II about that Gloria was yelling at her and throwing things. The same associate came to my ASD on friday nite that it happen again friday nite. This same associate still very upset about the situation came to me and explained to myself and Denise the deli manager about what went on. This is when Gloria was suspended. I talked to the union rep about this and I suggest that Gloria get a FINAL Warning letter in her file and transfered out of the store starting next week. The union rep said he has talked to you about this. I spoke to Tom Holden this morning about the situation and transfer. Please advise on what we will do. I would suggest a transfer to #7836 Smryna.


Thank You,
Stephen Briley

*Incident Tues 3-02-04*
*Yelling and throwing Things*
*again Fri 3-06-04*

> Steve,
>
>
>
> I received a letter from local 27 stating that Gloria Nieves has been
> suspended - when, for what?
>
> Please give me an update.
>
>
>
> Thanks

**ATTACHMENT ( C )**

>
> Steve Moyer

1

**Stephen Moyer**

| | |
|---|---|
| **From:** | s07816 dir [s07816dir@xprimary.7000 albertsons com] |
| **Sent:** | Friday, March 12, 2004 8:55 AM |
| **To:** | Stephen.Moyer@xprimary.7000.albertsons com;<br>Stephen.Moyer@xprimary.7000.albertsons com |
| **Cc:** | s07816.dir@albertsons.com |
| **Subject:** | [Fwd: RE: [Fwd: RE: To Steve re G. Nieves 7816]] |

Steve,
  After talking to Tom Holden. Gloria Nieves will be transfered to Store #7836 Smrnya
effective W/O 03-15-04. Please issue a final warning letter to her file as I had
suggested.

Thank You,
Stephen Briley


-------- Original Message --------
Subject: RE: [Fwd: RE: To Steve re G. Nieves 7816]
From: Tom Holden <Tom.Holden@xprimary.7000.albertsons.com>
Date: Thu, March 11, 2004 2:02 pm
To: "s07816.dir" <s07816dir@xprimary.7000.albertsons.com>

Steve,
     Per our discussion this morning..let's do it and fill Frank in on the issues. He may
need some help with taking some help out. -----Original Message-----
From: s07816.dir [mailto:s07816dir@xprimary.7000.albertsons.com]
Sent: Thursday, March 11, 2004 12:56 PM
To: Tom Holden; Tom Holden
Cc: s07816.dir@albertsons.com
Subject: [Fwd: RE: To Steve re G. Nieves 7816]


Tom,
  What do you think? Please let me know.

PS:  Frank,  She is a 40 hour deli clerk. If this makes you heavy I can take a couple deli
people off of you. Let me know.


Thank You,
Stephen Briley


-------- Original Message --------
Subject: RE: To Steve re G. Nieves 7816
From: Stephen Moyer <Stephen.Moyer@xprimary.7000.albertsons.com>
Date: Thu, March 11, 2004 11:12 am
To: "s07816.dir" <s07816dir@xprimary.7000.albertsons.com>

Steve B,

The union rep, (Henry) "mentioned" to me on Tuesday morning that there was a situation in
Middletown concerning a deli clerk and he was going to see if he could get the clerk
transferred. He didn't tell me who, or what the incident involved - naturally.

I have no problem with your suggestion, it Tom can arrange the transfer. Let me know
outcome and I will do a letter to her. I'll need to know when she is back on the schedule
and in what store.

ATTACHMENT ( C )                                                    A127

# EXHIBIT M

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

GLORIA NIEVES and EMILIO NIEVES,)
                                )
            Plaintiffs,          )
                                )   Civil Action
v.                              )   No. 06-123 GMS
                                )
ACME MARKETS, INC.,a Delaware   )
corporation, d/b/a Acme Markets )
No. 7816, ACME MARKETS, INC., a )
Pennsylvania Corporation, d/b/a )
Acme Markets No. 7816, ACME      )
MARKETS, INC., a Pennslvania    )
Corporation d/b/a Acme Markets  )
No. 7836,                       )
                                )
            Defendants.          )

        Deposition of STEPHEN MOYER taken pursuant to
notice at the law offices of Biggs and Battaglia,
921 North Orange Street, Wilmington, Delaware,
beginning at 11:19 a.m. on Monday, December 18, 2006,
before Lucinda M. Reeder, Registered Diplomate
Reporter and Notary Public.

APPEARANCES:

        PHILIP B. BARTOSHESKY, ESQ.
        Biggs and Battaglia
          921 Orange Street
          Wilmington, Delaware 19801
          for the Plaintiffs,

        ELIZABETH A. MALLOY, ESQ.
        BUCHANAN, INGERSOLL & ROONEY, P.C.
          1835 Market Street, 14th Floor
          Philadelphia, Pennsylvania 19103-2085
          for the Defendants.

ALSO PRESENT:
GLORIA NIEVES and EMILIO NIEVES
              WILCOX & FETZER, LTD.
    1330 King Street – Wilmington, Delaware  19801
                (302) 655-0477
                www.wilfet.com



**WILCOX & FETZER LTD.**
Registered Professional Reporters

A129



16

1    these incidents in March 2004 were substantiated?

2    A.   That means that any future incident -- the

3    reason for the word "substantiated" in there is to let

4    every, all parties involved know that if we get an

5    allegation, you're not going to -- the future

6    discipline will not occur, that we will certainly have

7    an investigation and find out the outcome of the

8    investigation before a future discipline will occur.

9    Q.   What was the nature -- do you believe that

10   there was an investigation of these incidents on

11   March 2 and March 6th by Acme?

12   A.   I believe the store director and the union rep

13   did their individual investigations, yes.

14   Q.   Well, what -- and what the store director told

15   you was in the e-mail?

16   A.   Yes.

17   Q.   The sort of middle paragraph on D0175; is that

18   right?

19   A.   Yes.

20   Q.   Did you agree with his decision to suspend

21   Gloria Nieves and have her transferred over this?

22   A.   Yes.

23   Q.   Why is that?

24   A.   Inappropriate personal conduct.  And you asked

Stephen Moyer

17

1    about progressive discipline.  Progressive discipline

2    does not typically -- progressive discipline, as I

3    explained earlier, is not typically used in situations

4    of inappropriate personal conduct.

5    Q.    You were satisfied with the nature and extent

6    of the investigation into this incident?

7    A.    Yes.

8    Q.    Now, did you ever or were you ever contacted by

9    anybody else from Acme after this incident about what

10   happened to Gloria Nieves?

11            Let me straighten that question out.  We

12   heard earlier Ms. Appenzeller talk about a call that

13   she received from somebody at loss -- I forget the

14   term.

15   A.    Loss prevention?

16   Q.    Right.  A Mr. Porte, is that his name?

17   A.    Mike Porte.

18   Q.    Were you aware that he was talking to people

19   about this situation?

20   A.    I was aware that a charge came into our office.

21   After the charge came into our office, Mr. Porte's

22   department is the department that's notified to

23   investigate that charge.

24   Q.    Were you part of his investigation in any way?



# EXHIBIT N



March 16, 2004

Ms. Gloria Nieves
595 20 7405
Store 7816 - 7836

Dear Ms. Nieves,

You were suspended on March 6, 2004 for an incident with a co-worker on March 2, 2004 and a repeat incident on March 6, 2004 for inappropriate personal conduct that contributed to a disruption in the work place.

All Customers and Associates deserve to be treated with **COURTESY**, **DIGNITY** and **RESPECT**. They must feel welcomed and appreciated. Therefore, we will not tolerate any inappropriate language or actions that are discriminatory or derogatory towards any people or groups. It is up to each of us to create a respectful environment. Sincere, courteous, fair and just treatment and a concern for the feelings of others must be practiced in all of our business relationships. With your help, we can make our company inviting to all people by embracing and learning from our unique differences. We can make this the best place to work and shop.

**Personal Conduct** – Conduct that causes or contributes to a disruption in the work place, interfering with another associate in regards to any of his/her work or employment, any derogatory act or statement to or about another associate or customer, or any other inappropriate conduct will not be tolerated and will subject you to disciplinary action up to and including discharge. Profanity is unacceptable under any circumstances.

In this non-precedent setting situation, your time missed, March 6, 2004 through March 13, 2004 shall serve as a disciplinary suspension, without pay. In addition, you were transferred to Store 7836. This shall serve as a Final Written Warning that any future substantiated incidents involving any of the above will result in further disciplinary action, up to and including discharge. If you have any questions, feel free to contact this office.

Sincerely,

Stephen E. Moyer
Manager, Associate Relations

CC:  H. Fajkowski, T. Holden, F. Murphy, File

A133

# EXHIBIT O

## CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974

**ENTER CHARGE NUMBER**

☐ FEPA   64040397
☐ EEOC   17CA400389

**Delaware Department of Labor** and EEOC
(State, or local Agency, if any)

| NAME (Indicate Mr., Mrs., Ms) Gloria Nieves | HOME TELEPHONE NO. (Include Area Code) 302-378-8207 | |
|---|---|---|
| STREET ADDRESS 625 Village Drive | CITY, STATE AND ZIP CODE Middletown De 19709   NC | COUNTY |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME *(If more than one, list below.)*

| NAME Acme Supermarkets | NO. OF EMPLOYEES OR MEMBERS 100+ | TELEPHONE NUMBER (Incl. Area Code) 302 449 1870 |
|---|---|---|
| STREET ADDRESS 460 East Main Street | CITY, STATE AND ZIP CODE Middletown De. 19706 | |
| NAME | | TELEPHONE NUMBER (Include Area Code) |
| STREET ADDRESS | CITY, STATE AND ZIP CODE | |

☐ RACE ☐ COLOR ☐ SEX ☐ RELIGION ☒ NATIONAL ORIGIN ☐ AGE

☒ RETALIATION ☐ DISABILITY ☐ OTHER (Specify)

DATE DISCRIMINATION TOOK PLACE
EARLIEST 7/24/2003
LATEST 3/16/2004
☒ CONTINUING ACTION

THE PARTICULARS ARE (If additional space is needed, attached extra sheet(s):

I. I am a Hispanic female of Columbian origin who began to work for the Respondent on 11/12/01. On or about the end of July, 2003 I began to be subjected to disparate treatment than my similarly situated English speaking, American co-workers. Since I cannot speak English as well as my co-workers I am harassed and held up to ridicule. My co-workers make false accusations to my supervisors that I violate employee rules. I have complained to my supervisors about this treatment and nothing is done to remedy the situation. I believe the reason why I am treated differently by my co-workers is because I can speak spanish to store customers to assist them and they cannot. Most recently when I have reported these problems with my co-workers to the Respondent I was suspended from work for one week.

II. The Respondent has stated the reason I was suspended from work was because I did not treat a coworker with courtesy, dignity, and respect.

III. I believe I have been discriminated against in violation of Title VII of the Civil Rights Act of 1964 as amended and the Delaware Discrimination in Employment Act as amended based on my national origin (Columbian) because 1. My co-worker Nancy ( White/last name unknown), Deli Worker told me I needed to speak only english at work. 2. My co-worker Joyce Alpin, (White) Deli Server, falsely accused me of throwing food and a bucket of mop water in her face. 3. My co-workers Nancy and Christina Shuw (White), Deli Server, made derogatory racial comments about my ability to speak english clearly and that I did not deserve to be given a full time position. 4. When I reported the problems I was having with my co-workers to the Respondent, no investigation was conducted. 5. My white co-workers specifically Michelle Warren (White) Deli Server, has violated company policy and was not disciplined for this infraction. 6. The incident for which I was suspended was never investigated and the store surveillance system was not reviewed. 7. Other than this incident I have never been disciplined for any infraction of store policy and received praise from my managers for my performance. 8. "BJ" (White/Female) last name unknown, Assistant Store Manager, said that if my husband came into the store she would have someone physically harm him.

| ☒ I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | SIGNATURE OF COMPLAINANT |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct. 4-2-04 Date     *Gloria Nieves* Charging Party (Signature) | NOTARY - (When necessary to meet State and Local Requirements) Subscribed and sworn to before me this date     (Day, month, and year) |

P-80

A135

# EXHIBIT P

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

GLORIA NIEVES and EMILIO NIEVES,)
                                )
            Plaintiffs,         )
                                )    Civil Action
v.                              )    No. 06-123 GMS
                                )
ACME MARKETS, INC.,a Delaware   )
corporation, d/b/a Acme Markets )
No. 7816, ACME MARKETS, INC., a )
Pennsylvania Corporation, d/b/a )
Acme Markets No. 7816, ACME     )
MARKETS, INC., a Pennslvania    )
Corporation d/b/a Acme Markets  )
No. 7836,                       )
                                )
            Defendants.         )

     Deposition of BARBARA J. APPENZELLER taken
pursuant to notice at the law offices of Biggs and
Battaglia, 921 North Orange Street, Wilmington,
Delaware, beginning at 9:30 a.m. on Monday,
December 18, 2006, before Lucinda M. Reeder,
Registered Diplomate Reporter and Notary Public.

APPEARANCES:

        PHILIP B. BARTOSHESKY, ESQ.
        Biggs and Battaglia
          921 Orange Street
          Wilmington Delaware 19801
          for the Plaintiffs,

        ELIZABETH A. MALLOY, ESQ.
        BUCHANAN, INGERSOLL & ROONEY, P.C.
          1835 Market Street, 14th Floor
          Philadelphia, Pennsylvania 19103-2085
          for the Defendants.

ALSO PRESENT:
GLORIA NIEVES and EMILIO NIEVES
STEPHEN MOYER
              WILCOX & FETZER, LTD.
    1330 King Street - Wilmington, Delaware  19801
                (302) 655-0477
                www.wilfet.com

                                              A137



**WILCOX & FETZER LTD.**
Registered Professional Reporters



Barbara J. Appenzeller

11

1   a co-worker, would it be part of your job to look into

2   it?

3       A.    That along with the store director.

4       Q.    Did you ever hear anything about any of Gloria

5   Nieves' co-workers having the opinion that she

6   shouldn't use her Spanish while at work?

7       A.    No.

8       Q.    Did you ever hear her speaking Spanish at work?

9       A.    No.

10      Q.    Did you ever see her talking to a customer who

11  may be a Spanish-speaking person trying to help that

12  person by speaking Spanish to them?

13      A.    No.

14      Q.    Are there some customers that come into -- that

15  came into that Middletown store who were Hispanic and

16  did speak primarily Spanish, do you know?

17      A.    Yes, mm-hmm.

18      Q.    Would it be a problem for someone who did speak

19  Spanish to help those people by speaking Spanish to

20  them?

21      A.    Absolutely not.

22      Q.    It would be something you would probably want

23  them to do?

24      A.    I would want them to do, yeah, right.

Barbara J. Appenzeller

28

1    BY MS. MALLOY:

2       Q.   Did any Acme associate talk to you about

3    Mr. Nieves?

4       A.   One day they, I think it was one day Gloria had

5    left, they said that he might be coming back in or

6    something like that.  The only thing I said -- you

7    know, they were kind of afraid that he might come in

8    and say something to them, and I just said, "Well, you

9    know, if he does, then we'll just call the police,"

10   but that's all I said.

11            MS. MALLOY:  I have nothing further.

12   BY MR. BARTOSHESKY:

13      Q.   Let me ask a little bit more about that.  Do

14   you think that was the day that Ms. Gloria, Ms. Nieves

15   left?

16      A.   I don't remember.

17      Q.   But it was after the time when she was

18   suspended that somebody came to you and said --

19      A.   To tell you the truth, I don't remember whether

20   it was before or after she was suspended.

21      Q.   But at some point somebody from the deli

22   department -- was it from the deli department somebody

23   came to you and said --

24      A.   Yes.



Barbara J. Appenzeller

29

1    Q.   And what was it that they said; they thought he

2    might be coming to the store?

3    A.   Yes.

4    Q.   Did they say that they had a concern about that

5    for some reason?

6    A.   They did.

7    Q.   What was --

8    A.   Well, from the stories that they had heard

9    about him, well, they were just afraid.

10   Q.   And the stories they heard about him were from

11   whom; from Gloria?

12   A.   They -- this is from what the girls were

13   telling me back in the deli.  I don't know where the

14   stories came from.

15   Q.   Did you tell them that they should be escorted

16   out of the store that day and have somebody with them

17   when they went to their cars or anything along those

18   lines?

19   A.   Not that I remember, no.

20   Q.   Did any problems ever arise --

21   A.   No.

22   Q.   Did he come to the store?

23   A.   No.  This is the first day I've ever seen the

24   man.

# EXHIBIT Q

1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                FOR THE DISTRICT OF DELAWARE
 3    GLORIA NIEVES and EMILIO NIEVES,:
 4                      Plaintiffs,    :
 5                vs.                  :    Civil Action No.
                                            06-123 GMS
 6    ACME MARKETS, INC., a Delaware   :
      corporation, et al.,
 7                                     :
                         Defendants.
 8                             - - -
 9              Deposition of EMILIO NIEVES, taken
      pursuant to notice in the law offices of Buchanan,
10    Ingersoll & Rooney, 1410 Brandywine Building, 1000
      West Street, Wilmington, Delaware, on Wednesday,
11    December 6, 2006, at 2:40 p.m., before Lorraine B.
      Marino, Registered Diplomate Reporter and Notary
12    Public.
                               - - -
13    APPEARANCES:
14              PHILIP B. BARTOSHESKY, ESQ.
                Biggs & Battaglia
15              921 North Orange Street
                Wilmington, DE  19801
16                for Plaintiffs
17              ELIZABETH A. MALLOY, ESQ.
                Buchanan, Ingersoll & Rooney
18              1835 Market Street - 14th Floor
                Philadelphia, PA  19103-2985
19                for Defendants
20    ALSO PRESENT:
21              GLORIA NIEVES
                STEPHEN MOYER
22
                   WILCOX & FETZER
23      1330 King Street - Wilmington, Delaware 19801
                    (302) 655-0477
24                  www.wilfet.com
```

A142



**W&F**
WILCOX & FETZER LTD.
Registered Professional Reporters



Emilio Nieves

30

1    washed my mouth with Listerine in the morning, and

2    that did it, because that got alcohol.  So I have to

3    report to the guy, and then he got to give me some

4    instruction how to get it back.

5                    I know one time at work it blow up,

6    the whole box.  I mean, I got a lot -- my mind was not

7    even thinking about any -- and, like, the time, it

8    seemed to me like it passed fast, because the problem

9    I have, was going to DUI classes and the Alcoholics

10   Anonymous, I was going whenever I could, because I

11   have got the schedule.  There is a schedule of paper,

12   a lot of different places you can go.

13        Q.        When your wife was in Miami when she

14   left, when she left Acme, did you ever go visit her?

15        A.        No.

16        Q.        How often did you talk on the phone?

17        A.        I would say once in a while I talked

18   to her.  Not a lot.

19        Q.        Once a month?

20        A.        Once in a while, maybe one or two

21   times a month.

22        Q.        One or two times a month.  Okay.  In

23   any of those conversations did you talk about whether

24   you had a girlfriend or anything like that?

Emilio Nieves

42

1   as you need to read them.  If for some reason I start

2   talking before you have had a chance to finish, just

3   tell me to stop.  (Pause)

4                   Exhibit 1 are documents provided by

5   your lawyer.  The first page says Richard Goodman

6   Associates.  Have you seen these documents before?

7        A.        See these, mine here, my taxes paper.

8        Q.        Okay.  Are these your tax returns for

9   2004?

10       A.        Yes.

11       Q.        Yes?  And the federal tax return, if

12  you want to turn, see where it says at the top 1040?

13       A.        1040V.

14       Q.        And the next page down at the bottom,

15  it says, "Sign here."  Did you sign this tax return?

16  I am just trying to find out if these were ones that

17  were really signed.  I assume so, but --

18       A.        I did sign them.

19       Q.        You signed them and sent them in in

20  2004?

21       A.        I send these off or --

22       Q.        They come and get you?

23       A.        Yes.  I owe money a couple times, and

24  I send them right away.

Emilio Nieves

43

1      Q.      And in this tax return you indicate
2   that you are married, filing separately?
3      A.      Yes.
4      Q.      Do you know why you did that?
5      A.      Well, one time we did joint and one
6   time Gloria, like, I talked to Gloria the last time,
7   she said she -- and I told her I will let her know,
8   and she said she was gonna already, that she was gonna
9   do it by herself, so I did mine by myself.
10     Q.      And this was when she was in Miami --
11     A.      Yes.
12     Q.      -- for the 2004 returns?
13     A.      Yes.
14     Q.      And why did she say she was doing it
15  by herself?
16     A.      She wanted to fill it up and get her
17  money real quick.  I usually don't -- I don't know
18  when I filled it out.  And I didn't worry about it.  I
19  don't, usually don't --
20     Q.      Did you talk to your accountant about
21  whether you should file separately or together?
22     A.      Yes, I did.
23     Q.      And what did they say?
24     A.      He explained to me about it, and, you

49

```
1    BY MS. MALLOY:
2         Q.     Did you ever consult with an attorney
3    about getting a divorce?
4         A.     Yes, I have.  I did.
5         Q.     And what lawyer was that?
6         A.     I don't know.  I don't remember.  It
7    was a lady.
8         Q.     Okay.
9         A.     And it was a lady, and in Peoples
10   Plaza.  That was a long -- a while ago.  I was
11   thinking about getting a divorce if I didn't have my
12   Gloria.
13        Q.     And when was that?
14        A.     Actually, I don't -- that's when she
15   left, after she was there.
16        Q.     When she was in Miami?
17        A.     Yes.
18        Q.     Did you file any paperwork --
19        A.     No, no.
20        Q.     -- to start a divorce?
21        A.     I just -- actually, what I did was
22   with that lady, I talked to her.  I talked to her --
23   she give me an appointment, and then I didn't do
24   anything with her.
```

50

```
 1        Q.        Did you go to --
 2        A.        I didn't --
 3        Q.        You have to let me finish the
 4   question.  Did you go to the appointment?
 5        A.        I did, but I didn't -- whatever she
 6   told me, I didn't like it.
 7        Q.        You didn't like it?
 8        A.        I guess what she told me, no.  I mean,
 9   the money, it was a tremendous amount of money that
10   she want.
11                  MS. MALLOY:  I have no questions.
12                  MR. BARTOSHESKY:  We will read.
13                       - - -
14                  Deposition concluded at 3:50 p.m.)
15                       - - -
16                       INDEX
17   EMILIO NIEVES DEPOSITION EXHIBITS        Marked
18   1  Letter dated 4/13/04, from Mr. Goodman
        to Mr. Nieves, with attachment---------   41
19
     2  2004 amended Form 1040-----------------   44
20
     3  2005 income tax returns----------------   45
21
                         - - -
22
     (Exhibits attached to original transcript and copies.)
23
24
```

# EXHIBIT R

Westlaw.

135 Fed Appx. 510                                                Page 1
135 Fed Appx. 510
**(Cite as: 135 Fed.Appx. 510)**



**Briefs and Other Related Documents**

This case was not selected for publication in the Federal Reporter.

NOT PRECEDENTIAL

Please use FIND to look at the applicable circuit court rule before citing this opinion. Third Circuit Local Appellate Rule 28.3(a) and Internal Operating Procedure 5.3 (FIND CTA3 Rule 28.0 and CTA3 IOP APP I 5 3 )

United States Court of Appeals,
Third Circuit.
Margaret M ANGELONI,
v.
The DIOCESE OF SCRANTON; Villa St. Joseph;
Hazzouri Margaret Angeloni,
Appellant.
**No. 03-4501.**

Submitted Under Third Circuit LAR 34.1(a) Feb 7,
2005
Decided March 17, 2005.

**Background:** Former employee brought a sexual harassment and retaliation claim under Title VII against her employer. The United States District Court for the Middle District of Pennsylvania, <u>A. Richard Caputo</u>, J., granted a defense motion for summary judgment, and the employee appealed.

**Holdings:** The Court of Appeals, <u>Barry</u>, Circuit Judge, held that:

(1) employee failed to prove that she was constructively discharged, as required to prevail on her Title VII claims of quid pro quo sexual harassment and retaliation, and

(2) employee failed to prove existence of respondeat superior liability, as required to prevail on a hostile work environment claim.

Affirmed

West Headnotes

[1] Civil Rights ⬤━1123
78k1123 Most Cited Cases

Former employee failed to prove that she was constructively discharged, as required to prevail on her Title VII claims of quid pro quo sexual harassment and retaliation; superior's suggestion that the employee consider resigning appeared completely benign, the conduct of which she complained had ended months earlier, and the decision to resign was made by her and her parents at home. Civil Rights Act of 1964, § 701 et seq., <u>42 U.S.C.A. § 2000e</u> et seq.

[2] Civil Rights ⬤━1189
78k1189 Most Cited Cases

[2] Civil Rights ⬤━1528
78k1528 Most Cited Cases

Former employee failed to prove existence of respondeat superior liability, as required to prevail on a hostile work environment claim under Title VII; even if the individuals she told of alleged sexual harassment were considered management-level employees, both took prompt and adequate remedial action, and by all accounts any touching that had occurred ended. Civil Rights Act of 1964, § 701 et seq., <u>42 U.S.C.A. § 2000e</u> et seq.

**\*511** Appeal from the United States District Court for the Middle District of Pennsylvania. D.C. Civil No. 02-cv-00276. District Judge: The Honorable <u>A. Richard Caputo</u>.

<u>Kimberly D. Borland</u>, Borland & Borland, Wilkes-Barre, PA, for Appellee

<u>James E. O'Brien, Jr.</u>, Kennedy, O'Brien, McCormack & Mulcahey, Scranton, PA, <u>Joseph A. O'Brien</u>, <u>Karoline Mehalchick</u>, Oliver, Price & Rhodes, Clarks Summit, PA, for Appellant.

Before <u>BARRY</u>, <u>FUENTES</u>, and <u>BECKER</u>, Circuit Judges.

OPINION

<u>BARRY</u>, Circuit Judge.

On February 20, 2002, Margaret M. Angeloni brought a sexual harassment and retaliation claim under Title VII of the Civil Rights Act of 1964, <u>42 U.S.C. § § 2000e-2000e-17</u>, against the Diocese of Scranton, Villa St. Joseph, and Reverend Alex Hazzouri (collectively "appellees"). The District

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works

135 Fed.Appx. 510
135 Fed.Appx. 510
(Cite as: 135 Fed.Appx. 510)

Court granted appellees' motion for summary judgment on October 22, 2003 and dismissed the state law claims. A timely appeal followed. We have jurisdiction under 28 U.S.C. § 1291. For the reasons that follow, we will affirm.

## I. Factual Background

As we write only for the parties, we will confine our discussion to those facts relevant to the instant disposition. Angeloni worked as a dining room and kitchen server at Villa St. Joseph, a home for priests in Pennsylvania, from August of 1996 until January 19, 1998. She was fourteen and fifteen years old. Reverend Hazzouri allegedly began touching her inappropriately a few months after she began working at Villa St. Joseph. She estimated that the touching occurred at least ten times, and always the same way--when she was waiting on Reverand Hazzouri's table, his right hand would come into contact with her left thigh.

In May or June of 1997, Angeloni told her supervisor, Annette Balint, about the touchings, and then in July of 1997, Angeloni told her parents. Also in July, Angeloni's mother had a meeting with Ms. Balint; by that time, Ms. Balint had spoken with Bishop John M. Dougherty, the rector at Villa St. Joseph. Both Ms Balint and Bishop Dougherty talked to Angeloni's co-workers and to Reverend Hazzouri, and all denied that any inappropriate touching took place. Based on these discussions, they suggested that Angeloni simply stop serving Reverend Hazzouri's table so that *512 she could avoid any discomfort. [FN1] Bishop Dougherty also met with her parents that summer, and tried to reassure them that steps were being taken to make sure that Angeloni was not in any danger.

> FN1. Angeloni did stop serving Reverend Hazzouri, but eventually resumed service to his table and did so of her own accord.

No further touching took place, but Angeloni stated that in December of 1997, Reverend Hazzouri approached her and told her he was worried about what she had said about him. Angeloni said she was intimidated, and told her parents.

On December 17, 1997, Angeloni's mother met again with Bishop Dougherty and expressed concerns for her daughter's safety. Bishop Dougherty replied that he did not think there was cause for concern, but added that if Mrs Angeloni was worried, Angeloni could stop working there. He also suggested that

they meet with Reverend Hazzouri. Mrs. Angeloni did not want to have such a meeting, and the family instead decided that Angeloni no longer work at Villa St. Joseph. Angeloni's resignation was effective January 19, 1998. She filed suit more than four years later.

## II. Standard of Review

We review the District Court's grant of summary judgment de novo. See _Sempier v. Johnson & Higgins_, 45 F.3d 724, 727 (3d Cir.1995). Summary judgment is proper when "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). If the evidence would be insufficient to allow a reasonable jury to find for the non-moving party, summary judgment is warranted. _Anderson v. Liberty Lobby, Inc._, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In reviewing that evidence, we consider it and all reasonable inferences therefrom in the light most favorable to the non-moving party. _Eddy v. V.I. Water & Power Auth._, 369 F.3d 227, 228 n. 1 (3d Cir.2004).

## III. Discussion

### 1 Title VII Claims

The District Court granted appellees' motion for summary judgment on the grounds that: (1) there was no causal connection between Reverend Hazzouri's alleged touching and Bishop Dougherty's "employment actions" against Angeloni to support a claim of _quid pro quo_ sexual harassment; (2) the elements of a hostile work environment claim were not satisfied because no reasonable jury could find that _respondeat superior_ liability exists; and (3) there was no retaliatory conduct because Angeloni was not constructively discharged, and therefore no adverse employment action was taken against her. [FN2]

> FN2. For reasons that escape us, appellees did not mention the fact that Angeloni never exhausted her administrative remedies prior to filing suit See _Robinson v. Dalton_, 107 F.3d 1018, 1021 (3d Cir.1997) (analogizing failure-to-exhaust to statutes of limitations); see also _Watson v. Eastman Kodak Co._, 235 F.3d 851, 854 (3d Cir.2000) (explaining that a plaintiff in Pennsylvania must first present her employment-discrimination claims to the appropriate agency before going to federal court) Indeed, the first action Angeloni

© 2007 Thomson/West. No Claim to Orig. U S Govt. Works

Page 3

135 Fed.Appx. 510
135 Fed.Appx. 510
(Cite as: 135 Fed.Appx. 510)

took with reference to this case was to file her complaint in the District Court on February 20, 2002.

*A. Quid Pro Quo Sexual Harassment and Retaliation*

[1] Both Angeloni's *quid pro quo* sexual harassment claim and her retaliation claim depend upon her ability to prove that she was constructively discharged. *See Farrell v. Planters Lifesavers Co., 206 F.3d 271, 281-82 (3d Cir.2000)* (explaining that a plaintiff trying to prove *quid pro quo* sexual harassment must show that "her response to unwelcome advances was subsequently used as a basis for a decision about [employment]."). This is fundamental to her claims, because "constructive discharge acts as the functional equivalent of an actual termination" that can ground an employment discrimination suit. *See Suders v. Easton, 325 F.3d 432, 446 (3d Cir.2003).*

To find constructive discharge, a court "need merely find that the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." *Goss v. Exxon Office Sys. Co., 747 F.2d 885, 888 (3d Cir.1984).* Put somewhat differently, the plaintiff must show that the alleged discrimination goes beyond a "threshold of 'intolerable conditions.'" *Duffy v. Paper Magic Group, Inc., 265 F.3d 163, 169 (3d Cir.2001)* "Intolerability ... is assessed by the objective standard of whether a 'reasonable person' in the employee's position would have felt compelled to resign--that is, whether [she] would have had no choice but to resign." *Connors v. Chrysler Financial Corp., 160 F.3d 971, 976 (3d Cir.1998)* (internal citations omitted)

Although we have considered an employer's suggestion or encouragement that one resign as indicative of constructive discharge, *see Clowes v. Allegheny Valley Hosp., 991 F.2d 1159, 1161 (3d Cir.1993),* any such suggestion or encouragement is not dispositive. *See Suders, 325 F.3d at 446* (noting that the inquiry into constructive discharge is "a heavily fact-driven determination.") (internal citations omitted). Here, it is not disputed that, in December of 1997, Bishop Dougherty suggested that if Angeloni did not feel comfortable working at Villa St. Joseph, she could resign; however, this suggestion was made during the course of a meeting with Angeloni's mother, during which she had expressed concerns for her daughter's safety. As Bishop Dougherty explained in his deposition, he

suggested the possibility of resignation because he "felt as a priest that [he] wanted to reach out to [Angeloni's parents]." A258-59. Significantly, during that same meeting, Bishop Dougherty offered to have a meeting with both of Angeloni's parents and Reverend Hazzouri to see if they could come to some sort of resolution. And, when Angeloni continued to work after the December 1997 meeting, Bishop Dougherty said that he was "thrilled with that." A263.

Not only does Bishop Dougherty's suggestion that Angeloni consider resigning seem completely benign, but the conduct of which Angeloni complained had ended months earlier and the decision to resign was made by Angeloni and her parents at home. Given these facts, there is little or nothing in the record that supports Angeloni's argument that a reasonable person would consider her work conditions so intolerable that she would feel compelled to resign. That conclusion destroys any constructive discharge claim and, thus, there was no adverse employment action. Summary judgment was, therefore, proper on both the *quid pro quo* sexual harassment and the retaliation claims. [FN3]

> FN3. It has been assumed for the purposes of argument that Bishop Dougherty could be considered an "employer" as the rector at Villa St. Joseph; however, it should be noted that Title VII defines an employer as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks". 42 U.S.C. § 2000e(b). We do not have information in the record confirming that the Villa would satisfy those requirements.

*B. Hostile Work Environment*

[2] In order to succeed on her claim that the Diocese of Scranton and the Villa *514 St. Joseph are liable for creating a "hostile work environment", Angeloni was required to satisfy a five-prong test, showing that: (1) she suffered intentional discrimination because of her sex; (2) the discrimination was "pervasive and regular"; (3) she was detrimentally affected; (4) the discrimination she points to would also detrimentally affect another reasonable young woman in the same position; and (5) respondeat superior liability exists. *See Suders, 325 F.3d at 441.* The District Court concluded that there was "no dispute" that the first and third requirements were satisfied, and held that a reasonable jury could find

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

135 Fed.Appx. 510                                                              Page 4
135 Fed.Appx. 510
**(Cite as: 135 Fed.Appx. 510)**

that the second and fourth requirements were also met. While it appears that the District Court's conclusions might have been overly generous to Angeloni, we will accept them and nonetheless affirm the grant of summary judgment, as the final requirement certainly was not met. Angeloni's claim of hostile work environment, therefore, necessarily fails.

Applying traditional agency principles, respondeat superior liability exists when "the defendant knew or should have known of the harassment and failed to take prompt remedial action." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1486 (3d Cir.1990) (internal citations omitted). Therefore, "if a plaintiff proves that management-level employees had actual or constructive knowledge about the existence of a sexually hostile work environment and failed to take prompt and adequate remedial action, the employer will be liable." *Id*

Angeloni admits that she did not tell Ms. Balint about the touching until May or June of 1997. By July, Ms. Balint had told Bishop Dougherty. Even assuming that Ms. Balint and Bishop Dougherty would be considered management-level "employees", both took "prompt and adequate" remedial action. For her part, Ms. Balint referred the matter to Bishop Dougherty, interviewed the other waitresses, and suggested that Angeloni could be relieved of her serving duties at Reverend Hazzouri's table. For his part, Bishop Dougherty said that he felt he "had to get to the bottom of this," so he spoke with Reverend Hazzouri and Ms. Balint several times. He also relayed the situation to the Diocese and told Reverend Hazzouri that he was to cease any conduct that might make Angeloni uncomfortable. Finally, he approved Ms. Balint's suggestion that Angeloni stop serving Reverend Hazzouri's table, a suggestion that was immediately implemented.

In terms of the adequacy of these remedial steps, by all accounts any touching that had occurred ended by July 1997. Indeed, even after Angeloni chose to ignore the suggestion not to serve Reverend Hazzouri, and began doing so again, she never reported further inappropriate conduct. Summary judgment was properly granted on the hostile environment claim. [FN4]

> FN4. Although individually named in the suit, Reverend Hazzouri could not be liable under Title VII because he was not Angeloni's employer; *see* 42 U.S.C. § 2000e(b)

### 2 State Law Claims

The District Court also concluded that, because summary judgment was granted on Angeloni's federal claims, it would not exercise supplemental jurisdiction over the state law claims. The exercise of supplemental jurisdiction is a matter of discretion. *See United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) ("[P]endent jurisdiction is a doctrine of discretion, not of plaintiff's right"), *superseded by statute in* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction ... if ... the district court **\*515** has dismissed all claims over which it has original jurisdiction"). And, as we have stated, when a federal claim could be, or has been, dismissed on summary judgment, "the court should ordinarily refrain from exercising [supplemental] jurisdiction in the absence of extraordinary circumstances." *Tully v. Mott Supermarkets, Inc.*, 540 F.2d 187, 196 (3d Cir.1976); *see also Univ. of Md. v. Peat, Marwick, Main & Co.*, 996 F.2d 1534, 1540 (3d Cir.1993). The District Court properly refrained from exercising supplemental jurisdiction here.

### IV. Conclusion

For the foregoing reasons, we will affirm the order of the District Court.

135 Fed.Appx. 510

**Briefs and Other Related Documents (Back to top)**

• 2004 WL 3759989 (Appellate Brief) Brief of Appellees (Sep. 13, 2004)Original Image of this Document (PDF)

• 2004 WL 3759988 (Appellate Brief) Brief of Appellant and Appendix (Volume One) (Pages 1-32) (Aug 13, 2004)Original Image of this Document with Appendix (PDF)

• 03-4501 (Docket) (Nov. 21, 2003)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1579828 (Del.Super.)
(Cite as: 2006 WL 1579828 (Del.Super.))

Page 1

**H**
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of Delaware,
New Castle County.
Katina COLLINS, Plaintiff,
v.
The AFRICAN METHODIST EPISOCAL ZION
CHURCH, a North Carolina Corporation;
Bishop Milton A. Williams, Sr.; Scott A.M.E. Zion
Church; and Rev. D. William
L. Burton, Jr., Defendants.
**C.A. No. 04C-02-121.**

Submitted: Dec. 13, 2005.
Decided: March 29, 2006.
Amended: April 10, 2006.

**Background:** Church member brought action against
church and bishop, alleging negligence, negligent
infliction of emotional distress, and intentional
infliction of emotional distress in regards to their
alleged failure to stop pastor's harassment.
Defendants moved for summary judgment.

**Holding:** The Superior Court, New Castle County,
Scott, J., held that trial court was jurisdictionally
barred under the First Amendment from hearing
claims involving church's book of discipline.
Motion granted.

**[1] Constitutional Law** 🔑 **84.5(10)**

92k84.5(10) Most Cited Cases
Church member's reliance on church's book of
discipline in her negligence and negligent infliction
of emotional distress claims against church and
bishop for their failure to act after member
complained that church pastor was sexually harassing
her required the court's interpretation and application
of what was fundamentally an ecclesiastical
document and required an inquiry into the internal
policies and practices of the church, and thus, the trial
court was jurisdictionally barred under the free
exercise clause of the First Amendment from hearing
such claims. U.S.C.A. Const.Amend. 1.

**[1] Religious Societies** 🔑 **30**
332k30 Most Cited Cases
Church member's reliance on church's book of
discipline in her negligence and negligent infliction
of emotional distress claims against church and
bishop for their failure to act after member
complained that church pastor was sexually harassing
her required the court's interpretation and application
of what was fundamentally an ecclesiastical
document and required an inquiry into the internal
policies and practices of the church, and thus, the
trial court was jurisdictionally barred under the free
exercise clause of the First Amendment from hearing
such claims. U.S.C.A. Const.Amend. 1.

**[2] Constitutional Law** 🔑 **84.5(10)**
92k84.5(10) Most Cited Cases
Church member's intentional infliction of emotional
distress claim against church and bishop in regards to
bishop's failure to take action against pastor, who was
sexually harassing member, involved the internal
disciplinary procedures utilized by the church, and
thus, the trial court was jurisdictionally barred from
hearing the claim under the free exercise clause of the
First Amendment. U.S.C.A. Const.Amend. 1.

**[2] Religious Societies** 🔑 **30**
332k30 Most Cited Cases
Church member's intentional infliction of emotional
distress claim against church and bishop in regards to
bishop's failure to take action against pastor, who was
sexually harassing member, involved the internal
disciplinary procedures utilized by the church, and
thus, the trial court was jurisdictionally barred from
hearing the claim under the free exercise clause of the
First Amendment. U.S.C.A. Const.Amend. 1.

**[3] Damages** 🔑 **57.48**
115k57.48 Most Cited Cases
Bishop was not liable for intentional infliction of
emotional distress in regards to his failure to act
when church member informed him that pastor was
sexually harassing her in the absence of evidence that
bishop engaged in extreme and outrageous conduct;
member merely stated that bishop was aware of
pastor's extreme and outrageous conduct but failed to
take action against him.
Upon Consideration of Church Defendants' Motion
for Summary Judgment  **GRANTED.**

John M. LaRosa, Esquire, Wilmington, Delaware;

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1579828 (Del.Super.)
(Cite as: 2006 WL 1579828 (Del.Super.))

Keith O. Dews, Esquire, Foley Thompson & Dews, LLP, Philadelphia, Pennsylvania; Attorneys for Plaintiff

Robert C. McDonald, Esquire, Silverman McDonald & Friedman, Wilmington, Delaware; Thomas L. McCally, Esquire, and Tina M. Maiolo, Esquire, Carr Maloney, P.C., Washington, DC; Attorneys for Church Defendants.

### AMENDED MEMORANDUM OPINION

SCOTT J.

*1 Having reviewed the decision of Defendant's Motion for Summary Judgment per Defendant's request, AME Church is hereby changed to AME Zion Church throughout the opinion. This is the amended opinion

### I. INTRODUCTION

This case arises from the alleged harassment of Plaintiff Katina Collins ("Collins") by Reverend William L. Burton, Jr. ("Burton") Collins has sued the African Methodist Episcopal Zion Church, Bishop Milton A. Williams, Sr., and Scott African Methodist Episcopal Zion Church (hereinafter "the Church Defendants") for negligence, negligent infliction of emotional distress, and intentional infliction of emotional distress. Presently before the Court is the Church Defendants' Motion for Summary Judgment. Because Collins is essentially seeking civil court review of ecclesiastical policies and procedures and the subjective judgments of religious officials concerning Reverend Burton, the Court grants the Church Defendants' Motion. [FN1] The Court is constitutionally precluded from entertaining religious and ecclesiastical matters of this kind by virtue of the First Amendment to the Constitution.

> FN1. See Allen v. Board of Incorporators, 1992 WL 390755, at *1 (N.D.Ill.)(defendants' motion to dismiss plaintiffs' complaint that alleged violation of ecclesiastical rules and documents was dismissed for lack of subject matter jurisdiction).

### II. BACKGROUND

Collins alleges Defendant Burton made sexually harassing, intimidating phone calls to her between the period of November 2002 until September 2003. Burton was pastor and Collins was a member and Vice Chairman of the Steward's Board at the Scott Church during the time in question. Collins states she

initially went to the administration of Scott African Methodist Episcopal Zion Church ("Scott Church") to stop the harassing phone calls, but no action was taken. Collins next attempted to contact Bishop Milton A. Williams, Sr., ("Bishop Williams") who presided over the Mid-Atlantic District of the denomination and who was also a representative for International Ministers. Bishop Williams refused to listen to tape recordings of Burton's comments to Collins and initially refused certified letters from Collins.

In September 2003, Collins filed a complaint with the Wilmington Police Department who subsequently arrested Burton. Bishop Williams then convened a committee who found Burton guilty of sexual harassment in violation of International Ministers' and The Book of Discipline of the A M E Zion Church ("The Book of Discipline")

Collins states she has suffered from a stroke, slurred speech, and mental and emotional anguish as the result of the Defendants failure to act.

### III. STANDARD OF REVIEW

Summary judgment may only be granted when no genuine issues of material fact exist. [FN2] The moving party bears the burden of establishing the non-existence of genuine issues of material fact. [FN3] If the burden is met, the burden shifts to the non-moving party to establish the existence of genuine issues of material fact. [FN4] "Where the moving party produces an affidavit or other evidence sufficient under Superior Court Civil Rule 56 in support of its motion and the burden shifts, then the non-moving party may not rest on its own pleadings, but must provide evidence showing a genuine issue of material fact for trial." [FN5] Summary judgment will not be granted if the record reasonably indicates a material fact in dispute or a need to inquire more thoroughly into the facts to clarify the application of law to the circumstances. [FN6] The court must view the facts in the light most favorable to the non-moving party. [FN7]

> FN2. Moore v. Sizemore, 405 A.2d 679, 680 (Del.1979).

> FN3. Id

> FN4. Id at 681.

> FN5. Super. Ct. Civ. R. 56(3); Ramsey v. State Farm Mutual Automobile Insurance Co., 2004 WL 2240164, at *1

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1579828 (Del.Super.)
**(Cite as: 2006 WL 1579828 (Del.Super.))**

(Del.Super.)(citing *Celotex Corp. v. Catrett,*
477 U.S. 317, 322-23, 106 S.Ct. 2548, 91
L.Ed.2d 265 (1986)).

FN6. *Ebersole v. Lowengrub,* 180 A.2d 467,
470 (Del.1962).

FN7. *Lupo v. Medical Center of Delaware,*
1996 LEXIS 46, at \*5 (Del.Super.).

**\*2** Moreover, summary judgment is generally not
appropriate for actions based on negligence. [FN8] It
is rare in a negligence action "because the moving
party must demonstrate 'not only that there are no
conflicts in the factual contentions of the parties but
that, also, the only reasonable inferences to be drawn
from the uncontested facts are adverse to the
plaintiff.'" [FN9]

FN8. *Ebersole,* 180 A.2d at 468.

FN9. *Upshur v. Bodie's Dairy Market,* 2003
WL 21999598, at \*3 (Del.Super.)

### IV. DISCUSSION

The Church Defendants argue that the Establishment
Clause of the First Amendment bars consideration of
Collins' claims against them because each count in
the Second Amended Complaint arises out of the
claim that the Defendants owed Collins a duty as set
forth in the Policies & Procedures Concerning Sexual
Misconduct contained in *The Book of Discipline.*
Specifically, Counts IV and V set forth claims of
negligent infliction of emotional distress and
negligence against Scott Church. Collins contends
that Scott Church had a duty as set forth in *The Book
of Discipline* to refer all complaints of sexual
misconduct to the Bishop. [FN10] Scott Church
allegedly breached that duty by failing to notify the
Bishop of Collins' complaint which was in direct
violation of *The Book of Discipline.* [FN11] As a
result of these actions, Collins suffered emotional
distress, depression, a stroke, headaches, and
developed slurred speech. [FN12] In addition, Counts
VII and VIII set forth claims of negligent infliction of
emotional distress and negligence against Bishop
Williams and the African Methodist Episcopal Zion
Church ("A.M.E. Zion Church"). Collins contends
that Bishop Williams, one of the twelve bishops with
the authority to perform duties on behalf of the
A.M.E. Zion Church, had a duty as set forth in *The
Book of Discipline* to promptly and thoroughly
investigate Collins' complaint of sexual misconduct.
[FN13] Bishop Williams allegedly breached that duty
by failing to take any action or by avoiding to deal

with Collins' concerns. [FN14] Collins also contends
that Bishop Williams did not appoint an investigative
committee until September 2003, after Reverend
Burton was arrested. [FN15] Moreover, it is alleged
that Bishop Williams did not take any action against
Burton after the investigative committee determined
that he was guilty of violating *The Book of
Discipline.* [FN16] These actions by Bishop Williams
and the A.M.E. Zion Church are allegedly in direct
violation of the Policies & Procedures Concerning
Sexual Misconduct contained in *The Book of
Discipline.* [FN17]

FN10. Compl. at ¶ ¶ 87, 95.

FN11. *Id* at ¶ ¶ 88, 89, 96, 97.

FN12. *Id* at ¶ ¶ 90-91, 98.

FN13. *Id* at ¶ ¶ 115, 126.

FN14. *Id* at ¶ ¶ 116-117, 127-128.

FN15. *Id* at ¶ ¶ 118, 129.

FN16. *Id* at ¶ ¶ 119, 130.

FN17. *Id* at ¶ ¶ 121, 132.

In Count VI Collins alleges a claim of intentional
infliction of emotional distress against Bishop
Williams and the A.M.E. Zion Church. Collins
contends that Bishop Williams was aware of the
extreme and outrageous conduct of Reverend Burton
but failed to take any action against him. [FN18] It is
also alleged that Bishop Williams did not appoint an
investigative committee until September 2003, after
Reverend Burton was arrested. [FN19] Again, it is
alleged that Bishop Williams did not take any action
against Burton even after the investigative and trial
committee had determined that Reverend Burton was
guilty of violating *The Book of Discipline.* [FN20]
Collins alleges that Bishop Williams' failure to act
was intentional. [FN21] The Church Defendants,
however, contend that Collins has failed to allege
sufficient facts to support a claim of intentional
infliction of emotional distress against Bishop
Williams and the A.M.E. Zion Church. Specifically,
the Church Defendants argue that there is no
allegation that either Bishop Williams or the A.M.E.
Zion Church acted extremely or outrageously.
Rather, Collins' allegations for intentional infliction
of emotional distress stem from the fact that Bishop
Williams was aware of Burton's extreme and
outrageous conduct but failed to take any action or

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 4
Not Reported in A.2d, 2006 WL 1579828 (Del.Super.)
(Cite as: 2006 WL 1579828 (Del.Super.))

avoided dealing with Collins' concerns. [FN22] The Defendants contend that these allegations rest upon their alleged failure to remove or discipline Burton, which is an ecclesiastical issue

> FN18. Id at ¶¶ 104, 105.

> FN19. Id at ¶ 107

> FN20. Id at ¶ 108

> FN21. Id at ¶ 111

> FN22. Id at ¶¶ 104, 105, 106.

## A. Overview Of The First Amendment

*3 The First Amendment to the United States Constitution provides that "Congress shall make no law respecting the establishment of religion, or prohibiting the free exercise thereof." [FN23] This constitutional guarantee is made applicable to the states through the Fourteenth Amendment. [FN24] The First Amendment contains two clauses regarding religion, the Free Exercise Clause and the Establishment Clause. The Free Exercise Clause guarantees "first and foremost, the right to believe and profess whatever religious doctrine one desires." [FN25] Moreover, "[a]t a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons." [FN26] The Free Exercise Clause protects religious relationships ... by preventing the judicial resolution of ecclesiastical disputes turning on matters of "religious doctrine or practice." [FN27] The United States Supreme Court has explained that the Free Exercise Clause "embraces two concepts--freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of society." [FN28] Thus, the First Amendment has never been interpreted to mean that "when otherwise prohibitable conduct is accompanied by religious convictions, not only the convictions but the conduct itself must be free from government regulation." [FN29] Government regulation includes both statutory law and court action through civil lawsuits. [FN30] Importantly, before the constitutional right to free exercise of religion is implicated, the threshold inquiry is whether the conduct sought to be regulated was "rooted in religious belief." [FN31] Further, in order to launch a free exercise challenge, it is necessary "to show the coercive effect of the enactment as it operates against [the individual] in the practice of his religion." [FN32] If it is demonstrated that the conduct at issue was rooted in religious beliefs, then the court must determine whether the law regulating that conduct is neutral both on its face and in its purpose. [FN33] "[I]f the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral, and it is invalid unless it is justified by a compelling interest and is narrowly tailored to advance that interest." [FN34] The State may, however, regulate conduct through neutral laws of general applicability. [FN35] Thus, "a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." [FN36]

> FN23. U.S. Const. amend. I.

> FN24. See Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290, 301, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000); Capitol Square Review & Advisory Bd. v. Pinette, 515 U.S. 753, 757, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995)

> FN25. Employment Div., Dept. of Human Resources v. Smith, 494 U.S. 872, 877, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990).

> FN26. Church of the Lukumi Babalu Aye Inc. v. City of Hialeah, 508 U.S. 520, 532, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993)

> FN27. Sanders v. Casa View Baptist Church, 134 F.3d 331, 335-36 (5th Cir.1998).

> FN28. Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940).

> FN29. Smith, 494 U.S. at 882.

> FN30. See Kreshik v. Saint Nicholas Cathedral, 363 U.S. 190, 191, 80 S.Ct. 1037, 4 L.Ed.2d 1140 (1960).

> FN31. Wisconsin v. Yoder, 406 U.S. 205, 215, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); see Sanders, 134 F.3d at 337-38; Destefano v. Grabrian, 763 P.2d 275, 283-84 (Colo.1988).

> FN32. School Dist. of Abington Tp., Pa. v.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A 2d                                                                                    Page 5
Not Reported in A 2d, 2006 WL 1579828 (Del.Super.)
(Cite as: 2006 WL 1579828 (Del.Super.))

> *Schempp*, 374 U.S. 203, 223, 83 S.Ct. 1560,
> 10 L.Ed.2d 844 (1963)
>
> FN33. See *Lukumi*, 508 U.S. at 531.
>
> FN34. *Id.* at 533.
>
> FN35. *Id.* at 531.
>
> FN36. *Id*

The second aspect of the First Amendment religion clause, the Establishment Clause, states that government "shall make no law respecting an establishment of religion." [FN37] This aspect of the First Amendment involves the separation of church and state and prevents the government from passing laws that "aid one religion, aid all religions, or prefer one religion over the other." [FN38] The United States Supreme Court has explained that there are "three main evils against which the Establishment Clause was intended to afford protection: 'sponsorship, financial support, and active involvement of the sovereign in religious activity.' " [FN39] In *Lemon*, the Court provided a three-part test to determine whether a neutral law violates the Establishment Clause: (1) the law must have a secular legislative purpose; (2) the primary or principal effect of the law must neither advance nor inhibit religion; and (3) the law must not foster an excessive government entanglement with religion. [FN40] Under *Lemon*, entanglement is measured by the "character and purposes" of the institution affected, the nature of the benefit or burden imposed, and the "resulting relationship between the government and the religious authority." [FN41] More recent cases examining the Establishment Clause have clarified that excessive government entanglement is merely a factor to consider in evaluating the second prong; that is, whether the principal effect of the statute is to advance or inhibit religion. [FN42]

> FN37. U.S. Const. amend. I.
>
> FN38. *Schempp*, 374 U.S. at 216.
>
> FN39. *Lemon v. Kurtzman*, 403 U.S. 602, 612 (1971)(quoting *Walz v. Tax Comm'n of City of New York*, 397 U.S. 664, 668, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970).
>
> FN40. *Lemon*, 403 U.S. at 612-13.
>
> FN41. *Id.* at 615.

> FN42. See *Mitchell v. Helms*, 530 U.S. 793, 120 S.Ct. 2530, 147 L.Ed.2d 660 (2000); *Agostini v. Felton*, 521 U.S. 203, 233, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997) We note that several U.S. Supreme Court Justices have expressed dissatisfaction with the *Lemon* test, advocating an alternative analytical framework for evaluating First Amendment claims. See *e g, Lee v. Weisman*, 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992)(advocating and applying a coercion-accommodation test); *Lynch v. Donnelly*, 465 U.S. 668, 691, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984)(O'Connor, J., concurring)(advocating adoption of an endorsement test) *But see Pinette*, 515 U.S. at 766-67, plurality opinion by Scalia, J., joined by Rehnquist, C.J., and Kennedy and Thomas, JJ., (rejecting endorsement test because it "exiles private religious speech to a realm of less-protected expression ... [T]he Establishment Clause ... was never meant to serve as an impediment to purely *private* religious speech connected to the State only through its occurrence in a public forum.") However, we must continue to apply the *Lemon* test until the U.S. Supreme Court reaches a consensus on the successor to the *Lemon* test.

*4 As particularly relevant to the analysis of the First Amendment challenge in this case, the Supreme Court has also held that the First Amendment prevents courts from resolving internal church disputes that would require adjudications of questions of religious doctrines. [FN43] For example, the Supreme Court has stated that "it is not within 'the judicial function and judicial competence' " of civil courts to determine which of two competing interpretations of scripture are correct. [FN44] Instead, civil courts "are bound to accept the decisions of the highest judicatories of a religious organization of hierarchical polity on matters of discipline, faith, internal organization, or ecclesiastical rule, custom or law." [FN45] Thus, the First Amendment provides churches with the "power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." [FN46]

> FN43. This protection has been referred to as the religious autonomy principle *See Smith v. O'Connell*, 986 F.Supp. 73, 76

© 2007 Thomson/West. No Claim to Orig. U.S Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1579828 (Del.Super.)
(Cite as: 2006 WL 1579828 (Del.Super.))

(D.R.I.1997). Although the United States Supreme Court has often discussed this principle in the context of the Free Exercise Clause, *see* *United States v. Lee,* 455 U.S. 252, 256, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982); *Kedroff v. St. Nicholas Cathedral,* 344 U.S. 94, 107-08, 73 S.Ct. 143, 97 L.Ed. 120 (1952), the United States Supreme Court has also referred to this principle in the context of the Establishment Clause *See* *Presbyterian Church v. Mary Elizabeth Blue Hull Mem. Presbyterian Church,* 393 U.S. 440, 449, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969). It is apparent that the religious autonomy principle articulated by the United States Supreme Court may implicate both the Free Exercise Clause and the Establishment Clause.

FN44. *Lee,* 455 U.S. at 256.

FN45. *Serbian Eastern Orthodox Diocese v. Milivojevich,* 426 U.S. 696, 713, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976).

FN46. *Kedroff,* 344 U.S. at 116; *see* *Serbian Eastern Orthodox Diocese,* 426 U.S. at 724-25.

This rule, sometimes referred to as the "deference rule" was first enunciated by the U.S. Supreme Court in *Watson v. Jones.* [FN47] That case revolved around the attempt of the national body of the Presbyterian Church to regain possession of a church property in Louisville that had been seized by a group of pro-slavery dissidents. In deferring to the ruling concerning ownership made by the national body, the court stated:

FN47. 13 Wall. 679, 80 U.S. 679, 20 L.Ed. 666 (1871).

Whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them in their application to the case before them. [FN48]

FN48. *Watson,* 80 U.S. at 727.

The court went further to hold:
Each [church] has a body of constitutional and ecclesiastical law of its own, to be found in their written organic laws, *their books of discipline,* in their collections of precedents, in their usage and customs, which as to each constitutes a system of ecclesiastical law and religious faith that tasks the ablest minds to become familiar with it. It is not to be supposed that the judges of the civil courts can be as competent in the ecclesiastical law and religious faith of all these bodies as the ablest men in each are in reference to their own. [FN49]

FN49. *Id.* at 729 (emphasis added).

In addition to finding church authority better able to decide such disputes within the church, the *Watson* court eschewed the prospect of civil courts examining "with minuteness and care" not only the "subject of doctrinal theology," but also "the usages and customs, the written laws, and fundamental organization of every religious denomination." [FN50] The court also quoted a decision of the Pennsylvania Supreme Court which stated:

FN50. *Id.* at 733.

The decisions of ecclesiastical courts, like every other judicial tribunal, are final; as they are the best judges of what constitutes an offense against the word of God and the discipline of the church. Any other than those courts must be incompetent judges of matters of faith, discipline, and doctrine; and civil courts, if they be so unwise as to attempt to supervise their judgments on matters which come [before] their jurisdiction, would only involve themselves in a sea of uncertainty and doubt, which would do any thing but improve either religion or good morals. [FN51]

FN51. *The* *German Reformed Church v. Seibert,* 3 Pa. 282, 1846 WL 4859, at *8.

**\*5** Despite the language in *Watson* this Court does not read this case or any of the following cases to say that the "deference rule" or the doctrine of church autonomy suggests blanket protection of the church from all accountability in our civil courts. We read *Watson* to hold only that civil courts may not take jurisdiction over a religious organization's internal, ecclesiastical matters. For instance, the Catholic Church only allows men to be priests. Such policy would not long survive a Title VII challenge in the secular world. However, Title VII recognizes an unwritten "ministerial exception" which places this Catholic policy outside the reach of civil courts. [FN52] Although *Watson* was not based on First Amendment grounds its "deference rule" did

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1579828 (Del.Super.)
(Cite as: 2006 WL 1579828 (Del.Super.))

explicitly become part of the body of First Amendment law in *Kedroff*

> FN52. *Elvig v. Calvin Presbyterian Church,* 375 F.3d 951, 955-57 (9th Cir.2004); *Bollard v. California Province of the Society of Jesus,* 196 F.3d 940, 945 (9th Cir.1999)

In *Kedroff,* the Supreme Court held unconstitutional a New York state statute which was passed specifically to address an intrachurch property dispute. [FN53] *Kedroff* explained that the *Watson* "opinion radiates ... a spirit of freedom for religious organizations, an independence from secular control or manipulation, in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." [FN54] Moreover, in *Serbian Eastern Orthodox Diocese,* the U.S. Supreme Court reviewed a ruling by the Illinois Supreme Court that had held that the church's proceedings were procedurally and substantively defective under the internal regulations of the church and were therefore arbitrary and invalid. [FN55] In reversing the judgment of the state court, the Supreme Court explained:

> FN53. *Kedroff,* 344 U.S. at 121.

> FN54. *Id.* at 116.

> FN55. *See Serbian Eastern Orthodox Diocese,* 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976)

The fallacy fatal to the judgment of the Illinois Supreme Court is that it rests upon an impermissible rejection of the decisions of the highest ecclesiastical tribunals of this hierarchical church upon the issues in dispute, and impermissibly substitutes its own inquiry into church polity and resolutions based thereon of those disputes ... To permit civil courts to probe deeply enough into the allocation of power within a [hierarchical] church so as to decide ... religious law [governing church polity] ... would violate the First Amendment in much the same manner as civil determination of religious doctrine. *For where resolution of the disputes cannot be made without extensive inquiry by civil courts into religious law and polity, the First and Fourteenth Amendments mandate that civil courts shall not disturb the decisions of the highest ecclesiastical tribunal within a church of hierarchical polity, but must accept such decisions as binding on them,* in their application to the religious issues of doctrine or

polity before them. [FN56]

> FN56. *Id.* at 708-09 (emphasis added) (citations omitted) (quoting *Maryland & Virginia Eldership of the Churches of God v. Church of God at Sharpsburg, Inc.,* 396 U.S. 367, 90 S.Ct. 499, 24 L.Ed.2d 582 (1970)(Brennan, J., concurring)))

The U.S. Supreme Court ruled that it was immaterial that the church authorities' actions were "arbitrary" in the sense they were not done in accordance with church laws and regulations, and the inquiry by the civil court was impermissible because it was bound to accept the decisions of the church authorities "on matters of discipline, faith, internal organization or ecclesiastical rule, custom or law." [FN57] Furthermore, and importantly, the Supreme Court opined that a civil court's inquiry into whether church law or regulation has been complied with "must inherently entail inquiry into the procedures that canon or ecclesiastical law supposedly requires the church adjudicatory to follow, or else into the substantive criteria by which they are supposedly to decide the ecclesiastical question. But this is exactly the inquiry that the First Amendment prohibits; recognition of such an exception would undermine the general rule that religious controversies are not the proper subject of civil court inquiry ... [FN58] The Supreme Court further asserted that there is no "dispute that questions of church discipline and the composition of the church hierarchy are at the core of ecclesiastical concern ... " [FN59] Thus, in short, the First and Fourteenth Amendments permit hierarchical religious organizations to establish their own rules and regulations for internal discipline and government, and to create tribunals for adjudicating disputes over these matters. When this choice is exercised and ecclesiastical tribunals are created to decide disputes over the government and direction of subordinate bodies, the Constitution requires that civil courts accept their decision as binding upon them. [FN60] Church members give their "implied consent" to be "subject only to such appeals as the organism itself provides for." [FN61]

> FN57. *Serbian Eastern Orthodox Diocese,* 426 U.S. at 713.

> FN58. *Id.*

> FN59. *Id.* at 717.

> FN60. *Id.* at 724-25.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 8
Not Reported in A.2d, 2006 WL 1579828 (Del.Super.)
(Cite as: 2006 WL 1579828 (Del.Super.))

FN61. *Id* at 711

**\*6** Courts, however, have distinguished between intrachurch disputes and disputes between churches and third parties. For instance, in *General Council on Fin. & Admin. v. California Superior Court,* Justice Rehnquist observed, in rejecting the argument that the Free Exercise Clause barred the Court's exercise of jurisdiction in a civil dispute involving a third party:

> In my view, applicant plainly is wrong when it asserts that the First and Fourteenth Amendments prevent a civil court from independently examining, and making the ultimate decision regarding, the structure and actual operation of a hierarchical church and its constituent units in an action such as this. There are constitutional limitations on the extent to which a civil court may inquire into and determine matters of ecclesiastical cognizance and polity in adjudicating intrachurch disputes .... [FN62] But this Court has never suggested that those constraints similarly apply outside the context of such intraorganization disputes.... *[Serbian Eastern Orthodox Diocese* and other related cases] are premised on a perceived danger that in resolving intrachurch disputes the State will become entangled in essentially religious controversies or intervene on behalf of groups espousing particular doctrinal beliefs. *Such considerations are not applicable to purely secular disputes between third parties and a particular defendant, albeit a religious affiliated organization, in which fraud, breach of contract, and statutory violations are alleged.* [FN63]

> > FN62. *See Serbian Eastern Orthodox Diocese*

> > FN63. *General Council on Finance & Administration of United Methodist Church v. Superior Court of California,* 439 U.S. 1355, 1372-73, 99 S.Ct. 35, 58 L.Ed.2d 63 (Rehnquist, Circuit Justice 1978) (emphasis added).

It should be noted, however, that Justice Rehnquist's conclusion that the Free Exercise Clause did not bar the Court's exercise of jurisdiction in a civil dispute between churches and third parties was expressly limited to "purely secular disputes between third parties ... [and religious organizations]    in which fraud, breach of contract, and statutory violations are alleged. These circumstances are not present here. In addition, it should be noted that the Supreme Court has also recognized that not all entanglements have

the effect of advancing or inhibiting religion. [FN64] In *Agostini v. Felton,* the court stated that interaction between the church and state is inevitable and that some level of involvement between the two is tolerated. [FN65] Entanglement must be "excessive" before it runs afoul of the Establishment Clause. [FN66]

> > FN64. *Agostini v. Felton,* 521 U.S. 203, 233, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997).

> > FN65. *Id*

> > FN66. *Id*

A court thus must determine whether the dispute "is an ecclesiastical one about 'discipline, faith, internal organization, or ecclesiastical rule, custom or law,' or whether it is a case in which [it] should hold religious organizations liable in civil courts for 'purely secular disputes between third parties and a particular defendant, albeit a religiously affiliated organization.' " [FN67]

> > FN67. *Bell v. Presbyterian Church (U.S.A.),* 126 F.3d 328, 331 (4th Cir.1997)(quoting *Serbian Eastern Orthodox Diocese,* 426 U.S. at 713; and *General Council on Finance,* 439 U.S. at 1373).

**B. Consideration Of Collins' Claims Of Negligent Infliction Of Emotional Distress And Negligence Against Scott Church, Bishop Williams, And A.M.E. Zion Church Is Barred By The First Amendment**

**\*7 [1]** In applying these First Amendment principles to Collins' claims against the Church Defendants, we must examine whether the determination of her claims necessarily implicates an excessive entanglement with religion. If the court is required to interpret church law, policies, or practices, the First Amendment prohibits such an inquiry. While it is true that the pleading caption in the instant case does identify a dispute between church officials and a third party, a closer inquiry reveals that the nature of the dispute in this instance, i.e., negligence, negligent infliction of emotional distress, and intentional infliction of emotional distress would implicate a secular examination into "intra-church" policies, practices, process and procedure; an action proscribed by our Constitution. Succinctly stated, Collins complains about both the manner and the outcome of the investigatory and disciplinary procedures that were started because of Collins'

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1579828 (Del.Super.)
(Cite as: 2006 WL 1579828 (Del.Super.))

complaint about Reverend Burton. Therefore, it seems to the Court that its adjudication of these claims would necessarily involve an inquiry into the propriety of the decisions of church authorities on matters of discipline, internal organization, ecclesiastical rule, custom, and law. [FN68] It would inherently entail inquiry into these areas; and, as stated by the U.S. Supreme Court in *Serbian Eastern Orthodox Diocese,* "this is exactly the inquiry that the First Amendment prohibits." [FN69] The purpose of the deference rule is to require a civil court to defer to the decisions of the church in resolving internal disputes. Such intrusion into the internal affairs of the church would amount to excessive government entanglement of religion by the state and, therefore, such a claim is barred by the First Amendment.

> FN68. *Podolinski v. Episcopal Diocese of Pittsburgh,* 23 Pa. D. & C. 4th 385, 411 (Armstrong C.P.1995)

> FN69. The court in the instant matter recognized that the pleadings do not establish whether the decisions are decisions of the "highest ecclesiastical tribunal", which is what the U.S. Supreme Court said must be given deference in *Serbian Eastern Orthodox Diocese.* Whether the instant case involves decisions of the highest tribunal or of some intermediate tribunal is logically of no import. *See Young v. Northern Ill. Conference of United Methodist Church,* 21 F.3d 184 (7th Cir.1994). The court distinguishes the case at bar and *Young* from *Poesnecker v. Ricchio,* 158 Pa.Cmwlth. 459, 631 A.2d 1097 (Pa.Commw.1993). In *Poesnecker,* the Commonwealth Court arguably placed great weight on the "highest ecclesiastical tribunal" requirement. However, a close reading of the case reveals that the contestants were "church" authorities of equal stature or rank within their religious body. In *Poesnecker,* there was simply no decision of a higher church authority to which the courts could defer, and a literal reading of the written organic laws of the body was capable of providing the basis for a resolution of the dispute.

As a statement of the church's policy and procedures regarding sexual misconduct, *The Book of Discipline* poses a serious risk of religious entanglement for a court attempting to discern its limits. [FN70] In *Allen v. Board of Incorporators,* the court stated that courts are virtually unanimous in concluding that disputes

concerning the employment or status of pastors, or the interpretation and application of ecclesiastical rules of polity and procedure like that contained in the *Book of Discipline,* constitutionally cannot be the subject of civil court review. [FN71] The court held that it lacked jurisdiction over the action since a number of plaintiffs' claims invoked the A.M.E. Church's *Book of Discipline* which would require the court to interpret and apply what is fundamentally an ecclesiastical document. The court noted that such an inquiry was constitutionally impermissible, as set forth by the Supreme Court in *Serbian Eastern Orthodox Diocese.* [FN72] Similarly, in *Belin v. West,* the appellee relied on the rules in *The Book of Discipline* in his complaint and at trial as establishing his reasonable reliance on a bishop's alleged promise of employment. [FN73] In the court's decision, it noted that the A.M.E. Church was a hierarchical religious organization that had its own judicial structure. [FN74] It also noted that *The Book of Discipline* contained the law, statutes, historical statements, and guidelines for behavior for all positions in the church. [FN75] It contained the rules regarding the settlement of disputes between church members, set out the method for having these disputes decided, and provided for appeal to the Judicial Council which is the highest judicatory body of the A.M.E. Church. [FN76] The court in that case found that the trial court lacked jurisdiction because it was impossible to decide the promissory estoppel claim without inquiring into A.M.E. Church doctrine and polity and drawing conclusions as to what those doctrines provided. [FN77] Additionally, in *United Methodist Church, Baltimore Annual Conference v. White,* a reverend filed suit claiming that the church had failed to comply with its own regulations as set forth in the *Discipline.* [FN78] The court found that the *Discipline* of the United Methodist Church ("UMC") was a religious document which the court could not construe without usurping the rights of the UMC to construe its own law. [FN79] The court held that if the court were to review the merits of the claims it would necessarily become entangled in matters of a highly religious nature and issues at the core of internal church discipline, faith and church organization. [FN80]

> FN70. See *Odenthal v. Minn. Conference of Seventh-Day Adventists,* 649 N.W.2d 426, 436 (Minn.2002).

> FN71. *Allen,* 1992 WL 390755, at *2 (citing *Hutchison v. Thomas,* 789 F.2d 392 (6th Cir.1986)(dismissal of Methodist minister's common law claims challenging forced

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 10
Not Reported in A.2d, 2006 WL 1579828 (Del.Super.)
(Cite as: 2006 WL 1579828 (Del.Super.))

retirement under church disciplinary rules), cert. denied, <u>479 U.S. 885, 107 S.Ct. 277, 93 L.Ed.2d 253 (1986)</u>; <u>Rayburn v. General Conf. of Seventh-Day Adventists, 772 F.2d 1164 (4th Cir.1985)</u>(ruling Religion Clauses required dismissal of race and sex discrimination claims of plaintiff denied pastoral position), cert. denied, <u>478 U.S. 1020, 106 S.Ct. 3333, 92 L.Ed.2d 739 (1986)</u>; <u>Hafner v. Lutheran Church-Missouri Synod, 616 F.Supp. 735 (N.D.Ind.1985)</u>(dismissal for lack of subject matter jurisdiction pastor's suit for alleged denial of benefits allegedly provided under terms of church constitution).

FN72. <u>426 U.S. at 713</u>; see also <u>United Methodist Church, Baltimore Annual Conference v. White, 571 A.2d 790, 794 (D.C.1990)</u>("secular evaluation of the procedures that ecclesiastical law requires the church to follow is precisely the type of inquiry the First Amendment prohibits").

FN73. <u>Belin v. West, 315 Ark. 61, 864 S.W.2d 838, 841 (Ark.1993)</u>

FN74. <u>Id</u>

FN75. <u>Id</u>

FN76. <u>Id</u> at 841-42.

FN77. <u>Id</u> at 842

FN78. <u>United Methodist Church, Baltimore Annual Conference, 571 A.2d at 794</u>

FN79. <u>Id</u> (citing <u>Knuth v. Lutheran Church Missouri Synod, 643 F.Supp. 444, 448 (D.Kan.1986)</u>

FN80. <u>Id</u> at 794-95 (citing <u>Kaufmann v. Sheehan, 707 F.2d 355, 358 (8th Cir.1983)</u>.

*8 Like <u>Allen, Belin,</u> and <u>United Methodist Church, Baltimore Annual Conference,</u> Collins' claims invoke the A.M.E. Zion Church's <u>Book of Discipline,</u> which contains more than simply internal procedures concerning sexual misconduct <u>The Book of Discipline</u> is subjective [FN81] and at times inextricably intertwined with the Church's religious tenants Inquiry into Collins' claims would therefore require our interpretation and application of what is fundamentally an ecclesiastical document [FN82]

and would require an inquiry into the internal policies and practices of the church, a determination beyond the court's scope of review. The Church Defendants would be compelled to defend as reasonable its formal internal processing and handling of Collins' claims. Every step the church took to respond and react to the claims would be reviewed to determine whether it was reasonable. Such an inquiry into whether the church exercised reasonable care would involve, by necessity, discovery and examination by litigation of the church's disciplinary procedures and subsequent responses

FN81. <i>See The Book of Discipline,</i> Policies and Procedures Concerning Sexual Misconduct, 2000 (stating that if the alleged offender is proved to be guilty of the charges brought by the alleged victim, he/she will be dealt with in accordance with Paragraphs 280-317 of the <i>Book of Discipline of the African Methodist Episcopal Zion Church</i> The Bishop will meet with the offender, who also may be accompanied by another person, if so desired. The Bishop will discuss with the offender <i>the actions the Bishop intends to take If appropriate,</i> the Bishop will refer the offender for therapy by persons professionally qualified in treatment of Sexual Misconduct. (emphasis added))

FN82. <u>United Methodist Church, Baltimore Annual Conference, 571 A.2d at 794</u>(citing <u>Minker v. Baltimore Annual Conference of United Methodist Church, 894 F.2d 1354, 1358-59 (D.C.Cir.1990)</u>(holding "the Book of Discipline [of the Methodist Church] is inherently an ecclesiastical matter").

In addition, the consideration of Collins' claim that Bishop Williams did not take any action against Burton after the investigative committee had determined that he violated <i>The Book of Discipline</i> is barred by the First Amendment for the above stated reasons. It is not within this Court's power to decide what procedures the church should have used or what the church should have done after Burton was found guilty of violating <i>The Book of Discipline</i> If the Court were to inquire into this, it would in effect be limiting the church's ability to supervise and decide what to do when an individual had violated <i>The Book of Discipline</i> Any award of damages would have a chilling effect, leading indirectly to state control over the future conduct of affairs of a religious denomination, a result violative of the First Amendment. Moreover, when the issue of one's

Not Reported in A.2d                                    Page 11
Not Reported in A.2d, 2006 WL 1579828 (Del.Super.)
(Cite as: 2006 WL 1579828 (Del.Super.))

fitness to serve a church organization as minister is brought before the courts, the First Amendment is implicated and the courts must then make a careful determination of whether the issues brought before it are ecclesiastical or secular in nature. After examining case law presenting both sides of the question the Court concludes that the reasoning of those courts holding that the First Amendment bars a claim for negligent hiring, retention, and supervision is more compelling in the present case. Courts have found that the "assessment of an individual's qualifications to be a minister, and the appointment and retention of ministers, are ecclesiastical matters entitled to constitutional protection against judicial or other state interference" [FN83] and that the selection and deployment of clergy is about as central to the life and purpose of a group of affiliated churches as anything we can imagine. [FN84] Courts have held that the First Amendment is implicated because mainstream denominations differ greatly in their rules and policies for "calling" and removing clergy and often their decision is guided by religious doctrine and/or practice. Thus, some courts have established that any inquiry into the decision of who should be permitted to become or remain a priest necessarily would involve prohibited excessive entanglement with religion. Based upon these decisions, the Court finds that it would be inappropriate and unconstitutional for this Court to determine after the fact that the ecclesiastical authorities negligently retained Reverend Burton. [FN85]

FN83. *See Alberts v. Devine*, 395 Mass. 59, 479 N.E.2d 113 (Mass.1985).

FN84. *Ehrens v. The Lutheran Church-Missouri Synod*, 269 F.Supp.2d 328, 333 (S.D.N.Y.2003), *aff'd*, 385 F.3d 232 (2d Cir.2004).

FN85. *Id.* (The court agreed that it was prevented by the First Amendment from determining, after the fact, that the ecclesiastical authorities of the Lutheran Church negligently supervised or retained a clergyman. The Court noted that New York courts have ruled that "any attempt to define the duty of care owed by a member of the clergy to a parishioner fosters excessive entanglement with religion." *Langford v. Roman Catholic Diocese*, 271 A.D.2d 494, 705 N.Y.S.2d 661, 662 (2d Dep't 2000) The court in *Ehrens* held that the same was true with regard to the duty of care in

determining the continued eligibility of a priest to serve as a pastor. The court referenced the holding in *Schmidt v. Bishop*, where a plaintiff's claims against the church defendants were dismissed as a matter of law because: Any inquiry into the policies and practices of the Church Defendants in hiring or supervising their clergy raises the same kind of First Amendment problems of entanglement ... which might involve the Court in making sensitive judgments about the propriety of the Church Defendants' supervision in light of their religious beliefs. Insofar as concerns retention or supervision, the pastor of a Presbyterian Church is not analogous to a common law employee. He may not demit his charge nor be removed by the session, without the consent of the presbytery, functioning essentially as an ecclesiastical court. The traditional denominations each have their own intricate principles of governance, as to which the state has no rights of visitation. Church governance is founded in scripture, modified by reformers over almost two millennia [sic]. 269 F.Supp.2d at 332.)

*9 Accordingly, the Court finds that adjudication of Collins' claims would ultimately involve an examination of the church tribunal's decision-making process [FN86] It would require the church to justify not only its entire disciplinary process, but also its ultimate decisions and actions. The internal governance of the church would be on trial, thereby, requiring this court to interpret the rules of the A.M.E. Zion Church. This situation, would involve a gross substantive and procedural entanglement with the church's core functions, its polity, and its autonomy. Collins should have stated her causes of action by reference to neutral standards and not by reference to *The Book of Discipline* Thus, it is for these reasons that the Church Defendants' Motion for Summary Judgment is granted with respect to the negligent infliction of emotional distress and negligence claims

FN86. *Davis Lee Pharmacy, Inc. v. Manhattan Central Capital Corp.*, 327 F.Supp.2d 159, 165 (E.D.N.Y.2004)

**C. The Church Defendants' Motion For Summary Judgment Should Be Granted With Respect To The Intentional Infliction of Emotional Distress Claim**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1579828 (Del.Super.)
**(Cite as: 2006 WL 1579828 (Del.Super.))**

[2][3] In determining whether or not the First Amendment bars Collins' cause of action against the Church Defendants for intentional infliction of emotional distress, it is necessary first to look closely at the complaint and discern the conduct which allegedly gave rise to the tort. In so doing, the alleged tortious conduct consists of the following:

1) Bishop Williams was aware of the extreme and outrageous conduct of Reverend Burton but failed to take any action against him; [FN87] 2) Bishop Williams did not appoint an investigative committee until September 2003; [FN88] and 3) Bishop Williams did not take any action against Reverend Burton even after the investigative and trial committee had determined that Reverend Burton was guilty of violating *The Book of Discipline* Having found that this Court is jurisdictionally barred from hearing the negligence and negligent infliction of emotional distress claims, we hold the same reasoning applies, to the claim of intentional infliction of emotional distress. This claim also involves the internal disciplinary procedures utilized by Bishop Williams. Accordingly, the Court will invoke the deference rule with regard to the intentional infliction of emotional distress cause of action Permitting an inquiry into the disciplinary and investigatory procedures is barred. [FN89]

FN87. Compl. at ¶¶ 104, 105.

FN88. *Id* at ¶ 107.

FN89. *Podolinski,* 23 Pa. D. & C. 4th at 413.

Moreover, even if not barred by the First Amendment, taking Collins' allegations as true, the Court is nonetheless convinced that she has failed to state a cause of action. The elements of the tort of intentional infliction of emotional distress appear in *Restatement (Second) of Torts §  46 (1965)* as follows:

(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

The Court must first determine whether Defendants' conduct was so extreme and outrageous as to permit recovery. [FN90] The Court may look to the *Restatement (Second) of Torts §  46* comment d (1965) for guidance in determining if extreme and outrageous conduct has been established. [FN91] There, it is provided:

FN90. *Mattern v. Hudson,* 532 A.2d 85, 86 (Del.Super.Ct.1987); *Ham v. Brandywine Chrysler-Plymouth, Inc.,* 1985 WL 189010, at *2 (Del.Super.); *Restatement (Second) Torts §  46* comment h (1965).

FN91. *Mattern,* 532 A.2d at 86.

*10 Extreme and outrageous conduct. The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim Outrageous!

In the Complaint, Collins has failed to allege that Bishop Williams' conduct was extreme and outrageous as those terms are defined above. She has merely stated that Bishop Williams was aware of the extreme and outrageous conduct of Reverend Burton and failed to take any action against him. Allegations of extreme and outrageous conduct are required in order to plead a claim for intentional infliction of emotional distress. [FN92] Therefore, Collins has not plead facts sufficient to establish her claim for intentional infliction of emotional distress.

FN92. *Atamian v. Nemours Health Clinic,* 2001 WL 1474819, at *2 (Del.Super.)(citing *Goldsborough v 397 Properties, LLC,* Del.Super., No 98C-09-001, 2000 WL 3310878, Vaughn, J., at *3 (2000).

For the foregoing reasons, the Church Defendants' Motion for Summary Judgment is hereby **GRANTED** with respect to the claim of intentional infliction of emotional distress.

IT IS SO ORDERED

Not Reported in A.2d, 2006 WL 1579828 (Del.Super.)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A 2d
Not Reported in A 2d, 2006 WL 1579828 (Del.Super.)
**(Cite as: 2006 WL 1579828 (Del.Super.))**

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

151 Fed.Appx. 162
151 Fed Appx. 162
**(Cite as: 151 Fed.Appx. 162)**

**H**

**Briefs and Other Related Documents**

This case was not selected for publication in the Federal Reporter.

NOT PRECEDENTIAL

Please use FIND to look at the applicable circuit court rule before citing this opinion  Third Circuit Local Appellate Rule 28.3(a) and Internal Operating Procedure 5.3  (FIND CTA3 Rule 28.0 and CTA3 IOP APP I 5 3 )

United States Court of Appeals,
Third Circuit.
EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION; Lisa Stepler
v.
AVECIA, INC  Lisa Stepler, Appellant.
**No. 04-3396.**

Argued July 12, 2005
Decided Oct. 13, 2005.

**Background:** Discharged employee brought action against former employer, alleging Title VII retaliation, wrongful termination in violation of Delaware law, and intentional infliction of emotional distress under Delaware law  The United States District Court for the District of Delaware, Susan L. Robinson, J , granted summary judgment in favor of employer on the retaliation and wrongful termination claims, and dismissed the emotional distress claim. Employee appealed

**Holdings:** The Court of Appeals held that:
(1) genuine issue of material fact precluded summary judgment in employee's Title VII retaliation claim, and
(2) discharge did not violate public policy and did not involve a falsification of employment records, for purpose of employee's wrongful termination claim
Affirmed in part; reversed and remanded in part

West Headnotes

**[1] Federal Civil Procedure** ☞2497.1
170Ak2497.1 Most Cited Cases

Genuine issue of material fact as to whether employee's discharge was related to her complaints about hostile work environment precluded summary judgment in employee's Title VII retaliation claim. Civil Rights Act of 1964, § 701 et seq , 42 U.S.C.A. § 2000e et seq

**[2] Labor and Employment** ☞759
231Hk759 Most Cited Cases
Under Delaware law, discharge of at-will employee did not violate public policy and did not involve a falsification of employment records, for purpose of employee's wrongful termination claim, absent showing of employer's violation of a recognized public interest, or actual manipulation of employment records.

***163** On Appeal from the United States District Court for the District of Delaware  Dist. Court Civil Action No. 03-CV-00320  District Judge: The Honorable Susan L. Robinson

Phillip B. Bartoshesky (Argued), Biggs and Battaglia, Wilmington, Del , for Appellant.

Ginger D. Schroder (Argued), Schroder, Joseph & Associates LLP, Buffalo, N.Y , Jennifer C. Jauffret, Richards, Layton & Finger, Wilmington, DE, for Appellee.

Before ALITO, BECKER, and GREENBERG, Circuit Judges

OPINION OF THE COURT

PER CURIAM

Lisa Stepler, a former laboratory technician for Avecia, Inc  ("Avecia") sued Avecia for retaliation under Title VII of the Civil Rights Act of 1964, wrongful termination under Delaware law, and intentional infliction of emotional distress under Delaware law  The District Court dismissed Stepler's claim for intentional infliction of emotional distress and granted summary judgment in favor of Avecia on Stepler's retaliation and wrongful termination claims. We affirm the dismissal of the claim for the intentional affliction of emotional distress and the entry of summary judgment in favor of Avecia on the wrongful termination claim  However, we reverse the entry of summary judgment in favor of Avecia on

© 2007 Thomson/West  No Claim to Orig. U S  Govt  Works

151 Fed.Appx. 162
151 Fed.Appx. 162
**(Cite as: 151 Fed.Appx. 162)**

the retaliation claim and remand for further proceedings.

I

Stepler asserts that this case should have been analyzed under the framework of *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). [FN1] Under that framework, the "burden of production and the risk of non-persuasion are shifted to the defendant," and the defendant must show "that even if discrimination was a motivating factor in the adverse employment decision, it would have made the same employment decision regardless of its discriminatory animus." *Armbruster v. Unisys Corp.,* 32 F.3d 768, 778 (3d Cir.1994). This framework only applies, however, where the employee can show *"direct evidence* that an illegitimate criterion was a substantial factor in the decision." *Price Waterhouse,* 490 U.S. at 276 109 S.Ct. 1775 (O'Connor, J., concurring in the judgment) (emphasis added); *see also Walden v. Georgia-Pacific Corp.,* 126 F.3d 506, 513 (3d Cir.1997). We have carefully considered the evidence on which Stepler relies in this case, and while the question is close we conclude that she did not meet the "direct evidence" standard.

> FN1. 42 U.S.C. § 2000e-2(m) does not reach retaliation claims. *Woodson v. Scott Paper Co.,* 109 F.3d 913, 934 (3d Cir.), *cert denied,* 522 U.S. 914, 118 S.Ct. 299, 139 L.Ed.2d 230 (1997).

Stepler's Title VII claims must be analyzed under the burden-shifting framework established by *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and its progeny. Under *164 this framework, Stepler was first required to make out a prima facie case of retaliation by establishing (1) that she engaged in a protected activity, (2) that she suffered an adverse employment action, and (3) that there was a causal link between her protected activity and the adverse employment action. *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 279 (3d Cir.2000). If Stepler successfully made out a prima facie case, Avecia had to point to evidence in the summary judgment record that was sufficient, if believed, to support a finding that Stepler was not discharged because of her protected activity. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506-507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). If Avecia met this burden, Stepler was required to prove that unlawful retaliation was a determinative cause of her firing. *See McDonnell Douglas,* 411 U.S. at 802-803, 93 S.Ct. 1817.

[1] Stepler clearly satisfied the first two prongs of the prima facie case standard. Her complaints about a hostile work environment and retaliation were protected activities, and her firing by Avecia obviously was an adverse employment action. Whether she proffered sufficient evidence to meet the third prong of the prima facie case standard is less clear due to the gap of almost one year between her initial complaint and her termination, but a gap of this magnitude is not conclusive and can be outweighed by a "pattern of harassment" or a "pattern of antagonism" in the intervening period. *See Woodson v. Scott Paper Co.,* 109 F.3d 913, 920 (3d Cir.1997); *see also Robinson v. Southeastern Pennsylvania Transp. Auth.,* 982 F.2d 892, 894-95 (3d Cir.1993). A reasonable jury considering the evidence in the light most favorable to Stepler--including Stepler's performance reviews, management's increased scrutiny of her, the tension with her co-workers, the memorandum of April 23, 2001, and the termination letter--could conclude that there was a causal link between Stepler's protected activities and Avecia's decision to fire her. We thus conclude that Stepler made out a prima facie case.

Avecia's proffered reasons for Stepler's termination were poor work performance and disruptive behavior, but a reasonable jury considering the evidence in the light most favorable to Stepler, and drawing all inferences in Stepler's favor, could conclude otherwise. Particularly noteworthy are the references in both the April 23 memo and the May 4, 2001, termination letter to Stepler's "intense focus upon alleged harassment [and] retaliation." App. 264, 371.

III.

Conversely, there are no issues of fact precluding summary judgment in favor of Avecia on Stepler's state law claim for breach of the covenant of good faith and fair dealing.

[2] The general rule in Delaware is that employees are employed "at will" and may be dismissed at any time without cause. *See Merrill v. Crothall-American, Inc.,* 606 A.2d 96, 103 (Del.1992). The general rule does not apply, however, in the following four situations:

    (i) where the termination violated public policy;

    (ii) where the employer misrepresented an important fact and the employee relied "thereon either to accept a new position or remain in a present one";

    (iii) where the employer used its superior bargaining power to deprive an employee of clearly

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

identifiable compensation related to the employee's past service; and

*165 (iv) where the employer falsified or manipulated employment records to create fictitious grounds for termination

*Lord v. Souder*, 748 A.2d 393, 400 (Del.2000) (citing *E.I. DuPont de Nemours and Co. v. Pressman*, 679 A.2d 436, 442-44 (Del.1996)). Stepler claims that Avecia's actions fit into either the first or fourth category. She contends that the first category fits because being fired for opposition to sexual harassment and retaliation violates public policy, and she argues that the fourth category fits because she was subjected to false criticisms of her work in her performance evaluation, false claims that she was using work time to study, and false claims that she was fired for behavioral and performance issues.

In order to make out a claim of a public policy violation, a plaintiff must satisfy a two-part test: "(i) the employee must assert a public interest recognized by some legislative, administrative or judicial authority and (ii) the employee must occupy a position with responsibility for advancing or sustaining that particular interest." *Lord*, 748 A.2d at 401 (citing *Pressman*, 679 A.2d at 441-42). To satisfy the first part, Stepler relies on the Delaware Supreme Court's decision in *Schuster v. Derocili*, 775 A.2d 1029 (Del.2001), which recognized a cause of action for breach of the covenant of good faith and fair dealing where the employee alleged that she was terminated following sexual harassment in the workplace. But in 2004 the Delaware legislature amended 19 Del. C. § 710 *et seq*, which prohibits discrimination in employment practices, in order to clarify that this statute was the "sole remedy" for an aggrieved employee "to the exclusion of all other remedies." 19 Del. C. § 712(b) (2005). In fact, the synopsis of the Senate Bill expressly states disagreement with the Delaware Supreme Court's decision in *Schuster*:

This bill confirms that Chapter 7 is the exclusive and sole remedy for employment discrimination claims, requiring initial processing of all such claims with the Department of Labor for review and action. This bill effectively re-establishes the exclusive remedy put in question by the decision in *Schuster v. Derocili*, 775 A.2d 1029 (2001).

Delaware Bill Summary, 2004 Reg. Sess. S.B. 154. Moreover, when the bill is read in light of the sponsor statement, which "confirms" and "re-establishes" the pre-existing rule "put in question by" *Schuster*, it is clear that the 2004 Amendment is meant to be retroactive. Thus Stepler has not asserted a recognized public interest, and Avecia's actions do

not fit into the first category.

Nor do they fit into the fourth category: falsification or manipulation of employment records to create fictitious grounds for termination. Even if we assume that Stepler was subjected to false criticisms of her work performance and false claims that she was using work time to study, there is no evidence that these particular criticisms and claims were the grounds for Stapler's termination. And even if we assume that Avecia falsely claimed that Stepler was fired for behavioral and performance issues, this is not the kind of falsehood specified in the fourth category, which provides that an employer violates the covenant of good faith and fair dealing when it "falsifie[s] or manipulate[s] employment records to create fictitious grounds for termination." *Lord*, 748 A.2d at 400. If the employer did not actually falsify or manipulate employment records, then it does not matter if the employer gave a false rationale for termination. *See Williams v. Caruso*, 966 F.Supp. 287, 291 (D.Del.1997) ("Nothing in *Pressman* suggests an employer who gives an employee a false reason for termination *166 is subject to liability under the implied covenant of good faith and fair dealing. *Pressman* only held culpable the *manufacture* of grounds for dismissal, not the *statement* of a false reason for dismissal.") (emphasis in original); *see also Geddis v. University of Delaware*, 40 Fed. Appx. 650, 654 (3d Cir.2002) (unpublished) (noting that the employee did not claim his supervisor "intentionally created 'fictitious negative information' about him in order to get him fired" and thus the conduct at issue did not fit the fourth *Pressman* category) (quoting *Schuster*, 775 A.2d at 1040).

IV

Under Delaware law, the general rule is that the worker's compensation administrative process is the exclusive remedy for an employee who suffers a work-related accident causing personal injury or death. *See* 19 Del.Code Ann. § 2304 (2005). However, the Delaware Supreme Court has held that "claims that involve a *true intent* by the employer to injure the employee fall outside of the Workers' Compensation Act and remain separately actionable as common law tort claims." *Rafferty v. Hartman Walsh Painting Co.*, 760 A.2d 157, 159 (Del.2000) (emphasis added); *see also Showell v. Langston*, No. Civ. A. 02C-01-016, 2003 WL 1387142, at *3 (Del.Super. March 5, 2003) (citing *Rafferty*). Thus, "for a complaint to survive a motion to dismiss, there must be more than a mere allegation that there was an intentional injury; there must be facts alleged which,

151 Fed Appx. 162
151 Fed Appx. 162
**(Cite as: 151 Fed.Appx. 162)**

if true, show deliberate intent to bring about an injury." *Rafferty, 760 A.2d at 160* In other words, an employee must allege facts that, if true, would show that the employer intended to injure her. It would not be enough to allege facts showing that the employer intended to do an action and that the worker was injured as a result of that action. Specific intent is required.

Stepler cites *Rafferty* and argues that her claim for intentional infliction of emotional distress is not barred. In a Memorandum Order of April 28, 2004, the District Court rejected Stepler's argument. We agree with the District Court's analysis.

We therefore affirm the District Court's order of summary judgment in favor of Avecia on Stepler's claims under Delaware law, but we reverse the District Court's order granting summary judgment in favor of Avecia on Stepler's retaliation claim, and we remand the case for further proceedings.

151 Fed.Appx. 162

**Briefs and Other Related Documents (Back to top)**

• 04-3396 (Docket) (Aug. 23, 2004)

END OF DOCUMENT

© 2007 Thomson/West No Claim to Orig. U.S. Govt. Works

Westlaw.

Not Reported in F.Supp.2d                                                    Page 1
Not Reported in F.Supp.2d, 2005 WL 751940 (D.Del.)
(Cite as: 2005 WL 751940 (D.Del.))

**C**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
George EVERETT, Plaintiff,
v.
HOSPITAL BILLING AND COLLECTION
SERVICE, LTD., et al., Defendants.
No. Civ.A. 04-049 JJF.

March 31, 2005.
William J. Rhodunda, Jr., Oberly, Jennings &
Rhodunda, P.A., Wilmington, Delaware, for Plaintiff.

Gregory V. Varallo, Jennifer C. Jauffret, and Kelly
A. Green, Richards, Layton & Finger, P.A.,
Wilmington, Delaware, for Defendants.

*MEMORANDUM OPINION*

FARNAN, J.

*1 Pending before the Court are Defendants' Motion
To Dismiss (D.I.7) and Defendants' Motion To Strike
Portions Of Plaintiff's Answering Brief, Or In The
Alternative, For Leave To Take Discovery (D.I.12).
For the reasons discussed, the Motion To Dismiss
(D.I.7) will be granted in part and denied in part and
the Motion To Strike (D.I.12) will be granted.

I. Background

On January 23, 2004, Plaintiff filed five-count
complaint against his former employer, Hospital
Billing and Collection Service, Ltd. ("Hospital
Billing"), and two of its employees, President Jack T.
Byrnes ("Byrnes") and Director of Information
Services and Technology Victoria Ostrow
("Ostrow"). Plaintiff claims that Defendants violated
the Americans With Disabilities Act (ADA), Title
VII of the Civil Rights Act of 1964, and 42 U.S.C. §
1981. Plaintiff further alleges intentional infliction of
emotional distress and conspiracy.

II. Legal Standard

A motion to dismiss tests the legal sufficiency of the
complaint. In reviewing a motion to dismiss pursuant
to Rule 12(b)(6), courts "must accept as true the
factual allegations in the [c]omplaint and all
reasonable inferences that can be drawn therefrom."
Langford v. Atlantic City, 235 F.3d 845, 847 (3d
Cir.2000). A court will grant a motion to dismiss only
when it appears that a plaintiff could prove no set of
facts that would entitle him or her to relief. Id.

III. Discussion

A. Release

Defendants contend that the Court should dismiss
Plaintiff's Complaint because Plaintiff knowingly and
willingly executed a valid release in which he
expressly waived his right to file any and all claims
or causes of action arising from his employment or
separation from employment against Defendants. In
response, Plaintiff contends, first, that the release
issue is improperly before the Court because the
Complaint does not rely on the release. Further,
Plaintiff contends that he signed the release under
duress, and that the release lacked consideration
because it decreased Plaintiff's benefits. In response,
Defendants have filed a Motion To Strike Portions Of
Plaintiff's Answering Brief, Or In The Alternative,
For Leave To Take Discovery (D.I.12) asking the
Court not to consider, in deciding the Motion to
Dismiss, any allegations regarding the alleged release
that were made for the first time in Plaintiff's
Answering Brief and Affidavit.

As noted above, a motion to dismiss tests the legal
sufficiency of the complaint. In this case, the alleged
release was not attached to Plaintiff's Complaint, and
therefore, the Court concludes that it cannot consider
the release in assessing Defendants' motion to
dismiss. For this reason, the Court will grant
Defendants' Motion To Strike (D.I.12).

B. Plaintiff's ADA Claim (Count I)

Defendants contend that Plaintiff's ADA claim
(Count I) should be dismissed in its entirety because
Plaintiff failed to properly plead a "regarded as"
claim. In response, Plaintiff contends that he was
"regarded as" having a disability because he has a
physical or mental impairment that does not
substantially limit major life activities but was treated

Not Reported in F.Supp 2d
Not Reported in F.Supp 2d, 2005 WL 751940 (D Del )
**(Cite as: 2005 WL 751940 (D.Del.))**

by Hospital Billing as having such a limitation

**\*2** Accepting Plaintiff's factual allegations as true, the Court concludes that Plaintiff has properly pled a "regarded as" claim under the ADA.

*C Plaintiff's ADA Claim (Count I) and Title VII Claim (Count II) regarding Defendants Byrnes and Ostrow*

Defendants Byrnes and Ostrow contend that Plaintiff cannot allege individual liability against Byrnes and Ostrow in Count I (ADA claim) and Count II (Title VII claim). In response, Plaintiff contends that Defendants were personally involved in his unlawful termination.

Individual employees cannot be held liable under Title VII or the ADA *See Sheridan v. E.I. DuPont de Nemours & Co.,* 100 F.3d 1061, 1077 (3d Cir.1996); *Emerson v. Thiel College,* 296 F.3d 184, 189 (3d Cir.2002) Thus, the Court will dismiss Plaintiff's claims against Byrnes and Ostrow pled in Counts I and II.

*D. Plaintiff's Section 1981 Claim (Count III) regarding Defendant Byrnes*

Defendant Byrnes contends that Count III must be dismissed because Plaintiff's Complaint does not allege that Byrnes committed any discriminatory acts. In response, Plaintiff contends that Byrnes, in his supervisory position, was involved in the scheme to wrongfully discharge Plaintiff. Plaintiff contends that Defendant Ostrow confirmed this allegation when stating to him, regarding the termination, "they made me do it." (D.I. 10 at 15 )

Based on Plaintiff's contested allegations, the Court concludes, at this juncture, that Plaintiff has sufficiently pled a claim against Byrnes.

*E Plaintiff's IIED Claim (Count IV)*

Defendants contend that Plaintiff's intentional infliction of emotional distress ("IIED") claim (Count IV) is barred by the Delaware Worker's Compensation Act, which provides the exclusive remedy for employees injured at work 19 Del. C. § 2304 Further, Defendants contend that Plaintiff failed to plead all the elements of IIED against all Defendants. In response, Plaintiff contends that the "personal dispute exception" of 19 Del. C. § 2301(15)(b) excludes coverage under the Worker's Compensation Act.

The personal dispute exception cited by Plaintiff applies to a "wilful act of another employee directed against the employee by reasons personal to such employee and not directed against the employee as an employee or because of the employee's employment." 19 Del. C. § 2301(15)(b) In making this determination,

> courts generally look to the time, place, and circumstances of the injury, with a focus on three factors: (1) the employee's act causing the injury was willful; (2) the injury must not have been directed against plaintiff as an employee or because of plaintiff's employment; and (3) the assault was directed against the plaintiff because of personal reasons.

*Lloyd v. Jefferson,* 53 F.Supp.2d 643, 690 (D.Del.1999).

Because the reasons for Everett's termination are fact-sensitive, the Court cannot, at this stage of the proceedings, conclude whether Everett was fired for non-personal reasons Therefore, the Court will not dismiss Plaintiff's IIED claims against Byrnes and Ostrow on the basis of the exclusivity provision of the Delaware Worker's Compensation Act. The Court, however, will dismiss the IIED claim against Hospital Billing because the personal dispute exception applies only to fellow employees. Plaintiff's claim and remedy against Hospital Billing, therefore, can only be pursued pursuant to the Delaware Worker's Compensation Act.

*F Plaintiff's Conspiracy Claim (Count V)*

**\*3** Defendants contend that Plaintiff's conspiracy claim (Count V) fails to plead the required elements of such a claim

A civil conspiracy claim requires a plaintiff to allege "(1) [a] confederation or combination of two or more persons; (2)[a]n unlawful act done in furtherance of the conspiracy; and (3)[a]ctual damage " *Nicolet, Inc. v. Nutt,* 525 A.2d 146, 149-50 (Del.1987) (citations omitted).

The Court has reviewed the allegations of Count V in the Complaint and measured those allegations against the elements required to prove a civil conspiracy under Delaware law and concludes that Plaintiff's factual allegations are sufficient to survive Defendants' Motion To Dismiss.

IV. Conclusion

© 2007 Thomson/West No Claim to Orig U S Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 751940 (D.Del.)
**(Cite as: 2005 WL 751940 (D.Del.))**

Page 3

In sum, the Court will (1) grant in part and deny in part Defendants' Motion To Dismiss (D.I.7) and (2) grant Defendants' Motion To Strike Portions Of Plaintiff's Answering Brief, Or In The Alternative, For Leave To Take Discovery (D.I.12).

An appropriate Order will be entered.

### ORDER

At Wilmington, this *31* day of March 2005, for the reasons set forth in the Memorandum Opinion issued this date;

IT IS HEREBY ORDERED THAT:

1) Defendants' Motion To Dismiss (D.I.7) is *GRANTED* in part and *DENIED* in part, specifically:

a. Plaintiff's claims against Byrnes and Ostrow in Counts I and II are dismissed;

b. Plaintiff's IIED claim against Hospital Billing in Count IV is dismissed;

c. All remaining claims are not dismissed;

2) Defendants' Motion To Strike Portions Of Plaintiff's Answering Brief, Or In The Alternative, For Leave To Take Discovery (D.I.12) is *GRANTED*. The Court has not considered any of Plaintiff's allegations concerning Defendants' release contentions.

Not Reported in F.Supp.2d, 2005 WL 751940 (D.Del.)

**Motions, Pleadings and Filings (Back to top)**

• 1:04CV00049 (Docket) (Jan. 23, 2004)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                           Page 1
Not Reported in F.Supp.2d, 2002 WL 1340311 (E.D.Pa.), 89 Fair Empl.Prac.Cas. (BNA) 252
**(Cite as: 2002 WL 1340311 (E.D.Pa.))**

▷

**Motions, Pleadings and Filings**

United States District Court, E.D. Pennsylvania.
Thomas M. KEOWN, Plaintiff,
v.
RICHFOOD HOLDINGS, Defendant.
**No. CIV.A. 01-2156.**

June 19, 2002.

*MEMORANDUM AND ORDER*

BERLE M. SCHILLER, Judge.

I. INTRODUCTION

*1 Plaintiff Thomas Keown has brought suit against his former employer alleging that he was compelled to resign due to sexual harassment, age discrimination, and in retaliation for complaining about Title VII violations in the workplace. Richfood has moved for summary judgment on all three claims. For reasons I explain below, the sexual harassment claim is dismissed, but the age discrimination and retaliation claims may proceed to a jury.

II. BACKGROUND

Mr. Keown worked in the Norristown office of Defendant Richfood Holdings, where he held the title Vice President in charge of Transportation and oversaw Management Information Systems.

Beginning in October 1998, Plaintiff began to find a number of pamphlets containing sexual content in his work mailbox. One such pamphlet was entitled "Testosterone Levels: the Key to Great Sex for Men Over Fifty," and discussed the possible benefits of the hormone androstenedione for older men's sexual potency. (Rotelle Dep Ex. 7).

Mr. Keown confronted Ms. Penny Mitchell, Richfood's accounting vice-president at Norristown, who admitted sending a pamphlet. (Keown Dep. at 203-04). She responded, "You're an older man. You've got gray hair. I thought they would be of interest to you." (Keown Dep. at 288). From October 1998 through approximately January 1999, Plaintiff

received approximately eight to eleven sexually suggestive pamphlets. (Keown Dep. at 265). The pamphlets were small booklets of about eight to ten pages each. Some pamphlets were more sexually explicit than others. (Keown Dep. at 217-18). Ms. Mitchell also sat so close to Mr. Keown during meetings that she touched him with her breasts. (Keown Dep. at 370). Ms. Mitchell had also, the year before, made sexually tinged comments while at Richfood's Brook Road facility, including one regarding the size of Mr. Keown's posterior. (Keown Dep at 191-93).

In a December 1998 telephone conversation, Plaintiff's co-worker Charlotte Edwards remarked, "Tom Keown, you're getting senile on me" and slammed down the telephone. (Keown Dep. at 444, 446). Ms. Edwards, the Corporate Director of Risk Management, was Mr. Keown's direct supervisor on risk management issues and reported directly to the company's chief executive officer. (Keown Dep. at 435-36; Convington Dep. at 75-76). Mr Keown reported the incident to his boss, Robert Romano. (Keown Dep. at 448; Romano Dep. at 138-40). No disciplinary action was taken against Ms. Edwards. (Richfood's Response to Plaintiff's Request for Admissions at ¶¶ 34-36).

Mr. Keown received another sexually explicit pamphlet in late December 1998 or early January 1999, which discussed erectile dysfunction in older men. Attached to the cover of this pamphlet was a post-it note signed in the name of Mr. Keown's much younger wife, Denise, directing Mr. Keown to a chart and picture on page two. Page two depicted a woman leering over a gray-haired man's shoulder as he was looking at the man's desiccated anatomy. Behind them was a graph about the male anatomy correlating its size with age. Ms. Mitchell admitted sending both the pamphlet and the note. (Mitchell Dep. at 126-29).

In January 1999, Mr. Keown complained about the pamphlet to Robert Romano, the General Manager of Richfood's Norristown office, and gave him the offending pamphlet and note. (Keown Dep at 368-69). Mr. Romano, in turn, referred the matter to Michael Rotelle and Alec Covington at Richfood's headquarters in Richmond, Virginia. [FN1] Mr Rotelle was Richfood's head of human resources and Mr. Covington was its Chief Operating Officer. Mr. Keown also complained to William Sharkey,

Not Reported in F.Supp.2d                                                              Page 2
Not Reported in F.Supp.2d, 2002 WL 1340311 (E.D.Pa.), 89 Fair Empl.Prac.Cas. (BNA) 252
(Cite as: 2002 WL 1340311 (E.D.Pa.))

Richfood's corporate Vice-President for Transportation who, in turn, also contacted Mr. Rotelle. [FN2] Following his complaint, Mr. Keown received no further pamphlets. (Keown Dep. at 369).

FN1. Witnesses diverge as to what action Richfood took following Plaintiff's complaint. Mr. Romano claims that he approached Ms. Mitchell about the pamphlet and instructed her to cease sending them. (Romano Dep. 97, 144, 156, 178). Mr. Keown then allegedly instructed him to take no further action, and Mr. Rotelle did not learn about the pamphlet until he visited Norristown on February 15, 1999. According to Mr. Keown--whose version is adopted for summary judgment purposes-- Mr. Romano stated that he would need to turn the matter over to Michael Rotelle. (Keown Dep. at 295-97). Ms. Mitchell denies that Mr. Romano ever spoke to her about the pamphlets, corroborating Mr. Keown's version. (Mitchell Dep. at 109-12).

FN2. The parties dispute whether Mr. Sharkey ever received the pamphlets. According to Mr. Sharkey, Mr. Keown gave him copies of the pamphlets. (Sharkey Dep. at 11, 30). Mr. Keown himself testified that the pamphlets were destroyed. (Keown Dep. at 208, 218, 258, 279). The court need not resolve the discrepancy at this stage.

*2 On February 15, 1999, Mr. Rotelle visited the Norristown facility and interviewed Mr. Romano, Ms. Mitchell, and Mr. Keown. (Rotelle Dep. at 146, 165- 70). During Mr. Rotelle's meeting with Mr. Keown, Mr. Keown stated that he had received approximately eight to ten sexually explicit pamphlets and gave the final one and the attached post-it to Mr. Rotelle. (Keown Dep. 196-98; Rotelle Dep. at 174-75). Mr. Rotelle never took any steps to ensure the pamphlets were not received at work. (Rotelle Dep. at 129). Although Mr. Rotelle insists that he verbally reprimanded Ms. Mitchell, she denies being disciplined in any manner. (Rotelle Dep. at 129; Mitchell Dep. at 111, 119, 121, 158, 188-89).

Mr. Rotelle and Mr. Convington visited the Norristown facility on March 24, 1999 and met with Ms. Mitchell. No one discussed Plaintiff's sexual harassment complaints with Ms. Mitchell. (Amendment to Richfood's Response to Plaintiff's Requests for Admissions at ¶ 27). Mr. Covington and Mr. Rotelle then met with Mr. Keown, with Mr.

Romano also present. Keown had believed the meeting was to discuss his complaint against Ms. Mitchell. (Keown Dep. at 333-34, 341-42, 386). However, his complaint was only touched on at the meeting. Instead, Mr. Convington denounced Mr. Keown's use of profanity at work and criticized his work and his work ethic, (Keown Dep. at 332-33; Rotelle Dep. at 199, 203; Romano Dep. at 167), and that his "work habits were less than equal to the rest of the management team." (Convington Dep. at 59). Mr. Convington raised his voice at the meeting. (Convington Dep. at 60). Mr. Keown felt the criticism unfair. Mr. Keown had consistently received high performance reviews and won the maximum raises allowed by the company (Keown Dep. at 52; Sharkey Dep. at 8; Tier Dep. at 106-09). He would arrive at work start work early and work as late as 1 a.m., and often worked weekends. (Tier Dep. at 105-07). He developed a centralized computer system--OMNI--for the Norristown Wholesale outfit. (Keown Dep. at 87-91, 146-54). Despite its successful development and implementation, Mr. Covington complained that Keown was even involved in the OMNI project (Rotelle Dep. at 200).

Mr. Keown left the March 24, 1999 meeting feeling "crushed." (Keown Dep. at 387). Shortly thereafter, he spoke with Mr. Romano. Mr. Romano informed him that he would not receive a car allowance as previously indicated, that his contract with Richfood would not be renewed, that he had no future at the company, and recommended Mr. Keown resign. (Keown Dep. at 386-87; 399-404; Keown Dep. Ex 14 at 4). Mr. Keown tendered his resignation via email on April 1, 1999 (Keown Dep. Ex. 17). During discovery, it was revealed that Richfood had decided as early as March 17, 1999, that it would not renew Plaintiff's employment contract. (Sharkey Dep. at 17).

One week after Mr. Keown's resignation, Mr. Sharkey, who went by the name Bill, spoke with Mr. Romano. Mr. Romano stated, "Bill, you better watch your step, too, you know, I think he [Mr. Convington] is trying to get the older guys out of here." (Sharkey Dep. at 26).

*3 Plaintiff filed a complaint with the EEOC and received his right to sue letter on February 5, 2001. He filed the current action on May 2, 2001, alleging gender discrimination (Count I), age discrimination (Count II), and retaliation for complaints of sexual harassment (Count III). Richfood has moved for summary judgment

Not Reported in F.Supp.2d                                                    Page 3
Not Reported in F.Supp.2d, 2002 WL 1340311 (E.D.Pa.), 89 Fair Empl.Prac.Cas. (BNA) 252
(Cite as: 2002 WL 1340311 (E.D.Pa.))

III. DISCUSSION

A. Standard of Review

On a motion for summary judgment, a court must determine whether, on the record presented by the parties, "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial burden of proving that there is no dispute as to a genuine issue of material fact. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The burden then shifts to the opposing party to set forth specific facts demonstrating a genuine issue for trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

A genuine issue exists only if there is sufficient evidence to enable a reasonable jury to return a verdict for the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In making this determination, the court views evidence in a light most favorable to the non-movant. See Groman v. Township of Manalapan, 47 F.3d 628, 633 (3d Cir.1995). It is inappropriate for the court to settle factual discrepancies and credibility determinations on summary judgment. See In re Unisys Savings Plan Litig., 74 F.3d 420, 433 n. 10 (3d Cir.1996). Therefore, ambiguities and conflicts in a deponent's testimony should be left for the fact-finder to resolve. See id. These standards are "applied with added rigor in employment discrimination cases, where intent and credibility are crucial issues." Stewart v. Rutgers, State Univ., 120 F.3d 426, 431 (3d Cir.1997).

B. Count I--Gender Discrimination Claim

Plaintiff's first claim is for gender discrimination based on a hostile work environment theory. (Pla. Response to Motion for Summary Judgment at 17). He asserts that placing the pamphlets in his mailbox constituted sexual harassment of so severe a degree that he felt compelled to resign to escape it. [FN3]

FN3. Plaintiff points to other examples of sexual harassment in his response to current Motion, such as: Ms. Mitchell's habit of standing in such proximity to Plaintiff that her breasts or other parts of her anatomy were in contact with Plaintiff, the use of profanity at work, and a comment Ms. Mitchell made in 1997 regarding the size of

Keown's posterior. However, Plaintiff specifically disavowed any claim based on contact with Ms. Mitchell's breasts or any misconduct other than receiving the pamphlets. (Keown Dep. at 222-23). Moreover, the comment regarding the size of Plaintiff's posterior, even if construed as part of this case, was an isolated instance which occurred in 1997 at the Defendant's former facility at Brook Road. (Keown Dep. at 189-95). According to Mr. Keown, this was the last such comment. (Keown Dep. at 195). Thus, the Court will examine Plaintiff's sexual harassment claim only with respect to the pamphlets.

To sustain his claim of sexual harassment, Plaintiff must show that: (1) he suffered intentional discrimination because of his sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondeat superior liability. See Kunin v. Sears Roebuck & Co., 175 F.3d 289, 293 (3d Cir.1999). The Court will focus on the second, third, and fourth elements.

Finding a work environment to be hostile or abusive requires a review of all relevant circumstances to see if the workplace is "permeated with discriminatory intimidation, ridicule and insult." Harris v. Forklift Sys., 510 U.S. 17, 21-23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). Factors which the court should consider include: (a) the frequency of the harassment, (b) its severity, (c) whether it is physically threatening or humiliating or merely an offensive utterance, (d) whether it unreasonably interferes with employee's work performance, and (e) its effect on an employee's psychological well-being. See id. at 23; Arasteh v. MBNA Am. Bank, N.A., 146 F.Supp.2d 476, 494-95 (D.Del.2001). What constitutes harassment defies reduction to a simple formula. "Common sense, and an appropriate sensitivity to social context, will enable courts ... to distinguish between simple teasing or roughhousing ... and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive." Id. (quoting Oncale v. Sundowner Offshore Servs., 523 U.S. 75, 82, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)).

*4 Viewing the evidence here in this light, Plaintiff cannot be said to have endured severe or pervasive harassment. Plaintiff's claim is that he received up to eleven small booklets of about eight to ten pages each

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1340311 (E.D.Pa.), 89 Fair Empl.Prac.Cas. (BNA) 252
(Cite as: 2002 WL 1340311 (E.D.Pa.))

containing sexually-related material. He has testified that some pamphlets were more sexually explicit than others. (Keown Dep. at 217-18). A number of the pamphlets provided medical information, including the one pamphlet included in the record advocating the hormone androstenedione to compensate for the effects of declining testosterone levels. (Rotelle Dep. Ex. 7). The pamphlet contained no sexually explicit images or text. Another booklet discussed erectile dysfunction in older men.

The pamphlets may have been seedy and in bad taste, but they do not approach the level of severe, pervasive, and regular sexual harassment needed to support a sexual harassment claim. Courts have deemed much more prurient behavior to be insufficient to sustain a claim of sexual harassment. *See e.g.* <u>Koelsch v. Beltone Elecs. Corp.</u>, 46 F.3d 705, 708 (7th Cir.1995) (two occasions of fondling female employee's leg and buttocks, presence of baby picture of supervisor superimposed with adult genitalia, request to donate pubic hairs as present to boss, after which alleged discriminator kept distance from plaintiff deemed not actionable); <u>Weiss v. Coca-Cola Bottling Co.</u>, 990 F.2d 333, 337 (7th Cir.1993) (finding that a male co-worker's conduct consisting of several incidents of unwanted touching, attempts to kiss, placing "I love you" signs in her work area, and asking a female employee out on dates did not create a hostile work environment); <u>Arasteh</u>, 146 F.Supp.2d at 495 (comments regarding relationship between plaintiff and her husband, insistence that plaintiff socialize more, rubbing of plaintiff's legs and staring at her chest an unspecified number of times too commonplace, vague and infrequent to be considered severe or pervasive); <u>Gautney v. Amerigas Propane, Inc.</u>, 107 F.Supp. 634, 643-45 (E.D.Pa.2000) (no sexual harassment claim by female plaintiff where co-workers visited strip clubs, lowered pants to display tattoo on pelvic bone, commented that women should use their physical attributes to gain business advantage, discussed the size of their sex organs and escapades with other women, and showed plaintiff a written story with sexually explicit content).

The pamphlets which Mr. Keown received may have been offensive, but they did not place Mr. Keown into a sexually threatening or humiliating position. Although Plaintiff claims the pamphlet and post-it note involving erectile dysfunction were particularly offensive to him because he had an implant in that region, there is no reason it should have interfered with his work performance or had a significant impact on his psychological well-being.

*5 Moreover, the Court the pamphlets were sent too infrequently--eight or nine pamphlets over a period of four month period--to constitute harassment. *Compare* <u>Gharzouzi v. Northwestern Human Servs. of Pa.</u>, Civ. A. No. 01-192, 2002 WL 987993, 2002 U.S. Dist. LEXIS 8621, at *62-63 (E.D.Pa. May 6, 2002) (finding one or two offensive comments made each month over period of several months to be insufficient evidence of pervasive hostility). After Plaintiff complained to Richfood management about the erectile dysfunction pamphlet and the post-it attached to it, delivery of the pamphlets ceased.

Accordingly, Plaintiff's claim for sexual harassment must be dismissed.

C. Count II--Age Discrimination Claim

Mr. Keown has stated a valid claim for age discrimination and may attempt to prove at trial that Richfood permitted an environment so hostile to him on the basis of age that he felt compelled to resign.

1. Constructive Discharge

An employer may be liable on a constructive discharge theory when an employee is forced to resign his or her jobs because the employer knowingly permitted conditions of discrimination to persist so intolerable the a reasonable person subject to them would resign. *See* <u>Cardenas v. Massey</u>, 269 F.3d 251, 263 (3d Cir.2001). The resignation is treated as if it were an outright dismissal by the employer, rendering the resignation an "adverse employment action" which can serve as the basis for age discrimination or retaliation claims. *See* <u>Duffy v. Paper Magic Group, Inc.</u>, 265 F.3d 163, 167-68 (3d Cir.2001) (constructive discharge as basis for age discrimination claim); <u>Aman v. Cort Furniture Rental Corp.</u>, 85 F.3d 1074, 1084-85 (3d Cir.1996) (constructive discharge as basis for race and retaliation claims).

Much of the harassment which Mr. Keown endured was age-based. The pamphlets, described more fully above, were directed to sexual performance problems of men over 50. Indeed, the last pamphlet was entitled: "Testosterone Levels: The Key to Great Sex for Men Over 50!" (Rotelle Dep. Ex. 7). Attached to the pamphlet was a note signed in the name of Mr. Keown's much younger wife. When Mr. Keown confronted Ms. Mitchell about the pamphlet, she responded that she placed the pamphlet in his mailbox because he had gray hair and she thought the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 5
Not Reported in F.Supp.2d, 2002 WL 1340311 (E.D.Pa.), 89 Fair Empl.Prac.Cas. (BNA) 252
**(Cite as: 2002 WL 1340311 (E.D.Pa.))**

pamphlets might be of interest to him. (Keown Dep. at 288). Mr. Keown complained to management about the pamphlet and note.

Second, Ms. Charlotte Edwards, the Corporate Director of Risk Management, made another age-based comment. In a December 1998 telephone conversation, she remarked, "Tom Keown, you're getting senile on me" and slammed down the telephone. (Keown Dep. at 444, 446). He reported the incident to his boss, Robert Romano. (Keown Dep. at 448; Romano Dep. at 138-40) No disciplinary action was taken against Ms. Edwards. (Richfood's Response to Plaintiff's Request for Admissions at ¶ ¶ 34-36).

Third, Plaintiff lost a company car which he had previously been told that he would receive. *See Clowes v. Allegheny Valley Hosp.,* 991 F.2d 1159, 1161 & n. 2 (3d Cir.1993) (suggesting reduction in pay or benefits may be evidence of constructive discharge). While Richfood argues that Plaintiff was not entitled to a company car, corporate representatives had in fact indicated Plaintiff would receive one. The question is one for the jury.

*6 Fourth, on March 24, 1999, Mr. Keown met at the Norristown office with Alec Covington, the Chief Operating Officer of Richfood, in the belief they were to discuss Mr. Mitchell. Instead, Mr. Covington denounced Mr. Keown's use of profanity at work and criticized his work and his work ethic, (Keown Dep. at 332-33; Rotelle Dep. at 199, 203; Romano Dep. at 167), and that his "work habits were less than equal to the rest of the management team." (Convington Dep. at 59). Mr. Convington raised his voice at the meeting. (Convington Dep. at 60). Mr. Keown felt the criticism unfair and untrue in light of his prior performance and the hours he had kept. Despite the successful development and implementation of the OMNI computer project, Mr. Covington complained that Keown was even involved with it. (Rotelle Dep. at 200). If Mr. Covington's statements were baseless, they may serve as a basis for a claim of constructive discharge. As our Court of Appeals has held in a related context, false accusations may be a relevant factor is deciding whether working conditions were intolerable. *Levendos v. Stern Entertainment, Inc.,* 860 F.2d 1227, 1231 (3d Cir.1988) (weighing false accusations of theft and drinking on the job among other facts as basis for constructive discharge claim).

Lastly, shortly after Plaintiff's encounter with Mr. Covington, Mr. Romano, the chief Richfood officer at Mr. Keown's site, told Mr. Keown that his contract

would not be renewed, that he had no future with the company, and recommended that Mr. Keown resign (Keown Dep. at 386-87; 399-404; Keown Dep. Ex. 14 at 4). [FN4]

> FN4. Tellingly, the record also contains evidence that as March 17, 1999, one week before Mr. Keown's meeting with Mr. Convington, Richfood was planning not to renew Plaintiff's contract as early.

Taken together, a jury may properly infer that Plaintiff was constructively discharged.

2. Discharge on the Basis of Age

Richfood next asserts that there is no evidence that Plaintiff's employment was terminated on the basis of age. To that end, it labels Ms. Mitchell's pamphlet and Mr. Edwards remarks to be irrelevant "stray remarks" made by non-decisionmakers and unrelated to any employment action. *See e.g. Ezold v. Wolf, Block, Schorr & Solis-Cohen,* 983 F.2d 509, 545 (3d Cir.1992).

However, a remark attributed to Mr. Covington, the Chief Operational Officer of Richfood suggests he was trying to get rid of older workers. (Sharkey Dep. at 25-28). Mr. Covington's comments, if introduced in a properly admissible form, would constitute a comment by a decision maker relating to the decision-making process and would satisfy Plaintiff's burden as to pretext.

Furthermore, Plaintiff's constructive discharge claim is not solely premised on the theory that decision makers were prejudiced. Rather, Plaintiff asserts that Richfood permitted age-based bias to exist to such a degree that conditions were so intolerable that he was compelled to resign. While Mr. Romano was aware of the offensive statements, Plaintiff was nonetheless subjected to the treatment described above. That sufficed to permit a claim of age discrimination.

*7 The Defense next asserts that Plaintiff's replacement was older, barring any age discrimination claim. However, the evidence also shows that a number of Mr. Keown's former functions were taken on by a man seventeen years his junior.

Taken in a light most favorable to the Plaintiff, sufficient evidence exists to sustain an age discrimination claim.

Not Reported in F Supp.2d                                    Page 6
Not Reported in F Supp.2d, 2002 WL 1340311 (E.D.Pa.), 89 Fair Empl Prac.Cas. (BNA) 252
(Cite as: 2002 WL 1340311 (E.D.Pa.))

D Count III--Retaliation for Complaints of Sexual Harassment

Richfood also seeks summary judgment on Plaintiff's claim that he was constructively discharged in retaliation for his complaints of sexual harassment. Richfood's first attack, that plaintiff suffered no adverse employment action, largely rehashes its arguments as to constructive discharge, which the Court has resolved in the preceding section. In its second challenge, Richfood contends that Plaintiff's complaints of sexual harassment occurred too far away from the time of his discharge to be causally connected.

To prevail on his claim of retaliatory discharge, Plaintiff must show that he: (1) engaged in a protected activity; (2) Richfood took an adverse employment action against him; and (3) a causal connection exists between the protected activity and the adverse employment action. *See Robinson v. City of Pittsburgh, 120 F.3d 1286, 1299 (3d Cir.1997)* [FN5] If the protected activity and the alleged retaliatory action are close together in time, a jury may infer a retaliatory motive to satisfy the causal link element. *See Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503 (3d Cir.1997)* Mere passage of time, however, is not conclusive proof against retaliation *See Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279 (3d Cir.2000); Aman, 85 F.3d at 1085-86*

> FN5. The parties agree that Plaintiff engaged in protected activity in seeking relief from sexual harassment at Richfood. Retaliation for complaints of age-based harassment are not part of the Complaint in this action

Viewing the evidence in a light most favorable to the Plaintiff, the evidence may establish a link between Plaintiff's complaint of sexual harassment and his constructive discharge Plaintiff complained to Mr Rotelle on February 15, 1999 of sexual harassment by Ms. Mitchell. (Rotelle Dep. at 174-76) Mr Rotelle neglected to conduct a proper investigation, to ask key witnesses about Mr Keown's sexual harassment allegations, and to inform Mr. Covington as to the Ms. Mitchell's alleged harassment. While Mr Keown awaited the outcome of the investigation, Richfood made the decision not to renew Plaintiff's contract. (Sharkey Dep. at 14-18). According to all accounts, the March 24 meeting was to pursue Rotelle's interviews of February 15 Plaintiff believed the February 15, 1999 would be used to discuss his complaint of sexual harassment. (Keown Dep. at

386). Nonetheless, Plaintiff received criticisms of his work performance at that meeting. Three days later, he learned his contract would not be renewed and was told he had no future at the company. A jury may properly believe that the intolerable working conditions which Plaintiff endured were the result of his complaint to Mr. Rotelle of sexual harassment.

IV CONCLUSION

*8 Summary judgment is entered for Defendant Richfood holdings on Plaintiff's claim of sexual discrimination by harassment. Plaintiff may proceed to trial on the theory that he was discharged due to age discrimination and in retaliation for complaining about sexual harassment. An appropriate order follows

*ORDER*

AND NOW, this day of June, 2002, upon consideration of Defendant Richfood Holding's Motion for Summary Judgment and Plaintiff Thomas M. Keown's response thereto, it is hereby ORDERED that:

Defendant's Motion for Summary Judgment (document no.8) is GRANTED IN PART AND DENIED IN PART as follows:

(a) Defendant's Motion is GRANTED with respect to Plaintiff's gender discrimination (sexual harassment) claim Judgment is entered in favor of Defendant Richfood Holdings and against the Plaintiff Thomas M. Keown on his claim of gender discrimination (sexual harassment), Count I of the Complaint.

(b) In all other respects, Defendant's Motion is DENIED.

Not Reported in F.Supp.2d, 2002 WL 1340311 (E.D.Pa.), 89 Fair Empl.Prac.Cas. (BNA) 252

**Motions, Pleadings and Filings (Back to top)**

• 2:01CV02156 (Docket) (May. 02, 2001)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Westlaw.*

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 304339 (Del.Super.)
**(Cite as: 2004 WL 304339 (Del.Super.))**

Page 1

**H**
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of Delaware.
Keith D. LIMEHOUSE
v.
STEAK & ALE RESTAURANT CORP., et al.
**No. Civ.A. 03C-03-299.**

Submitted Jan. 22, 2004.
Decided Feb. 5, 2004.

On Defendant's Motion to Dismiss Tort Claims
Granted.

On Defendant's Motion to Dismiss for Ineffective
Process and Ineffective Service of Process Denied.

Dear Mr. Limehouse and Mr. Cobb:

SLIGHTS, J.

*1 The Court has considered defendant Steak & Ale
Restaurant Corporation's motion to dismiss and Mr.
Limehouse's response and supplemental brief [FN1]

> FN1. At oral argument, the Court requested
> that the parties provide supplemental briefs
> addressing certain case law identified in the
> Court's pre-hearing research. Defendants'
> supplemental brief was not timely filed.
> Consequently, the Court did not consider it
> in reaching this decision.

Steak & Ale's motion to dismiss alleges that the so-
called "exclusivity provision" in the Workers'
Compensation Act precludes Mr. Limehouse from
asserting a claim for intentional infliction of
emotional distress [FN2] Mr. Limehouse responds
that the claim is viable because: (i) it is a "private
statutory law right of action," thus the Workers'
Compensation bar on asserting common law claims is
inapplicable; [FN3] (2) he suffered damages from
the conduct of his supervisors rather than from the
employment itself; and, (3) it falls under the
"personal dispute exception" to the Worker's
Compensation exclusivity provision since the

conditions giving rise to his termination occurred
outside of the workplace [FN4]

> FN2. Del.Code ann. tit. 19, § 2304
> (2003)("Every employer and employee
> shall be bound by this chapter respectively
> to pay and to accept compensation for
> personal injury or death by accident arising
> out of and in the course of employment,
> regardless of the question of negligence and
> to the exclusion of all other rights and
> remedies.")

> FN3. Mr. Limehouse cites to del. Code ann.
> tit. 10, § 3704 (2003) ("section 3704") as
> the basis for this claim. It provides: "[n]o
> action brought to recover damages for
> injuries to the person by negligence or
> default shall abate by reason of the death of
> the plaintiff, but the personal representatives
> of the deceased may be substituted as
> plaintiff and prosecute the suit to final
> judgment and satisfaction."

> FN4. Del.Code ann. tit. 19, §
> 2301(15)(b)(2003)

The Workers' Compensation Act bars the assertion
of any tort claim against the employer, regardless of
the nature of the personal injury alleged. [FN5] It is
well-established that the exclusivity provision of the
Workers' Compensation Act encompasses intentional
infliction of emotional distress claims. [FN6] Mr.
Limehouse's arguments to the contrary are
unpersuasive. His reliance on section 3704 is
misplaced because that statute deals with the survival
of personal injury actions after the original plaintiff is
deceased. Obviously, Mr. Limehouse is not bringing
this suit on behalf of a deceased plaintiff. Also, the
supervisory position(s) of the employee(s) causing
the alleged injury is irrelevant; the Workers'
Compensation Act defines "employee" as "every
person in service of any corporation ..." [FN7]

> FN5. See *Kofron v. Amoco Chems. Corp.*,
> 441 A.2d 226 (Del.1982).

> FN6. See *Nelson v. Fleet Nat'l Bank*, 949
> F.Supp. 254 (D.Del.1996); *Konstantopoulos
> v. Westvaco Corp.*, 690 A.2d 936
> (Del.1996); *Barber v. City of Lewes*, 1997

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A179

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 304339 (Del.Super.)
(Cite as: 2004 WL 304339 (Del.Super.))

Del.Super. LEXIS 73; *Allison v. J.C. Bennington Co.*, 1996 Del.Super. LEXIS 418; *Battista v. Chrysler*, 454 A.2d 286 (Del.Super.Ct.1982)

FN7. Del.Code ann. tit. 19, § 2301(9)(2003).

In order to qualify for the "personal dispute exception," an injury must be caused by conduct originating outside of the workplace. [FN8] Nothing in the complaint (or anywhere else in the record) points to Mr. Limehouse having contact with his co-workers or supervisors outside of the workplace. In fact, upon reading the complaint and attached documents, the Court is satisfied that the conduct giving rise to this claim occurred wholly within the workplace. The "personal dispute exception" is inapplicable.

FN8. Del.Code ann. tit. 19, § 2301(15)(b)(2003); *Konstantopoulos*, 690 A.2d at 939.

Steak & Ale's motion to dismiss is granted to the extent that Mr. Limehouse's complaint alleges a claim for intentional infliction of emotional distress. The Workers' Compensation Act does not, however, preclude a claim for wrongful termination. [FN9] Thus, to the extent that a wrongful termination claim is alleged, the complaint remains viable because Steak & Ale's motion addresses only the tort-based claims.

FN9. See *Lord v. Souder*, 748 A.2d 393 (Del.2000).

The common-law doctrine of employment at-will recognizes that an employee may be discharged at any time without cause. [FN10] Four narrow exceptions to this doctrine have been recognized based on the limited implied covenant of good faith and fair dealing: "(i) where the termination violated public policy; (ii) where the employer misrepresented an important fact and the employee relied 'thereon either to accept a new position or remain in a present one'; (iii) where the employer used its superior bargaining power to deprive an employee of clearly identifiable compensation related to the employee's past service; and (iv) where the employer falsified or manipulated employment records to create fictitious grounds for termination.' " [FN11]

FN10. *Lord*, 748 A.2d at 400 (citing *Merrill v. Crothall-American, Inc.*, 606 A.2d 96,

103 (Del.1992)).

FN11. *Id.* (citing *Merrill*, 606 A.2d at 103; *E.I. DuPont de Nemours and Co. v. Pressman*, 679 A.2d 436, 442-44 (Del.1996)).

*2 A *pro se* pleading is held to a less stringent standard than pleadings drafted by lawyers. [FN12] It appears that Mr. Limehouse has attempted to plead a wrongful termination claim. [FN13] Whether this claim is legally and/or factually viable is not before the Court, and will be decided, therefore, on another day.

FN12. *Alston v. Hudson, Jones, Jaywork, Williams & Liguori*, 748 A.2d 406 (Del.2000)(citing *Vick v. Haller*, 522 A.2d 865 (Del.1987)).

FN13. Specifically, Mr. Limehouse alleges that the Bennigan's restaurant in Tampa, Florida arranged for his transfer to the Bennigan's restaurant in Wilmington, Delaware. According to Mr. Limehouse, both employers knew that this job was his only source of income and he moved his residency in reliance upon Bennigan's promise of employment at the new location. (*See* Amended Complaint ¶ ¶ 22-30); (D.I.45). He seeks "back pay, front pay with prejudgment interest and/or reinstatement if practical...." (*Id.*)

Because there may be a claim that is still viable in the amended complaint, the Court must address Steak & Ale's second motion to dismiss, which alleges insufficient process and service of process pursuant to Delaware Superior Court Civil Rule 12. According to Steak & Ale, Mr. Limehouse exceeded the 120 day time limit for service of process imposed by Delaware Superior Court Civil Rule 4 ("Rule 4"), and failed to comply with the 30-day time extension granted by the Court. [FN14] For his part, Mr. Limehouse contends that he complied with the Court's order.

FN14. Steak & Ale claims that the time to serve the summons and complaint expired on or about August 28, 2003 and Mr. Limehouse did not serve them until September 3, 2003. The record reflects that the Court extended the deadline to September 1, 2003.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 304339 (Del Super.)
**(Cite as: 2004 WL 304339 (Del.Super.))**

 The Court generally adheres to a policy of judicial lenience towards *pro se* plaintiffs. [FN15] And, in this context, the Court recognizes that its order of August 11, 2003 extending the time for service was ambiguous. The Court's order provided: "service to be effected by 9/1/03." [FN16] September 1, 2003 was a holiday. Mr. Limehouse filed his amended summons on September 2, 2003. Service was effected on September 3, 2003. The Court is satisfied that Mr. Limehouse reasonably could have interpreted the Court's order to require him to initiate (as opposed to effect) service by September 1, and the Court will amend its August 11, 2003 order *nunc pro tunc* to so provide. In light of the deference accorded to *pro se* plaintiffs and the ambiguity in the Court's order, the Court concludes that Mr. Limehouse timely served his amended complaint upon defendant, Steak & Ale Restaurant Corporation. [FN17]

> FN15. *Wright v. Wilmington Trust Company,* 1993 Del Super. LEXIS 496, at *6
>
> FN16. D.I. 31.
>
> FN17. Since Steak & Ale has presented viable legal arguments in support of its motions, there is no need to consider Mr. Limehouse's allegations regarding violations of Delaware Superior Court Rules 8 and 11.

 Based on the foregoing, Steak & Ale's motion to dismiss pursuant to the "exclusivity provision" of the Workers' Compensation Act is GRANTED. Steak & Ale's motion to dismiss based upon insufficient process and service of process is DENIED.

 IT IS SO ORDERED.

 Not Reported in A.2d, 2004 WL 304339 (Del Super.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                    Page 1
Not Reported in F.Supp.2d, 2002 WL 732091 (D.Del.), 80 Soc.Sec.Rep.Serv. 167
(Cite as: 2002 WL 732091 (D.Del.))

**H**

**Motions, Pleadings and Filings**

United States District Court, D. Delaware.
Antoinette MORGAN, Plaintiff,
v.
SECRETARY OF HEALTH AND HUMAN
SERVICES, Defendant.
**No. CIV.A.01-244-MPT.**

Feb. 13, 2002.

Stephen A. Hampton, Esquire, Grady & Hampton,
P.A., Dover, for plaintiff.

Colm F. Connolly, Esquire, United States Attorney,
Virginia Gibson-Mason, Esquire, Assistant United
States Attorney, United States Attorney's Office,
Wilmington, for defendant.

OPINION

THYNGE, Magistrate J.

I. Introduction

*1 The plaintiff, Antoinette Morgan, brought this
claim against the Government pursuant to 42 U.S.C.
§ § 405, 416 and 1381. Having exhausted her
administrative remedies, she seeks review of the
administrative law judge's denial of disability
benefits, period of disability, and supplemental
security income. Presently before the court are the
parties' cross-motions for summary judgment. For the
reasons stated below, the plaintiff's motion is
DENIED and the defendant's motion is GRANTED.

II. Background

a. Social Security System

Under the Social Security Act, 42 U.S.C. § 423
[FN1], eligible persons may apply to the Social
Security Commissioner ("Commissioner") to receive
disability benefits. Eligible persons are those who are
"insured for disability insurance benefits...[have] not
attained retirement age...[have] filed an application
for disability insurance benefits, and [are] under a
disability." 42 U.S.C. § 423(a)(1). In order to
receive the benefits, a claimant must show that she is

disabled under § 423(d)(1). That section defines
disability as the "inability to engage in any
substantial gainful activity by reason of any
medically determinable physical or mental
impairment which can be expected to result in death
or which has lasted or can be expected to last for a
continuous period of not less than 12 months." 42
U.S.C. § 423(d)(1)(A).

> FN1. The plaintiff filed for disability
> benefits ("DIB") under § 423, a period of
> disability under § 416, and social security
> benefits ("SSI") under § 1381. Since these
> statutes are similar, and define disability in
> the same manner, the court will refer to the
> statutory sections governing disability
> benefits only. See Matthews v. Apfel, 239
> F.3d 589, 590 (3d Cir.2001), Borrero v.
> Callahan, 2 F.Supp.2d 235, 241
> (D.Conn.1998)

The Social Security regulations require that the
Commissioner or an administrative law judge
("ALJ") follow a five-step process when a person
requests Social Security benefits. See 20 C.F.R. §
404.1520. In Plummer v. Apfel, 186 F.3d 422, 428-29
(3d Cir.1999), the Third Circuit explained the process
mandated by the regulations. First, the Commissioner
must evaluate whether a claimant is participating in
"substantial gainful activity." Plummer at 428. If so,
the Commissioner should deny disability benefits. Id.
If a claimant is unable to participate in substantial
gainful activity, the Commissioner should determine
if a severe impairment is the basis. Id. If a claimant
suffers from a severe impairment, a comparison of
the claimant's medical evidence "to a list of
impairments presumed severe enough to preclude any
gainful work," is then required. Id. (citing 20 C.F.R. §
404.1520(d) ) If a claimant suffers from one of the
listed impairments, or its equivalent, the
Commissioner should grant disability benefits. Id.
However, should the claimant not suffer from a listed
impairment, the process continues. Id.

In step four, an ALJ must determine "whether the
claimant retains the residual functional capacity to
perform her past relevant work." Id. (citing 20 C.F.R.
§ 404.1520(d) ) If the ability to return to prior
employment exists, the Commissioner should deny
disability benefits. Id.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp 2d
Not Reported in F.Supp 2d, 2002 WL 732091 (D.Del.), 80 Soc Sec Rep.Serv 167
**(Cite as: 2002 WL 732091 (D.Del.))**

The burden of proof in each of the previous steps remains with the claimant. *Id* (citing 20 C.F.R. § 404.1520(f) ). However, the burden shifts to the Commissioner in the final step of the process. *Id* (citing 20 C.F.R. § 404.1520(f) ) In this step, the Commissioner must show that a claimant is capable of performing other work, and upon such a showing, an ALJ should uphold the decision to deny disability benefits. *Id*

*\*2* A claimant who disagrees with any decision of the Commissioner may request reconsideration of that decision. 42 U.S.C. § 405(g) Additionally, a claimant may request an administrative hearing in front of an ALJ *Id* If the request is granted, and the ALJ renders an unfavorable opinion, a claimant may appeal to the Social Security Appeals Counsel. *Id* If a claimant is dissatisfied with the decision of the Appeals Counsel, an appeal to the District Court in the jurisdiction where the claimant resides or is primarily employed is available. Id

b. Plaintiff's Background

The plaintiff in this matter injured her right wrist in late 1991 while working. *D.I 10 at 196* She experienced continuous pain in her right wrist and was treated by a number of physicians in 1992 *D.I 15 at 2* In September of that year, she underwent a carpal tunnel release, which provided a temporary relief in the discomfort *Id at 3* However, the discomfort in her wrist returned in late November 1992. *Id* In an attempt to relieve the pain, plaintiff underwent another procedure, a "right lunotriquetral arthrodesis with iliac crest bone graft on [her] wrist." *Id* The procedure involved a bone graft from plaintiff's hip, which according to plaintiff has caused chronic pain in her hip. *Id at 16, 27.*

Morgan's pain in her wrist and hip became chronic. She underwent physical therapy, and at times wore a brace to relieve the pain. *Id at 4* Then, in a 1994 automobile accident Morgan sustained injuries to her head, neck and back. *Id at 9* According to plaintiff, these injuries caused additional chronic ailments including constant headaches, muscle spasms, and neck pain *Id*

Finally, Morgan was raped by an acquaintance in 1997, which caused mental problems including anxiety and post traumatic stress. *Id at 16, 17.* She claims that these conditions have caused her to cry extensively, become easily agitated, and avoid going out in public. *Id at 17*

Morgan asserts that her physical injuries have caused constant pain in her joints, and left her unable to walk more than a block, sit for more than fifteen minutes, and stand for any extended period of time.

c. Procedural History

Plaintiff first filed for disability benefits on December 7, 1994, alleging physical and mental disabilities *See D.I 10 at 11* After the Commissioner initially denied her claim and on reconsideration, Morgan requested a hearing before an ALJ which was held on October 15, 1996. *Id* The ALJ denied Morgan's application for benefits, finding that she was capable of performing her past relevant work. *Id* Morgan appealed the decision to the Appeals Counsel, which vacated the decision and remanded the case because the record was incomplete. [FN2] On March 11, 1998, a new ALJ held a second hearing. [FN3] *Id* As a result of the hearing, the ALJ denied Morgan's requests for period of disability, disability benefits, and supplemental security income *Id* Morgan appealed the decision to the Appeals Counsel, who declined to review the case. Her action with this court was initiated on April 12, 2001. *Id*

> FN2. The record was incomplete because the recording device at the hearing malfunctioned Thus there was no full record of the testimony at that hearing.

> FN3. *Id at 12* A supplemental hearing in which the ALJ heard additional vocational testimony was held on July 21, 1998. For the purposes of this decision, the hearing and the supplemental hearing are the same.

d. The ALJ's Decision

*\*3* In his decision, the ALJ explained the prior history of plaintiff's application for benefits, and incorporated the ALJ's findings from the first hearing. *D.I at 11, 12*

The ALJ held that Morgan had a severe impairment, but that "the evidence [did] not demonstrate that the claimant's impairments, considered either singly or in combination, are of a severity to meet or equal any of the impairments listed in the Listing of Impairments." *Id at 13.* The ALJ also found that Morgan's testimony as to the severity of pain was not credible and not supported by any medical records. *Id at 17.* In support of this finding, the ALJ discussed Morgan's extensive daily activities, which

© 2007 Thomson/West No Claim to Orig U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2002 WL 732091 (D.Del.), 80 Soc.Sec.Rep.Serv. 167

**(Cite as: 2002 WL 732091 (D.Del.))**

included washing dishes, doing laundry, shopping, cleaning, cooking, getting the children ready for school, caring for an infant, reading, and watching television. *Id. at 18.* Further, the ALJ noted that Morgan's testimony was inconsistent at times. *Id.* For example, Morgan stated that she sat with her grandmother in order to keep her company, but also claimed that she was unable to sit for more than fifteen minutes. [FN4] The ALJ also noted that a number of medical records indicated that Morgan had full range of movement. *Id. at 13, 14.* For example, in a 1996 medical examination, Dr. Fred Kahn concluded that Morgan's right wrist "impairment was permanent but stable." *Id. at 14.* Dr. Kahn also found that plaintiff had "no other disabling conditions or limitations." *Id.* Also, in 1998, Dr. Donald Morgan [FN5] examined plaintiff's hip concluding that "she had full ROM, with pain on full waist flexion and extreme right-side bending. . . good right-hand strength and full motor strength in all other extremities." *Id.* Further, the ALJ noted that the "[m]edical records failed to reflect the presence of any atrophy typical in cases of inactivity due to pain."

> FN4. The ALJ also noted that Morgan's contentions regarding her inability to do any housework were contradicted by the testimony of one of her house-mates, who stated that she had witnessed Morgan perform light housework. *Id.*

> FN5. Dr. Morgan (no relation) examined the plaintiff at the request of the Social Security Administration.

With regard to her mental limitations, the ALJ found that despite her claims to the contrary, Morgan is able to get along with others, and socialize with her friends. *Id. at 18.* In reaching this conclusion, the ALJ relied on the opinion of Dr. Reynolds, a psychiatrist who examined the plaintiff. [FN6] Dr. Reynolds found that "[Morgan] has a good ability to follow work rules and function independently . . a fair ability to interact with supervisors and co-workers; use judgment; understand, remember, and carry out simple and detailed job instructions. . .[and] her ability to deal with the public, and behave in an emotionally stable manner . . is poor." *Id. at 15.*

> FN6. The Social Security Administration requested this examination.

Moreover, the ALJ stressed Morgan's failure to seek medical assistance, or counseling for the mental and medical problems she alleged. *Id. at 18.*

For the above reasons, the ALJ held: "[w]hen considered in combination, all of these factors . . [indicate]. . .that the claimant does not suffer pain of a disabling intensity." *Id.*

After finding that Morgan's medical conditions did not equal the listed impairments, the ALJ addressed plaintiff's ability to work. *Id.* Based on the vocational testimony at the hearing, the ALJ found that Morgan could "perform 25 percent of the sedentary occupational base." *Id. at 19.* Because there were opportunities in the national economy at that time, the ALJ found that Morgan was not disabled. *Id.*

II. Legal Standards

a. Summary Judgment Standard

*4 Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment should not be granted if the dispute involves a material fact. [FN7] "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson, 477 U.S. at 247-48.* There is a genuine issue of fact when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id. at 248* (citations omitted). Additionally, summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an [essential element] . .on which that party will bear the burden of proof at trial. . since a complete failure of proof concerning an essential element of [that] . . party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 91 L.Ed.2d 265, 106 S.Ct. 2548 (1986).*

> FN7. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson et. al. v. Liberty Lobby, Inc., et. al., 477 U.S. 242, 248, 91 L.Ed.2d 202, 106 S.Ct. 2505 (1986).*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F Supp.2d
Not Reported in F Supp.2d, 2002 WL 732091 (D.Del.), 80 Soc.Sec.Rep.Serv. 167
**(Cite as: 2002 WL 732091 (D.Del.))**

The party moving for summary judgment bears the burden of showing that there is no genuine issue of material fact. *Id. at 323.* A moving party can meet its burden if the party "point[s] out to the district court that there is an absence of evidence to support the nonmoving party's case." *Id. at 325.* On the other hand, "a party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleadings, but...must set forth specific facts showing that there is a genuine issue for trial.'" *'Id. at 321* (citing *Catrett v. Johns-Manville Sales Corp., 756 F.2d 181, 184 (1985)*).

When reviewing a motion for summary judgment, a court must evaluate the facts in a light most favorable to the nonmoving party drawing all reasonable inferences in that party's favor. *Anderson, 477 U.S. at 255.* The court should grant the motion "unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of that party." *Id at 251.* In deciding a motion the court should apply the evidentiary standard of the underlying cause of action. *Id at 251-52.*

> In every case, before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed... The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient.

*\*5 Id at 251.*

b. Jurisdiction

District Court review of an ALJ's decision regarding disability benefits is limited in scope. *42 U.S.C. § 405(g)* provides "[a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party...may obtain review of such decision by a civil action." A decision of the Commissioner becomes final when the Appeals Counsel affirms an ALJ decision, denies review of an ALJ decision, or when a claimant fails to pursue the available administrative remedies. *Aversa v. Secretary of Health & Human Services, 672 F.Supp. 775, 777 (D.N.J.1987), see also 20 C.F.R. § 404.905.*

This court has jurisdiction to review the case under *§ 405(g)* because the Commissioner's decision became final when the Appeals Counsel declined to review the ALJ's denial of benefits.

c. Standard Applicable to ALJ's Decision

A district court's review of an ALJ's decision is limited to whether the decision was supported by substantial evidence. *Jesurum v. Sec'y of the United States Department of Health & Human Servs., 48 F.3d 114, 117 (3d Cir.1995)* (citing *Brown v. Bowen, 845 F.2d 1211 (3d Cir.1988)*). If the decision is so supported, the court is bound by those factual findings. Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." [FN8] Substantial evidence is less than a preponderance, but more than a scintilla. *Jesurum, 48 F.3d at 117.*

> FN8. The Court applied this standard by analogy from decisions addressing the meaning of substantial evidence in the context of the *National Labor Relations Act § 10(e). Richardson v. Perales, 402 U.S. 389, 401, 28 L.Ed. 842, 91 S.Ct. 1420 (1971* (citing *Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)*).

III. Discussion

a. ALJ's Denial of Benefits

When deciding whether a claimant is entitled to disability benefits, an ALJ should consider both subjective complaints of pain, and the claimant's medical records. *Wimbley v. Massanari, 2001 WL 761210 (D.Del.2001).* The ALJ must give the plaintiff's complaints of pain serious consideration, even if those complaints are not supported by the medical evidence. *Id.* However, "when a claimant's subjective complaints of pain indicate a greater severity of impairment than the objective medical evidence supports, the ALJ can give weight to factors such as physicians' reports and claimant's daily activities. Additionally, the ALJ may properly look at the claimant's stated daily activities to assess credibility." *Id.*

When reviewing a decision, the district court must defer to the ALJ's determinations on the credibility of the witnesses and on whether the claimant has satisfied the burden of proof. *Murry v. Apfel, 1999 US App Lexis 28911 (9th Cir.1999), Davis v. Califano, 439 F.Supp. 94, 98 (E.D.Pa.1977)* "Great deference is given [to the ALJ's] judgment as fact-finder, since he actually heard the witnesses' testimony and observed their demeanor. 'Most particularly, the administrative law judge to whom the Secretary delegated fact finding responsibilities,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 732091 (D.Del.), 80 Soc.Sec.Rep.Serv. 167
(Cite as: 2002 WL 732091 (D.Del.))

must decide issues of credibility and appropriate weight to be given the exhibits." ' *Davis, 439 F.Supp. at 98*

*6 "A finding that a witness is not credible must be set forth with sufficient specificity to permit the court to engage in an intelligible review of the record." *Hanratty v Chater, 1997 U.S Dist LEXIS 15488 (W.D.N.Y 1997)*

The ALJ's denial of benefits was based on substantial evidence. In his decision, the ALJ noted that Morgan testified to severe pain. The ALJ found that some of Morgan's complaints of pain were credible. However, in light of Morgan's daily activities which included cooking, cleaning, doing laundry, reading, watching television, caring for and transporting her children to and from school, and caring for an infant, the ALJ found that Morgan's testimony concerning the extent of her pain was not fully credible. Additionally, the ALJ relied on medical records which indicated that she had full range of movement, and considered the inconsistencies in Morgan's testimony concerning her ability to perform housework, and to sit for extended periods of time. This court must give deference to the ALJ's assessment of Morgan's credibility. Furthermore, there is objective evidence which suggests that plaintiff has exaggerated pain. A medical report from Morgan's physical therapist stated: "[on] the pain questionnaire the patient scored very high indicating symptom exaggeration or fear of movement." *D.I 10 at 235* Thus, there is substantial evidence in the record to support the ALJ's decision.

b. Listed Impairments

In step three of the administrative process previously discussed herein, an ALJ must compare the claimant's injuries with those listed in 20 C.F.R. Pt. 404, Subpt P, App. 1.

Morgan argues that the ALJ erred in finding that her impairments did not equal the listed impairments. Specifically, she argues that her physical impairments fall under 1.09(A) and 1.09(C); and that her mental impairments fall under 12.04 A(1), 12.04(B), and 12.06.

In order to equal a listed impairment under 1.09(A) or (C) a claimant must show that her impairment affects both hands, or one hand and one foot. Morgan claims that she has problems with her left hand, resulting from overuse. She also asserts that her hip pain prevents her from walking and standing.

Plaintiff argues that when taking these impairments as a whole, she is disabled.

The ALJ held that when taking all the evidence into account, Morgan's injuries did not meet the listed impairments. He based his finding on the credibility he assigned to Morgan's subjective complaints of pain and the medical records. As previously discussed, the ALJ did not find Morgan's testimony concerning the extent of her pain credible because her own testimony and that of her house-mate contradicted her contentions regarding the inability to do housework and sit for long periods of time. Since the ALJ attached less significance to plaintiff's complaints, he found that her impairments did not rise to the level of a listed impairment. There is nothing in the record to suggest that the injuries to plaintiff's hip and left arm are of such severity that the combination of those injuries with the right wrist injury satisfies 1.09. As previously discussed, medical records from 1996 and 1998 show that Morgan had decreased right wrist function, but that she had full range of movement in her other extremities. Thus, the ALJ's finding that Morgan's injuries did not equal a listed impairment was supported by substantial evidence.

*7 At the time of the ALJ's decision, in order to equal a listed impairment under 12.04 or 12.06, a claimant had to show two of the following: "(1) [m]arked restriction of activities of daily living; or (2)[m]arked difficulties in maintaining social functioning; or (3)[d]eficiencies of concentration, persistence, or pace resulting in a frequent failure to complete tasks in a timely manner; or (4)[r]epeated episodes of deterioration in work-like settings which cause the individual to withdraw from that situation."

In his decision, the ALJ noted that Morgan was able to do light housework, care for her children, meet with her friends, and watch television for long periods of time. He based these findings on the plaintiff's testimony which he found only partially credible, and Dr. Reynolds' psychological assessment. Dr. Reynolds found that Morgan suffered from post-traumatic stress syndrome, which limited her ability to handle certain mental stressors. However, he also found that Morgan was able to "follow work rules. function independently. interact with supervisors use judgment; understand, remember carry out simple and detailed job instructions; and maintain personal appearance." *D.I 10 at 15.* Again, the ALJ's credibility determinations are entitled to deference from this court. Additionally, plaintiff presented no other evidence

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 732091 (D.Del.), 80 Soc.Sec.Rep.Serv. 167
(Cite as: 2002 WL 732091 (D.Del.))

regarding her mental impairments. [FN9] Thus, the ALJ's finding that plaintiff's mental impairments did not rise to the level of the listed impairments was based on substantial evidence.

> FN9. Dr. Reynolds' report generally described plaintiff's daily routine, and mental state, but did not evaluate whether Morgan's mental impairments equaled those listed in 12.04 and 12.06.

Finally, Morgan argues that the ALJ failed to consider the disabling effect of her combined injuries. However, as mentioned above, the ALJ found that plaintiff's impairments failed to equal the listed impairments whether they were evaluated individually or as a group. The ALJ stated: "Claimant's complaints of pain are exaggerated...the medical evidence fails to establish that she has sought any additional treatment for her impairments...[she] does not require an ambulatory device...[and she] takes no significant pain medication." *Id.* at 17. Further, the ALJ gave ample support for these conclusions in his opinion where he discussed both Morgan's physical and mental impairments.

b. Vocational Evidence

Morgan argues that even if the court finds that her impairments do not equal the listed impairments, she is still disabled because there are insufficient employment opportunities for a person with her mental and physical limitations. To support her argument, Morgan relies on two Social Security Rulings, SSR 96-9p and SSR 83-14.

Under 96-9p, when a claimant does not have the ability to do the full range of sedentary work, the ALJ's assessment of disability should follow certain guidelines. The ALJ should "show the presence and degree of any specific limitations and restrictions. [provide]...an explanation of how the evidence in the file was considered...[and state]...[t]he individual's maximum remaining capacities to perform sustained work on a regular and continuing basis." *Id.*

*8 At the hearing, the ALJ heard testimony from a vocational expert. *D.I. 10 at 106.* The expert concluded that a person with Morgan's limitations could perform less than the full range of sedentary work. *Id.* at 107. At the hearing, the ALJ posed a hypothetical containing many of Morgan's impairments and limitations to the vocational expert, asking if a person with such impairments would be

able to find employment. *Id.* at 18, 19. The expert stated that such a person would be able to find employment, and provided the number and examples of jobs available to a person with those limitations. [FN10] Then the ALJ asked the expert whether Morgan would be able to work, if he were to credit all of her testimony. *Id.* at 110. The expert stated that a person with such impairments would be incapable of finding employment. *Id.*

> FN10. *See id.* at 19. The expert opined that "such an individual could perform 25 percent of the sedentary occupational base...[and]... identified several unskilled, sedentary occupations such as a security worker (65,000 jobs nationally, 2,800 locally); quality control worker (39,000 nationally, 1,100 locally); and receptionist (41,000 nationally, 1,200 locally)." *Id.*

In his opinion, the ALJ discussed both Morgan's physical and mental conditions and the limitations caused by those conditions. *Id.* at 13-16. The ALJ also explained that he did not fully credit Morgan's testimony. *Id.* at 19. Further, he stated "[b]ased upon all of the evidence of record, including oral testimony from the vocational expert, claimant and witness, the Administrative Law Judge...finds that there are other jobs in the national economy which the claimant could perform and that those numbers are significant." *Id.* Thus, the ALJ followed the guidelines set forth in 96-9p in reaching his decision which was supported by substantial evidence.

Additionally, plaintiff relies on Social Security Ruling 83-14 to argue that someone with decreased bilateral manual dexterity is unable to perform sedentary work. Plaintiff argues that she is disabled because her lack of bilateral manual dexterity significantly erodes the employment base. *D.I. 15 at 31.* However, the ruling only states that such limitations *can* affect the capacity to perform work. *SSR 83-14.* The question of whether the limitations actually limit a claimant's ability, should be left to the ALJ. In this case, the ALJ held that Morgan's testimony regarding pain was not entirely credible, thus finding that she could perform activities with less pain than she claimed to endure while performing those activities. Based on the evidence in the record, that finding was supported by substantial evidence.

c. Commissioner's Subsequent Grant of SSI Benefits

Finally, plaintiff argues that the Commissioner's

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 732091 (D.Del.), 80 Soc.Sec.Rep.Serv. 167
(Cite as: 2002 WL 732091 (D.Del.))

subsequent grant of supplemental security income, effective in May of 2000, is new evidence showing that Morgan was disabled as of August 1993. Thus, the ALJ erred in denying plaintiff's application for disability benefits, period of disability, and supplemental security income for the period prior to May 2000.

42 U.S.C. § 405(g) sets forth requirements for courts deciding whether to remand a case in light of new evidence. The section states: "[t]he court may ... order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is a good cause for the failure to incorporate such evidence into the record in a prior proceeding."

*9 In *Matthews v. Apfel, 239 F.3d 589, 592-93 (3d Cir.2001)*, the Third Circuit applied the § 405(g) requirements, and addressed the issue raised by Morgan's arguments. In that case, the court explained that when the Appeals Counsel declines to review an ALJ's decision, and a "claimant seeks to rely on evidence that was not before the ALJ, the district court may remand to the Commissioner *but only if* the evidence is new and material *and* if there was good cause why it was not previously presented to the ALJ." *Id. at 593* (emphasis added).

This circuit defined "material evidence" in *Szubak v. Sec'y of Health and Human Services, 745 F.2d 831, 833 (3d Cir.1984)*. The court noted that material evidence must be both relative and probative. *Id.* It stated: "[t]he materiality standard requires that there be a reasonable possibility that the new evidence would have changed the outcome of the Secretary's determination." *Id.* Most importantly, the court held that "[a]n implicit materiality requirement is that the new evidence relate to the time period for which benefits were denied, and that it not concern evidence of a later-acquired disability or of the subsequent deterioration of the previously non-disabling condition." *Id.*

Assuming *arguendo* that there is new evidence in this case, this court cannot consider it in deciding whether the ALJ's decision was based on substantial evidence because the evidence was not presented to the ALJ. *Matthews, 239 F.3d 589, 593.* However, the court may remand the case to the Commissioner if the evidence is (1) new, (2) material, and (3) plaintiff has good cause for failing to present the evidence to the ALJ. *Id.*

Morgan attached a copy of a letter notifying her that she was entitled to SSI benefits from May 2000. However, beyond the assertions in her brief, she presented nothing to this court indicating that what was in evidence in her first and second applications was the same. Therefore, this court is unable to evaluate whether the second application contains new or different medical assessments. A mere finding of entitlement in 2000 does not confirm the same or similar disability existing in 1993, seven years earlier.

However, Morgan argues that the grant of benefits, alone, is new evidence of her previous entitlement to such benefits. Applying a similar set of facts, the Eleventh Circuit found that a subsequent grant of supplemental security benefits was not relevant when evaluating whether a prior denial of benefits was based on substantial evidence. *Wilson v. Apfel, 179 F.3d 1276, 1279 (11th Cir.1999).* In that case, the claimant appealed the ALJ's decision that Wilson did not suffer from a severe impairment. *Id.* The claimant attempted to introduce new evidence regarding disability before the Court of Appeals. *Id.* The court held that the new evidence was irrelevant to the ALJ's prior denial of benefits. *See id.*

This court adopts the rational present in the *Wilson* case as consistent with the approach the Third Circuit has taken regarding new evidence. Thus, Morgan's entitlement to supplemental security benefits in 2000, is not new evidence for purposes of reviewing the ALJ's denial of benefits approximately two years prior.

*10 In light of this court's finding regarding the new evidence element, evaluation of the remaining factors is not necessary, since all of the factors must be present in order to remand a case to the Commissioner. However, the Court will evaluate the other factors discussed in *Matthews*.

Under the standard set forth in *Szubak*, in order to be material, the new evidence must concern the same relevant time period as in the ALJ's decision denying benefits. *Szubak, 745 F.2d 831, 833.* As stated above, there is nothing in the record to indicate that plaintiff was eligible for benefits in 1993. Her eligibility for benefits in 2000, the only evidence before the court, is not material evidence showing that she was also entitled to benefits in 1993. Even if the genesis of the disability is the same, Morgan's condition may have subsequently deteriorated over the years, thereby increasing the severity of the disability and entitling her to benefits. As a result, the grant of benefits in

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 732091 (D.Del.), 80 Soc.Sec.Rep.Serv. 167
**(Cite as: 2002 WL 732091 (D.Del.))**

2000 alone, is not material evidence relating to Morgan's eligibility for benefits in 1993. Thus, plaintiff has failed to satisfy the second *Matthews* factor.

Plaintiff has similarly failed to meet the requirements of the third factor, good cause. In *Szubak,* the Third Circuit discussed this requirement noting: "claimants should generally be afforded only one fair opportunity to demonstrate eligibility for benefits under any one set of circumstances." *Szubak, 745 F.2d 831, 834.* Morgan presented no evidence which would explain the discrepancy between her eligibility in 2000 and her ineligibility in 1993. Again, she simply asserts that even in the absence of any new medical records in 2000, her eligibility proves that the ALJ erred in denying benefits for 1993. As previously stated herein such arguments are not supported, and cannot serve as the basis for good cause. Moreover, Morgan was given a fair opportunity to present her case to the ALJ, and seek the appropriate appeals. Remanding the case because of the Commissioner's 2000 eligibility determination would provide plaintiff with additional opportunity to present her case, thus giving her greater rights than the statute intended to grant. [FN11] Therefore, plaintiff has failed to show good cause.

> FN11. *Szubak, 754 F.2d 831, 834.* Plaintiff's "another bite at the apple" argument is inconsistent with 42 U.S.C. § § 423, 405.

**IV. Conclusion**

For the reasons discussed, this court finds that substantial evidence supported the ALJ's decision to deny disability benefits, period of disability, and supplemental security benefits. Viewing all the relevant facts in a light most favorable to the plaintiff, no reasonable jury applying the 'substantial evidence' standard could find for the plaintiff. Consequently, the defendant's motion for summary judgment is GRANTED, and the plaintiff's motion for summary judgment is therefore DENIED. An order consistent with this opinion will follow.

**Motions, Pleadings and Filings** (Back to top)

• 1:01CV00244 (Docket) (Apr. 12, 2001)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

92 Fed.Appx. 876                                                                    Page 1
92 Fed.Appx. 876, 2004 WL 474132 (C.A.3 (Pa.))
**(Cite as: 92 Fed.Appx. 876)**

# H

Briefs and Other Related Documents
Ocasio v. Lehigh Valley Family Health CenterC.A.3
(Pa.),2004.This case was not selected for publication
in the Federal Reporter.NOT PRECEDENTIAL.
Please use FIND to look at the applicable circuit
court rule before citing this opinion. Third Circuit
Local Appellate Rule 28.3(a) and Internal Operating
Procedure 5.3. (FIND CTA3 Rule 28.0 and CTA3
IOP APP I 5.3.)
United States Court of Appeals,Third Circuit.
Mary Beth OCASIO, Appellant,
v.
LEHIGH VALLEY FAMILY HEALTH CENTER.
No. 03-1561.

Submitted Pursuant to Third Circuit LAR 34.1(a)
Feb. 9, 2004.
Decided March 11, 2004.

**Background:** Former employee brought hostile
work environment and racial discrimination claims
against employer under § 1981, relating to
termination of her employment as medical assistant
for medical clinic. The United States District Court
for the Eastern District of Pennsylvania, Ronald L.
Buckwalter, J., summary judgment for employer.
Employee appealed.

**Holdings:** The Court of Appeals, Scirica, Chief
Judge, held that:

(1) employee did not establish that racial
discrimination at clinic was pervasive and regular, as
element of hostile work environment, and

(2) employee did not establish retaliation against her
because of her race.

Affirmed.
West Headnotes
[1] Civil Rights 78 ☜1147

78 Civil Rights
    78II Employment Practices
        78k1143 Harassment; Work Environment
            78k1147 k. Hostile Environment; Severity,
Pervasiveness, and Frequency. Most Cited Cases

The alleged racial discrimination at defendant
medical clinic was not pervasive and regular, as
element of plaintiff Hispanic medical assistant's
hostile work environment claim under § 1981,
relating to termination of her employment; plaintiff
alleged that, during three years of employment,
defendant once told her not to speak in Spanish with
co-worker, that Hispanic employees were referred to
as "Spanish people," that Colombian co-worker made
a joke about the work ethic of Puerto Ricans, and that
several white co-workers remarked to her and to
Hispanic co-worker that plaintiff and co-worker were
in America and should speak English. 42 U.S.C.A. §
1981.

[2] Civil Rights 78 ☜1120

78 Civil Rights
    78II Employment Practices
        78k1120 k. Particular Cases. Most Cited Cases

Civil Rights 78 ☜1246

78 Civil Rights
    78II Employment Practices
        78k1241 Retaliation for Exercise of Rights
            78k1246 k. Particular Cases. Most Cited
Cases

Health 198H ☜266

198H Health
    198HI Regulation in General
        198HI(C) Institutions and Facilities
            198Hk259 Officers and Employees
                198Hk266 k. Adverse Employment
Action; Wrongful Discharge. Most Cited Cases
Allegation that defendant medical clinic retaliated
against plaintiff Hispanic medical assistant for acting
as advocate for Hispanic patients did not establish
retaliation against plaintiff because of her race, as
element of racial discrimination claim under § 1981.
42 U.S.C.A. § 1981.

*877 On Appeal from the United States District
Court for the Eastern District of Pennsylvania. D.C.
Civil Action No. 00-cv-03555. (Honorable Ronald
L. Buckwalter).

Theodore Q. Thompson, Blue Bell, PA, for

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

92 Fed.Appx. 876
92 Fed.Appx. 876, 2004 WL 474132 (C.A.3 (Pa.))
**(Cite as: 92 Fed.Appx. 876)**

Appellant.
Jonathan B. Sprague, Post & Schell, Philadelphia, PA, for Appellee.

Before SCIRICA, Chief Judge, ROTH and McKEE, Circuit Judges.

### OPINION OF THE COURT

SCIRICA, Chief Judge.

**\*\*1** Plaintiff Mary Beth Ocasio appeals a grant of summary judgment in favor of defendant Lehigh Valley Family Health Center on her hostile work environment and racial discrimination claims. We will affirm.

### I.

### A.

Ocasio began working at Lehigh Valley Family Health Center on January 4, 1999 as a medical assistant. She received two wage increases within the first six months of her employment. At her six-month performance review in August 1999, she received an overall performance score of 3.1 on a 5 point scale, where a "3" indicates that "performance standard is consistently met." The review recognized Ocasio's strong advocacy for the Hispanic population but noted she got flustered easily and was absent from the floor when needed.

Ocasio alleges that while employed she felt isolated and received the "cold shoulder" from some of her co-workers and supervisors. She claims that she was told to not speak Spanish with her co-workers and did not receive adequate training. She also alleges that a hostile work environment was created at Lehigh Valley through references to Hispanic employees as "Spanish people," an e-mail she received that ridiculed how a Spanish-speaking patient pronounced the word "gateway," and **\*878** a joke deriding the work ethic of Puerto Ricans. Finally, she claims she was unjustifiably disciplined for complaining about the alleged mistreatment of Hispanic patients.

Lehigh Valley contends that Ocasio's alleged rude and inappropriate behavior led to her work difficulties and ultimate termination. On February 21, 2000, Ocasio received a written warning for seven instances of absenteeism within the previous twelve months. She received a "verbal counseling session" on March 1, 2000 with Practice Manager Sherry Roth for having sent an inappropriate e-mail

to a co-employee. On April 6, 2000, Roth counseled Ocasio again for changing her work assignments without prior warning and for her negative attitude towards co-employees and her supervisors. On April 28, 2000, Ocasio received a second written warning concerning eight instances of absenteeism within the previous twelve months.

On May 4, 2000, Ocasio received a "final warning" for breaking the chain of command and e-mailing a physician to complain about her supervisors. Also on May 4, she received counseling for leaving equipment in disinfecting solution for over five hours in contravention of Lehigh Valley's written procedures to not leave equipment in solution for over 45 minutes. Ocasio was warned that failure to improve her job performance could result in disciplinary action including suspension or termination.

In November 2001, Ocasio asked a Hispanic co-worker, Josie Clark, how Lehigh Valley had obtained a June 10, 2000 e-mail Ocasio had previously sent her. Clark complained to management that Ocasio had threatened her, and Lehigh Valley suspended Ocasio with pay pending an investigation. Upon conclusion of the investigation, Lehigh Valley believed Ocasio had threatened Clark, and on December 10, 2001, it suspended Ocasio for one day without pay.

**\*\*2** On February 4, 2002, Ocasio directed an Hispanic outpatient to pick up a disability form and a prescription at the first floor pick-up box of the Family Health Center. When the outpatient arrived, Clark, the receptionist on duty, sent the patient upstairs to see Ocasio instead of directing the patient to the pick-up box. Ocasio returned with the patient to pick up the paperwork. Angry that Clark sent the patient upstairs, Ocasio slammed the drawer of the pick-up box. After walking the patient to the door, Ocasio overheard Clark remarking to two staff members that Ocasio had a "problem." Ocasio asked Clark if there was a problem, and Clark allegedly started yelling at her. Immediately following this incident, Ocasio located Clark's supervisor, Dorene Svanda, and admittedly yelled and cursed at Svanda while relating to her the details of the incident with Clark.

On February 7, 2002, Ocasio met with a management team that had investigated the drawer slamming incident with Clark and the yelling incident with Svanda. Upon the conclusion of the meeting, Ocasio was suspended and told to go home. Lehigh Valley

92 Fed.Appx. 876
92 Fed.Appx. 876, 2004 WL 474132 (C.A.3 (Pa.))
(Cite as: 92 Fed.Appx. 876)

management met with Ocasio again on February 18, 2002 to clarify the events of February 4, 2002 and allow her to present additional information regarding the events. At the end of this meeting, management informed Ocasio she was terminated effective immediately.

**B.**

On July 24, 2000, Ocasio filed a claim alleging civil rights violations under the First Amendment, the Fourteenth Amendment, and 42 U.S.C. §§ 1981, 1982, 1985(1)(3), 1986 and 1988, plus claims for intentional infliction of emotional distress *879 and negligent supervision. The District Court granted Lehigh Valley's motion to dismiss on the civil rights claims but denied its motion to dismiss on the IIED claim. *Ocasio v. Lehigh Valley Family Health Ctr.*, 2000 U.S. Dist. LEXIS 16014 (E.D.Pa. Nov. 3, 2003). On December 12, 2001, the court granted Lehigh Valley's summary judgment motion to all surviving claims. *Ocasio v. Lehigh Valley Family Health Ctr.*, 2001 U.S. Dist. LEXIS 20449 (E.D.Pa. Dec. 12, 2001).

However, on January 9, 2002, the court granted Ocasio's motion for reconsideration, vacating its December 12, 2001 order, and on April 2, 2002, granted her motion for leave to file an amended complaint. The court then granted Lehigh Valley's motion for summary judgment in favor of Lehigh Valley on all claims. *Ocasio v. Lehigh Valley Family Health Ctr.*, 2003 U.S. Dist. LEXIS 3025 (E.D.Pa. Jan. 30, 2003). Ocasio timely appealed the District Court's holdings regarding the hostile work environment and racial discrimination claims.[FN1]

> **FN1.** Ocasio did not discuss the IIED and retaliation claims in her brief and has so waived her right to appeal the summary judgment dismissal of the claim. *Surace v. Caterpillar, Inc.*, 111 F.3d 1039 n. 8 (3d Cir.1997) (noting that failure to raise an issue on appeal constitutes a waiver).

**II.**

We exercise plenary review over the District Court's grant of summary judgment. *Reitz v. County of Bucks*, 125 F.3d 139, 143 (3d Cir.1997). We have appellate jurisdiction under 28 U.S.C. § 1291.

**III.**

**A.**

[1] Ocasio first contends that the District Court erred in granting summary judgment in favor of Lehigh Valley concerning her hostile work environment claim. 42 U.S.C. § 1981 guarantees all persons the right "to make and enforce contracts." As amended by the 1991 Civil Rights Act, § 1981 now encompasses hostile work environment claims,[FN2] and we apply the same standards as in a similar Title VII claim.[FN3]

> **FN2.** *See, e.g., Manatt v. Bank of Am.,* 339 F.3d 792, 797 (9th Cir.2003) ("We now join every other circuit to have decided this issue and hold that the congressional amendment to § 1981 evinced congressional intent to permit hostile work environment claims under § 1981."); *Witt v. Roadway Express,* 136 F.3d 1424, 1432 (10th Cir.1998) ("The Civil Rights Act of 1991 ... amended 42 U.S.C. § 1981 to provide a cause of action for racial harassment.").

> **FN3.** *Spriggs v. Diamond Auto Glass,* 242 F.3d 179, 183-84 (4th Cir.2001) ("The elements [of a racially hostile work environment] are the same under either § 1981 or Title VII."); *Ross v. Kansas City Power & Light Co.,* 293 F.3d 1041, 1050 (8th Cir.2002) ("In analyzing a claim of hostile work environment under section 1981, we apply the same standards as in a similar Title VII claim."); *Manatt,* 339 F.3d at 797 ("We also recognize that those legal principles guiding a court in a Title VII dispute apply with equal force in a § 1981 action.").

**\*\*3** To establish a *prima facie* case for employment discrimination due to a hostile work environment under 42 U.S.C. § 1981, a plaintiff must show:
(1) that he or she suffered intentional discrimination because of race; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same race in that position; and (5) the existence of respondeat superior liability.

*Aman v. Cort Furniture Rental Corp.,* 85 F.3d 1074, 1081 (3d Cir.1996). A court *880 must look at the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

92 Fed.Appx. 876
92 Fed.Appx. 876, 2004 WL 474132 (C.A.3 (Pa.))
**(Cite as: 92 Fed.Appx. 876)**

Page 4

totality of the circumstances to determine whether there exists a hostile or abusive environment that is "severe enough to affect the psychological stability of a minority employee." *Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 (3d Cir.1990)* Isolated incidents over a long period of time do not constitute a hostile work environment *Durham Life Ins. Co. v. Evans, 166 F.3d 139, 155 (3d Cir.1999)*

Ocasio claims that several incidents demonstrated animus towards her race. Lehigh Valley once told Ocasio not to speak in Spanish with a co-worker. [FN4] She claims that Hispanic employees were referred to as "Spanish people" and that a Columbian co-worker made a joke about the work ethic of Puerto Ricans. Finally, she alleges that several white co-workers remarked to her and an Hispanic co-worker that they were in America and should speak English.

> FN4. At the same time, Ocasio was never punished for speaking Spanish with a co-worker. In fact, she was encouraged to serve as a translator to Spanish-speaking patients in need of assistance.

The District Court found that Ocasio failed to show that the alleged discrimination was pervasive and regular, and we find no error. There is insufficient evidence that these few alleged incidents created a hostile work environment during the three years of Ocasio's employment. We will affirm the judgment of the District Court.

**B.**

[2] Ocasio also claims that the District Court erred in granting summary judgment to Lehigh Valley on her race discrimination claim. To state a *prima facie* case of racial discrimination under 42 U.S.C. § 1981, Ocasio must show (1) that she is a member of a racial minority; (2) that Lehigh Valley intended to discriminate against her on the basis of her race; and (3) the discrimination concerned one of the activities enumerated in the statute. *Brown v. Philip Morris, Inc., 250 F.3d 789, 797 (3d Cir.2001).* § 1981 can only be violated by intentional discrimination. *General Bldg. Contractors Ass'n v. Pennsylvania, 458 U.S. 375, 391, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982).*

The District Court found that Ocasio presented no evidence that Lehigh Valley intentionally discriminated against her because of her race. While Ocasio argues Lehigh Valley retaliated against her for acting as an advocate for Hispanic patients, this does not demonstrate retaliation against Ocasio because of her race. Ocasio did not establish a *prima facie* case for race discrimination, and the District Court properly granted Lehigh Valley's motion for summary judgment.

**IV.**

For the foregoing reasons, we will affirm the judgment of the District Court.

C.A.3 (Pa.),2004.
Ocasio v. Lehigh Valley Family Health Center
92 Fed.Appx. 876, 2004 WL 474132 (C.A.3 (Pa.))

Briefs and Other Related Documents (Back to top)

• 2003 WL 24301011 (Appellate Brief) Brief of Appellee Lehigh Valley Family Health Center (Aug. 12, 2003) Original Image of this Document (PDF)
• 2003 WL 24301010 (Appellate Brief) Brief of Appellant Mary Beth Ocasio and Appendix Volume I (Jul. 14, 2003) Original Image of this Document with Appendix (PDF)
• 03-1561 (Docket) (Feb. 28, 2003)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                    Page 1
Not Reported in F.Supp.2d, 2005 WL 1656930 (D.N.J.)
**(Cite as: 2005 WL 1656930 (D.N.J.))**

c

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. New Jersey.
Ravi PATEL, Plaintiff,
v.
CIGNA CORPORATION and TAC Professional
Staffing Services, Inc. d/b/a EDP
Contract Services, Defendants.
**No. Civ. 02-6141(JBS).**

July 12, 2005.
Mr. Ravi Patel, Jacksonville, FL, Plaintiff pro se.

<u>Michael K. Furey</u>, Ricker, Danzig, Scherer, Hyland
& Perretti, Morristown, NJ, for Defendant CIGNA
Corporation.

Lori Anne Fee, Braff, Harris & Sukoneck,
Livingston, NJ, for Defendant TAC Professional
Staffing Services, Inc.

*OPINION*

<u>SIMANDLE</u>, J.

**\*1** Plaintiff, Ravi Patel, brought suit against CIGNA
Corporation ("CIGNA") and TAC Professional
Staffing Services, Inc. d/b/a EDP Contract Services
("EDP") alleging that Defendants engaged in
discriminatory employment practices under Title VII
of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e),
*et seq.*, as amended by the Civil Rights Act of 1991,
<u>42 U.S.C. § 1981(a)</u> ( "Title VII") and the New
Jersey Law Against Discrimination ("NJLAD"),
N.J.S.A. 10:5.1 *et seq.* Defendants subsequently
moved for summary judgment seeking dismissal of
the Complaint in its entirety. For the reasons set forth
below, Defendants' motions for summary judgment
will be granted.

I. *BACKGROUND*
EDP is a personnel staffing company employing
persons to serve as temporary staff for other
companies. (Def. Br. at 2.) According to the Master
Information Processing Time and Materials

Consulting Services Agreement between EDP and
CIGNA ("Agreement"), "[EDP]'s personnel, shall
work under [EDP]'s supervision." (Def. Ex. B at 2:6.)
Furthermore, under the Agreement EDP personnel
are classified as "independent contractor[s] and not
that of a servant, agent or employee" of CIGNA. (*Id.*
at 6:18.)

On or about November 23, 1998, Plaintiff Ravi Patel
was hired by Defendant EDP and placed to work as a
consultant at CIGNA's Voorhees, New Jersey office
facility. (Pl. Opp. at 2.) On or about September 10,
2001, EDP's Contract Manager, Jeffery Gowan,
allegedly informed Plaintiff that his employment
contract would be renewed through November 2002.
(Pl. Compl. at ¶ 16.) Immediately following the
terrorists attacks in this country on September 11,
2001, Plaintiff, who is Indian, alleges that he was
subjected to a "systematic and continuous pattern of
harassment and discrimination on the basis of his
national origin ... by co-workers at CIGNA." (*Id.* at ¶
18.) According to Plaintiff, about ten days after
September 11 he reported this behavior to Mr.
Gowan who failed to take any action (Pl. Opp. at
10.) Mr. Patel then allegedly made a similar
complaint to Bruce Kline, CIGNA Manager in the
Security Administration. (*Id.*)

In his deposition, Mr. Gowan denies that during the
course of Mr. Patel's assignment to CIGNA Plaintiff
contacted him regarding his working relationship or
interactions with any individual at CIGNA. (Dep. J.
Gowan Sept. 19, 2003 ("Gowan Dep.") at 15:10-25.)
In fact, Mr. Gowan stated that Plaintiff told him that
CIGNA was a "good place to work." (*Id.* at 16:2-4.)
Similarly, Mr. Kline contends that Plaintiff never
spoke to him regarding employment discrimination
or inappropriate behavior on the part of employees at
CIGNA. (Dep. B. Kline Sept. 19, 2003 ("Kline
Dep.") at 4:13-25.)

Mr. Gowan alleges that on September 20, 2001,
Plaintiff requested a rate increase of twenty to thirty
dollars an hour, a claim which Plaintiff denies.
(Gowan Dep. at 18:13-24; 22:5-6; Dep. of R. Patel
April 30, 2003 ("4/30/03 Patel Dep.") at 202:7-24.)
Mr. Gowan subsequently approached Mr. Kline
regarding Mr. Patel's proposed rate increase. Mr.
Kline responded that, based on Plaintiff's request, it
appeared that Plaintiff no longer wanted to work at
CIGNA and, therefore, that his assignment should

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1656930 (D.N.J.)
(Cite as: 2005 WL 1656930 (D.N.J.))

Page 2

end (Gowan Dep. at 20:3-7.) According to Mr. Kline, CIGNA management told him that Plaintiff's requested rate increase was not within the company's budget. (Kline Dep. at 6:6-8.) On September 29, 2001, Mr. Gowan informed Mr. Patel that Defendant CIGNA had terminated his contract. (Gowan Dep. at 22:19-24.)

*2 Plaintiff subsequently filed a Charge of Discrimination against CIGNA and EDP with the U.S. Equal Employment Opportunity Commission ("EEOC"). The EEOC Determination dated June 28, 2002, stated that Defendants' actions did constitute a violation of Title VII. (Def.Ex. I.) According to the EEOC, the evidence before it indicated that CIGNA had a "sincere interest in extending [Plaintiff's] contract on September 13, 2001." (Id.) For that reason, the EEOC found it suspect that "approximately one week after September 11 ... [Plaintiff's] work status became a point of contention." (Id.) Several months later, on or about September 3, 2002, the EEOC downgraded its determination, concluding that there was insubstantial evidence to support a claim under Title VII. (Def.Ex. K.) On December 31, 2002, Mr. Patel brought this cause of action pursuant to Title VII and NJLAD. Defendants now move for summary judgment seeking dismissal of the Complaint in its entirety. [FN1]

> FN1. The Court has jurisdiction over this controversy pursuant to 28 U.S.C. § 1331. This Court also has jurisdiction over Plaintiff's state law claim pursuant to 28 U.S.C. § 1367.

## II. STANDARD OF REVIEW

Summary judgment is appropriate when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law. Id. Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. Id.

In deciding whether there is a disputed issue of material fact, the court must view the evidence in favor of the nonmoving party by extending any reasonable favorable inference to that party; in other words, "the nonmoving party's evidence 'is to be

believed, and all justifiable inferences are to be drawn in [that party's] favor.' " Hunt v. Cromartie, 526 U.S. 541, 552 (1999) (quoting Anderson, 477 U.S. at 255). The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson, 477 U.S. at 250.

The moving party always bears the initial burden of showing that no genuine issue of material fact exists, regardless of which party ultimately would have the burden of persuasion at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "[T]he burden on the moving party may be discharged by 'showing'-- that is, pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case." Celotex Corp., 477 U.S. at 325.

The nonmoving party "may not rest upon the mere allegations or denials of" its pleading in order to show the existence of a genuine issue. Fed.R.Civ.P. 56(e). Plaintiff must do more than rely only "upon bare assertions, conclusory allegations or suspicions." Gans v. Mundy, 762 F.2d 338, 341 (3d Cir.1985), cert. denied, 474 U.S. 1010 (1985) (citation omitted). Thus, if the plaintiff's evidence is a mere scintilla or is "not significantly probative," the court may grant summary judgment. Anderson, 477 U.S. at 249-50.

## III. DISCUSSION

*3 Plaintiff alleges that Defendants engaged in discriminatory employment practices in violation of Title VII and the NJLAD. Additionally, Plaintiff asserts that the actions of Defendants through their agents resulted in a hostile work environment in violation of both federal and state law. Plaintiff's arguments are without merit.

### A. Standing under Title VII and NJLAD

Defendant CIGNA denies that Mr. Patel was its employee, while EDP admits that it employed him. Thus, the question arises whether CIGNA is a proper defendant here. In order to bring a claim under Title VII or NJLAD, a plaintiff must be classified as an "employee" under the statutory framework. Equal Employment Opportunity Commission v. Zippo Mfr. Co., 713 F.2d 32, 37 (3d Cir.1983) (Congress's objective in enacting Title VII was to eliminate discrimination in employment). Title VII defines an employee as "an individual employed by an employer." 42 U.S.C. § 2000(e). According to the U.S. Supreme Court, when Congress provides a definition that is "completely circular and explains

Case 1:06-cv-00123-GMS    Document 32-7    Filed 02/01/2007    Page 3 of 28

Not Reported in F.Supp.2d                                                                    Page 3
Not Reported in F.Supp.2d, 2005 WL 1656930 (D.N.J.)
(Cite as: 2005 WL 1656930 (D.N.J.))

nothing," a court must adopt a common law test in order to determine whether an individual qualifies as an employee. *Nationwide Mut. Ins. Co. v. Darden,* 503 U.S. 318, 323 (1992). In determining whether a hired party is an employee under the common law, the Supreme Court considers "the hiring party's right to control the manner and means by which the product is accomplished." *Community for Creative Non-Violence v. Reid,* 490 U.S. 730, 751 (1989). The other factors relevant to the inquiry are:

(1) the skill required; (2) the source of the instrumentalities and tools; (3) the location of the work; (4) the duration of the relationship between the parties; (5) whether the hiring party has the right to assign additional projects to the hired party; (6) the extent of the hired party's discretion over when and how long to work; (7) the method of payment; (8) the hired party's role in hiring and paying assistants; (9) whether the work is part of the regular business of the hiring party; (10) whether the hiring party is a business; (11) the provision of employee benefits; and (12) the tax treatment of the hired party.

*Id.* at 751-52. No one of these factors is determinative in evaluating whether an individual is an employee. *Id.* at 752. "[A]ll of the incidents of the relationship must be assessed and weighed with no one factor being dispositive." *Darden,* 503 U.S. at 324 (quoting *Nat'l Labor Relations Bd. v. United Ins. Co. of Am.,* 390 U.S. 254, 258 (1968)).

The NJLAD defines an employee as any individual not "employed in the domestic service of any person." N.J.S.A. § 10:5-12. Under the statute an independent contractor is not considered an employee. *DaBronzo v. Roche Vitamins, Inc.,* 232 F.Supp.2d 306, 314 (D.N.J.2002). In construing the NJLAD, state courts have often looked to federal precedent governing Title VII "as a key source of interpretative authority." *Id.* at 313 (citation omitted). Since the language in the NJLAD does not provide a useful definition of employee, the common law agency test should also be used to determine whether Plaintiff is an employee or independent contractor under the NJLAD. *See Pukowsky v. Caruso,* 711 A.2d 398, 404 (N.J.Super.Ct.App.Div.1998) (noting that federal common law agency principles should be used to determine whether an individual is an employee under NJLAD).

**\*4** Since EDP concedes that Plaintiff was its employee at all relevant times, (Def. Br. at 4,) the Court will examine each factor of the common law test only as it applies to Plaintiff's relationship with CIGNA. Based on these factors, even extending all

favorable inferences to Mr. Patel, this Court finds that as a matter of law Plaintiff was an independent contractor and not an employee of CIGNA.

## 1. *Right to Control*

All other factors being equal, the right to control an individual's physical conduct may be determinative. *Metro. Pilots Ass'n, L.L.C. v. Schlosberg,* 151 F.Supp.2d 511, 519 (D.N.J.2001) (citing *Eisenberg v. Advance Relocation & Storage,* 237 F.3d 111, 115 (2d Cir.2000)). Courts should place the greatest emphasis on the hiring party's right to control the manner and means by which the work is accomplished. *Id.* This factor evaluates "the extent of control, which by the agreement, the master may exercise over the details of the work." *Marco v. Accent Publ'g Co., Inc.,* 969 F.2d 1547, 1550 (3d Cir.1992); Restatement (Second) of Agency § 220(2)(a) (1958). The mere monitoring of an independent contractor does not constitute control. *Carney v. Dexter Shoe Co.,* 701 F.Supp. 1093, 1099 (D.N.J.1988) (concluding control not exerted when an individual was not required to work a certain number of hours or handle a certain number of calls per day).

Even though Mr. Patel received work through a computer system at CIGNA, the Master Information Processing Time and Materials Consulting Services Agreement between EDP and CIGNA explicitly states that "[EDP]'s personnel, shall work under [EDP]'s supervision." (Def. Ex. B at 2:6.) Additionally, the Agreement states that consultants are not employees, agents or servants of CIGNA. (*Id.* at 6:18.) While Mr. Patel was required to work the same hours as CIGNA employees, this requirement was set forth in a Contract Employee Agreement between Mr. Patel and EDP. (Def. Ex. G at ¶ 2.) Even viewing the evidence in the light most favorable to Mr. Patel, CIGNA had no right to control the manner and means by which Plaintiff performed his job. Accordingly, this most important factor supports a finding that Mr. Patel was an independent contractor.

## 2. *Requisite Skill*

Individuals who are unskilled labor are usually regarded as employees rather than independent contractors. *Schlosberg,* 151 F.Supp.2d at 520; Restatement (Second) of Agency § 220(2)(d) (1957). Here, Plaintiff holds an associate degree from an Indian school. (4/30/03 Patel Dep. at 88:17-20.) Prior to moving to the United States in 1997, Plaintiff

Not Reported in F Supp 2d
Not Reported in F Supp 2d, 2005 WL 1656930 (D N J )
**(Cite as: 2005 WL 1656930 (D.N.J.))**

worked in computer networking for six or seven years in India. (*Id* at 86:17-17;92:2-6 ) In January of 1998, Mr Patel began taking courses at C N Technologies in the United States because he needed to enhance his computer skills in order to secure a networking position in the United States. (*Id* at 92:7-17 ) During this time, Plaintiff "volunteered" his networking services to Omega Corporation, a consultant company owned by his sister. (*Id* at 86:14-24; 87:2-3; 92:11-24; 93:1-3 )

**\*5** When Mr. Patel began working at CIGNA in 1998, Plaintiff was expected to know how to perform assignments before he received them. (*Id* at 149:9-13 ) At CIGNA, Plaintiff was responsible for adding user IDs, data migration, ID migration and creating mailboxes. (*Id* at 150 ) Moreover, he received no special training nor participated in any courses on how to perform his daily responsibilities. (*Id* ) Based on this evidence, Plaintiff was a skilled worker and, thus, likely an independent contractor.

*3. Duration of the Relationship*

A working relationship between an individual and a company that developed over a considerable period of time indicates that an individual is an employee rather than an independent contractor Restatement (Second) of Agency § 220(2)(e) (1958) Mr Patel began working at the Voorhees CIGNA facility in November of 1998. (4/30/03 Patel Dep. at 143:11 ) Plaintiff was released from his responsibilities at CIGNA in September of 2001. (First Am Compl at ¶ 24.) Plaintiff's three year working relationship with CIGNA is insufficient to establish that he was an employee of CIGNA.

*4. Degree of Discretion*

"An employer-employee relationship is more likely to exist when the hired party exerts a greater discretion over when and how long to work." *Schlosberg*, 151 F.Supp.2d at 522. Here, Plaintiff had no such discretion According to Plaintiff's Contract Employee Agreement with EDP, Mr. Patel was required to work the same hours as CIGNA employees. (Def. Ex. G at ¶ 2.) Furthermore, the Contract provided that Plaintiff's overtime hours had to be approved by personnel at CIGNA. (*Id* at ¶ 13.) Mr. Patel was required to record hours worked at CIGNA on an EDP form and submit such forms to EDP on a weekly basis. (*Id*, Def. Ex P.) While CIGNA exerted control over the overtime hours worked by Plaintiff, an EDP contract set forth the required working hours Therefore, even viewing the

facts in the light most favorable to Mr. Patel, this factor supports the conclusion that no employer-employee relationship existed between Plaintiff and CIGNA.

*5. Method of Payment*

To determine whether an individual is an employee or an independent contractor, the court may also look at whether the worker is paid hourly or by salary. *Schlosberg*, 151 F.Supp.2d at 523. An additional factor to consider is the source of that payment. *Id* Independent contractors are often paid a sum based on the completion of a specific job. *Reid*, 490 U.S. at 753 (quoting *Holt v. Winpisinger*, 811 F.2d 1532, 1540 (D.C.Cir.1987)) Here, Mr. Patel was paid on a weekly basis for the hours worked at the CIGNA facility. (4/30/03 Patel Dep. at 141:11-16 ) Plaintiff received his paycheck directly from EDP and was only paid for the amount of work he performed. (*Id* at 141:17-21; 143:3-5.) Since Mr. Patel was paid by EDP only for the hours he worked at CIGNA, he was likely an independent contractor and not an employee of CIGNA.

*6. The Provisions of Employee Benefits*

**\*6** Employees typically receive employee benefits. *Reid*, 490 U.S. at 753 In his deposition, Mr Patel stated that he did not receive health care insurance from CIGNA. (4/30/2003 Patel Dep at 105-7;109 .) Furthermore, Plaintiff noted that he participated in the 401k plan at EDP, not CIGNA. (*Id* at 141-2.) Based on this evidence, Mr. Patel was likely an independent contractor and not an employee of CIGNA.

*7 Tax Treatment of the Hired Party*

Here, Plaintiff's income taxes were withheld by EDP. (Gowan Dep. at 5:25; 6:1.) This factor indicates that Mr. Patel was an independent contractor and not an employee of CIGNA.

After viewing the above evidence in the light most favorable to Mr. Patel, and balancing all the factors in the *Reid* test, this Court concludes as a matter of law that Plaintiff was an independent contractor and not an employee of CIGNA. To be sure, some factors do support the inference that Mr. Patel was an employee. For example, there is no evidence from the record that Mr. Patel provided his own instruments or tools *See* Restatement (Second) of Agency § 220(2)(e) (1958) (noting that an individual who provides his own tools and instrumentalities is usually considered

© 2007 Thomson/West. No Claim to Orig. U.S. Govt Works.

Not Reported in F Supp.2d
Not Reported in F Supp.2d, 2005 WL 1656930 (D N J )
(Cite as: 2005 WL 1656930 (D.N.J.))

Page 5

an independent contractor) Indeed, Plaintiff was given a computer terminal and cubicle at the CIGNA facility. (4/30/03 Patel Dep. at 144:24; 145:1-9.) Moreover, Mr Patel worked at the CIGNA Voorhees, NJ facility location. (*Id* at 145:8-9); *See* Restatement (Second) of Agency § 220(2)(e) (1958) ("There is a strong indication of an employee-employer relationship if the work is performed on the premises of the employer.") During the first six months that Mr. Patel worked at the CIGNA facility he verbally received assignments from various CIGNA employees. (*Id* at 145:21-24; 146-7); *See Schlosberg, 151 F.Supp.2d at 522* ("An employer-employee relationship is more likely to exist if the hiring party has the right to assign additional projects to the hired party.") Additionally, there is no indication that Mr. Patel was able to hire assistants. *See Schlosberg, 151 F.Supp.2d at 523* (stating that an individual who can hire assistants is considered an independent contractor).

However, the majority of the factors, including the most important factor--the right to control the manner and the means by which the product is accomplished--weigh in favor of finding that Mr. Patel was not as a matter of law an employee of CIGNA. For that reason alone, CIGNA's motion for summary judgment should be granted. Even if Plaintiff was considered an employee of CIGNA under Title VII and NJLAD, though, the same result would follow.

### B *Employment Discrimination Claim*

Plaintiff alleges Defendants CIGNA and EDP engaged in discriminatory employment practices in violation of Title VII and NJLAD. Because both statutes utilize the same analytical framework, they will be discussed together. *Hargrave v. County of Atlantic, 262 F.Supp.2d 393, 411 n. 7 (D.N.J.2003)*. *See Abramson v. William Paterson College of New Jersey, 260 F.3d 265, 277 n. 7 (3d Cir.2001)* (observing that "any plaintiff who has fulfilled a Title VII prima facie case will have shown the elements required by the NJLAD"); *Murphy v. Housing Auth. and Urban Redevelopment Agency of the City of Atlantic City, 32 F.Supp.2d. 753, 763* (the prima facie elements of employment discrimination are the same under Title VII and NJLAD)

**\*7** A plaintiff may establish a claim of employment discrimination through direct evidence or by establishing the prima facie elements for discrimination *Fakete v. Aetna, Inc., 308 F.3d 335, 337 (3d Cir.2002)* Direct evidence is evidence sufficient to allow the jury to find that the "decision

makers placed substantial negative reliance on [the plaintiff's national origin] in reaching their decision." *Id.* at 338 (citing *Connors v. Chrysler Fin. Corp., 160 F.3d 971, 976 (3d Cir.1998)*) Such evidence "leads not only to a ready logical inference of bias, but also to a rational presumption that the person expressing bias acted on it" when he made the allegedly adverse employment decision. *Id.* at 338-339 (quoting *Starceski v. Westinghouse Elec. Corp., 54 F.3d 1089, 1097 (3d Cir.1995)*). Plaintiff in this case alleges that CIGNA and EPD engaged in unlawful discrimination, however, both claims fail.

### 1 *CIGNA*

Here, Plaintiff offers no direct evidence to establish a claim of employment discrimination against CIGNA. First, Plaintiff alleges that Josh Whalen, Fred Buonavolta, Bernard Swayer and John Zubyk, among others, directed harassing comments towards Plaintiff. (Dep. of R. Patel Sept. 11, 2003 ("9/11/03 Patel Dep.") at 40:18-21; 108:7-13 ) However, there is no indication that these individuals had any involvement in CIGNA's decision to release Mr Patel from his responsibilities at CIGNA. Nor is there evidence that management's decision was influenced by the employees' alleged comments.

Moreover, the record suggests that CIGNA's decision to release Plaintiff from his responsibilities at CIGNA was solely based on the company's budgetary constraints. In his deposition, Mr. Kline stated that CIGNA management informed him that the company could not afford Mr. Patel's requested rate increase. (Kline Dep. at 6:3-8.) The record is void of evidence suggesting that Mr Kline placed any reliance on Mr. Patel's national origin in reaching this decision. Therefore, there is no direct evidence establishing bias.

Similarly, Plaintiff fails to establish a prima facie case of employment discrimination. A plaintiff may establish a prima facie case of discrimination by showing that: (1) he is a member of a protected class; (2) he was laid off from a job which he was qualified for; and (3) others outside the protected class were treated more favorably. *Massarsky v. General Motors Corp., 706 F .2d 111, 118 (3d Cir.1983)* If the plaintiff is able to make a showing as to each element, the burden shifts to the employer to proffer a legitimate nondiscriminatory reason for the allegedly adverse treatment *Id* Upon a sufficient proffer, the burden then shifts back to the plaintiff to demonstrate that the defendant's reasons are pretext for unlawful discrimination *Id*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1656930 (D.N.J.)
(Cite as: 2005 WL 1656930 (D.N.J.))

Here, Plaintiff is a member of a protected class *Saini v. Bloomsburg Univ. Faculty,* 826 F.Supp. 882, 887 (M.D.Pa.1993) (noting that an Asian Indian individual is a member of a protected class) Plaintiff's responsibilities with CIGNA concluded on September 29, 2001. (Gowan Dep at 22:19-24.) Based on Mr Patel's education and employment experiences, he was qualified for the position (Def.Ex. Q.) CIGNA concedes that Plaintiff's performance while at CIGNA was satisfactory (Kline Dep. at 11:12-17.) Therefore, Mr. Patel meets the first two requirements of a prima facie case of discrimination.

**\*8** However, Mr. Patel fails to satisfy the third requirement because there is no indication that others outside the protected class were treated more favorably. After EDP released Plaintiff, Mr Gowan hired Michael Craw as his replacement and assigned him to the CIGNA account. (Gowan Dep at 23:2-20.) The record does not indicate the national origin of Mr. Craw nor does it provide information on the race or national origin of consultants retained by CIGNA. Likewise, there is no evidence that any similar employee was paid at the rate which was denied to Mr. Patel. Indeed, there was at least one other individual of Indian descent working in this CIGNA office (4/30/03 Patel Dep. at 183:5.) There simply is no indication that individuals outside of the protected class were treated more favorably than Mr. Patel. Thus, Plaintiff has failed to establish a prima facie case for employment discrimination against CIGNA [FN2].

> FN2. For these same reasons, Plaintiff's claim of retaliation is without merit. *See Verdin v. Weeks Marine Inc.,* 2005 WL 357006, at \*96 n. 2 (3d Cir. Feb. 16, 2005) (unpublished opinion) (citing *McKenna v. Pac. Rail Serv.,* 32 F.3d 820, 826 n. 3 (3d Cir.1994)).

Even if Plaintiff had established a prima facie claim of employment discrimination against CIGNA, Defendant offers a nondiscriminatory reason that is not pretextual. Specifically, CIGNA maintains that Mr. Patel was released from his responsibilities at the company as a result of his requesting a twenty to thirty dollar rate increase. Subsequently, Mr. Kline informed Mr. Gowan that CIGNA could not afford Plaintiff's requested pay increase and, therefore, that Mr. Patel should be released from his duties at the company. (Kline Dep. at 6:3-8.) This proffered reason is enough to satisfy Defendant's burden of a

non-discriminatory reason for the action taken.

Moreover, no reasonable factfinder could conclude that Defendant's proffered reason was pretextual Defendant's proffered reason is not pretext. The Third Circuit has recognized two ways in which a plaintiff can prove pretext. First, the plaintiff can present evidence that "casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication." *Parks v. Rumsfeld,* 2005 WL 19465, at \*384 (3d Cir. Jan. 5, 2005) (unpublished opinion) (quoting *Fuentes v. Perskie,* 32 F.3d 759, 762 (3d Cir.1994)). This prong is intentionally a "stringent standard" for plaintiffs because "federal courts are not arbitral boards ruling on the strength of 'cause' for discharge The question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is [discrimination]." *Keller v. Orix Credit Alliance, Inc.,* 130 F.3d 1101, 1108 (3d Cir.1997) (quoting *Carson v. Bethlehem Steep Corp.,* 82 F.3d 157, 159 (7th Cir.1996)).

Alternatively, a plaintiff can provide evidence that "allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Id.* at 1111. In other words, a plaintiff must demonstrate "weaknesses, implausibilities, inconsistences, incoherencies, or contradiction in the employer's proffered legitimate reasons for its actions" such that the "employer's articulated reason was not merely wrong, but that it was 'so plainly wrong that it cannot have been the employer's real reason'" *Jones v. School Dist. of Philadelphia,* 198 F.3d 403, 413 (3d Cir.1999) (quoting *Keller,* 130 F.3d at 1108-09).

**\*9** Here, Plaintiff does not present evidence that the legitimate reason proffered by Defendant CIGNA was pretext for unlawful discrimination. Mr. Gowan, an employee of EDP, informed Mr. Patel that his requested pay increase to \$85 was not a figure that EDP could afford to pay Plaintiff. Similarly, Mr. Gowan stated that EDP could not find Mr. Patel another position outside of CIGNA that could pay Plaintiff his current salary of \$55. (Gowan Dep at 19:6- 11). To be sure, Mr. Patel denies that he ever provided Mr. Gowan with a specific figure for a pay increase (4/30/03 Patel Dep. 202:20-24.) Instead, Plaintiff maintains that he informed Mr. Gowan that he should determine Mr Patel's rate increase. (*Id* at 203:7-14.) This evidence however, is insufficient to satisfy Plaintiff's stringent burden of raising a genuine issue of material fact from which a

© 2007 Thomson/West No Claim to Orig. U.S. Govt Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1656930 (D.N.J.)
(Cite as: 2005 WL 1656930 (D.N.J.))

reasonable jury could conclude that the real reason behind Defendant's decision to release Plaintiff from his responsibilities at CIGNA was discrimination.

### 2. EDP

Similarly, Mr. Patel fails to establish a claim of employment discrimination against EDP. First, there is no direct evidence to support Plaintiff's claim of discrimination. Specifically, Mr. Patel concedes that no EDP employee, including Mr. Gowan, made a discriminatory comment directed at Plaintiff. (9/11/03 Patel Dep. at 130:12-25.) Therefore, there is no indication that any EDP employee placed negative reliance on Plaintiff's national origin in reaching its alleged adverse employment decision.

Additionally, Plaintiff cannot establish a prima facie case of discrimination. Specifically, Plaintiff cannot satisfy the second prong of a prima facie discrimination case because Plaintiff has failed to provide this Court with any evidence of adverse employment action by EDP. [FN3] Furthermore, there is no indication that members outside of the protected class were treated more favorably than Mr. Patel. Since Plaintiff cannot survive a motion for summary judgment based on mere allegations, EDP's motion for summary judgment should be granted.

> FN3. Even if Plaintiff established a prima facie case of employment discrimination, Mr. Patel is not able to demonstrate that EDP's nondiscriminatory reason for not placing Plaintiff in another position was pretext for unlawful discrimination. Specifically, EDP alleges that Plaintiff never provided an updated resume and that alone was the reason Plaintiff was never placed at a new job site. Plaintiff, though, offers no evidence even suggesting that Defendant's nondiscriminatory reason is pretext for unlawful discrimination.

### C. Hostile Work Environment Claim

Finally, Plaintiff alleges that actions of Defendants and their employees subjected Mr. Patel to a hostile work environment in violation of Title VII. (Pl. Compl at 6-7.) A hostile work environment claim requires a plaintiff to show that the workplace is permeated with "discriminatory intimidation, ridicule and insult" that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993) (quoting

*Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 67 (1986)). In order to establish a hostile work environment claim, a plaintiff must show that: (1) he suffered intentional discrimination because of his national origin; (2) the discrimination was pervasive and regular; (3) it detrimentally affected him; (4) it would have detrimentally affected a reasonable person of the same protected class in his position; and (5) there is a basis for vicarious liability. *Cardenas v. Massey,* 269 F.3d 251, 260 (3d Cir.2001). In evaluating a hostile work environment claim, a court should look at "all the circumstances, including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.' " *Faragher v. City of Boca Raton,* 524 U.S. 775, 787-788 (1998) (quoting *Harris v. Forklift Svs., Inc.,* 510 U.S. 17, 23 (1993))

*\*10* Here, Mr. Patel alleges that co-workers suggested that Plaintiff "americanize" his name (4/30/03 Patel Dep. at 175:21-24.) Plaintiff contends that he was repeatedly asked if he had attended pilot training school and knew how to fly crop dusters. (Pl. Opp at 8.) Further, Mr. Patel maintains that since the beginning of 2000 co-workers commented that Plaintiff looked like a "pipe bomber" and made gestures to indicate such. (*Id* at 9.) On September 12, 2001, Plaintiff shaved his goatee and various co-workers inquired as to whether he was trying to "hide something." (9/11/03 Patel Dep. at 101:3-19; 102:15-16.) Additionally, Mr. Patel alleges that comments made by co-workers that his food was "nasty" and had a "bad smell" were humiliating. (*Id* at 103:6-17.)

These allegations are insufficient to establish a hostile work environment claim. First, there is no indication that the above mentioned incidents were sufficiently severe. Specifically, "[s]imple teasing, offhand comments, and isolated incidents (unless extremely serious)" do not rise to the level of a hostile work environment claim. *Faragher,* 524 U.S. at 788. Such standards "ensure that Title VII does not become a 'general civility code.' " *Id* (quoting *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 80 (1998).) Specifically, comments made by co-workers regarding the smell of ethnic food, even viewed collectively with other alleged hostile incidents, do not rise to the level of a hostile work environment claim. *Kosereis v. Rhode Island,* 331 F.3d 207, 216 (1st Cir.2003) (noting that allegations of name calling and teasing about ethnic food do not rise to the level of "severe conduct" required for a hostile work environment claim)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1656930 (D.N.J.)
(Cite as: 2005 WL 1656930 (D.N.J.))

Page 8

Furthermore, Plaintiff does not argue that the alleged comments were physically threatening. Indeed, in *Ashok v. Barnhart*, the plaintiff's hostile work environment claim was dismissed even after she alleged that a co-worker threatened to "break her legs" and the words "Bloody Indian" were found scrawled on her jacket. 289 F.Supp.2d 305, 308, 312 (E.D.N.Y.2003). While the alleged comments about pilot training school and pipe bombers could be considered offensive, no fellow employee threatened Mr. Patel with physical harm or retribution and these crude remarks are insufficient to establish a hostile work environment claim.

Second, Plaintiff failed to establish that the comments were pervasive. Mr. Patel brings to this Court's attention five alleged comments directed at him by co-workers during the course of his contract at CIGNA. However, in *Negron v. Rexam Inc.*, allegations that co-workers addressed a plaintiff on a handful of occasions using a racial epithet were insufficient to survive a summary judgment motion on a hostile work environment claim. 2004 WL 1496878, at * 770 (2d Cir. July 1, 2004) (unpublished opinion). Similarly, in *Rodriguez v. Saint-Gobain Containers, Inc.*, the court noted that the plaintiff asserted four allegations: plaintiff received written notes stating "return to Mexico"; grease and oil were deposited in his toolbox; he experienced unexplained "locker problems;" and racially derogatory comments were directed at him. 2003 WL 22977476, at *834 (7th Cir. Dec. 17, 2003) (unpublished opinion). Based on this evidence, the *Rodriguez* court concluded that, even though the treatment was objectionable, the plaintiff failed to establish a hostile work environment claim because he failed to show that the comments created an objectively intolerable environment. *Id.*

**\*11** Here, Plaintiff alleges that the harassing comments were "periodic." (Pl. Opp. at 9.) However, this statement does not provide this Court with sufficient evidence of the duration and frequency of the alleged harassing comments. Cumulatively, these comments could not be found by a reasonable jury to have been "pervasive" in Mr. Patel's workplace. After collectively evaluating the alleged comments, this Court concludes that Plaintiff has failed to point to evidence which, even if accepted as true, could establish a hostile work environment claim. Since Plaintiff cannot survive a motion for summary judgment based upon mere allegations, Defendant CIGNA's motion for summary judgment will be granted. [FN4]

FN4. The result would not be any different under the NJLAD. To establish a hostile work environment under the NJLAD, a plaintiff must demonstrate that the defendant's conduct (1) would not have occurred but for employee's national origin; and the conduct was (2) serve or pervasive enough to make a(3) reasonable person of the same protected class believe that (4) the conditions of employment are altered and the working environment is hostile or abusive. *Cardenas,* 269 F.3d at 263.

Lastly, Plaintiff has failed to assert a hostile work environment claim against EDP. To assert an actionable claim, there must be some basis for vicarious liability. Here, the alleged harassing comments were made by CIGNA employees in its Voorhees, New Jersey office facility. Plaintiff explicitly stated that neither Mr. Gowan, nor any other EDP employee, made any discriminatory comments to Mr. Patel. (9/11/03 Patel Dep. at 130:12-25.) Since EDP is not responsible for the actions of CIGNA employees, Plaintiff has failed to establish a hostile work environment claim against EDP. Therefore, summary judgment should be granted as to EDP.

### IV. *Conclusion*

For the reasons expressed in this Opinion, the motion for summary judgment by Defendants CIGNA and EDP will be granted and Plaintiff's Complaint will be dismissed in its entirety.

Not Reported in F.Supp.2d, 2005 WL 1656930 (D.N.J.)

**Motions, Pleadings and Filings (Back to top)**

• 1:02CV06141 (Docket) (Dec. 31, 2002)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Westlaw.**

Not Reported in F.Supp.2d                                    Page 1
Not Reported in F.Supp.2d, 2006 WL 733567 (D.Del.)
**(Cite as: 2006 WL 733567 (D.Del.))**

# H

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
Dino G. PETROCELLI, Plaintiff,
v
DAIMLERCHRYSLER CORPORATION,
Defendant.
**No. Civ.A. 04-943-KAJ.**

March 22, 2006.
Dino G. Petrocelli, Plaintiff, pro se.

Jennifer Gimler Brady, Sarah E. DiLuzio, Potter
Anderson & Corroon LLP, Wilmington, Delaware,
for Defendant.

William C. Martucci, Kristen Aggeler Page, Shook
Hardy & Bacon LLP, Kansas City, Missouri, of
counsel.

MEMORANDUM OPINION

JORDAN, J.

I. INTRODUCTION

*1 This is an employment discrimination case
brought by Dino G. Petrocelli ("Petrocelli"), who is
proceeding pro se, against his former employer,
DaimlerChrysler Corporation ("DaimlerChrysler" or
the "Company") Petrocelli, a Hispanic American,
claims that while he was working for
DaimlerChrysler he was the target of discrimination
based on his national origin, in violation of Title VII
of the Civil Rights Act of 1964 ("Title VII"), 42
U.S.C. § § 2000e et seq., and of the Delaware
Discrimination in Employment Act (the "Delaware
Act"), 19 Del.Code § 711. He also alleges that, in
violation of Title VII, DaimlerChrysler retaliated
against him for filing the first of two charges of
discrimination and that the Company defamed him by
accusing him of theft and by making derogatory
statements about his work habits. Before me now is
DaimlerChrysler's Motion for Summary Judgment.
(Docket Item ["D.I."] 56; the "Motion".) This court

has subject matter jurisdiction over the case pursuant
to 28 U.S.C. § § 1331, 1343, and 1367. For the
reasons that follow, the Motion will be granted in
part and denied in part.

II. BACKGROUND [FN1]

FN1. The following background information
is taken from the parties' submissions and
does not constitute findings of fact.

*A. Perceived Harassment During Petrocelli's
Employment at DaimlerChrysler*

Petrocelli applied for employment with
DaimlerChrysler on March 15, 1997 (D.I. 58 at A1-
2), after being referred to the Company through the
Latin American Community Center (id. at A8, 66:21-
67:14). On his application, Petrocelli listed "Spanish"
as one of his skills (id. at A1), and during his
interview with DaimlerChrysler, he was asked to "say
a few things in Spanish," because he "didn't look
Hispanic" (id. at A9-10, 73:24-74:8, 74:23-75:3). In
May 1997, Petrocelli began working at
DaimlerChrysler's Parts Distribution Center in
Newark, Delaware ("Newark PDC") (Id. at A11,
81:2-4.) Petrocelli worked on the night shift at
Newark PDC, initially on the dock and later in the
warehouse as a picker/packer. (Id. at A10-11, 77:12-
78:10.)

Petrocelli testified at his deposition about several
incidents at Newark PDC that he perceived to be
harassment based on his national origin. First, he
testified that his coworkers drew pictures of his "face
with a beard ... and [his] name under there and
saying, 'Me no speak English' ... [with] a sombrero ...
[o]r a jail cell with a sombrero with [his] name " (Id
at A23, 140:7-11.) Those pictures were drawn with
markers "[i]n the bathrooms, on the work equipment,
[and] out in the work area on boxes " (Id. at A23,
140:12- 18.) One particular picture, drawn in the
bathroom in October 2001, depicted "a snake with a
sombrero, [Petrocelli's] name underneath of it, ... bars
of a jail cell around it, ... [and] references to ... [him]
not speaking English " (Id. at A25, 169:21-24.) He
further testified that "on several occasions," starting
in January 2000, pictures and notes were left in work
areas "referring to burritos and tacos ... and
references to [him] wearing a bandanna ... being in
gangs and calling [him] 'Esse.'" (Id. at A26, 185:17-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A202

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 733567 (D.Del.)
(Cite as: 2006 WL 733567 (D.Del.))

186:3.)

*2 Petrocelli also testified that he was called "Spic" by coworkers on "numerous" occasions, including once in December 2001 in front of the control center at Newark PDC. (Id. at A26, 186:12-23.) Petrocelli testified that he was called "a lazy Latino," a "mushroom picker," and a "Spic" on other occasions in 1998 and 2000. (Id. at A34-35, 218:18-20, 220:16-221:1.) During some of those incidents, the speaker using those terms acted "like he was going to run [Petrocelli] over with his forklift." (Id. at A34-35, 220:23-221:1.)

According to Petrocelli, one of his supervisors saw him wearing a cross, asked if he was Catholic, and when Petrocelli said that he was, the supervisor "looked surprised ... [and] said, 'Well, I thought you people practiced "Santaria" or Voodoo or something like that,' and laughed." (Id. at A31, 206:12-207:1; see also id. at A20, 121:4-17.)

Finally, Petrocelli testified that, starting in September 2001, coworkers made references about his relationship with a non-Hispanic white female coworker. (Id. at A26, 187:24-188:5.) Those references included sexually explicit drawings posted on billboards (id. at A26, 188:15-22), as well as a particular occasion where a coworker said to Petrocelli and the female coworker, "Are you down with the brown tour?" (id. at A26-27, 188:9-15, 189:7-14).

B. Events Leading Up to Petrocelli's Firing

During his tenure at Newark PDC, which lasted from 1997 until January 2002, Petrocelli was disciplined many times for violating DaimlerChrysler's Standards of Conduct. Petrocelli's disciplinary record (id. at A99-119) includes, inter alia, violations for (1) leaving work during working hours without permission, or failing to return to work after lunch or relief without permission; (2) failing to exert normal work effort on the job, wasting time, loitering, loafing, or sleeping on the job; (3) failing to follow instructions from supervisors; (4) negligent or deliberate damage to DaimlerChrysler's property; and (5) threatening, intimidating, coercing, harassing, retaliating, or using abusive language to others. (See also id. at A96-97 (DaimlerChrysler Standards of Conduct).) Between April 14, 1999 and June 14, 2001, Petrocelli received four disciplinary layoffs, each lasting between five and thirty days. (Id. at A100-10.) On September 19, 2001, Petrocelli was suspended for attempting to steal DaimlerChrysler

property. (Id. at A111-14.) Finally, on January 9, 2002, Petrocelli was suspended indefinitely for violating DaimlerChrysler's standards of conduct. (Id. at A115-17.) That suspension was modified to a discharge effective January 11, 2002. (Id. at A118.)

Petrocelli testified that twelve of his coworkers committed similar violations but were not punished as severely as he was. (Id. at A21-23, 130:9-138:9.) Those violations included sleeping, loafing, and playing board games (id. at A22-23, 136:10-138:9), as well as the more severe issue of working under the influence of drugs (id. at A21-22, 133:11-134:23). According to Petrocelli, some coworkers received no discipline for those violations (id. at A22, 136:10-137:2), while others received too little discipline (id. at A22-23, 134:17-23, 138:1-9.) Petrocelli also admitted, however, that he did not know precisely what discipline those coworkers received, although he perceived it to be less severe than what he received. (Id. at A22-23, 134:20-136:4, 138:1- 9.)

*3 After he was discharged in January 2002, Petrocelli filed a union grievance to appeal that decision. (Id. at A152-53.) That grievance addressed whether discharge was an appropriate response to Petrocelli's violations, but it did not include any allegations of discrimination based on national origin. (Id.) On April 11, 2002, the Appeal Board, which included representatives of DaimlerChrysler and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW"), directed that Petrocelli be offered reinstatement, and that offer was extended in a letter to Petrocelli dated May 22, 2002. (Id. at A154-56.) The reinstatement offer required Petrocelli to report to Newark PDC on May 28, 2002. (Id. at A156.)

However, Petrocelli did not report as directed because, in March 2002, while his grievance was being considered, he had been arrested for possession of cocaine and he remained in custody. (Id. at A4, 33:2-5; id. at A157.) He was convicted of possession of a controlled substance and violation of probation, which had been imposed after an earlier conviction for offensive touching. (Id. at A5, 34:4-20, 35:24-36:15.) He was incarcerated for approximately eight months, beginning in March 2002. (Id. at A33, 213:22- 214:3 ) After failing to report by June 6, 2002, and failing to substantiate the reason for his failure, Petrocelli's seniority was terminated. (Id. at A158-59.)

C. Procedural History

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 733567 (D.Del.)
(Cite as: 2006 WL 733567 (D.Del.))

On January 22, 2002, while his grievance was pending, Petrocelli filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Delaware Department of Labor against DaimlerChrysler, alleging that he was subjected to discrimination and a hostile work environment in violation of Title VII and the Delaware Act. (*Id.* at A160.) On November 26, 2003, the Delaware Department of Labor issued a Reasonable Cause Finding that concluded there was evidence to support a finding of a hostile work environment but not a finding that the disciplinary actions and discharge resulted from discrimination. (*Id.* at A167-68.) The EEOC adopted those findings in a Notice of Right to Sue dated May 18, 2004. (*Id.* at A169.) The EEOC also issued a Notice of Right to Sue on January 6, 2005, stating that the EEOC found reasonable cause to believe that a violation had occurred, but that it had not obtained a settlement with DaimlerChrysler and would not bring suit. (*Id.* at A161.) That notice concluded the EEOC's processing of Petrocelli's first charge of discrimination against the Company. (*Id.*)

On April 3, 2003, Petrocelli filed with the EEOC a second Charge of Discrimination, alleging that DaimlerChrysler had retaliated against him for filing his first charge by offering him reinstatement when the Company knew that he was incarcerated and unable to report. (*Id.* at A162.) The EEOC issued a Dismissal and Notice of Right to Sue on September 10, 2003, stating that the retaliation charge could not be investigated because it was not filed within the statutory time limit. (*Id.*) That notice informed Petrocelli that he had ninety days to file a claim based on that second charge, or the right to sue would be lost. (*Id.*)

*4 Based on the May 18, 2004 Notice of Right to Sue on the first charge of discrimination, Petrocelli filed this suit against DaimlerChrysler on August 16, 2004, alleging that he was fired, disciplined, and subjected to a hostile work environment in violation of Title VII and the Delaware Act. (*Id.* at A164-70.) On September 28, 2005, Petrocelli was granted leave to amend his complaint. (D.I.53.) That amended complaint provided more explanation in support of Petrocelli's allegations of discrimination, as well as articulating his claims for retaliation and defamation. (D.I. 58 at A171-75.) Petrocelli seeks reinstatement, back pay, front pay, and compensatory and punitive damages. (*Id.* at A174.)

### III. STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56(c), a party is entitled to summary judgment if a court determines from its examination of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. In determining whether there is a triable dispute of material fact, a court must review the evidence and construe all inferences in the light most favorable to the non-moving party. *Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (3d Cir.1976). However, a court should not make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000). To defeat a motion for summary judgment, Rule 56(c) requires that the non-moving party "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986) (internal citation omitted). The non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(c). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita,* 475 U.S. at 587 (internal citation omitted). Accordingly, a mere scintilla of evidence in support of the non-moving party is insufficient for a court to deny summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986).

### IV. DISCUSSION

In his complaint, Petrocelli asserts that DaimlerChrysler violated both Title VII and the Delaware Act. (D.I. 58 at A164-70.) Since claims of employment discrimination under the Delaware Act are analyzed in the same way as claims under Title VII, *Giles v. Family Court,* 411 A.2d 599, 601-02 (Del.1980), the following analysis uses the Title VII framework, and the conclusions apply equally to the claims of hostile work environment and disparate treatment under the Delaware Act.

#### A. *Hostile Work Environment*

A hostile work environment may form the basis of a Title VII discrimination claim against an employer. *Cardenas v. Massey,* 269 F.3d 251, 260 (3d Cir.2001) (citing *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 65-68 (1986)). The inquiry into whether an environment is hostile requires a look into "all the circumstances ... [including] the frequency of the

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 733567 (D.Del.)
**(Cite as: 2006 WL 733567 (D.Del.))**

discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23 (1993). That analysis "must concentrate not on individual incidents, but on the overall scenario." *Durham Life Ins. Co. v. Evans,* 166 F.3d 139, 149 (3d Cir.1999). To establish a Title VII claim based upon a hostile work environment, Petrocelli must show that "(1) he suffered intentional discrimination because of his national origin; (2) the discrimination was pervasive and regular; (3) it detrimentally affected him; (4) it would have detrimentally affected a reasonable person of the same protected class in his position; and (5) there is a basis for vicarious liability." *Cardenas,* 269 F.3d at 260.

**\*5** For purposes of this Motion, DaimlerChrysler concedes four of those five elements, arguing only that the discrimination faced by Petrocelli was not pervasive and regular. (D.I. 57 at 28-32.) DaimlerChrysler first argues that the harassment discussed in Petrocelli's deposition is a series of isolated incidents. In particular, according to DaimlerChrysler, the name-calling, including epithets like "spic," "mushroom picker," "lazy Latino," and references to "you people" practicing Santaria or voodoo, were sporadic, and, in any event, constituted mere offensive utterances. (*Id* at 29.) Also, according to DaimlerChrysler, the picture of the snake with the sombrero in a jail cell with Petrocelli's name was a one-time occurrence, and that a "single item of graffiti" is not pervasive and regular discrimination. (*Id* at 30.)

DaimlerChrysler's argument misses the mark, because it focuses on individual incidents in isolation and, unsurprisingly, finds that each is a one-time occurrence. To the contrary, the analysis must consider the circumstances as a whole and not focus on each event individually. *Durham Life,* 166 F.3d at 149. According to Petrocelli's unrebutted testimony, he was called a "spic" on "numerous" occasions during his time at Newark PDC. (D.I. 58 at A26, 186:12- 23.) Other derogatory terms, such as "lazy Latino," and "mushroom picker," were allegedly directed at him. (*Id* at A34-35, 218:18-20, 220:16-221:1.) The reference to the religion practiced by "you people" was also clearly addressed to Petrocelli's Hispanic origin (*Id* at A31, 206:12-207:1.) Those statements, taken as a group and according to Petrocelli's testimony, were not sporadic, and they constitute more than offensive utterances. *See Smith v. Leggett Wire Co.,* 220 F.3d 752, 767 (6th Cir.2000) (holding that the commonplace use of the word "nigger" constituted more than mere offensive utterances). Finally, according to Petrocelli, pictures directed at his national origin were drawn in the bathrooms, on the work equipment, and out in the work area on boxes. (D.I. 58 at A23, 140:7-18; *id* at A25, 169:21-24.) DaimlerChrysler points to one such picture and calls it an isolated occurrence. (D.I. 57 at 30.) Again, by isolating individual events, DaimlerChrysler ignores the totality of Petrocelli's allegations.

DaimlerChrysler also argues that many events that were perceived by Petrocelli to constitute harassment, including the statements and drawings referring to Petrocelli's romantic relationship with a non-Hispanic white coworker, the request that he speak Spanish at his interview, and the discipline he received for violating the standards of conduct, were not actually directed at his national origin. (D.I. 57 at 28-31.) While I agree that each of those events, viewed in isolation, might not be obviously directed at Petrocelli's Hispanic origin, [FN2] when they are considered along with the epithets and offensive graffiti, a reasonable jury might conclude that those acts were motivated by a discriminatory purpose *See Aman v. Cort Furniture Rental Corp.,* 85 F.3d 1074, 1083 (3d Cir.1996) (interpreting less obvious incidents in light of other racially-motivated events). Therefore, the less overt incidents reported by Petrocelli are properly included in the totality of circumstances examined by the factfinder.

> FN2. The "brown tour" comment does seem so directed, however. (*See* D.I. 58 at A26-27, 188:9-15, 189:7-14.)

**\*6** DaimlerChrysler has failed to show that, viewing the evidence in the light most favorable to Petrocelli, the incidents of hostility were not "pervasive and regular" as required under Title VII. Petrocelli's unrebutted testimony raises a genuine issue of material fact concerning the frequency and severity of the hostility he experienced. Therefore, because that is the only issue raised by DaimlerChrysler, I will deny the Motion as to the hostile work environment claim.

B. *Disparate Treatment*

Petrocelli alleges that when DaimlerChrysler disciplined him for violating the standards of conduct and eventually fired him, it discriminated against him based on his national origin. (D.I. 58 at A165.) Those disparate treatment claims are analyzed under the

Not Reported in F Supp 2d                                                    Page 5
Not Reported in F Supp 2d, 2006 WL 733567 (D Del )
(Cite as: 2006 WL 733567 (D.Del.))

*McDonnell Douglas* burden shifting framework. *Jones v. Sch. Dist. Of Philadelphia,* 198 F.3d 403, 410 (3d Cir.1999) (referring to *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973)) Under that framework, Petrocelli must establish a prima facie case of discrimination based on national origin by showing: (1) that he is a member of a protected class; (2) that he suffered an adverse employment action; and (3) that that action occurred under circumstances that give rise to an inference of unlawful discrimination, such as might occur when a similarly situated person not of the protected class is treated differently *Jones,* 198 F.3d at 410- 11; *Boykins v. Lucent Techs., Inc.,* 78 F.Supp.2d 402, 409 (E.D.Pa.2000) If Petrocelli succeeds in establishing a prima facie case, then DaimlerChrysler must "articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *Jones,* 198 F.3d at 410. If DaimlerChrysler meets that burden, then Petrocelli must show by a preponderance of the evidence that those legitimate reasons were a pretext for discrimination. *Id* If DaimlerChrylser raises a legitimate nondiscriminatory reason for its actions, Petrocelli may overcome a summary judgment motion with evidence "from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir.1994)

Here, for both the claim based on disciplinary action and the claim based on discharge, DaimlerChrysler concedes, for purposes of this Motion, the first two elements of Petrocelli's prima facie case, but argues that he has not established the third element: that the circumstances give rise to an inference of unlawful discrimination. (D.I. 57 at 21-23, 25.) Furthermore, DaimlerChrysler argues that it had legitimate nondiscriminatory reasons for disciplining and firing Petrocelli, and Petrocelli has failed to establish that those reasons were pretextual. (*Id* at 23-25, 26-27.) The arguments concerning the inference of unlawful discrimination and the showing of pretext both focus on Petrocelli's failure to show that similarly situated coworkers were treated differently than he was. (*Id* at 22-25, 27.)

*7 If Petrocelli's assertions about the discipline received by his coworkers were the only relevant evidence, I would agree that Petrocelli had failed to establish an inference that his discipline and firing were based on unlawful discrimination Petrocelli

admitted that he did not know precisely what discipline other employees received (D.I. 58 at A22-23, 134:20-136:4, 138:1-9), and his unsubstantiated belief that he was punished more severely is insufficient to support his prima facie case *See Seabrook v. Gadow,* No. Civ.A.01-802, 2003 WL 21383719, at *7 (D. Del. June 10, 2003). Also, considering that DaimlerChrysler has articulated legitimate nondiscriminatory reasons for its actions by presenting the details of Petrocelli's disciplinary record (D.I 58 at A99-119), Petrocelli's belief about the discipline given to other employees is insufficient to raise a genuine issue of material fact as to pretext. *See Seabrook,* 2003 WL 21383719, at *7

However, for the claim based on disciplinary actions, Petrocelli has presented other relevant evidence. "Evidence of ... a hostile work environment is relevant to whether one of the principal non-discriminatory reasons asserted by an employer for its actions was in fact a pretext for discrimination." *Aman,* 85 F.3d at 1086 As discussed above, *supra* Section IV A, Petrocelli has presented sufficient evidence to overcome DaimlerChrysler's summary judgment motion as to his hostile work environment claim. That general evidence of a hostile work environment, viewed in the light most favorable to Petrocelli, raises genuine issues of material fact both as to open hostility at Newark PDC and as to the reasons underlying the disciplinary actions taken against Petrocelli by his supervisors That evidence is relevant not only for Petrocelli's prima facie case of discrimination, but could also support a reasonable factfinder's belief that an invidious discriminatory reason was a motivating or determinative cause of those actions. *Fuentes,* 32 F.3d at 764 Therefore, Petrocelli has presented sufficient evidence of pretext to survive a motion for summary judgment, and I will deny the Motion as to the disparate treatment claim based on the disciplinary actions taken against Petrocelli.

The evidence of a hostile work environment is not sufficient, however, to support Petrocelli's disparate treatment claim based on his discharge. DaimlerChrysler has articulated a legitimate nondiscriminatory reason for that action: Petrocelli failed to report to work after he was reinstated because he was incarcerated for possession of cocaine and violation of his probation (D.I 58 at A5, 34:4-20, 35:24-36:15; *id* at A33, 213:22-214:3; *id* at A157-59; *see also* D.I. 57 at 26.) While the evidence about the environment at Newark PDC raises a factual issue as to the motivation behind the discipline given to Petrocelli by his supervisors, a

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 733567 (D.Del.)
(Cite as: 2006 WL 733567 (D.Del.))

Page 6

reasonable factfinder could not infer that the decision to discharge Petrocelli after he failed to report was motivated by discrimination. His failure to report was caused by his own actions in March 2002 and his subsequent arrest, conviction, and incarceration. Therefore, I will grant the Motion as to the disparate treatment claim based on Petrocelli's discharge [FN3]

> FN3. In his claim that DaimlerChrysler retaliated against him for filing a discrimination charge, Petrocelli alleged that the Company knew that he was incarcerated and that the timing of his reinstatement was manipulated so that he would be unable to report. (D.I. 58 at A162.) As discussed below, *infra* Section IV.C, that retaliation claim is time-barred, and the allegations concerning the timing of his reinstatement were not raised in the EEOC charge which provides the basis for this suit (*id.* at A160) Thus, those allegations may not be used to support the disparate treatment claim based on his discharge. In addition, as noted below, *infra* Section IV.C, Petrocelli has adduced no evidence to support his allegation that the timing of his reinstatement was actually manipulated.

## C. Retaliation

*8 In his amended complaint, Petrocelli alleges that DaimlerChrysler discharged him in retaliation for filing his first Charge of Discrimination on January 22, 2002. (*Id.* at A172, (1)(c).) That allegation, made pursuant to Title VII, was first raised in a Charge of Discrimination filed by Petrocelli with the EEOC on April 3, 2003. (*Id.* at A162.) The EEOC issued a dismissal on September 10, 2003, giving Petrocelli notice that his right to sue on that charge would be lost after ninety days. (*Id.* at A163.)

DaimlerChrysler correctly points out (D.I. 57 at 33) that Petrocelli did not file his complaint until August 16, 2004 (D.I. 58 at A164-66), and so his claim of retaliation under Title VII was filed outside the ninety-day window and is therefore time-barred See 42 U.S.C. § 2000e-5(f)(1). That time bar is subject to equitable tolling if the filing was untimely "due to sufficiently inequitable circumstances." *Grice v. U.S. Postal Serv.*, No. Civ. A.05-2404, 2005 WL 1528880, at *4 (D.N.J. June 29, 2005). No such circumstances have been presented here. Even though Petrocelli is proceeding pro se, he filed his complaint in a timely manner after the EEOC dismissed his

disparate treatment and hostile work environment charges, and there is no apparent excuse for his failure to do so for his retaliation charge. (D.I. 58 at A164-66, A169.) Thus, I conclude that Petrocelli's retaliation claim is time-barred.

Even if that claim were not time-barred, Petrocelli has failed to demonstrate a causal link between his charge of discrimination and his discharge. *See Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 286 (3d Cir.2001) (requiring such a demonstration to support a prima facie claim of retaliation) As already noted, *supra* Section IV B, Petrocelli was discharged after failing to report to work because he was incarcerated. Petrocelli has produced no evidence to support the allegation that that decision was caused by a retaliatory motive. Therefore, in addition to being time-barred, Petrocelli has failed to establish a prima facie case of retaliation.

## D. Defamation

Finally, in addition to his claims under Title VII and the Delaware Act, Petrocelli makes a defamation claim, apparently pursuant to Delaware common law. (D.I. 58 at A173.) In support of its Motion, DaimlerChrysler does not dispute whether Petrocelli has established a prima facie claim of defamation, but asserts that it is protected by the qualified privilege between employer and employee. (D.I. 57 at 35-36.)

DaimlerChrysler is correct that, under Delaware law, statements made in furtherance of the common interest of management and labor in operating a successful business are privileged. *Gonzales v. Avon Prods., Inc.*, 609 F.Supp. 1555, 1559 (D.Del.1985) (citing *Battista v. Chrysler Corp.*, 454 A.2d 286, 291 (Del.Super.Ct.1982)). The statements made about Petrocelli, including allegations of theft and loafing (D.I. 58 at A173), appear to fall within that common interest. However, the qualified privilege will be lost if the speaker knows the statement is false, or if the speaker acts with express malice, a desire to cause harm, or bad faith. *Gonzales*, 609 F.Supp. at 1559 The evidence raised by Petrocelli in support of his hostile work environment claim, when viewed in the light most favorable to him, also raises a genuine issue as to the motives behind the allegedly defamatory statements. Therefore, I will deny the Motion as to the defamation claim.

## V. CONCLUSION

*9 Accordingly, I will grant the Motion for

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F Supp 2d
Not Reported in F Supp.2d, 2006 WL 733567 (D.Del.)
**(Cite as: 2006 WL 733567 (D.Del.))**

Summary Judgment as to the disparate treatment claim based on Petrocelli's discharge and as to the retaliation claim. I will deny the Motion in all other respects. An appropriate order will follow.

Not Reported in F Supp.2d, 2006 WL 733567 (D.Del.)

**Motions, Pleadings and Filings (Back to top)**

• 2006 WL 809107 (Trial Motion, Memorandum and Affidavit) Defendant Daimlerchrysler Corporation's Reply in Support of its Motion for Summary Judgment (Feb. 27, 2006)Original Image of this Document (PDF)

• 2005 WL 3666810 (Trial Motion, Memorandum and Affidavit) Opening Brief in Support of Defendant Daimlerchrysler Corporation's Motion for Summary Judgment (Nov. 1, 2005)Original Image of this Document (PDF)

• 2005 WL 3666809 (Trial Pleading) Answer of Daimlerchrysler Corporation to Plaintiff's Amended Complaint (Oct. 12, 2005)Original Image of this Document (PDF)

• 1:04cv00943 (Docket) (Aug. 16, 2004)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22939481 (D.Del.)
**(Cite as: 2003 WL 22939481 (D.Del.))**

Page 1

# H

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
Paul PHILLIPS, Plaintiff,
v
DAIMLERCHRYSLER CORPORATION,
Defendant.
**No. Civ.A. 01-247-JJF.**

March 27, 2003.
Paul Phillips, Plaintiff, pro se.

Richard Pell, of Tybout, Redfearn & Pell,
Wilmington, Delaware, Gary M. Smith and Kristine
K. Kraft, of Lewis, Rich & Fingersh, L.C., St. Louis,
Missouri, for Defendant, of counsel.

*MEMORANDUM OPINION*

FARNAN, J.

**\*1** Pending before the Court is Defendant
DaimlerChrysler Corporation's Motion for Summary
Judgment (D.I.50). For the reasons discussed below,
the Motion will be granted.

## I. BACKGROUND

Plaintiff Paul Phillips is a former hourly employee of
DaimlerChrysler who worked at the Newark
assembly plant. Plaintiff was a member of Local
UAW 1183 throughout his employment at
DaimlerChrysler. DaimlerChrysler and Local UAW
1183 have entered into a collective bargaining
agreement ("CBA") regarding the terms and
conditions of employment at the plant.

In 1991, Plaintiff was diagnosed with keratoconus, a
condition which affects the shape of the cornea and
causes vision problems. (D.I. 52, Tab 17). Plaintiff
notified Defendant that he had been diagnosed with
keratoconus and should avoid exposure to volatile
solvents. Consequently, Defendant's plant physician
gave Plaintiff a medical restriction, called a Physical
Qualification Code ("PQX"), of 150, which limits

exposure to volatile solvents.

In 1992, Plaintiff had a cornea transplant in his left
eye. (D.I. 52, Tab 13). Subsequently, Plaintiff
underwent repeated attempts to have rigid gas
permeable plastic contact lenses fitted to help correct
his vision. (*Id.*). Plaintiff's uncorrected vision is
20/100 in the right eye and 20/70 in the left eye. (*Id.*
at A42).

On January 19, 1999, Plaintiff filed for leave under
the Family Medical Leave Act ("FMLA") to undergo
a six month course of treatment to alleviate vision
problems related to his keratoconus. (D.I. 52, Tab 3).

On May 7, 1999, Plaintiff filed a Charge of
Discrimination with the Equal Employment
Opportunity Commission ("EEOC") and the
Delaware Department of Labor ("DDOL") alleging
that Defendant discriminated against him from
February 1999 to April 1999, on the basis of his
visual disability. (D.I. 52, Tab 9).

On October 15, 1999, Plaintiff filed a Charge of
Discrimination with the EEOC and the DDOL
alleging that Defendant retaliated against him for
filing the May 7, 1999, Charge of Discrimination. (D
.I. 52, Tab 13).

On June 19, 2001, Plaintiff filed a six-count Second
Amended Complaint (D.I.13) alleging racial
discrimination in violation of the Civil Rights Act of
1964 ("Title VII") (Count I) and 42 U.S.C. § 1981
(Count II), disability discrimination in violation of
the Americans with Disabilities Act ("ADA") (Count
III), retaliation under Title VII, the Occupational
Safety and Health Act ("OSHA"), and the FMLA
(Count IV), violation of the FMLA (Count V), and a
common law claim of detrimental reliance (Count
VI). Defendant now moves for summary judgment on
all counts.

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) provides that a
party is entitled to summary judgment where "the
pleadings, depositions, answers to interrogatories,
and admissions on file, together with the affidavits, if
any, show that there is no genuine issue of material
fact and that the moving party is entitled to judgment
as a matter of law." Fed.R.Civ.P. 56(c).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F Supp 2d                                                                Page 2
Not Reported in F Supp 2d, 2003 WL 22939481 (D Del )
**(Cite as: 2003 WL 22939481 (D.Del.))**

*2 In determining whether there is a triable dispute of material fact, a court must review all of the evidence and construe all inferences in the light most favorable to the non-moving party. *Valhal Corp. v. Sullivan Assocs., Inc.,* 44 F.3d 195, 200 (3d Cir.1995). However, a court should not make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000).

To defeat a motion for summary judgment, Rule 56(c) requires the non-moving party to show that there is more than:

> some metaphysical doubt as to the material facts.... In the language of the Rule, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial.... Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U .S. 574, 586-87 (1986) (citations and punctuation omitted). Accordingly, a mere scintilla of evidence in support of the non-moving party is insufficient for a court to deny summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986).

III DISCUSSION

A. COUNT I: TITLE VII

Plaintiff, a black male, contends Defendant racially discriminated against him in violation of Title VII; he contends he was denied three job assignments that were given to white employees.

In response, Defendant first contends that Plaintiff failed to exhaust his race discrimination claim under Title VII because he never filed an administrative charge with the EEOC regarding race discrimination. Defendant also contends Plaintiff has not established a prima facie case of disparate treatment under Title VII. Even assuming he did, Defendant contends it denied Plaintiff the three job assignments for legitimate nondiscriminatory reasons: PQX placement requirements and seniority requirements under the CBA.

Title VII requires a claimant to file an administrative charge within 300 days of the claimed discriminatory event. 42 U.S.C. § 2000e-5(e)(1). Plaintiff filed two charges with the DDOL and EEOC, one for disability discrimination and one for retaliation. (D I. 52, Tab 9,

13). Neither contained any reference to racial discrimination. *Id* However, Plaintiff did check the "race" box on DDOL's intake questionnaire, (D.I.58, Ex. G), and now argues that the intake questionnaire satisfies Title VII's exhaustion requirement. As Defendant points out in its Reply Brief (D I.61), the intake questionnaire does not serve the same function as the charge and therefore does not satisfy Title VII's exhaustion requirement. The Court finds the reasoning in *Rogan v Giant Eagle, Inc ,* persuasive:

> If we made the allegations in the intake questionnaire part of the charge itself, and therefore permitted the plaintiff to pursue claims made only in the questionnaire and not investigated by the EEOC, we would be circumventing the role of the Commission as well as depriving the defendant of notice of all claims against it.

*3 113 F.Supp.2d 777, 788 (W.D.Pa.2000) (concluding plaintiff failed to exhaust her administrative remedies where claims of harassment and retaliation were included in intake questionnaire but omitted from charge); *see also Park v. Howard Univ.,* 71 F.3d 904, 909 (D.C.Cir.1995).

In the instant case, Plaintiff reviewed and signed both charges, and neither charge contained any reference to race discrimination. Therefore, until the filing of this lawsuit, Defendant received no notice that Plaintiff had made allegations of race discrimination. Moreover, because neither charge mentioned race discrimination, the EEOC did not investigate whether race discrimination occurred. *See* EEOC Determination Re: Charge 17C990322 & 17CA00024. Because of the omission of any allegation of race discrimination from the charge, neither purpose served by the charge was achieved. For these reasons, the Court concludes that Plaintiff has not satisfied Title VII's exhaustion requirement, and therefore, the Court will grant summary judgment as to Count I.

B. COUNT II: SECTION 1981

Plaintiff contends Defendant racially discriminated against him in violation of 28 U S C. § 1981; he contends he was denied three job assignments that were given to white employees. Plaintiff also contends that Defendant's racial discrimination caused his constructive discharge.

Plaintiff has admitted that two of the denied transfers--involving the window bailey job (July 1998) and the park brake grommet job (March 1999)--occurred before April 30, 1999, (D I. 62 at C11.1-11.2, C16-17) or two years before Plaintiff first

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22939481 (D Del.)
(Cite as: 2003 WL 22939481 (D.Del.))

alleged a Section 1981 claim in his first Amended Complaint (D.I.5). The Court therefore concludes that Plaintiff's Section 1981 claim as to these two events is time barred. *See Hall v. Bell Atlantic Corp., 152 F.Supp.2d 543, 552 (D.Del.2001)* (noting that Section 1981 claims are subject to the two-year statute of limitations of *10 Del. C. § 8119*).

The third assignment denied to Plaintiff was the wiring harness job, which was filled by Edda Clayton in July 1999. To establish a prima facie case of race discrimination based on a failure to transfer, a plaintiff must demonstrate: 1) that he is a member of a protected class; 2) that he applied for, was qualified for, and was denied the position sought; and 3) circumstances that give rise to an inference of discrimination. *Stewart v. Rutgers, The State Univ., 120 F.3d 426, 432 (3d Cir.1997); Walker v. Pepsi-Cola Bottling Co., No. 898-225- SLR, 2000 WL 1251906, at *14 (D.Del. Aug. 10, 2000)*.

Defendant contends Plaintiff has not established a prima facie case, and even if he has, advances a legitimate, non-discriminatory reason for not placing Plaintiff in the wiring harness job. Defendant contends it was complying with specific placement procedures set for in the CBA for employees with PQX restrictions when it denied Plaintiff's assignment request.

Paragraph Fifteen of Defendant's Statement of Undisputed Facts asserts, "[a]n employee with PQX restrictions never has the right to select their job and the PQX committee does not consult with the employee about potential job assignments before assigning the employee to a job that is consistent with the employee's restrictions." (D.I. 51 at 5). In Paragraph Fifteen of his Affidavit, Plaintiff responds, "I do agree with the statements made in paragraph 15 of the Statement of Undisputed Facts." (D.I. 58, Ex. C at 9). Therefore, it is uncontested that Plaintiff, who is an employee with PQX restrictions, never had the right to select his job. Defendant denied Plaintiff's request because he had no right to make such a request under the PQX assignment procedures of the CBA. Accordingly, the Court concludes that Defendant had a legitimate, non-discriminatory reason for denying Plaintiff's assignment request. [FN1] Because Plaintiff has not, as a matter of law, demonstrated that Defendant racially discriminated against him, Plaintiff's claim that he was constructively discharged because of Defendant's racially discriminatory acts must also fail. *See e.g., Gaul v. Lucent Technologies, Inc., 134 F.3d 576, 581 (3d Cir.1998)* (holding that because disability

discrimination claim failed, constructive discharge claim based on same events must necessarily fails). Therefore, the Court will grant summary judgment as to Count II.

> FN1. Despite the fact that Plaintiff had no right to select his job, and even though he asserts his request for transfer was denied in July 1999, he was transferred to the wire transfer job in August 1999. *See* Deposition of Paul Phillips (D.I. 52, Tab 20 at A115-17) (Plaintiff testified that he worked the wire harness job from August 1999 to November 1999).

C. COUNT III: ADA

*4 In Plaintiff's Second Amended Complaint, he alleges that "Defendant failed to provide reasonable accommodations to plaintiff based on plaintiff's disability." (D.I.13, ¶ 49) The ADA mandates that employers provide "a reasonable accommodation to the known physical or mental limitations of an otherwise qualified individual with a disability." *42 U.S.C. § 12112(b)(5)(A)*. To establish a prima facie case of failure to accommodate, Plaintiff must prove: (1) he is an individual with a disability under the ADA; (2) he can perform the essential functions of his position with an accommodation; (3) his employer had notice of the alleged disability; and (4) the employer failed to accommodate him. *Conneen v. MBNA America Bank, 182 F.Supp.2d 370, 378-9 (D.Del.2002)*.

In Defendant's Opening Brief (D.I.51), it contends Plaintiff cannot establish elements one and four of the prima facie case. Specifically, as to element one, Defendant contends that Plaintiff is not disabled because he does not have "a physical or mental impairment that substantially limits one or more of [his] major life activities." *42 U.S.C. § 12102(2)(A)*.

There is no dispute that Plaintiff's keratoconus is a "physical impairment" and that seeing is a "major life activity." The issue is whether Plaintiff's keratoconus "substantially limits" his ability to see. EEOC regulations define the terms "substantially limits" to mean:
> i. Unable to perform a major life activity that the average person in the general population can perform; or
> ii. Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner or duration under which

© 2007 Thomson/West No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22939481 (D.Del.)
(Cite as: 2003 WL 22939481 (D.Del.))

Page 4

the average person in the general population can perform the same major life activity.

29 CFR § 1630.2(j). Generally, courts have held that visual impairments must be severe in order to substantially limit the major life activity of seeing. *See e.g., Overturf v. Penn Ventilator Co., Inc.,* 929 F.Supp. 895, 898 (E.D.Penn.1996) (holding plaintiff was not substantially limited in seeing despite double vision and lack of peripheral vision where he was able to drive a car, watch television, read, and work).

> A visual impairment which hinders, or makes it more difficult for an individual to function at a full visual capacity, does not amount to a substantial limitation on one's ability to see where the evidence suggests the individual can otherwise conduct activities requiring visual acuity.

*Person v. Wal-Mart Stores Inc.,* 65 F.Supp.2d 361, 364 (E.D.N.C.1999) (quoting *Cline v. Fort Howard Corp.,* 963 F.Supp. 1075, 1080 (E.D.Okla.1997).

In the instant case, Plaintiff's keratoconus does not prevent him from attending college classes (D.I. 52 at A46-47), working a variety of jobs (*Id.* at A48-64), caring for himself (*Id.* at A71-74), or driving (*Id.* at A74-75). Therefore, the Court concludes that Plaintiff is not substantially limited in the major life activity of seeing.

**\*5** "A plaintiff attempting to establish disability on the basis of substantial limitation in the major life activity of working must, at minimum, allege that he or she is unable to work in a broad class of jobs." *Tice v. Centre Area Transp. Authority,* 247 F.3d 506, 512 (3d Cir.2001) (quoting *Sutton v. United Air Lines,* Inc., 527 U.S. 471, 492-93 (1999)). In the instant case, Plaintiff's keratoconus prevents him only from working around volatile solvents. Plaintiff has performed many different jobs at DaimlerChrysler and has also been employed as a teacher, computer technician, mail sorter, furniture delivery person, United States Census Bureau enumerator, electrician, and salesperson (D.I. 52 at A48-64). Because Plaintiff's keratoconus does not prevent him from working in a broad class of jobs, the Court concludes Plaintiff is not substantially limited in the major life activity of working and, accordingly, also concludes that Plaintiff is not disabled within the meaning of 42 U.S.C. § 12102(2)(A).

Plaintiff, in his Answer Brief (D.I.58), abandons the allegation that he is disabled within the meaning of 42 U.S.C. § 12102(2)(A); rather, for the first time in the litigation, [FN2] he contends that he is disabled under the "regarded as" prong of the ADA's definition of disabled. *See* 42 U.S.C. § 12102(2)

("The term "disability" means ... (C) being regarded as having such an impairment.). Plaintiff contends that Defendant twice assigned him a PQX of 190, meaning that he was physically unable to work anywhere in the plant for safety reasons. Plaintiff contends these designations were unwarranted and demonstrate that Defendant regarded him as disabled.

> FN2. Defendant, relying on *Krouse v. American Sterilizer Co.,* 126 F.3d 494 (3d Cir.1997), contends that the Court should bar Plaintiff from asserting this new argument because it was not alleged in his Complaint. In *Krouse,* the court stated that, "[a]lthough a complaint's allegations are to be construed favorably to the pleader, we will not read causes of action into a complaint when they are not present. The ADA is one statutory scheme, but it provides more than one cause of action. Where, as here, a plaintiff asserts a cause of action for retaliation ... we will not find an implicit cause of action for failure to accommodate." *Id.* at 499. In Plaintiff's Complaint, he alleged that Defendant failed to accommodate him. Plaintiff's new argument asserts a different definition of disabled but is not a new, unpled cause of action. If employers are not required to provide reasonable accommodation to employees regarded as disabled, which is currently an open question in the Third Circuit, *see Deane v. Pocono Med. Ctr.,* 142 F.3d 138, 148-49 n. 12 (3d Cir.1998) (en banc), then Plaintiff's failure to allege in his Complaint that he was discriminated against because he was "regarded as" disabled could bar him from raising such an argument at this late stage of the proceedings. However, because employers may be required to reasonably accommodate employees regarded as disabled, *see Katz v. City Metal Co.,* 87 F.3d 26 (1st Cir.1996), and because the issue arises on summary judgment, the Court concludes that Plaintiff will be permitted to raise the new argument.

Defendant contends it temporarily assigned Plaintiff a PQX of 190 in response to complaints by Plaintiff that he was having problems seeing. Defendant further contends that the PQX 190 designations indicated that Plaintiff could not work until he received medical treatment that would allow him to safely return to work. (D.I. 52 at A112.1). Defendant asserts that it did not regard Plaintiff as disabled

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F Supp 2d
Not Reported in F Supp 2d, 2003 WL 22939481 (D Del.)
**(Cite as: 2003 WL 22939481 (D.Del.))**

Page 5

within the meaning of the ADA; instead, it perceived Plaintiff as being temporarily unable to perform the essential functions of his job Defendant contends that temporary impairments are not cognizable disabilities under the ADA, and thus, it did not violate the statute.

A person is "regarded as" having a disability if the person:

(1) Has a physical or mental impairment that does not substantially limit major life activities but is treated by the covered entity as constituting such limitation;

(2) Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or

(3) Has [no such impairment] but is treated by a covered entity as having a substantially limiting impairment

*Taylor v. Pathmark Stores, Inc.,* 177 F.3d 180, 187 (3d Cir.1999) (quoting 29 C.F.R. § 1630.2(1)) (brackets in original).

*6 "[T]o be covered under the regarded as prong of the ADA the employer must regard the employee to be suffering from an impairment within the meaning of the statutes, not just that the employer believed the employee to be somehow disabled." *Rinehimer v. Cemcolift, Inc.,* 292 F.3d 375, 381 (3d Cir.2002) (internal quotation marks and citations omitted).

Viewing the facts in the light most favorable to Plaintiff, the Court concludes that Defendant did not regard Plaintiff as disabled within the meaning of the ADA. Plaintiff's diagnosis of keratoconus is not what caused Defendant to assign Plaintiff the PQX 190 code. After being diagnosed with keratoconus, Plaintiff worked for Defendant in a wide variety of jobs over the course of several years In 1999, Defendant regarded Plaintiff's visual problems resulting from ill-fitting remedial contacts as a safety issue and accordingly assigned him a temporary PQX 190 code that prevented him from returning to work until he had the problem corrected. Temporary conditions or problems are not covered by the ADA because, by definition, they do not substantially limit a major life activity *In re Carnegie Center Associates,* 129 F.3d 290, 303 (3d Cir.1997) (collecting cases). Defendant did not regard Plaintiff as substantially limited in a major life activity because it viewed Plaintiff's condition as temporary and correctable. In fact, Defendant removed the first PQX 190 designation after Plaintiff was treated by his doctor, and Plaintiff was able to return to work.

(D I. 52 at A113-14). Following the second PQX 190 designation, Defendant's physicians examined Plaintiff several times to assess his ability to return to work. (*Id* at A124-125) These facts demonstrate the temporary nature of the PQX 190 designation *Rinehimer* explains that for an employee to be regarded as disabled, an employer must believe not just that he has an impairment, but that he has an impairment that rises to the level of a cognizable disability under the ADA. Because the PQX 190 designation was temporary, the Court concludes that Defendant's actions do not demonstrate that it regarded Plaintiff as disabled under the ADA

The Court further concludes that Defendant did not regard Plaintiff as disabled under the ADA because it viewed Plaintiff's problem as correctable. The United States Supreme Court has held that the effect of corrective measures "must be taken into account when judging whether that person is 'substantially limited' in a major life activity and thus 'disabled' under the Act." *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 482 (1999). Plaintiff's medical records indicate that properly fitted contact lenses increased his visual acuity, but that he had problems wearing them because of irritation. (D.I. 52 at A30-33). At no point prior to Plaintiff's resignation from Defendant did he provide Defendant with documentation that he could not be fitted with contact lenses. (*Id* at A219). Therefore, the Court concludes that Defendant regarded Plaintiff as having vision problems that could be alleviated with contacts and thus did not regard Plaintiff as having an impairment that rose to the level of a disability under the ADA

*7 Because the Court concludes that Plaintiff is not disabled within the meaning of 42 U.S.C. § 12102(2)(A) or (C), the Court will grant summary judgment as to Count III

### D. COUNT IV: RETALIATION

By his Second Amended Complaint, Plaintiff alleges Defendant unlawfully retaliated against him for filing a complaint with OSHA, for filing a charge of discrimination with the EEOC, and for filing for leave under the FMLA.

OSHA prohibits retaliation and provides a statutory procedure for aggrieved parties to pursue; however, there is no private right of action under OSHA for retaliation. 29 U.S.C. § 660(c); *Taylor v. Brighton Corp.,* 616 F.2d 256, 257 (6th Cir.1980). Therefore, the Court will grant summary judgment as to Plaintiff's OSHA retaliation claim

© 2007 Thomson/West No Claim to Orig U.S Govt Works

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22939481 (D.Del.)
(Cite as: 2003 WL 22939481 (D.Del.))

Page 6

To establish a prima facie case of retaliation under the ADA or the FMLA, Plaintiff must show: (1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action. *Krouse v. American Sterilizer Co., 126 F.3d 494, 500 (3d Cir.1997).* "If an employee establishes a prima facie case of retaliation under the ADA, the burden shifts to the employer to advance a legitimate, non-retaliatory reason for its adverse employment action." *Id.* "If the employer satisfies its burden, the plaintiff must be able to convince the fact finder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." *Id* at 501.

After examining all of Plaintiff's submissions, which are not a model of clarity, the Court has attempted to extract what it believes are the retaliatory acts complained of by Plaintiff. First, Plaintiff contends he was placed in the A/C Bolt-down job in retaliation for "making claims of racial and disability discrimination." (D.I.58, Ex. C, ¶ 12). Plaintiff was assigned to the A/C Bolt-down job in February/March 1999. (D.I. 52 at A20, A215). Plaintiff filed his first charge of discrimination in April 1999. (D.I. 52, Tab 13). Thus, the alleged retaliation occurred before the protected activity of filing a charge of discrimination. The Court concludes that Plaintiff's contention regarding his assignment to the A/C Bolt-down job does not satisfy element two of the prima facie case, which requires that the retaliation occur after the protected activity.

Second, Plaintiff contends he was placed in the A/C Bolt-down job in retaliation for filing for leave under the FMLA on January 19, 1999. Defendant contends that Plaintiff was placed in the A/C Bolt-down job in February/March 1999 through the PQX placement procedures set forth in the CBA. (D.I. 52 at A92, A215) ("Q: And you understood at the time that you were placed in the A/C Bolt-down job based on your PQX restrictions; right? A: [by Plaintiff] Yes."). The Court finds that the following facts regarding Plaintiff's placement in the A/C Bolt-down job are uncontested. The A/C Bolt-down job involved bolting air conditioners onto vehicles with an air gun. (*Id.* at A93-94). The internal components of the air gun are lubricated with Tribol ATO 100 LS lubricating oil. (*Id.* at 215-16). While working the A/C Bolt-down job, Plaintiff complained that oil mist from the air gun irritated his eyes. In response to

Plaintiff's complaints, Defendant issued Plaintiff safety goggles and a cloth to wrap around the handle of the air gun. (*Id.* at A10, A99). Plaintiff subsequently informed Defendant that the goggles were insufficient, and Defendant provided Plaintiff with a full face shield to wear, which enabled Plaintiff to perform the job. (*Id.* at A101-02). Also in response to Plaintiff's complaints about the A/C Bolt-down job, Defendant's plant physician and Director of Safety physically examined the requirements of the A/C Bolt-down job and confirmed the job was within Plaintiff's PQX restrictions. (*Id.* at A217). Additionally, Defendant had an industrial hygienist take air samples while Plaintiff was working on the A/C Bolt-down job. The tests confirmed that the hydrocarbons in the air were within permissible exposure limits. (*Id* at A218, A239-41). After further complaints about the A/C Bolt-down job by Plaintiff, Defendant transferred him to the Wire Harness job in August 1999. (*Id.* at A118). Plaintiff admitted in his deposition that he had no difficulty performing the Wire Harness job. (*Id.*) Based on the fact that the assignment comported with Plaintiff's PQX restrictions, the Court is unconvinced that Plaintiff's transfer to the A/C Bolt-down job was an adverse employment action and, even if it was, is also unconvinced that there was a causal connection between Plaintiff's application for FMLA leave and the transfer. Plaintiff relies solely on the temporal proximity between his application and the transfer, which is insufficient to establish a causal connection, particularly in light of Defendant's repeated attempts to accommodate Plaintiff's complaints about the position. The Court concludes that Plaintiff has not demonstrated that Defendant's proffered reason for the transfer was pretextual or animated by a retaliatory motive.

**\*8** Third, Plaintiff contends that he was laid off on June 17, 1999, in retaliation for filing a charge of discrimination with the EEOC on April 19, 1999. (D.I. 52, Tab 13). In response, Defendant contends that there is no causal connection between the two events and that Plaintiff elected lay-off after being assigned a PQX of 190 for vision problems. Other than temporal proximity, Plaintiff offers no facts to demonstrate that there was causal connection between the filing of the charge and his layoff. Moreover, Defendant's legitimate, non-discriminatory reason for the layoff is confirmed by Plaintiff in his deposition. Plaintiff testified that the plant physician noticed he was having eye problems, assigned him a PQX 190 code, which barred him from working in the plant for safety reasons, and sent him for medical treatment. (D.I. 52 at A112.1). Plaintiff's private

Not Reported in F Supp 2d
Not Reported in F Supp.2d, 2003 WL 22939481 (D.Del.)
**(Cite as: 2003 WL 22939481 (D.Del.))**

doctor treated him for corneal graph rejection (*Id* at A113) During treatment, Plaintiff was unable to work and elected layoff rather than disability. (*Id* at A114) Once treatment was complete, the plant physician removed the PQX 190 code and allowed him to return to work on July 14, 1999. (*Id*) Because the uncontroverted facts show that Plaintiff's June 17, 1999, layoff was not pretextual, the Court concludes that Plaintiff's retaliation claim must fail.

In addition to the specific actions addressed above, Plaintiff also suggests many times throughout his affidavit that Defendant's actions or inactions were retaliatory. However, Plaintiff, in the two-paragraph retaliation section of his brief (filed through counsel), submits only that "if anything comes through the facts set forth by both parties in their briefs, it is the concept of retaliation." (D.I. 58 at 8) Plaintiff's brief does not address how any specific acts of Defendant satisfy the elements of the prima facie case to establish retaliation. It is unclear to the Court what protected activity, if any, the alleged acts were in retaliation for and what connection, if any, the alleged acts had to such activity. Plaintiff cannot prevent summary judgment through bare allegations that acts he disagreed with or disliked were retaliatory. *See e.g., Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986). For all of the above reasons, the Court will grant summary judgment as to Count IV.

### E. COUNT V: FMLA

Plaintiff alleges that Defendant violated the FMLA by refusing to grant him continuous leave instead of intermittent leave. (D.I.13, ¶ 57) Plaintiff applied for leave to accommodate a six month course of treatment related to his contact lenses. (D.I. 52, Tab 3). Plaintiff was aware that the FMLA would only allow him to take approximately three months of continuous leave, which was insufficient for the required treatment (D.I. 52 at A89-90); *see also* 29 U.S.C. § 2612(a)(1) (allowing twelve work weeks of leave during a twelve-month period) Thus, if Defendant granted Plaintiff continuous leave, he would not have been able to complete his treatment.

**\*9** Plaintiff's contention that Defendant violated the FMLA by granting him intermittent leave is without merit for three reasons: (1) Plaintiff accepted the intermittent leave and now unreasonably complains it was unacceptable; (2) Plaintiff did not address the FMLA issue in his Response Brief (D.I 58) and thus is resting on the bare allegations in the Second Amended Complaint (D.I 13); and (3) Plaintiff

suffered no wage loss during his employment with Defendant due to the alleged FMLA violation and thus is not entitled to any relief 29 U.S.C. § 2617(a)(1); *Lapham v. Vanguard Cellular Sys., Inc.,* 102 F.Supp.2d 266, 269-70 (M.D.Pa.2000) (the FMLA "simply leaves no room for recovery when an employee does not sustain economic loss during the period of his or her employment"). Therefore, the Court will grant summary judgment as to Count V.

### F. COUNT VI: DETRIMENTAL RELIANCE

In Plaintiff's Second Amended Complaint, he alleges that he "relied to his detriment upon the many representations of defendant that defendant could and would accommodate his disability" and that these representations "caused him to forego other employment opportunities. .." (D.I. 13 at 11). In his deposition, Plaintiff stated that he was offered a job at General Motors in 1993 (D.I 52 at A62-62.1) and could have kept working at Info Systems in 1994 (*Id* at A60.1- 61).

Although Plaintiff labels his claim as one based on detrimental reliance, it is more appropriately characterized as a claim for promissory estoppel. To succeed on a claim for promissory estoppel, "a plaintiff must prove: (i) the making of a promise; (ii) with the intent to induce action or forbearance based on the promise; (iii) reasonable reliance; and (iv) injury." *Brooks v. Fiore,* 2001 WL 1218448, at \*5 (D.Del. Oct. 11, 2001) (citing *Scott-Douglas Corp. v. Greyhound Corp.,* 304 A.2d 309, 319 (Del.Super.1973)). "The asserting party must be able to prove the[ ] elements of promissory estoppel by clear and convincing evidence. Moreover, the promise, in such a case, must be definite and certain." *Continental Ins. Co. v. Rutledge & Co., Inc.,* 750 A.2d 1219, 1233 (Del. Ch.2000).

Defendant contends Plaintiff has not pointed to any promise that could support a promissory estoppel claim. Defendant further contends Plaintiff provides no evidence that Defendant intended to induce Plaintiff's reliance or that Plaintiff reasonably relied on Defendant's representations.

The Court concludes that Plaintiff's promissory estoppel claim fails as a matter of law. Plaintiff, resting on his pleadings, alleges that he detrimentally relied on Defendant's statement that it would accommodate his disability. However, "[p]romissory estoppel cannot be predicated upon a promise to do that which the promisor is already obliged to do," and Defendant is legally required to accommodate

Not Reported in F Supp 2d
Not Reported in F Supp 2d, 2003 WL 22939481 (D.Del.)
**(Cite as: 2003 WL 22939481 (D.Del.))**

disabled employees *Brooks, 2001 WL 1218448, at *6* (citing *Danby v. Osteopathic Assn. of Delaware, 104 A.2d 903, 907 (Del.Super.1954)*) Therefore, Defendant's alleged statement is not an actionable promise. Accordingly, the Court will grant summary judgment as to Count VI.

IV. CONCLUSION

**\*10** For the reasons discussed, Defendant DaimlerChrysler Corporation's Motion for Summary Judgment (D.I 50) will be granted.

An appropriate Order will be entered

*ORDER*

At Wilmington this 27th day of March 2003, for the reasons set forth in the Memorandum Opinion issued this date;

IT IS HEREBY ORDERED that Defendant DaimlerChrysler Corporation's Motion for Summary Judgment (D.I.50) is *GRANTED*

Not Reported in F.Supp.2d, 2003 WL 22939481 (D.Del.)

**Motions, Pleadings and Filings (Back to top)**

• 1:01CV00247 (Docket) (Apr. 13, 2001)

END OF DOCUMENT

© 2007 Thomson/West No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                          Page 1
Not Reported in F.Supp.2d, 2004 WL 609324 (D.Del.)
**(Cite as: 2004 WL 609324 (D.Del.))**

C

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
Maureen RICHARDS, Plaintiff,
v.
THE CITY OF WILMINGTON, Defendant.
**No. Civ. 03-106-SLR.**

March 24, 2004

Tiffany Quell Friedman, Wilmington, Delaware, for
Plaintiff.

Rosamaria Tassone, Wilmington, Delaware, for
Defendant.

MEMORANDUM OPINION

ROBINSON, Chief J.

I. INTRODUCTION

*1 Plaintiff Maureen Richards filed this action on
January 22, 2003 against defendants DaRon Mearlon
("Mearlon") and the City of Wilmington (the "City").
(D.I.1) Plaintiff alleges sexual harassment and
retaliation pursuant to Title VII of the Civil Rights
Act of 1964, 42 U.S.C. § 2000(e) *et seq* ("Title
VII"), and 19 Del. C. § 711 [FN1] On April 21,
2003, a stipulation of dismissal was filed dismissing
Mearlon with prejudice. (D.I.10) Currently before the
court is the City's motion for summary judgment.
(D.I.39) The court has jurisdiction over plaintiff's
claims pursuant to 28 U.S.C. § 1331. For the
following reasons, defendant's motion is granted in
part and denied in part.

> FN1. Plaintiff concedes in her answering
> brief to the instant motion that her claim for
> retaliation pursuant to 19 Del. C. § 711, her
> state law claim for intentional infliction of
> emotional distress, and her claim for
> punitive damages should be dismissed.

II. BACKGROUND

Plaintiff began working as an account clerk in the
Finance Department for the City in 1997. (D.I.1) Her
daily duties included preparing the bank deposits and
assisting customers with their inquiries. (D.I. 42 at A-
348) In 1998, Mearlon also began working in the
Finance Department for the City. (*Id* at A-347)
Plaintiff and Mearlon worked together on the first
floor of the City Building.

Plaintiff claims that Mearlon started to sexually
harass her after meeting her on his first day. (D.I. 42
at A-350) She alleges that Mearlon continued this
harassment for the next three years. Throughout this
time period, plaintiff occasionally asked her co-
workers or friends to tell Mearlon to stop bothering
her. After receiving these requests, Mearlon initially
left plaintiff alone, but eventually resumed his prior
behavior. (*Id* at A-353)

In July 1999, plaintiff complained about Mearlon to
her supervisor, Shayne Williams ("Williams").
Plaintiff said that Mearlon stared at her, expressed a
desire to touch her private parts, and called her
constantly at her desk. (D.I. 41 at A-354) Plaintiff
believed that her conversation with Williams
constituted a formal notice of the sexual harassment
because Williams was a supervisor. (*Id*.) Williams
spoke to Mearlon about his conduct. After this
discussion, he stopped engaging in such behavior
with respect to plaintiff. However, he resumed his
actions after a few weeks. (*Id*)

In December 1999, plaintiff again complained of
Mearlon's conduct to the former Director of
Personnel, Mary Dees ("Dees"). [FN2] (*Id*) Plaintiff
told Dees that Mearlon said that he would not leave
her alone and that he made sexual comments to her.
She also explained that Mearlon said that she
reminded him of his ex-wife. (*Id*) In response, Dees
informed plaintiff that she would speak to Mearlon.
(*Id* at A-356) Pursuant to this second discussion
about his conduct, Mearlon stopped bothering
plaintiff for a short period of time. Thereafter, he
resumed his prior behavior. (*Id* at A-358)

> FN2. Ironically, Dees is Mearlon's sister.
> (*Id* at A-355)

On July 20, 2001, plaintiff filed a written complaint
about Mearlon with her manager, Terry Toliver
("Toliver"). (D.I. 42 at A-232-236) In her complaint,

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 609324 (D.Del.)
**(Cite as: 2004 WL 609324 (D.Del.))**

plaintiff alleged that Mearlon repeatedly said that she looked liked his ex-wife and that "faith [sic] had brought them together" because both she and his ex-wife were from the islands. *(Id.)* Plaintiff also claimed that Mearlon "talk[ed] dirty" to her and told her that he was never going to leave her alone. *(Id.)* Additionally, plaintiff claimed that Mearlon professed his love for her and told her that he was going to take her to Texas where she would never get away from him. *(Id.)* Apart from his verbal comments, plaintiff explained that Mearlon stared at her while she worked and called her early in the mornings to ask her what she was wearing and late at night to hear her voice before going to sleep. *(Id.)* Plaintiff also documented that Mearlon had given her a letter enumerating the reasons why he believed that she loved him and the reasons why he believed she did not love him. (D.I. 41 at A-237) Because plaintiff stopped answering the phone when Mearlon called, she asserted that he called her sister to inquire about her whereabouts. (D.I. 41 at A-237) She further asserted that Mearlon drove to her house on one occasion and waited outside for her to emerge. (D.I. 41 at A-232 to 236) When she did, she immediately got into her car and departed. *(Id.)* She maintained that Mearlon followed her until she was able to lose him on the road. *(Id.)* Toliver told plaintiff that she should file a complaint with the police department regarding Mearlon's conduct outside of the workplace. [FN3] *(Id.* at A-225, A-230)

> FN3. Plaintiff filed a complaint with the police on September 21, 2001. (Id. at A-227-A-231) Mearlon was subsequently arrested and charged with stalking and sexual harassment. *(Id.)* On October 10, 2001, the police issued a "no-contact" order against Mearlon due to criminal charges pending against him. (D.I. 41 at A-231) The order mandated that Mearlon have no contact, direct or indirect, with plaintiff.

**\*2** In response to plaintiff's complaint, Elinza Cain ("Cain"), the Employee Relations Advisor for the City, investigated Mearlon's conduct within the workplace. *(Id.* at A-288) Cain substantiated plaintiff's complaint and concluded that Mearlon's actions were offensive. *(Id.* at A-293) Cain recommended that plaintiff and Mearlon discontinue working in the same area. Additionally, the City issued a written citation to Mearlon and ordered him to attend training about appropriate interaction between friends/co-workers on and off the job. *(Id.* at A-217)

Subsequent to this investigation, plaintiff asked to be reassigned to a position away from Mearlon. (D.I. 46 at B-90) The City informed plaintiff that only one such opening was available and that it was for a position lower than the one she currently held. *(Id.)* The City also informed plaintiff that her salary would remain the same in the lower level position, but that her pension benefits would be negatively impacted. *(Id.)* Plaintiff chose not to accept the opening.

On September 21, 2001, plaintiff began a medical leave of absence due to her problems with Mearlon. She returned to her position in the Finance Department on April 22, 2002. (D.I. 41 at A-300) At that time, she was informed that Mearlon had been transferred from the Finance Department to a vacant position in the Department of Real Estate and Housing. *(Id.* at A-221) On April 26, 2002, Mearlon was transferred back into the Finance Department. He was located, however, in a different building from where plaintiff worked. *(Id.* at A-222)

Following her medical leave, plaintiff alleges that her co-workers harassed her in retaliation for filing charges against Mearlon. *(Id.* at A-300) She filed a complaint with Monica Gonzales-Gillespie ("Gillespie"), Director of Personnel, as a result of this treatment. (D.I. 41 at A-304) In her complaint, plaintiff asserted that her co-workers excluded her professionally and socially during the workday. *(Id.)* She likewise claimed they often discussed Mearlon in her presence, even asking her directly why she chose to file charges against him. *(Id.)* Additionally, plaintiff avers that she frequently found business cards of mental health professionals on her desk. (D.I.1) Pursuant to her complaint about her co-workers, the City distributed a copy of the sexual harassment policy to all employees in the Finance Department at a quarterly staff meeting and reminded employees that no repercussions should occur if harassment is reported. (D.I. 41 at 305-A-306) Since this meeting, plaintiff made no additional complaints about her co-workers.

### III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c) The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 609324 (D.Del.)
(Cite as: 2004 WL 609324 (D.Del.))

586 n.10 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.,* 57 F.3d 300, 302 n.1 (3d Cir.1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial." ' *Matsushita,* 475 U.S. at 587 (quoting Fed.R.Civ.P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt,* 63 F.3d 231, 236 (3d Cir.1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a case sufficient showing on an essential element of its case with respect to which it has the burden of proof, then the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

IV. DISCUSSION

A. Sexual Harassment Claim Based on A Hostile Work Environment

*3 Plaintiff alleges that she was subject to sexual harassment in violation of Title VII of the Civil Rights Act of 1964. The sexual harassment section of Title VII provides in pertinent part that it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C.A. § 2000e-2(a)(1) (2004). A plaintiff who claims that she has been sexually harassed has a cause of action under Title VII if the unwelcome sexual conduct was either a *quid pro quo* arrangement or if the harassment was so pervasive that it had the effect of creating an intimidating, hostile, or offensive work environment. *See Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 66 (1986); *see also Kunin v. Sears Roebuck and Co.,* 175 F.3d 289, 293 (3d Cir.1999) (stating that it is well established that a plaintiff can prove a violation of Title VII by establishing that sexual harassment created a hostile or abusive work environment)

To qualify under the hostile work environment category, the conduct in question must be severe or pervasive enough to create both an "objectively hostile or abusive work environment--an environment that a reasonable person would find hostile," and an environment that the victim-employee subjectively perceives as abusive or hostile. *See Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21-22 (1993); *see also Faragher v. City of Boca Raton,* 524 U.S. 775, 783 (1998); *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 752 (1998). In other words, a plaintiff must prove five elements to fall within the purview of Title VII due to a hostile work environment: (1) she suffered intentional discrimination because of her sex; (2) the discrimination was pervasive and regular; (3) she was detrimentally affected by the discrimination; (4) the discrimination would detrimentally affect a reasonable person of the same sex in the same position; and (5) respondeat superior liability exists. *See Andrews v. City of Philadelphia,* 895 F.2d 1469, 1482 (3d Cir.1990); *see also Weston v. Pennsylvania,* 251 F.3d 420, 426 (3d Cir.2001). The court must examine the totality of the circumstances in deciding a hostile work environment claim, including: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; whether it unreasonably interferes with an employee's work performance." *Harris,* 510 U.S. at 23.

With regard to employer liability for sexual harassment, the Supreme Court has distinguished the principles applicable to harassment by co-workers versus the principles applicable to harassment by supervisors. *See Faragher,* 524 U.S. at 803. Specifically, the Supreme Court has noted that in the instance of co-worker sexual harassment, the standard for employer liability is negligence. *See id.* at 799. The Supreme Court has defined negligence with respect to sexual harassment as whether the employer knew or should have known about the conduct and failed to stop it. *See Ellerth,* 524 U.S. at 759 (1998); *see also* 29 C.F.R. § 1604.11(d) (2004).

*4 Viewing the underlying facts at bar and all reasonable inferences therefrom in the light most favorable to plaintiff, the court finds that genuine issues of material fact exist as to the five elements requisite to a claim for sexual harassment based on a hostile work environment for a limited time period Prior to July 1999, when plaintiff first complained about Mearlon to her supervisor, plaintiff points to no

Not Reported in F Supp.2d
Not Reported in F Supp.2d, 2004 WL 609324 (D Del.)
**(Cite as: 2004 WL 609324 (D.Del.))**

evidence of sexual harassment so "severe or pervasive" that the City necessarily knew or should have known about Mearlon's conduct. Absent such actual or constructive notice, the City cannot be held liable for Mearlon's behavior from his start date through July 1999. Additionally, after plaintiff returned from her medical leave of absence on September 21, 2001, plaintiff fails to bring forth any concrete evidence to suggest that Mearlon contacted or bothered her in any way. From July 1999 to September 21, 2001, however, the court finds that the present record is susceptible to differing interpretations regarding the existence of a hostile work environment. The court concludes that there are genuine issues of material fact as to the sufficiency of plaintiff's notice to the City and its response thereto, as well as to the frequency of Mearlon's conduct, its severity, whether it was physically threatening or humiliating, and whether it unreasonably interfered with plaintiff's work performance. Mere "offhand comments and isolated incidents" are not sufficient to set forth a claim for a hostile work environment. *See Faragher, 524 U.S. at 786.* Consequently, the court denies the City's motion for summary judgment as to plaintiff's hostile work environment claim for the twenty-seven months defined herein.

B. Retaliation Claim

Plaintiff alleges that she was subject to retaliation in violation of Title VII of the Civil Rights Act of 1964. The anti-retaliation section of Title VII provides in pertinent part:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment ... because she has opposed any practice made an unlawful employment practice by this subchapter, or because she has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a) (as amended 1991). To establish a prima facie case of retaliation under Title VII, a plaintiff must first prove: (1) that she engaged in a protected activity; (2) that her employer took adverse action against her either after, or contemporaneously with, her protected activity; and (3) that there is a causal connection between the protected activity and the employer's adverse action. *Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir.1997).* "To show the requisite causal link, the plaintiff must present evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action." *Ferguson v. E.I.*

*DuPont de Nemours and Co., 520 F. Supp 1172, 1200 (D Del 1983).* Once the plaintiff succeeds in establishing her prima facie case, the burden of production shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for its actions. *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).* If the defendant is able to successfully articulate such a reason, then the burden shifts back to the plaintiff to show that the defendant's non-discriminatory reason for the termination was pretextual, and that the real reason for the termination was unlawful discrimination. *Id. at 802-804.* The plaintiff's "ultimate burden in a retaliation case is to convince the factfinder that retaliatory intent had a 'determinative effect' on the employer's decision." *Shaner v. Synthes (USA), 204 F.3d 494, 501 (3d Cir.2000).*

*5 In the case at bar, the court need not engage in an extensive burden-shifting analysis because plaintiff has not presented facts sufficient to state a prima facie retaliation claim. The court finds that plaintiff has failed to meet the second element of the prima facie case of retaliation, namely, that the City took adverse employment action against plaintiff. The Third Circuit has defined an "adverse employment action" as an action that "alters the employee's compensation, terms, conditions, or privileges of employment." *See Calloway v. E.I. DuPont De Nemours and Co., 2000 WL 1251909 *8 (D.Del.2000).* Plaintiff was not demoted or in any way reprimanded as a result of her multiple complaints against Mearlon. Likewise, she returned to the same position that she held when the alleged misconduct occurred after she returned from her medical leave of absence. The City did not alter her compensation, terms, conditions or privileges of employment in any way at any time during the course of her employment. Rather, the City investigated plaintiff's complaint, substantiated her allegations, and took corrective actions against Mearlon. Additionally, after learning about her co-workers' actions following her leave, the City admonished the department during a quarterly staff meeting. Since plaintiff cannot establish the second element requisite to a retaliation claim, the court need not consider the remaining two elements. The court, therefore, concludes that plaintiff fails to state a cause of action for retaliation under Title VII and grants the City's motion for summary judgment as to this claim.

V. CONCLUSION

For the reasons stated, the City's motion for summary judgment is denied as to plaintiff's sexual

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 609324 (D.Del.)
**(Cite as: 2004 WL 609324 (D.Del.))**

Page 5

harassment claim for the period of time from July 1999 through September 21, 2001 and granted as to plaintiff's retaliation claim. An appropriate order shall issue.

Not Reported in F.Supp.2d, 2004 WL 609324 (D.Del.)

**Motions, Pleadings and Filings (Back to top)**

• 1:03CV00106 (Docket) (Jan. 22, 2003)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A221

Westlaw.

57 Fed.Appx. 68
57 Fed.Appx. 68
(Cite as: 57 Fed.Appx. 68)

Page 1

# H

**Briefs and Other Related Documents**

This case was not selected for publication in the Federal Reporter.

NOT PRECEDENTIAL

Please use FIND to look at the applicable circuit court rule before citing this opinion. Third Circuit Local Appellate Rule 28.3(a) and Internal Operating Procedure 5.3. (FIND CTA3 Rule 28.0 and CTA3 IOP APP I 5.3.)

United States Court of Appeals,
Third Circuit.
Claudia S. SHERROD, Appellant,
v.
PHILADELPHIA GAS WORKS.
No. 02-2153.

Submitted Under Third Circuit L.A.R. 34.1(a) Jan.
14, 2003.
Decided Jan. 29, 2003.

Former employee sued former employer under Age Discrimination in Employment Act (ADEA), Title VII, § 1981, Family and Medical Leave Act (FMLA), and Pennsylvania Human Relations Act (PHRA). The United States District Court for the Eastern District of Pennsylvania, Louis H. Pollak, J., 209 F.Supp.2d 443, entered summary judgment for former employer, and former employee appealed. The Court of Appeals, Smith, Circuit Judge, held that: (1) employer did not interfere with employee's FMLA rights in initially denying her leave to care for her grandmother; (2) employee was not constructively discharged; (3) employee failed to rebut employer's reason for paying her lower salary than that advertised; (4) employee failed to rebut employer's reason for paying her successors more than her; and (5) employee was not subjected to hostile work environment on basis of race.

Affirmed.

West Headnotes

**[1] Labor and Employment** ⌘355

231Hk355 Most Cited Cases
        (Formerly 78k1231, 78k173.1)
Employer did not interfere with employee's FMLA rights in initially denying her leave to care for her grandmother, where employee failed to tell employer that her grandmother had raised her, as required for FMLA coverage of leave to care for grandparent. Family and Medical Leave Act of 1993, § § 101(7), 102, 105(a)(1), 29 U.S.C.A. § § 2611(7), 2612, 2615(a)(1)

**[2] Civil Rights** ⌘1123
78k1123 Most Cited Cases
        (Formerly 78k145)
Mere fact that employee felt her job was unnecessary and that unspecified people were laughing at her was not so unpleasant or difficult as to constitute constructive discharge for purposes of Title VII and ADEA claim. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; Americans with Disabilities Act, § 2 et seq., 42 U.S.C.A. § 12101 et seq.

**[3] Civil Rights** ⌘1136
78k1136 Most Cited Cases
        (Formerly 78k152)

**[3] Civil Rights** ⌘1203
78k1203 Most Cited Cases
        (Formerly 78k168.1)
In Title VII and ADEA action, employee failed to rebut employer's proffered legitimate nondiscriminatory reason for paying her, for one week, lower salary than that advertised, i.e., that she did not have all necessary job skills, even though employee stated that her successor did not have experience in accounting and was not given lower salary, where successor's his lack of experience in accounting was countered by greater supervisory experience. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; Americans with Disabilities Act, § 2 et seq., 42 U.S.C.A. § 12101 et seq.

**[4] Civil Rights** ⌘1136
78k1136 Most Cited Cases
        (Formerly 78k152)

**[4] Civil Rights** ⌘1203
78k1203 Most Cited Cases
        (Formerly 78k168.1)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A222

57 Fed.Appx. 68
57 Fed.Appx. 68
(Cite as: 57 Fed.Appx. 68)

Page 2

In Title VII and ADEA action, employee failed to rebut employer's proffered legitimate nondiscriminatory reason for paying her successors more than they paid her, i.e., that they had more experience and better qualifications, where employee's position was not equivalent to that of one successor, and another successor had qualifications that were superior to employee's in some areas. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; Americans with Disabilities Act, § 2 et seq., 42 U.S.C.A. § 12101 et seq.

[5] Civil Rights ☜1147
78k1147 Most Cited Cases
     (Formerly 78k145)
Alleged incidents, including managers making comments that "the way [two African-American clerks] were eating at their desks, it must be their culture," and that if such clerks did not do their work "I'm going to sit at their desks with a whip," were not sufficiently severe and pervasive to establish hostile work environment for purposes of Title VII, even assuming that such comments were racially motivated, and even considering such incidents in conjunction with facially neutral alleged mistreatment of employee. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.
*69 On Appeal from the United States District Court for the Eastern District of Pennsylvania. (Civ.A. No. 00-4974) District Judge: Honorable Louis H. Pollak.

Before SCIRICA, BARRY and SMITH, Circuit Judges.

OPINION OF THE COURT

SMITH, Circuit Judge.

Claudia Sherrod appeals the District Court's grant of summary judgment in favor of Philadelphia Gas Works on her *70 claims under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq., Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"), the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq. and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Stat. § 951 et seq. For the reasons discussed herein, we will affirm the decision of the District Court.

I. FACTS
Appellant, Claudia Sherrod, is an African-American woman who was born on September 9, 1940.

Sherrod began working for the appellee, Pennsylvania Gas Works ("PGW"), in March of 1989, as a Junior Clerk in the Treasury Department. Sherrod was promoted several times, culminating in her promotion to Supervisor of the Bill Passing Department on September 27, 1997. When Sherrod was offered the promotion to Supervisor, she was told she would receive a salary of $38,500, below the minimum $40,705 advertised. Larry Hoffman, Vice President and Chief Accounting Officer and Sherrod's new supervisor, explained that this lower salary was based on the fact that she did not have experience with the material accounting system. However, when Sherrod actually assumed the position, she was given a salary of $40,000. She was later given an increase to $41,000, which was made retroactive to October 4, 1997. Appellant claims that Hoffman promised to raise her salary to $45,000 within six months, but that this did not occur.

When Sherrod assumed the position of Supervisor of Bill Passing, she inherited a huge backlog of unpaid bills. This problem was exacerbated by the fact that PGW was implementing a new accounting system known as ORACLE, and it was causing mass confusion. After ORACLE was installed, plaintiff took a stress-related leave of absence which lasted from December 2, 1998 to January 19, 1999. While she was on leave, Hoffman left PGW. In February, Tom Smyth took over as Chief Accounting Officer.

Sherrod took another leave of absence from March 1999 until July 1999. While out on leave, Sherrod told Ann Stewart, the manager of Staffing and Diversity, that she did not want to return to the Accounting Department because of Smyth's racism. Upon her return to work, Sherrod was transferred to the Public Affairs Department, to serve as "Community Relations Specialist." According to Sherrod, this new job had no duties because all of her assigned duties were already undertaken by James Emmanuel--another employee. Sherrod received the same pay and benefits in this position as she had in the Accounting Department. Nonetheless, she felt that her new position was humiliating and that people were laughing at her. [FN1] She resigned after seven months in this position

     FN1. Appellant was unable to specify exactly who she thought was laughing at her, stating "I can't be specific right now."

A. Disparate Treatment

Appellant claims she was paid a lower salary than

57 Fed.Appx. 68
57 Fed.Appx. 68
(Cite as: 57 Fed.Appx. 68)

similarly situated younger Caucasian employees and was eventually constructively terminated because of her race and age. Sherrod points out that both her temporary replacement in the position of Supervisor--Ann Breyer--and her permanent replacement--Daniel Andrews--were younger, [FN2] Caucasian and **71 were paid more than she. Breyer assumed Sherrod's responsibilities while the latter was on FMLA leave from March to May of 1999, and was paid an annual salary of $64,000. Daniel Andrews replaced Sherrod in May of 1999 and was paid an annual salary of $53,000. Andrews did not have a four-year degree, and was unfamiliar with accounting. In addition, Kim Brennan, the Supervisor of Property Records, was younger and Caucasian, and she was paid $53,000 in 1999. [FN3]

> FN2. Breyer was born on April 1, 1952 and Andrews was born on July 22, 1956.

> FN3. In her factual summary, appellant describes facts that might be the basis for a disparate treatment failure to promote claim. Because appellant does not mention failure to promote in her legal analysis of disparate treatment, we will assume that dismissal of this claim is not being appealed.

### B. Hostile Work Environment

Appellant claims she was subject to a hostile work environment based on her race. Shortly after he arrived in February of 1999, Smyth said that "he didn't like the way they [Jim Smith and Darcel Young--two African-American clerks that Sherrod supervised] were eating at their desks, it must be their culture." Then, in July of 1999, Joe Bogdonavage, the Senior Vice President of Finance, [FN4] told Sherrod "if they [Smith and Young] don't do their work, I'm going to sit at their desks with a whip." In addition, the minority clerks' desks were placed directly in front of their white supervisor's office windows. Sherrod admitted that this was related to seniority, and that she did not really have any opinion as to whether it was racially motivated. Sherrod also claims that one of the reports she prepared for the CEO was thrown away by his secretary, that Smyth told a clerk in the department "don't do nothing she [Sherrod] tells you to do," and that other members of the management team would scream at her and treat her badly. Sherrod claims that as a result of this hostile work environment, she had to go on leave and seek mental health treatment.

> FN4. Bogdonavage served as acting Chief

Accounting Officer from the time that Hoffman was terminated until Smyth was hired.

### C. Retaliation

Sherrod complained many times to Ann Stewart, prior to 1997, that she was being discriminated against based on her race and age. In March of 1999, Sherrod once again filed a written complaint with Stewart alleging racial and age-based discrimination. She claims that her constructive termination was in retaliation for these complaints.

### D. FMLA

On March 2, 1999, Sherrod requested thirty days of FMLA leave to begin on March 22, in order to care for her grandmother. Initially, the Director of Employee Services denied the request on the basis that one could not use FMLA leave to care for a grandparent. After appellant explained via e-mail on March 5, 1999 that her grandmother had raised her, the leave of absence was approved. [FN5] Instead of caring for her grandmother, however, appellant took sick leave in order to deal with stress and to address her own mental health issues. Appellant was out on leave from March 16, 1999 until July 1999.

> FN5. Appellant suggested during her deposition that PGW should have been aware of this close relationship because she had taken FMLA leave to care for her grandmother back in 1994.

### II. PROCEDURAL POSTURE

Appellant filed a five count complaint alleging violation of Title VII, the ADEA, Section 1981, the FMLA and the PHRA. **72 PGW moved for summary judgment on all counts, and the motion was granted by the District Court on March 29, 2002.

### III. JURISDICTION

The District Court had subject matter jurisdiction via 28 U.S.C. § 1331. This Court has jurisdiction over the appeal based on 28 U.S.C. § 1291.

### IV. STANDARD OF REVIEW

This court exercises plenary review over a district court's order granting summary judgment. *See Reitz v. County of Bucks,* 125 F.3d 139, 143 (3d Cir.1997). Summary judgment must be granted if "there is no genuine issue as to any material fact and [ ] the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue of fact

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

57 Fed.Appx. 68
57 Fed.Appx. 68
**(Cite as: 57 Fed.Appx. 68)**

Page 4

exists "only if a reasonable jury, considering the evidence presented, could find for the non-moving party." *Childers v. Joseph,* 842 F.2d 689, 694 (3d Cir.1988) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Although the moving party must initially point out the absence of evidence necessary to the non-moving party's case, once he has done so the burden shifts to the non-moving party to provide evidence to support each element of the party's claim. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323-25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The court must consider all evidence in the light most favorable to the non-moving party. *See Marzano v. Computer Sci.,* 91 F.3d 497, 502 (3d Cir.1996); *White v. Westinghouse Elec. Co.,* 862 F.2d 56, 59 (3d Cir.1988).

## V. LEGAL ANALYSIS
### A. Interference with rights under the FMLA

[1] The District Court dismissed appellant's FMLA claim, concluding that she was not retaliated against for taking FMLA leave because she did not suffer an adverse employment action. Appellant asserts that she did not have a retaliation claim, but that she was bringing a claim for the interference with her right to FMLA leave in March of 1999, because her claim was initially denied. Although PGW reversed its initial denial of leave once appellant clarified that her grandmother had raised her, appellant appears to believe that she is entitled to payment for her leave as a result of the initial denial. She therefore requests the $6,000 difference between her salary in 1998 and her salary in 1999.

The FMLA states that: "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1). The FMLA does not define interference, but the Department of Labor regulations indicate that interference includes "not only refusing to authorize FMLA leave, but discouraging an employee from using such leave." 29 C.F.R. § 825.220(b)

FMLA leave does not extend to leave to care for grandparents unless the grandparent served as the employee's parent. *See* 29 U.S.C. § 2612 (granting leave to care for parent), § 2611(7) (defining parent as "the biological parent of an employee or an individual who stood in loco parentis to an employee when the employee was a son or daughter"). In addition, "[a]n employee giving notice of the need for unpaid FMLA leave must explain the reasons for the needed leave so as to allow the employer to determine that the leave qualifies under the Act." 29 C.F.R. § 825.208(a)(1) Since appellant did not initially tell her employer that her grandmother had raised her, she failed to sufficiently explain her reasons *73 for the needed leave so as to allow the employer to determine that her request was covered by the FMLA. Therefore, the initial denial of leave was not improper, nor was it so discouraging that it interfered with appellant's right to leave under the FMLA. [FN6]

> FN6. Some district courts in this Circuit have suggested that an employee may bring an interference claim for actions which could "chill" desire to take FMLA leave, even when the employee takes the leave. *Compare Williams v. Shenango, Inc.,* 986 F.Supp. 309, 320-321 (W.D.Pa.1997) (where employer denied request for FMLA leave and suggested that employee take leave on a different week, but retroactively approved the leave after it was taken, reasonable person could conclude that employer interfered with FMLA rights); *Shtab v. Greate Bay Hotel and Casino, Inc.,* 173 F.Supp.2d 255, 267-68 (D.N.J.2001) (where authorization for FMLA leave was denied after leave occurred, noting that a jury could conclude that employer's suggestion that employee take different date of leave chilled plaintiff's assertion of rights under FMLA), *with Alifano v. Merck & Co., Inc.,* 175 F.Supp.2d 792 (E.D.Pa.2001) (plaintiff could not bring claim for interference in the absence of any adverse employment action where employer allegedly discouraged but did not deny leave). Nonetheless, appellant does not have a cause of action for interference in this case because she failed to give her employer sufficient notice that her FMLA requested leave qualified under the statute.

### B. Disparate Treatment under *Title VII, Section 1981, ADEA and PHRA*

Appellant's claims of disparate treatment under Title VII, ADEA, PHRA and Section 1981 must be analyzed under the test articulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) *See Jones v. School District of Philadelphia,* 198 F.3d 403, 410 (3d Cir.1999) (Title VII, PHRA and Section 1981 claims governed by *McDonnell Douglas* ); *Stanziale v.*

57 Fed.Appx. 68
57 Fed.Appx. 68
**(Cite as: 57 Fed.Appx. 68)**

*Jargowsky,* 200 F.3d 101, 105 (3d Cir.2000) (ADEA and *Title VII* claims governed by *McDonnell Douglas*).

In order to make out a prima facie case, appellant must show that: 1) she is a member of a protected class; 2) she was qualified for her position; 3) she suffered an adverse employment action; and 4) that action occurred under circumstances giving rise to an inference of discrimination. *See Jones,* 198 F.3d at 410-11. If plaintiff establishes a prima facie case, the burden shifts to the defendant "to articulate some legitimate nondiscriminatory reason for the employee's rejection." *Id* (quoting *McDonnel Douglas,* 411 U.S. at 802, 93 S.Ct. 1817). Then, if defendant carries this burden, the plaintiff must show that these reasons were not the true reasons, but were the pretext for discrimination *See id., Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252-53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

First, PGW asserts that plaintiff did not suffer any adverse employment action. An adverse employment action necessarily encompasses all tangible employment actions such as "hiring, firing, failing to promote, reassignment or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). In addition, paying an individual a lower salary for discriminatory reasons can be an adverse employment action. *See Stanziale v. Jargowsky,* 200 F.3d at 105. Thus, appellant argues that there are three adverse employment actions in this case: 1) a pay disparity between the amount advertised for Supervisor and the amount paid to appellant, 2) a pay disparity between appellant as Supervisor and her successors, and 3) a constructive discharge.

Constructive discharge occurs if the "conduct complained of would have the *74 foreseeable result that working conditions would be so unpleasant or difficult that a reasonable person in the employee's shoes would resign." *Gray v. York Newspapers, Inc.,* 957 F.2d 1070, 1079 (3d Cir.1992) In the case in which we first adopted the constructive discharge doctrine, *Goss v. Exxon Office Systems Co.,* 747 F.2d 885 (3d Cir.1984), we held that the work conditions were so intolerable as to constitute constructive discharge There, the plaintiff was a sales representative for Exxon with a lucrative territory Goss's supervisor began interrogating her about her plans to have a family Goss then became pregnant twice, and each time her supervisor became verbally abusive and expressed doubts about the plaintiff's ability to combine motherhood and a career. Goss miscarried both times and, upon her return to work after the second miscarriage, her supervisor informed her she would either have to accept a new territory or resign. The Supervisor also described Goss as a " 'wacko,' pregnant, and likely to leave " 747 F.2d at 888. We concluded that under these conditions a reasonable person in the employee's shoes would resign.

[2] Here, even viewing all the evidence in the light most favorable to the appellant, the work conditions were not so severe that a reasonable person in the employee's shoes would resign. Appellant suggests that she had to resign because, although she requested her transfer, her new job duties were duplicative of those of another employee and people were laughing at her Appellant does not allege that her new supervisor threatened her with demotion, in any way harassed her, or suggested she should leave. Accordingly, the mere fact that appellant felt her job was unnecessary and that unspecified people were laughing at her would not be "so unpleasant or difficult" to constitute constructive discharge.

As to the pay disparities between appellant and her successors, and between the advertised salary and the actual salary she received, PGW does not explain why these pay disparities did not constitute adverse employment actions. PGW does argue that appellant has not carried her burden to show that the reasons given by PGW for the pay disparities were pretextual. In order to show pretext, a plaintiff may introduce evidence from which a fact-finder could "(1) disbelieve the employer's articulated legitimate reason or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Abramson v. William Patterson College of New Jersey,* 260 F.3d 265, 283 (3d Cir.2001) (quoting *Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir.1994)) To disbelieve the employer's proffered reason, the question is not whether the action was prudent, but whether appellant has shown "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence'[.]" *Fuentes,* 32 F.3d at 765 (internal quotation omitted).

[3] PGW points to the fact that appellant received, for only one week, a lower salary than that advertised because she did not have all of the necessary job skills This is a legitimate reason. Appellant suggests that this reason was pretext for age and/or

© 2007 Thomson/West. No Claim to Orig U S Govt. Works.

57 Fed.Appx. 68
57 Fed.Appx. 68
(Cite as: 57 Fed.Appx. 68)

race discrimination because Andrews, her successor, did not have experience in accounting and he was not given a lower salary. The fact that Andrews was paid a higher salary approximately one-and-a-half years later does not cast doubt on PGW's proffered reason for Sherrod's salary inasmuch as his lack of experience in accounting was countered by his greater supervisory experience; he had received a *75 higher salary in his previous position; and PGW had difficulty finding anyone willing to take the position after the chaos caused by implementation of ORACLE. Since the fact that Andrews was paid more than the advertised salary is insufficient for a reasonable fact-finder to conclude that PGW's proffered reason for paying Sherrod less was "unworthy of credence," appellant has not carried her burden to show pretext on this count.

[4] With respect to the greater salaries paid to her successors, PGW explains that they had more experience and better qualifications. Daniel Andrews had been a supervisor in the Meter Reading Department for four years before becoming Supervisor of Bill Passing, and was already earning nearly $49,000 in that position. Ann Breyer had 20 years of management experience with PGW in departments such as Internal Auditing, Accounting and Budgets and Information Systems. Moreover, while Breyer temporarily assumed appellant's duties, she retained her primary responsibility to implement ORACLE. Accordingly, her position was hardly equivalent to the position held by Sherrod. [FN7]

> FN7. Sherrod also points to Kim Brennan as someone in an equivalent position: Supervisor of Property Records rather than Bill Passing, who was Caucasian, younger than her (born on 4/19/67), and was earning more than her. PGW explains that Brennan had more management experience, including two years as an Internal Auditor before transferring to Property Records. In addition, Brennan's starting salary was less than Sherrod's. Brennan was earning $36,000 when she became a supervisor in July of 1996, while Sherrod earned $40,000 when she became a supervisor in September 1997.

Appellant notes, however, that she had a four-year degree and Andrews did not. Andrews was also unfamiliar with accounting. This evidence suggests that Andrews was not better qualified than appellant in every category. Yet, the fact that appellant's qualifications were superior in some other areas is

not enough for a reasonable fact-finder to disbelieve PGW's explanation that Andrews was paid more because he had more years of supervisory experience. Appellant also introduced no evidence suggesting that the reasons that Breyer was paid more were pretext. Therefore, the District Court's grant of summary judgment will be affirmed on this count.

C. Hostile Work Environment under Title VII, Section 1981 and the PHRA

To establish a prima facie case of hostile work environment, appellant must show that (1) she suffered intentional discrimination because of her membership in a protected class; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected her; (4) the discrimination would have detrimentally affected a reasonable person in the same position; and (5) the existence of respondeat superior liability. See West v. Philadelphia Elec. Co., 45 F.3d 744, 753 (3d Cir.1995). Factors which may indicate a hostile work environment include: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Systems, Inc., 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). The analysis is the same whether under Title VII, Section 1981 or the PHRA. See Harley v. McCoach, 928 F.Supp. 533, 538 (E.D.Pa.1996).

Appellant points to several incidents that allegedly show a racially discriminatory work environment. First, shortly after he arrived in February of 1999, Smyth said that "he didn't like the way they [Jim Smith and Darcel Young--two African-*76 American clerks that Sherrod supervised] were eating at their desks, it must be their culture." Second, in July of 1999, Joe Bogdonavage, another manager in the Bill Passing Department, told Sherrod "if they [Smith and Young] don't do their work, I'm going to sit at their desks with a whip." Third, the minority clerk's desks were placed directly in front of their white supervisor's office windows. Sherrod also claims that: one of the reports she prepared for the CEO was thrown away by his secretary; Smyth told a clerk in the department "don't do nothing she [Sherrod] tells you to do;" she was told not to attend a meeting despite the fact that her presentation was on the agenda; Ann Breyer turned her back on Sherrod to snub her; Smyth told Sherrod that if he was fired he would fire her as well; and other members of the management team would scream at her and treat her

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

badly.

PGW argues that none of these incidents can reasonably be interpreted as acts of intentional discrimination against the plaintiff based on her race. PGW points out that Smyth testified that his "culture" comment was about corporate culture not racial culture, and after making this comment he established a work rule prohibiting all employees from eating at their desks. PGW also suggests that the "whipping" comment was unrelated to race and notes that Sherrod admitted that the clerk's desks were repositioned based on seniority. Finally, PGW argues that if any other members of the management team screamed at Sherrod or treated her badly, it was for reasons unrelated to race. For example, plaintiff admits that at one point Bogdonavage yelled at her because he believed that an employee had paid a PGW bill out of his own pocket. She also admits that some of the conflict with other managers was over her opinions about how to implement the ORACLE transition.

[5] This Court has recognized that "the advent of more sophisticated and subtle forms of discrimination requires that we analyze the aggregate effect of all evidence and reasonable inferences therefrom, including those concerning incidents of facially neutral mistreatment, in evaluating a hostile work environment claim." *Cardenas v. Massey,* 269 F.3d 251, 262 (3d Cir.2001). Assuming that Smyth's culture comment and Bogdonavage's whipping comment were racially motivated, these two incidents were not sufficiently severe and pervasive to establish a hostile work environment. *See Drinkwater v. Union Carbide Corp.,* 904 F.2d 853, 863 (3d Cir.1990) (two sexually stereotyped discriminatory comments do not constitute continuous, pervasive discrimination). However, in light of these two comments, a reasonable fact-finder could find that all the facially neutral mistreatment of Sherrod by other members of the management team was related to race. *See Cardenas,* 269 F.3d at 262. Therefore, we must determine whether all of the alleged conduct was severe and pervasive enough to create a hostile work environment.

In *Cardenas,* the defendants subjected the plaintiff to ethnic slurs, dealt with disagreements by asking if the plaintiff intended to pull out a switchblade, wrote derogatory messages on the marker board in the plaintiff's cubicle, rounded the numbers on all other employees evaluations upward while rounding the plaintiff's evaluation numbers downward, disproportionately assigned minorities and trainees to

the plaintiff's unit, gave plaintiff contradictory instructions and assignments incompatible with his staff resources, and spread the word that the plaintiff was an affirmative action hire. 269 F.3d at 258-59. This Court held that, looking at the totality of the circumstances, these activities were sufficiently severe and pervasive so as to \*77 constitute a hostile work environment. *Cardenas,* 269 F.3d at 263. In *Aman v. Cort Furniture Rental Corp.,* 85 F.3d 1074, 1082-84 (3d Cir.1996), this Court once again found the alleged conduct sufficiently severe and pervasive to constitute a hostile work environment where African-American employees were referred to as "one of them" or "another one," told not to touch anything or steal anything, made to do menial jobs, screamed at, threatened with termination, had their time cards stolen, were falsely accused of wrongdoing, had information necessary to their jobs withheld, were given conflicting orders, and the general manager stated at a district meeting that "the blacks were against the whites" and that if they did not like it at Cort Furniture they could leave.

Appellant's showing falls short of the severe and pervasive conduct in *Cardenas* and *Aman.* Unlike the plaintiff in *Cardenas,* there is no evidence that anyone ever referred to appellant using racial slurs. The statements which Sherrod considered offensive were subject to a non-racial interpretation and were not physically threatening or humiliating. In addition, although appellant was excluded from one meeting, a report was thrown away, and a colleague told one clerk not to listen to Sherrod, there is no evidence suggesting that this unreasonably interfered with her work performance, as was the case in *Cardenas* and *Aman.* Finally, even if the conduct described had a detrimental effect on appellant's mental health, these incidents would not have detrimentally affected a reasonable person in appellant's position. Accordingly, these incidents are insufficient to create a racially hostile work environment as a matter of law.

*D. Retaliation for asserting claims*

Retaliation requires a plaintiff to show that (1) she engaged in a protected activity; (2) the employer took an adverse action against her; and (3) there is a causal link between the activity and the adverse action. *See Charlton v. Paramus Bd. of Educ.,* 25 F.3d 194, 201 (3d Cir.1994). The definition of adverse employment action is the same in the retaliation and the disparate treatment context. *See Cardenas,* 269 F.3d at 263.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

57 Fed.Appx. 68
57 Fed.Appx. 68
**(Cite as: 57 Fed.Appx. 68)**

Appellant suggests that she was constructively terminated because she complained about age and race discrimination to Human Resources. Because, as discussed *supra,* appellant was not constructively discharged, she has not introduced any evidence from which a reasonable fact-finder could conclude that PGW took adverse action against her because of her complaints.

## VI. CONCLUSION

The District Court's grant of summary judgment will be affirmed.

57 Fed.Appx. 68

**Briefs and Other Related Documents (Back to top)**

• 2002 WL 32817144 (Appellate Brief) Brief of Appellee Philadelphia Gas Works (Sep. 20, 2002)Original Image of this Document (PDF)

• 2002 WL 32817143 (Appellate Brief) Brief of Appellant Claudia Sherrod (Aug. 21, 2002)Original Image of this Document with Appendix (PDF)

• 02-2153 (Docket) (Apr. 30, 2002)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

184 Fed.Appx. 140
184 Fed.Appx. 140, 98 Fair Empl.Prac.Cas. (BNA) 881
**(Cite as: 184 Fed.Appx. 140)**

Page 1

**Briefs and Other Related Documents**

This case was not selected for publication in the Federal Reporter.

NOT PRECEDENTIAL

Please use FIND to look at the applicable circuit court rule before citing this opinion. Third Circuit Local Appellate Rule 28.3(a) and Internal Operating Procedure 5.3. (FIND CTA3 Rule 28.0 and CTA3 IOP APP I 5.3.)

United States Court of Appeals,
Third Circuit.
James TUNIS; John C. Witsch
v.
CITY OF NEWARK
John C. Witsch, Appellant.
**No. 05-2467.**

Submitted Under Third Circuit LAR 34.1(a) June 8, 2006.
Filed: June 12, 2006.

**Background:** Former captain in the Newark Police Department filed a complaint alleging that he was constructively discharged on the basis of his age in violation of the Age Discrimination in Employment Act (ADEA) and the New Jersey Law Against Discrimination (LAD). The United States District Court for the District of New Jersey, Jose L. Linares, J., granted city's motion for summary judgment, and appeal was taken.

**Holding:** The Court of Appeals, Nygaard, Circuit Judge, held that city police captain was not constructively discharged on the basis of his age. Affirmed.

West Headnotes

**Civil Rights** 🔑1123
78k1123 Most Cited Cases
Former city police captain was not constructively discharged on the basis of his age in violation of the Age Discrimination in Employment Act (ADEA); although police department's director was known for his frequent reorganizations as well as his aggressive

use of the disciplinary process which impacted all ranks and age groups, the captain was promoted to a series of
powerful positions with increasing amounts of responsibility, and when captain retired, he was replaced by an officer older than himself. Age Discrimination in Employment Act of 1967, § 2, 29 U.S.C.A. § 621.
**\*140** On Appeal from the United States District Court for the District of New Jersey, (D.C. Civil No. 01-cv-00517), District Judge: The Honorable Jose L. Linares.

Stephen E. Klausner, Klausner & Hunter, Somerville, NJ, for Appellant.

Susan S. Singer, Newark, NJ, for Appellee

Before AMBRO, FUENTES, and NYGAARD, Circuit Judges.

OPINION OF THE COURT

NYGAARD, Circuit Judge.

I.

Appellant, John Witsch, a former Captain in the Newark Police Department ("NPD"), announced his decision to retire from the force in 1999 at age 49 and after 27 years of service. Precipitating this decision was a disciplinary charge. At the disciplinary hearing, Chief Ambrose, the hearing officer, offered to dismiss the charge, but Witsch refused, opting to go through with the hearing. Witsch was found not guilty but retired allegedly because he felt threatened by remarks made two years earlier by Joseph Santiago, the NPD's Director, who was known for his frequent reorganizations of the force as well as his aggressive use of the disciplinary process which impacted all ranks and age groups. Santiago admitted that his approach was high-pressure and resulted in stress throughout the NPD. Preceding his retirement, Witsch had been regularly promoted both horizontally and laterally to positions of increasing responsibility. At **\*141** the time of his retirement, he, along with several other Captains, was in charge of all of the operations of Newark's Command Operation Center when the Chief of Police was off duty. Witsch undeniably held a position of considerable stress in the already high-pressure NPD atmosphere that existed under Santiago. Upon

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

184 Fed.Appx. 140
184 Fed.Appx. 140, 98 Fair Empl.Prac.Cas. (BNA) 881
(Cite as: 184 Fed.Appx. 140)

Page 2

retirement, Witsch began collecting a $62,000 yearly pension, available regardless of any alternative employment, and lifetime medical benefits

Witsch filed a complaint alleging that he was constructively discharged on the basis of his age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, and the New Jersey Law Against Discrimination ("LAD"), N.J.S.A. 10:5-1 *et seq.* He complained, inter alia, that his forced retirement resulted in his missing the opportunity to become Deputy Chief, but he did not allege that the position had been filled by a younger officer having a lower score on the civil service tests. [FN1] Finding no disputed material facts, the District Court granted summary judgment in favor of Newark. The District Court found that while Witsch may have retired due to stressful conditions in the NPD, he failed to proffer any evidence of differential treatment based on his age The District Court subsequently denied Witsch's three motions for reconsideration. This appeal followed. Because we conclude that Witsch has failed to overcome the shortcomings in his case on appeal, we will affirm the judgment of the District Court.

> FN1. Promotions in the NPD turn on an officer's rank on a civil service test That rank is the product of state-created merit based selection criteria

*II*

We conclude that there is no evidence that age discrimination resulted in Witsch's constructive discharge. Instead, the undisputed facts show only his dissatisfaction with conditions that impacted the entire NPD during the Santiago administration. Proof of age discrimination under both the ADEA and the LAD require Witsch to show that he was discriminated against and therefore injured based upon his age, a protected characteristic. Proof of constructive discharge under both the ADEA and the LAD requires him to show that the age discrimination made his working conditions so intolerable that he reasonably felt compelled to resign his position in the NPD See *Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 718 (3d Cir.1997), *cert. denied*, 522 U.S. 1128, 118 S.Ct. 1079, 140 L.Ed.2d 137 (1998). Witsch can show neither.

First, the only factual dispute he identifies is whether Santiago's administration and management of the NPD was effective and whether crime reduction statistics during his tenure were accurate. This dispute is wholly irrelevant to his age discrimination

and constructive discharge case. See *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 647 (3d Cir.1998) (observing that discrimination laws are not to be employed to challenge the soundness of employers' business decisions)

Second, the record shows no evidence that Witsch suffered any adverse employment actions based on his age. In fact, the record reflects that Santiago promoted Witsch to a series of powerful positions with increasing amounts of responsibility throughout his tenure with the NPD. Instead of discriminating against Witsch, Santiago attempted to make Witsch's working conditions more palatable For example, when Witsch was appointed to oversee all of the NPD's investigative operations, and eventually complained of the substantial stress associated with this position, *142 Santiago transferred him to the Command Operations Center At the Command Operations Center, Witsch was admittedly in a position of significant authority and power but could enjoy a less stressful working environment

Third, Witsch's allegation that his compelled retirement caused him to forgo a Deputy Chief appointment focuses on the promotion of an officer older than himself, Captain John Esposito, to Acting Deputy Chief. Witsch concedes that no *younger* officer who scored lower than he did on the civil service exams was ever promoted over him to this rank. However, he alleges that, despite several openings, Santiago had permanently promoted only one Captain prior to Witsch's retirement, and, shortly after his retirement, appointed Esposito to Acting Deputy Chief despite Esposito's lower position on the active civil service promotional list. Age discrimination is not implicated simply because the NPD promoted the older Esposito over the younger Witsch, especially since Witsch had already retired. See *Keller v. Orix Cred. Alliance, Inc.*, 130 F.3d 1101, 1108 (3d Cir.1997) *(en banc)* (holding that to create an inference of age discrimination, plaintiff must show differential treatment of a sufficiently *younger* employee) (emphasis added) Discrimination laws are not to be used to attack the wisdom of managerial decisions. See *Simpson*, 142 F.3d at 647.

Fourth, Witsch's complaint that disciplinary charges were unfairly lodged against him does not allege that he suffered more disciplinary charges than any other officer solely because of his age, nor does it show that the charges were based on manufactured evidence or that he was ever unfairly convicted of any charge. Instead, the record reflects that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

184 Fed.Appx. 140
184 Fed.Appx. 140, 98 Fair Empl.Prac.Cas. (BNA) 881
(Cite as: 184 Fed.Appx. 140)

Santiago's administration, much to the consternation of the rank-and-file, was rife with the aggressive use of the disciplinary system against officers of every rank and age for those who committed even minor infractions and for those with tenuous relationships to minor and major investigations. The disciplinary process was used zealously against the entire force, not just against Witsch, and when officers were involved in the process, they had notice of the charges against them, a full and fair hearing and union representation.

Witsch also alleges that Santiago made discriminatory comments but failed to hear any ageist comments for the two years preceding his retirement and does not allege that any of the comments were directed toward him. These comments do not meet the considerably high burden required to prove constructive discharge. *See Shepherd v. Hunterdon Dev. Ctr.,* 174 N.J. 1, 803 A.2d 611 (2002) (observing that in applying the LAD, hostile work environment claim requires abusive, severe, pervasive and hostile conduct that objectively affects plaintiff's work environment, but a constructive discharge claim requires conduct so egregious and intolerable that plaintiff would feel forced to resign). Even under the less onerous burden required to prove hostile environment claims, courts have consistently recognized that offensive comments not directed at the plaintiff, even when they refer to protected characteristics, are insufficient to establish a claim.

Lastly, Witsch alleges that any reasonable officer in his position would have felt compelled to resign because of the disciplinary charge levied against him that precipitated his retirement. To bring a successful constructive discharge claim, Witsch must show that he reasonably believed he had no other option but to resign. *See Connors v. Chrysler Financial Corp.,* 160 F.3d 971, 976 (3d Cir.1998) (citing *143Gray v. York Newspapers, Inc.,* 957 F.2d 1070, 1083 (3d Cir.1992)) (observing that a stress-free employment environment is not ensured and "discrimination laws 'cannot be transformed into a palliative for every workplace grievance, real or imagined, by the simple expedient of quitting' ") While the law protects employees from concerted, calculated efforts to expel them or the imposition of unduly harsh conditions not visited upon their co-worker in order to force them to quit, it does not guarantee that they will not suffer frustrations, challenges, disappointments and discipline. *See Gray,* 957 F.2d at 1083. The record fails to show that Witsch was ever verbally threatened with dismissal, that evidence on which disciplinary charges were based was fabricated and

that he was specifically targeted for discipline. His argument that he believed that the disciplinary charge was used to "get" him and he therefore feared termination in the future is unpersuasive. The law of constructive discharge is not concerned with subjective fears of possible future dismissal. *See Gray,* 957 F.2d at 1082- 83.

The record shows that instead of being forced to leave his position because of disciplinary charges, the officer presiding over Witsch's disciplinary hearing freely offered to dismiss them. Instead, Witsch insisted on proceeding with the hearing. At the close of the hearing, before which he was given notice and during which he was afforded due process and vigorous representation by union counsel, Witsch was absolved of guilt. As opposed to an environment where he was given no other choice but resignation, the record shows one in which Witsch and other officers accused of disciplinary infractions were awarded notice, a full and fair hearing and substantial union support. [FN2]

> FN2. The police unions gave effective and substantial representation to NPD members during the Santiago administration, during which the disciplinary system was used aggressively. Union representation was provided at disciplinary hearings and when challenging disciplinary actions in state courts and in front of the Public Employee Relations Commission.

Based on this record, no reasonable person in Witsch's position would feel that he had no other choice but to leave the NPD. To the contrary, after his hearing, and a long tenure in a high-ranking, high-pressure job in the stressful atmosphere of a big city police department, Witsch freely chose to end his law enforcement career.

### III.

Because the record reflects no evidence of either age discrimination or constructive discharge, the Order of the District Court granting summary judgment to Newark will be affirmed.

184 Fed.Appx. 140, 98 Fair Empl.Prac.Cas. (BNA) 881

**Briefs and Other Related Documents (Back to top)**

• 05-2467 (Docket) (May 12, 2005)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

184 Fed.Appx. 140
184 Fed.Appx. 140, 98 Fair Empl.Prac.Cas. (BNA) 881
**(Cite as: 184 Fed.Appx. 140)**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

186 Fed.Appx. 319
186 Fed.Appx. 319
**(Cite as: 186 Fed.Appx. 319)**

Page 1

# H

**Briefs and Other Related Documents**

This case was not selected for publication in the Federal Reporter.

NOT PRECEDENTIAL

Please use FIND to look at the applicable circuit court rule before citing this opinion. Third Circuit Local Appellate Rule 28.3(a) and Internal Operating Procedure 5.3. (FIND CTA3 Rule 28.0 and CTA3 IOP APP I 5.3.)

United States Court of Appeals,
Third Circuit.
Sabino VALDES, Appellant
v.
UNION CITY BOARD OF EDUCATION.
No. 05-2554.

Submitted Under Third Circuit LAR 34.1(a) July 21, 2006.
Filed July 24, 2006.

**Background:** Former employee sued his former employer, a city board of education, alleging race/ethnicity discrimination in violation of Title VII and the New Jersey Law Against Discrimination. The United States District Court for the District of New Jersey, 2005 WL 1225105, John C. Lifland, J., granted a defense motion for summary judgment. The employee appealed.

**Holdings:** The Court of Appeals held that:
(1) the employee failed to prove that the board's explanations for failure to promote him to two positions were a pretext for discrimination, and
(2) there was no causal connection between the employee's filing of Equal Employment Opportunity Commission (EEOC) charges and his subsequent termination.
Affirmed.

West Headnotes

**[1] Civil Rights** 🔑**1548**
78k1548 Most Cited Cases
Former employee of a city board of education failed

to prove that the board's explanations for failure to promote him to the positions of director of building and grounds and director of custodial services, specifically his abuse of sick leave and his misconduct and poor performance evaluations, were a pretext for race/ethnicity discrimination in violation of Title VII; beyond his own opinion that the board treated him wrongfully, unprofessionally, and unfairly, the employee offered no evidence to rebut the explanations the board provided to support its decisions with respect to his promotion claims. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[2] Civil Rights** 🔑**1252**
78k1252 Most Cited Cases

**[2] Schools** 🔑**63(1)**
345k63(1) Most Cited Cases
There was no causal connection between former employee's filing of Equal Employment Opportunity Commission (EEOC) charges and his subsequent termination by city board of education, as required for him to prevail on a Title VII retaliation claim; it was undisputed that he was terminated based on continuing misconduct occurring before and after the EEOC complaint was filed. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.
***320** On Appeal from the United States District Court for the District of New Jersey, (D.C.Civ. No. 01-cv-05660), District Judge: Honorable John C. Lifland.

Sabino Valdes, Paramus, NJ, pro se.

Thomas R. Kobin, Chasan, Leyner & Lamparello, Secaucus, NJ, for Appellee.

Before SLOVITER, SMITH and VAN ANTWERPEN, Circuit Judges.

OPINION

PER CURIAM.

Sabino Valdes appeals *pro se* from the order of the United States District Court for the District of New Jersey granting the defendant's motion for summary judgment in this action brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII") and the New Jersey Law Against

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works

186 Fed Appx. 319                                                      Page 2
186 Fed Appx. 319
**(Cite as: 186 Fed.Appx. 319)**

Discrimination, N.J.S.A. 10:5-1 et seq. ("NJLAD").

### I.

Sabino Valdes was hired as a plumber by the Union City Board of Education (the "Board") in 1994. In 1995, he became Coordinator of Plumbing Activities responsible for purchasing materials and tools. From 1994 through 1998, Valdes was considered a stellar employee who received outstanding performance evaluations from his supervisor, William Hogan. But 1999 witnessed a downward spiral in relations between Valdes and the Board precipitated by the Board's decision not to hire Valdes as Director of Building and Grounds and by its decision to discipline him for abuse of sick leave in April and May 1999.

After he applied for the job of Director of Buildings and Grounds, Valdes took twenty-eight sick days from April 5 to June 16, 1999. Valdes spent some of the sick days assisting Neftali Cruz in his campaign for election to local office, by picking Cruz up and driving him around Union City. The Board investigated the matter and in September 1999, it charged Valdes with abuse of sick leave. On November 16, 1999, after unsuccessful attempts to reach a settlement, the Board notified *321 Valdes that his pay would be docked five days for abuse of sick leave.

Meanwhile, in June 1999, the Board hired John Knudsen for the Building and Grounds position. Initially, Valdes appeared to work well under Mr. Knudsen. But once he was disciplined for abuse of sick leave, Valdes started having problems with his new supervisor. Valdes alleged that from November 1999 until his temporary suspension on April 3, 2000, Knudsen singled him out for discipline for improper dress at work, took his computer, stripped him of some of the administrative responsibilities he had performed for four years, followed Valdes to his work assignments, required him to report his whereabouts by phone, verbally harassed him in front of other employees, assigned him a vehicle that had no heat in the middle of winter, made him work during his lunch break, and allowed at least two other employees to verbally harass him on account of his race and ethnic origin.

Valdes received his first negative performance evaluation in March 2000. On April 3, 2000, the Board suspended Valdes with pay for abuse of sick leave. In August 2000, the Board filed tenure charges against Valdes for unbecoming conduct, insubordination, and excessive absenteeism, arising

out of incidents beginning in 1999 and continuing through August 2000. The Board proposed a settlement agreement that all tenure charges be dropped and that Valdes be allowed to return to work. [FN1] In October 2000, the Commissioner of Education rejected the Board's proposal, but allowed Valdes to continue working pending the tenure hearing. In November 2000, during the pendency of the tenure charges, Valdes applied unsuccessfully for the position of Director of Custodial Services. The Board hired a Caucasian male, Louis Fusco, to fill the position.

> FN1. Valdes could only return to light duty work for medical reasons unrelated to this matter.

Valdes filed a complaint with the EEOC and the New Jersey Department of Law and Public Safety, Division of Civil Rights in October 2000. The EEOC issued a right-to-sue letter on September 13, 2001, a copy of which was sent to the Board. On December 5, 2001, Valdes filed a counseled employment discrimination complaint in District Court. On December 18, 2001, the Board amended its tenure charges, adding numerous incidents of insubordination and unbecoming conduct that occurred in 2001. On January 10, 2002, Valdes was suspended with pay. A twenty-five day hearing on the tenure charges occurred from May through August 2002. In May 2003, the Administrative Law Judge recommended Valdes's removal from his tenured position. On June 23, 2003, Valdes was terminated. The State Board of Education affirmed the Commissioner's decision in August 2004.

In the Complaint he filed in District Court, Valdes claimed job discrimination on account of his status as an African-American of Cuban descent and retaliation for filing an EEOC complaint, in violation of Title VII and the NJLAD. He sought backpay, damages, and injunctive relief. The Board filed a motion for summary judgment claiming that Valdes failed to establish a *prima facie* case of race/ethnicity discrimination and that, in any event, the Board terminated Valdes for legitimate, nondiscriminatory reasons. The Board also claimed that issue preclusion applied based on the findings of the Administrative Law Judge in the tenure proceedings. Valdes countered that his termination on the tenure charges was pretextual and that issue preclusion did not apply.

*322 Upon consideration of the parties' written submissions, the District Court granted summary

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

judgment for the Board. On the merits, the District Court held that (1) although Valdes established a *prima facie* case with respect to the Board's failure to promote him to the Director of Building and Grounds position in 1999, he failed to show that the Board's reason for not promoting him, namely his abuse of sick leave, was pretextual; (2) Valdes failed to establish a *prima facie* case that the Board discriminated against him on account of his race/ethnicity with respect to the position of Director of Custodial Services because Valdes could not demonstrate that he was qualified for the job in light of his excessive absences from work, negative performance evaluations, and the existence of tenure charges against him; (3) there was no causal link between Valdes's protected EEOC activity and the alleged retaliatory actions because (a) the Board was not served with a copy of the EEOC complaint until January 2002, well after it had amended the tenure charges, and (b) the other adverse actions alleged by Valdes had occurred before he filed an EEOC complaint; and (4) Valdes failed to make out a hostile work environment claim. The District Court also held that issue preclusion did not apply in Valdes's case. On April 29, 2005, the District Court granted summary judgment in the Board's favor as to all claims. Valdes timely appealed.

## II.

We have appellate jurisdiction pursuant to 28 U.S.C. § 1291 and exercise plenary review over an order granting summary judgment. *See Pub. Interest Research Group of N.J., Inc. v. Powell Duffryn Terminals, Inc.*, 913 F.2d 64 (3d Cir.1990). Summary judgment shall be granted when "no genuine issue [exists] as to any material fact and [when] the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). We view the facts in the light most favorable to the nonmoving party and we draw all inferences in that party's favor. *See Reitz v. County of Bucks*, 125 F.3d 139, 143 (3d Cir.1997). We will affirm substantially for the reasons set forth by the District Court in its opinion.

[1] We agree with the District Court that summary judgment in the Board's favor was warranted with respect to Valdes's Title VII claims concerning the Board's failure to promote him to the positions of Director of Building and Grounds and Director of Custodial Services. Assuming in Valdes's favor that he made out a *prima facie* case of employment discrimination in each instance, we turn to whether he could successfully rebut the Board's proffer of a legitimate non-discriminatory reason for each alleged adverse employment action. Proceeding under a

"pretext" framework, a plaintiff who establishes a *prima facie* case of discrimination must then demonstrate by a preponderance of the evidence that the employer's legitimate, nondiscriminatory reason for taking an adverse employment action is merely pretextual, and that the true reason for the adverse employment decision was discrimination. *See Iadimarco v. Runyon*, 190 F.3d 151, 166 (3d Cir.1999). Here, the Board explained that it did not promote Valdes to Director of Buildings and Grounds because of his abuse of sick leave in 1999 and that Valdes did not get the Custodial Services job because of his misconduct and poor performance evaluations in 2000.

Valdes was required to "point to some evidence, direct or circumstantial, from which a fact finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an *323 invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir.1994). This burden is met through a demonstration that "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reason are such that a reasonable factfinder could rationally find them 'unworthy of credence.' " *See id.* at 765.

Valdes has not made this showing. He attempts to demonstrate that the Board's reasons for deciding not to promote him were a pretext for race/ethnicity discrimination by emphasizing that his negative performance evaluations and the decision not to promote him, even though he was qualified, were wrong. This Court has held that "it is not enough for a plaintiff to show that the employer's decision was wrong or mistaken, because the issue is whether the employer acted with discriminatory animus." *Abramson v. William Paterson College of N.J.*, 260 F.3d 265, 283 (3d Cir.2001). Without some other evidence that would call into question the credibility of his supervisors' evaluation of his work or the Board's decision not to promote him, Valdes's assertions do not amount to a showing of pretext. *See Fuentes v. Perskie*, 32 F.3d 759, 766 (3d Cir.1994).

Beyond his own opinion that the Board treated him wrongfully, unprofessionally, and unfairly, Valdes offers no evidence to rebut the explanations the Board provided to support its decisions with respect to Valdes's promotion claims. Valdes may disagree with the wisdom, fairness, or correctness of the Board's actions, but disagreement, without more, does not rebut the Board's legitimate non-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

186 Fed.Appx. 319
186 Fed.Appx. 319
(Cite as: 186 Fed.Appx. 319)

Page 4

discriminatory reasons for its actions. Absent any evidence that would undermine the Board's articulated reasons for its decisions, Valdes cannot show discriminatory animus, and cannot avert summary judgment on his Title VII claims. As for Valdes's race-based hostile work environment claim, the District Court properly determined that Valdes failed to show that his work environment was permeated with discriminatory intimidation, ridicule, and insult that was severe or pervasive enough to alter the conditions of his employment. *See* _Faragher v. City of Boca Raton,_ 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).

Valdes argues that the District Court did not afford him the opportunity to show that the Board's proffered non-discriminatory reasons for not promoting him were pretextual. There is nothing in this record that leads us to the conclusion that the District Court decided summary judgment prematurely, without giving Valdes adequate time for discovery or for responding to the Board's summary judgment motion.

[2] Valdes also claimed that the Board retaliated against him for filing EEOC charges by amending the tenure charges in 2001, which led to his termination in 2003. To make out a retaliation claim under Title VII, a plaintiff must show that: (1) he engaged in a protected employee activity; (2) the employer took an adverse employment action after or contemporaneously with the protected activity; and (3) a causal link exists between the protected activity and the employer's adverse action. *See* _McDonnell Douglas Corp. v. Green,_ 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). If a plaintiff successfully establishes a *prima facie* case, the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse action. *Id.* Here, Valdes was engaged in protected activity when he pursued EEOC charges in 2000. *See* 42 U.S.C. § 2003-3a; *see also* ***324**_Abramson v. William Paterson College,_ 260 F.3d 265, 288 (3d Cir.2001). Valdes's termination constitutes an adverse action. Therefore, the primary issue before us is whether Valdes can demonstrate a causal link between his protected activity and the Board's actions that eventually led to his termination.

The causal link may be established by the "temporal proximity between the protected activity and the termination" or by proof that the employer "engaged in a pattern of antagonism in the intervening period." _Woodson v. Scott Paper Co.,_ 109 F.3d 913, 920-21 (3d Cir.1997). It may also be established from "other

evidence gleaned from the record as a whole from which causation can be inferred." _Farrell v. Planters Lifesavers Co.,_ 206 F.3d 271, 281 (3d Cir.2000). Viewing the evidence in the light most favorable to Valdes, we find nothing in the record to support a finding of a causal connection between the filing of the EEOC charges and his subsequent termination. *See* _Anderson v. Liberty Lobby, Inc.,_ 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); _Stewart v. Rutgers, The State Univ.,_ 120 F.3d 426, 431 (3d Cir.1997).

Valdes alleged in his Complaint, that after he filed EEOC charges in 2000, his supervisors subjected him to more stringent review and sought to induce his termination by eliminating his job responsibilities and by treating routine daily interactions as incidents of unprofessional conduct and insubordination. However, it is undisputed that Valdes was terminated based on continuing misconduct occurring before and after the EEOC complaint was filed. The Board amended the tenure charges in December 2001, more than a year after the filing of the EEOC Complaint. *See* Cert of Thomas Kobin, Exhs. 23 & 24. We agree with the District Court that the evidence failed to establish a causal link between the protected activity and the alleged adverse employment action. *See* _Aman v. Cort Furniture Rental Corp.,_ 85 F.3d 1074, 1085 (3d Cir.1996).

We have thoroughly reviewed Valdes's remaining arguments on appeal and find them to be meritless.

Accordingly, we will affirm the judgment of the District Court. Valdes's motion to supplement the record is denied. To the extent that Valdes seeks to submit documents and transcripts that are not part of the District Court record, the motion is denied pursuant to Federal Rule of Appellate Procedure 10(a). As for the documents and transcripts that are part of the District Court record, the Board's motion to file a supplemental appendix containing the District Court record, which Valdes did not oppose, was granted in March 2006, and thus, the documents and transcripts are already properly before this Court.

186 Fed.Appx. 319

**Briefs and Other Related Documents (Back to top)**

• 05-2554 (Docket) (May 19, 2005)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

79 Fed.Appx. 506
79 Fed.Appx. 506, 14 A.D. Cases 1920
**(Cite as: 79 Fed.Appx. 506)**

Page 1

# H

**Briefs and Other Related Documents**

This case was not selected for publication in the Federal Reporter.

NOT PRECEDENTIAL

Please use FIND to look at the applicable circuit court rule before citing this opinion. Third Circuit Local Appellate Rule 28.3(a) and Internal Operating Procedure 5.3. (FIND CTA3 Rule 28.0 and CTA3 IOP APP I 5.3.)

United States Court of Appeals,
Third Circuit.
Steven M. VENEZIANO, Appellant,
v.
LONG ISLAND PIPE FABRICATION & SUPPLY;
Robert Moss; Aetna, U.S. Healthcare,
LONG ISLAND PIPE FABRICATION & SUPPLY,
Defendant/Third-Party Plaintiff,
v.
UNITED STATES FIRE INSURANCE COMPANY,
Third-Party Defendant
**Nos. 02-3083, 03-2931.**

Submitted Under Third Circuit LAR 34.1(a) Sept. 3,
2003.
Decided Oct. 23, 2003.

Employee sued employer and employee's insurer under employee benefit plan governed by Employee Retirement Income Security Act (ERISA), alleging discrimination and retaliation in violation of Americans with Disabilities Act (ADA) and New Jersey Law Against Discrimination (NJLAD). The United States District Court for the District of New Jersey, Stephen M. Orlofsky, J., 238 F.Supp.2d 683, entered summary judgment in favor of insurer on all counts and in favor of employer on all counts except ERISA count, and awarded sanctions against employee's counsel. Employee appealed. The Court of Appeals, Nygaard, Circuit Judge, held that: (1) employee was judicially estopped from asserting that heavy lifting was not essential function of his job; (2) district court's application of negative 50% multiplier to employee's attorney fee award was not abuse of discretion; and (3) employee did not have standing to

appeal sanctions award against his counsel.

Affirmed in part, and dismissed in part.

West Headnotes

**[1] Estoppel** ⊂══68(2)
156k68(2) Most Cited Cases
Employee was judicially estopped from asserting in disability discrimination action under ADA and New Jersey Law Against Discrimination (NJLAD) that heavy lifting was not essential function of employee's job as warehouse manager, where employee had submitted disability report to Social Security Administration indicating that for one-third to two-thirds of work day he lifted more than 50 pounds. Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.; N.J.S.A. 10:5-1 et seq.

**[2] Labor and Employment** ⊂══720
231Hk720 Most Cited Cases
(Formerly 296k143, 296k88)
District court's application of negative 50% multiplier to attorney fee award in employee's ERISA action was not abuse of discretion, even though court had already excluded time attributable to claims on which employee did not prevail, in light of employee's limited success. Employee Retirement Income Security Act of 1974, § 502(g)(1), 29 U.S.C.A. § 1132(g)(1)

**[3] Federal Courts** ⊂══544
170Bk544 Most Cited Cases
Employee did not have standing to appeal sanctions award against his counsel. 28 U.S.C.A. § 1927.
**\*507** On Appeal from the United States District Court for the District of New Jersey. (D.C. Civil No. 99-cv-02753). District Judge: The Honorable Stephen M. Orlofsky.

Diana Andreacchio, Doylestown, PA, for Appellant.

Jeffrey N. Naness, Clifford P. Chaiet, Naness, Chaiet & Naness, Jericho, NY, Edward S. Wardell, Kelley, Wardell & Craig, Haddonfield, NJ, Vincent J. Pentima, Jill G. Weitz, Klett, Rooney, Lieber & Schorling, Philadelphia, PA, for Appellees.

Before SLOVITER, NYGAARD, and ROTH, Circuit Judges.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

79 Fed.Appx. 506
79 Fed.Appx. 506, 14 A.D. Cases 1920
(Cite as: 79 Fed.Appx. 506)

Page 2

## *508 OPINION OF THE COURT

NYGAARD, Circuit Judge

Appellant Steven M. Veneziano brought a suit against Appellees Long Island Pipe Fabrication & Supply ("LIP"), LIP owner Robert Moss, and Aetna U.S. Healthcare ("Aetna") asserting claims under the Americans with Disabilities Act ("ADA"), New Jersey's Law Against Discrimination ("NJLAD"), Employment Retirement Income Security Act ("ERISA"), and common law tort. The District Court granted summary judgment for LIP and Moss on all claims but ERISA. The Court also granted summary judgment to Aetna on all counts. After a bench trial on the ERISA claim, the District Court ruled for Veneziano and required LIP and Moss to pay modest penalties and attorney fees. In a subsequent suit by Aetna, the District Court awarded sanctions against Veneziano's counsel for asserting frivolous claims. We have consolidated these two cases–the underlying case and the sanctions award–for consideration in the instant appeal. We will affirm the District Court's orders of summary judgment, affirm the findings on penalties and attorney fees, and dismiss Veneziano's appeal of the sanctions award for lack of standing.

## I. FACTS AND PROCEDURAL HISTORY

Because the facts are known to the parties, we review them only briefly. Veneziano was employed as a warehouse manager by LIP for approximately one year, from January 1997 to January 1998. As a benefit of his employment, Veneziano had health insurance coverage as a member of LIP's group plan with Aetna.

Veneziano's employment with LIP ended after he was hospitalized and diagnosed with symptomatic HIV and PCP. Because Veneziano was no longer an employee of LIP, his insurance coverage was eventually terminated by Aetna. The insurance coverage was reinstated under Title X of the Consolidated Omnibus Reconciliation Act of 1985 ("COBRA"), but Veneziano lacked coverage from June 15, 1998 to August 1, 1998.

Veneziano brought claims against LIP, Moss, and Aetna. His claims against LIP and Moss were under the ADA, NJLAD, ERISA, and common law tort. His claims against Aetna were under the ADA and NJLAD. In response to Veneziano's claims, the defendants moved for summary judgment. The District Court granted summary judgment in favor of LIP and Moss on the ADA, NJLAD, and common

law tort claims, leaving the ERISA claim to be considered at trial. The District Court also granted summary judgment for Aetna as to all of Veneziano's claims. At a bench trial, the Court held that LIP had violated the ERISA statute, but since it had not done so in bad faith, the court imposed only modest penalties. Veneziano's appeal of the summary judgment orders and holding at trial was filed at No. 02-3083 and is the crux of the instant case. [FN1]

> FN1. We note that Veneziano has made previous appeals of the District Court's grant of summary judgment for LIP and Moss, but the appeals were dismissed as premature. Nos. 01-1977; 02-2318.

When it granted summary judgment for Aetna, the District Court found that the claims against Aetna were "frivolous, meritless, ... vexatious" and in bad faith under N.J. Stat. Ann. § 10:5-27.1, and therefore awarded Aetna attorney fees. Rather than charge the costs to Veneziano, the Court stipulated that the sanction was against Veneziano's counsel. 28 U.S.C. § 1927. Veneziano immediately filed an *509 appeal of the sanctions award, but this Court denied the appeal, without prejudice, because the amount had not yet been quantified. No. 03-1394. Once the amount was quantified, Veneziano renewed his appeal of the sanctions award in No. 03-2931.

On August 12, 2003, we granted the uncontested motion to consolidate the sanctions award appeal with the appeal of the case on the merits. We have jurisdiction over the appeals under 28 U.S.C. § 1291.

## II. DISCUSSION
### A. Standard of Review

This Court has plenary review of the District Court's decisions to grant summary judgment. See Blair v. Scott Specialty Gases, 283 F.3d 595, 602-03 (3d Cir.2002). The Court takes the facts in the light most favorable to the appellant and must grant summary judgment if there is no issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

This Court reviews a District Court's award of attorney fees under plenary review as to the standard applied, and for abuse of discretion as to amount. See Brytus v. Spang, 203 F.3d 238, 244 (3d Cir.2000) (citations omitted). Similarly, this Court reviews a District Court's determination of penalty amount for abuse of discretion. See Hennessy v. Fed. Deposit Ins. Corp., 58 F.3d 908, 916 (3d Cir.1995).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

79 Fed.Appx. 506
79 Fed.Appx. 506, 14 A.D. Cases 1920
**(Cite as: 79 Fed.Appx. 506)**

B.   ADA   and   NJLAD's   Qualified   Person
Requirement

Veneziano claims that the District Court erred when
it found that Veneziano had not shown a genuine
issue of material fact about whether he was a
qualified person under the ADA and NJLAD.

To make out a prima facie case under the ADA, a
plaintiff must show that he  (1) is disabled, (2) is
qualified to perform the essential functions of his job,
and (3) suffered an adverse employment decision as a
result of discrimination.  *Deane v. Pocono Med. Ctr.,
142 F.3d 138, 142 (3d Cir.1998)*  If a plaintiff fails to
make out a prima facie case under the ADA, he has
likewise failed to meet his burden under the NJLAD.

The issue under the qualified person prong of the
ADA and NJLAD is whether heavy lifting was an
essential function of Veneziano's job as a warehouse
manager.  The District Court applied judicial estoppel
and refused to consider any evidence, since on a
Disability Report submitted to the Social Security
Administration Veneziano indicated that for one-third
to two-thirds of the work day he lifted more than 50
pounds.

[1] "[J]udicial estoppel may be invoked by a court at
its discretion to preserve the integrity of the judicial
system by preventing parties from playing fast and
loose with the courts in assuming inconsistent
positions, and .. with a recognition that *each case
must be decided upon its own particular facts and
circumstances* "  *Motley v. New Jersey State Police,
196 F.3d 160, 163 (3d Cir.1999)* (emphasis and
ellipsis in original) (citations and quotations omitted).
Before applying judicial estoppel, a court should
assess whether the present position is inconsistent
with a prior position, and if so, whether the
inconsistent positions were offered in bad faith.  *Id.* at
163- 64.  We find, as did the District Court, that
Veneziano's statement on the Social Security form is
inconsistent with his current argument that heavy
lifting was not an essential function in his job, and
that Veneziano has failed to proffer a reasonable
explanation for the inconsistency.   We are not
persuaded by Veneziano's assertion that because he
did not fill out *510 the Social Security application
himself, judicial estoppel cannot apply.   Veneziano
signed the application and does not contest that the
information provided thereon was true.

We are further convinced the result we reach on this
issue-that Veneziano did not show an issue of

material fact about being qualified to perform the
essential functions of his job-is correct, since
Veneziano has conceded he was "physically
incapable of working between January 1998 and
March of 1999 "

Because we hold that the District Court was correct
in applying the doctrine of judicial estoppel, it
follows that the grant of summary judgment for
failure to make out a prima facie case under the ADA
and NJLAD was appropriate.

C. Intentional Infliction of Emotional Distress

The District Court granted summary judgment on
Veneziano's intentional infliction of emotional
distress claim because he had not shown that LIP's or
Moss's conduct was extreme and outrageous  We too
reject Veneziano's contention that the totality of the
circumstances constitutes extreme and outrageous
conduct  Veneziano cites no New Jersey case law to
demonstrate that the appropriate test is the totality of
the circumstances or that an employer-employee
relationship reduces the necessary showing of
outrageousness   In fact, Veneziano conveniently
overlooks the cases applying New Jersey law that say
"it is particularly difficult to establish intentional
infliction of emotional distress in the employment
context."  *See, e g., Witherspoon v. Rent-A-Center,
173 F.Supp.2d 239, 242 (D.N.J.2001)*.

Because Veneziano has failed to show extreme and
outrageous conduct, an element of the intentional
infliction of emotional distress tort, the District Court
properly granted summary judgment on that claim.

D. ERISA Penalties

At trial, the District Court held that although LIP
violated the ERISA statute by failing to provide
Veneziano sufficient or timely notice of his rights
under COBRA and ERISA, only modest penalties
were appropriate because Veneziano was not
prejudiced and LIP had not acted in bad faith.
Veneziano challenges the penalties and asserts that
LIP acted in bad faith and caused him prejudice.

The District Court fulfilled its obligations by asking
whether LIP acted in bad faith or caused Veneziano
prejudice, answering both questions in the negative.
Based on these findings, the Court awarded statutory
penalties.   We will not disturb the District Court's
exercise of discretion in assigning the penalty
amount.

© 2007 Thomson/West  No Claim to Orig  U.S. Govt  Works.

79 Fed.Appx. 506
79 Fed.Appx. 506, 14 A.D. Cases 1920
**(Cite as: 79 Fed.Appx. 506)**

Page 4

E. Attorney Fees

The District Court awarded attorney fees to Veneziano under 29 U.S.C. § 1132(g)(1), but not in the entire amount he sought. The District Court excluded the amount of fees attributable to claims on which Veneziano did not prevail. Veneziano argues that this reduction in fees was inappropriate.

*Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), requires that a District Court calculate a lodestar amount before it awards attorney fees. The lodestar is reached by multiplying the reasonable number of hours worked by a reasonable hourly rate. *Id.* at 433, 103 S.Ct. 1933. The first question on appeal is whether the District Court properly reduced the number of hours that it plugged into the lodestar formula. "In calculating the hours reasonably expended, a court should review the time charged, decide *511 whether the hours set out were reasonably expended for each of the particular purposes described and then exclude those that are excessive, redundant, or otherwise unnecessary." *Maldonado v. Houstoun,* 256 F.3d 181, 184 (3d Cir.2001) (citations and quotations omitted). Veneziano has failed to show that the number of hours was reasonable. The document that Veneziano submitted supporting his fee request was not redacted or prorated to account for unsuccessful claims. [FN2] The District Court found that only one-sixth of general administrative activities were reimbursable. It was entirely appropriate for the District Court to prorate these general fees, as it was something that Veneziano's counsel should have done before applying for attorney fees under § 1132(g)(1).

> FN2. The fee request included hours expended on an EEOC claim that was wholly separate from the ERISA claim before the District Court.

[2] Then the District Court proceeded to further reduce the reimbursable hours because of Veneziano's limited success. *See Hensley,* 461 U.S. at 434-36, 103 S.Ct. 1933. The Court applied a negative 50% multiplier. The issue is whether this additional reduction was appropriate, or whether it constituted an inappropriate double reduction. In *Hensley,* the Supreme Court stated that once the District Court has calculated the lodestar it may, in its discretion, adjust the amount based on the "results obtained" by the plaintiff. *Id.* at 434-35, 103 S.Ct. 1933. Here, the District Court properly exercised its discretion by further reducing the lodestar. *See Institutionalized Juveniles v. Sec'y of Pub. Welfare,*

758 F.2d 897, 925 (3d Cir.1985).

We find that the District Court applied the proper standard and did not abuse its discretion in setting the amount of attorney fees.

F. ADA's Covered Entity Requirement

The District Court properly granted summary judgment for Aetna on the ADA claim, because Aetna is not a "covered entity" subject to the ADA. Veneziano misreads the ADA's prohibition against retaliation and coercion, 42 U.S.C. § 12203, to apply to all "persons" when it clearly applies only to employers. *See, e.g., Hiler v. Brown,* 177 F.3d 542, 545-47 (6th Cir.1999). Since Aetna is not Veneziano's employer, nor can it be seen as an agent of his employer, it is not subject to ADA liability.

G. NJLAD's Bona Fide Insurance Plan Exception

The District Court did not err by granting summary judgment for Aetna on the NJLAD claim. Aetna is excluded from the NJLAD as a "bona fide insurance plan." *See* N.J. Stat. Ann. § 10:5-2.1. Veneziano argues that because Aetna failed to comply with state regulations by terminating Veneziano's coverage without prior notice it cannot be considered "bona fide." However, there is no legal precedent that supports this position. Aetna falls squarely within the definition of "bona fide" set forth by the Supreme Court for an analogous provision in the Age Discrimination in Employment Act-the plan must only "exist and pay benefits." *Pub. Employees Ret. Sys. v. Betts,* 492 U.S. 158, 166, 109 S.Ct. 2854, 106 L.Ed.2d 134 (1989) (citations omitted).

H. Sanctions Award

[3] Veneziano appeals the sanctions award against his counsel. We will not reach the merits of his argument because he lacks standing to so appeal. *See Bartels v. Sports Arena Employees Local 137,* 838 F.2d 101, 104 (3d Cir.1988) (stating *512 that plaintiffs lack standing to appeal sanctions imposed only against their counsel).

III. CONCLUSION

For the reasons set forth, we will affirm the District Court's orders of summary judgment, imposition of penalties, and award of attorney fees. We dismiss the appeal of the sanctions award against Veneziano's counsel for lack of standing.

79 Fed.Appx. 506, 14 A.D. Cases 1920

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works

79 Fed.Appx. 506
79 Fed.Appx. 506, 14 A.D. Cases 1920
**(Cite as: 79 Fed.Appx. 506)**

Page 5

**Briefs and Other Related Documents (Back to top)**

• 03-2931 (Docket) (Jul. 10, 2003)

• 2003 WL 24046293 (Appellate Brief) Reply Brief On Behalf of Appellant (Jan. 24, 2003)Original Image of this Document (PDF)

• 2003 WL 24213920 (Appellate Brief) Reply Brief on Behalf of Appellant (Jan. 24, 2003)Original Image of this Document (PDF)

• 2003 WL 24046292 (Appellate Brief) Brief For Appellee Aetna U.S. Healthcare (Jan. 08, 2003)Original Image of this Document (PDF)

• 2003 WL 24213921 (Appellate Brief) Brief for Appellees (Jan. 08, 2003)Original Image of this Document (PDF)

• 2002 WL 32941934 (Appellate Brief) Brief and Appendix Volume I OF III (Pages A1- A104) on Behalf of Appellant (Dec. 10, 2002)Original Image of this Document with Appendix (PDF)

• 02-3083 (Docket) (Jul. 31, 2002)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

122 Fed.Appx. 570                                                                    Page 1
122 Fed.Appx. 570
**(Cite as: 122 Fed.Appx. 570)**

**Briefs and Other Related Documents**

This case was not selected for publication in the Federal Reporter.

NOT PRECEDENTIAL

Please use FIND to look at the applicable circuit court rule before citing this opinion. Third Circuit Local Appellate Rule 28.3(a) and Internal Operating Procedure 5.3. (FIND CTA3 Rule 28.0 and CTA3 IOP APP I 5.3.)

United States Court of Appeals,
Third Circuit.
Linda WAGNER, Appellant,
v.
BERWICK INDUSTRIES.
No. 03-3878.

Submitted Under Third Circuit LAR 34.1(a) Nov. 12, 2004.
Decided Dec. 20, 2004.

**Background:** Former employee brought suit against former employer, alleging age discrimination in violation of the Age Discrimination in Employment Act (ADEA) and the Pennsylvania Human Relations Act (PHRA) and retaliation in violation of Title VII and the PHRA. The United States District Court for the Middle District of Pennsylvania, James M. Munley, J., granted summary judgment in favor of employer. Employee appealed.

**Holdings:** The Court of Appeals, Buckwalter, Senior District Judge, sitting by designation, held that:

(1) termination of employee for unsatisfactory job performance did not violate the ADEA or the PHRA;

(2) employee waived argument that erroneous listing of retaliation claim as arising under Title VII instead of the ADEA should not have resulted in the dismissal of that claim; and

(3) absence of causal connection between exercise of protected activity and employee's termination precluded recovery on PHRA retaliation claim. Affirmed.

West Headnotes

**[1] Civil Rights** ☜1204
78k1204 Most Cited Cases
Employee's termination did not violate the Age Discrimination in Employment Act (ADEA) or the Pennsylvania Human Relations Act (PHRA), where she had been evaluated upon her job performance and did not satisfy the job criterion. Age Discrimination in Employment Act of 1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.; 43 P.S. § 951 et seq.

**[2] Federal Courts** ☜614
170Bk614 Most Cited Cases
Former employee's argument that her erroneous listing of retaliation claim against employer as arising under Title VII instead of the Age Discrimination in Employment Act (ADEA) should not have resulted in dismissal of the claim, which was raised for the first time on appeal, was waived. Age Discrimination in Employment Act of 1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.; Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[3] Civil Rights** ☜1252
78k1252 Most Cited Cases
No causal connection existed between exercise of protected activity and employee's termination, as required to recover on retaliation claim brought under the Pennsylvania Human Rights Act (PHRA), where employee was terminated four months after meeting with employer's president but there was no evidence that anything except her unsatisfactory performance led to her dismissal. 43 P.S. § 951 et seq.
**\*570** Appeal from the United States District Court for the Middle District of Pennsylvania. (Civil Action No. 01-cv-1908). District Judge: Honorable James M. Munley.

Cynthia L. Pollick, The Employment Law Firm, Pittston, PA, for Appellant.

Daniel T. Brier, Donna A. Walsh, Myers, Brier & Kelly, Scranton, PA, for Appellee.

**\*571** Before McKEE and CHERTOFF, Circuit Judges and BUCKWALTER, Senior District Judge.
[FN*]

> FN* Honorable Ronald L. Buckwalter, Senior District Judge for the Eastern District of Pennsylvania, sitting by designation.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

122 Fed.Appx. 570
122 Fed.Appx. 570
(Cite as: 122 Fed.Appx. 570)

Page 2

OPINION

BUCKWALTER, Senior District Judge.

This is an appeal by Linda Wagner from the grant of summary judgment for Defendant Berwick Industries LLC in a suit alleging age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621-34 (Count I) and the Pennsylvania Human Relations Act, 43 P.S. § 951-63 (Count II) and retaliation in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, et seq. (Count III) and the Pennsylvania Human Relations Act (Count IV).

Our review of the District Court's grant of summary judgment is plenary. Wagner contends that the District Court erred in finding (1) that she did not present sufficient evidence to permit a fact finder to either disbelieve Berwick's non-discriminatory reason for her dismissal or believe that a discriminatory motive permeated that decision; and (2) that the record did not establish a causal link between the termination of her employment and any complaints she may have made regarding age discrimination.

Before discussing the first assignment of error, we note that the record clearly supports Berwick's non-discriminatory reason for dismissal. As set forth in the District Court's opinion, Wagner had at least four warnings that her job performance was not satisfactory. Actually, Wagner had more than four warnings, and was disciplined less severely than required under defendant's four-step disciplinary system up to the time of her termination.

Wagner argues, however, that she presented sufficient evidence to permit a fact finder to disbelieve defendant's non-discriminatory reason or believe that a discriminatory motive permeated the decision to terminate her.

To that end, she argues that (1) younger employees were neither disciplined nor specifically scrutinized as she was; (2) she was the sole employee evaluated in 1999; (3) she was singled out by defendant's instructions to certain departments to watch for her errors rather than scrutinize all employees; (4) she was disciplined more harshly than non-protected workers; and (5) younger workers made fun of her and made references to her being "so ancient."

The record, as found by the District Court (and with which finding we agree), does not support her

contentions. Simply stated, plaintiff has failed to point to evidence from which a fact finder could reasonably infer that she satisfied the criterion identified by the employer or that the employer did not actually rely upon the stated criterion. *Simpson v. Kay Jewelers, Div. of Sterling, Inc.,* 142 F.3d 639, 647 (3rd Cir.1998).

[1] In this case, defendant evaluated plaintiff based upon her job performance. Plaintiff does not dispute this. Instead, she argues that even though she admittedly did not satisfy the job criterion the employer relied upon, she has nevertheless presented sufficient evidence to permit a fact finder to disbelieve defendant's non-discriminatory reason or to believe a discriminatory motive permeated defendant's decision.

**\*572** For reasons substantially as set forth in the District Court's opinion, we disagree.

As to the second assignment of error, the District Court assumed that even if Wagner engaged in protected activity, the record does not support the requisite causal link. Even adopting that assumption, her retaliation charge faces other obstacles.

First, the retaliation count in Wagner's complaint was brought under Title VII and not the ADEA. The District Court properly dismissed this. For the first time in this litigation, Wagner mentions in footnote 2, page 22 of her brief that "such clerical error of listing Title VII instead of ADEA should not have eliminated Wagner's claim for retaliation since she specifically listed a claim for retaliation."

[2] As Berwick points out, and Wagner does not dispute in her reply brief, this is the very first time this argument has been raised. "Arguments asserted for the first time on appeal are deemed to be waived and consequently are not susceptible of review in this Court absent exceptional circumstances (e.g., the public interest requires that the issues be heard or manifest injustice would result from the failure to consider such issues)." *Brown v. Philip Morris, Inc.,* 250 F.3d 789, 799 (3rd Cir.2001). No such exceptional circumstances exist.

Second, Wagner does not contest in any of her briefs before this court the contention of Berwick that her retaliation charge under the PHRA was untimely filed precluding her from seeking relief in this proceeding.

[3] Finally, assuming that the PHRA retaliation charge was properly filed, as the District Court noted

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works

122 Fed.Appx. 570

122 Fed.Appx. 570
**(Cite as: 122 Fed.Appx. 570)**

(and we agree) there is no causal connection between the exercise of protected activity and Wagner's dismissal.

When Wagner met with Berwick's president for a third time, it was after her third written warning and while she was terminated about four months after that meeting, there is no evidence that anything but her unsatisfactory performance led to her dismissal.

The judgment of the District Court will be affirmed.

122 Fed.Appx. 570

**Briefs and Other Related Documents (Back to top)**

• 2004 WL 3759818 (Appellate Brief) Appellant's Reply Brief (May 5, 2004)Original Image of this Document (PDF)

• 2004 WL 3759817 (Appellate Brief) Brief of Appellee (Apr. 21, 2004)Original Image of this Document (PDF)

• 2004 WL 3759816 (Appellate Brief) Brief of Appellant and Appendix (Volume One) (Mar. 18, 2004)Original Image of this Document with Appendix (PDF)

• 03-3878 (Docket) (Sep. 24, 2003)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT S

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

GLORIA NIEVES and EMILIO NIEVES,               :        CIVIL ACTION
                                               :
        Plaintiffs,                            :
                                               :
           v.                                  :
                                               :        Number: 06-123 ( MS )
ACME MARKETS, INC., a Delaware corporation     :
d/b/a Acme Markets No. 7816, ACME MARKETS,     :        JURY TRIAL DEMANDED
INC., a Delaware Corporation d/b/a Acme Markets :
No. 7836, ACME MARKETS, INC., a Pennsylvania   :
Corporation, d/b/a Acme Markets No. 7816,      :
ACME MARKETS, INC., a Pennsylvania             :
Corporation d/b/a Acme Markets No. 7836,       :
                                               :
        Defendants.                            :

## DECLARATION OF BARBARA. J. APPENZELLER

I, Barbara J. Appenzeller, state that I hold the position of Assistant Store Director for

Acme Markets, Inc.'s Middletown, Delaware store, that I have the authority to make this

declaration on behalf of Acme Markets, Inc., and aver as follows:

1.    Alex Phillips was employed by Acme Markets, Inc. as a deli associate. He
      worked at the Middletown, Delaware store and later at the Smyrna, Delaware
      store.

2.    Mr. Phillips is Caucasian.

I declare under penalty of perjury that the facts in the foregoing Declaration are true and
correct.

Executed on this 31 day of Jan , 2007.


Barbara J. Appenzeller

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| GLORIA NIEVES AND EMILIO NIEVES | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | C.A. No. 06-123 GMS |
| ACME MARKETS, INC., a Delaware Corporation, | ) | |
| d/b/a Acme Markets No. 7816 | ) | |
| ACME MARKETS, INC., a Delaware Corporation, | ) | |
| d/b/a Acme Markets No.7836 | ) | |
| ACME MARKETS, INC., a Pennsylvania | ) | |
| Corporation, d/b/a/ Acme Markets No. 7816, | ) | |
| ACME MARKETS, INC., a Pennsylvania | ) | |
| Corporation, d/b/a Acme Markets No. 7836 | ) | |
| | ) | |
| Defendants. | ) | |

## CERTIFICATE OF SERVICE

I, Jennifer M. Becnel-Guzzo, hereby certify that on February 1, 2007, I electronically

filed the **Motion for Summary Judgment, Opening Memorandum in Support of Motion for**

**Summary Judgment, and Appendix to Opening Memorandum in Support of Motion for**

**Summary Judgment** with the Clerk of Court using CM/ECF which will send notification of

such filing to counsel of record.

BUCHANAN INGERSOLL & ROONEY PC

BY: /s/ Jennifer M. Becnel-Guzzo
　　　Jennifer M. Becnel-Guzzo (#4492)
　　　The Brandywine Building
　　　1000 West Street, Suite 1410
　　　Wilmington, DE 19801
　　　(302) 552-4200
　　　jennifer.becnelguzzo@bipc.com