IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| GLORIA NIEVES and EMILIO NIEVES, | § | |
| | § | |
| Plaintiffs, | § | C.A. Number: 06-123 GMS |
| | § | |
| v. | § | |
| | § | |
| ACME MARKETS, INC., a Delaware corporation | § | |
| d/b/a Acme Markets No. 7816, ACME MARKETS, | § | Trial by Jury Demanded |
| INC., a Delaware Corporation d/b/a Acme Markets | § | |
| No. 7836, ACME MARKETS, INC., a Pennsylvania | § | |
| Corporation, d/b/a Acme Markets No. 7816, | § | |
| ACME MARKETS, INC., a Pennsylvania | § | |
| Corporation d/b/a Acme Markets No. 7836, | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFFS' ANSWERING BRIEF TO DEFENDANT ACME MARKETS, INC'S OPENING BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

BIGGS AND BATTAGLIA
/s/ Victor F. Battaglia
/s/Philip B. Bartoshesky
Victor F. Battaglia, Sr. (ID# 156)
Philip B. Bartoshesky (ID# 2056)
921 Orange Street
Wilmington, DE 19801
(302) 655-9677
VictorSr@batlaw.com
Pbarto@batlaw.com
Attorneys for Plaintiffs

February 15, 2007

## TABLE OF CONTENTS

NATURE AND STAGE OF THE PROCEEDINGS....................................................................1

STATEMENT OF FACTS...........................................................................................................2

SUMMARY OF ARGUMENT ..................................................................................................10

ARGUMENT...............................................................................................................................13
    I.  PLAINTIFF'S HOSTILE ENVIRONMENT IN AND RETALIATION CLAIMS
UNDER TITLE VII AND 42 U.S.C. § 1981 PRESENT ISSUES OF MATERIAL FACT
WHICH MUST BE DECIDED BY A JURY ...........................................................................13

    1.  THERE ARE ISSUES OF FACT PRECLUDING SUMMARY JUDGMENT ON
PLAINTIFF GLORIA NIEVES'S HOSTILE ENVIRONMENT CLAIM...................................14

    2.  THERE ARE DISPUTED ISSUES OF MATERIAL FACT PRECLUDING
SUMMARY JUDGMENT IN PLANTIFF'S CLAIM FOR RETALIATION ...............................19

    II.  THERE ARE ISSUES OF FACT PRECLUDING SUMMARY JUDGMENT AS TO
WHETHER PLAINTIFF WAS CONSTRUCTIVELY DISCHARGED FROM HER
EMPLOYMENT ...........................................................................................................................24

    III.  PLAINTIFF HAS A VIABLE CAUSE OF ACTION FOR INTENTIONAL
INFLICTION OF EMOTIONAL DISTRESS ...........................................................................28

CONCLUSION……………………………………………………………………………….29

i

# TABLE OF CASES

*Allen v. Verizon Pennsylvania, Inc.*, 418 F.Supp.2d. 617, 629, 630 (W.D. Pa 2005) ......................25

*Aman, Inc. v. Cort Furniture Rental Corp.*, 85 F.3d. 1074 (3rd.Cir.1996) ........................................24

*Angeloni v. Diocese of Scranton*, 135 Fed.Appx. 510 (3rd.Cir. 2005) ...............................................26

*Anjelino v. New York Times Company*, 200 F.3d. 73, 87 (3rd.Cir.2000) ............................................26

*Brewer v. Quaker State Oil Refining Corporation*, 72 F.3d. 326 (3rd.Cir. 1995)..........................21, 23

*Brey v. Marriott Hotels*, 110 F.3d. 986, 990 (3rd.Cir.1997).................................................................19

*Burlington Northern and Santa Fe Railway Company v. White*, 126 S.Ct. 2405 (2006) ...................19

*Cardenas v. Massey*, 269 F.3d. 251, 262 (3rd.Cir. 2001) ..............................................................16

*Collins v. African Methodist Episcopal Zion Church*, 2006 WL1579828 (Del.Super. March 29, 2006) .....................................................................................................................................................28

*Colores v. Board of Trustees*, 130 Cal. Rptr.2d. 347 (Cal.App. 2003)............................................25

*Connors v. Chrysler Financial Corp.*, 160 F.3d. 971 (3rd.Cir. 1998) ..............................................24

*Conoshenti v. Public Service Electric and Gas Company*, 364 F.3d. 135 (3rd.Cr. 2004) ....................13

*Davis v. Monsanto Chemical Company*, 858 F.2d. 345, 349 (6th Cir. 1988) .................................16

*Duffey v. Paper Magic Group, Inc.*, 265 F.3d. 163 (3rd.Cir. 2001) ....................................................25

*Dunbar v. County of Saratoga*, 358 F.Supp.2d. 115 (N.D.N.Y. 2005) ............................................27

*Farrell v. Planters Lifesaver Company*, 206 F.3d. at 281 (3rd.Cir.2000)............................................20

*Gharzouzi v. Northwestern Human Services of Pennsylvania*, 225 F.Supp.2d. 514, 517 (Ed.Pa. 2000)..............................................................................................................13,16,21

*Goosby v. Johnson & Johnson Medical, Inc.*, 228 F.3d. 313, 321 (3rd.Cir. 2000) ........................13,19

*Goss v. Exxon Office System Company*, 747 F.2d. 885 (3rd.Cir.1984) ..............................................24

*Harris v. Forklift Systems, Inc.*, 510 U.S. 17 (1993) ........................................................................15

*Harris V. Parker College of Chiropractic*, 286 F.3d. 790 (5thCir.2002) ............................................27

*Hazen Paper Company v. Biggens*, 507 U.S. 604 (1993)..................................................................20

*Herrera v. Lufkin Industries, Inc.*, 475 F.3d. 675 (10th Cir. 2007) ....................................................15

*Josey v. Hollingsworth Corp.*, 996 F.2d. 632, 638 (3rd.Cir. 1993) ....................................................21

*Keown v. Richfield Holdings*, 2002 WL1340311 (ED.PA. 2002) ......................................................17

*Levendos v. Stern Entertainment, Inc.*, 860 F.2d. 1227 (3rd Cir. 1988) ............................................24

*McCowan v. AllStar Maintenance, Inc.*, 273 F.3d. 917, 923 (10th Cir. 2001)..................................15

ii

*Nieto v. Kapoor*, 268 F.3d. 1208, 1219 (10th Cir. 2001) .................................................. 15

*Ocasio v. Lehigh Valley Family Health Center*, 92 Fed.Appx. 876 (3rd.Cir. 2004) ......................... 18
*Oncale v. SunDowner Offshore Services*, 523 U.S. 75, 82 (1998) ..................................................... 17

*Paris v. Christiana Care Visiting Nurse Association*, 197 F.Supp.2d. 111 (D.Del. 2002)............. 13,17
*Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Company*, 998 F.2d. 1224, 1230 (3rd.Cir. 1993) .................................................................................................................................................. 13

*Rafferty v. Hartman Walsh Painting Company*, 768 A.2d. 157, 160 (Del. 2000) ............................ 28

*Saint Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993) ............................................................. 19
*Sempier v. Johnson & Higgins*, 45 F.3d. 724, 731 ....................................................................... 21,23
*Sherrod v. Philadelphia Gas Works*, 57 Fed.Appx. 68 (3d.Cir.2003) ......................................... 16,18
*Spencer v. WalMart Stores, Inc.*, 469 F.3d. 311, 317 note 4 (3rd.Cir. 2006) .................................... 25

*The McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) ....................................................... 19
*Turner v. Anheiser Busch, Inc.*, 876 P.2d. 1022 (Cal.Supreme 1994) ............................................. 25

*Washington v. Jenny Craig Weight Loss Centers, Inc.*, 3 F.Supp.2d. 941 (N.D.Ill. 1998) ................ 27
*Whitlow v. Visiting Nurses Association*, 420 F.Supp.2d. 92, (W.D.N.Y. 2005) ................................ 27

## TABLE OF AUTHORITIES

19 Del. C. § 730, et. seq. ....................................................................................................................... 8

19 <u>Del. C.</u> § 2304 ............................................................................................................................... 28

42 U.S.C. § 1981 .................................................................................................................................. 26

Title VII.................................................................................................................................... 15,19,25

## NATURE AND STATEMENT OF PROCEEDINGS

Plaintiff Gloria Nieves (hereafter "Plaintiff") was an employee of Defendant ACME Markets, Inc. (hereafter "ACME") from November, 2001 to January, 2005. Plaintiff worked at ACME Supermarkets in Middletown, Delaware from November of 2001 until she was suspended in March of 2004 and transferred to the ACME Supermarket in Smyrna, Delaware.

In April of 2004, she brought a charge of discrimination with the Delaware Department of Labor (DDOL) and the Equal Employment Opportunity Commission (EEOC), asserting discrimination on the basis of national origin and retaliation beginning in July of 2003. On March 31, 2005 the DDOL issued a determination of reasonable cause to believe unlawful employment practices had occurred (B-5) and the EEOC on November 30, 2005 issued a Right to Sue letter adopting the findings of the DDOL. (B-4)

Plaintiff, together with her husband, Plaintiff Emilio Nieves (hereafter Mr. Nieves) filed suit in this Court on or about February 28, 2006 alleging: a hostile environment on the basis of national origin and retaliation, in violation of Title VII and 42 U.S.C. § 1981; violations of the Delaware Discrimination and Employment Act; and state law claims of unlawful termination[1] and intentional infliction of emotional distress and the derivative claim of Mr. Nieves of loss of consortium.

Defendant ACME has now moved for Summary Judgment and filed an Opening Brief on February 1, 2007. This is Plaintiffs', Gloria and Emilio Nieves, Answering Brief.

---

[1] Plaintiffs agree that the state law unlawful termination claim should be dismissed due to the Amendments to Delaware employment laws.

i

**STATEMENT OF FACTS**

Plaintiff Gloria Nieves (Plaintiff) was born in Columbia, South America, in October of 1963.  Her father was engaged in international business transactions and as a consequence her family spent some time in the United States while she was growing up.  She was educated in Columbia and had some secondary education in medical training in Mexico.   In 2001 she married Plaintiff Emilio Nieves (Mr. Nieves), a Puerto Rican native who has been living in the United States since the mid-1970s and has worked at Formosa Plastics for over 30 years.

In May of 2001, Plaintiff began living in Middletown, Delaware and by November of 2001 had obtained employment part-time at the ACME Market in Middletown[2].  She began as a "bagger" at the ACME in Middletown and eventually worked her way up to an associate's position in the Deli department.  In April of 2003, ACME opened a new, much bigger store in Middletown and assigned a new store manager, Mr. Stephen Briley (hereafter Briley).  Plaintiff moved to the new store when it opened. (Plaintiff depo p.30, 82-87, B-12, 14)

Plaintiff had no problems at her employment until the late summer of 2003.  Her work environment became especially abusive in or about November of 2003 when she applied for and obtained a full-time position as the senior night-time associate in the deli department.[3]  Beginning

---

[2] Though Plaintiff remained a "part-time" employee of ACME until the summer or fall of 2003, most weeks she worked more than 40 hours. (A-95-100)

[3] Plaintiff does not recall exactly when she obtained this full-time position.  Her "personnel file" produced by ACME has no records relating to her promotion or any other aspects of her employment at the new Middletown store except for the written notice of suspension and transfer dated March 19, 2004. (A-132) In fact, in her personnel file contains only documents relating to her being hired in November of 2001, some injury reports from the summer of 2004 when she was at the Smyrna store and a form indicating the end of her employment in January of 2005.

2

in July of 2003 and accelerating in or about November of 2003 Plaintiff's co-workers began a

constant barrage of racially abusive remarks and conduct.  (Plaintiff depo. p.33-40, 82, B-12, 14,

24)  Contrary to Defendant's assertion, there were not simply 5 or 6 instances of abusive behavior

by Plaintiff's co-workers in the 2 ½, or so, years Plaintiff worked at the ACME Middletown

stores.  Rather, there were numerous, almost daily incidents, as described by Plaintiff from the

summer or early fall of 2003, until March of 2004, when she was suspended and transferred.

(Plaintiff depo. 33-43, B-12-15)

Plaintiff has testified she was told "many times" not to speak Spanish to Spanish-speaking

customers. (Plaintiff depo. p.44, B-15)  She was told this even though ACME management

admits the ability to speak Spanish to Spanish-speaking customers was not only not prohibited

but encouraged (Assistant Store Manager Appenzeller deposition, p.27, 28, A-138, 139).

When Plaintiff applied for and obtained the full-time Senior night Deli Associate

position, co-workers complained she should not have been given the position because of her

accent, and they questioned whether or not she had a "green card". (Plaintiff's deposition,

p.35-36, 58, B-13, 19).  A group of her co-workers were heard bragging they had looked through

her personnel file to see if she had a green card.  These same co-workers also bragged that one of

her co-workers had gone to a number of other stores in the Middletown area warning that she

should not be hired because she was an illegal alien.  (Cumberbatch depo. p.15, 47, 48, B-29, 35)

When she asked innocent questions about work assignments (but with an accent), a co-

worker frequently called her stupid.  She was referred to as "the little Chihuahua" and treated as

if she were ignorant or stupid (because she was from South America) and would not know

3

common things such as the location of the State of Alaska was. (Plaintiff's deposition, p.39, B-14; Cumberbatch deposition, p.15-21, B-29, 31)

On a number of occasions, (in fact whenever the subject of drug use or drug abuse came up in conversation), her co-workers would say, ask Gloria, she's from Columbia and knows all about drugs, or imply she was a drug runner. (Plaintiff's deposition, p.65, B-20; Cumberbatch depo. p.23, B-31)  On more than one occasion, co-workers made mocking references to her language, quoting a line from the old Fantasy Island television show "De Plane, De Plane". (Plaintiff depo. p.37, 38, B-13, 14; Cumberbatch depo. p. 16, B-29)  On two different occasions Plaintiff was denied vacation in situations where co-workers' vacations were granted. (Plaintiff depo. p.14-15, B-42)

In each and every instance where Plaintiff heard, or was told by other co-workers, that these abusive, hostile statements were being made to or about her, she complained to both her immediate supervisor, Denise Dean, and either the Store Assistant manager, Barbara Appenzeller, or the Store Manager, Stephen Briley. (Plaintiff depo. p.35, 40, 46, B-15)

In each and every instance her supervisor and the Manager or Assistant Manager indicated they understood her concerns and would address them with her co-workers.  They never did.  In fact, her supervisor, after seemingly assuring Plaintiff something would be done, would join her co-workers and laugh at Gloria's complaints. (Cumberbatch depo. p.19-21, B-30-31)

One co-worker, Amanda Cumberbatch, described the abusive atmosphere that Gloria had to contend with as feeling "like when you walk in there you are like in the 1960s in a small town down South where everybody is racist..." (Cumberbatch depo. p. 27, B-32).

4

After this barrage of hostile, abusive and racist remarks and conduct began, Plaintiff would nearly every night after work go home crying. This put a significant strain on her marriage. (Plaintiff's deposition, p.130-133, B-28; Cumberbatch deposition p.16, 29, 52, B-29, 33, 36; Mr. Nieves deposition p.33-34, B-10,11) Although ACME supervisors and management deny Plaintiff made these complaints, they admit seeing Plaintiff often in tears and have acknowledged there was extreme tension in the Deli Department. (Dean depo. p.13-14, B-56-57; Alphin depo. p.9, B-60) In late February of 2004, Plaintiff went to the Dover emergency room with what turned out to be work related stress chest pain. (Plaintiff depo., p.43, 130-133, B-15, 28) Her co-workers accused her of faking this illness. Again, she complained to management. (Plaintiff depo. p. 48-54, B-16-18)

In March of 2003, just after she returned to work after the chest pain incident, one of Plaintiff's co-workers, Joyce Alphin, fabricated accusations that Plaintiff had thrown water and deli ham at her and then two days later attempted to trip her with a mop handle. Alphin, supposedly, reported the first of these two incidents to management on March 2, 2003 and the second on or about March 5, 2003. (Alphin depo. p.8, B-60)

Plaintiff was first made aware of the purported problem with Alphin when she reported to work on March 6 and was told by the Assistant Manager not to clock in but to report to the office. ACME did not follow its progressive discipline policy. (Moyer depo. p. 6-7, B-39; Briley depo. p. 16, B-43) Instead she was told by Assistant Manager Appenzeller she was suspended. When she asked why, she was told the union would explain. Later that day she received a phone call at home from a union representative. She put Mr. Nieves on the phone because his English was better and also because he had some experience with union procedures. The union

5

representative explained Plaintiff had been suspended because Ms. Alphin claimed she had thrown water and deli ham at her. No mention was made of the purported incident with a mop handle. (Plaintiff depo. p.47-53, 91, B-16, 17, 26; Mr. Nieves depo. p.16, B-6)

Even though ACME management described her as a good worker, no one from ACME management or Human Resources Department ever asked Plaintiff what, if anything, occurred on March 2 or March 5. If they had, Plaintiff would have explained she had no idea what the basis for Ms. Alphin's accusations were. No one from ACME investigated the accuracy of Ms. Alphin's purported accusations. (Dean depo. p.12-13, B-56; Appenzeller depo. p.19-22, B-52-53) Despite the lack of any investigation, ACME management was satisfied with the process. (Moyer depo. p. 16, B-41) Instead ACME seized upon this situation as an excuse to get rid of Plaintiff, because she complained so frequently about being mistreated.

On or about March 19, Plaintiff received a letter from ACME's Human Resources Department Regional Manager, Stephen Moyer, which stated, *inter alia*, that Plaintiff would be suspended for one week and then transferred to the Smyrna ACME store. (A-132) It also stated she would be fired if there were any other "substantiated" breaches of ACME's personnel rules and regulations. E-mail messages between Moyer and Briley falsely claimed Plaintiff's co-workers were afraid of her. (Briley depo. p.27, 36, B-47, 48; e-mail A-125-127)

After receiving the March 19 letter, Plaintiff and Mr. Nieves met with Store Manager Briley. He told them that he and the union had agreed Plaintiff would be suspended and transferred to the Smyrna store. He also told them that if she did not accept the transfer or filed a grievance challenging that action, that there would be a different (and impliedly worse) result for Plaintiff. (Plaintiff depo. p.52-53, B-17; Mr. Nieves depo. p.16, B-6)

6

After this notice of suspension and transfer, ACME personnel falsely claimed Mr. Nieves had been "hanging around" the store and that Plaintiff's former co-workers were afraid of him. The workers were told by ACME management that if Mr. Nieves came into the store they should physically assault him and call the Middletown Police. Some ACME employees were escorted from the store at night because of the purported fear of Mr. Nieves. (Cumberbatch depo. p.23-26, B-31,32; Appenzeller depo. p.28-29, B-54; Alphin depo. p.29-32, B-65, 66) When Mr. Nieves heard ACME workers had been instructed to attack him, he himself called the Middletown Police. He was told there was nothing the police could do and their best advice was that he avoid the Middletown store. In fact, Mr. Nieves never went into the Middletown store after Plaintiff's suspension. (Mr. Nieves depo. p.19, 20, B-7)

Plaintiff reluctantly accepted the transfer to the Smyrna location. Her reluctance was based primarily on the fact that it was instead of a 5 or 10-minute trip from her house, a 30 or 65-minute trip. This was significant in that she was often needed at home to take care of her husband's extremely ill brother. While at the Middletown store, during breaks, especially her "lunch" break (Plaintiff worked the night shift), she was able to attend to her brother-in-law's needs. That became impossible after she was transferred to the Smyrna location. This was an emotional upset to her and an additional strain on her marriage. (Plaintiff depo. p.56, 57, B-18; Mr. Nieves depo. p.24, 25, B-8)

While at the Smyrna store, from mid March, 2004 until January of 2005, Plaintiff did not suffer any further direct hostility or abusive environment based upon her race except that one of her former co-workers, Christina Shaw, was sent to Smyrna by her former supervisor to find out her salary and work conditions. Also, in the late summer to early fall of 2004, an incident

7

occurred which confirmed Plaintiff's belief ACME had no interest in protecting her or retaining her as an employee. She was working in the ACME Smyrna Market and missed listing an item she was attempting to shelve and spoke a curse. Her supervisor hit her in the mouth. Plaintiff reported this and, as she suspected, nothing was done; as nothing had ever been done when she complained so many times in the past. (Plaintiff depo. p.61,62,77,78 B-19-23)

These incidents at the Smyrna store exacerbated her emotional distress and she decided she could no longer stay at ACME if it continued to ignore her complaints. Due to the strain this had put on her marriage she decided her best course was to leave the state and stay with relatives in Florida. She stayed at the Smyrna store and saved money so she could go to Florida until January of 2005. She resigned from ACME went to Florida and stayed with relatives for approximately seven months. During that time she had some communications with her husband and eventually they decided she would return to him in Delaware. She returned to Middletown and obtained employment at a Wawa store where she continues to be employed.

As indicated previously, none of the events which occurred during Plaintiff's time at the Middletown store from the time the new store opened in April of 2003 until her suspension and transfer in March of 2004 are reflected in Plaintiff's personnel file (except the written notice of suspension and transfer). In fact, there are no records of her promotion and assignment to full-time work nor are there any performance evaluations of Plaintiff during her entire time at ACME, even though these should be done on a yearly basis. (Appenzeller depo. p.67, B-49) The employment history and wage information included in ACME's appendix (A-95-100) was not included in the personnel file produced during discovery. According to ACME management, and Delaware Law (19 Del. C. § 730, et. seq.) performance evaluations, notices of promotion and

8

wage information should be in the personnel file. A reasonable inference from the omissions is that either ACME's record keeping is severely deficient, or materials adverse to ACME's arguments have been surreptitiously removed from her file.

After Plaintiff filed her charge with the DDOL and EEOC in April of 2004, an investigator contacted ACME. In March of 2005 the investigator sent a letter to ACME by fax[4] which stated, inter alia, that the evidence indicated ACME had engaged in discriminatory practices. The letter gave ACME 10 days to respond. ACME did not respond. The DDOL then issued a determination that ACME had violated the employment laws and scheduled a conciliation. Unfortunately, Plaintiff was, at the time in Florida, and did not receive notice of the conciliation meeting until after it was to have taken place.

---

[4] The "faxed" copy of the letter was produced by ACME together with the fax cover page. (B-1-3)

9

## SUMMARY OF ARGUMENT

    1. PLAINTIFF'S CLAIMS UNDER TITLE VII AND 42 U.S.C. § 1981 FOR HOSTILE WORK ENVIRONMENT AND RETALIATION PRESENT ISSUES OF MATERIAL FACT WHICH MUST BE DECIDED BY A JURY.

    a. With respect to Plaintiff Gloria Nieves's hostile environment claim, ACME only disputes that the abuses suffered by Plaintiff were serious or pervasive enough to support such a claim. Plaintiff suffered nearly daily abuses based on her race or national origin over a 4 to 5 month period. Under the circumstances of her employment this abuse made it exceptionally more difficult for her to perform her job. This presents questions of fact as to the pervasiveness of the abuses preventing entry of Summary Judgment.

    b. There are disputed issues of fact precluding Summary Judgment of Plaintiff's claim for retaliation. Under the burden shifting analysis, Plaintiff must show she engaged in a protected activity, the employer took actions likely to deter victims of discrimination from complaining, and a causal link. ACME only disputes the third prong of the prima facie analysis, that is, whether Plaintiff can establish a causal link between her complaints of discrimination and the employer's suspension and transfer of Plaintiff. ACME also argues it had a legitimate non-discriminatory reason for the actions it took and that Plaintiff must therefore establish that those reasons were pretext.

    Plaintiff was suspended and transferred by management purportedly due to complaints of a co-worker, however, ACME management did not investigate the co-worker's claims. Further, the description of those claims by ACME's management are inconsistent and contradictory to

10

such an extent that ACME's position is not credible. Plaintiff has established the causal link and that ACME's purported basis for its actions were pretext.

## 2. THERE ARE ISSUES OF FACT PRECLUDING SUMMARY JUDGMENT AS TO WHETHER PLAINTIFF WAS CONSTRUCTIVELY DISCHARGED FROM HER EMPLOYMENT.

Whether the conditions were such that employees suffered a constructive discharge is measured by an objective standard of whether a reasonable person in a specific employee's position would have been compelled to resign. The issue of whether there is a constructive discharge is a fact-based determination.

In this case, there was constructive discharge because of the repeated abuses by Plaintiff's co-workers, and, more importantly, despite her complaints, ACME's complete and utter failure to take any action to correct those abuses.

## 3. PLAINTIFF HAS A VIABLE CAUSE OF ACTION FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.

Under Delaware Law, the exclusive remedy of an employee who suffers a work-related accidental injury is through the Delaware Worker's Compensation Act. However, where the facts show deliberate intent by an employer to bring about an injury to an employee there is no "accident" and the exclusivity provisions do not apply.

In the present case, there are questions of fact as to whether ACME, by knowingly ignoring Plaintiff's complaints of harassment, intended to and did cause her emotional distress.

11

There are questions of fact precluding Summary Judgment as to ACME's intent and Plaintiff's emotional injuries.

12

<u>ARGUMENT</u>

I. **PLAINTIFF'S HOSTILE ENVIRONMENT IN AND RETALIATION CLAIMS UNDER TITLE 7 AND 42 U.S.C. § 1981 PRESENT ISSUES OF MATERIAL FACT WHICH MUST BE DECIDED BY A JURY.**

<u>(A) LEGAL STANDARD.</u>

In deciding a Motion for Summary Judgment, the court must view the record and draw inferences in the light most favorable to the non-moving party. *Conoshenti v. Public Service Electric and Gas Company,* 364 F.3d. 135 (3ʳᵈ.Cr. 2004); *Paris v. Christiana Care Visiting Nurse Association,* 197 F.Supp.2d. 111 (D.Del. 2002). The Third Circuit has urged, "…special caution in granting Summary Judgment to an employer when its intent is at issue, particularly in discrimination and retaliation cases." *Gharzouzi v. Northwestern Human Services of Pennsylvania,* 225 F.Supp.2d. 514, 517 (Ed.Pa. 2000) (citing *Goosby v. Johnson & Johnson Medical, Inc.,* 228 F.3d. 313, 321 (3ʳᵈ.Cir. 2000).

To demonstrate the existence of genuine disputes of material facts, the non-moving party "…need not match, item for item, each piece of evidence proffered by the Movant but simply must exceed the "mere scintilla" [of evidence]." *Paris v. Christiana Care Visiting Nurse Association,* <u>supra</u>, 197 F.supp.2d. at 117, quoting *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Company,* 998 F.2d. 1224, 1230 (3ʳᵈ.Cir. 1993)

In the present case, ACME asks this court to draw numerous inferences in its favor. When the record and the inferences from the record are construed in a light favorable to the Plaintiffs, it is clear Summary Judgment on Plaintiff's hostile environment and retaliation claims must be denied.

13

## B.  MERITS OF ARGUMENT

### 1. THERE ARE ISSUES OF FACT PRECLUDING SUMMARY JUDGMENT ON PLAINTIFF GLORIA NIEVES'S HOSTILE ENVIRONMENT CLAIM.

In it Opening Brief (page 12), ACME accurately sets forth the 5 elements of a hostile environment claim.  ACME then asserts it is entitled to Summary Judgment because Plaintiff cannot show there are disputes of material fact as to whether Plaintiffs suffered "severe or pervasive" harassment.

ACME's argument relies upon a construction of the facts and inferences from those facts, weighted heavily in ACME's favor.  ACME also relies upon a misapplication of applicable law.

The type, frequency, and nature of the abusive comments and conduct suffered by Plaintiff is set forth in Plaintiff's Statement of Facts, supra.  ACME repeatedly claims that there were only "a handful" of incidents during Plaintiff's two and a half years of employment at ACME's Middletown stores, and that a number of the abuses suffered by Plaintiff were not of a racially discriminatory nature.

In fact, there were not simply a "handful" of abuses, but rather an almost daily barrage from Plaintiff's co-workers.  Plaintiff complained about each of those incidents to management but nothing was ever done.

Further, these incidents did not occur over a two and a half year period as ACME repeatedly claims.  The harassment did not begin until Plaintiff moved to the new Middletown store which opened in April of 2003.  In fact, the earliest incident Plaintiff has described did not occur until July of 2003.  Most of the incidents, and the most intense of them, did not occur until after Plaintiff was promoted to the full-time position in the late fall of 2003.  Therefore, the

14

hostility she suffered occurred over a 4 to 5 month period culminating in ACME's retaliatory suspension and transfer of Plaintiff in March of 2004. Only if the evidence and inferences from the evidence are slanted highly in ACME's favor can this case be seen as a series of isolated incidents over two and a half years. What actually occurred was a intense period of harassment over a four to five month period.

In any event, contrary to Defendant's argument the assessment of whether hostility is pervasive under Title VII is not a simple counting exercise. As the Supreme Court stated in *Harris v. Forklift Systems, Inc.,* 510 U.S. 17 (1993), Title VII is intended to bar workplace conduct which would create an environment that could reasonably be perceived, and is perceived, as hostile or abusive. "This is not, and by its nature cannot be, a mathematically precise test." Id. at 22. Whether the environment is hostile or abusive must be determined only by looking at all of the circumstances of a particular employee's situation. The frequency of the discriminatory conduct is only one factor to be taken into account. Other factors include whether the conduct is physically threatening or humiliating, whether it interferes with an employee's work performance and the effect on the employee's psychological well-being. *Harris,* supra, 510 U.S. at 22, 23. See also *Herrera v. Lufkin Industries, Inc.,* 475 F.3d. 675 (10th Cir. 2007).[5]

In her concurring opinion in *Harris v. Forklift Systems,* supra, Justice Ginsberg stated that, "…it suffices to prove that a reasonable person subjected to the discriminatory conduct would

---

[5] Stating, "While courts have tended to count events over time to determine pervasiveness, the word pervasive is not a counting measure. The tryer of fact utilizes a broader contextual analysis" (quoting *Nieto v. Kapoor,* 268 F.3d. 1208, 1219 (10th Cir. 2001)). As the court in *Herrera* noted, because the evaluation of the pervasiveness and severity of a hostile environment is based upon an objective and subjective evaluation of all of the circumstances, it is particularly unsuited for Summary Judgment "because it is quintessentially a question of fact." (*Herrera,* supra, at page 2, citing *McCowan v. AllStar Maintenance, Inc.,* 273 F.3d. 917, 923 (10th Cir. 2001).
15

find, as the plaintiff did, that the harassment so altered working conditions so as to 'make it more difficult to do the job'". (citing *Davis v. Monsanto Chemical Company*, 858 F.2d. 345, 349 (6th Cir. 1988)).

In the present case, Plaintiff has presented clear evidence the harassment to which she was subjected made it more difficult for her to perform her job. Plaintiff, her co-worker Amanda Cumberbatch, and even ACME Supervisor, Denise Dean, testified as to Plaintiff's frequent crying and the tense atmosphere in the Deli department. (Cumberbatch depo. p. 16, B-29; Dean depo. p. 13-17, B-56-57) Eventually, Plaintiff dreaded going to work. While ACME has asked this court to accept its version of the facts (ie. that Plaintiff was upset because of marital difficulties or because she believed she was doing more work than others) the inferences in Plaintiff's favor demonstrate a reasonable person in her situation would find it more difficult to do her job.

ACME also asserts several instances of harassment were not racially motivated and therefore not pertinent. That is simply an incorrect characterization of the required analysis. As the Third Circuit Court of Appeals stated in *Cardenas v. Massey,* 269 F.3d. 251, 262 (3rd.Cir. 2001), "...the advent of more sophisticated and subtle forms of discrimination requires that we analyze the aggregate effect of all evidence and reasonable inferences therefrom, including those concerning incidents of facially neutral mistreatment, in evaluating a hostile work environment claim". See also *Gharzouzi v. Northwestern Human Services,* supra, 225 F.Supp.2d. at 535 (Words that appear facially neutral can be considered hostile discrimination if it can be shown they were motivated by some discriminatory animus under the circumstances.) In *Sherrod v. Philadelphia Gas Works,* 57 Fed.Appx. 68 (3d.Cir.2003) the court noted that in light of two racially motivated comments, a reasonable fact finder could have determined that some facially neutral

16

mistreatments of the plaintiff in that case were race related. In *Oncale v. SunDowner Offshore Services,* 523 U.S. 75, 82 (1998) the court noted that the events or activities which amount to actionable harassment cannot be reduced to a simple formula. Rather, they must be evaluated based upon common sense and "an appropriate sensitivity to social context," in order to distinguish between simple workplace teasing and conduct which a reasonable person in the position of a plaintiff would find severely hostile or abusive.

In the present case, in light of the mocking of Plaintiff's language, the references to "the little Chihuahua" and questioning of Plaintiff's legal status as a resident alien, a fact finder could determine that co-workers frequent questioning of Plaintiff's intelligence, calling her stupid, rudely yelling at her when she asked for help and accusing her of faking an illness were racially motivated incidents, when taken together with other incidents of clear racial animus demonstrate a hostile environment.

ACME also attempts to analogize the present case with a number of other hostile environment cases. These cases are not comparable. For example, in *Patel v. Cigna Corporation,* the plaintiff described five incidents over an approximately one year period, only two of which were reported to management. In *Keown v. Richfield Holdings,* 2002 WL1340311 (ED.PA. 2002) the plaintiff was sent 8 or 9 pamphlets which he considered sexually offensive over a four month period, but after he complained to management, the delivery of the pamphlets ceased. In the present case, Plaintiff complained over and over again to management but nothing was ever done. In *Paris v. Christiana Care Visiting Nurse Association,* supra, the plaintiff admitted that the conduct or conversations which were the basis of the hostile environment claim were not even

17

directed towards her. (i.e. she overheard a conversation, a joke was told at a large employee gathering, etc.)

In *Sherrod v. Philadelphia Gas Works,* supra, there was no evidence the plaintiff was referred to using a racial slur, and all the statements which were considered offensive were subject to a non-racial interpretation, and were neither physically threatening nor humiliating.

In the present case, Plaintiff was called "the little Chihuahua". Many of the statements were humiliating, especially in light of the fact she complained repeatedly and was falsely reassured something would be done.[6]

In *Ocasio v. Lehigh Valley Family Health Center,* 92 Fed.Appx. 876 (3rd.Cir. 2004) there were very few incidents, no racial epithets and several of the claimed incidents were not even directed towards the plaintiff. These cases, and the others relied upon by ACME simply are not comparable to the present case.

When the evidence, and inferences, are viewed in a light favorable to the Plaintiff there was clearly a regular, pervasive and serious course of hostility directed against Plaintiff because of her national origin. ACME's management was repeatedly informed of this harassment and repeatedly, falsely assured Plaintiff something would be done. Nothing ever was, and Plaintiff suffered serious emotional distress represented by her constant tears, dread of returning to work and the effect upon her marriage. Summary Judgment on ACME's hostile environment must be denied.

---

[6] There is also evidence that ACME was willing to use physical violence towards Plaintiff's husband. After Plaintiff was suspended Mr. Nieves discovered workers were told that if he entered the store he should be attacked and reported to the police. While not a direct threat of violence towards Gloria, clearly this workplace was permeated with racial bigotry which could have led to physical confrontations.

18

## 2. THERE ARE DISPUTED ISSUES OF MATERIAL FACT PRECLUDING SUMMARY JUDGMENT ON PLAINTIFF'S CLAIM FOR RETALIATION.

Under *The McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), burden shifting, or "pretext" framework, as recently modified in *Burlington Northern and Santa Fe Railway Company v. White,* 126 S.Ct. 2405 (2006), the plaintiff in a Title VII retaliation case may establish a prima facia case by showing: (1) she engaged in protected activities; (2) the employer took actions likely to deter victims of discrimination from complaining; and (3) a causal link between 1 and 2.

The employer may rebut the prima facie case by demonstrating legitimate reasons for its actions. In response, a plaintiff must then show the reasons proffered by the employer are, either not worthy of credence, or that the true reason for the employer's actions were retaliation. *Saint Mary's Honor Center v. Hicks,* 509 U.S. 502 (1993), *Brey v. Marriott Hotels,* 110 F.3d. 986, 990 (3rd.Cir.1997).

(a) The Prima Facie Case

In the present case ACME disputes only the third prong of Plaintiff's prima facie case. That is, the causal link between Plaintiff complaining about discrimination and harassment to management, and the employer's suspension and transfer of Plaintiff.

In arguing Plaintiff cannot establish the causal link, ACME relies heavily upon the self-serving testimony of its management personnel that the claimed adverse actions (i.e Plaintiff's suspension and transfer) were taken because of a complaint by co-worker Joyce Alphin. However, when an employer's intent is at issue summary judgment is rarely appropriate. *Goosby v. Johnson & Johnson Medical, Inc., supra.* It should be left to a jury to decide if ACME's professed motives were valid or the result of a retaliatory animus.

19

"The causal connection" may be established by many types of circumstantial evidence. "...[W]e have been willing to explore the record in search of evidence and our case law has set forth no limits on what we have been willing to consider." *Farrell v. Planters Lifesaver Company*, 206 F.3d. at 281 (3rd.Cir.2000)

In the present case, there is evidence Plaintiff repeatedly complained about the hostile environment to which she was being subjected by her co-workers. Plaintiff's supervisor has testified that she discussed the tense atmosphere in the deli department with the store manager, Stephen Briley. Plaintiff was suspended and transferred without hearing her side of the story and without any investigation of whether the purported incidents Alphin complained of even took place.

Plaintiff, and her husband were told her situation would be even worse if she protested or pursued a grievance. These factors (together with the evidence that Defendants' purported reason for taking action against Plaintiff are false and a pretext, as set forth below) clearly establish the causal connection between Plaintiff's protected activity and the employer's adverse employment action.

(b) ACME'S Justifications are Pretext.

ACME claims that there are adequate justifications for the actions it took against Plaintiff. These purported justifications are based upon a construction of the record favoring Defendant. When the evidence is seen in a light favorable to Plaintiff, Defendants' purported legitimate basis for its actions are a pretext for illegal conduct.

At the Summary Judgment stage it is not necessary for Plaintiff to demonstrate the legitimate factors are the sole reason for the adverse employment action. *Hazen Paper Company*

20

*v. Biggens,* 507 U.S. 604 (1993). Plaintiff need not prove that the employer's purported reason was false. *Gharzouzi v. Northwest Human Services,* supra, 225 F.Supp.2d. at 544 (ED.Pa. 2000). At this stage, Plaintiff need only criticize the employers' purported reasons for its actions effectively enough so as to raise a doubt as to whether they were the true reason for the employers' actions. The court in *Gharzouzi,* supra, stated:

> "the plaintiff can meet its burden either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employers' proffered explanation is unworthy of credence. (internal quotation omitted)  As the Third Circuit has recognized, "there will seldom be eyewitness testimony as to the employer's mental processes.  Where direct "smoking gun" evidence of discrimination is unavailable, this court has found that the proper inquiry is whether evidence of inconsistencies and implausabilities in the employer's proffered reasons for discharges reasonably could support an inference that the employer did not act for non-discriminatory reasons, not whether the evidence necessarily leads to [the] conclusion that the employer did act for discriminatory reasons."" *Josey v. Hollingsworth Corp.,* 996 F.2d. 632, 638 (3rd.Cir. 1993) (internal quotations and citations omitted).  The Third Circuit has found that various factors such as the defendant's credibility, the timing of an employee's dismissal and the employer's treatment of the employee, can raise an inference of pretext which will make summary judgment for the employer inappropriate. Id., 996 F.2d. at 638-39.

(See also *Sempier v. Johnson & Higgins,* 45 F.3d. 724, 731 and *Brewer v. Quaker State Oil Refining Corporation,* 72 F.3d. 326 (3rd.Cir. 1995)

In the present case, the record demonstrates the employer's purported justification for her suspension and transfer are implausible. ACME did no investigation of Joyce Alphin's claims regarding Plaintiff's actions. ACME management's various descriptions of what Alphin complained of are inconsistent. The store manager, Briley, testified he recalled that Alphin complained of Plaintiff yelling at her on two occasions. (Briley depo. p. 16-17, B-44) He placed a similar version of Alphin's complaint in an e-mail to ACME's Human Resources Department. (A-125-127)  The "official" written reprimand does not describe Plaintiff's purported misconduct

21

in any detail. Plaintiff's supervisor, to whom Alphin purportedly made her complaints, testified she recalled only that Plaintiff supposedly threw water at Alphin, but does not recall Alphin stating anything about Plaintiff throwing ham. (Dean depo. p. 18-25, B-58, 59) Alphin says she told Management Plaintiff slid a small bucket across the deli counter and it splashed her arm, the Plaintiff threw a piece of deli ham. (Alphin depo. p. 8-16, B-60-62) The Assistant Manager testified Alphin told her Plaintiff threw water across the floor. (Appenzeller depo. p. 18, B-51)

After Plaintiff was suspended co-workers were told that because Plaintiff's misconduct had been videotaped, she was being suspended and transferred. (Cumberbatch depo. p.17-1934, 35, B-30-34). When Plaintiff asked to see this video she was told none existed. ACME now contends the store's video system does not view the area in which these purported incidents between Alphin and Plaintiff took place. The inconsistent and confused descriptions by ACME management demonstrate that ACME's purported justifications for its actions are, at the least, subject to doubt.

Briley also testified that while he stated in an e-mail message to ACME's Human Resources Department that Plaintiff's co-workers were afraid of her, he did not really recall that to be the case. (e-mail A-125; Briley depo. p. 27-30, B-47, 48) No one else from ACME management indicated Plaintiff's co-workers really feared her. Defendants have also falsely claimed Mr. Nieves presented some kind of threatening presence. There is contradictory testimony offered by various ACME employees and management as to whether and to what extent ACME took steps to counter his purported threatening presence. Some ACME personnel claimed not to even recognize Mr. Nieves, and others claim that he was in the store on an almost daily basis both before and after Plaintiff was suspended. Some claim deli employees had to be

22

escorted to their cars at night because of fear of Mr. Nieves and others deny even knowing who he was. There has been testimony ACME management told deli workers to attack Mr. Nieves if he appeared, and also denials by ACME management that took place. (Dean depo. p. 20, B-58, Appenzeller depo. P. 28-29, B-54; Cumberbatch depo. p. 23-26, B-31, 32; Alphin depo. p. 29-32, B-65-66) When these inconsistencies are viewed together with the fact that it appears items are missing (or have been removed) from Plaintiff's personnel file it is clear ACME's assertions and justifications are not credible. There are clearly triable issues of fact with respect to whether or not the Defendants' proffered legitimate justifications for its actions are pretext. See *Brewer v. Quaker State Oil,* supra, 72 F.3d. at 331. As in *Sempier v. Johnson & Higgins,* supra, this case presents the "paradigmatic" situation where each party has produced evidence that conflicts on the ultimate issue of pretext. 45 F.3d. at 732. This conflict presents a jury issue which must not be resolved on summary judgment.

23

## II. THERE ARE ISSUES OF FACT PRECLUDING SUMMARY JUDGMENT AS TO WHETHER PLAINTIFF WAS CONSTRUCTIVELY DISCHARGED FROM HER EMPLOYMENT.

Whether the conditions of employment were such that an employee suffered a constructive discharge is assessed by the objective standard of whether a reasonable person in the specific employee's position would have felt compelled to resign. *Connors v. Chrysler Financial Corp.*, 160 F.3d. 971 (3rd.Cir. 1998). See also *Goss v. Exxon Office System Company*, 747 F.2d. 885 (3rd.Cir.1984). Whether there has been a constructive discharge is a heavily fact-laden determination. *Levendos v. Stern Entertainment, Inc.*, 860 F.2d. 1227 (3rd Cir. 1988)

The gist of ACME's argument is that as a matter of law Plaintiff cannot be considered to have been constructively discharged because she did not resign while being subjected to the abuse about which she complained to management. In essence, ACME condemns Plaintiff for staying on the job while attempting to rectify the illegal abuse from her co-workers, abuse which management condoned by ignoring her complaints.

It is well-settled that there can be a constructive discharge where there is a continuous harassment which an employer does nothing to stop. *Aman, Inc. v. Cort Furniture Rental Corp.*, 85 F.3d. 1074 (3rd.Cir.1996) This is not a case such as those relied upon by ACME where an employer took action after complaints were made by an employee. Here, ACME completely ignored Plaintiff's complaints.

While the length of time an employee remains on the job during and after abusive treatment may be a factor to be considered, it is not dispositive as to whether a constructive discharge has actually occurred. All of the circumstances of an individual's employment situation

24

must be considered. See e.g. *Colores v. Board of Trustees,* 130 Cal. Rptr.2d. 347 (Cal.App. 2003);

*Turner v. Anheiser Busch, Inc.,* 876 P.2d. 1022 (Cal.Supreme 1994)

In the present case Plaintiff decided to resign after the incident at the Smyrna ACME

where she was hit in the face by her supervisor, reported that misconduct to management, and

again ACME took no action. Though she continued to hope ACME would take some action, at

this point Plaintiff finally was convinced ACME had no regard for her as an employee and that

she was at the mercy of her co-workers who could do whatever they wanted to her without

reprisal. She stayed employed only as long as it took for her to save enough money to be able to

leave. It was ACME's misconduct which caused her to need to be away from her husband and

the state of Delaware. It was ACME's misconduct which led to her severe emotional distress

requiring her to take some time off and be with close family members. Based upon the totality of

the circumstances a reasonable person in Plaintiff's position would have resigned.

The repeated serious abuse from Plaintiff's co-workers has been described previously.

While a hostile environment under Title VII may not always be sufficient to justify a constructive

discharge ACME has overstated the importance of the language it quotes from the footnote in

*Spencer v. WalMart Stores, Inc.,* 469 F.3d. 311, 317 note 4 (3rd.Cir. 2006) *Spencer* held that the

1991 Amendments to the Civil Rights Act allowed an employee to collect damages for illegal

employment practices even if the workplace discrimination did not rise to the level necessary to

prove a constructive discharge. This does not mean that the evidence of hostile environment is

not also evidence supporting constructive discharge.

The present case is not comparable to *Duffey v. Paper Magic Group, Inc.,* 265 F.3d. 163

(3rd.Cir. 2001) where, as the court in *Allen v. Verizon Pennsylvania, Inc.,* 418 F.Supp.2d. 617, 629,

25

630 (W.D. Pa 2005) noted, the employee admitted she received some relief from the abusive atmosphere, after she had made complaints. In the present case it was management's failure to act upon Plaintiff's complaints, as much as the abusive atmosphere itself, that led to Plaintiff's ultimate decision to resign.

This is not a case like *Angeloni v. Diocese of Scranton,* 135 Fed.Appx. 510 (3rd.Cir. 2005) relied upon so heavily by the Defendants. In *Angeloni,* the court found that not only did the conduct about which the Plaintiff complained ceased, in part due to her complaints, months before she made the decision to resign, but also that the decision itself was made by the Plaintiff in concert with her parents while at home.

When all the circumstances of plaintiff's employment are considered (the abuse she suffered at the hands of co-employees and ACME's failure to act upon her complaints), it is clear a reasonable person in Plaintiff's situation would have resigned and Plaintiff was constructively discharged.

ACME also claims Plaintiff has no Title VII constructive discharge claim because she failed to exhaust her administrative remedies. Of course, Plaintiff's claim under 42 U.S.C. § 1981 is not affected in that there is no "exhaustion of remedies" requirement under that Section.

Further, the lack of exhaustion is not a jurisdictional bar to a Title VII action because the Federal Courts are permitted to equitably toll filing requirements. *Anjelino v. New York Times Company,* 200 F.3d. 73, 87 (3rd.Cir.2000). The parameters of a civil action are defined by the scope of the EEOC investigation which could have been reasonably been expected to grow out of the charge filed by the employee, including new acts which occurred during the pendency of the proceedings. *Anjelino,* supra at page 94.

26

In the present case at the time of the DDOL investigation and its communications with ACME, Plaintiff's employment had already been terminated. In March of 2005, the investigator wrote to ACME giving them 10 days to respond to his determination that illegal employment discrimination had taken place. ACME chose to ignore that letter, but if they had responded, clearly the Department of Labor would have been on notice Plaintiff's employment had ended and that would have been within the scope of its investigation. ACME should not be rewarded for ignoring communications from the Department of Labor. Moreover, there are numerous cases where constructive discharges which occurred during the pendency of an EEOC or other administrative investigation were allowed in a civil action even though the discharge claim was not part of the employee's original charge. See *Whitlow v. Visiting Nurses Association,* 420 F.Supp.2d. 92, (W.D.N.Y. 2005); *Dunbar v. County of Saratoga,* 358 F.Supp.2d. 115 (N.D.N.Y. 2005); *Harris V. Parker College of Chiropractic,* 286 F.3d. 790 (5thCir.2002); *Washington v. Jenny Craig Weight Loss Centers, Inc.,* 3 F.Supp.2d. 941 (N.D.Ill. 1998)

In the present case, the core of operative facts upon which Plaintiff's charge to the DDOL and EEOC was made were the same as that which led to her constructive discharge and the mere fact that the discharge occurred after the investigation began should not bar her action in this court.

### III. PLAINTIFF HAS A VIABLE CASUE OF ACTION FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.

Plaintiff's claim for intentional infliction of emotional distress is that ACME intentionally ignored her complaints of her co-workers' outrageous hostile abuse, thereby tacitly condoning that behavior. ACME then, as a punishment for Plaintiff complaining, suspended and transferred Plaintiff to a different location. This is the type of outrageous and extreme conduct upon which a claim for intentional infliction of emotional distress may be based. See *Collins v. African Methodist Episcopal Zion Church*, 2006 WL1579828 (Del.Super. March 29, 2006)

Under Delaware Law, the exclusive remedy of an employee who suffers a work-related injury is through the Workers Compensation administrative process. 19 <u>Del. C.</u> § 2304. However, the Delaware Supreme Court in *Rafferty v. Hartman Walsh Painting Company*, 768 A.2d. 157, 160 (Del. 2000) made it clear that there is an exception to worker's compensation exclusivity where there are facts which show a deliberate intent by an employer to bring about injury to an employee. The Delaware Supreme Court recognized that the exclusivity provision only applies to personal injuries or death caused by <u>accident</u>. When there is a true intent to injure an employee there is no "accident" and the victim has a common law tort claim.

In the present case there are questions of fact as to whether ACME, by knowingly ignoring Plaintiff's complaints of harassment over and over again, intended to cause her emotional distress. Clearly, based upon the testimony of ACME's supervisory personnel, they were aware of the extreme distress Plaintiff was suffering. ACME now contends her emotional distress was caused not by abuse from co-workers and ACME's failure to address that abuse in the face of her numerous complaints, but rather upon ACME's fabricated claim that Plaintiff was

28

suffering abuse at the hands of her husband. In any event the emotional distress was real, was recognized by ACME and, it is a question of fact whether ACME intended to cause that emotional distress.

Therefore, Plaintiff's claim of intentional infliction of emotional distress must not be decided on Summary Judgment, and likewise Plaintiff Mr. Nieves's derivative loss of consortium claim must also not be dismissed.

## CONCLUSION

For the reasons set forth Defendant's Motion for Summary Judgment must be denied.

There are genuine issues of material fact on each of Plaintiff's claims precluding entry of Summary Judgment.


BIGGS AND BATTAGLIA
/s/ Victor F. Battaglia
/s/ Philip B. Bartoshesky
Victor F. Battaglia, Sr.(ID# 156)
Philip B. Bartoshesky (ID# 2056)
921 Orange Street
Wilmington, DE 19801
(302) 655-9677
VictorSr@batlaw.com
Pbarto@batlaw.com
Attorneys for Plaintiffs

February 15, 2007


29

<u>CERTIFICATE OF SERVICE</u>

I, Philip B. Bartoshesky, do hereby certify that on February 15, 2007, I sent one true and correct copy of the foregoing **ANSWERING BRIEF TO DEFENDANT ACME MARKETS, INC.'S OPENING BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND APPENDIX** via electronic filing to the following:

By First-Class Mail:

   Elizabeth A. Malloy, Esquire
   Buchanan, Ingersoll & Rooney, P.C.
   1835 Market Street, 14th Floor
   Philadelphia, Pennsylvania 19103-2985
   215-665-5310
   Attorney for Defendant ACME Markets, Inc.

By Hand Delivery:

   Jennifer M. Becnel-Guzzo, Esquire
   Buchanan Ingersoll & Rooney, PC
   1000 West Street, Ste. 1410
   Wilmington, DE 19801
   302-552-4208
   Attorney for Defendant ACME Markets, Inc.

         **BIGGS & BATTAGLIA**
         <u>/s Philip B. Bartoshesky</u>
         Philip B. Bartoshesky (#2056)
         912 N. Orange Street
         P.O. Box 1489
         Wilmington, DE 19899
         (302) 655-9677
         Attorney for Plaintiff

February 15, 2007

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| GLORIA NIEVES and EMILIO NIEVES, | § | |
| | § | |
| Plaintiffs, | § | C.A. Number: 06-123 GMS |
| | § | |
| v. | § | |
| | § | |
| ACME MARKETS, INC., a Delaware corporation | § | |
| d/b/a Acme Markets No. 7816,  ACME MARKETS, | § | **Trial by Jury Demanded** |
| INC., a Delaware Corporation d/b/a Acme Markets | § | |
| No. 7836, ACME MARKETS, INC., a Pennsylvania | § | |
| Corporation,  d/b/a Acme Markets No. 7816, | § | |
| ACME MARKETS,  INC., a Pennsylvania | § | |
| Corporation d/b/a Acme Markets No. 7836, | § | |
| | § | |
| Defendants. | § | |

## APPENDIX TO PLAINTIFFS' ANSWERING BRIEF TO DEFENDANT ACME MARLETS, INC.'S OPENING BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

BIGGS AND BATTAGLIA
/s/ Victor F. Battaglia
/s/ Philip B. Bartoshesky
Philip B. Bartoshesky (ID# 2056)
Victor F. Battaglia, Sr. (ID# 156)
921 Orange Street
Wilmington, DE 19801
(302) 655-9677
VictorSr@batlaw.com
Pbarto@batlaw.com
Attorneys for Plaintiffs

February 15, 2007

## TABLE OF CONTENTS

Letter from Department of Labor to ACME..............................................................................B-1

EEOC Right to Sue Notice to Plaintiff, adopting the findings of the DDOL.............................B-4

DDOL Final Determination and Right to Sue Notice...............................................................B-5

Deposition pages

     Emilio Nieves .................................................................................................................B-6

     Gloria Nieves.................................................................................................................B-12

     Amanda Cumberbatch...................................................................................................B-29

     Stephen Moyer..............................................................................................................B-39

     Stephen Briley ..............................................................................................................B-43

     Barbara J. Appenzeller...................................................................................................B-49

     Denise Dean..................................................................................................................B-55

     Joyce Alphin.................................................................................................................B-60



**STATE OF DELAWARE**
DEPARTMENT OF LABOR
**DIVISION OF INDUSTRIAL AFFAIRS**
4425 NORTH MARKET STREET
WILMINGTON, DELAWARE 19802

TELEPHONE (302) 761-8200
FAX (302) 761-6601

March 18, 2005

*Winner, Delaware Quality Award of Merit*

Acme Supermarkets
75 Valley Stream Parkway
Malvern, PA 19355
Attn: Tamara Marshall

VIA FACSIMILE AND US MAIL

RE:   <u>Nieves v. Acme Markets,</u>
      04040397/17CA400389

Dear Ms. Marshall,

As you are aware, I have been assigned to the Charge of Discrimination mentioned in the caption above. This letter will serve to inform you that I have very nearly completed my investigation into this matter and that I will most likely be issuing a Cause Finding.

The Charging Party alleges that she was harassed by her coworkers because she spoke English with a Columbian accent. Also, that at least three of her coworkers would constantly make negative comments to the Charging Party about her national origin. Further, she alleges that these individuals falsely accused her of throwing food and a bucket of mop water in the face of one of these individuals. She also alleged that the store manager told her husband that if he were to come onto the premises, he risked physical harm.

In the course of my investigation I spoke with a witness that I found to be very credible. This individual was in a position to observe the interactions between the Charging Party and the individuals who were harassing her. Indeed, the harassers at one point attempted to recruit the witness into this behavior.

This individual stated that the she had not seen this sort of behavior since she was in school. The witness stated that the Charging Party's coworkers would often refer to the Charging Party in a derogatory manner as "Little Chihuahua". Also she stated these individuals looked into the Charging Party's personnel file to see if she had a Green Card. It appears that the only way this could occur was with the permission or tacit consent of management.

This individual also confirmed the fact that she was instructed by a manager that if Mr. Nieves were to come into the store, the employees were to "hit and subdue him, then call management so they could call the police." One of the striking statements the witness made was that she didn't think things like "this happened anymore." And that what happened to the Charging Party was "like throwing a kitten into a bear pit."

B-1

D0155

If you have further information or documentation for my review, I may be reached at 302.761.8214. Regardless, if you do not contact me not later than ten days after the receipt of this letter, I will make a decision in this matter without further input from you.

Regards,

Thomas X. Smith
Labor Law Enforcement Officer

B-2



## Division of Industrial Affairs

4425 N. Market Street, 3rd Floor
Wilmington, DE 19802
(302) 761-8200
(302) 761-6601 FAX

# Fax

| | | |
|---|---|---|
| **To:** Tamara Marshall | **From:** Tom Smith | |
| **Fax:** 610-889-3039 | **Pages:** 3 | |
| **Phone:** | **Date:** | |
| **Re:** Nieves v. Acme Markets | **CC:** | |

☐ Urgent   ☑ For Review   ☐ Please Comment   ☐ Please Reply   ☐ Please Recycle

● **Comments:**

B-3

D0157

EEOC Form 161 (3/98)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### DISMISSAL AND NOTICE OF RIGHTS

| | |
|---|---|
| To: Gloria Nieves<br>625 Village Drive<br>Middletown, DE 19709 | From: Philadelphia District Office<br>21 South 5th Street<br>Suite 400<br>Philadelphia, PA 19106 |

| | On behalf of person(s) aggrieved whose identity is<br>CONFIDENTIAL (29 CFR § 1601.7(a)) | | |
|---|---|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 17C-2004-00389 | Charles Brown, III,<br>State & Local Coordinator | (215) 440-2842 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[ ] The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ] Your allegations did not involve a disability as defined by the Americans with Disabilities Act.

[ ] The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ] Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge.

[ ] Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge.

[ ] While reasonable efforts were made to locate you, we were not able to do so.

[ ] You were given 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged.

[ ] The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

[X] The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ] Other (briefly state)

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit must be filed <u>WITHIN 90 DAYS</u> of your receipt of this Notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.

On behalf of the Commission

*Marie M. Tomasso*                                November 30, 2005

Marie M. Tomasso,                                          (Date Mailed)
District Director

Enclosure(s)

cc: ACME SUPERMARKETS
    460 East Main Street
    Middletown, DE 19709

B-4

P-87

**STATE OF DELAWARE**
**DEPARTMENT OF LABOR**
**DIVISION OF INDUSTRIAL AFFAIRS – DISCRIMINATION UNIT**

Ms. Gloria Nieves                                         04040397
626 Village Dr.
Middletown, DE 19709
vs.
Acme Supermarkets
75 Valley Stream Pky.
Malvern, PA 19355
Attn: Tamara Marshall

### FINAL DETERMINATION AND RIGHT TO SUE NOTICE

Pursuant to 19 Del. C. § 710, *et seq.*, the parties in the above-captioned matter are hereby Noticed of the Department's Final Determination and Right to Sue Notice, as follows:

### *Reasonable Cause Determination and Notice of Mandatory Conciliation.*

In this case, the Department has completed its investigation and found that there is reasonable cause to believe that an unlawful employment practice has occurred. Under the provisions of the law, the parties are now required to engage in mandatory conciliation with Thomas J. Smith. Please be prepared to appear for conciliation on the following date and time Monday April 18th ,2005 9am at the location of Delaware Dept. of Labor, 4425 N. Market St. Wilmington, DE 19802.

Your cooperation and good faith effort is anticipated. Your corresponding Delaware Right to Sue Notice will be effective one day after your compliance with the conciliation effort.

The reasonable cause finding is based primarily on the following facts:

Charging Party alleges that coworkers constantly harassed and subjected her to physical threats and name calling because she spoke English with a Spanish accent. She further stated these same individuals deliberately attempted to create circumstances for her termination. Statements from a former coworker confirmed that the Charging Party was harassed by these individuals because of her national origin. Further, when she complained to management, no action was taken to end this behavior.

This Final Determination is hereby issued on behalf of the Department of Labor, Division of Industrial Affairs, Discrimination Unit. See the attached Notice of Rights.

_3/31/05_
Date issued

_4/18/05 - CP failed to attend_
Date conciliation completed

_Julie K. Cutler_
Julie K. Cutler, Administrator

_Julie K. Cutler_
Julie K. Cutler, Administrator

*Delaware Department of Labor, Division of Industrial Affairs, 4425 N. Market St., Wilmington, DE 19802*

B-5

DOL Form C-12RC : 12/04

DDOL0040

# Emilio Nieves

1 charge with the EEOC?
2     A.    Pardon me?
3     Q.    With the Equal Employment Opportunity
4 Commission?
5     A.    No, never.
6     Q.    Did you ever go -- I am sorry.  Go
7 ahead.
8     A.    I really think that there was
9 something long, long time ago.  1973, a guy here in
10 Wilmington in the YMCA -- I don't know why I remember
11 that -- he want to force me to work a whole week
12 holiday, and I didn't.  And then he fired me, and I
13 went to the labor department.  And the labor
14 department called him and told him you got to hire
15 back.  You are wrong.  That was an example like that.
16 That was a long time.  That's how they worked then.
17     Q.    Was that with Formosa or was that
18 another employer?
19     A.    No.  That was in the YMCA, here at
20 11th and Washington.
21     Q.    Did you work there before Formosa?
22     A.    Yes.  I went from there to Formosa.
23     Q.    Okay.  Have you ever gone to your
24 employer and said that you thought that people were

1 discriminating against you?
2     A.    Not really, no, no.
3     Q.    Okay.  You heard your wife testify
4 today about conduct that she thinks was
5 discriminatory.  I want to ask you have you personally
6 observed any conduct by Acme that you thought was
7 discrimination or harassment or retaliation by Acme?
8     A.    I really believe they didn't -- they
9 didn't really treat her -- they didn't treat her they
10 should be when this problem happened, because I went
11 over there and talked to that guy about it, Gloria
12 mentioned, I talked to Steve Briely, I said -- I told
13 him what I know, and, you know, I tried not to get to
14 the point that we are.  But according to his answer
15 what he said --
16     Q.    Let me just put this in a timeframe.
17 So this was after -- do you mind if I call her Gloria?
18 Is that okay?
19     A.    Yes, yes.
20     Q.    This was after Gloria was suspended
21 you talked to Mr. Briely?
22     A.    Yes, I think -- I believe that was
23 then.
24     Q.    And tell me about this.

1     A.    And I went over there to talk to him
2 about.  You know, it was a meeting that he wanted to
3 see her, and I went with her.  And according to --
4 they didn't care.  They didn't think -- I really
5 believe they didn't think that she could have done
6 nothing about it, that they didn't care about her too
7 much, because that's when he told her that they didn't
8 want to hear nothing about that because it was gonna
9 be -- they are gonna be harder on her, more likely.
10     Q.    What specifically do you remember
11 Briely saying?
12     A.    They said it is something that -- I
13 can't remember, but I know he say that it was gonna be
14 more trouble for her, something like that.
15     Q.    If she filed a grievance?
16     A.    If it continued the problem, I guess.
17 I guess there was a problem in there.
18         The point was that they didn't -- to
19 me it was his fault because why didn't stop the
20 problem the people having.  When Gloria told them that
21 these people was saying what they said about plane,
22 you know, speaking English and all this stuff, why
23 they didn't have a meeting and stop them people.  The
24 company can do anything with an employee or either you

1 respect our policy or you out of here.  That's the way
2 I believe it.  And they didn't.  And they didn't do
3 that.
4     Q.    Did you personally -- I am not asking
5 you what your wife may have told you.  But did you
6 personally see or hear any conduct by anyone at Acme
7 that you thought was wrong?
8     A.    No, I didn't.
9     Q.    Or --
10     A.    I usually -- I didn't went to the Acme
11 that much.  Once in a while, but I didn't -- well, I
12 hear.  Let me see.  I hear people talking, employees
13 at Acme, and I hear even people outside, they said
14 they treat that poor girl like a dog in the Acme.  I
15 hear two people saying that.  People outside, I hear
16 them talking about the problem, the way they treat her
17 in the Acme.
18     Q.    Okay.  Tell me what you heard and from
19 whom.
20     A.    I hear they say that.  They were
21 treating her like a dog.
22     Q.    Who told you this?
23     A.    I hear that.  Lisa O'Grady, B-6
24 because Lisa O'Grady is friend -- they friends with

# Emilio Nieves

1  Connie, the Connie, that girl. And I went over there
2  to visit her one day, and she told me that was
3  happening, and I said I know that Gloria have a
4  problem in there, but --
5       Q.    What specifically did Lisa tell you?
6       A.    She told me that she hear the people
7  were saying that they were treating her like a dog in
8  there.
9       Q.    And when did you hear this from Lisa?
10      A.    That was after all that problems she
11 had, after all these commotion they have in there.
12      Q.    Was that when your wife was still
13 working at Middletown?
14      A.    Yes, she still working -- it was in
15 between all that time that that happened.
16      Q.    And I think you said there were two
17 people that you talked to?
18      A.    I think it was -- because Connie
19 Miller I think is the one that told O'Grady then, too.
20 I don't know -- I mean, Connie, I don't know Connie.
21 That's her last name, Miller? Connie.
22      Q.    Did you talk to Connie?
23      A.    Not really, no. I saw her, but I
24 didn't talk to her.

1       Q.    So who did you talk to? Was there
2  anybody other than Lisa O'Grady who talked to you
3  about how they felt Ms. Nieves was treated?
4       A.    No, no, I don't remember.
5       Q.    Okay. Just Lisa.
6             Your wife testified that when she
7  learned about the suspension, she, I guess, called you
8  and then went home or you couldn't find her. Did you
9  go, did you personally go to the store that day?
10      A.    I believe I did. I don't remember
11 really clear. I know she told me that. I was kind of
12 surprised because she went to work and she -- I don't
13 know if I was working. She told me they didn't let
14 her work. You know, that's all I know.
15            And then when I hear all these
16 situations, they even said that if I go in the store,
17 they was gonna beat me up, that somebody -- that lady
18 give an order to the people on the deli that if I went
19 to the store, that all the women in the deli jumping
20 on me. So I right away called the police and I told
21 them that this was happening. I said, "I don't want
22 any problem. I got a job, and I am not a violent
23 person." And the police told me, "What I recommend you
24 is not to go to the store."

1             That's what I did. I didn't even get
2  close to the store. Even I had to get my medicine for
3  my brother, I usually buy them on the Acme. I still
4  buy it on the Acme right now. And I just, you know --
5  that's what I did. I didn't went there no more.
6             But I was very worried. A lot of
7  times I see a pick-up truck turn into the parking lot,
8  I said I wonder if it is somebody, some of the ladies'
9  husband. I told Gloria that once in a while. I
10 was --
11      Q.    When did you first learn that
12 Mrs. Nieves was having problems at work?
13      A.    Actually, that was after, after they
14 opened the new store, the new -- to me I consider new
15 management, because when they was in the old store,
16 Mr. Ford, Mr. Ford was in control of the store, and --
17      Q.    Was or was not?
18      A.    He was in control.
19      Q.    Was?
20      A.    He keep everything -- I don't think
21 there was any kind of problem like that with anyone in
22 that store that I believe. But when it come to the
23 new store, when they had that Steve Briely, I don't
24 know. I think the management was not the same.

1       Q.    And how did you learn that Mrs. Nieves
2  was having problems at work?
3       A.    She told me. I mean, I talk with her
4  all the time, you know.
5       Q.    And what was the first thing she told
6  you?
7       A.    Well, she keep talking to me about all
8  the problem with that one, that lady, the lady they
9  leave down there lead to some of them. What is the
10 name? I don't remember.
11      Q.    Michele?
12      A.    Michele and all them. I don't keep
13 track.
14      Q.    What do you remember about the
15 problems that your wife told you about?
16      A.    She just -- I just remember everything
17 she talked about, how they talking about her language,
18 you know, that she didn't deserve the job, you know,
19 all that. I also -- I remember she mentioned they was
20 asking people if she got her green card or she was
21 illegal. I hear all that, too, from what my wife tell
22 me everything that happened.
23      Q.    Anything else you remember your wife
24 telling you?

# Emilio Nieves

**Page 22**

1    A.    Many times I told her to quit. I
2  mean, I came -- it was just put a lot of pressure on
3  me, hear her having problem, you know. I feel
4  helpless. I can't do nothing for her. I say you got
5  a union. And believe me, I talked to the union
6  people, and they was useless, believe me. They was
7  useless.
8    Q.    Did you tell your wife to go to the
9  union?
10    A.    Yes. I told her everything that -- I
11  told her I can't figure it out why if they got a shop
12  steward -- a shop steward when somebody got a problem,
13  the shop steward even have to offer you help. That's
14  the way it is in my place. I say the shop steward,
15  "Hey, I got a problem." The shop steward take care of
16  me what I got to do and whatever it is got to be done.
17    And that union they have in there, I
18  don't know what kind of union it is. It didn't -- I
19  talked to the guy in Spanish. I told him you know you
20  guys are wrong. There is no way they -- Gloria had to
21  be transferred to Smyrna and given her job to somebody
22  that only got six months, when they -- somebody they
23  don't even have, is not even in a union. And here she
24  is in a union and have about three or four years in

**Page 23**

1  Acme; how they can give the job to that lady and throw
2  her out to Smyrna far away? I talked to him and I
3  said this is wrong.
4    Q.    And what did he say? Who is this?
5  This is Henry?
6    A.    That was the guy from the union. And
7  then he told me -- he told me, the way it sound,
8  apparently he talked to Steve Briely, and I guess they
9  thought the problem they have in the Acme with all the
10  women together, it was -- I guess they can't fix the
11  problem. They told -- I think they told them get rid
12  of her, because she was doing such a great job. Steve
13  Briely told me, "She is the best girl I have in here."
14  He told me that she was the best worker. But the
15  other ones didn't like her because of the way she
16  worked. And I really think that's what they -- all
17  the problems started. And then they make her the
18  manager, whatever, and that's what really happened.
19    Q.    What else, if anything, do you
20  remember about your conversation with the union?
21    A.    That's -- I told them, you know, I
22  was -- I get upset, and sometimes I don't even want to
23  talk, because I can't see how can you pay union and
24  don't represent her. They didn't represent her. They

**Page 24**

1  know the rights she have, and they didn't represent
2  it. They didn't.
3    Q.    Did you talk to the union more than
4  once?
5    A.    I don't know. I probably talked more
6  than one time. I don't remember. But like I talked
7  to her, when they should never suspended her like
8  that, just like that, come in the door and leave.
9  That was wrong. And the union didn't do anything.
10  You know, that's all I know.
11    Q.    How many times have you personally
12  spoken with Mr. Briely?
13    A.    I talked to him only one time in that
14  time. I probably went in the store, you know, and say
15  hi to him.
16    Q.    Said hello?
17    A.    Hello, but that's it. I didn't talk
18  to him no more. Because actually, when I talked to
19  him the first time in the little meeting, I just said
20  I know the problem in here, that there was nothing
21  gonna be done. I really think that -- I tried to talk
22  to them and see if they get everything straight, it
23  would have never got to any -- but they didn't do
24  anything.

**Page 25**

1    How can it be possible that after she
2  moved from in Smyrna, that lady smack her on the face?
3  She came to the house and said, "I guess they don't
4  want me in Delaware." That's what she -- she decided
5  to leave the state. I can't hold it. I can't --
6    Q.    When did your wife first tell you
7  about the woman who hit her on the face?
8    A.    She has told me I guess the next day
9  or I don't know if -- see, I am on shift work. I
10  don't know --
11    Q.    Right.
12    A.    I don't know. But she told me the
13  next day or right away or either she called me. I
14  don't recall exactly, you know, but she told me when
15  it happened.
16    Q.    Did you and your wife talk about the
17  fact that she was going to leave the state?
18    A.    No, but she said that she was gonna
19  leave. I guess she mentioned that. And --
20    Q.    And tell me all the conversations you
21  had about her leaving.
22    A.    Well, we were talking about one time,
23  she talked to me one time about because all the
24  problems, separate for a while because of all that

49ad8395-1a3c-4c2f-9af1-4e92f56d9d3b

Page 26

1  stress and all that and see if everything get better.
2  And I guess when she left, you know, and we get
3  everything straight, that really was the end of it.
4      Q.     Were you surprised that your wife went
5  to Miami?
6      A.     Well, not -- well, I really miss her.
7  But I was not surprised, because she got a lot of
8  family over there, you know.  And where else can you
9  go when you find yourself in so much trouble?  And the
10  family sometimes I guess was the best place for her
11  then, you know.
12     Q.     When did your wife first tell you that
13  she was going to leave?
14     A.     That I don't remember.  I don't
15  remember.  I know that she mentioned that after she
16  was in Smyrna.  So it was after all that problem,
17  after the last problem in Smyrna, I think that she
18  was --
19     Q.     Were you and your wife having any
20  marital problems?
21     A.     We didn't, but it was a lot of
22  pressure, because, you know, her being with all that
23  problems, she -- sometimes I came home and she just
24  started crying because of the problem that she got.

Page 27

1  And I said, "Don't worry about the problem.  Quit.  I
2  make enough money."  But she don't want to do that,
3  you know.
4      Q.     Was that when she was in Middletown?
5      A.     Yes.
6      Q.     Did you and she talk about separating
7  at all for any reason?
8      A.     No.  I don't think we -- I don't think
9  we ever talk about that.
10     Q.     Did you ever hit your wife?
11     A.     No.  We play, but, I mean, I don't hit
12  her.
13     Q.     Why do you believe your wife went to
14  Florida for nine months?
15     A.     I really believe that she was so much
16  pressure on her with all that, she probably thought to
17  go there with her family for a while; that would maybe
18  change a little better on her.  And that's what I
19  believe.  I mean, sometimes that happens.
20     Q.     So she stayed in Florida for about
21  nine months, she said; is that right?
22     A.     I don't exactly know if it was nine or
23  seven or nine.
24     Q.     And what conversations did you have

Page 28

1  about her coming back to Delaware?
2      A.     Well, I just told her to come back,
3  that we would try to get everything -- you know, I
4  wasn't very happy for her to leave anyway, you know,
5  but -- nobody want his wife to leave.
6      Q.     Did you ever talk about getting
7  divorced?
8      A.     Not with her.
9      Q.     Not with her?
10     A.     I don't talk --
11     Q.     Did you ever talk with anyone else
12  about --
13     A.     I talked to somebody about getting
14  divorced.  I thought about it.  Because if she don't
15  come back, I have to divorce her.  I can't be married
16  without having a wife with me.  And I can't get
17  married again if I got a wife.  I have to divorce and
18  get another wife.
19     Q.     Was there any other lady in your life?
20     A.     No, never.  I told her that, and she
21  don't believe me.  Since I married her, I never been
22  out with another lady.  She don't believe me.  I said
23  get a bible.
24     Q.     Have you and your wife talked about

Page 29

1  that?
2      A.     Oh, yes, because sometimes, see -- I
3  go to Puerto Rico a lot.  My mother is 93 years old.
4  And I go a lot over there to see her, and I usually go
5  on Mother's Day, and she think that I got another
6  woman over there.  And I don't.  That I know.
7      Q.     Did you talk about that at all when
8  your wife was gone?
9      A.     About --
10     Q.     Whether you had another lady?
11     A.     Well, let me tell you something.  With
12  the problem that I have with the DUI and the accident,
13  I can't believe how fast the time went, and I didn't
14  even think about anything.  Like, I was my mind --
15  when I had that on my mind, the only thing was just to
16  get out of that trouble.
17         Imagine all the time you going.  A
18  couple times -- one time I wash my mouth with
19  Listerine, and then I went to start my car, blow that
20  thing on the car.  You got to blow the tube or the car
21  stop.  And it locked, and I was scared.  I got to go
22  to work.  I have to call the company.  I said,
23  "Listen, the thing lock and it don't want to start."
24  And they told me that what you did I said I just

Emilio Nieves

Page 30

1  washed my mouth with Listerine in the morning, and
2  that did it, because that got alcohol. So I have to
3  report to the guy, and then he got to give me some
4  instruction how to get it back.
5        I know one time at work it blow up,
6  the whole box. I mean, I got a lot -- my mind was not
7  even thinking about any -- and, like, the time, it
8  seemed to me like it passed fast, because the problem
9  I have, was going to DUI classes and the Alcoholics
10 Anonymous, I was going whenever I could, because I
11 have got the schedule. There is a schedule of paper,
12 a lot of different places you can go.
13       Q.    When your wife was in Miami when she
14 left, when she left Acme, did you ever go visit her?
15       A.    No.
16       Q.    How often did you talk on the phone?
17       A.    I would say once in a while I talked
18 to her. Not a lot.
19       Q.    Once a month?
20       A.    Once in a while, maybe one or two
21 times a month.
22       Q.    One or two times a month. Okay. In
23 any of those conversations did you talk about whether
24 you had a girlfriend or anything like that?

Page 31

1        A.    No.
2        Q.    Did that come up?
3        A.    No. No girlfriend. I still believe
4  in when you marry, you don't have no -- only your
5  wife.
6        Q.    Was it your idea to go to the
7  Department of Labor?
8        A.    I believe we talk together, yes. We
9  talk together and see what can, you know, what can be
10 done. That's you know --
11       Q.    Your wife testified at her deposition
12 that the paperwork from the Department of Labor that
13 was coming in in March and these exhibits --
14       A.    Yes, I didn't do no paper at all.
15       Q.    Did you open her mail when she was
16 gone?
17       A.    Well, it was so many -- it was a lot
18 of calls.
19       Q.    A lot of what?
20       A.    Telephone. It was Mr. Smith used to
21 call and ask me for her. Most of the time I used to
22 talk a lot --
23       Q.    Okay. You talked with Mr. Smith at
24 the Department of Labor?

Page 32

1        A.    Yes. He called my house.
2        Q.    How many times did you talk to him?
3        A.    He called a few times. I can't
4  recall. Five, six. I mean, he called.
5        Q.    And what do you remember talking to
6  him about?
7        A.    Pardon me?
8        Q.    What do you remember talking to him
9  about?
10       A.    Not really. He just -- because Gloria
11 was in Miami. He just want Gloria. He just want to
12 discuss the problem with Gloria. That's what --
13       Q.    Did you tell Smith that Gloria was in
14 Miami?
15       A.    Yes, I did.
16       Q.    Did you give him a telephone number
17 there?
18       A.    No, no, I didn't.
19       Q.    Did you open the mail that --
20       A.    No.
21       Q.    -- Ms. Nieves received?
22       A.    What I did, I called Gloria and tell
23 her that she got mail from the department. I believe
24 that she probably tell me open it and tell me what he

Page 33

1  said or something. But I did call her and tell them
2  that she got mail from the labor department about the
3  problem in the Acme. That's what I did that.
4        Q.    Did you ever tell the Department of
5  Labor who they should talk to to investigate the
6  charge? Did you ever give them any names?
7        A.    No. Well, actually, her. I can't
8  talk, you know -- I guess I cannot talk to them about
9  a problem where she is the one she was in the --
10       Q.    Okay. So your answer is you did not
11 talk to them about the charge?
12       A.    Yes. I can't -- I don't -- I cannot
13 do that without -- that was the main source was her,
14 the problem, you know. Actually, I didn't have any --
15 much problem with the Acme after that.
16       Q.    You testified that your wife was under
17 stress before she left to go to Miami.
18       A.    Yes, she was.
19       Q.    Could you describe that for me?
20       A.    Well, if I came home and she come and
21 tell me this has happened to me and started crying, I
22 know it wasn't too good. And this has happened so
23 many times, you know.
24       Q.    That was when she was at Middletown?

B-10

49ad8395-1a3c-4c2f-9af1-4e92f56d9d3b

Page 34

1    A.    Yes.
2    Q.    How about when she was at Smyrna?
3    A.    It seemed to me in Smyrna it was
4    pretty good for a while, because she used to tell me
5    the management, what was the -- the man that he was
6    the manager in there was really nice and excellent,
7    and she was pretty happy for a while until that woman
8    did what she did and said.  That was the end of it.
9    Q.    Well, that was, your wife testified,
10   Labor Day weekend of 2004; is that right?
11   A.    Yes.  I mean, I know she moved over
12   there, I guess she was a little unhappy.  But I wasn't
13   too happy about it.  I wasn't too happy about it
14   because knowing myself it was something they were
15   wrong what they did, and knowing that she worked
16   about -- I mean, it is so close to my house to the
17   Acme.  Actually, you can walk from my place to the
18   Acme.  And she was close to the house, and my brother
19   being, you know, disabled, and her giving me a hand, I
20   really think that -- I wasn't very happy either
21   because of that, you know.  It cost me -- it was hard
22   for me, because --
23   Q.    Your wife testified that the incident
24   with Linda was Labor Day weekend 2005.  After that

Page 35

1    when Mrs. Nieves was at Smyrna, how did she feel, to
2    your knowledge?
3    A.    She wasn't -- she wasn't very -- she
4    wasn't feeling very well after that happened, that.
5    It seemed to me that she was stressed a lot.
6    Q.    And describe that for me.
7    A.    She -- we have a few discomfort maybe
8    but --
9    Q.    Describe that for me.
10   A.    Well, we argued sometimes, you know.
11   Q.    About what?
12   A.    About everything and anything that
13   happened.  I don't -- you know, and then once I guess
14   she decided to leave and everything.  That's it.
15   Q.    Your claim in this lawsuit is called
16   loss of consortium.  Do you understand that you are a
17   plaintiff in this lawsuit?
18   A.    Yes.
19   Q.    And what does loss of consortium mean
20   to you?
21   A.    I don't understand.
22   Q.    Okay.  You are claiming in this
23   lawsuit that you have been hurt or damaged in some way
24   by the actions of Acme.  Do you believe that to be the

Page 36

1    case?
2    A.    I actually feel like, you know, they
3    hurt my wife.  They hurt me, too, and it did hurt me.
4    I mean, it is a great deal of pain for me what
5    happened to her and what it come to.
6    Q.    Describe that.  Describe that for me.
7    A.    That was my life.  I mean, I was to
8    the point when I was in all these problems and she was
9    not around, I was very busy to think in my mind.
10   Sometimes I worried about it at work a lot, because I
11   work in a chemical plant, and I have to go --
12   everything I do at work I have to kind of do -- think
13   twice, because I was thinking about the problem all
14   the time at work, you know.
15   Q.    Were you afraid that she wasn't going
16   to come back from Miami?
17   A.    Yes, I was.  I thought she wasn't
18   gonna come back.
19   Q.    Now, you say in the complaint that
20   actions of Acme have caused you to lose the
21   consortium, comfort and companionship of your wife.
22   Do you believe that to be true?
23   A.    Yes, I believe that.
24   Q.    Okay.  Could you describe that for me?

Page 37

1    A.    Well, all that problem then appears
2    the way it did, if everything would have been nice and
3    like any other place normally, if there is no problem
4    like that, Gloria, she would have never left and she
5    probably would have still been in the Acme.  Am I
6    right?  That's what I believe.  And I never would have
7    had any problem, you know, any pain.
8    Q.    Has your sexual relationship with your
9    wife changed over the period of time --
10   A.    Yes.
11   Q.    -- she was working at Acme?
12   A.    I am pretty sure it did a lot.
13   Q.    Can you explain that to me?
14   A.    Well, when a person is not happy, is
15   upset, there is not a lot of -- it is not a good
16   feeling.  There is no -- it doesn't work the same.
17   Q.    And when did that problem start?
18   A.    I believe it started after all the
19   problems started in Middletown.  It was just --
20   Q.    How about after the transfer to
21   Smyrna?
22   A.    It was even before that.  It was when
23   the whole problems started, because like I said, when
24   all that problem started in Middletown, and I come

Gloria Nieves

| Page 30 | Page 32 |
|---|---|

**Page 30**

1  A.    Male, yes.

2  Q.    How about Barbara Appenzeller?

3  A.    I don't know her. Barbara?

4  Q.    Somebody people sometimes called BJ.

5  A.    Ah, yes.

6  Q.    Is that a woman?

7  A.    Yes.

8  Q.    Was she an assistant store director?

9  A.    Yes, after Jeanie Black was transferred.

10 Q.    Okay. And how did you get along with -- did

11 you call her BJ? People called her --

12 A.    At the beginning she was fine. And I called

13 her B -- in Spanish, BG.

14 Q.    BG?

15 A.    BG. And she was fine. She understand. But

16 then she sometimes goes, sometimes no.

17 Q.    And I will give you an opportunity to

18 explain that in a minute. When you moved to the new

19 store, what position were you in?

20 A.    Service clerk on deli.

21 Q.    At this point were you full-time?

22 A.    No.

23 Q.    What was your next position?

24 A.    Full-time person in charge of nighttime of

**Page 31**

1  deli.

2  Q.    You were the person in charge once you

3  became full-time?

4  A.    Yes, at nighttime.

5  Q.    And what does person in charge mean? What

6  were your duties?

7  A.    Maintain everything clean, close the deli,

8  pull the produce out of cold, fill up the shelves on

9  the front of the deli, the new meats and everything,

10 and, yes, close the deli.

11 Q.    And what was the next position you held

12 after that?

13 A.    That's all.

14 Q.    At the Middletown store, let's talk about

15 when you moved to the new store. Okay?

16 A.    Yes.

17 Q.    Do you understand my timeframe? Who else

18 did you work with? Who were your co-workers?

19 A.    A lot. Nancy, Nancy, I don't know her last

20 name. Denise Dean is the manager. Penny Armstrong,

21 she moved to down in Smyrna, the Acme. She is now the

22 deli manager in Smyrna. I worked with Amanda

23 Cumberbatch, Connie -- I don't know her last name. I

24 don't remember the last name.

**Page 32**

1  Q.    What was the first name?

2  A.    Connie.

3  Q.    Connie. Okay.

4  A.    Connie. Christina Shaw, Joyce Alphin.

5  Q.    Joyce?

6  A.    Joyce Alphin. Warren, the last name is

7  Warren, Michele Warren. Alex, Phyllis, Jeanie,

8  Jeanie, I don't remember the last name. She is an old

9  one.

10       What else? A lot of people that they went

11 back and forth, back and forth.

12 Q.    Okay. Of the people that you mentioned,

13 which ones of them were supervisors or managers?

14 A.    None. Denise Dean was the deli manager.

15 Q.    And was Denise the deli manager the whole

16 period of time you were at Middletown?

17 A.    No.

18 Q.    Who came after Denise as deli manager?

19 A.    The first manager was Brenda. I don't know

20 the last name, Brenda. And she was transferred to

21 another store, and Denise Dean came like a deli

22 manager.

23 Q.    And then was Denise there until you left

24 Middletown?

**Page 33**

1  A.    Yes.

2  Q.    Can you place in time when Brenda left and

3  Denise came?

4  A.    A couple of months after they opened the

5  store.

6  Q.    At some point in time did you believe that

7  you were being discriminated against or harassed at

8  Middletown?

9  A.    Yes.

10 Q.    When did that start?

11 A.    When I get my full-time position.

12 Q.    Can you explain to me what happened that you

13 believe was discrimination or harassment? And I will

14 let you start in the beginning -- okay? -- and then we

15 will move forward. Do you understand my question?

16 A.    Yes.

17 Q.    Good.

18 A.    They begin like -- we have a lot of Spanish

19 people, and I speak Spanish. Many customers, all

20 people, like Puerto Rican, Mexican, they don't

21 understand. They cannot speak English. They look for

22 me. And one of the co-workers began to say, "Speak

23 English. Speak English. We are in America."

24 Q.    And who is the person who said that to you?

9 (Pages 30 to 33)

# Gloria Nieves

Page 34

1 A. Nancy.
2 Q. And what was Nancy's position?
3 A. Service, deli service clerk.
4 Q. Like you?
5 A. Yes.
6 Q. Did that bother you when she said <'Speak
7 English"?
8 A. Yes, because I was speak Spanish with my
9 customers.
10 Q. And did you do anything when Nancy said,
11 "Speak English"?
12 A. When the customer left, I told her. I
13 explained her that they don't speak English. They
14 don't understand. I have to talk with them in
15 Spanish.
16 Q. And what did Nancy say?
17 A. She walk away.
18 Q. Did that ever happen again?
19 A. No.
20 Q. So Nancy one day when you were interacting
21 with a customer told you to speak English?
22 A. Yes.
23 Q. And it only happened on that one day?
24 A. One day.

Page 35

1 Q. Did you report to any supervisor that you
2 didn't like that?
3 A. I report many stuff that they told me to my
4 supervisor, and they told me, "Let it go, Gloria.
5 Don't worry. We are gonna fix it."
6 Q. Did you ever report to a supervisor that
7 Nancy told you to speak English?
8 A. Yes.
9 Q. And who did you report that to?
10 A. To Jeanie Black.
11 Q. What did you say to Ms. Black?
12 A. That she was -- the truth. That she told
13 me, "Speak English. Speak English. We are in
14 America." And I told Jeanie Black that is not fair
15 because many -- we are supposed to customer first.
16 And when they don't understand English, they can speak
17 Spanish with me. And she told me, "Don't worry,
18 Gloria. Everything is gonna be fine."
19 Q. What was the next thing that happened that
20 you felt was discrimination or harassment?
21 A. Okay. When I -- they posted the position
22 for full-time, I put my name, my abilities, and I bid
23 that position. Many people apply, and I bid it. And
24 Michele Warren say that why I get full-time position

Page 36

1 if my English is not good.
2 Q. Who said that?
3 A. Michele Warren.
4 Q. And this was after you were selected?
5 A. Yes.
6 Q. And what did you say?
7 A. I say I don't need my English to show people
8 that I am working, I am a good worker. If I work, it
9 doesn't matter what language I speak. Work is work.
10 Q. And what was Michele Warren's position?
11 A. Deli service clerk.
12 Q. Did you report Michele's comment to anyone?
13 A. Yes, yes.
14 Q. To whom?
15 A. To Jeanie Black and then BJ.
16 Q. What did you tell Jeanie Black about this?
17 A. About this, the same thing.
18 Q. And what did she say?
19 A. "Don't worry, Gloria. Everything is gonna
20 be fine."
21 Q. And what did you tell BJ?
22 A. I said okay, because I don't need to show
23 you if I speak English to work. I work good, no
24 matter what language.

Page 37

1 Q. And what did BJ say?
2 A. "Don't worry, Gloria. Everything is gonna
3 be fine."
4 Q. The comment that Nancy made to you about
5 speaking English, was that before you moved into
6 full-time?
7 A. After.
8 Q. After. Okay. So all the problems happened
9 after you moved to full-time?
10 A. Yes.
11 Q. And you don't specifically remember what
12 date that was?
13 A. I don't remember what date I get full-time
14 position.
15 Q. Okay. I know we can get that for you.
16 A. Okay.
17 Q. What is the next thing that happened that
18 you felt was discrimination or harassment?
19 A. Okay. When they -- one day my husband,
20 Emilio Nieves, and me, we walk through the store like
21 customers, and Michele Warren and Christina Shaw began
22 to say, "The plane, the plane." Remember the movie
23 the "Fantasy Island"? The little guy and the old man,
24 they have an accent because one was from Mexico and

Gloria Nieves

| Page 38 |
|---|

1  the other was from France. The little one said, "The
2  plane, the plane." And Christina began to say, "The
3  plane, the plane."
4  Q.    Can you place this in time?
5  A.    I don't -- it was wintertime, like
6  Thanksgiving or something like that, because I know I
7  was using one coat, a heavy coat.
8  Q.    Did you say anything to them at the time?
9  A.    Just look at and I smile. That's all. I
10  can't say nothing. My English is not good to fight
11  with somebody else.
12  Q.    Did you report this to anyone?
13  A.    Yes.
14  Q.    To whom?
15  A.    BJ.
16  Q.    Is Jeanie Black gone at this time?
17  A.    Yes, she is gone.
18  Q.    And what specifically did you say to BJ?
19  A.    The same thing that I am telling you, "The
20  plane, the plane."
21  Q.    And what did she say?
22  A.    "Don't worry, Gloria. I gonna fix that."
23  Q.    What was Michele's position?
24  A.    Deli clerk service.

| Page 39 |
|---|

1  Q.    And what was Christina's position?
2  A.    The same.
3  Q.    What is the next thing that happened that
4  you thought was discrimination or harassment?
5  A.    The other one. One day we was Connie, the
6  last name I don't remember, Amanda Cumberbatch, and
7  Christina Shaw, and me, at nighttime, like 10:30 or
8  quarter of 11:00, we was -- everything was done, and
9  we was talking. And Christina told me -- we was
10  talking about, because we saw my husband using a hat
11  like Russian people they use in winter.
12  Q.    A hat, like a furry hat?
13  A.    Yes, yes. And she told me, "He looks like
14  an Eskimo." I said, "No, like a Russian, because he
15  looks like a Russian."
16        "No. An Eskimo."
17        I say, "Whatever. I thought it was
18  Russian." And she told me, "Gloria, anyway, do you
19  know where is Alaska?"
20  Q.    Who made that comment?
21  A.    Christina. "Do you know where is Alaska
22  is?"
23  Q.    And what did you say?
24  A.    I said, "Of course. I have the university."

| Page 40 |
|---|

1        "Oh, I thought South American people doesn't
2  have education like us."
3  Q.    And that is Christina telling you that?
4  A.    Yes.
5  Q.    Did you report that to anyone?
6  A.    Everybody. I told Jeanie, BJ, Steve Briely.
7  Sometimes I was crying.
8  Q.    What did you tell BJ about this?
9  A.    The same thing.
10  Q.    You just reported the story?
11  A.    Yes. Oral, no writing. Just oral.
12  Q.    And do you remember speaking to Steve Briely
13  about this --
14  A.    Yes.
15  Q.    -- Eskimo incident?
16  A.    About everything I say. They made me feel
17  like a cuccarachia.
18  Q.    You told Briely that?
19  A.    Yes, like a cuccarachia, because never --
20  nothing that I say or do was good for them.
21  Q.    Were BJ and Briely together --
22  A.    No.
23  Q.    -- when you told them this?
24  A.    Separate, separate, because sometimes BJ

| Page 41 |
|---|

1  work at nighttime and Steve Briely during the day.
2  Q.    And what did BJ say when you told her about
3  this?
4  A.    "Don't worry, Gloria. Don't pay attention.
5  They have bad jokes or hard jokes or not funny jokes."
6  Q.    And what did Briely say?
7  A.    "Well, I gonna fix that problem, Gloria.
8  Don't worry. You are a good worker."
9  Q.    What was the next thing that happened?
10  A.    The next thing, okay, the next thing, I
11  request off -- I work every single week, no matter
12  whether I was full-time or not full-time. In my days
13  off they call me, "Gloria, we need you." I don't
14  care. I work. And one Sunday I request off because
15  my husband best friend had a child, and they want to
16  make a Baptist.
17  Q.    Baptism?
18  A.    Yes, and I request off. And you know that
19  many times they change the time that we supposed to
20  request off. One week, one month, one day, whatever.
21  And I request one week before. And Denise Dean told
22  me, "I can't give you -- I will not give you that day
23  off because Michele Warren requested off." And I say,
24  "I have more seniority than her. And she doesn't work

Page 42

1   every weekend. I work every single Sunday. And I
2   need that Sunday off, because I have priorities: My
3   family, my husband." And she wasn't so happy to give
4   me that day off.
5   Q.    This is Denise you were talking to?
6   A.    Yes.
7   Q.    And this is when she was the deli manager?
8   A.    Yes. She is the deli manager now.
9   Q.    Did you get the day off?
10  A.    Yes. But they was mad. They were mad.
11  Q.    Who was mad?
12  A.    Denise. And they give me less hours than
13  they supposed to give me, 48 hours, because I was
14  full-time.
15  Q.    When did you get less hours?
16  A.    The day after I request off.
17  Q.    How many hours less did you get than you
18  usually would?
19  A.    I get hours, 48 hours every week. And after
20  that, two weeks in a row I get 45, 40 hours.
21  Q.    And how long did that happen?
22  A.    Two weeks, just two weeks.
23  Q.    Anything other than what you have already
24  told us that made you think that Denise was mad at you

Page 43

1   because you asked for time off?
2   A.    That I remember. I was off because I had a
3   problems, health problems. I have a mild heart
4   attack, and I went to the hospital, and I told my
5   husband, "Tell Denise that I can't work because I am
6   in the hospital." After that they suspend me for any
7   reason that I know.
8   Q.    This is in March of '04?
9   A.    Yes.
10  Q.    Okay. Is there anything other than what you
11  have already testified up until March of '04 that you
12  believe was discrimination or harassment?
13  A.    The other stuff that I told you. And Nancy,
14  Nancy, that girl told me one day that my question was
15  all the time stupid.
16  Q.    What do you remember about that?
17  A.    Because I ask her, "You gonna take your
18  break or I gonna take my break?" And she turned
19  around and say, "You always ask a stupid question."
20  And I say, "I am sorry. I just ask."
21  Q.    Do you believe that Nancy's response was
22  discrimination against you?
23  A.    Yes.
24  Q.    Why?

Page 44

1   A.    Because -- I don't know. I feel, I feel
2   like Michele Warren, they don't like. When I speak
3   Spanish with customer, all the time, "Gloria, don't
4   speak Spanish." And I was taking care of our
5   customers. And the customer, they look for me
6   everywhere.
7   Q.    Was there anybody other than Nancy who told
8   you to speak English?
9   A.    Yes, Michele Warren.
10  Q.    What did Warren say?
11  A.    That I have to speak English because nobody
12  understands Spanish in that store.
13  Q.    When did she tell you that?
14  A.    I don't know. Many times, because they
15  don't like -- because they feel bad when I speak
16  Spanish with customers, because they don't understand
17  what I say.
18  Q.    Did you ever report to any supervisor
19  Michele's comments?
20  A.    Yes, I report many times, many times.
21  Q.    Other than what you have already told me,
22  did you ever report Michele's comment?
23  A.    Yes.
24  Q.    To whom?

Page 45

1   A.    To BJ, to Briely.
2   Q.    What did you tell BJ about Michele?
3   A.    That she made me feel like a little animal
4   because I can't speak Spanish with my customers.
5   Q.    What was her response?
6   A.    "Don't pay attention to her."
7   Q.    And what did you tell Mr. Briely?
8   A.    The same thing, and "Don't pay attention to
9   her, Gloria. Everything gonna be fine."
10  Q.    Did any supervisor at Acme ever tell you
11  that you needed to speak English with customers?
12  A.    No. Never, never.
13  Q.    The incident with Nancy that she told you
14  your question was stupid, was that when you were in
15  the full-time position?
16  A.    Yes.
17  Q.    The incidents with Michele when she told you
18  to speak English, were they also when you were
19  full-time?
20  A.    Yes.
21  Q.    Yes. Okay. You were telling me about a
22  problem in March of 2004. What happened in March?
23  A.    I have a problem with my heart, a mild heart
24  attack, and I went to the doctor Thursday.

Gloria Nieves

Page 46

1  Q.    Thursday?
2  A.    Thursday with my husband, and the Bayhealth,
3  it was a walk-in clinic.  And they told my husband
4  that they have to call 911 because I have something in
5  my heart, mild heart attack, whatever, and they want
6  to know.  And they called 911.  I went to the
7  ambulance to the -- I don't know.  I don't remember
8  the name of the hospital in Dover.
9        MR. NIEVES:  Union Hospital.
10       THE WITNESS:  I went over there, and I
11  stay two nights in intensive care middle, middle, and
12  I told my husband that go to Acme.  I was worried
13  because I don't want they think that I don't want to
14  work.  And I told my husband tell them that I am sick,
15  that I don't want they think that I don't want to
16  work.  And my husband went over there, tell them, and
17  Denise say, "Don't worry."
18       After that I came back to work one
19  Monday, and I was so close with Joyce Alphin, so
20  close, like good co-workers, and she was so different
21  with me, and that week I worked with her, she was so
22  serious.
23       And Thursday or Friday -- I don't
24  remember -- when I tried to punch in again, BJ told

Page 47

1  me, "Gloria, come to my office."  And I say, "Any
2  problem?"  Because I didn't know.  "No, no, no.  Go to
3  my office.  Don't punch in."  And I went over there.
4  I sit down.  BJ called the shop steward, Anna Trump,
5  Anna Trump.  She was there.  And BJ told me, "Gloria,
6  you are suspended indefinitely."  And I say, "Why?"
7  And she told me, "You gonna know, because you have to
8  talk with your union representative."  They give me
9  the phone number.  And that's all.  That's all.  I was
10  suspended one week.
11       My union representative called me.  He
12  talk all the time with my husband because I don't
13  understand what he said.  The only thing that I
14  understand was that Joyce Alphin told BJ and BJ and
15  Steve Briely I throw away to her a bucket of water,
16  that big bucket that we use for mop, and a chunk of
17  ham, the big chunk in her face.  And I say she is
18  supposed to be hurt and wet.  And I said it is
19  impossible.  I never do.  I never did that.  And she
20  said that was the truth.
21       And my union representative told me,
22  "Gloria, I gonna fix."  I never meet him in person.
23  BY MS. MALLOY:
24  Q.    And what is his name?

Page 48

1  A.    Woloski, Uloski.  Something the last name
2  Woski, Woski.  Henry Woloski or something like that.
3  He talk with my husband because I don't have any
4  experience with unions.  In my country we don't have
5  unions.  And my husband talked with him.
6        And then they talk with Mr. Steve Briely and
7  the union, and they take out a determination that they
8  transfer me from Middletown to Town of Smyrna.
9  Q.    What is your understanding of what
10  Mr. Woloski said the problem was?
11  A.    The problem was like I throw away a bucket
12  of water on Joyce's face and a piece, a chunk of ham.
13  Q.    Did you get along well with Joyce?
14  A.    Yes.  We were so close.  Joyce, Amanda and
15  me, we were so close, because we work all the time at
16  nighttime, 2:45 until 11:15.
17  Q.    Is there anything that Joyce ever did that
18  you thought was discrimination or harassment against
19  you?
20  A.    No, no.  She changed that day that I was in
21  the hospital.  And when I was in the hospital, they
22  thought that I was faking my illness.  Faking, say
23  something that is not true, faking?
24  Q.    Who thought you were faking?

Page 49

1  A.    Denise, the other, Michele, that I was
2  faking my illness.
3  Q.    Why do you believe Denise and Michele
4  thought --
5  A.    They say.  They say that.  They thought I
6  was faking my illness.
7  Q.    They said that to you?
8  A.    No.  To Amanda Cumberbatch.
9  Q.    Is there anything Amanda ever did that you
10  believe was discrimination --
11  A.    No.
12  Q.    -- or harassment against you?
13  A.    No.
14  Q.    Do you remember anything that happened in
15  early March --
16  A.    Nothing.
17  Q.    -- where you may have been yelling at your
18  co-workers?
19  A.    No.
20  Q.    Was there any incident -- strike that.
21       Was there any occasion that you remember in
22  early March of '04 when water came out of the bucket?
23  A.    Never, never.  That night I was mopping the
24  floor.  I squash the mop and I begin to mop.  That's

13 (Pages 46 to 49)
ac5d0da1-e879-47e7-8c4a-d1e287fe9853

## Gloria Nieves

| Page 50 |
| --- |

1  all. That's all.
2  Q.    Is this March 2? Do you remember the date?
3  A.    I don't remember the date. But it was
4  before March 6.
5  Q.    Was your job, part of your job to mop the
6  floor at night?
7  A.    Yes. Everybody has to mop the floor.
8  Q.    Was there anything at all that happened
9  prior to March 6 when you were mopping the floor that
10  was out of the ordinary?
11  A.    Nothing, nothing.
12  Q.    So what do you think this was all about?
13  A.    I don't know. I don't know. I don't have
14  any idea why.
15  Q.    Do you think somebody made it up?
16  A.    I am sure. I am positive. Because I was
17  sick one week. You can check my records. I work
18  good. And one week I was absent because I have a mild
19  heart attack. And when I came back, Joyce Alphin was
20  strange with me, and the one week exactly after that
21  happened, my heart attack, they say that I drop -- you
22  know how much weight is a chunk of ham, the big ones?
23  It is so heavy. To throw away somebody's face? No.
24  And the bucket. Not was the plastic bucket. The

| Page 51 |
| --- |

1  other ones. They are heavy.
2  Q.    The metal one?
3  A.    Yes. We use that one. We don't use the
4  plastic. Now, I don't know now, but when I was
5  working, it was the metal. I feel that way.
6  Q.    Who were they accusing you of throwing the
7  water at?
8  A.    Joyce Alphin.
9  Q.    Have you ever talked to Joyce about this?
10  A.    Nothing. Nothing. They told me I am not
11  allowed to go to the deli. When I was suspended, I
12  take all my stuff and I leave my house -- I leave Acme
13  and I went home. I was crying.
14  Q.    Have you at any point talked to Joyce about
15  what happened?
16  A.    Nothing at all.
17  Q.    From your dealings with her, do you believe
18  Joyce is an honest person?
19  A.    When she was my friend, she was -- she told
20  me she was honest. I don't know after, when I went to
21  the hospital. I don't know.
22  Q.    Since you came back from the hospital in
23  March of '04, did you talk to anybody, any of your
24  co-workers about this problem?

| Page 52 |
| --- |

1  A.    My heart attack?
2  Q.    No. The problem at work.
3  A.    No. No. Because I didn't know. When I
4  worked that week, like a Friday, I tried to punch in,
5  and BJ told me, "Don't punch in. We need to talk with
6  you." I didn't know nothing. I discovered everything
7  when I called my union representative. BJ never told
8  me what happened, nothing. Just "You are suspended."
9       "Why?"
10       "You are going to know." That's all. I
11  never signed nothing. The shop steward, she give me
12  the phone number of the union. "Bye, Gloria, bye."
13  Q.    So just so I am correct, and you never
14  talked to any of your co-workers --
15  A.    No.
16  Q.    -- about the incident --
17  A.    No.
18  Q.    -- at all? Okay.
19       Do you have a meeting with Briely or BJ
20  about this?
21  A.    When they make a decision, Briely told me
22  that he need to talk with me. And I went with my
23  husband, because he understand better than me. And he
24  told me that I have to be transferred to Middletown to

| Page 53 |
| --- |

1  Smyrna.
2  Q.    Was anybody at this meeting other than you
3  and your husband and Mr. Briely?
4  A.    No. Just Briely, Emilio Nieves and me.
5  Q.    And tell me what happened at this meeting.
6  A.    We went over there. We talk. My husband
7  was trying to talking with him about what happened.
8  And he say that I was a good worker but remember that
9  nobody work like everybody else, and that's all.
10       And I say, "If I want to do more about my
11  case, defend more, what happen?" And he told me, "If
12  you continue with this problem, the end of this is
13  gonna be different." He told me that.
14  Q.    Could you say that again, please?
15  A.    If you continue to check all that stuff,
16  like you continue to -- maybe he pronounce this,
17  grievance.
18  Q.    Grievance, grievance?
19  A.    Okay. I don't know. I didn't know what is
20  grievance. I asked my husband when I left, "What is
21  grievance?" I don't know many words in English. I am
22  sorry. He told me, "The end of this history is gonna
23  be different." I don't know what was the meaning.
24       And I say, "Okay, Mr. Briely. Thank you so

# Gloria Nieves

Page 54

1  much.
2      "You begin next Monday on Smyrna, and they
3  gonna give you your hours, your day off and
4  everything.
5      "Thank you, Mr. Briely." When I went out, I
6  asked my husband, "Emilio, what is the meaning of
7  grievance, grievance, whatever?" And he explained to
8  me. And I say I don't know nothing about that.
9  That's all.
10  Q.    Did you personally have any conversations
11  with any union representative about the March problem?
12  A.    No.
13  Q.    So anybody from the union spoke to your
14  husband?
15  A.    Yes. And that guy speak with me also, but
16  when he began to explain a whole lot of stuff, I say,
17  "Hold on. My husband is gonna talk with you."
18  Q.    So you were suspended for one week?
19  A.    Yes.
20  Q.    And then you reported to the Smyrna store?
21  A.    Yes.
22      MS. MALLOY: We will take a break in a
23  couple of minutes. I just want to finish this one
24  thing.

Page 55

1      (Gloria Nieves Deposition Exhibit No.
2  9 was marked for identification.)
3  BY MS. MALLOY:
4  Q.    Exhibit 9 is a letter dated March 16, 2004.
5  Is that your handwriting on the top?
6  A.    Yes.
7  Q.    And that indicates that you received this
8  letter on March 19?
9  A.    Yes.
10  Q.    Did you get it in the mail?
11  A.    Yes.
12  Q.    When you met with Mr. Briely and he told you
13  about the transfer to Smyrna, was that before or after
14  you received this letter?
15  A.    After.
16  Q.    So when you met with Mr. Briely, you already
17  knew that you were gonna be transferred to Smyrna?
18  A.    Yes.
19  Q.    Other than what you have already testified
20  about, did you say anything else to Mr. Briely at this
21  meeting?
22  A.    No.
23  Q.    Had you ever worked in the Smyrna store
24  before?

Page 56

1  A.    No.
2  Q.    How far was the Smyrna store from your
3  house?
4  A.    Like 30 minutes, 45 minutes.
5  Q.    And what was your position when you started
6  work at Smyrna?
7  A.    Full-time position, PC, person in charge of
8  nighttime deli.
9  Q.    Same position you had at Middletown?
10  A.    Yes.
11  Q.    When you learned that you were gonna be
12  transferred to Smyrna, how did you feel about that?
13  A.    Kind of worried, because I don't know how to
14  drive many times some places, because I just drive
15  around Middletown. And my -- and I have to go before
16  I began to work over there, because my husband showed
17  me where was Acme, how can I get the direction and
18  everything. I was worried because it was so far from
19  my house. And in wintertime I don't know how to drive
20  in winter with the snow, because in my country we
21  don't have snow.
22      And another thing, that my husband's
23  brother, he is sick, and when I work in Wawa
24  Middletown, Middletown people, managers know that I

Page 57

1  have that kind of stuff in my house, because many
2  times he walk away from house, and the police went
3  over there to check for me and say, "Mrs. Nieves, your
4  husband's brother is walking around."
5  Q.    Is walking around?
6  A.    Yes. He is -- I don't know how you say. He
7  is a schizophrenic, kind of. And sometimes at the
8  beginning, and when I take my lunch break, I have time
9  to go house, because my husband work different shifts.
10  And I help him with -- I have to check him. I went to
11  my house to check him, how was he, feed him sometimes,
12  and I back to work.
13      But I was worried because he would be alone
14  in our house during the days that he work nighttime or
15  morning times. I was worried for that. It was a bad
16  inconvenience for me, because I have to help my
17  husband.
18      MS. MALLOY: Let's take just a
19  five-minute restroom break.
20      (Recess taken.)
21      MR. BARTOSHESKY: Just as we broke,
22  Gloria said to me, "I forgot something. Can I tell
23  her?" So I don't know what it was.

B-18

Gloria Nieves

Page 58

1  BY MS. MALLOY:
2  Q.    Is there anything you want to add to your
3  testimony?
4  A.    Yes, please.
5  Q.    Go ahead.
6  A.    Michele Warren at that time when I get
7  full-time position, she was asking if I am legal or
8  no, if I have green card. Of course, I am legal.
9  Nobody is gonna hire -- no big company can hire
10  illegal people. I showed the papers. And I told to
11  Steve Briely. "Don't worry, Gloria. She is a
12  troublemaker, making trouble."
13  Q.    Did you report this comment by Michele
14  Warren to anybody?
15  A.    Yes.
16  Q.    To whom?
17  A.    BJ and Steve Briely.
18  Q.    Were BJ and Briely together when you told
19  them?
20  A.    No; different.
21  Q.    What did you tell BJ?
22  A.    BJ told me she think that -- what she think,
23  she is saying that. "Of course, you are legal." And
24  Mr. Briely told me, "Gloria, don't worry. We gonna

Page 59

1  fix all kind of problems."
2  Q.    Anything else you wanted to add to your
3  testimony?
4  A.    That I remember, no.
5      MS. MALLOY: Off the record.
6      (Discussion off the record.)
7  BY MS. MALLOY:
8  Q.    Prior to your first day at Smyrna -- I just
9  want to kind of give you a timeframe. Prior to your
10  first day at Smyrna, did you ever report to anyone at
11  the union the types of problems you told us about
12  today?
13  A.    No.
14  Q.    At any time while you were employed by Acme
15  did you report to the union that you were having
16  problems at work?
17  A.    No.
18  Q.    When you started work at Smyrna, who was the
19  store director?
20  A.    Mr. Frank Murphy.
21  Q.    How did you get along with him?
22  A.    Good.
23  Q.    And who were the assistant store directors?
24  A.    I don't remember her name. It was a lady.

Page 60

1  Diana, Deana, Donna. Donna.
2  Q.    Do you remember her last name?
3  A.    No, I don't remember.
4  Q.    How did you get along with her?
5  A.    Good.
6  Q.    Any other store directors or assistant store
7  directors at Smyrna?
8  A.    Kevin. No. I get along with everybody over
9  there.
10  Q.    Who were your co-workers?
11  A.    In deli?
12  Q.    In the deli.
13  A.    Okay. Penny Armstrong was my deli manager.
14  Suzanna, I don't know the name, the last name.
15  Suzanna. And Mrs. Pink, nickname Pink. I don't know
16  the name. Everybody call her Pink, Mrs. Pink.
17  Suzanna, Jane, Freddie. Ay, the big guy. I don't
18  remember. I don't know the names.
19  Q.    How did you get along with Penny Armstrong?
20  A.    Good. I love her to death.
21  Q.    Did you have problems with any co-workers or
22  supervisors in Smyrna?
23  A.    On deli, no.
24  Q.    Did you like working at Smyrna?

Page 61

1  A.    At Smyrna, yes, until I went to seafood
2  department, because I was trying to learn -- I like to
3  learn everything. I told Mr. Frank Murphy, "Can I go
4  to the seafood, because I want to learn more.
5  "Sure, Gloria.
6  "But I gonna get my full-time.
7  "No, don't worry."
8  I went over there. I was working full-time,
9  the same thing I was working on deli.
10  Q.    Is that the person in charge at night?
11  A.    Yes, me.
12  Q.    So when you moved to seafood, you were the
13  person in charge at night?
14  A.    Yes, at nighttime. 2:45 until 11:15. One
15  day I remember, it was September, September 6,
16  Memorial Day or holiday, something like that.
17  Q.    Labor Day?
18  A.    Labor Day. I was working, and I make a
19  mistake. We supposed to write down the dates, how
20  many days you have to put on the shelves, the seafood,
21  and I forgot that. And I said bad words with F. And
22  my boss smack my mouth.
23  Q.    Who was that?                    B-19
24  A.    Linda Whitman.

Gloria Nieves

Page 62

1  Q.    Did she hit you or put her hand over your
2  mouth?
3  A.    No; hit me, hit me.  And I was crying
4  because nobody hit me.  Nobody supposed to touch
5  nobody, no matter what.  If somebody say bad word, say
6  "Gloria, shut up" or "be quiet" or "change your word."
7  But don't hit me.
8        And I went to Mr. Frank Murphy.  He try to
9  fix the problem.  And the security ask Linda Whitman,
10 and she said yes, she did it.  Nobody say nothing.
11 Nobody did nothing.
12 Q.    What did you want to happen?
13 A.    Because she told me that she doesn't like
14 that word, and I say, "You say other bad words and
15 nobody hit you."  That's all.
16 Q.    When you say that nothing happened to Linda,
17 what was it that you thought should happen to her?
18 A.    A warning or something or say you have to
19 respect or something like that.  I don't want trouble.
20 Just please, be more polite, or if you don't like that
21 word, say, "I don't like that word," but don't hit
22 nobody.  Nobody say nothing.
23 Q.    Where in the store were you and Linda when
24 this happened?

Page 63

1  A.    Inside the seafood, behind the counter.
2  Q.    Were there customers around?
3  A.    I don't remember.  Co-workers, yes.
4  Q.    Who was there?
5  A.    A lot of people.  Two guys, and they saw
6  that.
7  Q.    Who were they?
8  A.    I don't remember their names, but she say
9  that she did it.  She recognized that.
10 Q.    Did she ever apologize to you?
11 A.    No.
12 Q.    Do you agree that you should not have used
13 the F word?
14 A.    Yes.  I say I am sorry.  I know it is a bad
15 word.  But nobody can beat you.
16 Q.    Any other problems that you had at Smyrna?
17 A.    That's all.
18 Q.    Okay.  Did you get pay increases while you
19 were employed by Acme?
20 A.    Like every six months, like ten cents or 20
21 cents, like a regular payment.  Not like -- because
22 you was transferred to down there, you are going to
23 have more money, no.  Like a regular pay.
24 Q.    You got regular pay increases?

Page 64

1  A.    Yes, just one time when I work down in
2  Smyrna.
3  Q.    When you were at Middletown, did you ever
4  help your co-workers learn some Spanish words?
5  A.    Yes, yes.
6  Q.    Tell me about that.
7  A.    Amanda and Joyce, "How do you say good
8  morning?  How do you say bye?  How do you say boy?"
9  That's all.  The rest of the people, no.
10 Q.    Amanda and Joyce you did that with?
11 A.    Yes.
12       Sorry.  Can I say something that I forgot, I
13 remember at this moment?
14 Q.    Sure.
15 A.    When they was using -- everybody talk about
16 drugs, abuse drugs or whatever, everybody over there,
17 Michele, Nancy, "You have to ask Gloria because she is
18 from Colombia."
19 Q.    Tell me a little bit more about that.
20 People spoke about drugs?
21 A.    About drugs, about drugs, whatever topic,
22 and they say, each of them, between them, "You have to
23 talk with Gloria, because she knows better about drugs
24 because she is from Colombia."

Page 65

1  Q.    And who said that?
2  A.    Nancy, Michele, Christina.  And I say, "Why
3  you have to ask me about drugs?  I am from Colombia,
4  but I don't know nothing about that."
5  Q.    How many times did something like that
6  happen?
7  A.    Many times.
8  Q.    And was this after you became full-time in
9  Middletown?
10 A.    When I was part-time and when I was
11 full-time.
12 Q.    Can you estimate for me how many times a
13 comment like that was made?
14 A.    Four or five times.
15 Q.    And did you report any of those --
16 A.    Yes.
17 Q.    -- to anyone?
18 A.    Yes.
19 Q.    Who did you report it to?
20 A.    Steve Briely, when Jean Black was there, and
21 with BJ, Steve Briely, and with Phyllis.  She was a
22 CSL in front of Acme.
23 Q.    Phyllis?
24 A.    Phyllis.

B-20

## Gloria Nieves

### Page 66

1  Q.    What do you remember telling Phyllis?
2  A.    Everything.
3  Q.    Tell me what you told her.
4  A.    About the drugs, about that my English
5  wasn't good to get full-time position, that they call
6  me "The plane, the plane." Everything.
7  Q.    And what was Phyllis's position?
8  A.    She is CSL, service, customer service
9  leader.
10  Q.    And what did Phyllis say?
11  A.    "Gloria, talk with Mr. Briely.
12       "I talk already, but nothing done."
13  Q.    What do you remember telling Mr. Briely
14  about the "talk to Gloria, she is from Colombia" types
15  of comments?
16  A.    Type of comments that they talk about:  In
17  here or U.S.A. consume a lot of drugs because they
18  came from -- the drug came from other countries, and
19  Michele and Nancy: "No.  You know what?  Ask Gloria,
20  because she is from Colombia."
21  Q.    And what did Mr. Briely say?
22  A.    "Don't -- Gloria, don't worry, Gloria."
23  Q.    What did you tell BJ about this problem?
24  A.    The same thing that I talk with Mr. Briely.

### Page 67

1  Q.    Two different conversations?
2  A.    No.
3  Q.    Were Briely and BJ together?
4  A.    No, no.
5  Q.    And what did BJ say?
6  A.    She gonna talk with Briely.
7  Q.    Pardon me?
8  A.    She gonna talk with Mr. Briely.
9  Q.    Is there anything other than what you have
10  already told me today that you believe was
11  discrimination or harassment against you?
12  A.    I think so.  That I remember, everything is
13  tell you.
14  Q.    Okay.  Do you believe that you were
15  retaliated against by Acme?  Do you know what that
16  word means?
17  A.    No.  I am sorry.
18  Q.    Okay.  Do you believe that you were treated
19  differently by Acme because you brought complaints or
20  problems to people's attention?
21  A.    Yes.
22  Q.    You know what I mean by that?
23  A.    Yes.
24  Q.    How do you believe that you were treated

### Page 68

1  differently because you brought problems to people's
2  attention?
3  A.    Because one incident happened over there
4  that Christina and Alex was playing around, you know,
5  playing around or something.  And she complain with
6  Steve Briely, and he was -- Mr. Briely talk with him
7  and he was fired.  He touch her in a bad way, touch
8  her in back.
9  Q.    Touched her back in a bad way?
10  A.    Yes, in a bad way.  I don't know how it was,
11  because I wasn't work that day.  And he was fired.
12  Q.    Alex was fired?
13  A.    Yes.
14  Q.    Do you believe that you were transferred to
15  the Smyrna store because you brought problems to
16  people's attention?
17  A.    Yes.
18  Q.    Okay.  Why do you believe that was the
19  reason?
20  A.    Because they know that I was new in the
21  area.  They knew that I have my brother-in-law in my
22  house.  They don't want me there.  They don't want me
23  there.  I feel that way.  They don't want me there
24  anyway.

### Page 69

1  Q.    Why did you think they didn't want you there
2  in Middletown?
3  A.    How can I say, explain?
4  Q.    Explain the best you can, and then I can ask
5  you more questions.
6  A.    Okay.  When you try to work good and to the
7  best the things that supposed to -- like they told
8  you, they train you to do this, and you do more than
9  they train you, they don't like it.  The co-worker
10  doesn't like it.  You understand what I mean?
11  Q.    Yes.  They didn't like you because you tried
12  to do a really good job?
13  A.    Yes.  Because like if they teach me just
14  clean one time a week the shelf or the meat when we
15  supposed, the meat, I clean it every night because it
16  doesn't smell good, they don't like it.  I clean the
17  sharp, the slicer ever single night before we left.
18  They don't like it.  No, Gloria.  First time they do
19  it.  No.  Why the first time?  We have plenty of time.
20  We can do it.  It is the way that I feel.
21       When somebody work more than you supposed to
22  do it, because many people work by the book and I try
23  to work more than the book, I definitely -- that's the
24  way I feel.

Gloria Nieves

|  | Page 74 |
| --- | --- |

1  Q.    -- knew anything about Middletown when you
2  were there?
3  A.    I don't know.  They know that I was
4  transferred for some kind of problem.  But I don't
5  know if they know why it was, what was really the
6  problem.  I don't know.
7  Q.    Did you ever talk to anybody at Smyrna about
8  the problems that you had at Middletown?
9  A.    No.  I don't want nothing.
10  Q.    So you moved to Smyrna sometime at the end
11  of March of 2004?
12  A.    Yes.  Yes.  I think the middle, because I
13  was suspended in March 2, and one week, from 2 to one
14  week is 9 or 10.  And I begin one Monday.  I know that
15  I have --
16  Q.    So Exhibit 9 is the letter that is dated
17  March 16 --
18  A.    Yes.
19  Q.    -- and says that you were transferred to
20  Smyrna?
21  A.    Yes.
22  Q.    So it was right around there.
23  A.    Yes.
24  Q.    Okay.  And this letter, Exhibit 9, is signed

|  | Page 75 |
| --- | --- |

1  by Steve Moyer?
2  A.    I think so.
3  Q.    Had you ever talked to him?
4  A.    Never.
5  Q.    And there is a phone number written next to
6  his name.
7  A.    What?
8  Q.    Do you see on Exhibit 9?
9  A.    Yes.
10  Q.    Whose handwriting is that telephone number?
11  A.    This is -- I don't remember that phone
12  number.  I don't remember.
13  Q.    Okay.
14  A.    But now I remember something.
15  Q.    Go ahead.
16  A.    This Fajkowski, Fajkowski is the union guy
17  that supposed to defend me.
18  Q.    Is that the individual your husband spoke
19  to?
20  A.    Yes.
21  Q.    And do you know who Holden was?
22  A.    Meaning?
23  Q.    T. Holden, do you know who that was?
24  A.    No.

|  | Page 76 |
| --- | --- |

1  Q.    And Murphy is the store director?
2  A.    Murphy is, Frank, yes.
3  Q.    Okay.  Your employment with Acme ended in
4  January?
5  A.    January 15.
6  Q.    January 15 of '05.  Tell me what you told
7  Acme about that.
8  A.    About what?
9  Q.    Did you tell anybody that you were leaving?
10  A.    Yes.  I told Mr. Frank Murphy that I am
11  gonna -- I am gonna quit.  And he say okay.  And
12  January 15 I received my last check, and January 16 I
13  went to Miami.  That's all.
14  Q.    And did you tell Mr. Murphy why you were
15  going to quit?
16  A.    No, no.  Just I want to quit.  I am so
17  stressful, problems here with Linda Whitman, and I am
18  done.  I say that.  I am done.  Thank you for
19  everything.  They give me my -- the last -- the check
20  before the last one, and that's all.
21  Q.    Now, if you started at Smyrna in the middle
22  of March of '04, when was the incident with Linda?
23  A.    In November.  I mean -- yes.
24  Q.    Labor Day, I think you said; right?

|  | Page 77 |
| --- | --- |

1  A.    Yes, yes.
2  Q.    So that is September?
3  A.    Nine, two or three.  I don't remember.
4  Q.    Right.  Usually early September.  Anything
5  else you told Mr. Murphy about why you were leaving?
6  A.    No, no.
7  Q.    Did you tell any of your co-workers that you
8  were leaving?
9  A.    No.
10  Q.    You said that you felt that you were under
11  stress?
12  A.    Yes, because the problems in Middletown, she
13  beat me and nobody say nothing, and I say make me feel
14  like I am nobody, nobody.  I don't understand nothing
15  good for me.  And I say I have to go to any place to
16  disconnect me from everybody, because if I complain in
17  Middletown, nobody say nothing.  They suspend me.
18  They transfer me.  And here she beat me, nobody say
19  nothing.  "Let it go, Gloria.  Let it go."
20  Q.    Wait.  You said she smacked you -- she put
21  her hand over your --
22  A.    Yes (indicating).
23  Q.    She put her hand over your lip when you used
24  the word fuck?  Is that what you said?

ac5d0da1-e879-47e7-8c4a-d1e287fe9853

Page 78

1   A.    Yes. And I say --
2   Q.    So any other problems with Linda.
3   A.    No, no. That's all.
4   Q.    Why did you wait until four months later
5   then?
6   A.    Because I was saving money. I was saving
7   money, saving money, because I tried to go not by the
8   plane; just with my car. And it is expensive to go
9   from here to there. It is 28 hours or something like
10  that. And I have to go, and I say I am done.
11  Q.    Why did you feel that you needed to go to a
12  different state?
13  A.    Because I need to stay with somebody that
14  really love me outside my husband. I feel like I am a
15  human, like I deserve something good. No matter what.
16  If my husband say, "Gloria, don't worry. You are good
17  person," but I feel like I am not good enough for
18  nobody.
19  Q.    Were you having any marital problems at all
20  with your husband?
21  A.    Like every marriage. Fight, little fights,
22  because we are different countries. He is older than
23  me, and I am so -- how do you say when somebody is
24  spoiled? How do you say?

Page 79

1   Q.    Spoiled? What did you say; spoiled?
2   A.    Yes. And we have problems like every
3   marriage, like every marriage.
4   Q.    Did problems with your husband or your
5   marriage have any part at all in your decision to move
6   to Miami?
7   A.    I think sometimes yes, sometimes no. But
8   everything was together. Everything was together.
9   Q.    Did you give Acme anything in writing when
10  you left?
11  A.    No.
12  Q.    When you were at the Smyrna store, did you
13  talk to anybody about the fact that you felt that you
14  were under a lot of stress from the incident with
15  Linda?
16  A.    Yes. I was crying.
17  Q.    Who did you talk to?
18  A.    Who was that guy? I talk with Penny, Penny
19  Armstrong. She was the deli manager, my ex-boss, my
20  ex-boss.
21  Q.    And what did you tell Penny?
22  A.    I feel like I don't deserve nothing. I
23  don't want nobody be fired. I don't want nobody be
24  fired because I don't want be fired me. But something

Page 80

1   like she is human, I am human, I deserve some kind of
2   a little respect, no? No matter what position I have,
3   if she the boss or no. Everybody has to respect
4   everybody, no?
5   Q.    And was this conversation with Penny around
6   Labor Day, when the incident happened?
7   A.    No; after that. Between October,
8   December -- I mean, December, when I was -- I had
9   enough money to leave.
10         (Gloria Nieves Deposition Exhibit No.
11  10 was marked for identification.)
12  BY MS. MALLOY:
13  Q.    Exhibit 10 are some notes that your lawyer
14  gave to me. I put them all together as one exhibit so
15  you can explain that to me.
16  A.    Okay.
17  Q.    The first page is a letter from your lawyer.
18  A.    Yes.
19  Q.    The second page that says P256 in the
20  corner -- do you see that at the bottom? Is that the
21  one you are looking at?
22  A.    Yes.
23  Q.    Okay. Tell me about these notes, and then I
24  will ask you some more questions.

Page 81

1   A.    Okay. That is in Spanish. Everybody, I
2   told you about Michele Warren asked me, ask if I am --
3   my status immigration, Michele Warren asking for why I
4   get full-time position if my -- I am not good with my
5   English.
6   Q.    Okay. Let me stop you for a minute. And I
7   am going to let you go through and tell me what the
8   notes say. But if we are looking at the first page
9   that says 256, and the next page says 257, are both of
10  those pages in your handwriting?
11  A.    Yes.
12  Q.    Okay. And when did you make those notes?
13  A.    When everything began, I make a note, a
14  little note, a little note in -- you see these paper,
15  in these kind of papers (indicating).
16  Q.    Right. You are looking at 258?
17  A.    Yes. And then I wrote down everything in
18  one paper.
19  Q.    Okay. And that's 256 and 257?
20  A.    Yes.
21  Q.    Okay. Do you still have any of the little
22  papers?
23  A.    No. Just I keep that one, the 258. Keep
24  it.

# Gloria Nieves

**Page 82**

1  Q.  And what did you do with the little papers?
2  A.  I don't remember.
3  Q.  Okay. Did you throw them out?
4  A.  I don't remember. I think I throw away,
5  because I wrote down in one paper and I think I don't
6  need it.
7  Q.  Okay. So 256 and 257, did you write them
8  when you were still at Middletown?
9  A.  Yes, ma'am.
10 Q.  Okay. And then why don't you read to me
11 from the top here.
12 A.  In Spanish? Sorry.
13 Q.  I speak a little Spanish, but I actually was
14 very proud of myself because I could read, probably
15 read a lot of this. All that money I paid for my
16 education pays off.
17     If you don't mind, if you could tell me in
18 English.
19 A.  Okay. July 24, 2003, Michele asked me my
20 immigration status.
21 Q.  Okay. You already told me about that;
22 right?
23 A.  Yes.
24 Q.  All right. November 2?

**Page 83**

1  A.  November 16, 2003, the same person, Michele
2  Warren, they ask why Acme they give me the full-time
3  position if my English is not good enough.
4  Q.  Okay. We talked about that?
5  A.  Yes.
6  Q.  Okay. No. 3?
7  A.  Okay. New Year's Eve Michele Warren, she
8  yell at me in front of a customer. I didn't say that.
9  In front of a customer, and I make the complaint, and
10 nobody say nothing.
11 Q.  Tell me what happened on New Year's Eve? Is
12 this something we already talked about?
13 A.  No.
14 Q.  All right. Tell me about that.
15 A.  You see I forgot many stuff.
16 Q.  Okay. That's why I wanted to show you this.
17 A.  I was taking care -- New Year's Eve, you
18 know, we want to go home, and I was doing -- take a
19 customer, and I told Michele, "Will you please bring
20 one new ham." And she yell at me, "I don't have time.
21 You are not my boss."
22     "Sorry."
23     And the customer would say, "Gloria, I am
24 sorry. She doesn't -- nobody supposed to yell at you

**Page 84**

1  in front of nobody." And I say it is Christmas Eve.
2  What I going to say? She wants to go home and I want
3  to go home. And I complained. Nobody say nothing.
4  Q.  Okay. Who did you complain to?
5  A.  To -- I didn't put nothing here, but I
6  complained with BJ. Okay.
7  Q.  And what did you tell BJ?
8  A.  That she yell at me in customers. That's
9  all.
10 Q.  And what did BJ say?
11 A.  Nothing.
12 Q.  What is No. 4?
13 A.  No. 4, Joyce one night she told me and she
14 told Jeane Miller that Michele was cheating on the
15 scales. You know when you put a cup on the scale and
16 you have to take tear? She didn't take tear. When
17 the customer was her friend, she didn't take tear.
18 Q.  When the customer was what?
19 A.  Her friend.
20 Q.  Her friend?
21 A.  She never take a tear or she put less than
22 the tear supposed to put, and whatever was cheapest.
23 And we complained, and we talk to Denise, Denise Dean,
24 the manager. Nobody never -- they never said nothing.

**Page 85**

1  Q.  So tell me about 4 again. Joyce told you
2  that Michele did this?
3  A.  Yes. And she talk with me and Jean Miller.
4  Jean Miller was the old lady that she work in Acme for
5  35 years on deli. That she was cheating on the
6  scales.
7  Q.  Did you ever see Michele cheat on the
8  scales?
9  A.  I was checking on her, and she did one time,
10 one time. She didn't --
11 Q.  When was that?
12 A.  She put more tears than we supposed to take.
13 You put something in the scale empty, and like 25
14 grams weigh this. You take off from the computer. We
15 charge just the food, not the plastic cup.
16 Q.  Right. You subtract for the container?
17 A.  Yes, yes. She take off more, more stuff
18 from the plastic cup. And the price is gonna be
19 cheaper.
20 Q.  And did you see Michele do that once?
21 A.  Just one time.
22 Q.  And what was it that she was weighing?
23 A.  Chicken salad. Some kind of salad. I can't
24 tell you now if macaroni salad, seafood salad.

## Gloria Nieves

### Page 86

1  Q.    Okay.  And who was she doing that for?
2  A.    She doing it for a customer that she was
3  talking with very friendly.  I don't know if she was
4  friends.
5  Q.    Okay.  And how much less expensive, if you
6  know, was the product than it should have been?
7  A.    One dollar.  I remember that because I told
8  Denise, one dollar.
9  Q.    And this incident that you observed Michele,
10  when did that happen?
11  A.    Oy, after Christmas.
12  Q.    Of 2003?
13  A.    Yes, something like that.
14  Q.    Did you say anything to Michele when you saw
15  it?
16  A.    No.
17  Q.    Did you report this to anybody?
18  A.    Yes.
19  Q.    Who did you go to?
20  A.    Denise Dean.
21  Q.    She was the deli manager?
22  A.    Yes.
23  Q.    Was Denise in the union, like you?
24  A.    Yes, I think so.

### Page 87

1  Q.    Okay.  And what did you tell Denise?
2  A.    I told her Joyce told me and told Jean
3  Miller that she was cheating on the scales, and I was
4  checking on her and I saw her one time.
5  Q.    What did Denise say?
6  A.    "Oh, Gloria, we gonna take care.  Oh, yes,
7  Gloria, don't worry.  We gonna take care.  We are
8  gonna check on her."  I don't know.
9  Q.    Did you tell anybody about this problem
10  other than Denise?
11  A.    No.
12  Q.    Can you put in a timeframe No. 4 here when
13  Joyce told you that Michele --
14  A.    After, I know that was after New Year's, New
15  Year.
16  Q.    Did you and Joyce talk about this?
17  A.    Yes.
18  Q.    Did Joyce --
19  A.    In front of Jean Miller.
20  Q.    Did Joyce tell you that she had observed
21  Michele cheating on the scales?
22  A.    Yes.
23  Q.    Do you know how many times that was?
24  A.    No.

### Page 88

1  Q.    Okay.  What is No. 5?
2  A.    One Sunday we was working, Amanda, Connie,
3  and Ruth Williams, when the next day they make a
4  little note.  They put in front of the wall with they
5  say -- they put our names, Connie, Amanda, Ruth, and
6  Gloria, that we was eating bread pudding.
7         I asked Denise, "I want to see the video."
8  The video, they supposed to have videos.  And Denise
9  told me that I don't have any right to ask for the
10  video.  Because when we walk inside the deli, the
11  first thing that we see is the papers on the wall, and
12  it was a small paper, and the name was big:  Ruth
13  Williams, Connie, Amanda Cumberbatch and Gloria Nieves
14  eat bread pudding.
15         First of all, I don't like pudding.  Second,
16  we know that we not supposed to eat nothing from deli.
17  If you want to eat something, it is samples we put
18  outside for customers.  That's all.  But inside the
19  deli, we know that.  I know that.  I don't like
20  pudding.
21  Q.    Who made this sign?
22  A.    Denise.  And I ask her, "I want to see the
23  video, because if you say so, it is because somebody
24  saw on the video.  I want to see the video."  And she

### Page 89

1  told me, "You don't have any right to see the video."
2  Q.    Were you disciplined in any way for
3  eating --
4  A.    No, no.
5  Q.    And who do you believe told Denise that
6  these people were eating?
7  A.    I don't have any idea.  When we left, we
8  punch out.  We came back to the work, and we saw that
9  paper.
10  Q.    And you say this was a Sunday.  Can you put
11  it in a timeframe?
12  A.    I don't remember, ma'am.
13  Q.    Okay.
14  A.    I remember sometime I wrote down --
15  Q.    It was after New Year's?
16  A.    Yes.
17  Q.    Do these go in date order?
18  A.    Yes, yes.
19  Q.    Okay.
20  A.    Okay.
21  Q.    Number, now, the second page --
22  A.    257?
23  Q.    Yes.
24  A.    Okay.

B-25

# Gloria Nieves

Page 90

1  Q.    What does that say?
2  A.    Three, 5/04. That day somebody -- I
3  supposed to throw away something in nighttime,
4  something to Joyce Alphin. That day they told me that
5  I supposed to throw away something on her face.
6  Q.    Does this have to do with the bucket of
7  water?
8  A.    Yes.
9  Q.    Now, wasn't the bucket of water in March?
10 A.    The date that I throw away, that date. They
11 say that I throw away ham and bucket that date, that
12 date.
13 Q.    You learned on March 5?
14 A.    6th.
15 Q.    Okay. I am looking at the fifth right here,
16 the one that says 3. 5/04. What does that say?
17 A.    What number? 3, yes, 3. 5/04.
18 Q.    3. 5/04, yes.
19 A.    That day I supposed to throw away something
20 on her face. And 3/6/04 at 2:38 p.m. BJ told me that
21 I don't have to punch because she wants to talk with
22 me in a few minutes. And I went to the office with
23 Anna Trump, the shop steward. And BJ told me that one
24 co-workers made that complaints about me. And they

Page 91

1  suspend me immediately without any notification.
2  Q.    Okay. And then what does it say under that?
3  A.    For the last thing, Michele Warren told some
4  day -- one day to Connie -- she is black -- she told
5  MF.
6  Q.    Okay. Tell me about this.
7  A.    And nobody say nothing.
8  Q.    Michele Warren?
9  A.    Call her MF.
10 Q.    Okay. She used the bad words?
11 A.    Yes.
12 Q.    What day was that?
13 A.    Ay, it was on Thanksgiving day.
14 Q.    Did you hear that?
15 A.    Yes. When we complained, she deny
16 everything. "I never say that."
17 Q.    Who was there?
18 A.    We was Alex, Phyllis, Connie. Connie, and
19 Michele, Phyllis, me, and I gonna tell you. Williams,
20 Ruth Williams.
21 Q.    And all four of you heard this?
22 A.    Yes. Alex and me, we heard that. Phyllis
23 was cleaning the chicken oven where we put the chicken
24 to roast it, roasted chicken.

Page 92

1  Q.    Phyllis?
2  A.    Phyllis. I mean Alex. Alex.
3  Q.    And did you say anything to Michele?
4  A.    No, because they was fighting each other
5  because one day -- she was fighting all the time
6  because they don't -- they didn't like each other.
7  Q.    Michele --
8  A.    And Connie.
9  Q.    -- doesn't like Connie?
10 A.    And Connie doesn't like Michele. That's
11 all. I don't want to be in the middle and one fight.
12 Q.    What is Connie's race?
13 A.    Black.
14 Q.    And what is Michele's race?
15 A.    White.
16 Q.    So what is at the end of page 257 here?
17 A.    At the end said another side, when they
18 suspend me, the date they suspend me, Denise Dean told
19 Kim, Kim -- I don't know her name. The last name is a
20 weird name. Told Kim that she doesn't want me on deli
21 anymore.
22 Q.    And you learned this the day you were
23 suspended?
24 A.    Because Amanda Cumberbatch told me.

Page 93

1  Q.    So Amanda told you that Denise said --
2  A.    "I don't want Gloria" --
3  Q.    -- that Kim doesn't want you on the shift
4  anymore?
5  A.    No. Denise told Kim that. Like if I tell
6  you something, "Kim, I don't want Gloria on my deli
7  anymore."
8  Q.    Okay. Amanda told you --
9  A.    Yes.
10 Q.    -- that Denise told Kim?
11 A.    Yes.
12 Q.    I got it now.
13 A.    You see, my English is no good.
14 Q.    I am saying all these names are confusing,
15 so I just want to make sure I have it straight. I
16 understand you perfectly.
17        And you learned about that --
18 A.    After I was suspended.
19 Q.    Page 258, what does that say?
20 A.    March 16, Tuesday, when I saw -- when I saw
21 Christina Shaw, I say, "Why she is here if she work on
22 Middletown? She doesn't work in here." She went to
23 Smyrna to ask -- the March 16 was the date that I
24 begin on Smyrna. She went over there to ask to Penny

Gloria Nieves

Page 94

1  Armstrong -- Penny Armstrong is the deli manager.  She
2  asked Penny about me:  How many hours I get, what
3  position I get, what days is gonna be my days off.
4  Q.    So Christina goes to Smyrna to talk to Penny
5  about this?
6  A.    About me, ask about me.
7  Q.    How did you find that out?
8  A.    Because I saw Christina, and when they
9  finished to talk, I asked Penny what she want.  And
10 she said, "She was asking about you."  And I said,
11 "Why?  She has to leave me alone.  I am not working
12 anymore in Middletown.  I am working here.  Don't
13 bother me."
14 She's doing something, because why she has
15 to come over to ask for me?  Why?  And I know
16 Christina told Kim, Kim the lady that I was -- when
17 Denise told Kim that, told Kim that Denise and Joanne
18 send her to Smyrna to ask for me.  And she went over
19 there because she was afraid to lose her job.
20 Q.    That you went to Smyrna because you were
21 afraid to lose your job.
22 A.    No.
23 Q.    Christina?
24 A.    Christina went to Smyrna to ask for me, to

Page 95

1  ask many questions about me, because Denise, the
2  manager of the Middletown, told her go down to Smyrna
3  to ask for Gloria.  And she did that because she was
4  afraid to lose her job.
5  Q.    Okay.  Because Denise told her to do it?
6  A.    Yes.
7  Q.    Is that why she was afraid to lose her job?
8  A.    Yes.
9  Q.    Okay.  What is page 259?
10 A.    It is saying -- it is about the same thing,
11 the same thing that we have in 255 and 257, but in
12 English.
13 Q.    Okay.  Now, is 259 and 260 and 261, they are
14 all in your handwriting?
15 A.    Yes.
16 Q.    And when did you write them?
17 A.    When I went to the labor department and they
18 told me to write down everything that I have, because
19 I showed them the little papers, and they told me do
20 all this in English.
21 Q.    Okay.  So just so that I get it straight,
22 when you went to the labor department, you had all the
23 little pieces of paper?
24 A.    Yes.

Page 96

1  Q.    And they told you to write it up differently
2  or something?
3  A.    Yes, in one paper, more professional.
4  Q.    Okay.  And is that when you did 256 and 257?
5  A.    Yes.
6  Q.    Okay.
7  A.    Yes.  And then I translate in English.
8  Q.    Okay.
9  A.    You see?
10 Q.    Yes.  Now, where does 259 start, though?
11 Like it starts January 2004?
12 A.    Yes, January 2004.  I put in different -- it
13 is the continuation of the papers that they give me in
14 the labor department, that everything doesn't fit in
15 one paper on the --
16 Q.    Oh, I see.  Okay.  So 259 to the end is a
17 continuation of something you gave to the labor
18 department?
19 A.    Yes, yes.
20 Q.    Okay.  That's interesting, because we never
21 got that from --
22        MR. BARTOSHESKY:  From the labor
23 department?
24        MS. MALLOY:  From the labor

Page 97

1  department, yes.
2        MR. BARTOSHESKY:  It is in -- the
3  production of materials from the EEU or the labor
4  department that I sent you shows one and it has
5  continued.  And this was attached to that, the English
6  version.
7        MS. MALLOY:  Okay.  I didn't get that
8  from the labor department.  But not our problem, I
9  guess.
10        MR. BARTOSHESKY:  The part that I
11 sent, it is their form.
12        MS. MALLOY:  Right.  The
13 questionnaire; right.
14        MR. BARTOSHESKY:  I mean, there is
15 about five or six lines --
16        THE WITNESS:  Yes.
17        MR. BARTOSHESKY:  -- and then it
18 continues here, and attached to it was -- it is Part 1
19 of that document.  It says one and then continued, and
20 this was the --
21        MS. MALLOY:  Maybe it just got
22 reshuffled when it got copied and I wasn't putting it
23 together that way.
24        MR. BARTOSHESKY:  It wasn't in the

Gloria Nieves

Page 130

1    A.    Because I am so -- I am a happy person. And
2    when everything happen, I was crying all the time. I
3    was stress, just cry all the time, fight with him. I
4    don't want to see nobody. I don't want to talk with
5    nobody. I was -- I put something in my -- like a --
6    how do you say total, like somebocy -- I don't know
7    how you say. It is like a -- when you don't want to
8    talk with nobody and I don't want nobody see me, you
9    put something behind.
10   Q.    Curtain?
11   A.    Yes, something like that. And I don't want
12   to talk. I was crying all the time. I told my
13   husband I feel like I am not human. I was afraid to
14   go to work. At the beginning when I begin in Acme, I
15   was so happy. It was my first job in this country.
16   They give me my first opportunity. And then when
17   they -- all the problems began, and I say no. Another
18   day, another time, the same people. I don't want --
19   and I was so quiet, crying. I was crying all the
20   time.
21   Q.    When did that start?
22   A.    When they began to ask me if I am legal, why
23   they give me full -- Acme give me full-time if I don't
24   speak English.

Page 131

1    Q.    After you became part-time, after you went
2    from full-time, like you told me before?
3    A.    Yes, yes.
4    Q.    Any other ways in which you believe you have
5    suffered emotional distress?
6    A.    Yes. My relationship with my husband.
7    Q.    Tell me about that.
8    A.    We was fighting. We -- I went to home and I
9    don't talk with him, or if I talk with him, he asks me
10   something, and I answer, "What? What do you want?"
11   because I was so stressful (indicating).
12   Q.    And when did that start?
13   A.    When they begin problems in Acme.
14   Q.    When you became full-time?
15   A.    Yes, yes. And I feel like I get full-time
16   because I -- the Acme know that I work good. If they
17   know that I didn't work good, they don't give me the
18   full-time. I don't know if I am right. But I say
19   why, why they have to tell me if you don't speak
20   English, you don't deserve nothing. I know that I am
21   in America. I am learning my English. He teach me.
22   Everybody teach me. But I feel like I was
23   uncomfortable in my house. I was uncomfortable with
24   my husband's daughter. And I feel like I don't

Page 132

1    deserve nothing.
2    Q.    Any other ways in which you believe you have
3    suffered from emotional distress?
4    A.    With my heart attack, because I was
5    stressful. Everybody say something, everybody
6    complain that say something against me, and one day I
7    was working, I feel pain in here (indicating). The
8    other day I was ready to work when I told my husband,
9    "You know what? I don't feel good. Let's go to the
10   Bayhealth," walk-in hospital. And they found that.
11   I never feel nothing bad. I was a strong
12   woman. I work whatever time. How many hours -- in
13   one day I work many times 12 hours, 18 hours. I don't
14   mind. If you are good with me, I am good. And that
15   heart attack made me feel terrible because I don't
16   have any -- nothing with my husband.
17   Q.    What do you mean?
18   A.    Nothing. I don't sleep. I don't want he
19   touch me, nothing.
20   Q.    No sexual relationship?
21   A.    Yes.
22   Q.    And when did that problem start?
23   A.    After my heart attack and my stress with all
24   that problem. We fight, and I don't talk with him,

Page 133

1    and I go to bed and just sleep and be quiet.
2    Q.    And prior -- so the heart attack was in
3    early March?
4    A.    Yes.
5    Q.    End of --
6    A.    The week before they suspend me.
7    Q.    Right, right. So at the very end of
8    February?
9    A.    You see the difference. I had a heart
10   attack. How I gonna throw away something on
11   somebody's face if I was sick?
12   Q.    And prior to the heart attack -- let's use
13   that as the timeframe -- how would you describe your
14   sexual relationship with your husband?
15   A.    Good. Good.
16   Q.    And right after the heart attack it changed?
17   A.    Yes. When everything -- see, the problems
18   begin when I have that heart attack. Everything
19   changed. I left him. Everything.
20   Q.    And you are saying that -- strike that.
21   Have you visited any health care practitioner about
22   any of this emotional distress you are testifying
23   about?
24   A.    No, no.

B-28

Amanda Lea Cumberbatch

13

1    Cumberbatch
2    **Q.    What would your normal hours have been?**
3    A.    I worked -- I worked on the days on the
4    weekends, and I worked at night, I closed on the
5    week days.  Now, I went in at -- I want to say I
6    went in at like six, maybe.
7    **Q.    Six p.m.?**
8    A.    Six p.m. to close, which was about
9    eleven.  So, something like that.
10   **Q.    And how many weeknights a week would**
11   **you typically work?**
12   A.    Probably like three.  Three
13   weeknights, four weeknights, sometimes.  Either
14   one day on the weekends, or both days on the
15   weekends.  It depended on if people called out or
16   who was there, things like that.  It just kind of
17   depended.
18   **Q.    And who else worked on your shift?**
19   A.    I worked with Gloria.  I worked with
20   Joyce.  I don't know last names, so, excuse me on
21   that one.  I worked with Nancy.  I worked with
22   Denise.  I've worked with Kim.  I worked with --
23   there's another girl, I can't remember her name
24   for the life of me.  She had short blond hair and
25   she was really skinny.  I can't remember what her

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

Amanda Lea Cumberbatch

14

1    Cumberbatch
2    name is.  I worked with Michelle, and I don't
3    remember what the assistant manager's name was.
4    What was her name?  I don't remember what her
5    name is, either.
6    **Q.    Okay.  Did you get along with Mrs.**
7    **Nieves?**
8    A.    Yes.  I got along with everybody.
9    **Q.    Okay.  Did you know what her national**
10   **origin was?**
11   A.    Well, I assumed it was something of a
12   Spanish origin somewhere, just by her voice, but
13   that doesn't mean anything to me, so --
14   **Q.    Did she ever tell you where she grew**
15   **up?**
16   A.    Eventually, yes.
17   **Q.    And what did she tell you?**
18   A.    She told me she was Columbian or
19   something like that.  So, I never really -- I
20   mean, like, I don't -- that's like telling me like
21   I was born in Ohio.  So, it doesn't really mean
22   anything to me.  So --
23   **Q.    Did you ever personally observe any**
24   **behavior or treatment to Mrs. Nieves that you**
25   **thought was inappropriate?**

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

Amanda Lea Cumberbatch

15

1    **Cumberbatch**
2    A.    Very much so.
3    **Q.    Okay.  Why don't you tell me about**
4    **that, and then we will talk in more detail.**
5    A.    Okay.  There was a lot of -- a lot of
6    slurs that would go through there, a lot of jokes
7    behind her back,  a lot of downright ignorant
8    things.
9    .  Like one girl went around to all
10   the local businesses and told them that she was an
11   illegal alien and if they were ever going to hire
12   her they better green card her and things like
13   that.  They treated her like she was -- okay.
14   This got me: They treated her like she was like, I
15   don't know, had a kindergarten education or
16   something.
17   Her husband had come there one
18   night.  It was very cold outside, and he had a fur
19   hat on.  And one of the girls said something,
20   "Oh, you look like you are from Alaska, you know."
21   And then the other girl turned around to her and
22   said, you know, "Do you know where Alaska is,"
23   things like that, like asking her like really
24   stupid questions like that.  And that was like --
25   you know, she just kind of stood there and was

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

Amanda Lea Cumberbatch

16

1    Cumberbatch
2    like, what?  And I felt really bad for her,
3    because that was totally uncalled for.
4    They have called her the Chihuahua
5    from the Taco Bell commercials.  They have said
6    to her, you know, the old movie, what was it,
7    Fantasy Island, "The plane, boss, the plane."
8    They used to gang up on her all the time.  And
9    she would leave this place crying at night from
10   being so upset.  And I would try to help her as
11   much as I could, because the woman did so much
12   work and went through hell pretty much for no
13   reason.  There was no reason for any of it.
14   **Q.    I'm going to go back and ask you to**
15   **give me a little bit more detail?**
16   A.    Okay.
17   **Q.    If you know, about the things you have**
18   **told me but I want to make sure I have them all**
19   **down.**
20   Is there any other treatment that
21   **you personally observed towards Mrs. Nieves at**
22   **Acme that you think was inappropriate?**
23   A.    Well, I have a half and half one for
24   you.
25   **Q.    Go ahead.**

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

B-29

Amanda Lea Cumberbatch

17

1 **Cumberbatch**
2    A.    There was a thing that happened about
3 her throwing meat and a bucket of water at a girl.
4 And when I asked about that -- because when I
5 found out, she was very upset and crying.    And
6 she's like, "I never did this," da, da, da, and I
7 believed her, because she hadn't ever given me any
8 reason not to trust her or lie to me or anything.
9 Anything that she has ever said to me has come 100
10 percent true.
11        So -- and I am like, "Okay, what's
12 going on," you know, and so I am kind of like
13 just eavesdropping a little bit listening to
14 things.    Everybody just talks.    It's like a
15 Jerry Springer show in there, they talk and talk
16 and talk and talk, and you hear everything.    And
17 when I was listening to them, they had a woman who
18 apparently is somehow connected with the security
19 systems there, and the guy who's in charge of the
20 security systems.
21        And what happened was the girl said,
22 "Oh, this is on tape, and this is the reason she
23 was suspended from this place by BJ."    And we
24 found out there's no tape that exists.    This
25 never happened.

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

---

Amanda Lea Cumberbatch

18

1        Cumberbatch
2        So, I was like, whoah, hold on a
3 second.    And this is -- this is like towards the
4 end here, and this is by the time that it had
5 gotten so bad there, I mean, like mentally,
6 anybody in that kind of situation getting downed
7 left and right like that, getting made fun of,
8 getting anything, I mean, me, personally, I would
9 have snapped on people, because that's not right.
10        So -- but nothing was ever done for
11 her if she went there and complained.    She went
12 through the chain of command.    She did what she
13 was supposed to do, and no one ever helped her.
14 It just got worse and worse and worse and worse
15 months down the line.    And it was sad.    It was
16 very sad to see that.
17    Q.    **Is there any conduct other than what**
18 **you have already testified to that you personally**
19 **observed towards Mrs. Nieves that you think was**
20 **inappropriate?**
21    A.    Just other than the rude behavior and
22 the constant mental stress they were putting her
23 through, and -- I mean, I don't think it gets any
24 worse than that.    It's ridiculous.    It's
25 absolutely ridiculous.    I mean, I don't even

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

---

Amanda Lea Cumberbatch

19

1        Cumberbatch
2 think that -- like the way I grew up, I didn't
3 even think that kind of stuff happened any more.
4 So, I was appalled.    I was like, wow, you know.
5 So --
6    Q.    **I'm just going to go back and ask you a**
7 **few more questions about the things you have told**
8 **me.**
9    A.    Okay.
10    Q.    **You have said that there were slurs and**
11 **jokes behind her back.    What did you personally**
12 **observe?**
13    A.    I remember the Chihuahua incident.
14 They called her a Chihuahua.
15    Q.    **Who, who called her a Chihuahua?**
16    A.    This would have been -- this is the
17 little clique.    You have Joyce -- well, Joyce
18 wasn't in it at first, but she came into it.    But
19 it was -- mostly it was Nancy, Michelle --
20 Michelle was terrible.    Michelle was the worst
21 out of all of them, and Nancy was second right
22 behind her.    And the girl that I can't remember
23 her name with the -- she had short blond hair and
24 she was really skinny, and I cannot remember her
25 name for the life of me.    They were the three

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

---

Amanda Lea Cumberbatch

20

1        Cumberbatch
2 main at first.    Joyce ended up getting befriended
3 by them and into the little clique later on down
4 the road.    Denise would kind of like just shrug her
5 after -- you know, she would come to her and say
6 something to Denise.    And Denise would be like,
7 "Okay, I will take care of you," and then along
8 her off and go over there and they would all start
9 talking about her and laughing.    It was like
10 blatantly in your face.    The deli is not that
11 big.    Gloria would be standing here, and they
12 would be in a little group right here laughing at
13 her, you know.
14    Q.    **Did you personally hear anyone refer to**
15 **Mrs. Nieves as a Chihuahua?**
16    A.    Yes.
17    Q.    **Who did that talking?**
18    A.    That was Nancy and Joyce laughed about
19 it, and so did Michelle.    They were laughing,
20 like very hysterically about that.    And I was
21 walking by.    I'm like coming through the middle,
22 so, you know, and I just hear it.    And I am like,
23 wow.
24    Q.    **Was Mrs. Nieves there?**
25    A.    Yes.    She was over -- the way the deli

B-30

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

Amanda Lea Cumberbatch

21

1           Cumberbatch
2   was -- the deli is like a big L, kind of, and
3   there's like steamers right here.  So, she's
4   pretty much over here, and where the cases are,
5   which is right next to it, and there's always the
6   machines.  And they are standing like right in the
7   middle of the machines, right there, so --
8       Q.    Would you be able to estimate -- since
9   the court reporter can't take down your hand
10  gestures?
11      A.    Feet distance?  Feet distance?  We
12  will say eight feet, max, just guessing?
13      Q.    Did you hear the context of this
14  conversation?
15      A.    As in what?
16      Q.    Did you hear the conversation, or did
17  you just hear the word Chihuahua?
18              I'm trying to figure out what you
19  heard.
20      A.    Well, I heard Chihuahua.  It was
21  directed at her.  It was pointed at her.
22      Q.    At Gloria?
23      A.    Yes.  And they were just hysterically
24  laughing, and she's upset.  So, I -- you know,
25  that's a no-brainer right there.  So, plus

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

---

Amanda Lea Cumberbatch

22

1           Cumberbatch
2   knowing what's already going on, you know it's
3   that.  So --
4       Q.    If you started work in January and left
5   on March 19th, can you place this in time frame,
6   month or anything?
7       A.    I had already started the salon.  So,
8   I would say probably like the mid to end of
9   February, is when it was really getting bad.
10      Q.    Are there any other derogatory slurs
11  that you heard relating to Mrs. Nieves?
12      A.    Well, the green card thing.
13      Q.    The what?
14      A.    The green card thing.  I thought that
15  was pretty rude.
16      Q.    Why don't you tell me about that?
17      A.    She -- Michelle, went around to all the
18  businesses -- because she had been upset already.
19  So, she was going to go look for another job, just
20  get out of there and wash her hands of the whole
21  situation.
22      Q.    Michelle was going to leave?
23      A.    No, Gloria was.  And -- which was
24  probably, you know, a smart idea, just get out of
25  here, you know.  So, she went out to look for a

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

---

Amanda Lea Cumberbatch

23

1           Cumberbatch
2   job.
3               When she went out to go look for a
4   job, she started getting problems that no one
5   really wanted to take her application or anything
6   like that.  And we found out that Michelle had
7   been going around to these people telling her that
8   she was illegal alien, she -- I think she called
9   you a drug addict, too.  I think I remember that
10  one.  Stuff like that.  Oh, yes, that's right,
11  because she's from Colombia, so she's bringing
12  drugs through here and stuff like that.  Yes,
13  there was all kinds of stuff like that.
14      Q.    How do you know that Michelle went to
15  local businesses?  How did you learn that?
16      A.    Word of mouth.  And like I said,
17  that's all they do is talk and talk and talk, and
18  you know everything.  And nine times out of ten,
19  if you ever confronted Michelle about anything
20  that she said, she would agree to it, because she
21  never cared.
22      Q.    Did you personally talk to Michelle
23  about whether she went to any local businesses?
24      A.    No, I didn't.  I tried to stay away
25  from her as much as possible, she was just a

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

---

Amanda Lea Cumberbatch

24

1           Cumberbatch
2   troublemaker, big time.
3       Q.    Do you remember who you heard that
4   from, that Michelle --
5       A.    That came from --
6       Q.    You have to let me finish the question.
7       A.    That came from Kim.  And Kim was
8   another one who would never lie.  Who would never
9   do anything like that.  And she was pretty
10  straight forward and narrow, and Kim was a good
11  girl.  And she had heard that.  And she didn't
12  like it.  But she didn't say anything because she
13  was afraid of losing her job.
14      Q.    So, you heard it from Kim?
15      A.    Yes.  Yes.  I did.  And I also heard
16  from Kim about the escorting thing.  And that was
17  --
18      Q.    What's that?
19      A.    Towards the end here when she was
20  getting suspended, or whatever, I walked into work
21  that night and I got stopped right at the door by
22  Kim and said, "Let me know what time you are off
23  your shift, because we have to have everybody
24  escorted to their cars," and blah, blah, blah,
25  blah, blah, stuff like that.

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

B-31

Amanda Lea Cumberbatch

25

```
 1          Cumberbatch
 2        And I am like, "What are you talking
 3  about?""
 4        She goes, "Well, apparently,"  she
 5  was like, she goes, "we had a phone call, a
 6  threatening phone call from Gloria's husband."
 7        And I laughed at her right then and
 8  there.  I was like, "Yeah, okay."
 9        She goes, "No, I am serious."  She
10  said, "Denise and BJ instructed us that we need to
11  have escorts out to our car because he's going to
12  come here and start trouble."
13        And I turned around and flat-out
14  told her, "I don't need an escort, I know these
15  people.  You have nothing to worry about.  And
16  he's not even going to waste his time coming here.
17  Why would he do that?"
18        And that was the end of that.  And
19  I refused the escort, but other people got
20  escorted out to their car.  He never showed up.
21  So, I don't know what that was about.
22        They were instructed -- they were
23  also instructed to hit him if he walked into the
24  deli.  If he walked into the deli and pushed the
25  doors, they were instructed to pretty much just
```

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

Amanda Lea Cumberbatch

26

```
 1          Cumberbatch
 2  push him out or hit him or detain him somehow
 3  until the police could get there.  Which I know
 4  for a fact no corporation stands behind that.
 5      Q.    Who told you that --
 6      A.    That was Kim.  But she had instructed
 7  -- instructed directly by Denise and BJ.
 8      Q.    Kim told you she was instructed by
 9  Denise and BJ?
10      A.    Yes, she did.  And I have no reason to
11  not believe her, either, because she's always
12  proven to be very trustworthy.  Why would you
13  make something up like that?
14        Now, if it came out of Michelle or
15  Nancy or Joyce's mouth, then yes, I would have
16  questioned, I would be like, yeah, okay.  But
17  being  who it came from, it's not going to be
18  something fake.  I just know that.  So --
19      Q.    Do you know who Kim heard it from?
20      A.    She said she was directly, directly
21  told by -- well, instructed by BJ and Denise.
22  So, it came from them.
23        This store is, that place is a joke.
24  I don't know where they find these people, but
25  I've never seen anything like that ever in my
```

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

Amanda Lea Cumberbatch

27

```
 1          Cumberbatch
 2  life.  So -- honestly, if feels like when you
 3  walk in there you are like in the 1960's in a
 4  small town down south where everybody is racist
 5  and they all have their little thing.  That's
 6  what it likes in there.  It's disgusting.
 7        I don't know about the rest of the
 8  store, because the rest of the store's completely
 9  shut off from there.  It's like the deli's an
10  entity itself, it's own little thing, and it's
11  disgusting.
12      Q.    Other than what you have already told
13  us about, are you aware of any slurs or jokes
14  about Mrs. Nieves?
15      A.    Other than what I have told you?  No.
16  I would probably believe anything, if I heard it,
17  because I've seen enough.  That's enough for me,
18  right there.  So, that's too much.
19      Q.    I'm not challenging you.
20      A.    No.  No.
21      Q.    I need to ask questions.
22      A.    No, I understand.  But just that's --
23  I was totally blown away by this.  I just,
24  honestly, have never seen anything like this
25  before.  And this was a while ago, and I may be
```

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

Amanda Lea Cumberbatch

28

```
 1          Cumberbatch
 2  forgetting some extra little things here or there,
 3  but for the most part, I know that -- that, I
 4  know.
 5      Q.    You --
 6      A.    Sorry I can't jog my memory a little
 7  bit better, but --
 8      Q.    You referred to somebody making a
 9  comment about Mrs. Nieves and drugs.
10      A.    That was Michelle.
11      Q.    And what comment was made?
12      A.    She said something -- she was calling
13  her a drug runner or a drug lord, no.  How did
14  she put that? I don't know exactly how the words
15  were, but because she was from Columbia she was
16  running coke up here, or something like that.
17      Q.    Who did you hear that from?
18      A.    That came from the same conversation
19  overhearing with the green card and everything
20  like that.
21      Q.    So, tell me who you heard that from?
22      A.    That was also just word of mouth
23  outside, everybody hanging out for their
24  cigarettes, and the two big players in that one, I
25  believe were Nancy and Joyce standing out there
```

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

B-32

Amanda Lea Cumberbatch

29

Cumberbatch

1 smoking and drinking Pepsi by the soda machine.
2 It's off to the right-hand side of the store when
3 you are looking at it.
4    **Q.    You testified that Gloria had told you**
5 **that she was thinking about leaving?**
6    A.    Yes.
7    **Q.    What did she tell you about that?**
8    A.    She wanted a new job.  She was tired
9 of having all this stuff put on her, and she was
10 stressed out.  I mean, she would cry leaving work
11 every night because of everything she was hearing.
12 Anybody would.  But I know -- I mean, well, me, I
13 would either cry or I would just start snapping on
14 people.  But, I mean, that's ignorant.  But she
15 wanted to get out of there, and I don't blame her.
16 Who wants to work in that kind of environment?
17 You are belittled constantly and made fun of
18 constantly, and no matter, whatever you do, it
19 doesn't mean anything.
20    **Q.    Did you ever hear employees make fun of**
21 **Mrs. Nieves' English?**
22    A.    Actually, I have.  I don't remember
23 exactly what the words were, but she would say
24 something to them -- the girl -- the skinny girl

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

Amanda Lea Cumberbatch

30

Cumberbatch

1 with the blond hair -- it's probably still blond,
2 I don't know, she changed her hair all the time.
3 I can't remember what this girl's name is, but
4 every time that Gloria would say something to her
5 she would walk away muttering and saying whatever
6 she said to her in -- trying to make it like --
7 like you know when people get upset and they kind
8 of mock people?  She would try to do like that
9 and walk away.  And she would do it under her
10 breath, though, wouldn't -- I didn't see her
11 flat-out say anything to her in that way, but
12 she's always been a component in everything.  But
13 she would mutter stuff and mock her on the way --
14 walking away and stuff.  I'm sure she -- I'm sure
15 Gloria did hear that every once in a while.
16 Doesn't surprise me.
17    **Q.    Why are you sure of that?**
18    A.    Because just everything that was going
19 on.  And nobody cared.  Nobody cared.  They
20 just did what they wanted to do.
21    **Q.    You testified about Mr. Nieves' coat or**
22 **hat looking like he was from Alaska?**
23    A.    Uh-huh.
24    **Q.    Is that yes?**

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

Amanda Lea Cumberbatch

31

Cumberbatch

1    A.    Yes.  Sorry.
2    **Q.    Who was there for this conversation**
3 **about Alaska?**
4    A.    Nancy was there, Joyce was there, and
5 there was other people there, and I can't remember
6 who they are.  But I know Nancy and Joyce were
7 there.  I was there, Gloria was there and her
8 husband was there.
9    **Q.    And who was -- who made the comment**
10 **that you thought was derogatory?**
11    A.    Nancy.
12    **Q.    And what comment was that?**
13    A.    She turned around and said, "Oh, gee,
14 Gloria, do you know where Alaska is?" Like talking
15 to her like she was a baby or something, like she
16 had, you know -- like no intelligence whatsoever.
17    **Q.    You testified that there was a comment**
18 **about a plane?**
19    A.    Yes.
20    **Q.    Tell me about that?**
21    A.    They used to go, "The plane, boss, the
22 plane."  And that was mostly Nancy that did that
23 one.  But that was a recurring thing, actually.
24 That happened here and there all the time, but,

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

Amanda Lea Cumberbatch

32

Cumberbatch

1 yes, any time she would say something, they would
2 be like, "The plane, boss, the plane," like that.
3    **Q.    Did you personally observe that?**
4    A.    I saw it once.
5    **Q.    Okay.**
6    A.    But it happened several times.
7    **Q.    You testified that there was an issue**
8 **where Mrs. Nieves was accused of throwing meat and**
9 **water at somebody?**
10    A.    Yes.
11    **Q.    What do you know about that?**
12    A.    What I know, as much as I know, is she
13 was accused of throwing a block of either ham or
14 -- I don't know what it was, but a block of meat,
15 tossing it at her -- and hitting her with it, I
16 guess.  And then throwing one -- we had these
17 white buckets that they used for cleaning with the
18 rags in them.  And apparently she had that full
19 of water and threw it on this girl.  And it never
20 happened.  One, I can never see her doing it;
21 two, there is no tape that exists, and apparently
22 for why they suspended her, she's on tape doing
23 this, and they have all the proof in the world,
24 and it's automatic termination for that, or

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

B-33

Amanda Lea Cumberbatch

33

Cumberbatch

1    whatever's going on.  If it's automatic
2    termination, why did they only suspend her, you
3    know,  and if that really happened, you know,
4    where's the documentation behind it?  There is
5    none.
6        Q.    Were you working the night that
7    incident supposedly occurred?
8        A.    Didn't I come in later?  I think I
9    came in later.  I don't remember.  I don't know
10   if it was later or the next day.
11       Q.    Did you see anything happen?
12       A.    No.
13       Q.    When you say you came in later, was
14   that after the incident supposedly happened?
15       A.    Yes.  It would have to be.
16       Q.    And who told you about it?
17       A.    Gloria told me she was upset, because I
18   saw her -- I think I did go in that night, because
19   I remember walking in and she was just balling,
20   crying.  And I was like, "What's going on?"
21           She said, "They accused me of
22   throwing water on her and throwing meat at her,"
23   and stuff like that.  And she's like, "I
24   never did it, I never did it."

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

Amanda Lea Cumberbatch

34

Cumberbatch

1           And like, "Okay," so I am trying
2    to calm her down and everything.
3        Q.    Did you talk to anybody else about the
4    incident?
5        A.    I talked to -- I said something -- I
6    think it may have been a couple days later,
7    because everybody was talking about that.  They
8    are like, "Oh, Gloria's gone, and she did, you
9    know, she threw meat and threw water," something
10   like that.
11          And I turned around and flat-out
12   told them all flat to their face -- see, I got
13   along with everybody up until this point, because
14   I turned around and told everybody flat to their
15   face that, I was like, "I don't think she did it."
16   I said, "Where's the proof?"
17          And no one could say anything.  And
18   then word of mouth was, there is no proof, you
19   know.  There's no tape.  There's nothing.
20   There's nothing for this at all.
21          And up until that point, though -- I
22   kind of got thrown out of the clique at that
23   point, I guess, because I stuck up for her.  I
24   didn't really care.  It doesn't bother me.  I'm

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

Amanda Lea Cumberbatch

35

Cumberbatch

1    not there to make friends.  I'm there to do my
2    job.
3        Q.    You said something that you -- there
4    was a woman familiar with the security system?
5        A.    Yes.  There was a woman -- I can't
6    remember her name, either.  She was like a little
7    older woman who knew or who was associated somehow
8    -- I don't know how their thing works over there,
9    but was associated with somehow, with a guy who
10   was in charge of the security or something like
11   that, I don't know.  But she had turned around
12   and, you know, said that there's no tape, there's
13   nothing there.  Didn't say it directly to me, but
14   I've heard that.  And I don't believe there is a
15   tape.  And I've never seen anything, and no one's
16   ever given me a reason that there was anything, so
17   I don't believe there is one.  So --
18       Q.    Have you ever seen a security tape that
19   showed behind the deli counter?
20       A.    No.
21       Q.    Did you personally have any
22   conversations with Denise Dean about Mrs. Nieves?
23       A.    No.  I chose not to go that path.
24       Q.    Did you ever hear of an incident in

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

Amanda Lea Cumberbatch

36

Cumberbatch

1    which Mrs. Nieves was accused of tripping or
2    pushing Joyce Alvan with a mop handle; did you
3    ever hear of that?
4        A.    I remember something about a mop
5    handle, but I don't exactly remember what the
6    situation was.
7        Q.    And do you remember how you heard about
8    that?
9        A.    Probably from Gloria.
10       Q.    Do you remember anything about that?
11       A.    Not really.
12       Q.    Mrs. Nieves was transferred to the
13   Smyrna store, did you know that?
14       A.    Yes, I knew that.
15       Q.    Did you stay in touch with her after
16   she left Middletown?
17       A.    Yes, I did.
18       Q.    In what way?
19       A.    I would call her once in a while,
20   check up on her.  I went down to the store and
21   visited her one time.  Yes, I did.  We talked
22   here or there, have a conversation here or there,
23   once in a while, just checking up on her, making
24   sure she was okay, things were going okay.  She

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

Amanda Lea Cumberbatch

45

Cumberbatch

1  Cumberbatch
2  did what she was supposed to do, went through the
3  chain of command.  So, that's all on them.
4  That's their problem.
5      Q.    So --
6      A.    I try to stick to my own, you know.
7      Q.    So, the answer is that you never --
8      A.    No.
9      Q.    You have to let me finish the question.
10  I'm not -- I'm not doing this to be difficult, but
11  the court reporter can only get one person down at
12  a time.  So, this isn't like a normal
13  conversation.
14          So, the answer -- is this correct --
15  that you never spoke to anybody in management
16  about the problems that you perceived that Mrs.
17  Nieves was having?
18      A.    No.  I never spoke to BJ or Briley.
19      Q.    Briley or any other assistant manager,
20  I think there were two.
21      A.    Oh, Denise and the other lady?  No, I
22  never really talked to them, either.
23      Q.    Do you know whether Mrs. Nieves spoke
24  to anybody in management?
25      A.    She -- I watched her walk up to Denise

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

Amanda Lea Cumberbatch

46

1  Cumberbatch
2  and the other lady -- I don't remember what her
3  name is, the assistant manager, I am sorry, I
4  don't remember what her name is -- I've seen her
5  walk up to them constantly telling her things.
6      Q.    What did Mrs. Nieves tell them; what
7  did you hear her say?
8      A.    I don't know.  I don't know what she
9  told them, but I would watch her constantly go to
10  them.  I've watched her go to BJ, because she was
11  really upset.  She had left the deli, going, "I
12  am upset, I need to go talk to them.  Okay.  I
13  will take care of the deli right now." You know,
14  she would walk up there.  So, she had to talk to
15  them about something.
16      Q.    Did you personally ever hear what she
17  was telling them in these situations?
18      A.    No.
19      Q.    You are describing --
20      A.    Because that was her business, and she
21  was taking care of it on her own.  No, I stayed
22  out of it.  I assumed something was being done
23  about it, because she was doing what she was
24  supposed to be doing, the correct chain of
25  command.  Unfortunately, that doesn't seem to

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

Amanda Lea Cumberbatch

47

1  Cumberbatch
2  have worked.  So --
3      Q.    Do you know whether any of these
4  coworkers in the deli ever looked in Mrs. Nieves'
5  personnel file?
6      A.    I heard a rumor, but I don't know.
7      Q.    What rumor did you hear?
8      A.    I heard a rumor that they were looking
9  up places she's lived and checking for her green
10  card information to see if Michelle's thing was
11  true or not, but I didn't see that, and I don't
12  know for a fact.  I wouldn't doubt it, but I
13  mean, I'm seriously not going to put it past them,
14  but I don't know for sure.  I don't have proof of
15  that at all.
16      Q.    Who did you hear the rumor from?
17      A.    That would be the talk again going
18  through the deli, that's multiple people.  The
19  girl that talked the most was a skinny girl with
20  the short hair.  She had a loud mouth, you heard
21  a lot out of her.  Nancy said a lot, and then --
22  it was pretty much those two most of the time,
23  they were like the ring leaders, and Michelle.
24  It's just word of mouth.  You here a little
25  gaggling (sic. )here, little gaggling there and

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

Amanda Lea Cumberbatch

48

1  Cumberbatch
2  pick up information on the way.
3      Q.    Do you --
4      A.    It's hard to not hear it because you
5  are standing right there.  You have to.
6      Q.    Do you remember the person who you
7  heard the rumor from that somebody went into Mrs.
8  Nieves' personnel file?
9      A.    No, I do not.  I can just tell you the
10  grouping of people that was around.
11      Q.    Can you place in time when you heard
12  that?
13      A.    No, I can't.
14      Q.    After you left Acme, did you talk to
15  anybody at all about any of the problems that you
16  felt Mrs. Nieves was having?
17      A.    No.  I didn't talk to anybody there.
18  If I ever talked to anybody, it was probably like
19  a hi and good-bye thing, if I was going shopping
20  at Acme.  I didn't talk to any of these people.
21  I never kept in touch with them, nothing.  I
22  wanted nothing to do with them.
23      Q.    Why?
24      A.    I don't like -- I don't have any
25  respect for those people whatsoever for being like

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

B-35

Amanda Lea Cumberbatch

49

1           Cumberbatch
2  that, doing that to people.  That's horrible.
3  You don't do that to people.  It's appalling.
4     Q.   Were they, this group of people you are
5  referring to, ever rude to you?
6     A.   Towards the end, when I said I don't
7  think she did it when it came to that meat and
8  water thing, I said, "I don't think she did it, I
9  think you are all full of crap."  That's when I
10  got treated mean after that.  I didn't care,
11  though.  I was leaving.  I was like, whatever.
12  So, that's the kind of thing -- I have very thick
13  skin.  Those kinds of things don't bother me.
14     Q.   In what way do you think you were
15  treated mean?
16     A.   You know, I just got the cold shoulder
17  kind of thing and the, oh, she thinks she's
18  whatever, and she's probably just as bad as
19  Gloria.  I'm like, whatever, you know.  Things
20  like that don't bother me.
21     Q.   Did you ever talk to an individual from
22  the Delaware Department of Labor?
23     A.   Yes.  I don't remember what his name
24  is.
25     Q.   What do you remember about the

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

Amanda Lea Cumberbatch

50

1           Cumberbatch
2  situation?
3     A.   I just told him basically what I saw,
4  basically what I am telling you, the same thing
5  today.  That was pretty much it.  Then I got off
6  the phone with him, never spoke to him again.  He
7  didn't really ask me too much, either.
8     Q.   How did he get in touch with you?
9     A.   I called him.
10     Q.   And why did you call him?
11     A.   Because I felt very passionate about
12  the situation, that nothing had gotten done, and I
13  can't believe we are, you know -- it's -- you
14  don't do things like that.  And I don't feel that
15  it's right for them things to happen and nothing
16  to happen to them.  And she got suspended, for
17  what reason, for what reason?  Went through hell,
18  for what reason? So, if she had to go through all
19  that for no reason, they are okay, they are fine,
20  nothing happened to them.  They all have their
21  jobs, they are all happy and go lucky and
22  everything like that.  It's not fair.  Why did
23  they get away with things like that?
24     Q.   Did Mrs. Nieves tell you that she had
25  filed some sort of a charge or lawsuit with the

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

Amanda Lea Cumberbatch

51

1           Cumberbatch
2  Delaware Department of Labor?
3     A.   She had called them.  She said she was
4  making a complaint.  That's what she said to me.
5  "I'm making a complaint," blah, blah, blah.
6           I said, "Give me his number and I
7  will call and back you up on it because I did see
8  those things."
9     Q.   Did he contact you first or just out of
10  the blue did you call him?
11     A.   I think I called him.  I'm not sure.
12  I don't know.  I don't remember that.  I think I
13  called him, but I'm not sure.
14     Q.   Did he ask you any questions?
15     A.   No.  Just pretty much he's like, "what
16  was the general situation?"
17           So, I gave him a generalization of
18  the situation.
19     Q.   What do you remember specifically
20  telling him?
21     A.   Specifically everything I am telling to
22  you today.
23     Q.   Everything?
24     A.   Well, pretty much, yes.  I don't think
25  there's anything different, really.  Same stuff.

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

Amanda Lea Cumberbatch

52

1           Cumberbatch
2     Q.   How long was this telephone call?
3     A.   Not that long.  I have no idea, that
4  was so long ago.
5     Q.   Were you at home or at work?
6     A.   I was at home.
7     Q.   Do you remember anything else about
8  that call?
9     A.   Not really.
10     Q.   Anything else you remember about why
11  you think Mrs. Nieves was not -- was -- why Mrs.
12  Nieves, in your mind, was not treated
13  appropriately?
14     A.   Any particular situations, other than
15  that, I'm sure things have happened, it's been so
16  long I know I'm probably forgetting something, but
17  just the every day -- it was like her own personal
18  hell.
19           And if I -- if you can take
20  yourself, detach yourself from yourself and put
21  yourself in that situation and have to deal with
22  it every single time you go to work, it's enough
23  to make anybody crazy.  So, you know, that --
24  it's just wrong.  It's wrong.  There's no
25  fairness in it.

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

B-36

Amanda Lea Cumberbatch

53

Cumberbatch

1  Cumberbatch
2  And then, you know, a corporation
3  sets out a policy for you to follow if some kind
4  of harassment or something is going on, and you do
5  what you are supposed to do, and they still do
6  nothing about it. And it's kind of like a joke,
7  you know, then I got a problem with that. Things
8  like that shouldn't be happening any more.
9  **Q.    When did you learn that Mrs. Nieves**
10 **moved back to Delaware?**
11 A.    Actually, I ran into her at a WaWa one
12 morning before I was going to work. Had no idea.
13 I just kind of ran into her pretty much, and I was
14 like, "Whoah, how you doing?" That was it.
15 **Q.    How long ago was that?**
16 A.    Three weeks ago, two weeks ago? Not
17 that long ago at all. Something -- it wasn't
18 that long ago at all.
19 **Q.    Okay.**
20 A.    So -- and apparently she had seen my
21 stepfather like a year prior to that, or
22 something, or six months, I don't know.
23 Sometime prior to that, and he never told me.
24 So, I don't know. But that was the first time I
25 really talked to her in a long time. So --

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

Amanda Lea Cumberbatch

54

1  Cumberbatch
2  **Q.    What did she tell you about her**
3  **lawsuit?**
4  A.    Just that she wanted me to talk to her
5  lawyer, and that was it, really. So --
6  MS. MALLOY: I don't have any other
7  questions.
8  BY MR. BARTOSHESKY:
9  **Q.    I have a couple. You mentioned several**
10 **times a coworker that you described as skinny with**
11 **short hair, you couldn't remember her name?**
12 A.    Yes, I can't remember her name.
13 **Q.    Is it possible her name was Christina?**
14 A.    It could be a possibility. That
15 sounds familiar, but I'm not sure off the top of
16 my head.
17 **Q.    You also talked about the time when you**
18 **came to work and a coworker named Kim told you**
19 **about a situation where you are going to have to**
20 **be escorted to your car?**
21 A.    Yes.
22 **Q.    And you refused that?**
23 A.    Yes.
24 **Q.    Did you actually see workers being**
25 **escorted to their car that evening?**

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

Amanda Lea Cumberbatch

55

1  **Cumberbatch**
2  A.    I saw two different workers, I don't
3  know who they were, they were from other parts of
4  the store, but they were escorted to their cars.
5  **Q.    You talked a little bit about -- well,**
6  **there was some testimony about a possibility of a**
7  **tape recording or a video of something happening**
8  **in the deli counter involving Gloria. Where did**
9  **you hear that there was a tape; do you remember?**
10 A.    Well, that was the reason she was
11 suspended. That was the whole thing.
12 **Q.    Who told you that was the reason, that**
13 **it was on tape, do you remember?**
14 A.    I can tell you the grouping of people
15 that was there, but that's it. I don't remember
16 -- do you want the grouping of people?
17 **Q.    I assume --**
18 A.    It's the same grouping of people.
19 **Q.    And you overheard some conversation**
20 **that there was a tape of what had transpired?**
21 A.    I heard -- of what, excuse me?
22 **Q.    Of what happened?**
23 A.    Pretty much, yes. But that it was on
24 tape, and that was that, and she doesn't have a
25 leg to stand on, or something like that. I don't

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

Amanda Lea Cumberbatch

56

1  Cumberbatch
2  know.
3  **Q.    And you mentioned several people all on**
4  **the management level, Denise, there was a BJ?**
5  A.    Yes.
6  **Q.    And Mr. Briley, correct?**
7  A.    Yes, but I've never talked to him. I
8  don't think I've ever met him, really.
9  **Q.    Any other management people whose names**
10 **you can remember?**
11 A.    There's an assistant manager, but I
12 can't remember what her name is, and she's the
13 assistant manager for the deli. She's under
14 Denise, and I can't remember what her name is.
15 **Q.    There was somebody else in the deli**
16 **department that had some supervisory authority?**
17 A.    Yes.
18 **Q.    Did you ever hear or observe any of**
19 **those things that you were going -- talking about,**
20 **the different slurs and talking about green cards**
21 **and these kinds of things --**
22 A.    I heard.
23 **Q.    Wait. Wait -- did you ever --**
24 A.    Sorry.
25 **Q.    -- observe that -- those kind of**

B-37

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

Amanda Lea Cumberbatch

57

1    **Cumberbatch**
2    conversations going on within the earshot of
3    Denise Dean or the other assistant, or any of the
4    managers?
5        A.    Placement-wise, I can't tell you.  I
6    don't know.
7        Q.    I don't have any other questions.
8    BY MS. MALLOY:
9        Q.    Go back to the tape for a second,
10   because I think maybe I got confused when Mr.
11   Bartoshesky asked you questions.
12          Did somebody tell you that there was
13   a tape of the mop, ham, water incident, or any of
14   that?
15       A.    I heard that there was not a tape.
16   That was that rumor, but I heard that the reason
17   she was suspended from the grouping of people that
18   we have been going on, the same grouping of
19   people, the reason she was suspended is because
20   it's on tape that she threw water or the meat or
21   whatever the incident was, it's on tape.  It's on
22   tape.  It's on tape, that's all I heard.
23          And then throughout this other woman
24   and through conversation you heard there is no
25   tape that exists.  So --

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

---

Amanda Lea Cumberbatch

59

1    **Cumberbatch**
2        A.    It's just once in a while he would just
3    stop by.
4        Q.    Were there any instances where any of
5    these management level people, whether it was Mr.
6    Briley or BJ or Denise, or the other assistant,
7    what you call an assistant manager, did you ever
8    observe any of them either engaging in any kind of
9    racial slurs or anything along those lines, or
10   observing those things going on?
11          MS. MALLOY:  Objection as to form.
12          THE WITNESS:  The only -- the
13   observation I would see would have Gloria going to
14   them saying whatever she was saying to them, and
15   they would go, okay.  Okay, you know, like acting
16   they are really concerned, and soon as she turned
17   her back, they would laugh and be like, yeah, and
18   walk away.  So, no one took her seriously.
19          MR. BARTOSHESKY: I don't have
20   anything else.
21          MS. MALLOY:  I have nothing.
22          (Whereupon, the deposition was
23   concluded at 12:00 p.m.)
24
25

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

---

Amanda Lea Cumberbatch

58

1        Cumberbatch
2        Q.    The grouping of people who may have
3    said something that there was a tape --
4        A.    It's --
5        Q.    -- just tell me again who that is, so
6    we are clear?
7        A.    It's the Nancy, Joyce, Michelle
8    grouping, Chris -- well, I can't ask you -- that
9    does sound familiar.  That might be it.
10       Q.    Okay.
11       A.    The real skinny girl.
12       Q.    I have nothing further.
13   BY MR. BARTOSHESKY:
14       Q.    And other than -- well, you mentioned
15   that you saw Mr. Nieves in the store at least the
16   time with the hat?
17       A.    With the hat.
18       Q.    Was he in the store a lot?
19       A.    He would stop by once in a blue moon
20   just, you know, for like a five second
21   conversation with her.  And she would give him a
22   kiss over-the-counter, and he would roll.  He was
23   gone.  It's not like he hung out there or
24   anything.
25       Q.    Okay.

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

---

Amanda Lea Cumberbatch

60

1        Cumberbatch
2
3
4        I N D E X
5
6    WITNESS                    PAGE
7
8    AMANDA LEA CUMBERBATCH
9
10   BY MS. MALLOY:        3, 57
11   BY MR. BARTOSHESKY:   54, 58
12
13
14
15
16
17
18
19
20
21
22
23
24
25

B-38

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

Nieves                              v. Acme Markets, Inc., et al.
Stephen Moyer          C.A. # 06-123 GMS    December 18, 2006

---

**Page 6**

1  Ms. Appenzeller testified and I asked about a
2  progressive discipline policy. Does Acme have that
3  kind of policy?
4    A. Yes, we have a progressive discipline policy.
5    Q. Is it in writing someplace?
6    A. Yes. It's common knowledge among our store
7  directors also and the union.
8    Q. Is it part of the union contract?
9    A. No, it's not part of the union contract.
10   Q. But there is a writing someplace that sets that
11 out, how it would work under normal circumstances?
12   A. Yes.
13   Q. And what document is that in, a description of
14 that? Is it an employee handbook, or? It could be in
15 more than one place, I assume.
16   A. It's been a few years since anything was given
17 out. We used to give it out to store directors. We
18 also used to give it out in training sessions for new
19 ASD-Is, ASD-IIs, management trainees and so forth. In
20 fact, I make a presentation currently to management
21 employees about discipline. It's covered in a
22 presentation we make.
23   Q. Is there a writing also? You said it hasn't
24 been done lately. I'm not sure I understood that part

**Page 7**

1  of your answer.
2    A. It hasn't been updated and along with that it
3  hasn't -- it hasn't changed either, no.
4    Q. Is the policy under normal circumstances oral
5  warning first?
6    A. What progressive discipline is -- different
7  disciplines are used for different types of incidents.
8  The best example I can give you for the progressive
9  discipline, which would be a documented oral warning,
10 then a documented written warning, a one-day
11 suspension, a three-day suspension, a five-day
12 suspension and then termination. The best example of
13 a process that would go through that would be someone
14 with a poor attendance record.
15   Q. For some kind of violations, for example, if
16 someone was stealing money from a cash register, you
17 wouldn't need to go through all those steps; is that
18 right?
19   A. That's right.
20   Q. You probably would just fire them normally,
21 termination?
22   A. If the investigation revealed that it occurred,
23 there would be no progressive discipline.
24   Q. In Gloria Nieves' case, we heard -- well, let

**Page 8**

1  me strike that. Did you ever have occasion to go to
2  the Middletown store and observe any of the employees
3  who were working there?
4    A. No.
5    Q. So you never saw Gloria Nieves at work; is that
6  correct?
7    A. I never saw Gloria Nieves until last week until
8  we had the depositions.
9    Q. And did you ever speak to her before you met
10 her at her deposition last week?
11   A. No.
12   Q. Did you ever speak to her husband?
13   A. No.
14   Q. How did you find out that there was a problem
15 with Gloria Nieves at the Middletown store, do you
16 remember?
17   A. The initial information I got was from the
18 union representative, Henry Fajkowski.
19   Q. Was that a telephone call, an e-mail, a letter,
20 do you remember?
21   A. I believe what it was, I was meeting with him
22 on a particular day -- I couldn't tell you what day; I
23 don't remember -- over other issues and as a parting
24 thing he was telling me something else that was going

**Page 9**

1  on that you may hear more about, I have a situation in
2  the Middletown store that I am finding out more
3  information about. That was my initial information
4  about Gloria.
5    Q. And what was the next item of information that
6  you found out about that situation?
7    A. That's when I e-mailed the store director --
8    Q. Okay.
9    A. -- and asked him to give me some information
10 about the incident.
11   Q. Let me show you what's been marked as Briley
12 No. 1.
13       (Discussion off the record.)
14       THE WITNESS: Which document am I at?
15 BY MR. BARTOSHESKY:
16   Q. We'll just use it as Briley Exhibit 1, if
17 that's not a problem.
18       MS. MALLOY: That's fine with me.
19   Q. The document at the bottom is D0175 and let me
20 ask you if that's the e-mail that you are talking
21 about. It says, "I received a letter from local 27
22 stating that Gloria Nieves had been suspended - when,
23 for what? Please give me an update."
24       Is this later in the process, this e-mail, 30

3  (Pages 6 to 9)

Nieves                                v. Acme Markets, Inc., et al.
Stephen Moyer            C.A. # 06-123 GMS    December 18, 2006

---

Page 10

1  because it says he received a letter?
2    A.  All right, then.  This part of this e-mail
3  doesn't have a date and time on it.
4    Q.  Right.
5    A.  From looking at this now, I would say the first
6  thing I did get was a letter from Henry.
7    Q.  Do you think you still have that letter
8  someplace?
9    A.  There is a copy, I believe, of it in Gloria's
10  file, yes.  Gloria Nieves' personnel file.
11    Q.  The letter from the union to you?  I am just
12  trying to identify when you say --
13    A.  A letter from Henry Fajkowski from the union to
14  myself advising me that Ms. Nieves was suspended and
15  he was requesting a meeting to resolve it.
16    Q.  And --
17      MS. MALLOY:  Could we go off the record for
18  a second?
19      MR. BARTOSHESKY:  Sure.
20      (Discussion off the record.)
21  BY MR. BARTOSHESKY:
22    Q.  Mr. Moyer, we have just been looking at these
23  two pages of e-mail, and it looks like at the bottom
24  of D0176 coincides with what you mentioned earlier,

---

Page 11

1  that the union representative had talked to you
2  initially -- and that was before you received the
3  letter; is that your recollection?
4    A.  That's the way I recall, yes.
5    Q.  And in either the letter or in your
6  conversation with the union representative, was there
7  any description of what Gloria Nieves is accused of
8  doing?
9    A.  No.
10    Q.  So then you contacted Mr. Briley, the store
11  manager --
12    A.  Yes.
13    Q.  -- and asked him what had happened; is that
14  correct?
15    A.  That's correct.
16    Q.  Was his response what's on D0175, the sort of
17  the writing in the middle of that page?
18    A.  Yes, it was.
19    Q.  And did you talk to him about this situation
20  either before or after you received this e-mail that's
21  in the middle of the page on D0175?
22    A.  I don't recall if I talked to him.  Typically,
23  what I would do, this document here, the underlining
24  and the writing on it, is from myself.

---

Page 12

1    Q.  Okay.
2    A.  What I would do then, typically, is call him
3  and make sure that the understanding is correct
4  between what he and I think from reading the e-mail.
5    Q.  Were you ever made aware of exactly what the
6  incidents were that these associates was complaining
7  about?  I see the handwriting here.  It says, "yelling
8  and throwing things."  Did you have any further
9  information on that, any more detail?
10    A.  No, I didn't.
11    Q.  Who was it that made the consequences of
12  Gloria's actions would be a suspension?
13    A.  She was suspended by the time I was aware of
14  the situation.
15    Q.  So --
16    A.  Steve Briley suspended her.
17    Q.  Why is it then that you wrote this letter which
18  has been marked Appenzeller No. 1, which -- go ahead.
19  Is that just policy that something has to come from
20  human resources to finally put these things into
21  effect or why did you write the letter?
22    A.  It was a follow-up letter to the union and also
23  to the store and to go in Ms. Nieves' file.
24    Q.  The first line of that letter says -- well, I'm

---

Page 13

1  sorry, the first paragraph of the letter, dated
2  March 16, talks about an incident on March 2nd and a
3  repeat incident on March 6th.  Can you tell me what
4  you were told happened on March 2?
5    A.  The information that I used was the information
6  from the e-mail from Steve Briley on the other
7  document.
8    Q.  Did you talk to anybody other than Mr. Briley
9  about this before your letter went out?
10    A.  I talked to Henry Fajkowski, yes.
11    Q.  Well, did you talk to anybody else from Acme
12  about this?
13    A.  No.
14    Q.  And Mr. Fajkowski, do you remember what he told
15  you about this incident, if anything?
16    A.  He told me that he had talked to the employees
17  in the store.  That's his normal operating way also.
18  He will -- the union typically does their own
19  investigation also.
20    Q.  Did he tell what the employees in the store
21  said?
22    A.  He told me that he didn't find anything
23  differently than what she was being accused of.
24    Q.  Does that mean your understanding was that some

---

4  (Pages 10 to 13)

Nieves                                v. Acme Markets, Inc., et al.
Stephen Moyer            C.A. # 06-123 GMS   December 18, 2006

| Page 14 | Page 16 |
|---|---|

**Page 14**

1 store employees had told the union that, yes, Gloria
2 did do these things?
3   A. Yes.
4   Q. Did he tell you who those store employees were?
5   A. I don't recall.
6   Q. And you didn't talk personally -- and I guess I
7 already asked you this -- you didn't talk personally
8 to any of those store employees?
9   A. No, I did not.
10   Q. And no one from human resources did any other
11 investigation of this, these incidents that Gloria was
12 accused of?
13   A. To my understanding, that is correct.
14   Q. Now, the second paragraph of the March 16
15 letter says in the second sentence, "We will not
16 tolerate any inappropriate language or actions that
17 are discriminatory or derogatory towards any people or
18 groups."
19      Did you have some information that there
20 was some kind of inappropriate language used by
21 Ms. Nieves?
22   A. No, I did not. Actually what I did there, I
23 quoted our policy on personal conduct right from the
24 rules we work by.

**Page 15**

1   Q. That's the second paragraph and the third
2 paragraph where it says, "Personal Conduct"?
3   A. Yes.
4   Q. They're quotes from a policy manual of some
5 sort?
6   A. Yes.
7   Q. Now, in the last paragraph there it says, "In
8 this non-precedent setting situation." What did you
9 mean by that?
10   A. Typically, what a non-precedent setting
11 situation is, it's an agreement between the union and
12 the company that a particular decision of a particular
13 case will not be used for a future case.
14   Q. Now, do you know if there were any written or
15 oral warnings given to Gloria Nieves before she was
16 suspended here for any reason?
17   A. No, I do not.
18   Q. Did you ever, at that point in time, back in
19 the March or so time frame, review her personnel file?
20   A. Typically, I will do that. I don't recall
21 whether I did that on this instance or not.
22   Q. And three or so -- in the third line of that
23 last paragraph, it talks about "any future
24 substantiated incidents." By that do you mean that

**Page 16**

1 these incidents in March 2004 were substantiated?
2   A. That means that any future incident -- the
3 reason for the word "substantiated" in there is to let
4 every, all parties involved know that if we get an
5 allegation, you're not going to -- the future
6 discipline will not occur, that we will certainly have
7 an investigation and find out the outcome of the
8 investigation before a future discipline will occur.
9   Q. What was the nature -- do you believe that
10 there was an investigation of these incidents on
11 March 2 and March 6th by Acme?
12   A. I believe the store director and the union rep
13 did their individual investigations, yes.
14   Q. Well, what -- and what the store director told
15 you was in the e-mail?
16   A. Yes.
17   Q. The sort of middle paragraph on D0175; is that
18 right?
19   A. Yes.
20   Q. Did you agree with his decision to suspend
21 Gloria Nieves and have her transferred over this?
22   A. Yes.
23   Q. Why is that?
24   A. Inappropriate personal conduct. And you asked

**Page 17**

1 about progressive discipline. Progressive discipline
2 does not typically -- progressive discipline, as I
3 explained earlier, is not typically used in situations
4 of inappropriate personal conduct.
5   Q. You were satisfied with the nature and extent
6 of the investigation into this incident?
7   A. Yes.
8   Q. Now, did you ever or were you ever contacted by
9 anybody else from Acme after this incident about what
10 happened to Gloria Nieves?
11      Let me straighten that question out. We
12 heard earlier Ms. Appenzeller talk about a call that
13 she received from somebody at loss -- I forget the
14 term.
15   A. Loss prevention?
16   Q. Right. A Mr. Porte, is that his name?
17   A. Mike Porte.
18   Q. Were you aware that he was talking to people
19 about this situation?
20   A. I was aware that a charge came into our office.
21 After the charge came into our office, Mr. Porte's
22 department is the department that's notified to
23 investigate that charge.
24   Q. Were you part of his investigation in any way?

5 (Pages 14 to 17)

5fd977dc-2e0d-4305-814d-ddb749470b32

Nieves                              v. Acme Markets, Inc., et al.
Stephen Moyer           C.A. # 06-123 GMS    December 18, 2006

---

Page 22

1   A.  Yes.
2   Q.  What area did she cover back when Gloria Nieves
3   was employed at Acme and suspended?
4   A.  I don't know where Tamara was at that time, but
5   I know that Tamara did not have the geographical area
6   where Gloria Nieves is at any time.
7   Q.  She didn't have that geographical area in March
8   of 2005 for the Middletown store?
9   A.  No, I did.
10  Q.  Do you know why this letter was sent to her?
11  A.  I have no idea.
12  Q.  Did you ever see this letter in March of 2005?
13  A.  No.
14  Q.  Did you see any communications from Mr. Smith
15  about Gloria Nieves' claim or charge of discrimination
16  back in March of -- in that time frame, 2005?
17  A.  I don't recall the time frame. I saw one
18  letter from Mr. Smith, and it was a one-page letter.
19  I do remember that.
20  Q.  Now, if you can answer this. If a letter came
21  to Ms. Marshall and she saw that it really wasn't
22  something that she was familiar with, what would she
23  have done with it?
24  A.  I would hope that she would give it to our

---

Page 23

1   supervisor and give it to the people that are working
2   on the case.
3   Q.  And the people working on the case were loss
4   prevention; is that right?
5   A.  The person working on this case was Stacy,
6   Stacy Slate.
7   Q.  In what department is Stacy Slate in?
8   A.  She's from associate relations also.
9   Q.  The fact that you were involved with the
10  situation with Gloria Nieves doesn't mean that you
11  would have been in on any of these kind of
12  communications from the Department of Labor?
13  A.  I -- the first time I saw this letter was in
14  preparation for this case, within the last month.
15  Q.  You don't know whether it ever got to the right
16  people at Acme or not?
17      MS. MALLOY:  Object as to form.
18  Q.  Let me change the question. Do you know if
19  anybody at Acme ever saw this letter back in the
20  March 2005 time frame?
21  A.  I don't know. Typically, what we will do,
22  there is four -- well, there is six of us right now.
23  Back at that time, I don't know how many of us there
24  were. Typically, what we'll do, if we get a charge in

---

Page 24

1   with Mr. XYZ, has charged the company with something,
2   if the person getting the mail that day doesn't
3   recognize the name, will talk to other amongst us and
4   find out who might be familiar with the case, who
5   knows the name.
6       The other thing we may do is look the
7   person up in our system, see which store they're from
8   and try to identify who is responsible for that store.
9   Q.  You mentioned -- I forgot the last name already
10  -- Stacy?
11  A.  Stacy Slate.
12  Q.  Stacy Slate was in charge of Gloria Nieves'
13  claim through Department of Labor; is that correct?
14  A.  Yes, yes.
15  Q.  What was her position?
16  A.  She's an HR manager also. Not HR. You got me
17  doing it. AR manager. She has been -- her title at
18  one time was EEO officer.
19  Q.  And did she ever talk to you about Gloria
20  Nieves' situation?
21  A.  I can recall when we initially got the charge,
22  yes, she came to me because I -- they identified the
23  store that she was in and then they came to me and
24  asked me what I knew about anything concerning Gloria.

---

Page 25

1   Q.  Does she still -- does Stacy Slate still have
2   that -- well, is she still employed by Acme?
3   A.  Yes.
4   Q.  And she has a different title now than she did
5   back in 2005 or not?
6   A.  I believe she has a different title, yes.
7   Manager of associate relations.
8   Q.  Does she still handle EEO-type complaints?
9   A.  From time to time. Not as much as she did in
10  the past.
11  Q.  Is there one -- okay. In 2005, was that one of
12  her main responsibilities, handling EEO complaints?
13  A.  I don't know. I don't know.
14  Q.  Do you know why she was assigned to the Gloria
15  Nieves situation?
16  A.  No, I don't.
17  Q.  The third page of this document is a fax cover
18  sheet. At the top it has -- it makes -- it looks like
19  it's part of this same document, at least as it was
20  faxed. Was it faxed to a number of -- fax number
21  610-889-3039? Is this the number of the offices of
22  Acme in Malvern, the fax number?
23  A.  The 889 is our exchange. If someone were to
24  ask me for our fax number, it's 4210 in our

---

Wilcox & Fetzer, Ltd.    Professional Court Reporters        (302) 655-0477

5fd977dc-2e0d-4305-814d-ddb749470b32

Nieves                          v. Acme Markets, Inc., et al.
Stephen Briley          C.A. # 06-123 GMS    December 18, 2006

---

**Page 10**

1  Q.  Do you know if they were done?
2  A.  I cannot say positively, no.
3  Q.  Did Acme -- and, again, the time frame while
4  you were at the Middletown store while Gloria Nieves
5  was there -- did Acme have a policy for progressive
6  discipline?
7  A.  Yes, we do have a policy for progressive
8  discipline.
9  Q.  How does that work?
10  A.  It depends on the infraction.
11  Q.  Okay.  Well, what kind of infraction -- is part
12  of the policy in some instances to be an oral warning
13  to an employee?
14  A.  Yes, sir.
15  Q.  If there is an oral warning, does that get put
16  in writing in the file or is it just oral --
17  A.  It's oral.
18  Q.  Would the next step be then some kind of
19  written warning, usually?
20  A.  It would be an oral -- it would be a written
21  warning and written on there that an oral warning was
22  given.
23  Q.  How do you keep track of whether an oral
24  warning was given?

---

**Page 11**

1  A.  You mean an initial oral warning?
2  Q.  Yes.
3  A.  By that second written warning.
4  Q.  So it just has to be somebody remembers that an
5  oral warning was given six months ago or something
6  like that?
7  A.  That's why you would give the oral warning in
8  the presence of another person.
9  Q.  Meaning another management person?
10  A.  It doesn't have to be.  It could be a union
11  representative.
12  Q.  Okay.  But are you saying that there is no
13  writing anywhere that says that somebody was given an
14  oral warning?
15  A.  Yes, there should be.
16  Q.  And that would be in the individual employee's
17  personnel file?
18  A.  Yes.
19  Q.  Now, have you ever reviewed Gloria Nieves'
20  personnel file?
21  A.  If it was in the store, probably at one time I
22  did.
23  Q.  Do you have any specific recollection of
24  reviewing it?

---

**Page 12**

1  A.  No.
2  Q.  Do you know whether she was ever given an oral
3  warning for anything?
4  A.  Not to my knowledge.
5  Q.  Do you know if she was ever given a written
6  warning for anything, other than the writing that led
7  to her suspension?
8  A.  Not to my knowledge, sir.
9  Q.  Did you ever have occasion to personally review
10  or observe Gloria Nieves' work?
11  A.  Yes.
12  Q.  Was she a good worker?
13  A.  Very good.
14  Q.  Now, as I understand it, at some point, she was
15  suspended and transferred because of a complaint of an
16  incident by -- from a co-worker.  Is that right?
17  A.  Correct.
18  Q.  Before that incident, were you aware of any
19  co-workers who complained about Gloria?
20  A.  It was a couple days before her suspension.
21  Q.  Before that complaint a couple days before her
22  suspension, were there any complaints from her
23  co-workers?
24  A.  Not to my knowledge.

---

**Page 13**

1  Q.  Were there ever any complaints from customers
2  about Gloria Nieves?
3  A.  No.
4  Q.  Now, did Gloria Nieves ever come to you with
5  any problems that she may have had with any of her
6  co-workers?
7  A.  Not to my knowledge.
8  Q.  So you don't recall her ever coming to you with
9  a problem about a co-worker?
10  A.  I don't recall, sir.
11  Q.  Do you ever recall her coming to you to talk
12  about any kind of problems that she had?
13  A.  Come and talk to me personally?
14  Q.  Yes.
15  A.  I was aware -- she had told me she had a
16  problem with her husband.
17  Q.  She came and talked to you about a problem she
18  had with her husband?
19  A.  In casual conversation.
20  Q.  What did she say?
21  A.  That she just was having problems with her
22  husband.  I don't recall any details about it.
23  Q.  Do you know about when that was?
24  A.  No.

B-43

4  (Pages 10 to 13)

Nieves                          v. Acme Markets, Inc., et al.
Stephen Briley          C.A. # 06-123 GMS    December 18, 2006

Page 14

1    Q.  Did you ever hear from any other source that
2  she was having these kind of personal problems?
3    A.  It was talk in the store, general talk.
4    Q.  Do you remember who you heard saying anything
5  like that?
6    A.  No, I don't.
7    Q.  Do you know anything else about her living
8  situation, whether she and her husband were living
9  with anybody else in their house?
10    A.  I didn't know anything about that.
11    Q.  Other than these problems that she was
12  supposedly having with her husband, did she ever talk
13  to you about any other kind of problems that she was
14  having?
15    A.  She had mentioned her mother was ill.
16    Q.  Anything else?
17    A.  No problems, no.
18    Q.  Did you ever have occasion that you can recall
19  to make a note of any kind that went into her
20  personnel file?
21    A.  No.
22    Q.  Now, you mentioned a situation that arose in --
23  well, I don't know if you did.  You said a few days
24  before she was suspended?

Page 15

1    A.  Yes.
2    Q.  What happened and how did you find out what the
3  problem was?
4    A.  Had found out, it was on a Saturday, because
5  apparently an associate had went to one of my
6  assistant directors earlier in the week about a
7  problem.
8    Q.  Who was the assistant director?
9    A.  I can't remember at the time.
10    Q.  Could it have been B.J.?
11    A.  It could have been.
12    Q.  That's Barbara Appenzeller?
13    A.  Yes.
14    Q.  How did you find out somebody had gone to the
15  assistant director?  Did the assistant director tell
16  you?
17    A.  I can't recall who specifically told me.
18    Q.  Do you remember what you were told?
19    A.  It was something about Gloria yelling at this
20  associate.
21    Q.  Who was the associate?
22    A.  Her first name is Joyce.  I don't remember her
23  last name.
24    Q.  Is it Alphin?  Sounds familiar?

Page 16

1    A.  I am not sure.
2    Q.  So you heard from someplace that you are not
3  sure where today that Gloria had been yelling at
4  somebody named Joyce.  Is that what you can recall
5  now?
6    A.  Yes.
7    Q.  Anything other than that?
8    A.  Yeah, I was made aware that it happened again
9  that week.
10    Q.  It being?
11    A.  The yelling at the same associate.
12    Q.  Do you know, were you made aware, can you
13  recall whether you were made aware of what kind of
14  yelling it was?  I mean, the words spoken, profanity,
15  anything along those lines?
16    A.  I can't recall any specifics.
17    Q.  You can't recall precisely who told you this
18  other than it was one of your assistant --
19    A.  One of my assistant directors.  Because I -- at
20  a store that size I had two, an ASD-I it's called and
21  an ASD-II.
22    Q.  Did you look into this situation?
23    A.  I reviewed it with Joyce.  I believe because
24  she brought it to her immediate supervisor's

Page 17

1  attention, which was Denise, who was the deli manager.
2    Q.  She, the assistant director brought it to the
3  deli manager's attention?  Is that what you are
4  saying?
5    A.  The associate did, Joyce.
6    Q.  Joyce brought it to whose attention, Denise?
7    A.  Denise.
8    Q.  So you went and talked to Denise about the
9  situation?
10    A.  Denise and Joyce and myself, yes, we talked
11  about it.
12    Q.  Do you remember what you were told during those
13  conversations?
14    A.  I can't recall.
15    Q.  Other than talking to Denise and Joyce, do you
16  remember talking to anybody else about this situation?
17    A.  Afterwards, yes.
18    Q.  After what?
19    A.  After she was suspended.
20    Q.  Did you talk to Gloria about the situation
21  before you suspended her?
22    A.  I believe I would have, yes.
23    Q.  Do you remember anything that she said?
24    A.  No.

B-44

5 (Pages 14 to 17)

Wilcox & Fetzer, Ltd.    Professional Court Reporters        (302)655-0477

b691a104-9bb5-4707-8248-81f3d3c1da68

Nieves                                    v. Acme Markets, Inc., et al.
Stephen Briley          C.A. # 06-123 GMS    December 18, 2006

| Page 18 | Page 20 |
|---|---|
| 1  Q. Did she deny it, deny that any of these things | 1  A. I would have probably contacted HR and my |
| 2  occurred? | 2  district manager. |
| 3  A. I don't recall. | 3  Q. Who was the district manager? |
| 4  Q. You said you talked to somebody after she was | 4  A. At the time his name was Tom Holden. |
| 5  suspended? | 5  Q. Would you have had any contact with Mr. Moyer |
| 6  A. Yes. | 6  about the situation? |
| 7  Q. Who did you talk to after? | 7  A. Probably. |
| 8  A. That was the union representative. | 8  Q. Would that have been before or after you made |
| 9  Q. Who was that? | 9  the decision to -- |
| 10  A. His name is Henry. | 10  A. I believe in this instance, it was after. |
| 11  Q. Do you remember his last name? | 11  Q. And so, let me just see if I can sort of recap |
| 12  A. No. | 12  some of this. You talked to Joyce Alphin and Denise |
| 13  Q. And -- tell us about the conversation you had | 13  about the situation, and you think you talked to -- |
| 14  with Henry. | 14  you talked to Gloria about the situation. Is that |
| 15  A. From what I can remember, the -- we came to an | 15  right? |
| 16  agreement that she was suspended and there would be a | 16  A. I would assume I would have. I wouldn't have |
| 17  final letter put in her file, and she would be | 17  suspended an employee without talking to them, yes, |
| 18  suspended -- I mean, excuse me, transferred to another | 18  sir. |
| 19  store. | 19  Q. Then after the fact, you talked to the union |
| 20  Q. When you say a final letter, what does that | 20  person and probably Mr. Holden and probably Mr. Moyer? |
| 21  mean? | 21  A. Correct. |
| 22  A. A final warning for the infraction. | 22  Q. Anybody else you can recall talking to about |
| 23  Q. And did you ever talk to -- other than -- well, | 23  this situation? |
| 24  this union person, Henry, did he convey to you that he | 24  A. Not that I can recall. |

| Page 19 | Page 21 |
|---|---|
| 1  knew anything about these incidents? | 1  Q. At some point, did anybody from the Delaware |
| 2  A. I don't recall if he did. | 2  Department of Labor or Equal Employment Opportunity |
| 3  Q. And you say that Henry was a union | 3  Commission ever come talk to you about Gloria's |
| 4  representative. Was he an Acme employee? | 4  suspension or anything about her employment? |
| 5  A. No, sir. | 5  A. Not that I can remember. |
| 6  Q. He worked strictly for the union? | 6  Q. Did anybody from Acme's loss prevention or |
| 7  A. Yes, sir. | 7  anything along those lines ever after the fact come |
| 8  Q. He was not a shop steward or anything like | 8  and talk to you about the situation? |
| 9  that? | 9  A. Not that I can remember, no. |
| 10  A. No. | 10  Q. I think I already asked you about this, but I'm |
| 11  Q. Did you ever talk to, other than Henry, did you | 11  not sure, so I am going to ask you. You mentioned |
| 12  ever talk to anybody else about the situation? | 12  Gloria talked to you about a couple of personal |
| 13  A. I can't recall. | 13  issues. Did she ever complain to you about any |
| 14  Q. Did you ever talk to Mr. Nieves about the | 14  problems she had with co-workers? |
| 15  situation? | 15  A. No that I can recall, sir, no. |
| 16  A. I remember talking to him, but about that | 16  Q. Did you ever hear anything in the store about |
| 17  specific situation I don't remember. | 17  anybody having a problem with Gloria Nieves speaking |
| 18  Q. Do you remember what you did talk to him about? | 18  Spanish to customers or co-workers or anything along |
| 19  A. No. | 19  those lines? |
| 20  Q. Now, did you have the authority to take this | 20  A. No, no. |
| 21  action, the suspension on your own? | 21  Q. That wouldn't have been a problem if she spoke |
| 22  A. Yes, sir. | 22  to Hispanic customers in Spanish, would it? |
| 23  Q. And did you consult with anybody else at Acme | 23  A. No, sir. |
| 24  before you took that action? | 24  Q. Was any part of the Middletown store under -- |

6 (Pages 18 to 21)

b691a104-9bb5-4707-8248-81f3d3c1da68

Nieves                          v. Acme Markets, Inc., et al.
Stephen Briley          C.A. # 06-123 GMS    December 18, 2006

Page 22

1  had video cameras that looked at what was going on in
2  the store?
3     A.  It does have a video camera surveillance system
4  in it.
5     Q.  Part of that is at the deli, the deli counter?
6     A.  There is probably shots of the deli counter,
7  yes.
8     Q.  Do you know what portion of the deli area were
9  under surveillance?
10    A.  Not right offhand sir, I don't know.
11    Q.  Do you know what kind of system -- and, again,
12 talking about the time when Gloria Nieves was working
13 there.
14    A.  Okay.
15    Q.  Do you know what kind of system it was?  Did it
16 make videotapes, or?
17    A.  It's a digital system.
18    Q.  How long were the digital images maintained, do
19 you remember?
20    A.  I do not know how long they stayed in the
21 system.
22    Q.  Now, do you remember any employees in the deli
23 department or any place else at Acme back in the time
24 frame when Gloria was employed there named Amanda?

Page 23

1     A.  No.
2     Q.  Let me show you a copy of -- let me leave it as
3  what's already been marked as Appenzeller 1.  I am
4  going to ask if you have ever seen a copy of that
5  letter before.
6     A.  Yes.
7     Q.  Other than in connection with this litigation,
8  which Acme's attorneys may have shown it to you, have
9  you ever seen it before that?
10    A.  This specific letter?
11    Q.  Yes.
12    A.  No.
13    Q.  Did you ever see any other letter that was
14 written to Gloria Nieves or any other writing about
15 this incident?  I am just asking when you say this
16 specific letter, I --
17    A.  No.
18    Q.  So the only time you've ever seen a copy of
19 this letter is in connection with this case?
20    A.  Yes.
21    Q.  Now, this says, the beginning of this says that
22 Ms. Nieves was suspended on March 6 for an incident
23 with a co-worker on March 2 and a repeat incident on
24 March 6.  Does that sound like the right time frame

Page 24

1  for when she was suspended?
2     A.  It was in March, yes.
3     Q.  It seems like there were two separate
4  incidents.  Is that the two yelling incidents that you
5  mentioned earlier?
6     A.  I believe so, yes.
7     Q.  Other than yelling, do you remember if anything
8  else happened?  Was it she was just yelling at
9  somebody?
10    A.  The only thing I can recall, sir, is something
11 about food being thrown.
12    Q.  Where did you get that information, do you
13 remember?
14    A.  I believe from the same associate.
15    Q.  The one that felt she was the victim of this?
16    A.  Joyce, yes.
17    Q.  Did you talk to anybody else who may have been
18 in the deli department that day to see if they heard
19 anything going on or if there was a problem?
20    A.  From recollection, a girl named Michelle comes
21 to mind, but I don't recall any specific outcome.
22    Q.  Do you think you talked to Michelle or did you
23 get that information secondhand?
24    A.  I can't recall, sir.

Page 25

1     Q.  Now, the first paragraph of this letter
2  indicates that she was suspended as of March 6 and one
3  of the incidents that took place was the same day.
4  Does that jibe with your memory?
5     A.  March 6th.  I know she was suspended on a
6  Saturday.
7     Q.  Was one of the incidents that resulted in her
8  being suspended, did one of those incidents occur the
9  same day she was suspended?
10    A.  I believe it occurred Friday night, the night
11 before.
12    Q.  When she came -- how did it work that she
13 became or she was told that she was going to be
14 suspended?  Did you tell her that?
15    A.  I would have probably had a meeting with her
16 that day, yes.
17    Q.  Did you tell somebody else, some -- one of the
18 assistant directors:  "When Gloria comes in, tell her
19 to come see me"?  Is that how something like that
20 would work?
21    A.  I don't recall.
22    Q.  Now, the last paragraph of this letter, it
23 talks about the final written warning.  And I think
24 you mentioned something about that earlier.

R 46

7 (Pages 22 to 25)

Nieves                          v. Acme Markets, Inc., et al.
Stephen Briley          C.A. # 06-123 GMS     December 18, 2006

| | Page 26 |
|---|---|

1   A.  Yes.
2   Q.  And this letter would be that warning as far as
3   you can tell?
4   A.  Yes.
5   Q.  So you didn't actually write her a letter of
6   warning; is that correct?  Or did you?
7   A.  Not that I can recall, no.
8   Q.  This line here says, "... shall serve as a
9   final written warning that any future substantiated
10  incidents ..."  Do you know how the incidents that led
11  to her suspension were substantiated?
12  A.  No, I don't.
13  Q.  At the bottom of this page it notes some carbon
14  copies and the first one is "H. Fajkowski."  Is that
15  the Henry you were talking about, do you think, the cc
16  at the bottom of the page?
17  A.  Yes.
18  Q.  That's the union person?
19  A.  Yes.
20  Q.  And Mr. Holden I think you mentioned was the
21  district manager at the time?
22  A.  Yes.
23  Q.  And Mr. Murphy, he was the manager of the store
24  to which Gloria was being transferred?

| | Page 27 |
|---|---|

1   A.  Yes, Smyrna.
2   Q.  The Smyrna store?
3   A.  Yes.
4   Q.  Did you ever -- while you were -- while Gloria
5   was at the Middletown store, did you ever become aware
6   that she had any health problems?
7   A.  Not that I can recall.
8   Q.  Was the transfer to Smyrna -- why was she
9   transferred to a different store as part of this
10  discipline you imposed?
11  A.  To my recollection, that was the decision that
12  Henry, the union representative, and myself came to.
13  Q.  But do you know why that decision, why you came
14  to that decision?
15  A.  I don't recall the specific reason why.
16  Q.  Did anyone in the deli department or anybody
17  else at Acme in the Middletown store in that time
18  frame ever convey to you that some co-workers were
19  afraid of Gloria Nieves?
20  A.  Of Gloria?
21  Q.  Yeah.
22  A.  No.
23  Q.  Did any of them ever convey to you that they
24  might have been afraid of Mr. Nieves?

| | Page 28 |
|---|---|

1   A.  There was talk of that, yes.
2   Q.  What kind of talk?
3   A.  Something about that he was out in the parking
4   lot on some evenings, was specific evenings.  It was
5   just talk that I heard.
6   Q.  Did you do anything about that talk?
7   A.  No.
8   Q.  Do you remember who that talk came from?
9   A.  No, sir.
10  Q.  Did you ever tell anybody to -- like the
11  assistant director or anyone else -- that they should
12  look into that?
13  A.  Not that I can recall.
14  Q.  Did you ever sit down and talk with Mr. Nieves
15  about anything?
16  A.  Sit down and talk?  I -- I remember having
17  conversation.  I don't know if it was a
18  sit-down-and-talk.  I don't -- I can't recall any
19  conversation, sit-down conversation with him, no.
20  Q.  Did you have telephone conversation?
21  A.  I can't recall if I did.
22  Q.  You can't recall the gist of any of those
23  conversations?
24  A.  No.

| | Page 29 |
|---|---|

1   Q.  Let me show you two pages of e-mails and I
2   guess -- let me go off the record for a second.
3         (Discussion off the record.)
4         MR. BARTOSHESKY:  I am going to ask the
5   court reporter to mark two pages of e-mail printouts
6   that have been stamped at the bottom D0175 and D0176.
7   We'll mark them both as one exhibit.
8         (Briley Deposition Exhibit No. 1 was marked
9   for identification.)
10  BY MR. BARTOSHESKY:
11  Q.  Mr. Briley, we've marked as Exhibit No. 1
12  to your deposition two pages that have been produced.
13  First I'm going to ask if you remember sending or
14  receiving any of the e-mails that are printed out
15  here.
16  A.  Yes, I do.
17  Q.  In fact, you were either the author or
18  recipient or copied on all of these; is that correct?
19  A.  I don't know if it was all of these.  Recipient
20  and author of some.
21  Q.  Now, on the one that's -- the page that's
22  marked at the bottom "D0175," there is a -- the second
23  one on the page, and they're probably and usually --
24  they're in sort of reverse chronological order, but

Wilcox & Fetzer, Ltd.   Professional Court Reporters        (302) 655-0477

b691a104-9bb5-4707-8248-81f3d3c1da68

Nieves                          v. Acme Markets, Inc., et al.
Stephen Briley          C.A. # 06-123 GMS    December 18, 2006

---

Page 30

1  there is one that begins with "Steve," and I guess
2  you're writing to Mr. Moyer. It's the one with the
3  longer paragraph there.
4    A.  Yes.
5    Q.  It begins with "She was suspended on Saturday,
6  3/6/04." It says there, "Most of the associates in
7  our deli are afraid to work with her." Do you
8  remember writing that to Mr. Moyer?
9    A.  I don't remember writing it, but it is in the
10  e-mail, yes, sir.
11    Q.  Do you know where you got that information?
12    A.  No, sir.
13    Q.  Why are you writing to Mr. Moyer about this
14  situation?
15    A.  After an employee is suspended, HR is
16  contacted.
17    Q.  From the last message on that page, D0175, it
18  looks like Mr. Moyer is writing to you saying that he
19  received notice from the union that she had been
20  suspended. Is that right, that's what it says?
21    A.  Yes.
22    Q.  So up until this point, you hadn't made anybody
23  at human resources aware that this had taken place?
24    A.  No.

Page 31

1    Q.  Is that the way it should be? Should you have
2  contacted somebody before they contacted you about
3  this?
4        MS. MALLOY:  Objection as to form.
5    A.  Before she was suspended are you saying, sir?
6  I don't understand your question.
7    Q.  It looks to me like she was suspended on
8  March 6th. Is that right?
9    A.  It was a Saturday, yes, sir.
10    Q.  And it looks like on March 11 or 12 that
11  Mr. Moyer is writing to you saying, what's going on?
12  Is that your recollection of what happened?
13    A.  It looks to me by these e-mails that Mr. Moyer
14  had e-mailed me that he talked to Henry, the union
15  representative, the Tuesday after her suspension.
16    Q.  And he's asking you what --
17    A.  What took place.
18    Q.  Do you remember getting this e-mail from
19  Mr. Moyer?
20    A.  I don't remember, no.
21    Q.  On the page that's marked "D1076," the message
22  at the very bottom of the page, it's from you -- I'm
23  sorry, that's incorrect. Well, let me ask you if you
24  know. There is a "To:" line on the last e-mail on

Page 32

1  that page. It says, "s07816.dir." Do you know whose
2  e-mail that is? In the brackets it says,
3  "Albertsons.com."
4    A.  That would be mine.
5    Q.  That's your --
6    A.  That's the store director e-mail.
7    Q.  Well, do you know when the decision was made
8  to -- Gloria Nieves' transfer to the Smyrna store?
9    A.  I believe it was the following week after her
10  suspension.
11    Q.  So when you talked to her on that Saturday, did
12  you tell her she was suspended?
13    A.  I would assume I would have.
14    Q.  Did you tell her she was going to be
15  transferred or was that something that was decided
16  later?
17    A.  That was a decision that was probably made
18  later.
19    Q.  Now, there is a, on the page marked D0175,
20  there is, at the top of the page, there is some
21  handwriting. It says, "Gloria Nieves 7816." Do you
22  know what the "7816" is?
23    A.  It's the store number for the Middletown store.
24    Q.  And says, "trans to Smyrna! Send letter." Do

Page 33

1  you know whose handwriting that is?
2    A.  No, sir.
3    Q.  There is some more handwriting towards the
4  bottom of the page. Do you know whose handwriting
5  that is?
6    A.  No, sir.
7    Q.  And is it -- can I assume it's not your
8  handwriting?
9    A.  Yes, sir.
10    Q.  And on the next page there is, in the first
11  e-mail, there is some part of it is that's circled.
12  Do you know who circled -- it says, the words, "final
13  warning letter" is circled. Do you know who put that
14  circle there?
15    A.  No.
16    Q.  Can I assume you did not?
17    A.  Yes.
18    Q.  Have you seen a printout of these e-mails
19  before today?
20    A.  Yes.
21    Q.  Other than in association with this litigation,
22  have you ever seen a printout of these?
23    A.  In association with the litigation.
24    Q.  So they weren't printed out back in that time

Nieves                          v. Acme Markets, Inc., et al.
Barbara J. Appenzeller  C.A. # 06-123 GMS        December 18, 2006

---

**Page 6**

1    Q.  When you came in, did anybody say anything
2  about what kind of worker she was or anything like
3  that?
4    A.  No.
5    Q.  When you came in as this, in this management
6  position to a new store, do you look at the personnel
7  files of the people or do anything to find out what
8  kind of people are working under you?
9    A.  No.
10   Q.  During the time that you were at the Middletown
11  store and Gloria Nieves was there, did you ever do any
12  kind of job evaluation for her?
13   A.  No.
14   Q.  Do you know if anyone did?
15   A.  Not to my knowledge.
16   Q.  Is it -- does Acme have a practice of doing
17  formal kind of written job evaluations for the
18  employees?
19   A.  Yes, they do.
20   Q.  And what is the policy?  How often does that
21  take place and who does it?
22   A.  It's done once a year.  It's done by the store
23  director.
24   Q.  When you were at Middletown and Gloria Nieves

---

**Page 7**

1  was at Middletown, who was the store director?
2    A.  Steve Briley.
3    Q.  How does the store director evaluate each
4  individual employee?  Does he get reports from the
5  immediate supervisors of that employee or how does
6  that work?
7    A.  Yes, he gets evaluations from their immediate
8  supervisor.  They also do a self-evaluation.
9    Q.  Each employee?
10   A.  Yes, sir.
11   Q.  And the reports from immediate supervisors, are
12  they all in writing?
13   A.  Most of them are.
14   Q.  Well, the ones that aren't, how does that work?
15  Does the store supervisor or I mean store director sit
16  down with the supervisors and just talk to them about
17  the employees?
18   A.  That's correct.
19   Q.  Have you ever reviewed Gloria Nieves' personnel
20  file?
21   A.  No.
22   Q.  Am I correct in assuming that those yearly
23  evaluations would turn up in the employee's personnel
24  file?

---

**Page 8**

1    A.  Yes, sir.
2    Q.  Now, did you ever have occasion to -- well,
3  strike that.  As the ASD-II or night manager, whatever
4  the terminology we're going to use, would part of your
5  job be to make some reports on employees to the store
6  manager for the purpose of that evaluation?
7    A.  Not necessarily.  If I saw something that, you
8  know, indicated something that needed to be said, yes,
9  but not necessarily.
10   Q.  So you wouldn't be one of the people that the
11  store manager would sit down with and say, okay, I'm
12  doing my evaluation of John Doe employee, what do you
13  think about that?
14   A.  No.
15   Q.  So you normally would have very little input on
16  an employee's job evaluation; is that right?
17   A.  Yes.
18   Q.  Now, did you ever have occasion to observe
19  Gloria and the way she worked?
20   A.  Yes.
21   Q.  What were your impressions of how she did her
22  work?
23   A.  She was a very good worker.
24   Q.  Did you know anything about her personal home

---

**Page 9**

1  situation at all?
2    A.  Just some of the things that the girls had told
3  me by word of mouth.
4    Q.  What did they tell you?
5    A.  Just that she was, you know, having problems at
6  home.
7    Q.  What kind of problems did they tell you about?
8    A.  Just things with her husband, but nothing in
9  detail.  It was just, you know, what girls had told
10  me.
11   Q.  Which girls told you those things, do you
12  remember?
13   A.  No, I don't.
14   Q.  Who else?  Do you know the names of the
15  individuals who worked in the deli department with
16  Gloria Nieves?
17   A.  Yes.
18   Q.  Who were they?
19   A.  There was Denise Dean, which is the deli
20  manager.  There was Joyce Alphin.  I think Michelle
21  Warren was there.  There was about 15 employees.  I
22  mean, the turnover right now is so high in the deli, I
23  can't remember everyone that was back there at that
24  time.

B-49

3  (Pages 6 to 9)

Wilcox & Fetzer, Ltd.    Professional Court Reporters        (302) 655-0477

96755c0b-c548-4425-9024-d813e8177bb5

Nieves                           v. Acme Markets, Inc., et al.
Barbara J. Appenzeller  C.A. # 06-123 GMS        December 18, 2006

---

**Page 10**

1  Q.  Were there any employees there named Amanda?
2  A.  I don't remember that employee.
3  Q.  Did you ever know or anybody ever tell you that
4  Mr. Nieves' brother was living part-time or at least
5  some of the time at Gloria Nieves' house?  Did you
6  know --
7  A.  No, sir.
8  Q.  Now, did Gloria Nieves ever come to you with
9  any complaints about how she was being treated by any
10  co-workers?
11  A.  No.
12  Q.  Did she ever talk to you about co-workers at
13  all?
14  A.  Just to say that she was the one doing all the
15  work, but as far as that goes, nothing else specific.
16  Q.  Did you look into that kind of complaint at all
17  to see if in fact she was doing all the work?
18  A.  It was part of my job to go around as night
19  manager and observe all the different things in the
20  department, but at that time, no.  Everybody seemed to
21  be working together.
22  Q.  So you did look into it?
23  A.  Yes.
24  Q.  If somebody raises any kind of complaint about

**Page 11**

1  a co-worker, would it be part of your job to look into
2  it?
3  A.  That along with the store director.
4  Q.  Did you ever hear anything about any of Gloria
5  Nieves' co-workers having the opinion that she
6  shouldn't use her Spanish while at work?
7  A.  No.
8  Q.  Did you ever hear her speaking Spanish at work?
9  A.  No.
10  Q.  Did you ever see her talking to a customer who
11  may be a Spanish-speaking person trying to help that
12  person by speaking Spanish to them?
13  A.  No.
14  Q.  Are there some customers that come into -- that
15  came into that Middletown store who were Hispanic and
16  did speak primarily Spanish, do you know?
17  A.  Yes, mm-hmm.
18  Q.  Would it be a problem for someone who did speak
19  Spanish to help those people by speaking Spanish to
20  them?
21  A.  Absolutely not.
22  Q.  It would be something you would probably want
23  them to do?
24  A.  I would want them to do, yeah, right.

**Page 12**

1  Q.  Now, if a co-worker of Gloria Nieves told her
2  that she shouldn't speak Spanish to Spanish-speaking
3  customers, would you have a problem with that?
4  A.  Yes.
5  Q.  You would have done something about it?
6  A.  Yes.
7  Q.  But you are saying Gloria never said anything
8  like that to you?
9  A.  No.
10  Q.  Do you know what Gloria's job was when you came
11  to the Middletown store about two years ago or
12  whenever it was?  We're not going to hold you to
13  exactly two years.
14      MS. MALLOY:  We'll actually get you the
15  dates.
16      MR. BARTOSHESKY:  I understand that.
17  That's fine.
18  A.  Deli clerk.  Nighttime deli clerk.
19  Q.  Did she at some point get any kind of other
20  position at Middletown while you were there?
21  A.  I don't know whether she was classified as a
22  night deli clerk.  Like manager, there is no quote,
23  quote, classification for that.  But I do know she
24  worked all nights.

**Page 13**

1  Q.  All nights, meaning she never worked --
2  A.  In the evenings, right.
3  Q.  She never worked a day shift?
4  A.  Not that I can recall.
5  Q.  Whenever -- you said that she came to you and
6  claimed that she was doing the bulk of the work in the
7  deli.  Was she ever upset or teary-eyed when she made
8  those complaints to you?
9  Q.  Now, while you were -- well, strike that.  Does
10  Acme have a progressive discipline policy?
11  A.  Yes.
12  Q.  Do you understand what I mean by that?
13  A.  Yes.
14  Q.  What is that policy?
15  A.  It's an oral warning, written warning, one-day
16  suspension, then three-day suspension, and then
17  termination.  Depending on what the -- the nature of
18  the incident.
19  Q.  Now, did you ever give Gloria Nieves an oral
20  warning for anything?
21  A.  No, not to my knowledge.
22  Q.  Do you know if anyone ever gave her a written
23  warning?
24  A.  That I do not know.

B-50

4  (Pages 10 to 13)

Nieves                              v. Acme Markets, Inc., et al.
Barbara J. Appenzeller  C.A. # 06-123 GMS        December 18, 2006

| Page 14 | Page 16 |
|---|---|

**Page 14**

1  Q.  Do you know if she ever had a one-day
2  suspension?
3  A.  That I do not know.
4  Q.  Do you know if she ever had a three-day
5  suspension?
6  A.  I do not know that either.
7  Q.  Well, if she was suspended for a day while you
8  were one of the co-managers or night managers, would
9  you know about that?
10  A.  Yes. I should know about that.
11  Q.  Who would have been able to give an oral
12  warning to Gloria Nieves? I don't necessarily mean
13  the names of people that -- what positions can give an
14  oral warning to an employee?
15  A.  A department manager can.
16  Q.  Was that Denise Dean then?
17      MS. MALLOY:  Is that a "yes"?
18      THE WITNESS:  Yes. I'm sorry.
19  BY MR. BARTOSHESKY:
20  Q.  Anybody -- and maybe this isn't the correct
21  terminology, really, but. Anybody below her level --
22  A.  No.
23  Q.  -- could -- could anybody below that level --
24  A.  No.

**Page 15**

1  Q.  So it would be -- I forget what title you gave
2  her now, Denise.
3  A.  She was deli manager.
4  Q.  So department manager?
5  A.  Yes, sir.
6  Q.  Who would be next higher in the level of
7  command that could give a warning to a --
8  A.  That would be myself or the store director.
9  Q.  So, essentially, people in three different
10  positions?
11  A.  That's correct. In any given store, you know.
12  Some management -- some stores have three levels of
13  managements. We have a night manager, an ASD-II,
14  ASD-I, and then goes to store director.
15  Q.  Now, at the Middletown store back in the time
16  when Gloria Nieves was employed there, were there
17  video cameras that watched any part of the store?
18  A.  Yes.
19  Q.  Was there a video camera that watched any part
20  of the deli department?
21  A.  Just on the sales floor area, not back in the
22  prep area or the work area.
23  Q.  What's the difference between the sales floor
24  area and the prep area?

**Page 16**

1  A.  The sales floor area is where the customers
2  are, where all the product is at. The prep area is
3  actually back there where the employees are back there
4  working, slicing, back where the fryers are. There is
5  no cameras back there.
6  Q.  So what does the camera show, just the
7  customers?
8  A.  It shows the front of the case. You can see
9  the back of the case, but not to any extent. Like a
10  downscope on it. You can't see that.
11  Q.  Does it show a cash -- there isn't a cashier at
12  the deli, is there?
13  A.  No.
14  Q.  There is a scale?
15  A.  Yes.
16  Q.  Does it show -- does the video show the scale?
17  A.  Yes.
18  Q.  How long are the tapes -- strike that. Are
19  they videotapes?
20  A.  No, they're not. It's a digital system.
21  Q.  How long is a record of the digital system
22  maintained?
23  A.  90 days.
24  Q.  Then what happens to it?

**Page 17**

1  A.  It just gets deleted.
2  Q.  Is that an automatic system.
3  A.  Yes.
4  Q.  Before the digital record is deleted, does
5  somebody look at it? Or is it only if somebody thinks
6  there is a problem?
7  A.  Only if we have a problem with something.
8  Q.  Now, at some point, I believe you're aware that
9  Gloria Nieves was suspended; is that right?
10  A.  Yes.
11  Q.  And were you the one that told her that she was
12  going to be suspended?
13  A.  Not to my knowledge, no.
14  Q.  Well, do you know who did tell her she was
15  going to be suspended?
16  A.  No.
17  Q.  Do you know why she was suspended?
18  A.  Because of a water incident with one of the
19  other associates, a bucket of water that she threw at
20  one of the other deli associates.
21  Q.  How did you learn of that incident?
22  A.  It's because one of -- the deli associate came
23  and told me.
24  Q.  Who was that deli associate?

B-51

Wilcox & Fetzer, Ltd.   Professional Court Reporters        (302) 655-0477

96755c0b-c548-4425-9024-d813e8177bb5

Nieves                           v. Acme Markets, Inc., et al.
Barbara J. Appenzeller  C.A. # 06-123 GMS        December 18, 2006

| Page 18 | Page 20 |
|---|---|

**Page 18**

1  A.  That would be Joyce Alphin.
2  Q.  What did she say happened?
3  A.  She said Gloria had -- was angry and just took
4  and threw the water across the floor at her.
5  Q.  Did she say -- was this like the next day or
6  the same day or did she tell you when it happened or
7  anything like that?
8  A.  I don't remember that.  I don't know whether it
9  was that night or the next day.
10  Q.  Is that as best as you can remember the extent
11  of the conversation --
12  A.  Yes, sir.
13  Q.  -- that Joyce Alphin had with you?
14  A.  Mm-hmm.
15       MS. MALLOY:  Is that a yes?
16       THE WITNESS:  Yes.  I'm sorry.
17  BY MR. BARTOSHESKY:
18  Q.  Your answer -- it happens all the time, you
19  anticipate where the questions go.
20  A.  Yeah, right.
21  Q.  When she told you this, when Ms. Alphin told
22  you this, what did you do?
23  A.  I believe I talked to Steve Briley about it.
24  Q.  What did he say?  What was the conversation you

**Page 19**

1  had with him?
2  A.  He was going to handle it.
3  Q.  Do you know if he had already heard something
4  about this incident?
5  A.  I don't know.
6  Q.  Did anybody ask Ms. Alphin if there were other
7  people there that saw this thing happened?
8  A.  I don't know.
9  Q.  You didn't ask her that?
10  A.  No.
11  Q.  Did you talk to Gloria Nieves about this
12  incident?
13  A.  No.
14  Q.  Before this incident, did any co-workers of
15  Ms. Nieves make any kind of complaint about her to
16  you?
17  A.  No.
18  Q.  I may have asked you this already, and I
19  apologize if I did, but.  When did you find out that
20  Gloria Nieves was going to be suspended because of
21  this incident?
22  A.  After Steve told me.
23  Q.  How long after Joyce Alphin had complained to
24  you about this did Mr. Briley say something to you?

**Page 20**

1  A.  I don't remember.  I don't remember.
2  Q.  Do you think it was within days?
3  A.  Oh, I am sure it was within days, but the
4  specific day I don't remember.
5  Q.  Were you, did you -- did Gloria come to work
6  one day and was told: "Go see Mr. Briley"?
7  A.  Yes.
8  Q.  Did you tell her that?
9  A.  Yes.
10  Q.  Did you know what was going to happen?  Did you
11  know that this was going to be a suspension?
12  A.  I wasn't sure at that time what he was going to
13  do.
14  Q.  So he had told you: "When Gloria comes in
15  today, tell her to come see me"?
16  A.  Yes.
17  Q.  And so Gloria went to see Mr. Briley, right?
18  A.  Yes.
19  Q.  Were you in that meeting?
20  A.  No.
21  Q.  And were you there when Gloria came out of that
22  meeting?
23  A.  I don't remember.
24  Q.  Well, did you ever -- do you remember ever

**Page 21**

1  seeing Gloria again after that before today?
2  A.  She's been shopping in the store, yes.
3  Q.  But other than when she's shopping in the
4  storem, did you see her as an Acme employee?  Let me
5  put it that way.
6  A.  No.
7  Q.  Do you know if she was told not to come back to
8  the store?
9  A.  No, not as far as I know.
10  Q.  Were there any instructions given by anyone
11  that you know of concerning Mr. Nieves and his coming
12  to the store?
13  A.  No.
14  Q.  So the day that Ms. Nieves -- by the way, do
15  you remember what day of the week it was that she came
16  in and had to go see Mr. Briley?
17  A.  No, I don't.
18  Q.  Other than Joyce Alphin reporting this incident
19  with a water bucket to you, do you know if any, if
20  anybody else went to store management and complained
21  about Gloria Nieves and that incident?
22  A.  Not to my knowledge.
23  Q.  Do you know if anybody from the store
24  management looked into whether Joyce Alphin was being

Wilcox & Fetzer, Ltd.    Professional Court Reporters        (302) 655-0477

96755c0b-c548-4425-9024-d813e8177bb5

Nieves                              v. Acme Markets, Inc., et al.
Barbara J. Appenzeller  C.A. # 06-123 GMS         December 18, 2006

---

Page 22

1  accurate when she came to you with that complaint?
2   A.  I don't know whether Steve did or not or talked
3  to Denise, or.
4   Q.  Do you know who would have been on duty in the
5  deli department when that incident supposedly
6  occurred?
7   A.  No, I don't.  That was two years ago.  You
8  know, I don't know.
9   Q.  Would there be records, still, that would show
10  that?
11   A.  Yes, mm-hmm.  We should have schedules from
12  that time.
13   Q.  How are those schedules maintained?  Or what do
14  they look like?
15   A.  They look like regular typewritten or computer-
16  generated schedules.  And our deli manager has them
17  from back then.  She's a very good recordkeeper.
18   Q.  And that's Denise?
19   A.  Yes, sir.
20   Q.  And there also would be or would there also be
21  records of the people clocking in and out they
22  maintained for that period of time, do you know?
23   A.  To be honest with you, I don't know how long we
24  keep those records.  Do you, Steve?

Page 23

1       MR. MOYER:  I can't help you.
2  BY MR. BARTOSHESKY:
3   Q.  Let me show you a letter that was, a copy of a
4  letter that was given or sent to Gloria Nieves.  Let
5  me have the court reporter mark it as I Appenzeller?
6       (Appenzeller Depositoin Exhibit No. 1 was
7  marked for identification.)
8  BY MR. BARTOSHESKY:
9   Q.  My first question is going to be if you have
10  ever seen a copy of this letter before.
11   A.  No, I haven't.
12   Q.  Let me ask you to look at the bottom, the cc's,
13  H. Fajkowski.
14   A.  Yes.
15   Q.  I should be able to say it.
16   A.  Yes.
17   Q.  Do you know who that is?
18   Q.  How about T. Holden, do --
19   A.  Tom Holden, yes, sir.
20   Q.  Who is Tom Holden?
21   A.  He was acting district manager at the time.
22   Q.  Okay.  And F. Murphy?
23   A.  That I am assuming is Frank Murphy, who is the
24  store director at 7836, the Smyrna, Delaware store.

---

Page 24

1   Q.  The store where Ms. Nieves was transferred?
2   A.  Yes, sir.
3   Q.  And we know the letter is written by Mr. Moyer.
4  You know who he is; correct?
5   A.  Yes, sir.
6   Q.  This letter says that Ms. Nieves was suspended
7  on March 6 for an incident with a co-worker on March 2
8  and a repeat incident on March 6.  Do you know of two
9  separate incidents that contributed to the decision to
10  have Ms. Nieves suspended?
11   A.  I am just aware of the water incident.
12   Q.  Assuming that she was, the day that she was
13  suspended was March 6th, the day she came in and you
14  told her to go see Mr. Briley, would that mean that
15  the water incident was March 2?
16   A.  That's what I am assuming, yes.
17   Q.  Does it sound like it was about four days
18  before she came in and was told to go see Mr. Briley?
19  Does the timing sound about right?
20   A.  It sounds about right.
21   Q.  Now, in the last paragraph here, it talks about
22  this letter serving as a final written warning.  Do
23  you know -- do you personally know of any other
24  warnings that were ever given, either written or oral,

Page 25

1  to Ms. Nieves?
2   A.  No.
3   Q.  Did anyone ever indicate to you, anybody else
4  in the deli department, any of Gloria's co-workers in
5  the deli department that they were afraid of her?
6   A.  No.
7   Q.  Now, before today and excluding any
8  conversations you may have had with the Acme
9  attorneys, has anyone ever talked to you about Gloria
10  Nieves and her suspension?
11   A.  No.
12   Q.  No one contacted you from the Department of
13  Labor or the Equal Employment Opportunity Commission?
14   A.  No, sir.
15   Q.  Did anybody from Acme back before today, and
16  excluding conversations with your attorneys, ever talk
17  to you about Gloria's situation?
18   A.  No.
19   Q.  No Acme loss prevention person came to you and
20  asked about her claims that she had made to the
21  Department of Labor?
22   A.  Mike Porte did.
23   Q.  Who is Mike Porte?
24   A.  His -- I don't know what his title is now, but

---

7 (Pages 22 to 25)

Nieves                         v. Acme Markets, Inc., et al.
Barbara J. Appenzeller   C.A. # 06-123 GMS        December 18, 2006

**Page 26**

1  back there he was head of security/loss prevention.
2  Q.  What did he ask you?
3  A.  He just asked me a few questions.  To be honest
4  with you, I don't remember all the questions he asked
5  me.  It was -- I believe, it was just a phone call.
6  Q.  And do you remember anything that he asked you?
7  A.  To be honest with you, no, I don't.
8  Q.  So I guess you don't remember anything you told
9  him; right?
10  A.  No, I don't remember anything he asked me; no,
11  I don't remember everything I told him.
12  Q.  Were you -- did he tell you or at that point in
13  time were you aware that Ms. Nieves was making some
14  kind of claims against Acme?
15  A.  No.
16  Q.  So this sort of just came out of the blue when
17  he called you and started asking you questions about
18  Gloria Nieves?
19  A.  Yes.
20  Q.  And you didn't ask him why he was asking those
21  questions?
22  A.  To be honest with you, I don't remember.
23      MR. BARTOSHESKY:  Let me take a minute.  I
24  think I'm just about done.

**Page 27**

1      MS. MALLOY:  Okay.
2      (Recess taken.)
3  BY MR. BARTOSHESKY:
4  Q.  Ms. Appenzeller, I just think I have a couple
5  more questions.  The day that Gloria came in, was told
6  to go see Mr. Briley, did you have any conversations
7  with the other people in the deli department to tell
8  them what was going on?
9  A.  Not to my knowledge.
10  Q.  You don't remember anything?
11  A.  I don't remember.
12  Q.  Do you know if anyone from Acme had a
13  conversation with anybody in the deli department that
14  told them what was going on?
15  A.  That I don't know.
16  Q.  Again, I apologize if I've asked this already,
17  but.  Did you have any conversation with anyone in the
18  deli department about, or anybody else in the Acme
19  store, about Mr. Nieves?
20  A.  No.
21      MR. BARTOSHESKY:  I don't have any other
22  questions.
23      MS. MALLOY:  I just have one or two.
24

**Page 28**

1  BY MS. MALLOY:
2  Q.  Did any Acme associate talk to you about
3  Mr. Nieves?
4  A.  One day they, I think it was one day Gloria had
5  left, they said that he might be coming back in or
6  something like that.  The only thing I said -- you
7  know, they were kind of afraid that he might come in
8  and say something to them, and I just said, "Well, you
9  know, if he does, then we'll just call the police,"
10  but that's all I said.
11      MS. MALLOY:  I have nothing further.
12  BY MR. BARTOSHESKY:
13  Q.  Let me ask a little bit more about that.  Do
14  you think that was the day that Ms. Gloria, Ms. Nieves
15  left?
16  A.  I don't remember.
17  Q.  But it was after the time when she was
18  suspended that somebody came to you and said --
19  A.  To tell you the truth, I don't remember whether
20  it was before or after she was suspended.
21  Q.  But at some point somebody from the deli
22  department -- was it from the deli department somebody
23  came to you and said --
24  A.  Yes.

**Page 29**

1  Q.  And what was it that they said; they thought he
2  might be coming to the store?
3  A.  Yes.
4  Q.  Did they say that they had a concern about that
5  for some reason?
6  A.  They did.
7  Q.  What was --
8  A.  Well, from the stories that they had heard
9  about him, well, they were just afraid.
10  Q.  And the stories they heard about him were from
11  whom; from Gloria?
12  A.  They -- this is from what the girls were
13  telling me back in the deli.  I don't know where the
14  stories came from.
15  Q.  Did you tell them that they should be escorted
16  out of the store that day and have somebody with them
17  when they went to their cars or anything along those
18  lines?
19  A.  Not that I remember, no.
20  Q.  Did any problems ever arise --
21  A.  No.
22  Q.  Did he come to the store?
23  A.  No.  This is the first day I've ever seen the
24  man.

B-54

8 (Pages 26 to 29)

Denise K. Dean

## Page 6

1    Q.   And I understand that the store in Middletown
2    is a relatively new store.  Is that right?
3    A.   Yes.
4    Q.   And there was an Acme in Middletown before
5    that.  Did you ever work at the old Acme in
6    Middletown?
7    A.   No.
8    Q.   So you came on when the new store started?
9    A.   Shortly after.
10   Q.   And who was the store manager when you started
11   at the Acme Middletown store?
12   A.   Steve Briley.
13   Q.   He's at a different Acme now.  Is that right?
14   A.   Yes.
15   Q.   Did you ever have occasion to discuss with
16   Mr. Briley any disciplinary action that needed to be
17   taken against any employee?  I mean, is that something
18   as a deli manager you would have occasion to do?
19   A.   Yes.
20   Q.   And did you ever have any trouble communicating
21   with Mr. Briley?
22   A.   No.
23   Q.   Now, while Mr. Briley was the store manager,
24   did he ever have occasion to reprimand you for

## Page 7

1    anything?
2    A.   No.
3    Q.   Now, when you started at the Acme Middletown
4    store, was Gloria Nieves already employed by Acme at
5    that store?
6    A.   Yes.
7    Q.   And do you know what her position was?
8    A.   Deli clerk.
9    Q.   And do you know what hours she worked?
10   A.   I don't remember.
11   Q.   Was she normally there in the daytime when you
12   were there or was she there at night more often than
13   not?
14   A.   More often than not, she was night.
15   Q.   Did you know by sight Gloria's husband Emilio?
16   A.   Yes.
17   Q.   How did you know him?
18   A.   She introduced him one day.
19   Q.   Now, do you remember an Acme employee named
20   Amanda Cumberbatch?
21   A.   I don't remember her.
22   Q.   Do you remember even the name, that there was
23   an employee -- do you believe there was an employee
24   named Amanda Cumberbatch that worked at Acme?

## Page 8

1    A.   I believe there was -- I don't remember her.
2    Q.   So if you saw her, you don't know if you would
3    recognize her or not?
4    A.   I wouldn't, no.
5    Q.   Do you remember an employee at Acme named
6    Michele Warren?
7    A.   Yes.
8    Q.   What was Michele Warren's job?  Do you
9    remember?
10   A.   She was also a deli clerk.
11   Q.   And she no longer works at Acme.  Is that
12   correct?
13   A.   Yes.
14   Q.   Do you know why she no longer works at Acme?
15   A.   She, she was let go while I was out on sick
16   leave.
17   Q.   How long ago was that?  Do you remember?
18   A.   It was either February or March of last year.
19   Q.   Of 2006?
20   A.   Yes.
21   Q.   So just about a year ago?
22   A.   Correct.  I'm not sure exactly.  I was out for
23   four months, so I'm not exactly sure when it was.
24   Q.   Now, during the time that Gloria was employed

## Page 9

1    at Acme, did you ever hear any of her coworkers make
2    any derogatory remarks about Gloria?
3    A.   No.
4    Q.   Did you ever hear any of them say anything
5    about the way Gloria spoke, her accent, anything along
6    those lines?
7    A.   No.
8    Q.   Did you ever hear Gloria speaking Spanish to
9    any employees or customers of Acme?
10   A.   Did I hear her?
11   Q.   Yes.
12   A.   No.
13   Q.   Did you ever hear or come to an understanding
14   that she did use her Spanish with some customers?
15   A.   I don't know about customers.
16   Q.   Okay.  Did she speak, did you hear that she
17   spoke Spanish at work sometimes?
18   A.   Yes.
19   Q.   Where did you hear that?
20   A.   From some of the coworkers.
21   Q.   And what did they say to you?
22   A.   They said that when she would get upset with
23   them at nighttime she would start speaking Spanish and
24   they would not understand what she was trying to tell

B-55

3  (Pages 6 to 9)

Denise K. Dean

Page 10

```
1   them.
2   Q.  And who said that to you?  Do you remember?
3   A.  Nancy Coulborne for one, Michele Warren.  I
4   don't really remember any of the others.
5   Q.  Was Joyce Alphin an employee of Acme?
6   A.  Yes.
7   Q.  And she still is.  Is that right?
8   A.  Yes.
9   Q.  Was she in the deli department also?
10  A.  Yes.
11  Q.  Did she ever come to you with any kind of
12  statement about Gloria speaking Spanish when she was
13  upset?
14  A.  I don't remember if Joyce ever did.
15  Q.  Now, when these people, either Nancy Coulborne
16  or Michele Warren, talked to you about that, what did
17  you say to them?
18  A.  I don't remember what I said to them.
19  Q.  Was this a complaint that they had or was it
20  just something that they said to you in --
21  A.  Just a comment.
22  Q.  Just a comment?
23  A.  That they would have.
24  Q.  Did you go, did you talk to Gloria about this?
```

Page 11

```
1   A.  No.
2   Q.  Now, other than that instance, those two people
3   talking to you about Gloria's speaking Spanish when
4   she was upset, did any of her coworkers ever complain
5   to you about any other behaviors of Gloria?
6   A.  Yes.
7   Q.  Tell us about that.
8   A.  Joyce Alphin came in one day and said that the
9   prior night the only thing I remember is a bucket of
10  water being thrown by Gloria.
11  Q.  That's all you can remember about what she
12  said?
13  A.  That's all I remember, is a bucket of water.
14  Q.  Other than that instance where Joyce Alphin
15  came to you, did any other coworkers complain about
16  Gloria?
17  A.  Not really complaints, no.
18  Q.  Well, did they talk to you about Gloria in some
19  way?
20  A.  Just comments on attitude.
21  Q.  Tell me who made comments about her attitude.
22  Do you remember?
23  A.  Basically the total group.
24  Q.  Who was that, who was in that group?
```

Page 12

```
1   A.  Jean Miller worked mostly during the day.  Kim
2   Nobayashi, Chrissy Shaw.  I'm trying to think who else
3   was there.
4   Joyce Alphin, Nancy Coulborne, Michele
5   Warren.  I'm sure I've left somebody out, but...
6   Q.  Now, when you say the whole group, was this
7   like the group came to you and said something or was
8   this individually?
9   A.  Individually.
10  Q.  And did you take any action or do anything
11  about these complaints?
12  A.  No.  Because basically it was attitude.
13  Q.  Well, what did they say to you?  Do you
14  remember?
15  A.  Well, just, you know, that she -- Gloria would
16  say that she had done all the work and they were doing
17  nothing to help and would get upset with them
18  because they weren't helping her.  But somebody has to
19  service my customers, so the others had to be working
20  if she was doing all the cleaning.
21  Q.  That's the kind of thing that they would say to
22  you?
23  A.  Correct.
24  Q.  And you didn't go talk to Gloria about this?
```

Page 13

```
1   A.  No.
2   Q.  And were any of these complaints in writing
3   anywhere?
4   A.  No.
5   Q.  Did you ever relay any of these problems to
6   Mr. Briley or to an assistant store manager or anyone
7   else?
8   A.  Well, we would have frequent talks on attitude,
9   but the biggest thing was where the bucket of water
10  was thrown.  I mean, that's no longer something that
11  we can just, you know, chalk up to a bad day.
12  Q.  Okay.  Leaving aside the incident where the
13  bucket of water, where Joyce Alphin told you a bucket
14  of water was thrown, did you ever talk to Mr. Briley
15  or any other store management person about these
16  complaints, these general complaints about Gloria's
17  attitude?
18  A.  Yes.
19  Q.  Who did you talk to?
20  A.  Steve Briley.
21  Q.  And what did you tell him?  Do you remember?
22  A.  Basically that there was a lot of turmoil going
23  on in the deli department.
24  Q.  And did anybody suggest any kind of action be
```

B-56

4 (Pages 10 to 13)

Denise K. Dean

| Page 14 | Page 16 |
|---|---|

**Page 14**

1  taken or do anything to address this turmoil?
2  A. No.
3  Q. And how many times do you think that you talked
4  to Mr. Briley, again other than the complaint Joyce
5  Alphin made about the water bucket, how many times do
6  you think you talked to Mr. Briley about this turmoil
7  in the deli department?
8  A. Two to three times a week.
9  Q. And for how long had that been? Was that over
10  a several-month period or over a year period?
11  A. Several months.
12  Q. Was this from the very beginning of your time
13  at the Middletown store?
14  A. Yes.
15  Q. Now, did Gloria Nieves ever come to you with
16  any complaints about anything?
17  A. Yes.
18  Q. What did she complain about?
19  A. She would complain that no one was doing work.
20  The other biggest complaints that she would come with
21  would be about her husband abusing her at home.
22  Q. What did she say about that?
23  A. That he was mean and he would beat her.
24  Q. And let's first go to the complaints about she

**Page 16**

1  that she was doing all the cleaning -- is that what
2  the complaints were?
3  A. Correct.
4  Q. Did you ever go look and see if that was
5  accurate?
6  A. How could I look and see when I worked during
7  the day and she worked at night?
8  Q. Is there a night deli manager?
9  A. For a while Gloria was that position.
10  Q. How did she get that position?
11  A. She applied for it.
12  Q. And was she the only one that applied?
13  A. Michele Warren, I believe, also applied.
14  Q. And who made the decision of who would get that
15  position?
16  A. Personnel. I believe it was Sunday Council at
17  that particular time.
18  Q. Did you have any input into that?
19  A. No. No. It's all based on seniority and
20  because we're union members, it's all based on
21  seniority.
22  Q. Did anybody ever complain to you about the fact
23  that Gloria did get that position?
24  A. No.

**Page 15**

1  was doing all the work.
2  Did you ever do anything to look into
3  that, whether it was accurate or not?
4  A. Well, like I said previous, if she was doing
5  all the cleaning and we did $5,000 in sales, someone
6  had to wait on those customers to be able to get that
7  amount in sales. If she's cleaning everything,
8  somebody else has to be waiting on those customers.
9  So you can't tell me that no one else in
10  the department was working. If she was doing all the
11  cleaning, somebody was waiting on customers and
12  slicing meat and cheese.
13  Q. And you reached that conclusion just based on
14  the amount of business that was done?
15  A. Correct.
16  Q. Did you ever go into the deli department and
17  see if the division of labor was fair and she was
18  doing all the cleaning? Did you ever look into that?
19  A. I leave a list for everyone and I still do to
20  this day. I leave a list for everyone to work on, but
21  the main priority of our business is customer service.
22  Customer service comes first. Everything else comes
23  next.
24  Q. Okay. When Gloria came to you with complaints

**Page 17**

1  Q. Going back to the complaint that Gloria made,
2  you said she also complained about her husband. Did
3  you tell her or did you do anything about that at all?
4  A. No. I told her if it was really a problem she
5  needed to call the police and get herself some help.
6  Q. And these complaints about her husband, did she
7  make them the entire time that she was employed at the
8  Middletown store to you?
9  A. A lot. And not only to me.
10  Q. Did you hear her make those complaints to
11  somebody else?
12  A. To several people. Basically three quarters of
13  the week she would be in tears.
14  Q. And did that cause any problems on her job, her
15  job performance?
16  A. Not as I know of.
17  Q. Did anybody ever accuse her of not doing her
18  job?
19  A. No.
20  Q. Now, you said the only two things she ever
21  complained about were that she was doing all the
22  cleaning work --
23  A. Correct.
24  Q. -- and her husband?

B-57

Denise K. Dean

Page 18

1    A.  Correct.
2    Q.  Any complaints about anything else?
3    A.  Not as I remember.
4    Q.  Now, did you ever relay any of her complaints
5    to Mr. Briley or to a store assistant manager?
6    A.  Referring to what?
7    Q.  The complaints that Gloria made to you about
8    doing too much work or about her husband.
9    A.  Yes.
10   Q.  Who did you tell about that?
11   A.  Steve Briley.
12   Q.  And what did he say?  Do you remember?
13   A.  I don't remember what his answer was.
14   Q.  Now, were any of these complaints from Gloria
15   ever put in writing?
16   A.  No.  Never.
17   Q.  Did you ever make any note to any personnel
18   file or anywhere else about her complaints?
19   A.  No.
20   Q.  Okay.  Let me ask you about you mentioned the
21   incident where Joyce Alphin came to you and said last
22   night something happened with the water bucket.
23       Do you remember what she said?  I think
24   you testified about it already.

Page 19

1    A.  Yes.  What I remember of the incident was she
2    came in in tears and she said, "We have got to do
3    something.  Gloria now has thrown a bucket of water at
4    me." And she requested to be moved out of the
5    department at that time.
6    Q.  And what did you do next?  What happened next?
7    A.  I went to Steve Briley.
8    Q.  And what did you tell him?
9    A.  Exactly what Joyce had told me.
10   Q.  Now, did Joyce also talk to Mr. Briley at this
11   point or did you just relay the concern?
12   A.  I relayed the concern.  I don't remember if she
13   went with me.
14   Q.  And what did Mr. Briley do then?  Did he tell
15   you --
16   A.  I believe he called personnel at that
17   particular time.
18   Q.  And did you hear him talking to personnel?
19   A.  No.
20   Q.  What happened next?  Did you talk to Gloria
21   about it?  Did you talk to anybody else about it?
22   A.  No.  Because I was the department head and I
23   took it to the store director who was to handle it
24   from there.

Page 20

1    Q.  And when Gloria came to work the next time she
2    came to work, did you meet with her?
3    A.  I don't remember meeting with her.
4    Q.  Do you know what happened next?  Do you know
5    what Mr. Briley did?
6    A.  As far as I know, he contacted personnel.
7    Q.  And did somebody from personnel come to talk to
8    you about the situation?
9    A.  No.  No.
10   Q.  Do you know if somebody from personnel talked
11   to Ms. Alphin about the situation?
12   A.  I don't know.
13   Q.  Well, eventually Gloria was suspended, correct?
14   A.  Correct.
15   Q.  Because of this incident?
16   A.  Correct.
17   Q.  And do you know how it came about that she was
18   notified that she was going to be suspended?
19   A.  I don't know.  I don't know.
20   Q.  And she was then transferred to the Smyrna
21   Acme.  Is that right?
22   A.  Yes.
23   Q.  Did you ever have occasion to contact her at
24   the Smyrna location?

Page 21

1    A.  No.
2    Q.  Do you know if any of her coworkers ever
3    contacted her at the Smyrna location?
4    A.  I really don't know.
5    Q.  Did you ever ask anyone to go talk to her or
6    see what she was doing down at Smyrna?
7    A.  No.
8    Q.  Now, the day that she was -- were you there the
9    day that she was notified that she was suspended?
10   A.  I don't remember.  I don't.
11   Q.  Was there any concern when she was suspended
12   that her husband might come to the store and confront
13   somebody about her situation?
14       Did you ever hear anything about that?
15   A.  No.
16   Q.  Now, you were the deli manager.  Is there any
17   kind of security cameras in that area of the store?
18   A.  There are security cameras, but not in the
19   department.
20   Q.  Do they show any portion of the deli
21   department?
22   A.  The very front of the case.
23   Q.  And what is the purpose of showing the front of
24   the case or having a camera on the front of the case?

B-58

Denise K. Dean

| Page 22 | Page 24 |
|---|---|
| 1  Do you know? | 1  the following week. |
| 2  A. Well, it's for surveillance of customers. | 2  Q. Who told you that? |
| 3  Q. So is the camera behind the case and shows the | 3  A. Steve Briley. |
| 4  customers coming up to the case?  Is that what it | 4  Q. And when did he tell you that?  Was it the same |
| 5  would show? | 5  day that you reported to him that Joyce Alphin had |
| 6  A. No. There's no cameras in the deli. | 6  made this complaint? |
| 7  Q. So where is the camera that shows the front of | 7  A. I don't remember.  It was before the next |
| 8  the case located?  Straight right above it? | 8  week's schedule started, so it was either on a Friday |
| 9  A. No. Out in the store up in the ceiling. | 9  or a Saturday. |
| 10  Q. And it shows the front of the deli case? | 10  Q. What did he tell you?  He said, "Just don't put |
| 11  A. Correct. And the cheese island. | 11  her on the schedule for the next week" or did he say, |
| 12  Q. The -- excuse me? | 12  "She's going to be transferred"? |
| 13  A. And the cheese island. | 13  A. He told me she was suspended until a meeting |
| 14  Q. The cheese island? | 14  and then not to put her on the schedule. |
| 15  A. Island, yes. | 15  Q. And how did you find out that she wasn't going |
| 16  Q. If you looked at the film of that -- and I know | 16  to be back to, be back at the Middletown store at all? |
| 17  it's not a film.  It's probably a digital recording. | 17  A. He told me. |
| 18      If you looked at the screen showing that, | 18  Q. When did he tell you that?  Do you remember? |
| 19  you would see the front of the case.  Would you see | 19  A. I don't remember. |
| 20  any of the employees? | 20  Q. Other than Joyce Alphin talking to you about |
| 21  A. You could probably see employees, but you | 21  this incident, did anybody else say anything to you |
| 22  probably can't figure out who they are. | 22  about what may have happened that night? |
| 23  Q. Why is that? | 23  A. Which incident? |
| 24  A. It's not actually in the department.  I guess | 24  Q. Joyce Alphin came to you and said that she had |

| Page 23 | Page 25 |
|---|---|
| 1  it's too far away. | 1  thrown a bucket of water, Gloria had thrown a bucket |
| 2  Q. Does it show the scale?  Can you see the scale | 2  of water. |
| 3  on that tape? | 3      Did anybody else tell you that Gloria had |
| 4  A. I don't think so. | 4  done anything that same night? |
| 5  Q. Do you ever have occasion to look at those? | 5  A. No. |
| 6  A. No. | 6  Q. When I asked the question, you said which |
| 7  Q. Well, then, how do you know what it sees then, | 7  incident?  Was there some other incident with Gloria? |
| 8  what it shows? | 8  A. Well, it is being said that there was ham.  I |
| 9  A. In the manager's office there is a TV screen | 9  don't remember ham. |
| 10  and it shows you exactly all the different cameras and | 10  Q. Where did you hear something about ham? |
| 11  that's what it shows, is the cheese island and the | 11  A. From another associate. |
| 12  front of the deli on that particular camera.  There's | 12  Q. Who? |
| 13  actually no cameras in departments. | 13  A. From Nancy. |
| 14  Q. Now, after Gloria was suspended and | 14  Q. When did you hear something about ham? |
| 15  transferred, did you ever have occasion to talk to her | 15  A. A couple of weeks ago about the ham incident, |
| 16  ever again? | 16  but I don't remember it at all. |
| 17  A. Not that I remember. | 17  Q. Nancy Coulborne told you that? |
| 18  Q. Have you talked to her husband again? | 18  A. Mm-hmm. |
| 19  A. No, not that I remember. | 19  Q. What did she tell you?  This was just, I mean |
| 20  Q. Had you ever talked to her husband? | 20  just a couple of weeks ago from now? |
| 21  A. No more than hello.  Basically that's it. | 21  A. Correct. |
| 22  Q. How did you find out that she was going to be | 22  Q. What did she say? |
| 23  suspended? | 23  A. She just said she heard about ham being thrown. |
| 24  A. I was told not to put her on the schedule for | 24  Q. She didn't say she saw ham -- |

B-59

Joyce A. Alphin

| Page 6 | Page 8 |

**Page 6**

1   A.  Yes.

2   Q.  That's the job you had when you first came to

3   Acme in Middletown?

4   A.  Yes.

5   Q.  Did you work with Gloria Nieves?

6   A.  Yes.

7   Q.  So you both worked nights?

8   A.  Yes.

9   Q.  Were you friendly with Gloria?

10  A.  Yes.

11  Q.  Did you ever complain to anybody, either the

12  deli manager or the store manager, about Gloria?

13  A.  At sometime, yes.

14  Q.  How often did you make a complaint about her?

15  Was it more than once?

16  A.  Probably -- yes, more than once.

17  Q.  What did you complain about?

18  A.  It was toward the end.  You know, for the first

19  time, for the longest time we got along, Gloria and I,

20  and it was toward the end, like about six months after

21  we worked together.

22  Q.  What kind of problems came up?  What happened?

23  A.  She got mad at me for talking to two other

24  girls.

**Page 7**

1   Q.  Did she tell you about that?

2   A.  Yes.  She told me not to talk to them if I was

3   going to talk to her.

4   Q.  And who were the two girls?

5   A.  Chrissy, Chrissy Shaw I think it is and the

6   other girl's name is Kim, but I don't know her last

7   name.

8   Q.  Did Gloria tell you why she didn't want you to

9   talk to them?

10  A.  She said they would stab me in the back.

11  Q.  That they would stab you in the back?

12  A.  Right.

13  Q.  Did you ask her what she meant by that?

14  A.  No.  I just told her that I was old enough to

15  make my own decision on who I would talk to.

16  Q.  Did you ever hear any of the employees at Acme

17  make any kind of derogatory remarks about Gloria?

18  A.  No.

19  Q.  You never heard them say anything about her

20  speaking Spanish or her accent?

21  A.  No.

22  Q.  Did you go to somebody to complain about Gloria

23  telling you not to talk to those two girls?

24  A.  No.

**Page 8**

1   Q.  Other than that, she told you don't talk to

2   those two girls or she would get mad at you because

3   you did --

4   A.  Right.

5   Q.  -- did you have any other problems with Gloria?

6   A.  We stopped talking.  And her and I closed at

7   night, so it was just her and I toward the end of the

8   night.  And one night she picked a bucket of water up

9   and threw it down the counter at me and it splashed

10  all over my arm.  I just looked at her and then she

11  picked up a slab of ham and threw it at me.

12       And then about two nights later I was

13  wiping the bottom of the counter and I was squatted

14  down and she took the mop and almost knocked me off my

15  feet.

16  Q.  Okay.  So there was one night she threw a

17  bucket of water and a slab of ham?

18  A.  Right.

19  Q.  Then two nights later there was something with

20  a mop?

21  A.  Right.

22  Q.  Now, the situation with the water and the ham,

23  did you complain to anybody about that?

24  A.  I told Denise, the manager.

**Page 9**

1   Q.  When did you tell her that?

2   A.  The next morning when I came in.

3   Q.  And the thing with the mop two nights later --

4   A.  That was on a Friday and I worked Saturday

5   morning and I told Denise that I was not going to work

6   with her no more.

7   Q.  Now, other than those incidents -- and that was

8   near the end of the time Gloria was at the Middletown

9   store, right?

10  A.  Right.

11  Q.  Did you ever complain to anybody at Acme

12  management about Gloria?

13  A.  No.

14  Q.  Did you ever tell Denise Dean or Mr. Briley

15  that Gloria's attitude was bad or anything along those

16  lines?

17  A.  I may have said it.  I don't recall.  Because

18  the tension was real thick back there.  It was really

19  tough.

20  Q.  Why was that?

21  A.  Because she wasn't speaking and, you know, if I

22  asked her something she would ignore me.  And she was

23  management, she was second in command.  And if I asked

24  her a question, she would just turn around, turn her

B-60

3  (Pages 6 to 9)

Joyce A. Alphin

Page 10

1  head and walk away from me.
2    Q.  And that was the last six months or so that she
3  was there?
4    A.  That was toward the end of the six months.  I
5  mean, her and I got along great.
6    Q.  Until then?
7    A.  Until then, yeah.
8    Q.  During the times when you were getting along
9  great, did she ever talk to you about problems that
10  she was having with any other Acme employees?
11    A.  Yeah.  Because it was just, you know, this one
12  and that one and all that but, you know, I never seen
13  it or heard it.
14    Q.  What did she say was going on?
15    A.  That they would pick on her or talk about her
16  and she said that they would be talking to me about
17  her.  Nobody has ever talked to me about her.
18    Q.  What kind of things did she say they were doing
19  picking on her?
20    A.  She said they would make fun of her language or
21  things like that.
22    Q.  Her accent?
23    A.  Yeah.
24    Q.  Did she ever tell you that somebody had asked

Page 11

1  her whether she had a green card, that kind of thing?
2    A.  No.
3    Q.  Nothing like that?
4    A.  No.
5    Q.  But you never heard anybody say anything about
6  that to her?
7    A.  No.
8    Q.  Do you know if she ever talked to Denise Dean
9  or Steve Briley about those things?
10    A.  No.
11    Q.  You don't know?
12    A.  No.
13    Q.  One of the coworkers I believe was named
14  Michele Warren?
15    A.  Yeah.
16    Q.  Did she work in the deli also?
17    A.  Yes.
18    Q.  And she no longer works at Acme.  Is that
19  right?
20    A.  No.
21    Q.  Do you know why?
22    A.  I think it was because of samples or something
23  like that.  I wasn't there that day.
24    Q.  She got terminated?

Page 12

1    A.  Yes.
2    Q.  Did you ever talk to Michele Warren about
3  Gloria Nieves?
4    A.  No.
5    Q.  Do you know where Michele Warren is now?
6    A.  She drives a school bus, I think.
7    Q.  Do you know for whom?
8    A.  Oh, God.  I want to say Boulden.
9    Q.  You're not sure?
10    A.  No.
11    Q.  Have you seen her lately?
12    A.  No.
13    Q.  Why do you believe she drives a school bus now?
14    A.  Because she started out with us, the same
15  company, and she left us and went to McKean and she
16  was fired from McKean.  And I don't know who she's
17  driving for right now, but I know she's still driving.
18    Q.  When you say, "started out with us" --
19    A.  At Stapleford's.
20    Q.  What school do you drive for or what school
21  district?
22    A.  I drive for St. Georges Vo-Tech.  They're not
23  in the district.  They're by themself.  It's a vo-tech
24  school.

Page 13

1    Q.  Does your company drive for other than that
2  school?
3    A.  Yeah.  We drive for Colonial School District
4  and Appoquinimink School District.
5    Q.  Did Gloria ever complain to you about anything
6  else or talk to you about any other problems she's
7  had?
8    A.  Her husband.
9    Q.  What did she say?
10    A.  That he was beating on her and he would take
11  her check and she wasn't allowed to have the money
12  from her check.  And she borrowed money a couple of
13  times off of me because he didn't allow her to have
14  money.
15    Q.  Did she pay it back?
16    A.  Yeah.
17    Q.  Did you know her husband?
18    A.  I met him one time.
19    Q.  Was it in the store?
20    A.  Yes.
21    Q.  He came into the store to see Gloria or to shop
22  or something?
23    A.  Yeah.  She said he comes in to check on her.
24    Q.  But you only saw him one time?

B-61

Joyce A. Alphin

| Page 14 | Page 16 |
|---|---|

**Page 14**

1  A. Right. No. I mean I saw him in the store but,
2  you know, she only introduced us the one night.
3  Q. How often did you see him in the store?
4  A. He would be there maybe every time she worked
5  or he would skip a night that she was working.
6  Q. So he was in the store almost every night?
7  A. Mm-hmm, that she worked.
8  Q. Other than her husband and you said she
9  complained about her husband to you and she complained
10  about some of the other workers picking on her --
11  A. Right.
12  Q. -- did she complain to you about anything else?
13  A. No.
14  Q. Did she ever tell you that she thought she was
15  doing more of the work than everybody else?
16  A. No.
17  Q. Now I'm going to ask you some details about the
18  situation with the water bucket and the ham.
19  A. Okay.
20  Q. You said, I think, that that was near the end
21  of your shift?
22  A. Yeah.
23  Q. And you and she were cleaning up. Is that
24  right?

**Page 15**

1  A. Yes.
2  Q. Did you have some kind of argument or something
3  like that or just out of nowhere she threw something?
4  A. I asked for the water bucket and she picked it
5  up and threw it down the counter at me.
6  Q. What kind of bucket was it?
7  A. It's just a little bucket about this tall
8  (indicating). It's a red bucket and it holds
9  sanitizer.
10  Q. So it wasn't a metal mop bucket?
11  A. No. No.
12  Q. And she threw it down the top of the counter?
13  A. Yeah. She picked it up and just threw it down
14  at me.
15  Q. This was not a bucket on the floor?
16  A. No.
17  Q. And when you motioned about this high, it was
18  about 10 inches tall?
19  A. Yeah, about that high.
20  Q. And holds how much? A couple of quarts?
21  A. Yeah, couple of quarts. They're just little
22  wash buckets for wiping down the counters and slicers.
23  Q. And did she throw the water at you or the whole
24  bucket?

**Page 16**

1  A. The whole bucket.
2  Q. So she slid it down the counter?
3  A. She picked it up off the counter and threw it.
4  Q. Did it splash on you?
5  A. Yeah.
6  Q. And then what happened after that?
7  A. Then --
8  Q. Did you say something to her?
9  A. No. I just looked at her, shook my head
10  because, you know, we still had customers coming in
11  and all, so there wasn't no sense in arguing over it.
12  Q. Then what happened?
13  A. And she had a piece of meat that was just a
14  little piece left over from the slicer and she acted
15  like she was throwing it to the trash can and she
16  missed and hit me with it and just looked at me.
17  Q. Did you say anything to her then?
18  A. Nope.
19  Q. Did she say anything to you?
20  A. Nope.
21  Q. So about what time was this? It was near the
22  end of your shift did you say?
23  A. About 9:30, 10:00 o'clock.
24  Q. And who was in charge of the store at that

**Page 17**

1  point? Was there a manager there or assistant
2  manager?
3  A. No. It was front end, which would have been
4  the same thing as I am now.
5  Q. Who was that? Do you recall?
6  A. Kyle Curry.
7  Q. Say that again.
8  A. Kyle Curry.
9  Q. Is that C-u-r-r-y?
10  A. Yes.
11  Q. Kyle Curry?
12  A. Mm-hmm.
13  Q. Is that a man?
14  A. Yes.
15  Q. Did you go tell him that there was a problem?
16  A. No. No.
17  Q. Why not?
18  A. No. Because he was a younger guy and, you
19  know, I wasn't going to involve him in it.
20  Q. Who was in charge of the deli at that point?
21  A. Denise Dean.
22  Q. But she wasn't there at night, right?
23  A. Right. It was Gloria.
24  Q. So Gloria was in charge of the deli at night?

B-62

5 (Pages 14 to 17)

Joyce A. Alphin

---

### Page 18

1   A. Yes.

2   Q. Do you know how she got to be in charge, how

3  she got that job?

4   A. By seniority.

5   Q. How do you know that?

6   A. Because I pretty much knew who was next in line

7  for, you know, positions.

8   Q. Did anybody ever complain about the fact that

9  Gloria got that job?

10   A. No.

11   Q. No?

12   A. No.

13   Q. Okay. So Denise Dean was in charge of the

14  deli. When did you tell Denise Dean about this

15  incident?

16   A. The first one was the next morning.

17   Q. What day of the week was this? Do you

18  remember?

19   A. No. I would figure it was probably a Tuesday

20  night.

21   Q. And then Denise Dean comes in at what time?

22   A. She's there by 5:00 o'clock in the morning.

23   Q. And when did you talk to her about the

24  situation?

### Page 19

1   A. When I got done the school bus run.

2   Q. So you went over to Acme before your workday at

3  Acme began?

4   A. I gave her a call.

5   Q. You called her on the telephone?

6   A. Mm-hmm.

7   Q. Did you go and talk to her in person?

8   A. Not until I showed up next on Saturday for

9  work.

10   Q. So you think it was a Tuesday night?

11   A. Yeah.

12   Q. You didn't work again until Saturday?

13   A. No. We get two nights off, so it would have

14  been Wednesday, Thursday and then I worked Friday

15  night.

16   Q. So you called Denise Dean and you told her --

17  do you remember what you told her?

18   A. That just, you know, her attitude, Gloria's

19  attitude was bad and she had picked a bucket of water

20  up and threw it at me. And then I said she threw a

21  piece of ham at me and I told her I didn't want to

22  work with Gloria anymore.

23   Q. What did Denise say to you?

24   A. She said she would check into it, but the

### Page 20

1  schedule was already posted and they pretty much made

2  the schedule for the following week.

3   Q. And did she say she was going to talk to

4  somebody else about the situation?

5     MS. FONG: Objection as to form.

6     MR. BARTOSHESKY: What's the nature of the

7  objection?

8     MS. FONG: You're leading.

9     MR. BARTOSHESKY: It's leading? This is

10  an adverse witness. I'm allowed to ask leading

11  questions.

12  BY MR. BARTOSHESKY:

13   Q. She's not instructed you not to answer. Do you

14  know what? I'll change the question.

15     Did Denise tell you what she was going to

16  do about the situation?

17   A. She said she would check into it.

18   Q. And when's the next time you talked to Denise

19  Dean about your problems with Gloria?

20   A. Saturday morning when I came into work.

21   Q. And why were you there Saturday morning?

22   A. Because I worked.

23   Q. You weren't working Saturday nights?

24   A. No.

### Page 21

1   Q. So sometimes you worked during the day shift?

2   A. During the week I worked nights; during the

3  weekends, day shift.

4   Q. So you saw Denise Saturday morning?

5   A. Right.

6   Q. Had you worked with Gloria in the interim?

7   A. Friday night.

8   Q. So you worked Friday night and then you were

9  going to work Saturday morning too?

10   A. Right.

11   Q. So you worked a double shift?

12   A. No. As long as you have so many hours in

13  between the shifts and I didn't have to come in until

14  7:00 o'clock in the morning.

15   Q. So you worked until like what time Friday

16  night?

17   A. Till 11:00, 11:30.

18   Q. Then you came back in at what time on Saturday?

19   A. 7:00.

20   Q. 7:00 Saturday morning. When you saw Denise

21  Dean at about 7:00 on Saturday morning, what did you

22  say to her?

23   A. That Friday night was the last straw; that

24  Gloria took the mop and tried to knock me off my feet.

B-63

Joyce A. Alphin

Page 22

1  And I said that there were too many knives and things
2  back there and I wasn't playing her games anymore.
3   Q.  Tell me what happened Friday night with Gloria.
4   A.  It was toward the end of the night.  We were
5  finishing up mopping up the floors, sweeping up and I
6  was wiping the front of the deli counter and I was
7  squatted down and she took the mop right behind my
8  feet and almost knocked me over.
9   Q.  And did you say anything to her?
10   A.  Nope.
11   Q.  Did she say anything to you before she did
12  that?
13   A.  Nope.
14   Q.  It was just out of nowhere as far as you were
15  concerned?
16   A.  Yep.
17   Q.  And did you report this incident to anybody
18  before you talked to Denise Dean the next morning?
19   A.  No.
20   Q.  Again, was there any manager or assistant
21  manager on duty that night?
22   A.  It could have been Kyle or Joe.  I don't
23  recall.
24   Q.  Who is Joe?

Page 23

1   A.  He's another, he was another front end manager.
2  He's not there anymore.
3   Q.  But you didn't report anything to them?
4   A.  No.
5   Q.  Okay.  When you talked to Denise Dean the next
6  morning, Saturday morning, what did you tell her?
7   A.  That that was the last straw; I wasn't working
8  with her no more and if they didn't do something, then
9  I was done, I was quitting.
10   Q.  And what did she say to you?
11   A.  She called Steve Briley back, which was the
12  store manager.
13   Q.  Called him back?  What do you mean by that?
14   A.  Back into the deli.
15   Q.  Did you talk to Mr. Briley?
16   A.  Yes, I did.
17   Q.  What did you tell him?
18   A.  I told him exactly what had happened with the
19  water and the ham and the mop.  And I told him, you
20  know, I wasn't going to play the games no more.  I
21  said there was knives in the deli and all and I said
22  the way she's been acting I'm not playing her.
23   Q.  And what did he say to you?
24   A.  He told me to just settle down and that he

Page 24

1  would take care of it.
2   Q.  And do you know what he did?
3   A.  Well, I had left that day.  I was done.  So
4  when I was done my shift, I left.  And then when I
5  went back in, I heard she had gotten suspended.
6   Q.  When did you go back in?
7   A.  Sunday morning.
8   Q.  Now, other than you talked to Denise Dean about
9  this situation and you talked to Mr. Briley about the
10  situation, did anybody else ask you about what
11  happened?
12   A.  No.
13   Q.  Nobody from personnel or anything like that?
14   A.  No.
15   Q.  Anybody from the union?
16   A.  No.
17   Q.  Going back to the night with the bucket of
18  cleaner and the ham, was there anybody else in the
19  deli department that saw that happen?
20   A.  No.
21   Q.  And in the Friday night incident with the mop
22  handle, did anybody else see that happen?
23   A.  No.
24   Q.  Normally how many people were working in the

Page 25

1  deli at one time?
2   A.  There was two closers and that would have been
3  Gloria and I, and then the other people get off at
4  8:00 and 9:00.
5   Q.  How many other people were there?
6   A.  There would be about four to five, depending on
7  how busy we were.
8   Q.  Four to five total?
9   A.  Mm-hmm.
10   Q.  So you and Gloria and two or three others?
11   A.  Right.
12   Q.  The others left earlier than you and Gloria?
13   A.  Right.
14   Q.  Is that because that's just how the assignments
15  were?
16   A.  Yes.
17   Q.  Why is it that you and Gloria were the ones
18  assigned to I guess clean up?
19   A.  Because that's the hours we picked.
20   Q.  So you started a little later and stayed a
21  little later than the others?
22   A.  Yes.
23   Q.  Is any part of the deli area seen by some kind
24  of a security camera?

B-64

Joyce A. Alphin

| Page 26 | Page 28 |
|---|---|

**Page 26**

1  A.  No.
2  Q.  No?
3  A.  I mean, it catches maybe when you're up on the
4  front line, but that's about it.
5  Q.  Would this camera have captured any of the
6  incidents with you and Gloria?
7  A.  No.  No.
8  Q.  When you clean up the deli, you and Gloria were
9  there later to clean up, has the deli been shut down
10  until the next morning?
11  A.  No.  You do the work as you're waiting on
12  customers.
13  Q.  But does it shut down until the next morning?
14  A.  When we're done, yes.
15  Q.  So the deli is only opened until like 10:00
16  o'clock or something?
17  A.  10:30, 10:00 o'clock.  11:00 o'clock it was
18  then.  They have changed it now.
19  Q.  But does the store stay open the rest of the
20  night?
21  A.  No.  We close at midnight.
22  Q.  The whole store closes at midnight?
23  A.  Yes.
24  Q.  Then opens at what time in the morning?

**Page 27**

1  A.  6:00.
2  Q.  So the deli closed a little bit before the
3  store?
4  A.  Yes.
5  Q.  An hour or so?
6  A.  Yes.
7  Q.  Now a little bit more than an hour?
8  A.  Yeah.
9  Q.  Now, do you remember an Acme employ named
10  Amanda Cumberbatch?
11  A.  No.
12  Q.  No?
13  A.  (Witness shakes head).
14  Q.  Do you remember any Acme employee named Amanda?
15  A.  No.
16  Q.  Let me just make sure I have the timing
17  straight.  You talked to Denise Dean on a Saturday
18  morning about the problems with Gloria.
19       That was the second time you talked to her
20  about the problem?
21  A.  Yes.
22  Q.  And the next time you worked was Sunday
23  morning?
24  A.  Right.

**Page 28**

1  Q.  You didn't work Saturday night?
2  A.  No.  I worked Saturday day.
3  Q.  And then you worked Sunday morning?
4  A.  Right.
5  Q.  And that's when you found out that Gloria had
6  been suspended?
7  A.  Well, they said she was transferred.
8  Q.  Who told you that?
9  A.  One of the coworkers.
10  Q.  Do you remember who?
11  A.  No.
12  Q.  They said she had been transferred?
13  A.  Right.
14  Q.  Did you find out where she had been transferred
15  to?
16  A.  They said Smyrna.
17  Q.  You don't remember who told you that?
18  A.  No.
19  Q.  Did Denise Dean ever tell you what happened?
20  A.  No.
21  Q.  Or Mr. Briley?
22  A.  No.
23  Q.  So you just found out that you weren't going to
24  have to work with Gloria anymore?

**Page 29**

1  A.  Yes.
2  Q.  Did you ever talk to Gloria again?
3  A.  No.
4  Q.  Do you know if anybody from the store ever went
5  to Smyrna to see what was going on with Gloria?
6  A.  No.
7  Q.  Did you ever talk to Christina Shaw about
8  Gloria?
9  A.  No.
10  Q.  Was there any concern that you heard from any
11  coworkers or Acme management about Mr. Nieves coming
12  into the store after Gloria had been suspended?
13  A.  It was a while after and he'd come in and he
14  would linger around the deli area.  And I had talked
15  to B. J. and said, you know, I didn't think that he
16  should be hanging around there.
17       And she said, "Let me know if he's in the
18  store and we'll call the cops" because I got to where
19  I didn't want to go out to my car because his car
20  would be out in the parking lot.
21  Q.  When you say, "a while after," is that —
22  A.  Probably like a week or so after she was
23  transferred.
24  Q.  Did he ever talk to you?

B-65

Joyce A. Alphin

|  | Page 30 |
|---|---|
| 1 | A.  No. |
| 2 | Q.  And B. J. is who? |
| 3 | A.  Assistant manager. |
| 4 | Q.  Do you know her last name? |
| 5 | A.  No.  I can think of it but right now I can't. |
| 6 | Q.  So about a week or so after Gloria had been |
| 7 | transferred or a week or so after she was no longer |
| 8 | working at the Middletown store, you noticed |
| 9 | Mr. Nieves in the store near the deli department? |
| 10 | A.  Yes. |
| 11 | Q.  How many times? |
| 12 | A.  It was pretty much whenever I was in there. |
| 13 | You know, if I worked five days or six days, he would |
| 14 | show up. |
| 15 | Q.  So it was every night for five or six days? |
| 16 | A.  Yes. |
| 17 | Q.  And then at that point you went to B. J.? |
| 18 | A.  Yes. |
| 19 | Q.  And after you went to B. J. did he stop showing |
| 20 | up at some point? |
| 21 | A.  Eventually. |
| 22 | Q.  Did you ever call the police -- |
| 23 | A.  No. |
| 24 | Q.  -- or do anything like that? |

|  | Page 32 |
|---|---|
| 1 | A.  No.  But they would see his car out in the |
| 2 | parking lot and they would tell me he was out there. |
| 3 | Q.  Who is "they"? |
| 4 | A.  Like the associates that would be outside or |
| 5 | like if management walked out to check on carts, which |
| 6 | would be the front end manager, and, you know, they |
| 7 | would call me in the deli and tell me he was outside. |
| 8 | Q.  What kind of car was it?  Do you remember? |
| 9 | A.  He used to drive a little, red car. |
| 10 | Q.  And that's the one that people said that was |
| 11 | outside? |
| 12 | A.  Yes. |
| 13 | Q.  Did he ever talk to you about anything or |
| 14 | confront you, say anything to you? |
| 15 | A.  No. |
| 16 | Q.  Do you know if he said anything to anybody at |
| 17 | Acme? |
| 18 | A.  No. |
| 19 | Q.  You don't know? |
| 20 | A.  (Witness shakes head). |
| 21 | MR. BARTOSHESKY:  I think I'm just about |
| 22 | finished.  Let me just take a minute. |
| 23 | MS. MALLOY:  Okay. |
| 24 | (A brief recess was taken.) |

|  | Page 31 |
|---|---|
| 1 | A.  No.  They started walking me out to my car at |
| 2 | night. |
| 3 | Q.  Who is "they"? |
| 4 | A.  The front end guys, you know, or we would walk |
| 5 | out in a group.  You know, whoever was walking out |
| 6 | that time of night, we would walk out together. |
| 7 | Q.  Did you see him outside too? |
| 8 | A.  No.  I didn't -- I would just go right to my |
| 9 | car because they made me start parking up front. |
| 10 | Q.  Who is "they"? |
| 11 | A.  The management. |
| 12 | Q.  So management suggested that you park close to |
| 13 | the store because of the concern about Mr. Nieves? |
| 14 | A.  Yes. |
| 15 | Q.  When you say, "management," is that Denise Dean |
| 16 | or is it B. J.? |
| 17 | A.  B. J. and Steve. |
| 18 | Q.  Steve talked to you about that? |
| 19 | A.  Yeah. |
| 20 | Q.  How long did you do that, park close and get |
| 21 | escorted out or anything along those lines? |
| 22 | A.  For about two months. |
| 23 | Q.  And were you still seeing him two months later |
| 24 | in the store, Mr. Nieves? |

|  | Page 33 |
|---|---|
| 1 | BY MR. BARTOSHESKY: |
| 2 | Q.  Just a couple more things and then I'm going to |
| 3 | probably repeat some things that we went over before. |
| 4 | You say you don't remember working with |
| 5 | anyone named Amanda in the deli at Acme.  Is that |
| 6 | right? |
| 7 | A.  No. |
| 8 | Q.  Was there a Connie that worked at Acme? |
| 9 | A.  Yes. |
| 10 | Q.  Was there more than one Connie? |
| 11 | A.  One. |
| 12 | Q.  Just one? |
| 13 | A.  (The witness nodded.) |
| 14 | Q.  And was she a deli clerk also? |
| 15 | A.  Yes. |
| 16 | Q.  Did she work the same shift as you and Gloria? |
| 17 | A.  Every now and then. |
| 18 | Q.  Did some people rotate when you say every now |
| 19 | and then? |
| 20 | A.  Mm-hmm. |
| 21 | Q.  That's a yes? |
| 22 | A.  Yes. |
| 23 | Q.  Does Connie still work for Acme? |
| 24 | A.  No. |

B-66

CERTIFICATE OF SERVICE

I, Philip B. Bartoshesky, do hereby certify that on February 15, 2007, I sent one true and

correct copy of the foregoing **ANSWERING BRIEF TO DEFENDANT ACME MARKETS,**

**INC.'S OPENING BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY**

**JUDGMENT AND APPENDIX** via electronic filing to the following:

By First-Class Mail:

        Elizabeth A. Malloy, Esquire
        Buchanan, Ingersoll & Rooney, P.C.
        1835 Market Street, 14th Floor
        Philadelphia, Pennsylvania 19103-2985
        215-665-5310
        Attorney for Defendant ACME Markets, Inc.

By Hand Delivery:

        Jennifer M. Becnel-Guzzo, Esquire
        Buchanan Ingersoll & Rooney, PC
        1000 West Street, Ste. 1410
        Wilmington, DE 19801
        302-552-4208
        Attorney for Defendant ACME Markets, Inc.

                        **BIGGS & BATTAGLIA**
                        */s Philip B. Bartoshesky*
                        Philip B. Bartoshesky (#2056)
                        912 N. Orange Street
                        P.O. Box 1489
                        Wilmington, DE 19899
                        (302) 655-9677
                        Attorney for Plaintiff

February 15, 2007