## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

GLORIA NIEVES and EMILIO NIEVES,

    Plaintiffs,

        v.

ACME MARKETS, INC., a Delaware corporation
d/b/a Acme Markets No. 7816, ACME MARKETS,
INC., a Delaware Corporation d/b/a Acme Markets
No. 7836, ACME MARKETS, INC., a Pennsylvania
Corporation, d/b/a Acme Markets No. 7816,
ACME MARKETS, INC., a Pennsylvania
Corporation d/b/a Acme Markets No. 7836,

    Defendants.

CIVIL ACTION

Number: 06-123 (GMS)

JURY TRIAL
DEMANDED

## DEFENDANT ACME MARKETS, INC.'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

JENNIFER M. BECNEL-GUZZO (No. 4492)
BUCHANAN INGERSOLL & ROONEY PC
The Brandywine Building
1000 West Street, Suite 1410
Wilmington, DE 19801
(302) 552-4200
(302) 552-4295 (facsimile)
jennifer.becnelguzzo@bipc.com

and

ELIZABETH A. MALLOY (admitted pro hac vice)
BUCHANAN INGERSOLL & ROONEY PC
1835 Market Street
14th Floor
Philadelphia, PA  19103
(215) 665-8700

Attorneys for Defendant,
Acme Markets, Inc.

Dated:  February 28, 2007

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................... 1

II.   ARGUMENT.......................................................................................... 2

      A.    Standard ....................................................................................2

      B.    Even With Facts Construed In a Light Favorable to Ms. Nieves,
            Her Hostile Environment Claim Under Title VII and 42 U.S.C. §
            1981 Fails As a Matter of Law Because She Cannot Prove the
            Complained of Conduct was Severe or Pervasive as Required by
            Law. ...........................................................................................2

            1.    Ms. Nieves Misconstrues the Record................................2

            2.    The Conduct Does Not Establish A Hostile Work
                  Environment.....................................................................7

      C.    Even With Facts Construed in a Light Favorable to Ms. Nieves,
            Her Retaliation Claim Under Title VII and 42 U.S.C. § 1981 Fails
            As a Matter of Law Because She Cannot Establish a Causal Link
            and Acme Had A Legitimate Non-Discriminatory Reason For Its
            Actions. ...................................................................................10

      D.    Even With Facts Construed in a Light Favorable to Ms. Nieves,
            Her Constructive Discharge Claim Fails Because Her Claim is
            Barred for Failure to Exhaust Her Remedies, and Fails As a Matter
            of Law Because She Cannot Establish Such Intolerable Conditions
            That A Reasonable Person in Her Position Would Feel Compelled
            to Resign. ................................................................................15

      E.    Ms. Nieves Does Not Have A Viable Cause of Action for
            Intentional Infliction of Emotional Distress Because It is Barred
            By Delaware's Workers Compensation Act and Acme's Actions
            were Not So Severe and Outrageous. ......................................17

      F.    Ms. Nieves Does Not Oppose Acme's Arguments on Good Faith
            and Fair Dealing and Disparate Treatment. ............................19

III.  CONCLUSION.................................................................................... 20

# TABLE OF AUTHORITIES

## CASES

Angeloni v. Diocese of Scranton, 135 Fed. Appx. 510 (3d Cir. 2005)............................ 17

Arasteh v. MBNA America Bank, 146 F. Supp. 2d 476 (D. Del. 2001) ........................... 5

Billet v. Cigna Corp., 940 F.2d 812 (3d Cir. 1991) ...................................................... 12

Blackburn v. United Parcel Serv., 179 F.3d 81 (3d Cir. 1999).......................................... 6

Caver v. City of Trenton, 420 F.3d 243 (3d Cir. 2005) ...................................................... 5

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ................................................................. 2

Chambers v. Doe, 453 F. Supp. 2d 858 (D. Del. 2006)...................................................... 6

Collins v. African Methodist Episcopal Zion Church, 2006 WL 1579828
    (Del. Super. March 29, 2006) .................................................................................. 18

Duffy v. Paper Magic Group, Inc., 265 F.3d 163 (3d Cir. 2001) .................................... 17

EEOC v. Avecia, Inc., 151 Fed. Appx. 162 (3d Cir. 2005)............................................... 18

Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509 (3d Cir. 1993).............. 12, 13

Farrell v. Planters Lifesavers Company, 206 F.3d 271 (3d Cir. 2001)............................ 10

Hardage v. CBS Broadcasting Corp., 427 F.3d 1177 (9th Cir. 2005) ............................. 17

Harris v. Forklift Sys., Inc., 510 U.S. 17 (1993)................................................................. 7

Hirchfield v. New Mexico Corrections Dept., 916 F.2d 572 (10th Cir. 1990)................. 17

Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101 (3d Cir. 1997)............................ 11, 12

Konstantopoulos v. Westvaco Corp., 690 A.2d 936 (Del. 1996) ..................................... 18

Krouse v. American Sterilizer Co., 126 F.3d 494 (3d Cir. 1997)...................................... 11

Neal v. Honeywell, Inc., 958 F. Supp. 345 (N.D. Ill. 1997)............................................. 16

Ocasio v. Lehigh Valley Family Health Center, 92 Fed. Appx. 876 (3d. Cir. 2004) ......... 8

Patel v. Cigna Corp., 2005 WL 1656930 (D.N.J. July 12, 2005) ....................................... 9

Philbin v. Trans Union Corp., 101 F.3d 957 (3d Cir. 1996)............................................... 2

Podobnik v. Postal Serv., 409 F.3d 584 (3d Cir. 2005) ...................................................... 2

Rafferty v. Hartman Walsh Painting Co., 760 A.2d 157 (Del. 2000)............................... 18

Sherrod v. Philadelphia Gas Works, 57 Fed. Appx. 68 (3d Cir. 2003) .......................... 8, 9

Smith v. Bath Iron Works Corp., 943 F.2d 164 (1st Cir. 1991) ....................................... 17

Williams v. Borough of West Chester, 891 F.2d 458 (3d Cir. 1989) ................................. 6

**RULES**

FED. R. CIV. P. 56(e).......................................................................................................... 2

## I.    INTRODUCTION

Defendant Acme Markets, Inc. ("Defendant" or "Acme") hereby submits this Reply Brief in support of its Motion for Summary Judgment. Summary judgment should be granted in Acme's favor because:

1) despite Ms. Nieves' attempt to exaggerate the circumstances and distort the record, the undisputed facts demonstrate that the complained of conduct was not severe or pervasive to rise to a level of hostile environment;

2) there was no causal nexus between Ms. Nieves' alleged protected activity and any adverse action she experienced, and Acme had a legitimate, non-discriminatory reason for transferring Ms. Nieves;

3) Ms. Nieves' claims under Title VII and the Delaware Discrimination Act are barred for failure to exhaust her administrative remedies, and fall far short of the legal standard for constructive discharge – she cannot meet the high legal threshold required to prove constructive discharge, which requires that the conditions were *so intolerable* because of discrimination that a reasonable person in her position would be compelled to resign;

4) Ms. Nieves cannot prove that Acme deliberately intended to injure her to except it from the Workers Compensation Act, and Acme's behavior was not sufficiently extreme and outrageous to be intentional infliction of emotional distress. Thus, the derivative claim of loss of consortium also fails; and

5) Ms. Nieves does not respond in any way to Defendant's arguments for both her good faith and fair dealing claim and her disparate treatment claim, if any, indicating that she has no legal basis to pursue these claims.

1

## II.    ARGUMENT

### A.    Standard

To survive summary judgment, a party must present "more than just bare assertions, conclusory allegations, or suspicions" to show the existence of a genuine issue. Podobnik v. Postal Serv., 409 F.3d 584 (3d Cir. 2005)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). The party must set forth admissible evidence establishing a genuine issue for trial. FED. R. CIV. P. 56(e); Celotex Corp., 477 U.S. at 324. Even viewing the facts in the light most favorable to the non-moving party, hearsay statements are not admissible at trial and cannot be considered on a motion for summary judgment. Philbin v. Trans Union Corp., 101 F.3d 957, 961 (3d Cir. 1996).

### B.    Even With Facts Construed In a Light Favorable to Ms. Nieves, Her Hostile Environment Claim Under Title VII and 42 U.S.C. § 1981 Fails As a Matter of Law Because She Cannot Prove the Complained of Conduct was Severe or Pervasive as Required by Law.

A review of all the admissible evidence and an undistorted record in the light most favorable to Ms. Nieves reveals that Ms. Nieves' complaints do in fact, revolve around a handful of comments. However, in an effort to avoid summary judgment on her hostile environment claim, Ms. Nieves grossly exaggerates the record by making broad statements that her co-workers allegedly made discriminatory comments at her "frequently," "numerous" times, and on an "almost daily" basis.

#### 1.    Ms. Nieves Misconstrues the Record.

In Acme's opening brief, Acme described and discussed all of the conduct which Ms. Nieves testified at her deposition that she considered to be hostile. Contrary to Ms. Nieves' bold blanket statements in her response, Ms. Nieves herself testified that these incidents did not all occur as frequently as she purports.

2

For instance, Ms. Nieves purports that she was told "many times" not to speak Spanish to Spanish-speaking customers. Answering Brief, p. 3. While she did testify that her co-workers, Michelle Warren and Nancy Colbourn, asked her to speak English, Ms. Nieves omits from her response that Ms. Colbourn in fact only asked her to speak English <u>one time</u>. (Q: "So Nancy one day when you were interacting with a customer told you to speak English?" A: "Yes." Q: "And it only happened on that one day?" A: "One day".) G. Nieves Dep., A23, p. 34. She insinuates that Acme management forbade her from speaking Spanish to customers even though they admitted that doing so was encouraged. Answering Brief, p. 3. However, her testimony clearly reflects that no supervisor at Acme ever told her that she needed to speak English with customers. (Q: "Did any supervisor at Acme ever tell you that you needed to speak English with customers?" A: "No. Never, never.") G. Nieves Dep., A34, p. 45. She also purports that when she obtained the full-time Senior night Deli Associate position, co-workers complained she should not be given the position because of her accent and questioned whether or not she had a green card. Answering Brief, p. 3. To the contrary, only <u>one co-worker</u>, Michelle Warren, asked why she received the position if her English was not good and asked whether she had a Green Card. G. Nieves Dep., A24-A25, A41, p. 35-36, p. 58. She also asserts that co-workers frequently questioned her intelligence by treating her as if she would not know common things such as the location of Alaska. Answering Brief, p. 3-4, 17. However, Ms. Nieves only identified <u>one incident</u> where her co-worker "<u>one day</u>" questioned her education by asking her whether she knew the location of Alaska. G. Nieves Dep., A28-A29, p. 39-40. Ms. Nieves also claims that on a number of occasions, or whenever the subject of drug use or abuse came up in

3

conversation, her co-workers would suggest talking to her because she would know better since she was from Colombia. Answering Brief, p. 4. Ms. Nieves testified in general terms that this happened "many times." G. Nieves Dep., A47, p. 65. Notably, however, when asked to identify the number of times a similar comment was made, Ms. Nieves responded "<u>four or five times</u>." <u>Id</u>.

Likewise, Ms. Nieves inflates the record even for those incidents that have nothing to do with her national origin. She states that "a co-worker frequently called her stupid." Answering Brief, p. 3. In fact, Ms. Nieves herself testified that her co-worker told her "<u>one day</u>" that her questions were "stupid." ("And Nancy, that girl told me <u>one day</u> that my question was all the time stupid.") G. Nieves Dep., A32, p. 43. Ms. Nieves also seriously misrepresents the record by stating that she was denied vacation twice where other co-workers' vacations were granted. Answering Brief, p. 4. On the contrary, Ms. Nieves in fact received the time she requested off on one occasion where another co-worker had asked for the day off first. (Q: "Did you get the day off?" A: "Yes.") G. Nieves Dep., A31, p. 42. On the second occasion, Ms. Nieves was denied vacation when she requested two or three weeks off during the month of December. <u>Id</u>. at A58-A59, p. 98-99. Ms. Nieves admitted that December was a very busy time of year at a food store and importantly, was unable to identify any other co-worker who did receive such time off in December of any year. (Q: "Is there anybody who you know got two or three weeks vacation in December any year?" A: "I don't know. I don't know.") <u>Id</u>. at A59-A60, p. 99-100.

To support her argument, Ms. Nieves also relies on numerous second-hand rumors of which she had no personal knowledge. For instance, her former co-worker,

4

Amanda Cumberbatch testified that she heard rumors that her co-workers bragged that they looked through Ms. Nieves' personnel file to see if she had a green card and one of them (Michelle Warren) went to stores in the area and told them not to hire Ms. Nieves because she was an illegal alien. Ms. Cumberbatch also testified that she heard her co-workers refer to Ms. Nieves as "the little Chihuahua." Even assuming for the purposes of summary judgment that these statements were true, there is no record or evidence that Ms. Nieves heard any of these comments. She did not testify to any of these comments in her deposition when she was asked about all the incidents she thought contributed to an alleged racially hostile environment. As a threshold matter, Ms. Nieves cannot rely on comments of which she had no personal knowledge or heard second-hand to prove a hostile work environment. Caver v. City of Trenton, 420 F.3d 243, 263 (3d Cir. 2005)(finding that plaintiff cannot meet burden of proving hostile work environment by relying on comments that were not directed at him); Arasteh v. MBNA America Bank, 146 F. Supp. 2d 476, 495 (D. Del. 2001)(co-worker's questioning plaintiff's orientation was not made in her presence and was merely repeated to plaintiff by co-worker; not enough to be severely hostile or abusive).

Even more compelling, Ms. Cumberbatch's testimony is so weak and unreliable that this court should give it no weight. For example, when she was asked what she knew about her co-workers looking through Ms. Nieves' personnel file, Ms. Cumberbatch responded, "I heard a rumor, but I don't know." Cumberbatch Dep., Ex. A at 47. When asked whether she remembers the person from whom she heard the rumor, she responded, "No, I do not. I can just tell you the grouping of people that was around." Id. at 48. When asked how she knew Ms. Warren went to local businesses, she responded

5

"Word of mouth. And like I said, that's all they do is talk and talk and talk, and you know everything." Id. at 23. When pressed for an individual, Ms. Cumberbatch responded that she heard the rumor from another co-worker by the name of Kim, who heard from someone else. Id. at 24. Finally, when asked who she heard call Ms. Nieves a "Chihuahua," Ms. Cumberbatch responded, "This would have been – this is the little clique." Id. at 19. Ms. Cumberbatch was both unable to identify the individual(s) who allegedly called Ms. Nieves a "Chihuahua" and unable to place the word in the context of conversation, but relied on mere conjecture that it was a "no-brainer." Id. at 21.

Ms. Nieves also claims her co-workers accused her of faking her illness when she was out sick. Answering Brief, p. 5. Again, Ms. Nieves omits the fact that she did not hear this information first-hand, but heard this unreliable rumor from Ms. Cumberbatch. (A: "They say. They say that. They thought I was faking my illness." A: "They said that to you?" A: "No. To Amanda Cumberbatch.") G. Nieves Dep., A37, p. 49. As a threshold matter, these comments are unrelated to Ms. Nieves' national origin. Moreover, Ms. Nieves heard them second-hand, and the source is so tenuous that they are not properly considered at this stage of summary judgment.

These allegations are also hearsay statements which are likely to be inadmissible in court. "A hearsay statement that is not capable of being admissible at trial should not be considered on a summary judgment motion." Blackburn v. United Parcel Serv., 179 F.3d 81, 95 (3d Cir. 1999); see also Chambers v. Doe, 453 F. Supp. 2d 858, 862 (D. Del. 2006). "Hearsay evidence...may [only] be considered if the out-of-court declarant could later present that evidence through direct testimony...." Williams v. Borough of West Chester, 891 F.2d 458, 466 n.12 (3d Cir. 1989)(quoting Celotex Corp., 477 U.S. at 324).

6

Here, much of the rumors lack an identifiable source from which direct testimony can cure.

Finally, Ms. Nieves complains that on more than one occasion, co-workers mocked her husband by quoting a line from a television show, "de plane, de plane." Answering Brief, p. 4. However, none of the cites referenced by her and nowhere in the record does it indicate that this incident happened on more than one occasion. G. Nieves Dep., A26-A27, p. 37-38. In any case, any comments directed at her husband and about her husband were not even directed towards Ms. Nieves and are irrelevant to the determination of a hostile environment. Therefore, the handful of comments about which Ms. Nieves complains simply do not equate to the overstated "constant barrage" of comments she alleges in her response. Answering Brief, p. 3.

2.    The Conduct Does Not Establish A Hostile Work Environment.

As discussed in Acme's opening brief, and echoed in Ms. Nieves' response, a court must consider a totality of the circumstances to determine whether an environment is sufficiently hostile. Opening Brief, p. 13. As established in Harris v. Forklift Sys., Inc., a totality of the circumstances include: 1) frequency; 2) severity; 3) whether conduct is physically threatening or humiliating rather than merely offensive; 4) whether it unreasonably interferes with an employee's work performance; and 5) effect on employee's psychological well-being. 510 U.S. 17, 23 (1993).

In addition to the frequency of comments, a court must also consider the remaining Harris factors. The complained of conduct, while insensitive, was certainly not physically threatening to Ms. Nieves. Also, as explained in Acme's opening brief, Ms. Nieves has presented no evidence that the comments were so extreme and severe that

they altered the conditions of Ms. Nieves' employment or unreasonably affected her psychological stability as required by the standard. In fact, all of the conduct was alleged to have been by co-workers. Ms. Nieves' response assesses Ms. Nieves' crying and the generally tense atmosphere in the deli department in a vacuum, and asks the Court to find a hostile environment based on these superficial reasons which are not tied in any regard to the allegedly harassing conduct.[1] Answering Brief, p. 16.

Ms. Nieves also makes a poor attempt to distinguish the cases on which Acme relies. Ms. Nieves tries to dispose of Ocasio v. Lehigh Valley Family Health Center, 92 Fed. Appx. 876 (3d. Cir. 2004), by saying that there were few incidents and no racial epithets, and that several of the claimed incidents were not even directed towards the plaintiff. Indeed, these are the exact circumstances in Ms. Nieves' situation. Ms. Nieves never testified to hearing that she was called a "Chihuahua," there were only a few incidents, and several of the claimed incidents were directed at her husband. The Ocasio court did not find that the environment was "severe enough to affect the psychological stability of a minority employee." 92 Fed. Appx. at 880.

Further, while making the argument that in modern times, facially neutral mistreatment must also be considered in evaluating a hostile environment, Ms. Nieves simultaneously attempts to distinguish Sherrod v. Philadelphia Gas Works, 57 Fed. Appx. 68 (3d Cir. 2003), by arguing that the comments in that case were subject to non-racial interpretation and were neither physically threatening or humiliating. Ms. Nieves cannot have it both ways, conveniently touting case law when to her benefit and overlooking it when not. The comments in Sherrod were made by a supervisor and included "the way

---

[1] Unlike Ms. Nieves' disingenuous assertions, Ms. Dean testified that Ms. Nieves cried because Ms. Nieves frequently told her that she was being abused by her husband at home. Dean Dep., Ex. B at p. 14, 17.

[African-American employees] were eating at their desks, it must be their culture" and if the employees were not working, "I'm going to sit at their desks with a whip." Id. at 75-76. Comparatively, the comments allegedly made by Ms. Nieves' co-workers certainly are subject to non-racial interpretation and certainly cannot plausibly be physically threatening or humiliating.

Ms. Nieves also misreads Patel v. Cigna Corp., 2005 WL 1656930 (D.N.J. July 12, 2005), claiming that in Patel, there were only five incidents over a one year period. On the contrary, while the plaintiff's contract was renewed for the duration of a one-year period on September 10, 2001, his contract was terminated a mere 19 days later on September 29, 2001. Id. at *1. The plaintiff in Patel was subjected to harassment right after the September 11, 2001 attacks on the United States, and in fact, five incidents occurred over the course of 19 days. In ensuring that Title VII does not become a "general civility code," the Patel court found these incidents insufficiently severe to establish a hostile environment, characterizing the incidents as "simple teasing and offhand comments." Id. at *10. Additionally, the court found the incidents were not pervasive. In light of Patel, the handful of incidents described by Ms. Nieves would similarly be insufficiently severe or pervasive.

Despite Ms. Nieves' tortured efforts to create disputed issues and distinguish the case law, the less than frequent, non-threatening nature of the comments are simply insufficient to rise to the severe or pervasive standard as required by law, and Acme is entitled to summary judgment on her hostile environment claim as a matter of law.[2]

---

[2] Plaintiff did not respond to the hostile environment claim under the Delaware Discrimination Act.

9

**C.    Even With Facts Construed in a Light Favorable to Ms. Nieves, Her Retaliation Claim Under Title VII and 42 U.S.C. § 1981 Fails As a Matter of Law Because She Cannot Establish a Causal Link and Acme Had A Legitimate Non-Discriminatory Reason For Its Actions.**

As discussed in Acme's opening brief, to establish retaliation, Ms. Nieves must show that she participated in a protected activity, that she experienced an adverse action, and there was a causal nexus between the two. In support of her argument that a causal connection may be established by circumstantial evidence which when viewed as a whole, supports the inference of retaliation, Ms. Nieves cites to Farrell v. Planters Lifesavers Company, 206 F.3d 271, 281 (3d Cir. 2001). However the court in Farrell importantly noted that this does not grant the plaintiff unconditional latitude to identify remotely related evidence. Id. (requiring more proof than mere demonstration that the protected activity and the adverse action were not wholly unrelated). The court lists several examples of this type of evidence supporting an inference of retaliation: inconsistent reasons for the adverse action, a pattern of antagonism, and temporal proximity. Id. Even at this summary judgment stage, Ms. Nieves cannot meet her burden of proof on these factors.

To the contrary, Acme *consistently* explained that Ms. Nieves was suspended and transferred to the Smyrna store in accordance with policy because her co-worker complained that she violated personal conduct rules when Ms. Nieves threw food and water at her. Ms. Nieves also attempts to prove a pattern of antagonism by Acme by relying heavily on a generally tense work atmosphere to prove causation. As explained above and in Acme's opening brief, Title VII is not meant to be a "general civility code." Allowing such a reason to prove causation would make a plaintiff's burden of proving causation laughable. Finally, Ms. Nieves utterly fails to show temporal proximity.

Krouse v. American Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997)(timing must be "unusually suggestive" to establish causation). The timing between Ms. Alphin's complaint that Ms. Nieves threw ham and water at her and the suspension and transfer was a matter of days. Such was "unusually suggestive" to establish the inference that Acme's actions were indeed based on her violation of the personal conduct rules, not because Acme wanted to retaliate against her for her alleged complaints to management. Therefore, Ms. Nieves fails to establish a causal connection and Acme is entitled to summary judgment as a matter of law.

Assuming, *arguendo*, that Ms. Nieves could establish a prima facie case of retaliation, Acme easily surpasses its relatively low burden to show a legitimate, nondiscriminatory reason for suspending and transferring her. It is undisputed that Ms. Alphin complained to management that Ms. Nieves threw ham and a bucket of water at her. Such conduct is in contravention of Acme's rules governing workplace conduct, and in accordance with the work rules, Acme subjected Ms. Nieves to corrective action.

Ms. Nieves fails to rebut Acme's legitimate, non-discriminatory reason. As discussed in Acme's opening brief, to show pretext, Ms. Nieves must offer evidence to show that Acme's proffered reasons are unbelievable or that an invidious discriminatory reason was more likely than not the motivating cause for Acme's actions. Contrary to Ms. Nieves' assertion that she only needs to raise a doubt as to whether Acme's actions were true, she in fact must show that the reason was so obviously weak, incoherent, implausible or inconsistent that a reasonable fact finder could not believe the reason and thus could conclude that the reason was retaliatory. Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108-09 (3d Cir. 1997); Ezold v. Wolf, Block, Schorr & Solis-Cohen,

11

983 F.2d 509, 531 (3d Cir. 1993). Absent such an invidious reason, a company has a right to make business judgments on employee status, and a court will not disturb a valid business decision even if considered erroneous or in poor judgment to outsiders. Billet v. Cigna Corp., 940 F.2d 812, 825, 828 (3d Cir. 1991).

Ms. Nieves goes to lengths to not focus on Acme's articulated reason for suspending and transferring her - that Ms. Alphin complained about her inappropriate behavior. However, an analysis of pretext necessarily requires focusing on Acme's articulated reason, Ezold, 983 F.2d at 524, and Ms. Nieves carries the burden of challenging that reason. Nowhere in the record does Ms. Nieves dispute the fact that Ms. Alphin complained about her behavior, and, of course, Ms. Alphin testified that she complained. Instead, Ms. Nieves attempts to avoid summary judgment by splitting hairs as to what Acme remembers of Ms. Alphin's complaints. Contrary to Ms. Nieves' assertion that Acme's descriptions of Ms. Alphin's complaints are inconsistent, all Acme personnel who testified remember that Ms. Alphin complained that Ms. Nieves was yelling and throwing things. Ms. Nieves endeavors to paint a picture of inconsistency by making inconsequential distinctions in testimony as to the type of object thrown, or the location the water landed. Such minor inconsistencies are trivial and are evident of Ms. Nieves' flimsy attempt to establish inconsistency. These distinctions cannot make Acme's reason for suspending and transferring Ms. Nieves so "weak, incoherent, implausible, or so inconsistent" to be pretextual. Keller, 130 F.3d at 1109 (holding that plaintiff must show "not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason.").

Ms. Nieves also attempts to show pretext by stating incorrectly that Acme did not conduct an investigation on her co-worker's complaints that Ms. Nieves violated personal conduct rules. Answering Brief, p. 6, 21. Ms. Nieves cites to Denise Dean and B.J. Appenzeller's testimony for this assertion. Id. at 6. Both Ms. Dean and Ms. Appenzeller in fact explain that they relayed the information to Stephen Briley, the Store Director, who was the appropriate individual to handle such complaints. Dean Dep., A124, p. 19; Appenzeller Dep., Ex. C at 18. In explaining why she did not talk to Ms. Nieves about the incident, Ms. Dean explained, "No. Because I was the department head and I took it to the store director who was to handle it from there." Dean Dep., A124, p. 19. Notably, Ms. Nieves fails to cite to Mr. Briley's testimony, where he explains that he would not suspend an employee without first talking with that employee. Briley Dep., Ex. D at 17, 20. Additionally, Ms. Alphin also testified that Mr. Briley questioned her about the incident. Alphin Dep., A117, p. 23. Indeed, the record plainly demonstrates that Acme did conduct such an investigation and based its decision to suspend and transfer Ms. Nieves on the investigation. Briley Dep., Ex. D at 17-20; Moyer Dep., A130, p. 16. Ms. Nieves also accuses Acme of not following its progressive disciplinary policy when disciplining her, Answering Brief, p. 5, but conveniently ignores the established record that the progressive disciplinary policy is not used in situations of inappropriate personal conduct, which this was. Moyer Dep., A131, p. 17.

Ms. Nieves also attempts to cloud the record by introducing extraneous, irrelevant and inadmissible hearsay evidence. To prove pretext, Ms. Nieves cannot simply point to extraneous evidence on which Acme did not rely in making its decision. Ezold, 983 F.2d at 531. For example, Ms. Nieves purports that co-workers heard she was suspended and

13

transferred because her misconduct was videotaped. Ms. Nieves never testified that management told her that her conduct was recorded on videotape. Contrary to her assertion, Acme *consistently* testified that the store's video system did not record the area where the Ms. Nieves' misconduct occurred, and further did not rely on this extraneous "evidence" for its actions. Much like the other rumors in the deli department, this hearsay evidence amongst co-workers is not only inadmissible, but is also irrelevant to the analysis and is no doubt raised to distract the Court from the real issues.

Likewise, evidence that Acme personnel were escorted to their cars one night or told to harm Mr. Nieves if he came into the store is irrelevant to prove retaliation. Ms. Nieves testified that she heard the rumor from Ms. Cumberbatch, G. Nieves Dep., A64, p. 108, who testified that she heard it from another co-worker, Cumberbatch Dep., Ex. A at 24-25. Ms. Appenzeller testified that she simply told the girls that she would call the police if he bothered them because some of the employees told her that they were afraid of Mr. Nieves. Appenzeller Dep., A139, p. 28. This testimony cannot be inconsistent simply because she did not know what he looked like. In any event, Ms. Nieves attempts to confuse the court because any evidence about Mr. Nieves coming to the store is legally irrelevant to the determination of Ms. Nieves' retaliation claim.

Ms. Nieves has adduced no evidence that would enable a reasonable jury to find that Acme acted with retaliatory animus. Thus, Acme is entitled to summary judgment as a matter of law.[3]

---

[3] Plaintiff did not respond to the retaliation claim under the Delaware Discrimination Act.

14

**D.**    **Even With Facts Construed in a Light Favorable to Ms. Nieves, Her Constructive Discharge Claim Fails Because Her Claim is Barred for Failure to Exhaust Her Remedies, and Fails As a Matter of Law Because She Cannot Establish Such Intolerable Conditions That A Reasonable Person in Her Position Would Feel Compelled to Resign.**

In an attempt to sway this Court, Ms. Nieves preposterously puts the onus on Acme to help her beat the jurisdictional hurdle by claiming that Acme should have responded to the DDOL investigator's March 2005 letter in order to put the investigator on notice that her employment had ended and to put the issue within the scope of the investigation. It is simply not Acme's responsibility to assist Ms. Nieves to exhaust her remedies. Indeed, Ms. Nieves also received a March 2005 letter from the investigator indicating that it was not possible to issue a cause finding unless she had further information. At the time, Ms. Nieves was in Miami, Florida and testified that while she was there, she forgot about the case and did not even communicate with the DDOL until her return to Delaware many months later. Ms. Nieves had every opportunity, and more importantly, a duty, to communicate with the DDOL and to put the DDOL on notice of her departure from Acme and her purported reasons for leaving. Ms. Nieves should not be rewarded for ignoring communications from the DDOL.

Ms. Nieves cites to cases where discharge claims were allowed even though they were not part of the employee's original charge. These cases echo the reasoning in the cases Acme cites, which express that exhaustion is not required only where the incident falls within the scope of a prior administrative charge or the investigation that arose out of it. Ms. Nieves' argument that it was Acme's task to bring the constructive discharge issue within the scope of the investigation necessarily concedes that her discharge claim was not encompassed in her original charge. Additionally, she fails to adequately address

15

Acme's argument that her transfer generated new working conditions, new co-workers, and new facts. The relevant working conditions in a constructive discharge claim are those that exist at the time of the plaintiff's resignation, Neal v. Honeywell, Inc., 958 F. Supp. 345, 348 (N.D. Ill. 1997), none of which existed at the time Ms. Nieves filed her charge with the DDOL. Ms. Nieves' transfer and her testimony that she was happy at the Smyrna store require that the core operative facts that led to her alleged constructive discharge be different from those she shared with the DDOL. Because Ms. Nieves did not file a new charge with the DDOL after her transfer or resignation, her claim of constructive discharge under Title VII and the Delaware Discrimination Act is barred for failure to exhaust her administrative remedies.

Additionally, the undisputed facts demonstrate that Ms. Nieves cannot meet the high legal threshold necessary to establish a constructive discharge claim. As set forth in Acme's opening brief, the Third Circuit Court of Appeals has repeatedly held that a constructive discharge only occurs if the plaintiff can prove that the employer "knowingly permitted conditions of discrimination in employment *so intolerable* that a reasonable person subject to them would resign." Opening Brief, p. 18.

Ms. Nieves urges this Court to focus on the fact that Acme took no action in response to her alleged complaints at the Middletown store which ceased a full ten months before she resigned, and attempts to single-handedly distinguish the cases relied on by Acme in this manner. In doing so, she glosses over the fact that a determination of constructive discharge is governed by whether the conditions are *so intolerable* that a reasonable person in her position would have felt compelled to resign, not whether Acme took any action in response to her alleged complaints. Therefore, Angeloni v. Diocese of

16

Scranton, 135 Fed. Appx. 510 (3d Cir. 2005), and Duffy v. Paper Magic Group, Inc., 265 F.3d 163 (3d Cir. 2001), are very much applicable to show that constructive discharge claims fail when plaintiffs resigned after a period of time where the harassment ceased.[4] Similarly, the undisputed facts clearly indicate that the complained of conduct did end when Ms. Nieves transferred to the Smyrna store.  By her own testimony, Ms. Nieves admits that she was happy at the Smyrna store and that she got along with everyone there. Ms. Nieves' response attempts to associate a sole incident at the Smyrna store with the seafood manager to the allegedly discriminatory conduct at Middletown.  However, one incident five months after the alleged discriminatory conduct stopped and four months before she resigned is insufficient to show constructive discharge.

> **E.** **Ms. Nieves Does Not Have A Viable Cause of Action for Intentional Infliction of Emotional Distress Because It is Barred By Delaware's Workers Compensation Act and Acme's Actions were Not So Severe and Outrageous.**

Ms. Nieves' claim of intentional infliction of emotional distress must fail.  Ms. Nieves accurately explains that the Workers Compensation Act does not bar a claim where the employer had true intent to injure the employee, but then fails to adequately address a true intent by Acme to deliberately injure her.  Ms. Nieves alleges that Acme ignored her complaints about her co-workers' comments and then suspended and transferred her.  She suggests that this allegation is sufficient to allow the claim to remain separately actionable as a common law tort claim, but her position is unsupported by any authority.  To show true intent, the facts must show a deliberate and specific intent by the

---

[4] See also Hardage v. CBS Broadcasting Corp., 427 F.3d 1177, 1184 (9th Cir. 2005)(no constructive discharge where employee resigned five months after purported harassment ceased); Smith v. Bath Iron Works Corp., 943 F.2d 164 (1st Cir. 1991)(no constructive discharge where female employee did not resign until six months after last reported incident of sexual harassment, resignation had to have taken place "within reasonable time"); Hirchfield v. New Mexico Corrections Dept., 916 F.2d 572 (10th Cir. 1990)(no constructive discharge where last incident occurred four months before resignation).

employer to bring about an injury. <u>Rafferty v. Hartman Walsh Painting Co.</u>, 760 A.2d 157, 160 (Del. 2000)(finding failure of employer to provide adequate safety procedures and training programs insufficient to show actual intent to injure employee). Additionally, it is not enough to allege facts showing that the employer intended to do an action and the worker was injured as result. <u>EEOC v. Avecia, Inc.</u>, 151 Fed. Appx. 162, 166 (2005). As evidenced by these cases, it is rare to find such true intent in employment cases. Even sexual harassment claims are not excepted by the exclusivity provision of the Workers Compensation Act. <u>Konstantopoulos v. Westvaco Corp.</u>, 690 A.2d 936, 940 (Del. 1996). Thus, Acme's allegedly ignoring her complaints and then suspending and transferring her based on her misconduct demonstrates no deliberate and specific intent by Acme to injure Ms. Nieves.

Even if the IIED claim is not preempted by the Workers Compensation law, Acme's failure to address Ms. Nieves' alleged complaints, and then suspending and transferring her due to her misconduct, cannot plausibly be deemed extreme and outrageous. In <u>Collins v. African Methodist Episcopal Zion Church</u>, 2006 WL 1579828 (Del. Super. March 29, 2006), a case on which Ms. Nieves relies, the court found that the plaintiff failed to allege sufficient facts to support an IIED claim against the bishop and the church because the bishop did not engage in extreme or outrageous conduct by failing to investigate complaints of sexual misconduct. <u>Id</u>. at *2. Notably, Ms. Nieves does not point out that the court rejected the plaintiff's IIED argument. Like <u>Collins</u>, Acme's purported failure to act does not rise to a level of extreme and outrageous to meet the test for IIED. Nor does Acme's ordinary suspension and transfer of Ms. Nieves constitute such extreme and outrageous conduct.

Ms. Nieves also makes another feeble attempt at attacking Acme by claiming that Acme's supervisory personnel were aware of the emotional distress Ms. Nieves was suffering. Answering Brief, p. 29. Again, she takes much liberty with an established record. Contrary to what she would like this Court to believe, all of Acme's witnesses *consistently* explained that any distress she might have been experiencing was caused by problems with her husband. Dean Dep., Ex. B at 14; Appenzeller Dep., Ex. C at 9; Briley Dep., Ex. D at 13. As Ms. Nieves explains on p. 29 of her response, the emotional distress might have been real and might have been recognized by Acme. But inconsistent with her response, there is no question of fact based on the record as to whether Acme intended to cause the emotional distress. Indeed, Acme management did not intend to cause Ms. Nieves any emotional distress nor did any conduct by Acme management rise to the level of "extreme and outrageous." Notably, the record shows that Ms. Nieves did not complain about any distress the entire ten months she was working at the Smyrna store. Acme is therefore entitled to summary judgment on IIED as a matter of law. Likewise, Mr. Nieves' loss of consortium claim must also be dismissed.

**F.    Ms. Nieves Does Not Oppose Acme's Arguments on Good Faith and Fair Dealing and Disparate Treatment.**

Ms. Nieves does not address any of the legal arguments raised by Acme regarding her breach of good faith and fair dealing claim. Acme also raised the issue of whether or not Plaintiff's Complaint alleged a claim for disparate treatment. In an abundance of caution, Acme addressed this possible claim and explained that Ms. Nieves' claim of disparate treatment fails under the undisputed facts. In her response to Acme's Motion, Ms. Nieves also does not state one way or another if she is asserting a claim for disparate treatment and does not address any of the legal arguments raised by Defendant.

19

Therefore, she has failed to carry her burden on both issues. Thus, the Court may consider Acme's arguments as unopposed and should enter judgment in its favor on both issues as a matter of law.[5]

## III.    CONCLUSION

For all the foregoing reasons, as well as the reasons set forth in Acme's initial moving papers, Acme respectfully requests this Court to grant Acme Markets, Inc.'s Motion for Summary Judgment on all Counts of Plaintiff's Complaint and to dismiss with prejudice Plaintiff's Complaint in its entirety.

BUCHANAN INGERSOLL & ROONEY PC

JENNIFER M. BECNEL-GUZZO (No. 4492)
The Brandywine Building
1000 West Street, Suite 1410
Wilmington, DE 19801
(302) 552-4200
(302) 552-4295 (facsimile)
jennifer.becnelguzzo@bipc.com

and

ELIZABETH A. MALLOY *(admitted pro hac vice)*
1835 Market Street, 14th Floor
Philadelphia, PA  19103
(215) 665-8700

Attorneys for Defendant,
Acme Markets, Inc.

Dated:  February 28, 2007

---

[5] Ms. Nieves' bare accusation that Acme surreptitiously removed documents from her personnel file is a desperate but nonetheless futile attempt to overcome what she realizes is a well-supported motion for summary judgment. There is no evidence whatsoever that the integrity of her file has been compromised. Ms. Nieves' argument is especially unfounded because whether Acme maintained the service history document in her file is completely irrelevant to the case. There is no dispute as to when Ms. Nieves was hired, when she became a full time employee and when she left.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| GLORIA NIEVES and EMILIO NIEVES, | : | CIVIL ACTION |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | Number:  06-123 (GMS) |
| ACME MARKETS, INC., a Delaware corporation | : | |
| d/b/a Acme Markets No. 7816, ACME MARKETS, | : | JURY TRIAL DEMANDED |
| INC., a Delaware Corporation d/b/a Acme Markets | : | |
| No. 7836, ACME MARKETS, INC., a Pennsylvania | : | |
| Corporation, d/b/a Acme Markets No. 7816, | : | |
| ACME MARKETS, INC., a Pennsylvania | : | |
| Corporation d/b/a Acme Markets No. 7836, | : | |
| | : | |
| Defendants. | : | |

## APPENDIX TO DEFENDANT ACME MARKETS, INC.'S REPLY BRIEF IN SUPPORT
## OF ITS MOTION FOR SUMMARY JUDGMENT

JENNIFER M. BECNEL-GUZZO (No. 4492)
BUCHANAN INGERSOLL & ROONEY PC
The Brandywine Building
1000 West Street, Suite 1410
Wilmington, DE 19801
(302) 552-4200
(302) 552-4295 (facsimile)
jennifer.becnelguzzo@bipc.com

and

ELIZABETH A. MALLOY *(admitted pro hac vice)*
BUCHANAN INGERSOLL & ROONEY PC
1835 Market Street
14th Floor
Philadelphia, PA  19103
(215) 665-8700

Attorneys for Defendant,
Acme Markets, Inc.

Dated:  February 28, 2007

# APPENDIX TABLE OF CONTENTS

TAB

EXHIBIT A        Amanda Cumberbatch Deposition ................................................C-1 – C-9

EXHIBIT B        Denise Dean Deposition ...............................................................C-10 - C-13

EXHIBIT C        Barbara J. Appenzeller..................................................................C-14 – C-17

EXHIBIT D        Stephen Briley...............................................................................C-18 – C-24

# EXHIBIT A

Amanda Lea Cumberbatch

1

```
 1                    Cumberbatch
 2
 3
 4
 5
 6       IN THE UNITED STATES DISTRICT COURT
 7         FOR THE DISTRICT OF DELAWARE
 8
         GLORIA NIEVES and    : CIVIL ACTION
 9       EMILIO NIEVES        :
                              :
10            vs.             :
                              :
11       ACME MARKETS, INC., a :
         Delaware Corporation, :
12       et al.               : NO. 06-123-GMS
13
14
                         ---
15              January 24, 2007
                Wilmington, Delaware
16                       ---
17
18           Oral deposition of AMANDA LEA CUMBERBATCH,
         taken in the offices of Buchanan, Ingersoll &
19       Rooney, 1000 North West Street, on the above date,
         commencing at 11:03 a.m., before Janice M. Leaman,
20       a Notary Public and Approved Reporter of the
         United States District Court for the Eastern
21       District of Pennsylvania.
                         ---
22
23
                KAPLAN, LEAMAN & WOLFE
24         Registered Professional Reporters
             325 Chestnut Street, Suite 909
25          Philadelphia, Pennsylvania 19106
                   (215) 922-7112
```

Amanda Lea Cumberbatch

```
 1                    Cumberbatch
 2    think that -- like the way I grew up, I didn't
 3    even think that kind of stuff happened any more.
 4    So, I was appalled.    I was like, wow, you know.
 5    So --
 6         Q.    I'm just going to go back and ask you a
 7    few more questions about the things you have told
 8    me.
 9         A.    Okay.
10         Q.    You have said that there were slurs and
11    jokes behind her back.    What did you personally
12    observe?
13         A.    I remember the Chihuahua incident.
14    They called her a Chihuahua.
15         Q.    Who, who called her a Chihuahua?
16         A.    This would have been -- this is the
17    little clique.    You have Joyce -- well, Joyce
18    wasn't in it at first, but she came into it.    But
19    it was -- mostly it was Nancy, Michelle --
20    Michelle was terrible.    Michelle was the worst
21    out of all of them, and Nancy was second right
22    behind her.    And the girl that I can't remember
23    her name with the -- she had short blond hair and
24    she was really skinny, and I cannot remember her
25    name for the life of me.    They were the three
```

Amanda Lea Cumberbatch

21

1                    Cumberbatch
2    was -- the deli is like a big L, kind of, and
3    there's like steamers right here.   So, she's
4    pretty much over here, and where the cases are,
5    which is right next to it, and there's always the
6    machines.  And they are standing like right in the
7    middle of the machines, right there, so --
8        Q.     Would you be able to estimate -- since
9    the court reporter can't take down your hand
10   gestures?
11       A.     Feet distance?   Feet distance?   We
12   will say eight feet, max, just guessing?
13       Q.     Did you hear the context of this
14   conversation?
15       A.     As in what?
16       Q.     Did you hear the conversation, or did
17   you just hear the word Chihuahua?
18              I'm trying to figure out what you
19   heard.
20       A.     Well, I heard Chihuahua.   It was
21   directed at her.   It was pointed at her.
22       Q.     At Gloria?
23       A.     Yes.   And they were just hysterically
24   laughing, and she's upset.   So, I -- you know,
25   that's a no-brainer right there.   So, plus

Amanda Lea Cumberbatch

```
 1                    Cumberbatch
 2   job.
 3                When she went out to go look for a
 4   job, she started getting problems that no one
 5   really wanted to take her application or anything
 6   like that.   And we found out that Michelle had
 7   been going around to these people telling her that
 8   she was illegal alien, she -- I think she called
 9   you a drug addict, too.   I think I remember that
10   one.   Stuff like that.   Oh, yes, that's right,
11   because she's from Colombia, so she's bringing
12   drugs through here and stuff like that.   Yes,
13   there was all kinds of stuff like that.
14        Q.     How do you know that Michelle went to
15   local businesses?   How did you learn that?
16        A.     Word of mouth.   And like I said,
17   that's all they do is talk and talk and talk, and
18   you know everything.   And nine times out of ten,
19   if you ever confronted Michelle about anything
20   that she said, she would agree to it, because she
21   never cared.
22        Q.     Did you personally talk to Michelle
23   about whether she went to any local businesses?
24        A.     No, I didn't.   I tried to stay away
25   from her as much as possible, she was just a
```

Amanda Lea Cumberbatch

24

```
 1                    Cumberbatch
 2   troublemaker, big time.
 3        Q.     Do you remember who you heard that
 4   from, that Michelle  --
 5        A.     That came from --
 6        Q.     You have to let me finish the question.
 7        A.     That came from Kim.   And Kim was
 8   another one who would never lie.  Who would never
 9   do anything like that.  And she was pretty
10   straight forward and narrow, and Kim was a good
11   girl.   And she had heard that.   And she didn't
12   like it.   But she didn't say anything because she
13   was afraid of losing her job.
14        Q.     So, you heard it from Kim?
15        A.     Yes.   Yes.   I did.   And I also heard
16   from Kim about the escorting thing.   And that was
17   --
18        Q.     What's that?
19        A.     Towards the end here when she was
20   getting suspended, or whatever, I walked into work
21   that night and I got stopped right at the door by
22   Kim and said, "Let me know what time you are off
23   your shift, because we have to have everybody
24   escorted to their cars," and blah, blah, blah,
25   blah, blah, stuff like that.
```

Amanda Lea Cumberbatch

25

```
 1                      Cumberbatch
 2                 And I am like, "What are you talking
 3       about?""
 4                 She goes, "Well, apparently,"  she
 5       was like, she goes, "we had a phone call, a
 6       threatening phone call from Gloria's husband."
 7                 And I laughed at her right then and
 8       there.   I was like, "Yeah, okay."
 9                 She goes, "No, I am serious."   She
10       said, "Denise and BJ instructed us that we need to
11       have escorts out to our car because he's going to
12       come here and start trouble."
13                 And I turned around and flat-out
14       told her, "I don't need an escort, I know these
15       people.   You have nothing to worry about.   And
16       he's not even going to waste his time coming here.
17       Why would he do that?"
18                 And that was the end of that.   And
19       I refused the escort, but other people got
20       escorted out to their car.   He never showed up.
21       So, I don't know what that was about.
22                 They were instructed -- they were
23       also instructed to hit him if he walked into the
24       deli.   If he walked into the deli and pushed the
25       doors, they were instructed to pretty much just
```

Amanda Lea Cumberbatch

47

1                      Cumberbatch
2   have worked.   So --
3        Q.     Do you know whether any of these
4   coworkers in the deli ever looked in Mrs. Nieves'
5   personnel file?
6        A.     I heard a rumor, but I don't know.
7        Q.     What rumor did you hear?
8        A.     I heard a rumor that they were looking
9   up places she's lived and checking for her green
10  card information to see if Michelle's thing was
11  true or not, but I didn't see that, and I don't
12  know for a fact.   I wouldn't doubt it, but I
13  mean, I'm seriously not going to put it past them,
14  but I don't know for sure.   I don't have proof of
15  that at all.
16       Q.     Who did you hear the rumor from?
17       A.     That would be the talk again going
18  through the deli, that's multiple people.   The
19  girl that talked the most was a skinny girl with
20  the short hair.   She had a loud mouth, you heard
21  a lot out of her.   Nancy said a lot, and then --
22  it was pretty much those two most of the time,
23  they were like the ring leaders, and Michelle.
24  It's just word of mouth.   You here a little
25  gaggling (sic. )here, little gaggling there and

Amanda Lea Cumberbatch

48

```
 1                    Cumberbatch
 2   pick up information on the way.
 3        Q.     Do you --
 4        A.     It's hard to not hear it because you
 5   are standing right there.   You have to.
 6        Q.     Do you remember the person who you
 7   heard the rumor from that somebody went into Mrs.
 8   Nieves' personnel file?
 9        A.     No, I do not.   I can just tell you the
10   grouping of people that was around.
11        Q.     Can you place in time when you heard
12   that?
13        A.     No, I can't.
14        Q.     After you left Acme, did you talk to
15   anybody at all about any of the problems that you
16   felt Mrs. Nieves was having?
17        A.     No.   I didn't talk to anybody there.
18   If I ever talked to anybody, it was probably like
19   a hi and good-bye thing, if I was going shopping
20   at Acme.   I didn't talk to any of these people.
21   I never kept in touch with them, nothing.    I
22   wanted nothing to do with them.
23        Q.     Why?
24        A.     I don't like -- I don't have any
25   respect for those people whatsoever for being like
```

# EXHIBIT B

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


GLORIA NIEVES and EMILIO NIEVES,       )
                                       )
            Plaintiffs,                )
                                       ) Civil Action
v.                                     ) No. 06-123 GMS
                                       )
ACME MARKETS, INC., a Delaware         )
corporation d/b/a Acme Markets         )
No. 7816, ACME MARKETS, INC., a        )
Delaware Corporation d/b/a Acme        )
Markets No. 7836, ACME MARKETS,        )
INC., a Pennsylvania Corporation,      )
d/b/a Acme Markets No. 7816, ACME      )
MARKETS, INC., a Pennsylvania          )
Corporation, d/b/a Acme                )
Markets No. 7836,                      )
                                       )
            Defendants.                )


            Deposition of DENISE K. DEAN taken
pursuant to notice at the law offices of Biggs &
Battaglia, 921 North Orange Street, Wilmington,
Delaware, beginning at 10:05 a.m., on Thursday,
January 18, 2007, before Kurt A. Fetzer, Registered
Diplomate Reporter and Notary Public.

APPEARANCES:

      PHILIP B. BARTOSHESKY, ESQ.
      BIGGS AND BATTAGLIA
        921 North Orange Street
        Wilmington, Delaware  19801
        For the Plaintiff



            WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
            (302) 655-0477
            www.wilfet.com



**W&F**
**WILCOX & FETZER LTD.**
Registered Professional Reporters

C-11

Denise K. Dean                    14

1    taken or do anything to address this turmoil?

2        A.    No.

3        Q.    And how many times do you think that you talked

4    to Mr. Briley, again other than the complaint Joyce

5    Alphin made about the water bucket, how many times do

6    you think you talked to Mr. Briley about this turmoil

7    in the deli department?

8        A.    Two to three times a week.

9        Q.    And for how long had that been?  Was that over

10   a several-month period or over a year period?

11       A.    Several months.

12       Q.    Was this from the very beginning of your time

13   at the Middletown store?

14       A.    Yes.

15       Q.    Now, did Gloria Nieves ever come to you with

16   any complaints about anything?

17       A.    Yes.

18       Q.    What did she complain about?

19       A.    She would complain that no one was doing work.

20   The other biggest complaints that she would come with

21   would be about her husband abusing her at home.

22       Q.    What did she say about that?

23       A.    That he was mean and he would beat her.

24       Q.    And let's first go to the complaints about she

Denise K. Dean                    17

1    Q.    Going back to the complaint that Gloria made,

2    you said she also complained about her husband.  Did

3    you tell her or did you do anything about that at all?

4    A.    No.  I told her if it was really a problem she

5    needed to call the police and get herself some help.

6    Q.    And these complaints about her husband, did she

7    make them the entire time that she was employed at the

8    Middletown store to you?

9    A.    A lot.  And not only to me.

10   Q.    Did you hear her make those complaints to

11   somebody else?

12   A.    To several people.  Basically three quarters of

13   the week she would be in tears.

14   Q.    And did that cause any problems on her job, her

15   job performance?

16   A.    Not as I know of.

17   Q.    Did anybody ever accuse her of not doing her

18   job?

19   A.    No.

20   Q.    Now, you said the only two things she ever

21   complained about were that she was doing all the

22   cleaning work --

23   A.    Correct.

24   Q.    -- and her husband?

# EXHIBIT C

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

GLORIA NIEVES and EMILIO NIEVES, )
                                 )
              Plaintiffs,        )
                                 )      Civil Action
v.                               )      No. 06-123 GMS
                                 )
ACME MARKETS, INC.,a Delaware    )
corporation, d/b/a Acme Markets )
No. 7816, ACME MARKETS, INC., a )
Pennsylvania Corporation, d/b/a )
Acme Markets No. 7816, ACME      )
MARKETS, INC., a Pennslvania     )
Corporation d/b/a Acme Markets   )
No. 7836,                        )
                                 )
              Defendants.        )

     Deposition of BARBARA J. APPENZELLER taken
pursuant to notice at the law offices of Biggs and
Battaglia, 921 North Orange Street, Wilmington,
Delaware, beginning at 9:30 a.m. on Monday,
December 18, 2006, before Lucinda M. Reeder,
Registered Diplomate Reporter and Notary Public.

APPEARANCES:

        PHILIP B. BARTOSHESKY, ESQ.
        Biggs and Battaglia
          921 Orange Street
          Wilmington Delaware 19801
          for the Plaintiffs,

        ELIZABETH A. MALLOY, ESQ.
        BUCHANAN, INGERSOLL & ROONEY, P.C.
          1835 Market Street, 14th Floor
          Philadelphia, Pennsylvania 19103-2085
          for the Defendants.

ALSO PRESENT:
GLORIA NIEVES and EMILIO NIEVES
STEPHEN MOYER
              WILCOX & FETZER, LTD.
   1330 King Street - Wilmington, Delaware  19801
              (302) 655-0477
              www.wilfet.com



**WILCOX & FETZER LTD.**
Registered Professional Reporters

C-15



Barbara J. Appenzeller

9

1    situation at all?

2      A.   Just some of the things that the girls had told

3    me by word of mouth.

4      Q.   What did they tell you?

5      A.   Just that she was, you know, having problems at

6    home.

7      Q.   What kind of problems did they tell you about?

8      A.   Just things with her husband, but nothing in

9    detail.  It was just, you know, what girls had told

10   me.

11     Q.   Which girls told you those things, do you

12   remember?

13     A.   No, I don't.

14     Q.   Who else?  Do you know the names of the

15   individuals who worked in the deli department with

16   Gloria Nieves?

17     A.   Yes.

18     Q.   Who were they?

19     A.   There was Denise Dean, which is the deli

20   manager.  There was Joyce Alphin.  I think Michelle

21   Warren was there.  There was about 15 employees.  I

22   mean, the turnover right now is so high in the deli, I

23   can't remember everyone that was back there at that

24   time.

**W&F**

Barbara J. Appenzeller

18

1    A.    That would be Joyce Alphin.

2    Q.    What did she say happened?

3    A.    She said Gloria had -- was angry and just took

4    and threw the water across the floor at her.

5    Q.    Did she say -- was this like the next day or

6    the same day or did she tell you when it happened or

7    anything like that?

8    A.    I don't remember that.  I don't know whether it

9    was that night or the next day.

10   Q.    Is that as best as you can remember the extent

11   of the conversation --

12   A.    Yes, sir.

13   Q.    -- that Joyce Alphin had with you?

14   A.    Mm-hmm.

15            MS. MALLOY:  Is that a yes?

16            THE WITNESS:  Yes.  I'm sorry.

17   BY MR. BARTOSHESKY:

18   Q.    Your answer -- it happens all the time, you

19   anticipate where the questions go.

20   A.    Yeah, right.

21   Q.    When she told you this, when Ms. Alphin told

22   you this, what did you do?

23   A.    I believe I talked to Steve Briley about it.

24   Q.    What did he say?  What was the conversation you

# EXHIBIT D

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

GLORIA NIEVES and EMILIO NIEVES,)
)
           Plaintiffs,    )
)  Civil Action
v.                   )  No. 06-123 GMS
)
ACME MARKETS, INC.,a Delaware  )
corporation, d/b/a Acme Markets )
No. 7816, ACME MARKETS, INC., a )
Pennsylvania Corporation, d/b/a )
Acme Markets No. 7816, ACME    )
MARKETS, INC., a Pennslvania   )
Corporation d/b/a Acme Markets )
No. 7836,               )
)
          Defendants.   )

Deposition of STEPHEN BRILEY taken pursuant to notice at the law offices of Biggs and Battaglia, 921 North Orange Street, Wilmington, Delaware, beginning at 10:22 a.m. on Monday, December 18, 2006, before Lucinda M. Reeder, Registered Diplomate Reporter and Notary Public.

APPEARANCES:

       PHILIP B. BARTOSHESKY, ESQ.
       Biggs and Battaglia
         921 Orange Street
         Wilmington Delaware 19801
         for the Plaintiffs,

       ELIZABETH A. MALLOY, ESQ.
       BUCHANAN, INGERSOLL & ROONEY, P.C.
         1835 Market Street, 14th Floor
         Philadelphia, Pennsylvania 19103-2085
         for the Defendants.

ALSO PRESENT:
GLORIA NIEVES and EMILIO NIEVES
STEPHEN MOYER
          WILCOX & FETZER, LTD.
  1330 King Street - Wilmington, Delaware  19801
          (302) 655-0477
          www.wilfet.com

C-19





Stephen Briley

13

1   Q.   Were there ever any complaints from customers

2  about Gloria Nieves?

3   A.   No.

4   Q.   Now, did Gloria Nieves ever come to you with

5  any problems that she may have had with any of her

6  co-workers?

7   A.   Not to my knowledge.

8   Q.   So you don't recall her ever coming to you with

9  a problem about a co-worker?

10   A.   I don't recall, sir.

11   Q.   Do you ever recall her coming to you to talk

12  about any kind of problems that she had?

13   A.   Come and talk to me personally?

14   Q.   Yes.

15   A.   I was aware -- she had told me she had a

16  problem with her husband.

17   Q.   She came and talked to you about a problem she

18  had with her husband?

19   A.   In casual conversation.

20   Q.   What did she say?

21   A.   That she just was having problems with her

22  husband.  I don't recall any details about it.

23   Q.   Do you know about when that was?

24   A.   No.

Stephen Briley

17

1   attention, which was Denise, who was the deli manager.

2   Q.   She, the assistant director brought it to the

3   deli manager's attention?  Is that what you are

4   saying?

5   A.   The associate did, Joyce.

6   Q.   Joyce brought it to whose attention, Denise?

7   A.   Denise.

8   Q.   So you went and talked to Denise about the

9   situation?

10   A.   Denise and Joyce and myself, yes, we talked

11   about it.

12   Q.   Do you remember what you were told during those

13   conversations?

14   A.   I can't recall.

15   Q.   Other than talking to Denise and Joyce, do you

16   remember talking to anybody else about this situation?

17   A.   Afterwards, yes.

18   Q.   After what?

19   A.   After she was suspended.

20   Q.   Did you talk to Gloria about the situation

21   before you suspended her?

22   A.   I believe I would have, yes.

23   Q.   Do you remember anything that she said?

24   A.   No.



WILCOX & FETZER LTD.
Registered Professional Reporters

Stephen Briley

18

1    Q.   Did she deny it, deny that any of these things

2  occurred?

3    A.   I don't recall.

4    Q.   You said you talked to somebody after she was

5  suspended?

6    A.   Yes.

7    Q.   Who did you talk to after?

8    A.   That was the union representative.

9    Q.   Who was that?

10    A.   His name is Henry.

11    Q.   Do you remember his last name?

12    A.   No.

13    Q.   And -- tell us about the conversation you had

14  with Henry.

15    A.   From what I can remember, the -- we came to an

16  agreement that she was suspended and there would be a

17  final letter put in her file, and she would be

18  suspended -- I mean, excuse me, transferred to another

19  store.

20    Q.   When you say a final letter, what does that

21  mean?

22    A.   A final warning for the infraction.

23    Q.   And did you ever talk to -- other than -- well,

24  this union person, Henry, did he convey to you that he

Stephen Briley

19

1    knew anything about these incidents?

2    A.    I don't recall if he did.

3    Q.    And you say that Henry was a union

4    representative.  Was he an Acme employee?

5    A.    No, sir.

6    Q.    He worked strictly for the union?

7    A.    Yes, sir.

8    Q.    He was not a shop steward or anything like

9    that?

10   A.    No.

11   Q.    Did you ever talk to, other than Henry, did you

12   ever talk to anybody else about the situation?

13   A.    I can't recall.

14   Q.    Did you ever talk to Mr. Nieves about the

15   situation?

16   A.    I remember talking to him, but about that

17   specific situation I don't remember.

18   Q.    Do you remember what you did talk to him about?

19   A.    No.

20   Q.    Now, did you have the authority to take this

21   action, the suspension on your own?

22   A.    Yes, sir.

23   Q.    And did you consult with anybody else at Acme

24   before you took that action?

Stephen Briley

20

1  A.   I would have probably contacted HR and my

2  district manager.

3  Q.   Who was the district manager?

4  A.   At the time his name was Tom Holden.

5  Q.   Would you have had any contact with Mr. Moyer

6  about the situation?

7  A.   Probably.

8  Q.   Would that have been before or after you made

9  the decision to --

10  A.   I believe in this instance, it was after.

11  Q.   And so, let me just see if I can sort of recap

12  some of this.  You talked to Joyce Alphin and Denise

13  about the situation, and you think you talked to --

14  you talked to Gloria about the situation.  Is that

15  right?

16  A.   I would assume I would have.  I wouldn't have

17  suspended an employee without talking to them, yes,

18  sir.

19  Q.   Then after the fact, you talked to the union

20  person and probably Mr. Holden and probably Mr. Moyer?

21  A.   Correct.

22  Q.   Anybody else you can recall talking to about

23  this situation?

24  A.   Not that I can recall.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| GLORIA NIEVES AND EMILIO NIEVES, | : | CIVIL ACTION |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | NO. 06-123 (GMS) |
| | : | |
| ACME MARKETS, INC., a Delaware | : | JURY TRIAL DEMANDED |
| Corporation, d/b/a Acme Markets No. 7816, | : | |
| ACME MARKETS, INC. a Delaware | : | |
| Corporation d/b/a Acme Markets No. 7836, | : | |
| ACME MARKETS, INC., a Pennsylvania | : | |
| Corporation, d/b/a Acme Markets No. 7816, | : | |
| ACME MARKETS, INC., a Pennsylvania | : | |
| Corporation, d/b/a Acme Markets No. 7836, | : | |
| | : | |
| Defendants. | : | |

## CERTIFICATE OF SERVICE

I, Jennifer M. Becnel-Guzzo, hereby certify that on February 28, 2007, I electronically

filed **Defendant Acme Markets, Inc.'s Reply Brief In Support of Its Motion for Summary**

**Judgment and accompanying Appendix** with the Clerk of Court using CM/ECF which will

send notification of such filing to counsel of record.

BUCHANAN INGERSOLL & ROONEY PC

BY: _Jennifer M. Becnel-Guzzo_

Jennifer M. Becnel-Guzzo (#4492)
1000 West Street, Suite 1410
Wilmington, DE 19801
(302) 552-4200
jennifer.becnelguzzo@bipc.com
*Attorneys for Defendant Acme Markets, Inc.*

February 28, 2007