## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| GLORIA NIEVES and EMILIO NIEVES, | : | CIVIL ACTION |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | Number: 06-123 (GMS) |
| ACME MARKETS, INC., a Delaware corporation | : | |
| d/b/a Acme Markets No. 7816, ACME MARKETS, | : | JURY TRIAL DEMANDED |
| INC., a Delaware Corporation d/b/a Acme Markets | : | |
| No. 7836, ACME MARKETS, INC., a Pennsylvania | : | |
| Corporation, d/b/a Acme Markets No. 7816, | : | |
| ACME MARKETS, INC., a Pennsylvania | : | |
| Corporation d/b/a Acme Markets No. 7836, | : | |
| | : | |
| Defendants. | | |

## DEFENDANT ACME MARKETS, INC.'S PRETRIAL BRIEF

JENNIFER M. BECNEL-GUZZO (No. 4492)
BUCHANAN INGERSOLL & ROONEY PC
The Brandywine Building
1000 West Street, Suite 1410
Wilmington, DE 19801
(302) 552-4200

and

ELIZABETH A. MALLOY (admitted pro hac vice)
BUCHANAN INGERSOLL & ROONEY PC
1835 Market Street
14th Floor
Philadelphia, PA 19103
(215) 665-8700

Dated: May 29, 2007

*Attorneys for Defendant, Acme Markets, Inc.*

## TABLE OF CONTENTS

I.      NATURE OF THE CASE ........................................................................................ 1

II.     STATEMENT OF CONTESTED FACTS ........................................................... 1

III.    THEORY OF DEFENSE....................................................................................... 5

        A.    Hostile Environment ............................................................................... 5

        B.    Constructive Discharge ........................................................................... 7

        C.    Retaliation ................................................................................................ 9

        D.    Race Discrimination in Suspension and Transfer ................................ 11

        E.    Breach of Implied Covenant of Good Faith and Fair Dealing.............. 11

        F.    Intentional Infliction of Emotional Distress ........................................ 12

        G.    Loss of Consortium................................................................................ 13

IV.     DAMAGES IF LIABILITY ESTABLISHED.................................................... 14

V.      ANTICIPATED MOTION FOR DIRECTED VERDICT ................................. 15

VI.     CONCLUSION.................................................................................................... 15

# TABLE OF AUTHORITIES

## Federal Cases

Abramson v. William Patterson College of New Jersey, 260 F.3d 265 (3d Cir. 2001)............... 10
Andrews v. City of Philadelphia, 895 F.2d 1469 (3d. Cir. 1990).................................... 5
Angeloni v. Diocese of Scranton, 135 Fed. Appx. 510 (3d Cir. 2005).......................... 9
Anjelino v. The New York Times Co., 200 F.3d 73 (3d Cir. 2000)............................. 7
Antol v. Perry, 82 F.3d 1291 (3d Cir. 1996)................................................. 7
Arasteh v. MBNA Bank, 146 F. Supp. 2d 476 (D. Del. 2001)...................................... 5
Burlington Northern & Santa Fe R.R. Co., 126 S. Ct. 2405 (2006)........................ 9, 10
Clowes v. Allegheny Valley Hospital, 991 F.2d 1159 (3d Cir. 1993)........................ 8
Cole v. Delaware Technical and Community College, 459 F. Supp. 2d 296 (D. Del. 2006)... 6, 12
Cuffee v. Dover Wipes Co., 334 F. Supp. 2d 565 (D. Del. 2004)............................... 8
E.E.O.C. v. Avecia, Inc., 151 Fed. Appx. 162 (3d Cir. 2005)............................. 11, 12
Everett v. Hospital Billing and Collection Service, Ltd., 2005 WL 751940 (D. Del.)............... 12
Faragher v. City of Boca Raton, 524 U.S. 775 (1986)......................................... 5, 6
Fuentes v. Perksie, 32 F.3d 759 (3d Cir. 1994) ............................................. 10
Gray v. York Newspapers, Inc., 957 F.2d 1070 (3d Cir. 1992)................................ 8
Harris v. Forklift Sys., Inc., 510 U.S. 17 (1993)............................................ 6
Jensen v. Potter, 435 F.3d 444 (3d Cir. 2006) .............................................. 5
Jones v. School District of Philadelphia, 198 F.3d 403 (3d Cir. 1999) ...................... 10
Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101 (3d Cir. 1997)........................... 11
Krouse v. Am. Sterilizer Co., 126 F.3d 494 (3d Cir. 1997).................................. 10
Matczak v. Frankford Candy and Chocolate Co., 136 F.3d 933 (3d Cir. 1997).................. 13
McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) .................................. 10, 11
Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75 (1998).............................. 5
Paris v. Christiana Care Visiting Nurse, 197 F. Supp. 2d 111 (D. Del. 2002) ............... 6
Petrocelli v. DaimlerChrysler Corp., 2006 WL 733567 (D. Del.)............................... 5
Petrocelli v. Daniel Woodhead Co., 993 F.2d 27 (3d Cir. 1993).............................. 14
Richards v. The City of Wilmington, 2004 WL 609324 (D. Del.)............................... 9
Tunis v. City of Newark, 184 Fed. Appx. 140 (3d Cir. 2006)................................. 8
Waiters v. J.L.G. Parsons II, 729 F.2d 233 (3d Cir. 1984) ................................. 7
Woodson v. Scott Paper Co., 109 F.3d 913 (3d Cir. 1997).................................... 9
Yatzus v. Appoquinimink School District, 458 F. Supp. 2d 235 (D. Del. 2006) .............. 11

## State Cases

Battista v. Chrysler Corp., 454 A.2d 286 (Del. Super. 1982)................................ 12
Collins v. African Methodist Episcopal Zion Church, 2006 WL 1579828 (Del. Super.) ......... 13
Jones v. Elliott, 551 A.2d 62 (Del. 1988) ................................................ 14
Kofron v. Amoco Chemicals Corp., 441 A.2d 226 (Del. 1982).................................. 12
Limehouse v. Steak & Ale Restaurant Corp., 2004 WL 304339 (Del. Super.).................... 12
Rafferty v. Hartman Walsh Painting, Co., 760 A.2d 157 (Del. 2000).......................... 12

**Federal Statutes**

42 U.S.C. § 1981 ................................................................................................ passim

**State Statutes**

19 *Del. C.* §712 ...................................................................................................... 11
19 *Del. C.* § 2304 .................................................................................................... 12

## I.    NATURE OF THE CASE

In the present action, Plaintiff Gloria Nieves alleges a hostile environment on the basis of her national origin, resulting constructive discharge, and retaliation in violation of Title VII, 42 U.S.C. § 1981, and Delaware's Discrimination in Employment Act.  Mrs. Nieves also claims that Acme wrongfully discharged her in violation of the Covenant of Good Faith and Fair Dealing, and that Acme's actions amounted to an intentional infliction of emotional distress.  Plaintiff Emilio Nieves, Mrs. Nieves' husband, alleges loss of consortium.  Plaintiffs seek lost wages, compensatory and punitive damages, equitable relief, attorneys' fees and costs, and pre and post judgment interest.  Defendant moved for summary judgment on February 1, 2007, which motion is pending before this District Court.  On May 24, 2007 the Court granted the Motion to Withdraw filed by Plaintiffs' counsel, Biggs and Battaglia.   This case is scheduled to commence trial on July 10, 2007.

## II.    STATEMENT OF CONTESTED FACTS

Defendant will substantiate the following at trial.

Acme's witnesses will testify that during Mrs. Nieves' tenure at the Middletown store, she frequently complained to co-workers and the deli manager, Denise Dean, that she was verbally and physically abused by her husband; some employees saw bruises on her.  Mrs. Nieves also told co-workers that she had intentions of leaving her husband one day.

In early March 2004, one of Mrs. Nieves' co-workers, Joyce Alphin, complained to  Ms. Dean that while she and Mrs. Nieves were closing the deli the prior night, Mrs. Nieves threw a bucket of water and a piece of ham at her.  That same week, on Saturday morning, Ms. Alphin again complained to Ms. Dean that Mrs. Nieves tried to knock her off her feet by swiping a mop under her feet during their shift the night before.  Ms. Dean reported these incidents to Store

Director, Stephen Briley. In response, Mr. Briley spoke with Ms. Alphin, who confirmed the two incidents with Mrs. Nieves. Because Mrs. Nieves' disruptive behavior was in clear violation of Acme Store Work Rules, Mr. Briley suspended Mrs. Nieves in accordance with store policy and practice.

While she was suspended, Mrs. Nieves' Union Representative, Henry Fajkowski, met with Mr. Briley. While originally disagreeing with Acme's actions, Mr. Fajkowski reported to Mr. Briley that its own investigation of the matter confirmed Mrs. Nieves' inappropriate behavior. The Union did not disagree with the decision to suspend Mrs. Nieves for one week with no pay, and to transfer her to the Smyrna store beginning March 14, 2004. The Company in no way discouraged Mrs. Nieves from filing a grievance. A final warning letter regarding Mrs. Nieves' behavior was also issued.[1]

Approximately two weeks after her one-week suspension and transfer to the Smyrna store, Mrs. Nieves filed a Discrimination Charge with the DDOL against Acme on April 2, 2004 upon her husband's urging. Witnesses for the defense will testify that Acme's receipt of the Charge was the first time Acme management learned of any alleged harassment toward Mrs. Nieves by co-workers based on her national origin. In fact, throughout her employment at the Middletown store, Mrs. Nieves neither complained to any member of management nor her deli manager, Ms. Dean (who was a bargaining unit employee and her direct supervisor), about any alleged racial discrimination or hostile work environment.

In the Charge, Mrs. Nieves identifies, for the first time, isolated incidents where her co-workers allegedly told her to speak English while at work and allegedly made derogatory

---

[1] Because this was a personal conduct offense, the progressive disciplinary system did not apply.

2

comments about her ability to speak English.[2]  While a couple of Mrs. Nieves' co-workers

sometimes may have kidded with her by saying "English, English" when she spoke to them in

Spanish, Acme will establish that they did not make derogatory comments toward her about her

ability to speak English.

     Mrs. Nieves also alleges in the Charge that the assistant store manager, B.J. Appenzeller,

threatened to have someone harm her husband if he entered the store.  Ms. Appenzeller will

testify that she never made such a statement.  However, in response to the concerns of Acme

employees who were afraid (because Mrs. Nieves told them her husband beat her), Ms.

Appenzeller said if Mr. Nieves comes into the store, and there were problems, she would call the

police.  Mrs. Nieves further alleges that she complained to management that she was subjected to

such harassment and that management took no action.  However, Acme will prove that none of

this alleged conduct had been brought to the attention of Mrs. Nieves' supervisor, store director,

assistant store director or Human Resources, as Acme's policies require.

     Mrs. Nieves also identifies other incidents, such as:  her co-workers accused her of

throwing food and mop water at others, her white co-worker violated company policy but was

not disciplined, and her deli manager posted a note in the deli chastising certain employees,

including Mrs. Nieves, for eating on the night shift.  As Acme will demonstrate, these incidents,

even if they did occur, are largely unrelated to Mrs. Nieves' national origin.

     Upon receiving the DDOL Charge, Acme promptly investigated the allegations in

accordance with its policy and practice, and found no evidence that Mrs. Nieves was a victim of

discrimination.  Rather, the investigation uncovered Mrs. Nieves' constant complaints to co-

---

[2] In her deposition, Mrs. Nieves elaborates on the incidents alleged in the Charge. She complains that co-workers questioned why she received a full-time job when she could not speak English well, asked her whether she had a Green Card, commented on her educational background, and suggested she knew more about drugs because she was from Colombia. Mrs. Nieves also alleges that a couple of her co-workers mocked her husband when he walked by them by saying "the plane, the plane boss," referencing a line from a movie played by a non-English speaker.

workers that she was abused at home as well as Acme's legitimate and non-discriminatory reasons for suspending and transferring Mrs. Nieves for inappropriate personal conduct.

After she filed her Charge, Mrs. Nieves continued to work for Acme. Witnesses for the defense will testify that while at the Smyrna store, Mrs. Nieves continued to complain to co-workers, the store director, and deli manager about her husband's abusive behavior toward her. Despite her personal problems at home, Mrs. Nieves enjoyed working at the Smyrna store. The only problem she had there, according to Mrs. Nieves, was that the seafood manager, a bargaining unit employee, "smacked" her on the mouth when Mrs. Nieves said "F _ _ _." This allegedly occurred on Labor Day weekend, on or around September 6, 2004, four months before Mrs. Nieves voluntarily resigned. However, Mrs. Nieves did not believe that this incident was related to any act of discrimination.

Ten full months after her transfer to the Smyrna store, and ten full months after any alleged discrimination ceased, Mrs. Nieves resigned from her employment at Acme on or about January 15, 2005 to move to Miami with her aunt and uncle. Her husband did not move with her. It will be quite apparent from co-worker and supervisor testimony that she left the area to get away from her husband, not because of alleged harassment at Acme. Mr. Nieves has also corroborated marital problems, as he consulted a lawyer about securing a divorce, but did not follow through because the lawyer was too expensive.

Mrs. Nieves lived with her aunt and uncle in Miami for seven months, and worked at a local nail salon. While she was away, she forgot about the Charge she filed with the DDOL, and in fact, did not communicate with the agency at all. Mrs. Nieves returned to Delaware and to her husband in August 2005. Upon her return, she easily secured a job at the local Wawa.

### III.    THEORY OF DEFENSE

#### A.    Hostile Environment

Mrs. Nieves will fail to show the existence of a hostile work environment based on her national origin. To prove a hostile environment claim under Title VII, Mrs. Nieves must prove: (1) that she suffered intentional discrimination because of her race; (2) that the discrimination was severe or pervasive; (3) that the discrimination detrimentally affected her; (4) that the discrimination would have detrimentally affected a reasonable person of the same race as the plaintiff, in like position; and (5) a basis for respondent superior liability. Jensen v. Potter, 435 F.3d 444, 449 (3d Cir. 2006)*(overturned on other grounds)*; Arasteh v. MBNA Bank, 146 F. Supp. 2d 476, 494 n.36 (D. Del. 2001). This same analysis is applied to the claims under Delaware's Discrimination in Employment Act and 42 U.S.C. §1981. Petrocelli v. DaimlerChrysler Corp., 2006 WL 733567, at *4 (D. Del.)(citations omitted).[3]

Mrs. Nieves was not subjected to intentional discrimination based on her national origin. Even if Mrs. Nieves proves that a few insensitive comments were made, it is not enough to prove a hostile work environment existed. Casual, isolated, or sporadic incidents cannot support a hostile environment claim. The incidents must be "repeated, if not persistent acts of harassment." Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 (3d. Cir. 1990). Thus, the law does not come into play unless the alleged conduct was "severe or pervasive." The United States Supreme Court explained that this element requires a plaintiff to establish conduct that is so extreme and objectively offensive that it amounts to a change in the conditions of employment. See, e.g., Faragher v. City of Boca Raton, 524 U.S. 775, 786 (1986); Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998). Inherent in the test is a requirement

---

[3] All decisions which are not reported in official reporters are attached in alphabetical order as Ex. A.

that a plaintiff prove that a *reasonable person* in similar circumstances would also find the conduct similarly hostile or abusive. Harris v. Forklift Sys., Inc., 510 U.S. 17, 20 (1993).

In determining whether an environment is sufficiently hostile, the factfinder must consider the totality of the circumstances, including (1) the frequency of the discriminatory conduct, (2) its severity, (3) whether it is physically threatening or humiliating, rather than a mere offensive utterance, (4) whether it unreasonably interferes with an employee's work performance, and (5) the effect on the employee's psychological well-being. Paris v. Christiana Care Visiting Nurse, 197 F. Supp. 2d 111, 118 (D. Del. 2002); Cole v. Delaware Technical and Community College, 459 F. Supp. 2d 296, 307 (D. Del. 2006) (citing Harris, 510 U.S. at 23).

Even if Mrs. Nieves could prove that a handful of insensitive comments were made by her co-workers, these incidents alone are not sufficiently severe or pervasive to create a hostile environment. Likewise, there is no evidence that these comments altered the conditions of Mrs. Nieves' employment or unreasonably interfered with her work performance, as required by the standard established in Faragher and Harris. Faragher, 524 U.S. at 786, 788; Harris, 510 U.S. at 23. Nor is there evidence that these comments would interfere with a reasonable person's work performance.

Furthermore, Mrs. Nieves cannot prove that she complained to any member of management while this alleged behavior was occurring. Acme had no knowledge that Mrs. Nieves was being allegedly harassed or discriminated against, and therefore, there is no basis for respondeat superior liability.[4] Mr. Briley and Ms. Appenzeller will consistently testify that they

---

[4] Indeed, when Acme first received notice that Mrs. Nieves filed a Charge with the DDOL for harassment and discrimination, Acme conducted a thorough investigation into the complaints. Had Mrs. Nieves complained of discrimination or harassment to management, Acme would have similarly conducted a prompt investigation, in accordance with its policies and practice.

did not receive any complaints of discrimination or harassment from Mrs. Nieves. Thus, Mrs.
Nieves' claim of hostile work environment must fail.

**B.    Constructive Discharge**

Additionally, Mrs. Nieves claims constructive termination from her employment at the
Smyrna store both for hostile working conditions and in retaliation of her alleged complaints of
racial discrimination at the Middletown store. This claim is both without merit, and barred under
Title VII and Delaware's Discrimination in Employment Act due to her failure to exhaust
administrative remedies.

To claim constructive discharge based on a discriminatorily hostile environment under
Title VII and Delaware's Discrimination in Employment Act, Mrs. Nieves must first assert the
claim administratively. Antol v. Perry, 82 F.3d 1291, 1296 (3d Cir. 1996). Mrs. Nieves filed her
Charge with the DDOL on April 2, 2004, just two weeks after her transfer to the Smyrna store.
The charge obviously makes no mention of her resignation which occurred ten months later.
After Mrs. Nieves' transfer to the Smyrna store, she worked with new co-workers and new
management. Mrs. Nieves never spoke with the investigator from the DDOL after she filed her
initial Charge, and thus never amended her charge to claim constructive discharge in this new
environment, barring her claim in court.

There is a narrow exception to the general exhaustion requirement where the plaintiff
may bring suit in court without any further exhaustion if the claim falls within the scope of a
prior administrative agency complaint or the investigation that arose out of it. Waiters v. J.L.G.
Parsons II, 729 F.2d 233, 234-35 (3d Cir. 1984); Anjelino v. The New York Times Co., 200 F.3d
73, 94 (3d Cir. 2000). However, the present situation does not fall within this exception. With
Mrs. Nieves' transfer arose a new situation, with new management and new co-workers who

7

were not aware of any alleged environment at the Middletown store. More importantly, because

Mrs. Nieves never communicated with the DDOL after filing her initial charge, an explanation of

any "constructive discharge" could not be within the scope of the original investigation.

Therefore, Mrs. Nieves' claim is barred for failure to exhaust her administrative remedies.[5]

Also, Mrs. Nieves cannot prove that she was constructively discharged due to harassment

based on her national origin. To prove constructive discharge, Mrs. Nieves must prove the

considerably high burden that Acme *knowingly* permitted conditions of discrimination in

employment so unpleasant that a reasonable person subject to them would have believed he had

no other option but to resign. Gray v. York Newspapers, Inc., 957 F.2d 1070, 1079 (3d Cir.

1992); Tunis v. City of Newark, 184 Fed. Appx. 140, 142 (3d Cir. 2006). In other words, "mere

stressful and frustrating conduct would not compel a reasonable person to resign." Washington,

Jr., 452 F. Supp. 2d at 553 (citing Duffy, 265 F.3d at 169). Moreover, in the absence of

shockingly intolerable behavior, courts have held that a reasonable employee would explore

alternative avenues thoroughly before concluding that resignation was the only solution. Clowes

v. Allegheny Valley Hospital, 991 F.2d 1159, 1161-62 (3d Cir. 1993); Cuffee v. Dover Wipes

Co., 334 F. Supp. 2d 565, 578 (D. Del. 2004).

The evidence will show that Mrs. Nieves was not constructively discharged. It is

incredulous to believe that a handful of insensitive but innocuous remarks from co-workers was

"shockingly intolerable," and Mrs. Nieves explored no alternative avenues before resigning. She

was saving money for at least four months to drive to Miami with her car, undermining her claim

that she was constructively discharged. If she truly had to leave because of intolerable

conditions, she could have quit and secured other local employment. Moreover, a constructive

---

[5] Additionally, similar to Ms. Nieves claim of constructive discharge, her claim for constructive termination in retaliation under Title VII and Delaware's Discrimination in Employment Act is also barred for her failure to exhaust her administrative remedies.

discharge claim cannot be sustained where there has been a passage of time after the intolerable conduct ceased. In <u>Angeloni v. Diocese of Scranton</u>, the court held that because the conduct the plaintiff complained about ended seven months earlier, "there is little or nothing on the record that supports [the plaintiff's] argument that a reasonable person would consider her work conditions so intolerable that she would feel compelled to resign." 135 Fed. Appx. 510, 513 (3d Cir. 2005). Likewise, any alleged hostile environment Mrs. Nieves alleged stopped when she was transferred to the Smyrna store, ten months before she voluntarily resigned from her employment to move to Miami, Florida.

###    C.    Retaliation

Mrs. Nieves also cannot carry her prima facie burden on retaliation, even if she is found to have exhausted her administrative remedies. To establish a prima facie case of retaliation under Title VII, Delaware's Discrimination in Employment Act, and § 1981, Mrs. Nieves must prove that: (1) she engaged in a protected activity; (2) she suffered an adverse employment action after or contemporaneously with her protected activity; and (3) there was a causal connection between the two. <u>Richards v. The City of Wilmington</u>, 2004 WL 609324, at *4 (D. Del.) (citing <u>Woodson v. Scott Paper Co.</u>, 109 F.3d 913, 920 (3d Cir. 1997)).

The Supreme Court recently addressed the second prong of the prima facie case for retaliation, redefining and expanding what constitutes an adverse action by the employer. <u>Burlington Northern & Santa Fe R.R. Co.</u>, 126 S. Ct. 2405, 2414-25 (2006). The Supreme Court stated that to be retaliatory, a reasonable employee must find the action only to be "materially adverse, … dissuading a reasonable worker from making or supporting a charge of discrimination." <u>Id</u>. at 2415. The Supreme Court noted that while a lateral transfer may be

viewed as "materially adverse" in some contexts, transfers and reassignments of job duties are "not automatically actionable." Id. at 2417.

Initially, Mrs. Nieves will not be able to show that she engaged in protected activity because she never complained to management regarding any harassment or hostile environment. While Acme did suspend Mrs. Nieves and transfer her to the Smyrna store, such action was legitimately and non-discriminatorily taken as a result of her clearly unacceptable and disruptive behavior on both March 2 and March 6. Further, the transfer was a lateral transfer, a course of action Acme frequently utilizes when business needs arise, and cannot be viewed adversely. Indeed, Mrs. Nieves very much enjoyed working at the Smyrna store. Mrs. Nieves will be unable to prove that Acme's actions was in any way causally related to her lack of complaints. Therefore, Mrs. Nieves' claim for retaliation fails.

If Mrs. Nieves establishes a prima facie case, then the burden of production shifts to Acme to show that it had a legitimate, non-retaliatory reason for its conduct. Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500-01 (3d Cir. 1997); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). If Acme succeeds, then Mrs. Nieves must show pretext, not only that Acme's proffered reason was false, but that retaliation was more likely than not the real reason. Id.; Jones v. School District of Philadelphia, 198 F.3d 403, 410 (3d Cir. 1999). To show pretext, Mrs. Nieves must introduce evidence for a fact finder to "(1) disbelieve the employer's articulated legitimate reason, or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Abramson v. William Patterson College of New Jersey, 260 F.3d 265, 283 (3d Cir. 2001) (quoting Fuentes v. Perksie, 32 F.3d 759, 764 (3d Cir. 1994)). In evaluating Acme's proffered reason for believability, the question is not whether the reason was prudent or correct, but whether it was so

"weak, incoherent, implausible, or so inconsistent that a reasonable fact finder could rationally find [it] unworthy of credence." Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108-09 (3d Cir. 1997).

As noted above, Acme acted on a legitimate belief that Mrs. Nieves engaged in personal misconduct. Mrs. Nieves cannot meet her burden of proving that Acme's decision to suspend and transfer her was so "weak, incoherent, implausible, or so inconsistent" to be pretextual. Thus, there is no evidence that retaliation motivated Acme, and her retaliation claim must fail.

### D.    Race Discrimination in Suspension and Transfer

It is the Company's position that Mrs. Nieves has not pled a claim for race/national origin discrimination in the suspension and transfer. Acme raised this in its Motion for Summary Judgment, and Plaintiff did not disagree.[6]

### E.    Breach of Implied Covenant of Good Faith and Fair Dealing

Mrs. Nieves' claim that Acme breached the implied covenant of good faith and fair dealing by constructively terminating her in violation of public policy is not viable. In 2004, the Delaware legislature amended its employment discrimination law to state that 19 DEL. C. §712 was to be the "sole remedy for claims alleging a violation of this chapter to the exclusion of all other remedies." 19 DEL. C. §712(B) (2005); Yatzus v. Appoquinimink School District, 458 F. Supp. 2d 235, 248 (D. Del. 2006). Since the statute's amendment, courts in the Third Circuit have followed suit. Yatzus, 458 F. Supp. 2d at 248 (dismissing plaintiff's breach of covenant claim for wrongful termination based on sexual harassment because Delaware Discrimination statute provides exclusive remedy for relief); E.E.O.C. v. Avecia, Inc., 151 Fed. Appx. 162, 165

---

[6] If such a claim is permitted, it will proceed under the McDonnell Douglas paradigm explained above. Mrs. Nieves cannot meet her prima facie case because she cannot prove that the lateral transfer was an adverse employment action. As to both the transfer and suspension, she cannot prove that similarly situated employees were treated differently. Furthermore, she cannot prove that Acme's reasons for the suspension and transfer were a pretext for intentional race discrimination.

11

(3d Cir. 2005) (barring breach of covenant claim for wrongful termination because amended

statute provided exclusive remedy). Thus, Mrs. Nieves cannot assert a breach of covenant claim

because it is barred by statute.[7]

**F.    Intentional Infliction of Emotional Distress**

The "exclusivity provision" of Delaware's Workers Compensation Act states that:

> Every employer and employee…shall be bound by this chapter
> respectively to pay and to accept compensation for personal injury
> or death by accident arising out of and in the course of
> employment, regardless of the question of negligence and to the
> exclusion of all other rights and remedies.

Limehouse v. Steak & Ale Restaurant Corp., 2004 WL 304339, at *1 (Del. Super.). It is well-

established that the Workers Compensation Act's "exclusivity provision" also encompasses

employment-related intentional infliction of emotional distress claims. Id.; see also Battista v.

Chrysler Corp., 454 A.2d 286, 289 (Del. Super. 1982); Kofron v. Amoco Chemicals Corp., 441

A.2d 226 (Del. 1982). Thus, Mrs. Nieves' IIED claim is barred by the Delaware Workers

Compensation Act because any alleged emotional distress Mrs. Nieves might have suffered

would have been within the course of employment. 19 DEL. C. § 2304; Everett v. Hospital

Billing and Collection Service, Ltd., 2005 WL 751940 (D. Del.) (dismissing IIED claim against

employer because the Delaware Workers Compensation Act is the exclusive remedy). [8]

---

[7] In any event, Ms. Nieves cannot prove there was a termination, as required by this state law claim. Her voluntary resignation from her employment with the Smyrna store, an environment she admits was not discriminatory or harassing towards her, to move to Miami does not amount to a constructive termination. Ms. Nieves chose to resign on her own, devoid of any such fraud or deceit on the part of the Company. See Cole, 459 F. Supp. 2d at 309.

[8] The Delaware Supreme Court recognizes an exception only where there was a "true intent by the employer to injure the employee." Rafferty v. Hartman Walsh Painting, Co., 760 A.2d 157, 159 (Del. 2000). The Workers Compensation Act still bars IIED claims where the employer intends "to do an action and that the worker was injured as a result." Avecia, 151 Fed. Appx. at 166. The exception is not implicated here because Ms. Nieves cannot prove that Acme's suspending and transferring her based on her misconduct demonstrates a deliberate and specific intent by Acme to injure Mrs. Nieves.

Even if a common law IIED claim applied to Acme, establishing such a claim requires proving *intentional or reckless extreme and outrageous conduct which causes severe emotional distress*. Collins v. African Methodist Episcopal Zion Church, 2006 WL 1579828, at *9 (Del. Super.)(emphasis added). Liability for common law IIED has been found only where the conduct has been "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Collins, 2006 WL 1579828, at *10. As a threshold matter, it is very rare that extreme and outrageous conduct can be established in the employment context. Matczak v. Frankford Candy and Chocolate Co., 136 F.3d 933, 940 (3d Cir. 1997). Certainly, Acme's ordinary suspension and subsequent transfer of Mrs. Nieves to the Smyrna store does not meet the high threshold of "extreme and outrageous." Such a conventional measure of discipline in the face of a personal conduct violation cannot conceivably go beyond all possible bounds of decency. Additionally, Mrs. Nieves cannot prove that any emotional distress allegedly suffered by her was severe in nature. She never visited any health care practitioner or counselor as a result of her alleged emotional distress. Nor does she offer any other form of evidence illustrating physical injury. Her claim of emotional distress a full ten (10) months after the alleged discriminatory conduct ceased due to her transfer to the Smyrna store additionally demonstrates the weakness of her claim.

**G.    Loss of Consortium**

Under Delaware law, a cause of action for loss of consortium is predicated on three elements: (1) that the party asserting the cause of action was married to the person who suffered a physical injury at the time the physical injury occurred; (2) as a result of the physical injury, the other spouse was deprived of some sort of benefit which formerly existed in the marriage;

and (3) the injured spouse has a valid cause of action against the tortfeasor. Jones v. Elliott, 551 A.2d 62, 63-64 (Del. 1988). A loss of consortium claim is a derivative claim which cannot survive as a separate cause of action without an underlying claim. Petrocelli v. Daniel Woodhead Co., 993 F.2d 27, 30 (3d Cir. 1993). Because Mrs. Nieves' intentional inflection of emotional distress claim and breach of the covenant of good faith and fair dealing claim fail, Mr. Nieves' claim for loss of consortium also fails. Mr. Nieves will be unable to prove that he was in any way affected by Mrs. Nieves' alleged emotional distress. The only doctors or counselors he visited during the relevant time period were for a work related injury, heartburn, and an itch on his hand. The only "counseling" he ever attended was due to a DUI charge. The serious marital problems also belie this claim.

## IV.    DAMAGES IF LIABILITY ESTABLISHED

As a threshold matter, there are no backpay damages if Mrs. Nieves cannot establish a constructive discharge. If liability is established, Defendant will also show that Mrs. Nieves failed to mitigate damages when she worked (mostly for cash but certainly well below her wages at Acme) at a nail salon in Miami. Upon securing a job at Wawa upon her return to Delaware, she mitigated damages.

Further plaintiffs are not entitled to punitive damages. Punitive damages are only warranted when defendant's conduct was especially egregious, motivated either by malice or reckless indifference to plaintiffs' rights. There is no basis for concluding that Acme engaged in any evil-minded acts that were designed, intended and done specifically to injure Mrs. Nieves.

## V.    ANTICIPATED MOTION FOR DIRECTED VERDICT

Acme anticipates moving for a directed verdict on the grounds set forth above after plaintiffs have been fully heard on the issues as counsel for defendant believes that a reasonable jury would not have a legally sufficient evidentiary basis to find for plaintiffs.

## VI.    CONCLUSION

For the foregoing reasons, Defendant Acme markets, Inc. respectfully submits that the law and the evidence at trial require that Plaintiffs' claim be dismissed in its entirety, with prejudice, as a matter of law.

Respectfully submitted,

BUCHANAN INGERSOLL & ROONEY PC

JENNIFER M. BECNEL-GUZZO (No. 4492)
The Brandywine Building
1000 West Street, Suite 1410
Wilmington, DE 19801
(302) 552-4200

and

ELIZABETH A. MALLOY *(admitted pro hac vice)*
BUCHANAN INGERSOLL & ROONEY PC
1835 Market Street
14th Floor
Philadelphia, PA 19103
(215) 665-8700

Dated: May 29, 2007                *Attorneys for Defendant, Acme Markets, Inc.*

15

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

GLORIA NIEVES and EMILIO NIEVES,    :    CIVIL ACTION
    :
    Plaintiffs,    :
    :
    v.    :
    :    Number:  06-123 (GMS)
ACME MARKETS, INC., a Delaware corporation    :
d/b/a Acme Markets No. 7816, ACME MARKETS,    :    JURY TRIAL DEMANDED
INC., a Delaware Corporation d/b/a Acme Markets    :
No. 7836, ACME MARKETS, INC., a Pennsylvania    :
Corporation, d/b/a Acme Markets No. 7816,    :
ACME MARKETS, INC., a Pennsylvania    :
Corporation d/b/a Acme Markets No. 7836,    :
    :
    Defendants.    :

**APPENDIX TO DEFENDANT ACME MARKETS, INC.'S PRETRIAL BRIEF**

JENNIFER M. BECNEL-GUZZO (No. 4492)
BUCHANAN INGERSOLL & ROONEY PC
The Brandywine Building
1000 West Street, Suite 1410
Wilmington, DE 19801
(302) 552-4200
(302) 552-4295 (facsimile)
jennifer.becnelguzzo@bipc.com

and

ELIZABETH A. MALLOY (admitted pro hac vice)
BUCHANAN INGERSOLL & ROONEY PC
1835 Market Street
14th Floor
Philadelphia, PA  19103
(215) 665-8700

Attorneys for Defendant,
Acme Markets, Inc.

Dated:  May 29, 2007

## APPENDIX TABLE OF CONTENTS

<u>TAB</u>

EXHIBIT A          Unreported Decisions.................................................................A-1 – A-28

# EXHIBIT A

A000001

Westlaw.

135 Fed.Appx. 510
135 Fed.Appx. 510
(Cite as: 135 Fed.Appx. 510)

C

**Briefs and Other Related Documents**

This case was not selected for publication in the
Federal Reporter.

NOT PRECEDENTIAL

Please use FIND to look at the applicable circuit
court rule before citing this opinion. Third Circuit
Local Appellate Rule 28.3(a) and Internal Operating
Procedure 5.3. (FIND CTA3 Rule 28.0 and CTA3
IOP APP I 5.3.)

United States Court of Appeals,
Third Circuit.
Margaret M. ANGELONI,
v.
The DIOCESE OF SCRANTON; Villa St. Joseph;
Hazzouri Margaret Angeloni,
Appellant.
No. 03-4501.

Submitted Under Third Circuit LAR 34.1(a) Feb. 7,
2005.
Decided March 17, 2005.

**Background:** Former employee brought a sexual
harassment and retaliation claim under Title VII
against her employer. The United States District
Court for the Middle District of Pennsylvania, A.
Richard Caputo, J., granted a defense motion for
summary judgment, and the employee appealed.

**Holdings:** The Court of Appeals, Barry, Circuit
Judge, held that:
(1) employee failed to prove that she was
constructively discharged, as required to prevail on
her Title VII claims of quid pro quo sexual
harassment and retaliation, and
(2) employee failed to prove existence of respondeat
superior liability, as required to prevail on a hostile
work environment claim.
Affirmed.

West Headnotes

[1] Civil Rights 1123
78k1123 Most Cited Cases

Former employee failed to prove that she was
constructively discharged, as required to prevail on
her Title VII claims of quid pro quo sexual
harassment and retaliation; superior's suggestion that
the employee consider resigning appeared completely
benign, the conduct of which she complained had
ended months earlier, and the decision to resign was
made by her and her parents at home. Civil Rights
Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et
seq.

[2] Civil Rights 1189
78k1189 Most Cited Cases

[2] Civil Rights 1528
78k1528 Most Cited Cases
Former employee failed to prove existence of
respondeat superior liability, as required to prevail on
a hostile work environment claim under Title VII;
even if the individuals she told of alleged sexual
harassment were considered management-level
employees, both took prompt and adequate remedial
action, and by all accounts any touching that had
occurred ended. Civil Rights Act of 1964, § 701 et
seq., 42 U.S.C.A. § 2000e et seq.
*511 Appeal from the United States District Court
for the Middle District of Pennsylvania. D.C. Civil
No. 02-cv-00276. District Judge: The Honorable A.
Richard Caputo.

Kimberly D. Borland, Borland & Borland, Wilkes-
Barre, PA, for Appellee.

James E. O'Brien, Jr., Kennedy, O'Brien,
McCormack & Mulcahey, Scranton, PA, Joseph A.
O'Brien, Karoline Mehalchick, Oliver, Price &
Rhodes, Clarks Summit, PA, for Appellant.

Before BARRY, FUENTES, and BECKER, Circuit
Judges.

OPINION

BARRY, Circuit Judge.

On February 20, 2002, Margaret M. Angeloni
brought a sexual harassment and retaliation claim
under Title VII of the Civil Rights Act of 1964, 42
U.S.C. §§ 2000e-2000e-17, against the Diocese of
Scranton, Villa St. Joseph, and Reverend Alex
Hazzouri (collectively "appellees"). The District

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

135 Fed.Appx. 510
135 Fed.Appx. 510
(Cite as: 135 Fed.Appx. 510)

Page 2

Court granted appellees' motion for summary judgment on October 22, 2003 and dismissed the state law claims A timely appeal followed We have jurisdiction under 28 U.S.C. § 1291. For the reasons that follow, we will affirm.

**I. Factual Background**

As we write only for the parties, we will confine our discussion to those facts relevant to the instant disposition. Angeloni worked as a dining room and kitchen server at Villa St. Joseph, a home for priests in Pennsylvania, from August of 1996 until January 19, 1998. She was fourteen and fifteen years old. Reverend Hazzouri allegedly began touching her inappropriately a few months after she began working at Villa St. Joseph She estimated that the touching occurred at least ten times, and always the same way--when she was waiting on Reverand Hazzouri's table, his right hand would come into contact with her left thigh.

In May or June of 1997, Angeloni told her supervisor, Annette Balint, about the touchings, and then in July of 1997, Angeloni told her parents. Also in July, Angeloni's mother had a meeting with Ms. Balint; by that time, Ms. Balint had spoken with Bishop John M. Dougherty, the rector at Villa St. Joseph. Both Ms. Balint and Bishop Dougherty talked to Angeloni's co-workers and to Reverend Hazzouri, and all denied that any inappropriate touching took place. Based on these discussions, they suggested that Angeloni simply stop serving Reverend Hazzouri's table so that *512 she could avoid any discomfort. [FN1] Bishop Dougherty also met with her parents that summer, and tried to reassure them that steps were being taken to make sure that Angeloni was not in any danger.

> FN1. Angeloni did stop serving Reverend Hazzouri, but eventually resumed service to his table and did so of her own accord.

No further touching took place, but Angeloni stated that in December of 1997, Reverend Hazzouri approached her and told her he was worried about what she had said about him. Angeloni said she was intimidated, and told her parents.

On December 17, 1997, Angeloni's mother met again with Bishop Dougherty and expressed concerns for her daughter's safety. Bishop Dougherty replied that he did not think there was cause for concern, but added that if Mrs. Angeloni was worried, Angeloni could stop working there. He also suggested that

they meet with Reverend Hazzouri. Mrs. Angeloni did not want to have such a meeting, and the family instead decided that Angeloni should no longer work at Villa St. Joseph. Angeloni's resignation was effective January 19, 1998. She filed suit more than four years later.

**II. Standard of Review**

We review the District Court's grant of summary judgment de novo. See *Sempier v. Johnson & Higgins,* 45 F.3d 724, 727 (3d Cir.1995). Summary judgment is proper when "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). If the evidence would be insufficient to allow a reasonable jury to find for the non-moving party, summary judgment is warranted. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In reviewing that evidence, we consider it and all reasonable inferences therefrom in the light most favorable to the non-moving party. *Eddy v. V.I. Water & Power Auth.,* 369 F.3d 227, 228 n. 1 (3d Cir.2004).

**III. Discussion**

*1. Title VII Claims*

The District Court granted appellees' motion for summary judgment on the grounds that: (1) there was no causal connection between Reverend Hazzouri's alleged touching and Bishop Dougherty's "employment actions" against Angeloni to support a claim of *quid pro quo* sexual harassment; (2) the elements of a hostile work environment claim were not satisfied because no reasonable jury could find that *respondeat superior* liability exists; and (3) there was no retaliatory conduct because Angeloni was not constructively discharged, and therefore no adverse employment action was taken against her. [FN2]

> FN2. For reasons that escape us, appellees did not mention the fact that Angeloni never exhausted her administrative remedies prior to filing suit. See *Robinson v. Dalton,* 107 F.3d 1018, 1021 (3d Cir.1997) (analogizing failure-to-exhaust to statutes of limitations); see also *Watson v. Eastman Kodak Co.,* 235 F.3d 851, 854 (3d Cir.2000) (explaining that a plaintiff in Pennsylvania must first present her employment-discrimination claims to the appropriate agency before going to federal court). Indeed, the first action Angeloni

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

135 Fed.Appx. 510                                                                                    Page 3
135 Fed.Appx. 510
(Cite as: 135 Fed.Appx. 510)

took with reference to this case was to file her complaint in the District Court on February 20, 2002.

*A. Quid Pro Quo Sexual Harassment and Retaliation*

[1] Both Angeloni's *quid pro quo* sexual harassment claim and her retaliation claim depend upon her ability to prove that she was constructively discharged. *See Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 281-82 (3d Cir.2000) (explaining that a plaintiff trying to prove *quid pro \*513 quo* sexual harassment must show that "her response to unwelcome advances was subsequently used as a basis for a decision about [employment].")· This is fundamental to her claims, because "constructive discharge acts as the functional equivalent of an actual termination" that can ground an employment discrimination suit. *See Suders v. Easton,* 325 F.3d 432, 446 (3d Cir.2003).

To find constructive discharge, a court "need merely find that the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." *Goss v. Exxon Office Sys. Co.,* 747 F.2d 885, 888 (3d Cir.1984). Put somewhat differently, the plaintiff must show that the alleged discrimination goes beyond a "threshold of 'intolerable conditions' " *Duffy v. Paper Magic Group, Inc.,* 265 F.3d 163, 169 (3d Cir.2001). "Intolerability ... is assessed by the objective standard of whether a 'reasonable person' in the employee's position would have felt compelled to resign--that is, whether [she] would have had no choice but to resign." *Connors v. Chrysler Financial Corp.,* 160 F.3d 971, 976 (3d Cir.1998) (internal citations omitted).

Although we have considered an employer's suggestion or encouragement that one resign as indicative of constructive discharge, *see Clowes v. Allegheny Valley Hosp.,* 991 F.2d 1159, 1161 (3d Cir.1993), any such suggestion or encouragement is not dispositive. *See Suders,* 325 F.3d at 446 (noting that the inquiry into constructive discharge is "a heavily fact-driven determination.") (internal citations omitted). Here, it is not disputed that, in December of 1997, Bishop Dougherty suggested that if Angeloni did not feel comfortable working at Villa St. Joseph, she could resign; however, this suggestion was made during the course of a meeting with Angeloni's mother, during which she had expressed concerns for her daughter's safety. As Bishop Dougherty explained in his deposition, he

suggested the possibility of resignation because he "felt as a priest that [he] wanted to reach out to [Angeloni's parents]." A258-59. Significantly, during that same meeting, Bishop Dougherty offered to have a meeting with both of Angeloni's parents and Reverend Hazzouri to see if they could come to some sort of resolution. And, when Angeloni continued to work after the December 1997 meeting, Bishop Dougherty said that he was "thrilled with that." A263.

Not only does Bishop Dougherty's suggestion that Angeloni consider resigning seem completely benign, but the conduct of which Angeloni complained had ended months earlier and the decision to resign was made by Angeloni and her parents at home. Given these facts, there is little or nothing in the record that supports Angeloni's argument that a reasonable person would consider her work conditions so intolerable that she would feel compelled to resign. That conclusion destroys any constructive discharge claim and, thus, there was no adverse employment action. Summary judgment was, therefore, proper on both the *quid pro quo* sexual harassment and the retaliation claims. [FN3]

> FN3. It has been assumed for the purposes of argument that Bishop Dougherty could be considered an "employer" as the rector at Villa St. Joseph; however, it should be noted that Title VII defines an employer as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks". 42 U.S.C. § 2000e(b). We do not have information in the record confirming that the Villa would satisfy those requirements.

*B. Hostile Work Environment*

[2] In order to succeed on her claim that the Diocese of Scranton and the Villa \*514 St. Joseph are liable for creating a "hostile work environment", Angeloni was required to satisfy a five-prong test, showing that: (1) she suffered intentional discrimination because of her sex; (2) the discrimination was "pervasive and regular"; (3) she was detrimentally affected; (4) the discrimination she points to would also detrimentally affect another reasonable young woman in the same position; and (5) respondeat superior liability exists. *See Suders,* 325 F.3d at 441. The District Court concluded that there was "no dispute" that the first and third requirements were satisfied, and held that a reasonable jury could find

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

135 Fed.Appx. 510
135 Fed.Appx. 510
(Cite as: 135 Fed.Appx. 510)

that the second and fourth requirements were also met. While it appears that the District Court's conclusions might have been overly generous to Angeloni, we will accept them and nonetheless affirm the grant of summary judgment, as the final requirement certainly was not met. Angeloni's claim of hostile work environment, therefore, necessarily fails.

Applying traditional agency principles, respondeat superior liability exists when "the defendant knew or should have known of the harassment and failed to take prompt remedial action." _Andrews v. City of Philadelphia_, 895 F.2d 1469, 1486 (3d Cir.1990) (internal citations omitted). Therefore, "if a plaintiff proves that management-level employees had actual or constructive knowledge about the existence of a sexually hostile work environment and failed to take prompt and adequate remedial action, the employer will be liable." _Id_

Angeloni admits that she did not tell Ms. Balint about the touching until May or June of 1997. By July, Ms. Balint had told Bishop Dougherty. Even assuming that Ms. Balint and Bishop Dougherty would be considered management-level "employees", both took "prompt and adequate" remedial action. For her part, Ms. Balint referred the matter to Bishop Dougherty, interviewed the other waitresses, and suggested that Angeloni could be relieved of her serving duties at Reverend Hazzouri's table. For his part, Bishop Dougherty said that he felt he "had to get to the bottom of this," so he spoke with Reverend Hazzouri and Ms. Balint several times. He also relayed the situation to the Diocese and told Reverend Hazzouri that he was to cease any conduct that might make Angeloni uncomfortable. Finally, he approved Ms. Balint's suggestion that Angeloni stop serving Reverend Hazzouri's table, a suggestion that was immediately implemented.

In terms of the adequacy of these remedial steps, by all accounts any touching that had occurred ended by July 1997. Indeed, even after Angeloni chose to ignore the suggestion not to serve Reverend Hazzouri, and began doing so again, she never reported further inappropriate conduct. Summary judgment was properly granted on the hostile environment claim. [FN4]

> FN4. Although individually named in the suit, Reverend Hazzouri could not be liable under Title VII because he was not Angeloni's employer; _see_ 42 U.S.C. § 2000e(b).

### 2. State Law Claims

The District Court also concluded that, because summary judgment was granted on Angeloni's federal claims, it would not exercise supplemental jurisdiction over the state law claims. The exercise of supplemental jurisdiction is a matter of discretion. _See United Mine Workers of America v. Gibbs_, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) ("[P]endent jurisdiction is a doctrine of discretion, not of plaintiff's right "), _superseded by statute in_ 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction ... if ... the district court *515 has dismissed all claims over which it has original jurisdiction"). And, as we have stated, when a federal claim could be, or has been, dismissed on summary judgment, "the court should ordinarily refrain from exercising [supplemental] jurisdiction in the absence of extraordinary circumstances." _Tully v. Mott Supermarkets, Inc._, 540 F.2d 187, 196 (3d Cir.1976); _see also Univ. of Md. v. Peat, Marwick, Main & Co._, 996 F.2d 1534, 1540 (3d Cir.1993). The District Court properly refrained from exercising supplemental jurisdiction here.

### IV. Conclusion

For the foregoing reasons, we will affirm the order of the District Court.

135 Fed.Appx. 510

### Briefs and Other Related Documents (Back to top)

• 2004 WL 3759989 (Appellate Brief) Brief of Appellees (Sep. 13, 2004)Original Image of this Document (PDF)

• 2004 WL 3759988 (Appellate Brief) Brief of Appellant and Appendix (Volume One) (Pages 1-32) (Aug. 13, 2004)Original Image of this Document with Appendix (PDF)

• 03-4501 (Docket) (Nov 21, 2003)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

151 Fed.Appx. 162                                                                                      Page 1
151 Fed.Appx. 162
(Cite as: 151 Fed.Appx. 162)

**H**

**Briefs and Other Related Documents**

This case was not selected for publication in the Federal Reporter.

NOT PRECEDENTIAL

Please use FIND to look at the applicable circuit court rule before citing this opinion. Third Circuit Local Appellate Rule 28.3(a) and Internal Operating Procedure 5.3. (FIND CTA3 Rule 28.0 and CTA3 IOP APP I 5.3.)

United States Court of Appeals,
Third Circuit.
EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION; Lisa Stepler
v.
AVECIA, INC. Lisa Stepler, Appellant.
No. 04-3396.

Argued July 12, 2005.
Decided Oct. 13, 2005.

**Background:** Discharged employee brought action against former employer, alleging Title VII retaliation, wrongful termination in violation of Delaware law, and intentional infliction of emotional distress under Delaware law. The United States District Court for the District of Delaware, Susan L. Robinson, J., granted summary judgment in favor of employer on the retaliation and wrongful termination claims, and dismissed the emotional distress claim. Employee appealed.

**Holdings:** The Court of Appeals held that:
(1) genuine issue of material fact precluded summary judgment in employee's Title VII retaliation claim, and
(2) discharge did not violate public policy and did not involve a falsification of employment records, for purpose of employee's wrongful termination claim.
Affirmed in part; reversed and remanded in part.

West Headnotes

[1] Federal Civil Procedure 🗝2497.1
170Ak2497.1 Most Cited Cases

Genuine issue of material fact as to whether employee's discharge was related to her complaints about hostile work environment precluded summary judgment in employee's Title VII retaliation claim. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

[2] Labor and Employment 🗝759
231Hk759 Most Cited Cases
Under Delaware law, discharge of at-will employee did not violate public policy and did not involve a falsification of employment records, for purpose of employee's wrongful termination claim, absent showing of employer's violation of a recognized public interest, or actual manipulation of employment records.
*163 On Appeal from the United States District Court for the District of Delaware. Dist. Court Civil Action No. 03-CV-00320. District Judge: The Honorable Susan L. Robinson.

Phillip B. Bartoshesky (Argued), Biggs and Battaglia, Wilmington, Del., for Appellant.

Ginger D. Schroder (Argued), Schroder, Joseph & Associates LLP, Buffalo, N.Y., Jennifer C. Jauffret, Richards, Layton & Finger, Wilmington, DE, for Appellee.

Before ALITO, BECKER, and GREENBERG, Circuit Judges.

OPINION OF THE COURT

PER CURIAM.

Lisa Stepler, a former laboratory technician for Avecia, Inc. ("Avecia") sued Avecia for retaliation under Title VII of the Civil Rights Act of 1964, wrongful termination under Delaware law, and intentional infliction of emotional distress under Delaware law. The District Court dismissed Stepler's claim for intentional infliction of emotional distress and granted summary judgment in favor of Avecia on Stepler's retaliation and wrongful termination claims. We affirm the dismissal of the claim for the intentional affliction of emotional distress and the entry of summary judgment in favor of Avecia on the wrongful termination claim. However, we reverse the entry of summary judgment in favor of Avecia on

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

151 Fed.Appx. 162
151 Fed.Appx. 162
(Cite as: 151 Fed.Appx. 162)

Page 2

the retaliation claim and remand for further proceedings.

I.

Stepler asserts that this case should have been analyzed under the framework of *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). [FN1] Under that framework, the "burden of production and the risk of non-persuasion are shifted to the defendant," and the defendant must show "that even if discrimination was a motivating factor in the adverse employment decision, it would have made the same employment decision regardless of its discriminatory animus." *Armbuster v. Unisys Corp.*, 32 F.3d 768, 778 (3d Cir.1994). This framework only applies, however, where the employee can show "*direct evidence* that an illegitimate criterion was a substantial factor in the decision." *Price Waterhouse*, 490 U.S. at 276 109 S.Ct. 1775 (O'Connor, J., concurring in the judgment) (emphasis added); *see also Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 513 (3d Cir.1997). We have carefully considered the evidence on which Stepler relies in this case, and while the question is close we conclude that she did not meet the "direct evidence" standard.

> FN1. 42 U.S.C. § 2000e-2(m) does not reach retaliation claims. *Woodson v. Scott Paper Co.*, 109 F.3d 913, 934 (3d Cir.), cert. denied, 522 U.S. 914, 118 S.Ct. 299, 139 L.Ed.2d 230 (1997).

Stepler's Title VII claims must be analyzed under the burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and its progeny. Under *164 this framework, Stepler was first required to make out a prima facie case of retaliation by establishing (1) that she engaged in a protected activity, (2) that she suffered an adverse employment action, and (3) that there was a causal link between her protected activity and the adverse employment action. *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 (3d Cir.2000). If Stepler successfully made out a prima facie case, Avecia had to point to evidence in the summary judgment record that was sufficient, if believed, to support a finding that Stepler was not discharged because of her protected activity. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). If Avecia met this burden, Stepler was required to prove that unlawful retaliation was a determinative cause of her firing. *See McDonnell Douglas*, 411 U.S. at 802-803, 93 S.Ct. 1817.

[1] Stepler clearly satisfied the first two prongs of the prima facie case standard. Her complaints about a hostile work environment and retaliation were protected activities, and her firing by Avecia obviously was an adverse employment action. Whether she proffered sufficient evidence to meet the third prong of the prima facie case standard is less clear due to the gap of almost one year between her initial complaint and her termination, but a gap of this magnitude is not conclusive and can be outweighed by a "pattern of harassment" or a "pattern of antagonism" in the intervening period. *See Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir.1997); *see also Robinson v. Southeastern Pennsylvania Transp. Auth.*, 982 F.2d 892, 894-95 (3d Cir.1993). A reasonable jury considering the evidence in the light most favorable to Stepler-- including Stepler's performance reviews, management's increased scrutiny of her, the tension with her co-workers, the memorandum of April 23, 2001, and the termination letter--could conclude that there was a causal link between Stepler's protected activities and Avecia's decision to fire her. We thus conclude that Stepler made out a prima facie case.

Avecia's proffered reasons for Stepler's termination were poor work performance and disruptive behavior, but a reasonable jury considering the evidence in the light most favorable to Stepler, and drawing all inferences in Stepler's favor, could conclude otherwise. Particularly noteworthy are the references in both the April 23 memo and the May 4, 2001, termination letter to Stepler's "intense focus upon alleged harassment [and] retaliation." App. 264, 371.

III.

Conversely, there are no issues of fact precluding summary judgment in favor of Avecia on Stepler's state law claim for breach of the covenant of good faith and fair dealing.

[2] The general rule in Delaware is that employees are employed "at will" and may be dismissed at any time without cause. *See Merrill v. Crothall-American, Inc.*, 606 A.2d 96, 103 (Del.1992). The general rule does not apply, however, in the following four situations:

(i) where the termination violated public policy;

(ii) where the employer misrepresented an important fact and the employee relied "thereon either to accept a new position or remain in a present one";

(iii) where the employer used its superior bargaining power to deprive an employee of clearly

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

identifiable compensation related to the employee's past service; and
*165 (iv) where the employer falsified or manipulated employment records to create fictitious grounds for termination.

*Lord v. Souder,* 748 A.2d 393, 400 (Del.2000) (citing *E.I. DuPont de Nemours and Co. v. Pressman,* 679 A.2d 436, 442-44 (Del.1996)). Stepler claims that Avecia's actions fit into either the first or fourth category. She contends that the first category fits because being fired for opposition to sexual harassment and retaliation violates public policy, and she argues that the fourth category fits because she was subjected to false criticisms of her work in her performance evaluation, false claims that she was using work time to study, and false claims that she was fired for behavioral and performance issues.

In order to make out a claim of a public policy violation, a plaintiff must satisfy a two-part test: "(i) the employee must assert a public interest recognized by some legislative, administrative or judicial authority and (ii) the employee must occupy a position with responsibility for advancing or sustaining that particular interest." *Lord,* 748 A.2d at 401 (citing *Pressman,* 679 A.2d at 441-42). To satisfy the first part, Stepler relies on the Delaware Supreme Court's decision in *Schuster v. Derocili,* 775 A.2d 1029 (Del.2001), which recognized a cause of action for breach of the covenant of good faith and fair dealing where the employee alleged that she was terminated following sexual harassment in the workplace. But in 2004 the Delaware legislature amended 19 Del. C. § 710 *et seq.,* which prohibits discrimination in employment practices, in order to clarify that this statute was the "sole remedy" for an aggrieved employee "to the exclusion of all other remedies." 19 Del. C. § 712(b) (2005). In fact, the synopsis of the Senate Bill expressly states disagreement with the Delaware Supreme Court's decision in *Schuster:*

> This bill confirms that Chapter 7 is the exclusive and sole remedy for employment discrimination claims, requiring initial processing of all such claims with the Department of Labor for review and action. This bill effectively re-establishes the exclusive remedy put in question by the decision in *Schuster v. Derocili,* 775 A.2d 1029 (2001).

Delaware Bill Summary, 2004 Reg. Sess. S.B. 154. Moreover, when the bill is read in light of the sponsor statement, which "confirms" and "re-establishes" the pre-existing rule "put in question by" *Schuster,* it is clear that the 2004 Amendment is meant to be retroactive. Thus Stepler has not asserted a recognized public interest, and Avecia's actions do not fit into the first category.

Nor do they fit into the fourth category: falsification or manipulation of employment records to create fictitious grounds for termination. Even if we assume that Stepler was subjected to false criticisms of her work performance and false claims that she was using work time to study, there is no evidence that these particular criticisms and claims were the grounds for Stapler's termination. And even if we assume that Avecia falsely claimed that Stepler was fired for behavioral and performance issues, this is not the kind of falsehood specified in the fourth category, which provides that an employer violates the covenant of good faith and fair dealing when it "falsifie[s] or manipulate[s] employment records to create fictitious grounds for termination." *Lord,* 748 A.2d at 400. If the employer did not actually falsify or manipulate employment records, then it does not matter if the employer gave a false rationale for termination. *See Williams v. Caruso,* 966 F.Supp. 287, 291 (D.Del.1997) ("Nothing in *Pressman* suggests an employer who gives an employee a false reason for termination *166 is subject to liability under the implied covenant of good faith and fair dealing. *Pressman* only held culpable the *manufacture* of grounds for dismissal, not the *statement* of a false reason for dismissal.") (emphasis in original); *see also Geddis v. University of Delaware,* 40 Fed. Appx. 650, 654 (3d Cir.2002) (unpublished) (noting that the employee did not claim his supervisor "intentionally created 'fictitious negative information' about him in order to get him fired" and thus the conduct at issue did not fit the fourth *Pressman* category) (quoting *Schuster,* 775 A.2d at 1040).

## IV.

Under Delaware law, the general rule is that the worker's compensation administrative process is the exclusive remedy for an employee who suffers a work-related accident causing personal injury or death. *See* 19 Del.Code Ann. § 2304 (2005). However, the Delaware Supreme Court has held that "claims that involve a *true intent* by the employer to injure the employee fall outside of the Workers' Compensation Act and remain separately actionable as common law tort claims." *Rafferty v. Hartman Walsh Painting Co.,* 760 A.2d 157, 159 (Del.2000) (emphasis added); *see also Showell v. Langston,* No. Civ. A. 02C-01-016, 2003 WL 1387142, at *3 (Del.Super. March 5, 2003) (citing *Rafferty*). Thus, "for a complaint to survive a motion to dismiss, there must be more than a mere allegation that there was an intentional injury; there must be facts alleged, which,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

151 Fed.Appx. 162
151 Fed.Appx. 162
(Cite as: 151 Fed.Appx. 162)

Page 4

if true, show deliberate intent to bring about an
injury." *Rafferty, 760 A.2d at 160*.  In other words,
an employee must allege facts that, if true, would
show that the employer intended to injure her.  It
would not be enough to allege facts showing that the
employer intended to do an action and that the
worker was injured as a result of that action.  Specific
intent is required.

Stepler cites *Rafferty* and argues that her claim for
intentional infliction of emotional distress is not
barred.  In a Memorandum Order of April 28, 2004,
the District Court rejected Stepler's argument.  We
agree with the District Court's analysis.

We therefore affirm the District Court's order of
summary judgment in favor of Avecia on Stepler's
claims under Delaware law, but we reverse the
District Court's order granting summary judgment in
favor of Avecia on Stepler's retaliation claim, and we
remand the case for further proceedings.

151 Fed.Appx. 162

**Briefs and Other Related Documents** (Back to top)

• 04-3396 (Docket) (Aug. 23, 2004)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 751940 (D.Del.)
(Cite as: 2005 WL 751940 (D.Del.))

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
George EVERETT, Plaintiff,
v.
HOSPITAL BILLING AND COLLECTION
SERVICE, LTD., et al., Defendants.
No. Civ.A. 04-049 JJF.

March 31, 2005.

William J. Rhodunda, Jr., Oberly, Jennings &
Rhodunda, P.A., Wilmington, Delaware, for Plaintiff.

Gregory V. Varallo, Jennifer C. Jauffret, and Kelly
A. Green,  Richards, Layton & Finger, P.A.,
Wilmington, Delaware, for Defendants.

*MEMORANDUM OPINION*

FARNAN, J.

*1 Pending before the Court are Defendants' Motion
To Dismiss (D.I.7) and Defendants' Motion To Strike
Portions Of Plaintiff's Answering Brief, Or In The
Alternative, For Leave To Take Discovery (D.I.12).
For the reasons discussed, the Motion To Dismiss
(D.I.7) will be granted in part and denied in part and
the Motion To Strike (D.I 12) will be granted.

I. Background

On January 23, 2004, Plaintiff filed five-count
complaint against his former employer, Hospital
Billing and Collection Service, Ltd. ("Hospital
Billing"), and two of its employees, President Jack T.
Byrnes ("Byrnes") and Director of Information
Services and Technology Victoria Ostrow
("Ostrow"). Plaintiff claims that Defendants violated
the Americans With Disabilities Act (ADA), Title
VII of the Civil Rights Act of 1964, and 42 U.S.C. §
1981. Plaintiff further alleges intentional infliction of
emotional distress and conspiracy.

II. Legal Standard

A motion to dismiss tests the legal sufficiency of the
complaint. In reviewing a motion to dismiss pursuant
to Rule 12(b)(6), courts "must accept as true the
factual allegations in the [c]omplaint and all
reasonable inferences that can be drawn therefrom."
Langford v. Atlantic City, 235 F.3d 845, 847 (3d
Cir.2000) A court will grant a motion to dismiss only
when it appears that a plaintiff could prove no set of
facts that would entitle him or her to relief. Id.

III. Discussion

A Release

Defendants contend that the Court should dismiss
Plaintiff's Complaint because Plaintiff knowingly and
willingly executed a valid release in which he
expressly waived his right to file any and all claims
or causes of action arising from his employment or
separation from employment against Defendants. In
response, Plaintiff contends, first, that the release
issue is improperly before the Court because the
Complaint does not rely on the release. Further,
Plaintiff contends that he signed the release under
duress, and that the release lacked consideration
because it decreased Plaintiff's benefits. In response,
Defendants have filed a Motion To Strike Portions Of
Plaintiff's Answering Brief, Or In The Alternative,
For Leave To Take Discovery (D.I.12) asking the
Court not to consider, in deciding the Motion to
Dismiss, any allegations regarding the alleged release
that were made for the first time in Plaintiff's
Answering Brief and Affidavit.

As noted above, a motion to dismiss tests the legal
sufficiency of the complaint. In this case, the alleged
release was not attached to Plaintiff's Complaint, and
therefore, the Court concludes that it cannot consider
the release in assessing Defendants' motion to
dismiss. For this reason, the Court will grant
Defendants' Motion To Strike (D.I.12).

B Plaintiff's ADA Claim (Count I)

Defendants contend that Plaintiff's ADA claim
(Count I) should be dismissed in its entirety because
Plaintiff failed to properly plead a "regarded as"
claim. In response, Plaintiff contends that he was
"regarded as" having a disability because he has a
physical or mental impairment that does not
substantially limit major life activities but was treated

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 751940 (D.Del.)
(Cite as: 2005 WL 751940 (D.Del.))

Page 2

by Hospital Billing as having such a limitation.

*2 Accepting Plaintiff's factual allegations as true, the Court concludes that Plaintiff has properly pled a "regarded as" claim under the ADA.

*C. Plaintiff's ADA Claim (Count I) and Title VII Claim (Count II) regarding Defendants Byrnes and Ostrow*

Defendants Byrnes and Ostrow contend that Plaintiff cannot allege individual liability against Byrnes and Ostrow in Count I (ADA claim) and Count II (Title VII claim). In response, Plaintiff contends that Defendants were personally involved in his unlawful termination.

Individual employees cannot be held liable under Title VII or the ADA See *Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1077 (3d Cir.1996); Emerson v. Thiel College, 296 F.3d 184, 189 (3d Cir.2002).* Thus, the Court will dismiss Plaintiff's claims against Byrnes and Ostrow pled in Counts I and II.

*D. Plaintiff's Section 1981 Claim (Count III) regarding Defendant Byrnes*

Defendant Byrnes contends that Count III must be dismissed because Plaintiff's Complaint does not allege that Byrnes committed any discriminatory acts. In response, Plaintiff contends that Byrnes, in his supervisory position, was involved in the scheme to wrongfully discharge Plaintiff. Plaintiff contends that Defendant Ostrow confirmed this allegation when stating to him, regarding the termination, "they made me do it." (D.I. 10 at 15.)

Based on Plaintiff's contested allegations, the Court concludes, at this juncture, that Plaintiff has sufficiently pled a claim against Byrnes.

*E. Plaintiff's IIED Claim (Count IV)*

Defendants contend that Plaintiff's intentional infliction of emotional distress ("IIED") claim (Count IV) is barred by the Delaware Worker's Compensation Act, which provides the exclusive remedy for employees injured at work. 19 Del. C. § 2304. Further, Defendants contend that Plaintiff failed to plead all the elements of IIED against all Defendants. In response, Plaintiff contends that the "personal dispute exception" of 19 Del. C. § 2301(15)(b) excludes coverage under the Worker's Compensation Act.

The personal dispute exception cited by Plaintiff applies to a "wilful act of another employee directed against the employee by reasons personal to such employee and not directed against the employee as an employee or because of the employee's employment." 19 Del. C. § 2301(15)(b). In making this determination,

> courts generally look to the time, place, and circumstances of the injury, with a focus on three factors: (1) the employee's act causing the injury was willful; (2) the injury must not have been directed against plaintiff as an employee or because of plaintiff's employment; and (3) the assault was directed against the plaintiff because of personal reasons.

*Lloyd v. Jefferson, 53 F.Supp.2d 643, 690 (D.Del.1999).*

Because the reasons for Everett's termination are fact-sensitive, the Court cannot, at this stage of the proceedings, conclude whether Everett was fired for non-personal reasons. Therefore, the Court will not dismiss Plaintiff's IIED claims against Byrnes and Ostrow on the basis of the exclusivity provision of the Delaware Worker's Compensation Act. The Court, however, will dismiss the IIED claim against Hospital Billing because the personal dispute exception applies only to fellow employees. Plaintiff's claim and remedy against Hospital Billing, therefore, can only be pursued pursuant to the Delaware Worker's Compensation Act.

*F. Plaintiff's Conspiracy Claim (Count V)*

*3 Defendants contend that Plaintiff's conspiracy claim (Count V) fails to plead the required elements of such a claim.

A civil conspiracy claim requires a plaintiff to allege "(1) [a] confederation or combination of two or more persons; (2)[a]n unlawful act done in furtherance of the conspiracy; and (3)[a]ctual damage." *Nicolet, Inc. v. Nutt, 525 A.2d 146, 149-50 (Del.1987)* (citations omitted).

The Court has reviewed the allegations of Count V in the Complaint and measured those allegations against the elements required to prove a civil conspiracy under Delaware law and concludes that Plaintiff's factual allegations are sufficient to survive Defendants' Motion To Dismiss.

*IV. Conclusion*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A000011

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 751940 (D.Del.)
**(Cite as: 2005 WL 751940 (D.Del.))**

In sum, the Court will (1) grant in part and deny in part Defendants' Motion To Dismiss (D.I.7) and (2) grant Defendants' Motion To Strike Portions Of Plaintiff's Answering Brief, Or In The Alternative, For Leave To Take Discovery (D.I.12).

An appropriate Order will be entered.

*ORDER*

At Wilmington, this *31* day of March 2005, for the reasons set forth in the Memorandum Opinion issued this date;

IT IS HEREBY ORDERED THAT:

1) Defendants' Motion To Dismiss (D.I.7) is *GRANTED* in part and *DENIED* in part, specifically:

a. Plaintiff's claims against Byrnes and Ostrow in Counts I and II are dismissed;

b. Plaintiff's IIED claim against Hospital Billing in Count IV is dismissed;

c. All remaining claims are not dismissed;

2) Defendants' Motion To Strike Portions Of Plaintiff's Answering Brief, Or In The Alternative, For Leave To Take Discovery (D.I.12) is *GRANTED.* The Court has not considered any of Plaintiff's allegations concerning Defendants' release contentions.

Not Reported in F.Supp.2d, 2005 WL 751940 (D.Del.)

**Motions, Pleadings and Filings (Back to top)**

• 1:04CV00049 (Docket) (Jan. 23, 2004)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A000012

Westlaw.

Not Reported in F.Supp.2d                                                                    Page 1
Not Reported in F.Supp.2d, 2006 WL 733567 (D.Del.)
(Cite as: 2006 WL 733567 (D.Del.))

**H**

<u>Motions, Pleadings and Filings</u>

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
Dino G. PETROCELLI, Plaintiff,
v.
DAIMLERCHRYSLER CORPORATION,
Defendant.
**No. Civ.A. 04-943-KAJ.**

March 22, 2006.
Dino G. Petrocelli, Plaintiff, pro se.

<u>Jennifer Gimler Brady</u>, <u>Sarah E. DiLuzio</u>, Potter Anderson & Corroon LLP, Wilmington, Delaware, for Defendant.

<u>William C. Martucci</u>, <u>Kristen Aggeler Page</u>, Shook Hardy & Bacon LLP, Kansas City, Missouri, of counsel.

MEMORANDUM OPINION

JORDAN, J.

I. INTRODUCTION

**\*1** This is an employment discrimination case brought by Dino G. Petrocelli ("Petrocelli"), who is proceeding pro se, against his former employer, DaimlerChrysler Corporation ("DaimlerChrysler" or the "Company") Petrocelli, a Hispanic American, claims that while he was working for DaimlerChrysler he was the target of discrimination based on his national origin, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), <u>42 U.S.C. § § 2000e</u> et seq., and of the Delaware Discrimination in Employment Act (the "Delaware Act"), <u>19 Del.Code § 711</u>. He also alleges that, in violation of Title VII, DaimlerChrysler retaliated against him for filing the first of two charges of discrimination and that the Company defamed him by accusing him of theft and by making derogatory statements about his work habits. Before me now is DaimlerChrysler's Motion for Summary Judgment. (Docket Item ["D.I."] 56; the "Motion".) This court

has subject matter jurisdiction over the case pursuant to <u>28 U.S.C. § § 1331</u>, <u>1343</u>, and <u>1367</u>. For the reasons that follow, the Motion will be granted in part and denied in part.

II. BACKGROUND [FN1]

> FN1. The following background information is taken from the parties' submissions and does not constitute findings of fact.

A. *Perceived Harassment During Petrocelli's Employment at DaimlerChrysler*

Petrocelli applied for employment with DaimlerChrysler on March 15, 1997 (D.I. 58 at A1-2), after being referred to the Company through the Latin American Community Center (*id.* at A8, 66:21-67:14). On his application, Petrocelli listed "Spanish" as one of his skills (*id.* at A1), and during his interview with DaimlerChrysler, he was asked to "say a few things in Spanish," because he "didn't look Hispanic" (*id* at A9-10, 73:24-74:8, 74:23-75:3). In May 1997, Petrocelli began working at DaimlerChrysler's Parts Distribution Center in Newark, Delaware ("Newark PDC"). (*Id.* at A11, 81:2-4.) Petrocelli worked on the night shift at Newark PDC, initially on the dock and later in the warehouse as a picker/packer. (*Id* at A10-11, 77:12-78:10.)

Petrocelli testified at his deposition about several incidents at Newark PDC that he perceived to be harassment based on his national origin. First, he testified that his coworkers drew pictures of his "face with a beard ... and [his] name under there and saying, 'Me no speak English' ... [with] a sombrero ... [o]r a jail cell with a sombrero with [his] name." (*Id* at A23, 140:7-11.) Those pictures were drawn with markers "[i]n the bathrooms, on the work equipment, [and] out in the work area on boxes." (*Id.* at A23, 140:12- 18.) One particular picture, drawn in the bathroom in October 2001, depicted "a snake with a sombrero, [Petrocelli's] name underneath of it, ... bars of a jail cell around it, ... [and] references to . . [him] not speaking English." (*Id* at A25, 169:21-24.) He further testified that "on several occasions," starting in January 2000, pictures and notes were left in work areas "referring to burritos and tacos ... and references to [him] wearing a bandanna ... being in gangs and calling [him] 'Esse'." (*Id* at A26, 185:17-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 733567 (D.Del.)
(Cite as: 2006 WL 733567 (D.Del.))

Page 2

186:3.)

**\*2** Petrocelli also testified that he was called "Spic" by coworkers on "numerous" occasions, including once in December 2001 in front of the control center at Newark PDC. (*Id* at A26, 186:12-23.) Petrocelli testified that he was called "a lazy Latino," a "mushroom picker," and a "Spic" on other occasions in 1998 and 2000. (*Id* at A34-35, 218:18-20, 220:16-221:1.) During some of those incidents, the speaker using those terms acted "like he was going to run [Petrocelli] over with his forklift." (*Id* at A34-35, 220:23-221:1.)

According to Petrocelli, one of his supervisors saw him wearing a cross, asked if he was Catholic, and when Petrocelli said that he was, the supervisor "looked surprised ... [and] said, 'Well, I thought you people practiced "Santaria" or Voodoo or something like that,' and laughed." (*Id.* at A31, 206:12-207:1; *see also id.* at A20, 121:4-17.)

Finally, Petrocelli testified that, starting in September 2001, coworkers made references about his relationship with a non-Hispanic white female coworker. (*Id* at A26, 187:24-188:5.) Those references included sexually explicit drawings posted on billboards (*id* at A26, 188:15-22), as well as a particular occasion where a coworker said to Petrocelli and the female coworker, "Are you down with the brown tour?" (*id* at A26-27, 188:9-15, 189:7-14).

B. *Events Leading Up to Petrocelli's Firing*

During his tenure at Newark PDC, which lasted from 1997 until January 2002, Petrocelli was disciplined many times for violating DaimlerChrysler's Standards of Conduct. Petrocelli's disciplinary record (*id* at A99-119) includes, inter alia, violations for (1) leaving work during working hours without permission, or failing to return to work after lunch or relief without permission; (2) failing to exert normal work effort on the job, wasting time, loitering, loafing, or sleeping on the job; (3) failing to follow instructions from supervisors; (4) negligent or deliberate damage to DaimlerChrysler's property; and (5) threatening, intimidating, coercing, harassing, retaliating, or using abusive language to others. (*See also id* at A96-97 (DaimlerChrysler Standards of Conduct).) Between April 14, 1999 and June 14, 2001, Petrocelli received four disciplinary layoffs, each lasting between five and thirty days. (*Id* at A100-10.) On September 19, 2001, Petrocelli was suspended for attempting to steal DaimlerChrysler

property. (*Id* at A111- 14.) Finally, on January 9, 2002, Petrocelli was suspended indefinitely for violating DaimlerChrysler's standards of conduct. (*Id* at A115-17.) That suspension was modified to a discharge effective January 11, 2002. (*Id* at A118.)

Petrocelli testified that twelve of his coworkers committed similar violations but were not punished as severely as he was. (*Id* at A21-23, 130:9-138:9.) Those violations included sleeping, loafing, and playing board games (*id.* at A22-23, 136:10-138:9), as well as the more severe issue of working under the influence of drugs (*id* at A21-22, 133:11-134:23). According to Petrocelli, some coworkers received no discipline for those violations (*id* at A22, 136:10-137:2), while others received too little discipline (*id* at A22-23, 134:17-23, 138:1-9). Petrocelli also admitted, however, that he did not know precisely what discipline those coworkers received, although he perceived it to be less severe than what he received. (*Id* at A22-23, 134:20-136:4, 138:1- 9.)

**\*3** After he was discharged in January 2002, Petrocelli filed a union grievance to appeal that decision. (*Id* at A152-53.) That grievance addressed whether discharge was an appropriate response to Petrocelli's violations, but it did not include any allegations of discrimination based on national origin. (*Id*) On April 11, 2002, the Appeal Board, which included representatives of DaimlerChrysler and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW"), directed that Petrocelli be offered reinstatement, and that offer was extended in a letter to Petrocelli dated May 22, 2002. (*Id* at A154-56.) The reinstatement offer required Petrocelli to report to Newark PDC on May 28, 2002. (*Id* at A156.)

However, Petrocelli did not report as directed because, in March 2002, while his grievance was being considered, he had been arrested for possession of cocaine and he remained in custody. (*Id.* at A4, 33:2-5; *id* at A157.) He was convicted of possession of a controlled substance and violation of probation, which had been imposed after an earlier conviction for offensive touching. (*Id.* at A5, 34:4-20, 35:24-36:15.) He was incarcerated for approximately eight months, beginning in March 2002. (*Id* at A33, 213:22- 214:3.) After failing to report by June 6, 2002, and failing to substantiate the reason for his failure, Petrocelli's seniority was terminated. (*Id* at A158-59.)

C. *Procedural History*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A000014

Not Reported in F.Supp.2d
Page 3
Not Reported in F.Supp.2d, 2006 WL 733567 (D.Del.)
(Cite as: 2006 WL 733567 (D.Del.))

On January 22, 2002, while his grievance was pending, Petrocelli filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Delaware Department of Labor against DaimlerChrysler, alleging that he was subjected to discrimination and a hostile work environment in violation of Title VII and the Delaware Act. (*Id.* at A160.) On November 26, 2003, the Delaware Department of Labor issued a Reasonable Cause Finding that concluded there was evidence to support a finding of a hostile work environment but not a finding that the disciplinary actions and discharge resulted from discrimination. (*Id.* at A167-68.) The EEOC adopted those findings in a Notice of Right to Sue dated May 18, 2004. (*Id.* at A169.) The EEOC also issued a Notice of Right to Sue on January 6, 2005, stating that the EEOC found reasonable cause to believe that a violation had occurred, but that it had not obtained a settlement with DaimlerChrysler and would not bring suit. (*Id.* at A161.) That notice concluded the EEOC's processing of Petrocelli's first charge of discrimination against the Company. (*Id.*)

On April 3, 2003, Petrocelli filed with the EEOC a second Charge of Discrimination, alleging that DaimlerChrysler had retaliated against him for filing his first charge by offering him reinstatement when the Company knew that he was incarcerated and unable to report. (*Id.* at A162.) The EEOC issued a Dismissal and Notice of Right to Sue on September 10, 2003, stating that the retaliation charge could not be investigated because it was not filed within the statutory time limit. (*Id.*) That notice informed Petrocelli that he had ninety days to file a claim based on that second charge, or the right to sue would be lost. (*Id.*)

*4 Based on the May 18, 2004 Notice of Right to Sue on the first charge of discrimination, Petrocelli filed this suit against DaimlerChrysler on August 16, 2004, alleging that he was fired, disciplined, and subjected to a hostile work environment in violation of Title VII and the Delaware Act. (*Id.* at A164-70.) On September 28, 2005, Petrocelli was granted leave to amend his complaint. (D.I.53.) That amended complaint provided more explanation in support of Petrocelli's allegations of discrimination, as well as articulating his claims for retaliation and defamation. (D.I. 58 at A171-75.) Petrocelli seeks reinstatement, back pay, front pay, and compensatory and punitive damages. (*Id.* at A174.)

III. STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56(c), a party is entitled to summary judgment if a court determines from its examination of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. In determining whether there is a triable dispute of material fact, a court must review the evidence and construe all inferences in the light most favorable to the non-moving party. *Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (3d Cir.1976). However, a court should not make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000). To defeat a motion for summary judgment, Rule 56(c) requires that the non-moving party "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986) (internal citation omitted). The non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Fed.R.Civ.P. 56(c).* "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita,* 475 U.S. at 587 (internal citation omitted). Accordingly, a mere scintilla of evidence in support of the non-moving party is insufficient for a court to deny summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986).

IV. DISCUSSION

In his complaint, Petrocelli asserts that DaimlerChrysler violated both Title VII and the Delaware Act. (D.I. 58 at A164-70.) Since claims of employment discrimination under the Delaware Act are analyzed in the same way as claims under Title VII, *Giles v. Family Court,* 411 A.2d 599, 601-02 (Del.1980), the following analysis uses the Title VII framework, and the conclusions apply equally to the claims of hostile work environment and disparate treatment under the Delaware Act.

A. Hostile Work Environment

A hostile work environment may form the basis of a Title VII discrimination claim against an employer. *Cardenas v. Massey,* 269 F.3d 251, 260 (3d Cir.2001) (citing *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 65-68 (1986)). The inquiry into whether an environment is hostile requires a look into "all the circumstances ... [including] the frequency of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 733567 (D.Del.)
(Cite as: 2006 WL 733567 (D.Del.))

discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23 (1993) That analysis "must concentrate not on individual incidents, but on the overall scenario." *Durham Life Ins. Co. v. Evans,* 166 F.3d 139, 149 (3d Cir.1999). To establish a Title VII claim based upon a hostile work environment, Petrocelli must show that "(1) he suffered intentional discrimination because of his national origin; (2) the discrimination was pervasive and regular; (3) it detrimentally affected him; (4) it would have detrimentally affected a reasonable person of the same protected class in his position; and (5) there is a basis for vicarious liability." *Cardenas,* 269 F.3d at 260.

*5 For purposes of this Motion, DaimlerChrysler concedes four of those five elements, arguing only that the discrimination faced by Petrocelli was not pervasive and regular. (D.I. 57 at 28-32.) DaimlerChrysler first argues that the harassment discussed in Petrocelli's deposition is a series of isolated incidents. In particular, according to DaimlerChrysler, the name-calling, including epithets like "spic," "mushroom picker," "lazy Latino," and references to "you people" practicing Santaria or voodoo, were sporadic, and, in any event, constituted mere offensive utterances. (*Id.* at 29.) Also, according to DaimlerChrysler, the picture of the snake with the sombrero in a jail cell with Petrocelli's name was a one-time occurrence, and that a "single item of graffiti" is not pervasive and regular discrimination. (*Id.* at 30.)

DaimlerChrysler's argument misses the mark, because it focuses on individual incidents in isolation and, unsurprisingly, finds that each is a one-time occurrence. To the contrary, the analysis must consider the circumstances as a whole and not focus on each event individually. *Durham Life,* 166 F.3d at 149. According to Petrocelli's unrebutted testimony, he was called a "spic" on "numerous" occasions during his time at Newark PDC. (D.I. 58 at A26, 186:12- 23.) Other derogatory terms, such as "lazy Latino," and "mushroom picker," were allegedly directed at him. (*Id.* at A34-35, 218:18-20, 220:16-221:1.) The reference to the religion practiced by "you people" was also clearly addressed to Petrocelli's Hispanic origin. (*Id.* at A31, 206:12-207:1.) Those statements, taken as a group and according to Petrocelli's testimony, were not sporadic, and they constitute more than offensive utterances. *See Smith v. Leggett Wire Co.,* 220 F.3d

752, 767 (6th Cir.2000) (holding that the commonplace use of the word "nigger" constituted more than mere offensive utterances). Finally, according to Petrocelli, pictures directed at his national origin were drawn in the bathrooms, on the work equipment, and out in the work area on boxes. (D.I. 58 at A23, 140:7-18; *id.* at A25, 169:21-24.) DaimlerChrysler points to one such picture and calls it an isolated occurrence. (D.I. 57 at 30.) Again, by isolating individual events, DaimlerChrysler ignores the totality of Petrocelli's allegations.

DaimlerChrysler also argues that many events that were perceived by Petrocelli to constitute harassment, including the statements and drawings referring to Petrocelli's romantic relationship with a non-Hispanic white coworker, the request that he speak Spanish at his interview, and the discipline he received for violating the standards of conduct, were not actually directed at his national origin. (D.I. 57 at 28-31.) While I agree that each of those events, viewed in isolation, might not be obviously directed at Petrocelli's Hispanic origin, [FN2] when they are considered along with the epithets and offensive graffiti, a reasonable jury might conclude that those acts were motivated by a discriminatory purpose. *See Aman v. Cort Furniture Rental Corp.,* 85 F.3d 1074, 1083 (3d Cir.1996) (interpreting less obvious incidents in light of other racially-motivated events). Therefore, the less overt incidents reported by Petrocelli are properly included in the totality of circumstances examined by the factfinder.

> FN2. The "brown tour" comment does seem so directed, however. (*See* D.I. 58 at A26-27, 188:9-15, 189:7-14.)

*6 DaimlerChrysler has failed to show that, viewing the evidence in the light most favorable to Petrocelli, the incidents of hostility were not "pervasive and regular" as required under Title VII. Petrocelli's unrebutted testimony raises a genuine issue of material fact concerning the frequency and severity of the hostility he experienced. Therefore, because that is the only issue raised by DaimlerChrysler, I will deny the Motion as to the hostile work environment claim.

### B. Disparate Treatment

Petrocelli alleges that when DaimlerChrysler disciplined him for violating the standards of conduct and eventually fired him, it discriminated against him based on his national origin. (D.I. 58 at A165.) Those disparate treatment claims are analyzed under the

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 733567 (D.Del.)
(Cite as: 2006 WL 733567 (D.Del.))

*McDonnell Douglas* burden shifting framework. *Jones v. Sch. Dist. Of Philadelphia,* 198 F.3d 403, 410 (3d Cir.1999)* (referring to *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973)). Under that framework, Petrocelli must establish a prima facie case of discrimination based on national origin by showing: (1) that he is a member of a protected class; (2) that he suffered an adverse employment action; and (3) that that action occurred under circumstances that give rise to an inference of unlawful discrimination, such as might occur when a similarly situated person not of the protected class is treated differently. *Jones,* 198 F.3d at 410- 11; *Boykins v. Lucent Techs., Inc.,* 78 F.Supp.2d 402, 409 (E.D.Pa.2000). If Petrocelli succeeds in establishing a prima facie case, then DaimlerChrysler must "articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *Jones,* 198 F.3d at 410. If DaimlerChrysler meets that burden, then Petrocelli must show by a preponderance of the evidence that those legitimate reasons were a pretext for discrimination. *Id.* If DaimlerChrysler raises a legitimate nondiscriminatory reason for its actions, Petrocelli may overcome a summary judgment motion with evidence "from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir.1994).

Here, for both the claim based on disciplinary action and the claim based on discharge, DaimlerChrysler concedes, for purposes of this Motion, the first two elements of Petrocelli's prima facie case, but argues that he has not established the third element: that the circumstances give rise to an inference of unlawful discrimination. (D.I. 57 at 21-23, 25.) Furthermore, DaimlerChrysler argues that it had legitimate nondiscriminatory reasons for disciplining and firing Petrocelli, and Petrocelli has failed to establish that those reasons were pretextual (*Id.* at 23-25, 26-27.) The arguments concerning the inference of unlawful discrimination and the showing of pretext both focus on Petrocelli's failure to show that similarly situated coworkers were treated differently than he was. (*Id.* at 22-25, 27.)

\*7 If Petrocelli's assertions about the discipline received by his coworkers were the only relevant evidence, I would agree that Petrocelli had failed to establish an Inference that his discipline and firing were based on unlawful discrimination. Petrocelli

admitted that he did not know precisely what discipline other employees received (D.I. 58 at A22-23, 134:20-136:4, 138:1-9), and his unsubstantiated belief that he was punished more severely is insufficient to support his prima facie case. *See Seabrook v. Gadow,* No. Civ.A.01-802, 2003 WL 21383719, at \*7 (D. Del. June 10, 2003). Also, considering that DaimlerChrysler has articulated legitimate nondiscriminatory reasons for its actions by presenting the details of Petrocelli's disciplinary record (D.I. 58 at A99-119), Petrocelli's belief about the discipline given to other employees is insufficient to raise a genuine issue of material fact as to pretext. *See Seabrook,* 2003 WL 21383719, at \*7.

However, for the claim based on disciplinary actions, Petrocelli has presented other relevant evidence. "Evidence of ... a hostile work environment is relevant to whether one of the principal nondiscriminatory reasons asserted by an employer for its actions was in fact a pretext for discrimination." *Aman,* 85 F.3d at 1086. As discussed above, *supra* Section IV.A, Petrocelli has presented sufficient evidence to overcome DaimlerChrysler's summary judgment motion as to his hostile work environment claim. That general evidence of a hostile environment, viewed in the light most favorable to Petrocelli, raises genuine issues of material fact both as to open hostility at Newark PDC and as to the reasons underlying the disciplinary actions taken against Petrocelli by his supervisors. That evidence is relevant not only for Petrocelli's prima facie case of discrimination, but could also support a reasonable factfinder's belief that an invidious discriminatory reason was a motivating or determinative cause of those actions. *Fuentes,* 32 F.3d at 764. Therefore, Petrocelli has presented sufficient evidence of pretext to survive a motion for summary judgment, and I will deny the Motion as to the disparate treatment claim based on the disciplinary actions taken against Petrocelli.

The evidence of a hostile work environment is not sufficient, however, to support Petrocelli's disparate treatment claim based on his discharge. DaimlerChrysler has articulated a legitimate nondiscriminatory reason for that action: Petrocelli failed to report to work after he was reinstated because he was incarcerated for possession of cocaine and violation of his probation. (D.I. 58 at A5, 34:4-20, 35:24-36:15; *id.* at A33, 213:22-214:3; *id.* at A157-59; *see also* D.I. 57 at 26.) While the evidence about the environment at Newark PDC raises a factual issue as to the motivation behind the discipline given to Petrocelli by his supervisors, a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 733567 (D.Del.)
(Cite as: 2006 WL 733567 (D.Del.))

reasonable factfinder could not infer that the decision to discharge Petrocelli after he failed to report was motivated by discrimination. His failure to report was caused by his own actions in March 2002 and his subsequent arrest, conviction, and incarceration. Therefore, I will grant the Motion as to the disparate treatment claim based on Petrocelli's discharge. [FN3]

> FN3. In his claim that DaimlerChrysler retaliated against him for filing a discrimination charge, Petrocelli alleged that the Company knew that he was incarcerated and that the timing of his reinstatement was manipulated so that he would be unable to report. (D.I. 58 at A162.) As discussed below, *infra* Section IV.C, that retaliation claim is time-barred, and the allegations concerning the timing of his reinstatement were not raised in the EEOC charge which provides the basis for this suit (*id* at A160). Thus, those allegations may not be used to support the disparate treatment claim based on his discharge. In addition, as noted below, *infra* Section IV.C, Petrocelli has adduced no evidence to support his allegation that the timing of his reinstatement was actually manipulated.

*C. Retaliation*

*8 In his amended complaint, Petrocelli alleges that DaimlerChrysler discharged him in retaliation for filing his first Charge of Discrimination on January 22, 2002. (*Id* at A172, (1)(c).) That allegation, made pursuant to Title VII, was first raised in a Charge of Discrimination filed by Petrocelli with the EEOC on April 3, 2003. (*Id.* at A162.) The EEOC issued a dismissal on September 10, 2003, giving Petrocelli notice that his right to sue on that charge would be lost after ninety days. (*Id* at A163.)

DaimlerChrysler correctly points out (D.I. 57 at 33) that Petrocelli did not file his compliant until August 16, 2004 (D.I. 58 at A164-66), and so his claim of retaliation under Title VII was filed outside the ninety-day window and is therefore time-barred. *See* 42 U.S.C. § 2000e-5(f)(1). That time bar is subject to equitable tolling if the filing was untimely "due to sufficiently inequitable circumstances." *Grice v. U.S. Postal Serv.,* No. Civ .A.05-2404, 2005 WL 1528880, at *4 (D.N.J. June 29, 2005). No such circumstances have been presented here. Even though Petrocelli is proceeding pro se, he filed his complaint in a timely manner after the EEOC dismissed his

disparate treatment and hostile work environment charges, and there is no apparent excuse for his failure to do so for his retaliation charge. (D.I. 58 at A164-66, A169.) Thus, I conclude that Petrocelli's retaliation claim is time-barred.

Even if that claim were not time-barred, Petrocelli has failed to demonstrate a causal link between his charge of discrimination and his discharge. *See Abramson v. William Paterson Coll. of N.J.,* 260 F.3d 265, 286 (3d Cir.2001) (requiring such a demonstration to support a prima facie claim of retaliation). As already noted, *supra* Section IV.B, Petrocelli was discharged after failing to report to work because he was incarcerated. Petrocelli has produced no evidence to support the allegation that that decision was caused by a retaliatory motive. Therefore, in addition to being time-barred, Petrocelli has failed to establish a prima facie case of retaliation.

*D. Defamation*

Finally, in addition to his claims under Title VII and the Delaware Act, Petrocelli makes a defamation claim, apparently pursuant to Delaware common law. (D.I. 58 at A173.) In support of its Motion, DaimlerChrysler does not dispute whether Petrocelli has established a prima facie claim of defamation, but asserts that it is protected by the qualified privilege between employer and employee. (D.I. 57 at 35-36.)

DaimlerChrysler is correct that, under Delaware law, statements made in furtherance of the common interest of management and labor in operating a successful business are privileged. *Gonzales v. Avon Prods., Inc.,* 609 F.Supp. 1555, 1559 (D.Del.1985) (citing *Battista v. Chrysler Corp.,* 454 A.2d 286, 291 (Del.Super.Ct.1982)). The statements made about Petrocelli, including allegations of theft and loafing (D.I. 58 at A173), appear to fall within that common interest. However, the qualified privilege will be lost if the speaker knows the statement is false, or if the speaker acts with express malice, a desire to cause harm, or bad faith. *Gonzales,* 609 F.Supp. at 1559. The evidence raised by Petrocelli in support of his hostile work environment claim, when viewed in the light most favorable to him, also raises a genuine issue as to the motives behind the allegedly defamatory statements. Therefore, I will deny the Motion as to the defamation claim.

V. CONCLUSION

*9 Accordingly, I will grant the Motion for

© 2007 Thomson/West. No Claim to Orig. U.S Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 733567 (D.Del.)
(Cite as: 2006 WL 733567 (D.Del.))

Summary Judgment as to the disparate treatment claim based on Petrocelli's discharge and as to the retaliation claim. I will deny the Motion in all other respects. An appropriate order will follow.

Not Reported in F.Supp.2d, 2006 WL 733567 (D.Del.)

**Motions, Pleadings and Filings (Back to top)**

• 2006 WL 809107 (Trial Motion, Memorandum and Affidavit) Defendant Daimlerchrysler Corporation's Reply in Support of its Motion for Summary Judgment (Feb. 27, 2006)Original Image of this Document (PDF)

• 2005 WL 3666810 (Trial Motion, Memorandum and Affidavit) Opening Brief in Support of Defendant Daimlerchrysler Corporation's Motion for Summary Judgment (Nov. 1, 2005)Original Image of this Document (PDF)

• 2005 WL 3666809 (Trial Pleading) Answer of Daimlerchrysler Corporation to Plaintiff's Amended Complaint (Oct. 12, 2005)Original Image of this Document (PDF)

• 1:04cv00943 (Docket) (Aug. 16, 2004)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 609324 (D.Del.)
(Cite as: 2004 WL 609324 (D.Del.))

**c**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
Maureen RICHARDS, Plaintiff,
v.
THE CITY OF WILMINGTON, Defendant.
No. Civ. 03-106-SLR.

March 24, 2004.

Tiffany Quell Friedman, Wilmington, Delaware, for Plaintiff.

Rosamaria Tassone, Wilmington, Delaware, for Defendant

MEMORANDUM OPINION

ROBINSON, Chief J.

I. INTRODUCTION

*1 Plaintiff Maureen Richards filed this action on January 22, 2003 against defendants DaRon Mearlon ("Mearlon") and the City of Wilmington (the "City"). (D.I.1) Plaintiff alleges sexual harassment and retaliation pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq.* ("Title VII"), and 19 Del. C. § 711. [FN1] On April 21, 2003, a stipulation of dismissal was filed dismissing Mearlon with prejudice (D.I.10) Currently before the court is the City's motion for summary judgment. (D.I.39) The court has jurisdiction over plaintiff's claims pursuant to 28 U.S.C. § 1331. For the following reasons, defendant's motion is granted in part and denied in part.

> FN1. Plaintiff concedes in her answering brief to the instant motion that her claim for retaliation pursuant to 19 Del. C. § 711, her state law claim for intentional infliction of emotional distress, and her claim for punitive damages should be dismissed.

II. BACKGROUND

Plaintiff began working as an account clerk in the Finance Department for the City in 1997. (D.I.1.) Her daily duties included preparing the bank deposits and assisting customers with their inquiries. (D.I 42 at A-348) In 1998, Mearlon also began working in the Finance Department for the City. (*Id* at A-347) Plaintiff and Mearlon worked together on the first floor of the City Building.

Plaintiff claims that Mearlon started to sexually harass her after meeting her on his first day. (D.I. 42 at A-350) She alleges that Mearlon continued this harassment for the next three years. Throughout this time period, plaintiff occasionally asked her co-workers or friends to tell Mearlon to stop bothering her. After receiving these requests, Mearlon initially left plaintiff alone, but eventually resumed his prior behavior (*Id* at A-353)

In July 1999, plaintiff complained about Mearlon to her supervisor, Shayne Williams ("Williams"). Plaintiff said that Mearlon stared at her, expressed a desire to touch her private parts, and called her constantly at her desk. (D.I. 41 at A-354) Plaintiff believed that her conversation with Williams constituted a formal notice of the sexual harassment because Williams was a supervisor. (*Id*) Williams spoke to Mearlon about his conduct. After this discussion, he stopped engaging in such behavior with respect to plaintiff. However, he resumed his actions after a few weeks. (*Id*)

In December 1999, plaintiff again complained of Mearlon's conduct to the former Director of Personnel, Mary Dees ("Dees"). [FN2] (*Id*) Plaintiff told Dees that Mearlon said that he would not leave her alone and that he made sexual comments to her. She also explained that Mearlon said that she reminded him of his ex-wife. (*Id*) In response, Dees informed plaintiff that she would speak to Mearlon. (*Id* at A-356) Pursuant to this second discussion about his conduct, Mearlon stopped bothering plaintiff for a short period of time. Thereafter, he resumed his prior behavior. (*Id* at A-358)

> FN2. Ironically, Dees is Mearlon's sister. (*Id* at A-355)

On July 20, 2001, plaintiff filed a written complaint about Mearlon with her manager, Terry Toliver ("Toliver"). (D.I. 42 at A-232-236) In her complaint,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 609324 (D.Del.)
(Cite as: 2004 WL 609324 (D.Del.))

Page 2

plaintiff alleged that Mearlon repeatedly said that she looked liked his ex-wife and that "faith [sic] had brought them together" because both she and his ex-wife were from the islands. (Id.) Plaintiff also claimed that Mearlon "talk[ed] dirty" to her and told her that he was never going to leave her alone. (Id.) Additionally, plaintiff claimed that Mearlon professed his love for her and told her that he was going to take her to Texas where she would never get away from him. (Id.) Apart from his verbal comments, plaintiff explained that Mearlon stared at her while she worked and called her early in the mornings to ask her what she was wearing and late at night to hear her voice before going to sleep. (Id.) Plaintiff also documented that Mearlon had given her a letter enumerating the reasons why he believed that she loved him and the reasons why he believed she did not love him. (D.I. 41 at A-237) Because plaintiff stopped answering the phone when Mearlon called, she asserted that he called her sister to inquire about her whereabouts. (D.I. 41 at A-237) She further asserted that Mearlon drove to her house on one occasion and waited outside for her to emerge. (D.I. 41 at A-232 to 236) When she did, she immediately got into her car and departed. (Id.) She maintained that Mearlon followed her until she was able to lose him on the road. (Id.) Toliver told plaintiff that she should file a complaint with the police department regarding Mearlon's conduct outside of the workplace. [FN3] (Id at A-225, A-230)

> FN3. Plaintiff filed a complaint with the police on September 21, 2001. (Id. at A-227-A-231) Mearlon was subsequently arrested and charged with stalking and sexual harassment. (Id.) On October 10, 2001, the police issued a "no-contact" order against Mearlon due to criminal charges pending against him. (D.I. 41 at A-231) The order mandated that Mearlon have no contact, direct or indirect, with plaintiff.

*2 In response to plaintiff's complaint, Elinza Cain ("Cain"), the Employee Relations Advisor for the City, investigated Mearlon's conduct within the workplace. (Id at A-288) Cain substantiated plaintiff's complaint and concluded that Mearlon's actions were offensive. (Id at A-293) Cain recommended that plaintiff and Mearlon discontinue working in the same area. Additionally, the City issued a written citation to Mearlon and ordered him to attend training about appropriate interaction between friends/co-workers on and off the job. (Id. at A-217)

Subsequent to this investigation, plaintiff asked to be reassigned to a position away from Mearlon. (D.I. 46 at B-90) The City informed plaintiff that only one such opening was available and that it was for a position lower than the one she currently held. (Id.) The City also informed plaintiff that her salary would remain the same in the lower level position, but that her pension benefits would be negatively impacted. (Id.) Plaintiff chose not to accept the opening.

On September 21, 2001, plaintiff began a medical leave of absence due to her problems with Mearlon. She returned to her position in the Finance Department on April 22, 2002. (D.I. 41 at A-300) At that time, she was informed that Mearlon had been transferred from the Finance Department to a vacant position in the Department of Real Estate and Housing. (Id. at A-221) On April 26, 2002, Mearlon was transferred back into the Finance Department. He was located, however, in a different building from where plaintiff worked. (Id at A-222)

Following her medical leave, plaintiff alleges that her co-workers harassed her in retaliation for filing charges against Mearlon. (Id at A-300) She filed a complaint with Monica Gonzales-Gillespie ("Gillespie"), Director of Personnel, as a result of this treatment. (D.I. 41 at A-304) In her complaint, plaintiff asserted that her co-workers excluded her professionally and socially during the workday. (Id.) She likewise claimed they often discussed Mearlon in her presence, even asking her directly why she chose to file charges against him. (Id.) Additionally, plaintiff avers that she frequently found business cards of mental health professionals on her desk. (D.I.1) Pursuant to her complaint about her co-workers, the City distributed a copy of the sexual harassment policy to all employees in the Finance Department at a quarterly staff meeting and reminded employees that no repercussions should occur if harassment is reported. (D.I. 41 at 305-A-306). Since this meeting, plaintiff made no additional complaints about her co-workers

III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 609324 (D.Del.)
(Cite as: 2004 WL 609324 (D.Del.))

Page 3

586 n.10 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.,* 57 F.3d 300, 302 n.1 (3d Cir.1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial." ' *Matsushita,* 475 U.S. at 587 (quoting Fed.R.Civ.P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt,* 63 F.3d 231, 236 (3d Cir.1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, then the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

IV. DISCUSSION

A. Sexual Harassment Claim Based on A Hostile Work Environment

**\*3** Plaintiff alleges that she was subject to sexual harassment in violation of Title VII of the Civil Rights Act of 1964. The sexual harassment section of Title VII provides in pertinent part that it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C.A. § 2000e-2(a)(1) (2004). A plaintiff who claims that she has been sexually harassed has a cause of action under Title VII if the unwelcome sexual conduct was either a *quid pro quo* arrangement or if the harassment was so pervasive that it had the effect of creating an intimidating, hostile, or offensive work environment. *See Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 66 (1986); *see also Kunin v. Sears Roebuck and Co.,* 175 F.3d 289, 293 (3d Cir.1999) (stating that it is well established that a plaintiff can prove a violation of Title VII by establishing that sexual harassment created a hostile or abusive work environment).

To qualify under the hostile work environment category, the conduct in question must be severe or pervasive enough to create both an "objectively hostile or abusive work environment--an environment that a reasonable person would find hostile," and an environment that the victim-employee subjectively perceives as abusive or hostile. *See Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21-22 (1993); *see also Faragher v. City of Boca Raton,* 524 U.S. 775, 783 (1998); *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 752 (1998). In other words, a plaintiff must prove five elements to fall within the purview of Title VII due to a hostile work environment: (1) she suffered intentional discrimination because of her sex; (2) the discrimination was pervasive and regular; (3) she was detrimentally affected by the discrimination; (4) the discrimination would detrimentally affect a reasonable person of the same sex in the same position; and (5) respondeat superior liability exists. *See Andrews v. City of Philadelphia,* 895 F.2d 1469, 1482 (3d Cir.1990); *see also Weston v. Pennsylvania,* 251 F.3d 420, 426 (3d Cir.2001). The court must examine the totality of the circumstances in deciding a hostile work environment claim, including: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; whether it unreasonably interferes with an employee's work performance." *Harris,* 510 U.S. at 23.

With regard to employer liability for sexual harassment, the Supreme Court has distinguished the principles applicable to harassment by co-workers versus the principles applicable to harassment by supervisors. *See Faragher,* 524 U.S. at 803. Specifically, the Supreme Court has noted that in the instance of co-worker sexual harassment, the standard for employer liability is negligence. *See id.* at 799. The Supreme Court has defined negligence with respect to sexual harassment as whether the employer knew or should have known about the conduct and failed to stop it. *See Ellerth,* 524 U.S. at 759 (1998); *see also* 29 C.F.R. § 1604.11(d) (2004).

**\*4** Viewing the underlying facts at bar and all reasonable inferences therefrom in the light most favorable to plaintiff, the court finds that genuine issues of material fact exist as to the five elements requisite to a claim for sexual harassment based on a hostile work environment for a limited time period. Prior to July 1999, when plaintiff first complained about Mearlon to her supervisor, plaintiff points to no

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 609324 (D.Del.)
(Cite as: 2004 WL 609324 (D.Del.))

evidence of sexual harassment so "severe or pervasive" that the City necessarily knew or should have known about Mearlon's conduct. Absent such actual or constructive notice, the City cannot be held liable for Mearlon's behavior from his start date through July 1999. Additionally, after plaintiff returned from her medical leave of absence on September 21, 2001, plaintiff fails to bring forth any concrete evidence to suggest that Mearlon contacted or bothered her in any way. From July 1999 to September 21, 2001, however, the court finds that the present record is susceptible to differing interpretations regarding the existence of a hostile work environment. The court concludes that there are genuine issues of material fact as to the sufficiency of plaintiff's notice to the City and its response thereto, as well as to the frequency of Mearlon's conduct, its severity, whether it was physically threatening or humiliating, and whether it unreasonably interfered with plaintiff's work performance. Mere "offhand comments and isolated incidents" are not sufficient to set forth a claim for a hostile work environment. *See* Faragher, 524 U.S. at 786. Consequently, the court denies the City's motion for summary judgment as to plaintiff's hostile work environment claim for the twenty-seven months defined herein.

**B. Retaliation Claim**

Plaintiff alleges that she was subject to retaliation in violation of Title VII of the Civil Rights Act of 1964. The anti-retaliation section of Title VII provides in pertinent part:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment ... because she has opposed any practice made an unlawful employment practice by this subchapter, or because she has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a) (as amended 1991). To establish a prima facie case of retaliation under Title VII, a plaintiff must first prove: (1) that she engaged in a protected activity; (2) that her employer took adverse action against her either after, or contemporaneously with, her protected activity; and (3) that there is a causal connection between the protected activity and the employer's adverse action. Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir.1997). "To show the requisite causal link, the plaintiff must present evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action." Ferguson v. E.I.

DuPont de Nemours and Co., 520 F. Supp. 1172, 1200 (D.Del.1983). Once the plaintiff succeeds in establishing her prima facie case, the burden of production shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for its actions. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). If the defendant is able to successfully articulate such a reason, then the burden shifts back to the plaintiff to show that the defendant's non-discriminatory reason for the termination was pretextual, and that the real reason for the termination was unlawful discrimination. Id. at 802-804. The plaintiff's "ultimate burden in a retaliation case is to convince the factfinder that retaliatory intent had a 'determinative effect' on the employer's decision." Shaner v. Synthes (USA), 204 F.3d 494, 501 (3d Cir.2000).

*5 In the case at bar, the court need not engage in an extensive burden-shifting analysis because plaintiff has not presented facts sufficient to state a prima facie retaliation claim. The court finds that plaintiff has failed to meet the second element of the prima facie case of retaliation, namely, that the City took adverse employment action against plaintiff. The Third Circuit has defined an "adverse employment action" as an action that "alters the employee's compensation, terms, conditions, or privileges of employment." *See* Calloway v. E.I. DuPont De Nemours and Co., 2000 WL 1251909 *8 (D.Del.2000). Plaintiff was not demoted or in any way reprimanded as a result of her multiple complaints against Mearlon. Likewise, she returned to the same position that she held when the alleged misconduct occurred after she returned from her medical leave of absence. The City did not alter her compensation, terms, conditions or privileges of employment in any way at any time during the course of her employment. Rather, the City investigated plaintiff's complaint, substantiated her allegations, and took corrective actions against Mearlon. Additionally, after learning about her co-workers' actions following her leave, the City admonished the department during a quarterly staff meeting. Since plaintiff cannot establish the second element requisite to a retaliation claim, the court need not consider the remaining two elements. The court, therefore, concludes that plaintiff fails to state a cause of action for retaliation under Title VII and grants the City's motion for summary judgment as to this claim.

**V. CONCLUSION**

For the reasons stated, the City's motion for summary judgment is denied as to plaintiff's sexual

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 609324 (D.Del.)
**(Cite as: 2004 WL 609324 (D.Del.))**

harassment claim for the period of time from July 1999 through September 21, 2001 and granted as to plaintiff's retaliation claim. An appropriate order shall issue.

 Not Reported in F.Supp.2d, 2004 WL 609324 (D.Del.)

 **Motions, Pleadings and Filings (Back to top)**

• 1:03CV00106 (Docket) (Jan. 22, 2003)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

184 Fed.Appx. 140                                                                    Page 1
184 Fed.Appx. 140, 98 Fair Empl.Prac.Cas. (BNA) 881
**(Cite as: 184 Fed.Appx. 140)**

**Briefs and Other Related Documents**

This case was not selected for publication in the Federal Reporter.

NOT PRECEDENTIAL

Please use FIND to look at the applicable circuit court rule before citing this opinion. Third Circuit Local Appellate Rule 28.3(a) and Internal Operating Procedure 5.3. (FIND CTA3 Rule 28.0 and CTA3 IOP APP I 5.3.)

United States Court of Appeals,
Third Circuit.
James TUNIS; John C. Witsch
v.
CITY OF NEWARK.
John C. Witsch, Appellant.
No. 05-2467.

Submitted Under Third Circuit LAR 34.1(a) June 8,
2006.
Filed: June 12, 2006.

**Background:** Former captain in the Newark Police Department filed a complaint alleging that he was constructively discharged on the basis of his age in violation of the Age Discrimination in Employment Act (ADEA) and the New Jersey Law Against Discrimination (LAD). The United States District Court for the District of New Jersey, Jose L. Linares, J., granted city's motion for summary judgment, and appeal was taken.

**Holding:** The Court of Appeals, Nygaard, Circuit Judge, held that city police captain was not constructively discharged on the basis of his age. Affirmed.

West Headnotes

Civil Rights ☞1123
78k1123 Most Cited Cases
Former city police captain was not constructively discharged on the basis of his age in violation of the Age Discrimination in Employment Act (ADEA); although police department's director was known for his frequent reorganizations as well as his aggressive

use of the disciplinary process which impacted all ranks and age groups, the captain was promoted to a series of
powerful positions with increasing amounts of responsibility, and when captain retired, he was replaced by an officer older than himself. Age Discrimination in Employment Act of 1967, § 2, 29 U.S.C.A. § 621.
*140 On Appeal from the United States District Court for the District of New Jersey, (D.C. Civil No. 01-cv-00517), District Judge: The Honorable Jose L. Linares.

Stephen E. Klausner, Klausner & Hunter, Somerville, NJ, for Appellant.

Susan S. Singer, Newark, NJ, for Appellee.

Before AMBRO, FUENTES, and NYGAARD, Circuit Judges.

OPINION OF THE COURT

NYGAARD, Circuit Judge.

I.

Appellant, John Witsch, a former Captain in the Newark Police Department ("NPD"), announced his decision to retire from the force in 1999 at age 49 and after 27 years of service. Precipitating this decision was a disciplinary charge. At the disciplinary hearing, Chief Ambrose, the hearing officer, offered to dismiss the charge, but Witsch refused, opting to go through with the hearing. Witsch was found not guilty but retired allegedly because he felt threatened by remarks made two years earlier by Joseph Santiago, the NPD's Director, who was known for his frequent reorganizations of the force as well as his aggressive use of the disciplinary process which impacted all ranks and age groups. Santiago admitted that his approach was high-pressure and resulted in stress throughout the NPD. Preceding his retirement, Witsch had been regularly promoted both horizontally and laterally to positions of increasing responsibility. At *141 the time of his retirement, he, along with several other Captains, was in charge of all of the operations of Newark's Command Operation Center when the Chief of Police was off duty. Witsch undeniably held a position of considerable stress in the already high-pressure NPD atmosphere that existed under Santiago. Upon

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

184 Fed.Appx 140
184 Fed.Appx. 140, 98 Fair Empl.Prac.Cas. (BNA) 881
(Cite as: 184 Fed.Appx. 140)

Page 2

retirement, Witsch began collecting a $62,000 yearly pension, available regardless of any alternative employment, and lifetime medical benefits.

Witsch filed a complaint alleging that he was constructively discharged on the basis of his age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq, and the New Jersey Law Against Discrimination ("LAD"), N.J.S.A. 10:5-1 et seq He complained, inter alia, that his forced retirement resulted in his missing the opportunity to become Deputy Chief, but he did not allege that the position had been filled by a younger officer having a lower score on the civil service tests. [FN1] Finding no disputed material facts, the District Court granted summary judgment in favor of Newark. The District Court found that while Witsch may have retired due to stressful conditions in the NPD, he failed to proffer any evidence of differential treatment based on his age. The District Court subsequently denied Witsch's three motions for reconsideration. This appeal followed. Because we conclude that Witsch has failed to overcome the shortcomings in his case on appeal, we will affirm the judgment of the District Court.

> FN1. Promotions in the NPD turn on an officer's rank on a civil service test. That rank is the product of state-created merit based selection criteria.

## II

We conclude that there is no evidence that age discrimination resulted in Witsch's constructive discharge. Instead, the undisputed facts show only his dissatisfaction with conditions that impacted the entire NPD during the Santiago administration. Proof of age discrimination under both the ADEA and the LAD require Witsch to show that he was discriminated against and therefore injured based upon his age, a protected characteristic. Proof of constructive discharge under both the ADEA and the LAD requires him to show that the age discrimination made his working conditions so intolerable that he reasonably felt compelled to resign his position in the NPD. See Konstantopoulos v. Westvaco Corp., 112 F.3d 710, 718 (3d Cir.1997), cert. denied, 522 U.S. 1128, 118 S.Ct. 1079, 140 L.Ed.2d 137 (1998). Witsch can show neither.

First, the only factual dispute he identifies is whether Santiago's administration and management of the NPD was effective and whether crime reduction statistics during his tenure were accurate. This dispute is wholly irrelevant to his age discrimination

and constructive discharge case. See Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 647 (3d Cir.1998) (observing that discrimination laws are not to be employed to challenge the soundness of employers' business decisions).

Second, the record shows no evidence that Witsch suffered any adverse employment actions based on his age. In fact, the record reflects that Santiago promoted Witsch to a series of powerful positions with increasing amounts of responsibility throughout his tenure with the NPD. Instead of discriminating against Witsch, Santiago attempted to make Witsch's working conditions more palatable. For example, when Witsch was appointed to oversee all of the NPD's investigative operations, and eventually complained of the substantial stress associated with this position, *142 Santiago transferred him to the Command Operations Center. At the Command Operations Center, Witsch was admittedly in a position of significant authority and power but could enjoy a less stressful working environment.

Third, Witsch's allegation that his compelled retirement caused him to forgo a Deputy Chief appointment focuses on the promotion of an officer older than himself, Captain John Esposito, to Acting Deputy Chief. Witsch concedes that no younger officer who scored lower than he did on the civil service exams was ever promoted over him to this rank. However, he alleges that, despite several openings, Santiago had permanently promoted only one Captain prior to Witsch's retirement and, shortly after his retirement, appointed Esposito to Acting Deputy Chief despite Esposito's lower position on the active civil service promotional list. Age discrimination is not implicated simply because the NPD promoted the older Esposito over the younger Witsch, especially since Witsch had already retired. See Keller v. Orix Cred. Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir.1997) (en banc) (holding that to create an inference of age discrimination, plaintiff must show differential treatment of a sufficiently younger employee) (emphasis added). Discrimination laws are not to be used to attack the wisdom of managerial decisions. See Simpson, 142 F.3d at 647.

Fourth, Witsch's complaint that disciplinary charges were unfairly lodged against him does not allege that he suffered more disciplinary charges than any other officer solely because of his age, nor does it show that the charges were based on manufactured evidence or that he was ever unfairly convicted of any charge. Instead, the record reflects that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A000026

184 Fed.Appx. 140
184 Fed.Appx. 140, 98 Fair Empl.Prac.Cas. (BNA) 881
(Cite as: 184 Fed.Appx. 140)

Page 3

Santiago's administration, much to the consternation of the rank-and-file, was rife with the aggressive use of the disciplinary system against officers of every rank and age for those who committed even minor infractions and for those with tenuous relationships to minor and major investigations. The disciplinary process was used zealously against the entire force, not just against Witsch, and when officers were involved in the process, they had notice of the charges against them, a full and fair hearing and union representation.

Witsch also alleges that Santiago made discriminatory comments but failed to hear any ageist comments for the two years preceding his retirement and does not allege that any of the comments were directed toward him. These comments do not meet the considerably high burden required to prove constructive discharge. *See Shepherd v. Hunterdon Dev. Ctr., 174 N.J. 1, 803 A.2d 611 (2002)* (observing that in applying the LAD, hostile work environment claim requires abusive, severe, pervasive and hostile conduct that objectively affects plaintiff's work environment, but a constructive discharge claim requires conduct so egregious and intolerable that plaintiff would feel forced to resign). Even under the less onerous burden required to prove hostile environment claims, courts have consistently recognized that offensive comments not directed at the plaintiff, even when they refer to protected characteristics, are insufficient to establish a claim.

Lastly, Witsch alleges that any reasonable officer in his position would have felt compelled to resign because of the disciplinary charge levied against him that precipitated his retirement. To bring a successful constructive discharge claim, Witsch must show that he reasonably believed he had no other option but to resign. *See Connors v. Chrysler Financial Corp., 160 F.3d 971, 976 (3d Cir.1998)* (citing *143Gray v. York Newspapers, Inc., 957 F.2d 1070, 1083 (3d Cir.1992)*) (observing that a stress-free employment environment is not ensured and "discrimination laws 'cannot be transformed into a palliative for every workplace grievance, real or imagined, by the simple expedient of quitting'"). While the law protects employees from concerted, calculated efforts to expel them or the imposition of unduly harsh conditions not visited upon their co-worker in order to force them to quit, it does not guarantee that they will not suffer frustrations, challenges, disappointments and discipline. *See Gray, 957 F.2d at 1083.* The record fails to show that Witsch was ever verbally threatened with dismissal, that evidence on which disciplinary charges were based was fabricated and

that he was specifically targeted for discipline. His argument that he believed that the disciplinary charge was used to "get" him and he therefore feared termination in the future is unpersuasive. The law of constructive discharge is not concerned with subjective fears of possible future dismissal. *See Gray, 957 F.2d at 1082-83.*

The record shows that instead of being forced to leave his position because of disciplinary charges, the officer presiding over Witsch's disciplinary hearing freely offered to dismiss them. Instead, Witsch insisted on proceeding with the hearing. At the close of the hearing, before which he was given notice and during which he was afforded due process and vigorous representation by union counsel, Witsch was absolved of guilt. As opposed to an environment where he was given no other choice but resignation, the record shows one in which Witsch and other officers accused of disciplinary infractions were awarded notice, a full and fair hearing and substantial union support. [FN2].

> FN2. The police unions gave effective and substantial representation to NPD members during the Santiago administration, during which the disciplinary system was used aggressively. Union representation was provided at disciplinary hearings and when challenging disciplinary actions in state courts and in front of the Public Employee Relations Commission.

Based on this record, no reasonable person in Witsch's position would feel that he had no other choice but to leave the NPD. To the contrary, after his hearing, and a long tenure in a high-ranking, high-pressure job in the stressful atmosphere of a big city police department, Witsch freely chose to end his law enforcement career.

### III.

Because the record reflects no evidence of either age discrimination or constructive discharge, the Order of the District Court granting summary judgment to Newark will be affirmed.

184 Fed.Appx. 140, 98 Fair Empl.Prac.Cas. (BNA) 881

**Briefs and Other Related Documents** (Back to top)

• 05-2467 (Docket) (May 12, 2005)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A000027

184 Fed.Appx. 140
184 Fed.Appx. 140, 98 Fair Empl.Prac.Cas. (BNA) 881
(Cite as: 184 Fed.Appx. 140)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A000028

**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

GLORIA NIEVES and EMILIO NIEVES,    :    CIVIL ACTION
                                  :
      Plaintiffs,                  :
                                    :
      v.                        :
                                    :    Number: 06-123 (GMS)
ACME MARKETS, INC., a Delaware corporation    :
d/b/a Acme Markets No. 7816, ACME MARKETS,    :    JURY TRIAL DEMANDED
INC., a Delaware Corporation d/b/a Acme Markets    :
No. 7836, ACME MARKETS, INC., a Pennsylvania    :
Corporation, d/b/a Acme Markets No. 7816,    :
ACME MARKETS, INC., a Pennsylvania    :
Corporation d/b/a Acme Markets No. 7836,    :
                                  :
      Defendants.               :

## <u>CERTIFICATE OF SERVICE</u>

I, Jennifer M. Becnel-Guzzo, hereby certify that on May 29, 2007, I electronically filed

Defendant Acme Markets, Inc.'s Pretrial Brief with the Clerk of Court using CM/ECF and also

served two copies, via first class mail, postage prepaid, to:

> Gloria and Emilio Nieves
> 625 Village Drive
> Middletown, Delaware 19709

BUCHANAN INGERSOLL & ROONEY PC

BY: *Jennifer Becnel-Guzzo*

Jennifer M. Becnel-Guzzo (#4492)
1000 West Street, Suite 1410
Wilmington, DE 19801
(302) 552-4200
jennifer.becnelguzzo@bipc.com

May 29, 2007                    *Attorneys for Defendant Acme Markets, Inc.*