IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| GLORIA NIEVES and EMILIO NIEVES, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civ. Action No. 06-123-GMS |
| | ) |
| ACME MARKETS, INC., a Delaware | ) |
| corporation d/b/a Acme Markets Nos. 7816 | ) |
| and 7836 and ACME MARKETS, INC., a | ) |
| Pennsylvania corporation d/b/a Acme | ) |
| Markets Nos. 7816 and 7836, | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM**

**I. INTRODUCTION**

The plaintiffs, Gloria Nieves ("Mrs. Nieves") and Emilio Nieves ("Mr. Nieves") (together "the Nieves"), filed this lawsuit pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, Del. Code Ann. tit. 19, § 710, and Delaware common law alleging unlawful employment practices, harassment, and a hostile work environment. The Nieves were originally represented by counsel, but now proceed *pro se.* (D.I. 41, 52.) Before the court is the defendants' ("Acme") motion for summary judgment, supporting brief, the Nieves' response[1], and Acme's reply. (D.I. 31, 32, 33, 37.) For the reasons that follow, the court will grant in part and deny in part the motion for summary judgment.

**II. BACKGROUND**

The court views the evidence in the light most favorable to the Nieves and draws all

---

[1]The Nieves were represented by counsel at the time they filed their response to the defendants' motion for summary judgment.

reasonable inferences in their favor. Mrs. Nieves is a Hispanic female of Colombian origin. (D.I. 32, ex. O.) In November 2001, Mrs. Nieves obtained part-time employment with Acme Markets, Inc. ("Acme") at its Middletown, Delaware store. (D.I. 32, ex. A at A7, A16.) Acme opened a newer, larger store in Middletown and, when the store opened in April 2003, Mrs. Nieves obtained a transfer to the new store. *Id.* at A17. In November 2003, Mrs. Nieves applied for, and obtained, a full-time position as the senior night-time associate in the deli department. *Id.* at A8, A19-20. At least one other person applied for the job. *Id.* at A50. Mrs. Nieves received the position based upon her seniority. *Id.* at ex. J, A113. Stephen Briley ("Briley") was the store director and B.J. Appenzeller ("Appenzeller") and Jeannie Black ("Black") were assistant store directors. *Id.* at A17-19. Denise Dean ("Dean") was the deli manager. *Id.* at ex. A, A20-21.

Mrs. Nieves testified that discrimination and harassment began after she received full time employment. *Id.* at A22. She testified that she was told not to speak Spanish to Spanish-speaking customers; she was questioned why she received the full-time position because her English was not good; she was questioned whether she had a "green card"; because of her accent, a co-worker called her stupid when she asked questions; because she was from South America she was treated as uneducated; when drugs were discussed her co-workers would say, "ask Gloria because she is from Colombia"; and co-workers made inappropriate references to her language and quoted the introductory line "de plane, de plane," which was taken from a television series, when her husband came into the store. *Id.* at A22, A25-27, 32-33, A41, A46-47. Mrs. Nieves testified that she complained to either Black, Appenzeller, Briley, or others, and they always responded with "don't worry." *Id.* at A24-30, A33-34, A41, A47. Conversely, Briley and

-2-

Appenzeller testified that Mrs. Nieves never spoke to them about the conduct of her co-workers. (D.I. 32, ex. I at A107; D.I. 33, ex. B-50.) Dean testified that Mrs. Nieves made complaints to her about her co-workers because Mrs. Nieves felt she was doing all the cleaning work. (D.I. 33, ex. B-57-58.

Mrs. Nieves' co-worker, Amanda Cumberbatch ("Cumberbatch"), testified that she personally observed inappropriate behavior or treatment directed towards Mrs. Nieves. (D.I. 33, B-29.) She explained there were a lot of slurs and jokes behind Mrs. Nieves' back and that her co-workers treated her as if she were uneducated. *Id.* Cumberbatch testified that she had heard that one girl visited local businesses and told them that Mrs. Nieves was an illegal alien and to "green card her" if they were going to hire her. *Id.* She heard co-workers call Mrs. Nieves "Chihuahua," from the Taco Bell commercials. *Id.* Cumberbatch described an occasion where Mrs. Nieves made a complaint to her supervisor and once her back was turned, the supervisor and Mrs. Nieves' other co-workers laughed at Mrs. Nieves, and did not take her seriously. *Id.* at B-38. Cumberbatch described the atmosphere in the deli as "like in the 1960's in a small town down South where everybody is racist." *Id.* at B-32. Cumberbatch testified that Mrs. Nieves went through the chain of command and complained, but nothing was done for her and no one ever helped her. *Id.* at B-30.

Mrs. Nieves testified that the working conditions caused to cry frequently. (D.I. 33, B-28.) Acme employees attributed Mrs. Nieves' emotional state to marital problems. In late February 2004, she presented to the emergency room with work-related chest pain. (D.I. 32, ex. A, A34.) Mrs. Nieves testified that her co-workers accused her of faking the illness and she complaint to management. *Id.* at A36-37. The next week, Mrs. Nieves was suspended. (D.I. 33,

-3-

ex B-28.)

Joyce Alphin ("Alphin"), Mrs. Nieves' co-worker, testified that she and Mrs. Nieves used to get along. (D.I. 33, ex. B-60.) When they were on good terms, Alphin testified that Mrs. Nieves told her other co-workers would make fun of her language and accent, but Alphin never saw or heard anything. *Id.* at B-61. On March 2, 2003, Alphin accused Mrs. Nieves of throwing mop water and ham at her. (D.I. 32, ex. J, A111.) Alphin testified that she reported the incident the next morning to Dean, the deli manager, on March 3, 2003. *Id.* at A113. Appenzeller also testified that Alphin reported the incident to her and, in turn, she spoke to Briley. (D.I. 33, ex. B-52.) Briley said that he would handle the situation. *Id.* Appenzeller did not speak to Mrs. Nieves about the incident. *Id.* There had been no complaints about Mrs. Nieves from any of her co-workers prior to this incident. *Id.*

Alphin testified that on March 5, 2003, she reported a second incident when Mrs. Nieves attempted to trip her with a mop handle. (D.I. 32, ex. A at A111, A115, A117.) Dean reported the complaints to Briley, the store director. *Id.* at ex. K, A124. Dean did not talk to Mrs. Nieves about the incident. *Id.* Dean testified that workers told her that Mrs. Nieves sometimes spoke Spanish at work when she was upset. (D.I. 33, ex. B-55-56.) She testified that Mrs. Nieves' co-workers had commented about Mrs. Nieves' attitude, but she did not speak to Mrs. Nieves. *Id.* at B-56. Over a seven month period, two to three times per week, Dean spoke to Briley and told him that there was a "lot of turmoil going on in the deli department." *Id.* at B-56-57.

Mrs. Nieves denied the accusations. She testified that when she reported to work on March 6, 2003, she was advised by the assistant manager not to clock in but to report to the office. *Id.* at A35. There, she was told by Appenzeller that she was suspended, and was also told

-4-

that the union would explain the matter. *Id.* at A35. The union official explained that Mrs. Nieves was suspended because she had thrown water and ham at Alphin.[2] *Id.* at A36.

Briley testified that he believed he would have spoken to Mrs. Nieves about the incident but did not recall the conversation. *Id.* at ex. I, A106. He could not recall the specifics as to why he and the union representative decided to transfer Mrs. Nieves to a different store. *Id.* at A108. Mrs. Nieves received a letter from Acme stating that she would be fired if there were any other "substantiated" breaches of Acme's personnel rules and regulations. *Id.* at ex. N, A133.

Mrs. Nieves was subsequently transferred to Acme's Smyrna store and reported to work there on March 14, 2004.[3] Mrs. Nieves testified that she felt she was transferred to Smyrna because she had tried to do a really good job at the Middletown store, and her co-workers did not like that. *Id.* at A49. Mrs. Nieves was told by the union official that if she did not accept the transfer or if she filed a grievance challenging the action, a different result would be reached. *Id.* at A39. On April 2, 2004, Mrs. Nieves filed a charge of discrimination with the Delaware Department of Labor ("DDOL") and the Equal Employment Opportunity Commission ("EEOC") asserting discrimination on the basis of her national origin. *Id.* at ex. O, A135.

Mrs. Nieves testified that during the time she worked at the Smyrna store the work environment was not hostile or abusive. *Id.* at A51. She did not have any problems with her co-workers or supervisors. *Id.* at A42. She experienced one incident on Labor Day of 2004 when

---

[2]There was no mention of the second incident.

[3]After Mrs. Nieves was transferred, certain Acme personnel claimed that Mr. Nieves was hanging around the Middletown store and they were afraid of him. Cumberbatch testified the workers were instructed that, if Mr. Nieves walked into the deli, they were to hit him, push him, or detain him somehow until the police arrived. (D.I. 33, B-32.) Mr. Nieves testified that he did not return to the Middletown store following Mrs. Nieves' suspension.

-5-

she uttered a profanity and her supervisor "smacked" her mouth. *Id.* at A43, A52. Mrs. Nieves reported the incident, but nothing was done. *Id.* at A44. She had no other problems with the supervisor. *Id.* at A54.

In part, due to marital problems, Mrs. Nieves made a decision to leave Delaware and to travel to Florida to stay with relatives. *Id.* at A53-54. After saving money for four months, Mrs. Nieves resigned from Acme on January 15, 2005, and she moved to Florida. *Id.* at A52. Mrs. Nieves testified that she was under stress as a result of the Labor Day incident. *Id.* at A54. However, she did not speak to her boss about this until December when she had saved enough money for her trip. *Id.* at A55.

In March 2005 the EEOC sent a letter to Acme that stated the evidence indicated Acme had engaged in discriminatory practices. (D.I. 33, B-1.) The DDOL issued a determination that Acme had violated the employment laws and scheduled a conciliation. *Id.* at B-5. Mrs. Nieves, however, was in Florida at the time, had not advised the DDOL or EEOC of her change of address, and did not receive notice of the conciliation. (D.I. 32, ex. A, A54.) She testified that during the time she was in Florida she forgot about the case. *Id.* Mrs. Nieves returned to Delaware in August 2005 and filed this lawsuit in February 2006.

## III. STANDARD OF REVIEW

The court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

574, 586 n.10 (1986). When determining whether a genuine issue of material fact exists, the

court must view the evidence in the light most favorable to the nonmoving party and draw all

reasonable inferences in that party's favor. *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007).

If the moving party has demonstrated an absence of material fact, the nonmoving party then

"must come forward with 'specific facts showing that there is a genuine issue for trial.'"

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. at 587 (quoting Fed. R. Civ. P.

56(e)). However, a party opposing summary judgment "must present more than just 'bare

assertions, conclusory allegations or suspicions' to show the existence of a genuine issue."

*Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (quoting *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 325 (1986)). If the nonmoving party fails to make a sufficient showing on

an essential element of its case with respect to which it has the burden of proof, the moving party

is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322

(1986).

## IV. DISCUSSION

### A. Hostile Work Environment

Acme argues that summary judgment is appropriate on the issue of hostile work

environment on the basis that Mrs. Nieves cannot meet her burden to prove that the alleged

harassment was "severe or pervasive." The Nieves argue that summary judgment is

inappropriate because there remain genuine issues of material fact, and further, viewing the

evidence in the light most favorable to them, there was clearly regular, pervasive, and serious

hostility directed toward Mrs. Nieves because of her national origin.

A plaintiff can establish a violation of Title VII by proving that discrimination based upon

-7-

national origin created a hostile or abusive work environment. *Clegg v. Falcon Plastics, Inc.*,

174 Fed. Appx. 18, 25 (3d Cir. 2006) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66,

(1986). In order to establish a hostile work environment claim under Title VII, Mrs. Nieves must

show that (1) she suffered intentional discrimination because of her national origin; (2) the

discrimination was severe and pervasive; (3) it detrimentally affected her; (4) it would have

detrimentally affected a reasonable person of the same protected class in her position; and (5)

there is a basis for vicarious liability. *Jenson v.* Potter, 435 F.3d 444, 449 (3d Cir. 2006)

(*overruled on other grounds*); *Cardenas v. Massey*, 269 F.3d 251, 260 (3d Cir. 2001).[4] For the

purposes of this motion, Acme argues that the discrimination faced by Mrs. Nieves was not

severe or pervasive, but it does not dispute the other prongs of a prima facie case.

Not all workplace conduct that may be described as harassment rises to the level of a

hostile work environment. *Clegg*, 174 Fed. Appx. at 25. The harassment must be "sufficiently

severe or pervasive to alter the conditions of the [plaintiff's] employment and create an abusive

working environment." *Id.* The court uses a totality of the circumstances test to determine

whether the threshold level of severity and pervasiveness has been reached. Several factors

inform that determination such as the severity of the harassment, the frequency of the

harassment, and the degree of abuse. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993).

Indeed, workplace conduct is not measured in isolation; instead, whether an environment is

sufficiently hostile or abusive must be judged by looking at all the circumstances, including the

---

[4]The same analysis applies under 42 U.S.C. § 1981 and Delaware's Discrimination Act.
*See Ocasio v. Lehigh Valley Family Health Ctr.*, 92 Fed. Appx. 876 n.3 (3d Cir. 2004); *Petrocelli v. Daimler Chrysler Corp.*, No. Civ. A. 04-943-KAJ, 2006 WL 733567, at *4 (D. Del. Mar. 22, 2006).

frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 270-71 (2001) (internal quotes and citations omitted). Hence, simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment. *Id.* at 271. *See also Faragher v. Boca Raton*, 524 U.S. 775, 788 (1998) (noting that the standard for judging hostility under Title VII must be sufficiently demanding so that the statute does not become "a general civility code").

Acme argues that Mrs. Nieves identified isolated incidents over a period of approximately two and one-half years prior to her transfer to the Smyrna store. It contends that the comments Mrs. Nieves testified to were neither repeated nor persistent acts of harassment.

Mrs. Nieves testified that the harassment began once she became a full time employee in November 2003 and continued until she was transferred in March 2004, a period of approximately four months. Mrs. Nieves testified that she was told not to speak Spanish to Spanish-speaking customers; she was questioned why she received the full-time position because her English was not good; she was questioned whether she had a "green card"; because of her accent, a co-worker called her stupid when she asked questions; because she was from South America she was treated as uneducated; when drugs were discussed her co-workers would say, "ask Mrs. Nieves because she is from Colombia"; and co-workers made inappropriate references to her language and quoted the line "de plane, de plane" when her husband came into the store. Some of the acts took place once, others on more than one occasion. Interestingly, in its motion, Acme makes no reference to the testimony of Cumberbatch who personally observed

-9-

inappropriate behavior or treatment directed towards Mrs. Nieves, including slurs and jokes behind Mrs. Nieves' back, derogatory name-calling, and inaction by Mrs. Nieves' supervisors when she complained. Most telling is Cumberbatch's description of the atmosphere in the deli as being "like in the 1960's in a small town down South where everybody is racist."[5] Indeed, Mrs. Nieves was in tears on many occasions, and testified that she suffered work related chest pains.

While each act/comment, in isolation, might be perceived as insensitive, taken as a whole, a reasonable jury might conclude that the acts/comments were motivated by a discriminatory purpose. Acme has failed to show that, viewing the evidence in the light most favorable to the Nieves, the incidents of hostility were not "pervasive and severe" as required under Title VII. The testimony of Mrs. Nieves and Cumberbatch raises genuine issues of material fact. Therefore, the court will deny Acme's motion for summary judgment on the issue of whether there was a hostile work environment at the store.

## B. Constructive Discharge

Acme moves for summary judgment on the constructive discharge issue on the basis that Mrs. Nieves cannot prove she was constructively discharged due to harassment based upon her national origin. It argues that any alleged hostile work environment as alleged by Mrs. Nieves stopped once she transferred to the Acme Smyrna store. Mrs. Nieves contends that she resigned after she was hit by a fellow employee, reported the incident to her supervisor, and Acme failed to take any action.

---

[5]Acme argues that Cumberbatch's testimony is so weak and unreliable that the court should give it no weight. The court, however, may not weigh evidence or make credibility determinations during the summary judgment stage. *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.,* 998 F.2d 1224, 1230 (3d Cir. 1993); *see Carpenter v. Proctor & Gamble Disability Benefit Plan & Benefit Plans Trust,* 229 Fed. Appx. 170 (3d Cir. 2007).

"Constructive discharge occurs when an employer knowingly permit[s] conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." *Hare v. Potter*, 220 Fed. Appx. 120, 135 (3d Cir. 2007) (quoting *Spencer v. Wal-Mart Stores, Inc.*, 469 F.3d 311, 317 n.4 (3d Cir. 2006) (internal citation and quotation omitted)). "To prove constructive discharge, the plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment." *Id.* (internal quotation and citation omitted). Hence, the discriminatory conduct must be associated in some fashion with the intolerable atmosphere leading to the constructive discharge. *McWilliams v. Western Pennsylvania Hosp.*, 717 F. Supp. 351, 355-56 (W.D. Pa. 1989). Accordingly, there must be at least some relation between the occurrence of the discriminatory conduct and the employee's resignation. *Beaubrun v. Inter Cultural Family*, No. 05-06688, 2007 WL 172385, at *7 (E.D. Pa. Jan. 17, 2007). *See also Angeloni v. Diocese of Scranton*, 135 Fed. Appx. 510, 511 (3d Cir. 2005) (no constructive discharge when acts complained of occurred of had ended six months earlier); *Jett v. Dallas Independent School Dist.*, 798 F.2d 748 (5th Cir. 1986) (resignation five months after discriminatory action did not constitute intolerable conditions).

The facts before the court are that Mrs. Nieves transferred to the Smyrna store on March 14, 2004. She testified that during the time she worked there the work environment was not hostile or abusive and she did not have any problems with her co-workers of supervisors. Mrs. Nieves experienced one incident with a co-worker at the Smyrna store on Labor Day 2004, but had no other problems with that person, although she testified she was under stress as a result of the incident. Mrs. Nieves resigned from Acme on January 15, 2005, after saving money for four months.

-11-

While the Labor Day incident could have made it more difficult for Mrs. Nieves to complete her work, there is no evidence in the record that could lead a jury to reasonably find that this one incident was related to Mrs. Nieves' national origin or that it forced Mrs. Nieves to resign. There is nothing in the record that indicates Mrs. Nieves was harassed or discriminated at the Smyrna store based upon her national origin. Notably, she testified that the atmosphere at the Smyrna store was not hostile or abusive. Moreover, the September incident she complains of took place some five months after she left the Middletown store and approximately four months prior to the her resignation from the Smyrna store. Mrs. Nieves argues that the Smyrna store's alleged inaction after she complained about the September incident caused her to resign, but her deposition testimony is that she resigned to move to Florida. She testified further that it was her marriage and "everything together" that caused her to resign. (D.I. 32, ex. A at A53.)

Given the facts before the court there is little in the record to support Mrs. Nieves' position that a reasonable person would consider the one incident of which she complains was related to her national origin or that her working conditions at the Smyrna store were so intolerable that she would feel compelled to resign. This conclusion is particularly appropriate in light of her testimony that the work environment was not hostile or abusive and she had many other reasons for resigning from her position. Therefore, based upon the foregoing, the court will grant Acme's motion for summary judgment on the issue of constructive discharge.[6]

## C. Retaliation

Acme moves for summary judgment on Mrs. Nieves' retaliation issue on the basis that it

---

[6]Given the court's ruling, it will not address the exhaustion of administrative remedies issue.

-12-

had a legitimate, non-discriminatory reason for suspending and transferring her to the Smyrna store. Mrs. Nieves argues that Acme relies upon the self-serving testimony of its management personnel to support its position and, that its justification for suspending Mrs. Nieves and transferring her were a pretext.

Mrs. Nieves' retaliation claim is controlled by the three-step burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03(1973). *See Moore v. City of Philadelphia*, 461 F.3d 331, 342 (3d Cir. 2006) (applying the framework to a retaliation claim); *Atkinson v. LaFayette College*, 460 F.3d 447, 454 n.7 (3d Cir.2006) (applying the framework to a gender discrimination claim). Mrs. Nieves must establish a prima facie case of retaliation or national origin discrimination. If she succeeds, the burden shifts to Acme to advance a legitimate, nonretaliatory or nondiscriminatory reason for its actions. If Acme advances such a reason, the burden shifts back to Acme to prove that the nonretaliatory or nondiscriminatory explanation is merely a pretext for discrimination. *See Atkinson*, 460 F.3d at 454. In order for Mrs. Nieves to defeat Acme's motion for summary judgment, she "must 'point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'" *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006) (citing and quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)). That is, she must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] non-discriminatory

reasons." *Id.* (citations and quotations omitted; alteration in original).

      To establish a prima facie case of retaliation under Title VII, a plaintiff must show the following: (1) she engaged in conduct protected by Title VII; (2) after or contemporaneous with engaging in that conduct, her employer took an adverse action against her; (3) the adverse action was "materially adverse"; and (4) there was a causal connection between her participation in the protected activity and the adverse employment action. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S.Ct. 2405, 2415 (2006); *Moore*, 461 F.3d at 340-41; *Weston v. Pennsylvania*, 251 F.3d 420, 430 (3d Cir.2001). A materially adverse employment action means "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 548 U.S. at ----, 126 S.Ct. at 2415 (citation and internal quotation omitted). Whether an action is materially adverse "often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Id.* With respect to the causation prong, the court considers whether a reasonable jury could link the employer's conduct to retaliatory animus. *See Jensen v. Potter*, 435 F.3d 444, 449 n.2 (3d Cir. 2006) (explaining "[t]he ultimate question in any retaliation case is an intent to retaliate vel non"). In assessing this, the court considers the "temporal proximity" between the plaintiff's protected activity and the employer's allegedly retaliatory response, and "the existence of a pattern of antagonism in the intervening period." *Id.* at 450 (quotations and citations omitted).

      Mrs. Nieves alleges that Acme retaliated against her due to her complaints of a hostile work environment at the Middletown store when it suspended her and transferred her to its Smyrna store. (D.I. 1.) Acme argues that, even if Mrs. Nieves engaged in protected activity, she

cannot fulfill the third prong of the prima facie case to show there is a causal link between the protected activity and Acme's decision to suspend and transfer her. Mrs. Nieves argues that Acme's proffered reason is a pretext.

At the outset, the court notes that from the record, it is unclear when Mrs. Nieves engaged in the protected activity (i.e., her complaints) which resulted in the alleged retaliatory conduct. For the purposes of discussion, however, the court will assume that Mrs. Nieves engaged in protected activity.

"[T]o avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a reasonable factfinder to infer that each of the employer's proffered non-discriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." *Harding v. Careerbuilder, LLC*, 168 Fed.Appx. 535, 537 (3d Cir. 2006) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir.1994) (citation omitted)). Mrs. Nieves has not met this standard. She argues, among other things, that management's varying versions of Alphin's complaints are inconsistent, that the official reprimand did not describe Mrs. Nieves' purported misconduct, and that management did not conduct a proper investigation of the matter.

Regardless, the record reflects that Acme took the action it did within days of Alphin's complaints. Indeed, Alphin's first complaint was made on March 3, 2004, and within three days, by March 6, 2004, Mrs. Nieves was notified of her suspension. She was subsequently transferred to the Smyrna store. Mrs. Nieves argues that inconsistencies in Acme employee's testimonies support her position, but the record indicates that Alphin's complaints were eventually referred to Briley by the other supervisors. The evidence and documentation, particularly internal e-mails,

-15-

indicate that Mrs. Nieves was suspended for violation of company work rules for personal

conduct. There is nothing before the court that contradicts the proffered reason for Mrs. Nieves'

suspension and transfer. Nor is Acme's proffered reason for its action weak, incoherent,

implausible, or so inconsistent that a reasonable factfinder could rationally find it unworthy of

credence. *See Sarullo v. United States Postal Service*, 352 F.3d 789, 800 (3d Cir. 2003). Even

construing the evidence in the light most favorable to Mrs. Nieves, she has not provided

evidence from which a fact finder could either disbelieve Acme's articulated reason, or believe

that a discriminatory reason was more likely than not the cause of the employment action.

Accordingly, the court will grant Acme's motion for summary judgment on the retaliation issue.

### D. Breach of Covenant of Good Faith and Fair Dealing

The complaint alleges that Acme breached the covenant of good faith and fair dealing by

constructively discharging Mrs. Nieves in violation of public policy. Acme moves for summary

judgment on this claim and argues it is not viable because said claim is barred by Del. Code Ann.

tit. 19, § 712. The Nieves did not respond to this portion of Acme's pending motion.

The amended employment discrimination statute, 19 Del. C. § 712(b), provides the "sole

remedy for claims alleging a violation of this subchapter to the exclusion of all other remedies."

Therefore, Mrs. Nieves "cannot assert a common law claim for the breach of the implied

covenant of good faith and fair dealing in discrimination cases where the Delaware state statute

provides the exclusive remedy." *See E.E.O.C. v. Avecia, Inc.*, 151 Fed. Appx. 162 (3d Cir. 2005)

(amended statute barred a state law claim for breach of the covenant of good faith and fair

dealing); *see also Moon v. Del. River & Bay Auth.*, No. 05-261-JJF, 2006 WL 462551, *4 (D.

Del. Feb. 24, 2006). Accordingly, the court will grant the motion for summary judgment on the

claim for breach of covenant of good faith and fair dealing as it barred by Delaware's
employment discrimination statute.

### E. Intentional Infliction of Emotional Distress

Acme argues that Mrs. Nieves' claim for intentional infliction of emotional distress is
barred by the exclusive provision of Delaware's Worker's Compensation Act and, therefore, it
should be granted summary judgment as to this claim. In the alternative, it argues that even if
Mrs. Nieves stated a cognizable intentional infliction of emotional distress claim, the facts do not
establish that Acme actions were extreme and outrageous. Mrs. Nieves responds that there is an
exception to worker's compensation exclusivity where there are facts which show a deliberate
intent by an employer to bring about an injury to an employee, relying upon *Rafferty v. Hartman
Walsh Painting Co.*, 760 A.2d 157, 160 (Del. 2000).[7] She argues that Acme intentionally
ignored her complaints of her co-workers' abuse and, thereby, tacitly condoned their behavior.
Mrs. Nieves also claims that as punishment for her complaints, Acme suspended and transferred
her to a different store.

The Delaware Workers' Compensation Act provides the exclusive remedy for employees
injured at work. Del. Code. Ann. tit. 19, § 2304. However, the Delaware Supreme Court has
held that "claims that involve a true intent by the employer to injure the employee fall outside of

---

[7]In *Limehouse v. Steak & Ale Restaurant Corp.*, No. 03C-03-299, 2004 WL 304339 (Del.
Super. Ct. 2004) the court states that "it is well established that the exclusivity provision of the
Workers' Compensation Act encompasses intentional infliction of emotional distress claims and
cites to *Nelson v. Fleet Nat'l Bank*, 949 F. Supp. 254 (D. Del. 1996); *Konstantopoulos v.
Westvaco Corp.*, 690 A.2d 936 (Del. 1996); *Barber v. City of Lewes*, No. 95C-08-006, 1997 WL
127951 (Del. Super Co. Jan. 31, 1997); *Allison v. J.C. Bennington Co.* No. 96C-04-047-WJQ,
1996 WL 944908 (Del. Super. Ct. Aug. 6, 1996); and *Battista v. Chrysler*, 454 A.2d 286 (Del.
Super. Ct. 1982). All of these cases, however, were decided prior to *Rafferty*. Therefore, the
court will discuss whether the facts support a claim of intentional infliction of emotional distress.

the Workers' Compensation Act and remain separately actionable as common law tort claims."

*Rafferty v. Hartman Walsh Painting Co.*, 760 A.2d at 159. Hence, in order to escape the

exclusivity provision of the Workers' Compensation Act, the facts before the court must show a

deliberate intent to bring about an injury to Mrs. Nieves. *Id.* at 160; *see Equal Employment

Opportunity Comm'n v. Avecia, Inc.*, 151 Fed. Appx. 162 (3d Cir. 2005).

In order to recover for the tort of intentional infliction of emotional distress Mrs. Nieves

must establish the elements set forth in the Restatement (Second) of Torts § 46 (1965), as

follows: "One who by extreme and outrageous conduct intentionally or recklessly causes severe

emotional distress to another is subject to liability for such emotional distress, and if bodily harm

to the other results from it, for such bodily harm." *Goode v. Bayhealth Medical Center, Inc.*, 931

A.2d 437, 2007 WL 2050761 (Del. 2007) (table decision). Even viewing the facts in the light

most favorable to Mrs. Nieves, at worst, Acme negligently failed to investigate her complaints.

Indeed, there is no record evidence that would support a finding that Acme intended to cause

Mrs. Nieves emotional distress. Mrs. Nieves suspension and transfer were employment decisions

based upon complaints made against Mrs. Nieves by her co-worker.

The facts do not support a finding of an intent to injure Mrs. Nieves, and therefore, this

claim is barred by the Workers' Compensation Act. Accordingly, the court will grant the motion

for summary judgment as to the Nieves' intentional infliction of emotional distress claim.

## F. Disparate Treatment

Acme moves for summary judgment on the issue of disparate treatment "out of an

abundance of caution." (D.I. 32 ¶ G.) The Nieves did not respond to this section of Acme's

pending motion. The court has thoroughly read the complaint, and discerns no cause of action

-18-

for disparate treatment. Therefore, the court will deny as moot Acme's motion for summary on the issue of disparate treatment.

### G. Loss of Consortium

Acme moves for summary judgment on Mr. Nieves' loss of consortium claim on the basis that it a derivative claim of the intentional infliction of emotional distress claim and the breach of the covenant of good faith and fair dealing and cannot survive if those two claims are dismissed. The Nieves did not respond to this ground for summary judgment.

Under Delaware law a loss of consortium claim is derivative to that of the injured spouse and is dependent upon the existence of a valid claim by the injured spouse for physical injury against the tortfeasor. *Mergenthaler v. Asbestos Corp. of Am.*, 534 A.2d 272, 280-81 (Del. Super. Ct. 1987). A claim for loss of consortium consists of three elements: (1) the party asserting the claim must have been married to the person who suffered the physical injury at the time the injury occurred; (2) as a result of the physical injury, the spouse asserting the loss of consortium claim must have been deprived of some benefit which formerly existed in the marriage; and (3) the physically injured spouse must have had a valid cause of action for recovery against the tortfeasors. *Newman v. Exxon, Corp.*, 722. F. Supp. 1146, 2148 (D. Del. 1989) (citing *Jones v. Elliott*, 551 A.2d 62, 63-64 (Del. 1988).

As discussed above, the court will grant Acme summary judgment on the issues of intentional infliction of emotional distress claim and the breach of the covenant of good faith and faith. Inasmuch as there no longer exist valid causes of action for recovery under Delaware law, the loss of consortium claim is extinguished. Therefore, the court will grant the motion for summary judgment on the loss of consortium claim.

## V.    CONCLUSION

For the above stated reasons the court will deny the motion for summary judgment on the issue of a hostile work environment, will deny as moot the motion for summary as to the disparate treatment issue, and will grant it in all other respects. Emilio Nieves will no longer have any pending claims since the court will grant the defendants summary judgment on the derivative claims raised by Emilio Nieves.


CHIEF, UNITED STATES DISTRICT JUDGE


_____, 2008
Wilmington, Delaware


F I L E D

MAR – 7  2008

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| GLORIA NIEVES and EMILIO NIEVES, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civ. Action No. 06-123-GMS |
| | ) |
| ACME MARKETS, INC., a Delaware | ) |
| corporation d/b/a Acme Markets Nos. 7816 | ) |
| and 7836 and ACME MARKETS, INC., a | ) |
| Pennsylvania corporation d/b/a Acme | ) |
| Markets Nos. 7816 and 7836, | ) |
| | ) |
| Defendants. | ) |

**ORDER**

At Wilmington this 7th day of March, 2008, for the reasons set forth in the Memorandum issued this date;

    1. The defendants' motion for summary judgment (D.I. 31.) is **DENIED** as to the hostile work environment issue, **DENIED** as moot as to the disparate treatment issue, and **GRANTED** in all other respects.

    2. At the close of the case, the clerk of the court is directed to enter judgment in favor of the defendants and against the plaintiff Emilio Nieves.

CHIEF, UNITED STATES DISTRICT JUDGE

**F I L E D**

MAR − 7 2008

U.S. DISTRICT COURT
DISTRICT OF DELAWARE